MATTHEW D. ZINN (State Bar No. 214587)
EDWARD T. SCHEXNAYDER (State Bar No. 284494)
MINDY K. JIAN (State Bar No. 336139)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:   (415) 552-7272
Facsimile:    (415) 552-5816
Zinn@smwlaw.com
Schexnayder@smwlaw.com
Mjian@smwlaw.com

Attorneys for Defendants and Respondents
Alameda County and Alameda County Board of
Supervisors

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN WILLIAMS, ROBERT VOGEL, SHEANNA ROGERS, MICHAEL LOEB, JAQUELINE WATSON-BAKER, and HOUSING PROVIDERS OF AMERICA, <br><br> Plaintiffs and Petitioners, <br><br> v. <br><br> ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL, and DOES 1-10, <br><br> Defendants and Respondents, <br><br> v. <br><br> ALLIANCE OF CALIFORNIANS FOR COMMUNITY EMPOWERMENT ACTION, <br><br> Defendant-Intervenor. | Case No. 3:22-cv-01274-LB <br> Case No. 3:22-cv-02705-LB (related) <br><br> **COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT** <br><br> Date:      September 29, 2022 <br> Time:     9:30 a.m. <br> Courtroom: Courtroom B, 15th Floor <br><br> Hon. Laurel Beeler <br><br> Trial Date:          none set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. 4

INTRODUCTION ............................................................................................... 11

BACKGROUND .................................................................................................. 12

    I.     The State and the County COVID-19 States of Emergency. ........................... 12

    II.    California's renter relief legislation. ................................................................ 13

    III.   The County of Alameda's temporary eviction moratorium ........................... 14

    IV.   Plaintiffs challenge the Moratorium and seek summary judgment on some of their facial claims. ....................................................................... 16

SUMMARY JUDGMENT STANDARD ............................................................. 17

ARGUMENT ....................................................................................................... 17

    I.     The Moratorium on its face does not physically "take" residential rental property in the County. (Williams and CAA) ................................................ 17

         A.    Physical takings are a small subset of regulatory takings in which government physically invades property rather than regulating its use. ........................................................................................... 18

         B.    The Moratorium regulates the use of residential rental property. *Yee* thus dictates that the Moratorium does not cause a physical taking. ..................................................................................... 22

         C.    Plaintiffs' as-applied, regulatory takings claims supply the appropriate rubric for evaluating the Moratorium under the Takings Clause. ................................................................................ 30

    II.    The Moratorium on its face does not unconstitutionally impair contracts. (CAA) ................................................................................................................ 31

         A.    The Moratorium does not substantially impair contracts between landlords and tenants. ....................................................................... 32

         B.    The Moratorium appropriately and reasonably advances a significant and legitimate public purpose. ............................................. 34

    III.   The County Moratorium does not violate due process. (Williams) ................. 37

    IV.   State law does not preempt the Moratorium. (Williams and CAA) ............... 39

         A.    The state renter relief statutes do not preempt the Moratorium. (Williams) ........................................................................................... 40

         B.    The Ellis Act does not preempt the Moratorium. (CAA) ....................... 44

V.    The Moratorium does not "amend" the City's Just Cause for Eviction Ordinance.  (Williams) ..........................................................................................44

CONCLUSION....................................................................................................................45

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

# TABLE OF AUTHORITIES

**U.S. CONSTITUTION**

U.S. Const. art. I, § 10, cl. 1............................................................................31

**FEDERAL CASES**

*Aiuto v. S.F. Mayor's Office of Hous.*,
    No. C-09-2093-CW, 2010 WL 1532319 (N.D. Cal. Apr. 16, 2010)..............................39

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)................................................................32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................17

*Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*,
    10 F.4th 905 (9th Cir. 2021) ....................................................... passim

*Ark. Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012)................................................................31

*Auracle Homes, LLC v. Lamont*,
    478 F. Supp. 3d 199 (D. Conn. 2020)........................................24, 33

*Ballinger v. City of Oakland*,
    24 F.4th 1287 (9th Cir. 2022) ....................................21, 22, 26

*Baptiste v. Kennealy*,
    490 F. Supp. 3d 353 (D. Mass. 2020)........................................23

*Block v. Hirsh*,
    256 U.S. 135 (1921)................................................................25

*Carson Harbor Vill., Ltd. v. City of Carson*,
    37 F.3d 468 (9th Cir. 1994)......................................................30

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021)................................................19, 20, 26

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 323 (1986)........................................................17

*Chrysafis v. Marks*,
    141 S. Ct. 2482 (2021)................................................................38

*Colony Cove Props., LLC v. City of Carson*,
    888 F.3d 445 (9th Cir. 2018)......................................................19

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
    318 F.3d 105 (2d Cir. 2003) ............................................................ 32, 35

*Drouet v. Superior Ct.*,
    31 Cal. 4th 583 (2003) .................................................................. 27

*Duncan v. Bonta*,
    142 S. Ct. 2895 (2022) ................................................................. 29

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) ........................................................ 28, 29

*El Papel LLC v. Durkan*,
    No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323 (W.D. Wash. Sep. 15, 2021)..... 23, 35

*Elmsford Apartment Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) ............................................. 24

*Energy Reserves Group, Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) ...................................................... 33, 34, 36

*Farhoud v. Brown*,
    No. 3:20-cv-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022) ................... 23

*Federal Communications Commission v. Florida Power Corp.*,
    480 U.S. 245 (1987) .................................................... 20, 21, 26

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) .................................................................. 29

*Gallo v. District of Columbia*,
    --- F. Supp. 3d ---, 2022 WL 2208934 (D.D.C. June 21, 2022) ............ 23, 24, 33

*Guggenheim v. City of Goleta*,
    638 F.3d 1111 (9th Cir. 2010) ..................................... 22, 28, 29

*Halverson v. Skagit County*,
    42 F.3d 1257 (9th Cir. 1994) ....................................................... 39

*Harris v. County of Riverside*,
    904 F.2d 497 (9th Cir. 1990) ....................................................... 37

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) .................................................................. 22

*Heights Apartments, LLC v. Walz*,
    30 F.4th 720 (8th Cir. 2022) ....................................................... 24

*Heights Apartments, LLC v. Walz*,
    39 F.4th 479 (8th Cir. 2022) .................................................... 24, 33

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981) .................................................................. 28

*Home Bldg. & Loan Ass'n v. Blaisdell,*
    290 U.S. 398 (1934) ................................................................................. 34, 37

*Jevons v. Inslee,*
    561 F. Supp. 3d 1082 (E.D. Wash. 2021) ............................................... passim

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
    480 U.S. 470 (1987) ......................................................................................... 28

*Levald, Inc. v. City of Palm Desert,*
    998 F.2d 680 (9th Cir. 1993) ..................................................................... 28, 29

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2004) ...................................................................... 18, 19, 30, 31

*Lochner v. New York,*
    198 U.S. 45 (1905) ........................................................................................... 12

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ................................................................................. passim

*Matsuda v. City & Cnty. of Honolulu,*
    512 F.3d 1148 (9th Cir. 2008) ......................................................................... 32

*Matthews v. Eldridge,*
    424 U.S. 319 (1976) ......................................................................................... 37

*MHC Fin. LP v. City of San Rafael,*
    714 F.3d 1118 (9th Cir. 2013) ......................................................................... 21

*New York State Rifle & Pistol Association v. Bruen,*
    142 S. Ct. 2111 (2022) ..................................................................................... 29

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) ................................................................................... 18, 31

*Parker v. Fleming,*
    329 U.S. 531 (1947) ......................................................................................... 25

*Penn Central Transportation Co. v. City of New York,*
    428 U.S. 104 (1978) ...................................................................... 18, 20, 30, 31

*Pennsylvania Coal Co. v. Mahon,*
    260 U.S. 393 (1922) ......................................................................................... 18

*PruneYard Shopping Center v. Robins,*
    447 U.S. 74 (1980) ..................................................................................... 20, 22

*Rancho de Calistoga v. City of Calistoga,*
    800 F.3d 1083 (9th Cir. 2015) ......................................................................... 21

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ......................................................................................... 35

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego,*
    550 F. Supp. 3d 853 (S.D. Cal. 2021)............................................................23, 33, 34

*In Re Seltzer,*
    104 F.3d 234 (9th Cir. 1996) .......................................................................34, 35

*Soremekun v. Thrifty Payless, Inc.,*
    509 F.3d 978 (9th Cir. 2007)................................................................................17

*Sveen v. Melin,*
    138 S. Ct. 1815 (2018).................................................................................32, 34

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,*
    216 F.3d 764 (9th Cir. 2000)...............................................................................30

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002)................................................................................. passim

*Tatoma, Inc. v. Newsom,*
    No. 3:21-CV-098-BEN-JLB, 2022 WL 686965 (S.D. Cal. Mar. 8, 2022) ...................35

*U.S. Trust Co. of N.Y. v. New Jersey,*
    431 U.S. 1 (1977)..............................................................................................34

*United States v. Salerno,*
    481 U.S. 739 (1987)..............................................................................28, 30, 32, 37

*United States v. Scrivner,*
    189 F.3d 825 (9th Cir. 1999)...............................................................................28

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008)..........................................................................................29

*William Jefferson & Co. v. Bd. of Assessment Appeals No. 3 ex rel. Orange Cnty.,*
    695 F.3d 960 (9th Cir. 2012)...............................................................................37

*Yee v. City of Escondido,*
    503 U.S. 519 (1992)............................................................................... passim


**CALIFORNIA CONSTITUTION**

Cal. Const. art. II, § 10 ...............................................................................................45

Cal. Const. art. XI, § 7 ...............................................................................................39


**STATE CASES**

*Arche v. Scallon,*
    --- Cal. Rptr. 3d ---, 2022 WL 3650703 (Cal. App. Dep't Super. Ct. Aug. 1,
    2022) ...................................................................................40, 41, 43, 44

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

*Big Creek Lumber Co. v. County of Santa Cruz,*
  38 Cal. 4th 1139, 1150 (2006) .......................................................................... 39, 41, 42

*Birkenfeld v. City of Berkeley,*
  17 Cal. 3d 129, 148 (1976) ................................................................................ 25, 38, 42

*City & County of San Francisco v. Regents of Univ. of Cal.,*
  7 Cal. 5th 536 (2019) ................................................................................................. 42

*Colyear v. Tobriner,*
  7 Cal. 2d 735 (1936) .................................................................................................. 27

*Fisher v. City of Berkeley,*
  37 Cal. 3d 644, 693 (1984) ....................................................................................... 25, 41

*Hong Sang Market, Inc. v. Peng*, 20 Cal. App. 5th 474, 491 (2018).................................... 23

*Howard v. County of Amador,*
  220 Cal. App. 3d 962 (1990) ..................................................................................... 23, 26

*Sherwin-Williams Co. v. City of Los Angeles,*
  4 Cal. 4th 893 (1993) ................................................................................................ 41

**CALIFORNIA ATTORNEY GENERAL OPINIONS**

62 Cal. Op. Att'y Gen. 701 (1979)................................................................................ 45

**STATE STATUTES**

Cal. Civ. Code. § 1941 et seq. .................................................................................... 33

Cal. Civ. Code § 1946.2 ......................................................................................... 33, 42

Cal. Civ. Code § 1946.2(g)(1)(B) ................................................................................. 43

Cal. Civ. Code § 1946.2(g)(1)(B)(iii)............................................................................ 43

Cal. Civ. Proc. Code § 1179.01 et seq. .......................................................................... 14

Cal. Civ. Proc. Code § 1179.01.5(b) ............................................................................. 14

Cal. Civ. Proc. Code § 1179.03.05................................................................................ 14

Cal. Civ. Proc. Code § 1179.03.5(a)(3) .......................................................................... 40

Cal. Civ. Proc. Code § 1179.05(a) ................................................................................ 41

Cal. Civ. Proc. Code § 1179.05(b) ............................................................................ 40, 42

Cal. Civ. Proc. Code § 1179.05(e) ................................................................................ 42

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

Cal. Civ. Proc. Code § 1179.05(f) ................................................................................40

Cal. Civ. Proc. Code § 1179.07................................................................................14

Cal. Civ. Proc. Code § 1179.11(a) ......................................................................14, 40

Cal. Civ. Proc. Code § 1179.11(a)(2)......................................................................40

Cal. Civ. Proc. Code § 1179.11(c)...........................................................................40

Cal. Civ. Proc. Code § 1179.11(c)(1)(B) ................................................................40

Cal. Civ. Proc. Code § 1179.15...............................................................................14

Cal. Elec. Code § 9217 ............................................................................................45

Cal. Gov't Code § 7060(a)........................................................................................27

Cal. Gov't Code § 8630 ............................................................................................45

Cal. Gov't Code § 8634 ............................................................................................45

Cal. Gov't Code § 12900 et seq. ..............................................................................33

Cal. Health & Saf. Code § 17910 et seq. .................................................................33

Cal. Health & Saf. Code §§ 26147-48......................................................................33

Cal. Health & Safety Code § 101080 .......................................................................15

**RULES**

Fed. R. Civ. P. 56(a).................................................................................................17

Fed. R. Civ. P. 56(c) ................................................................................................17

**MISCELLANEOUS**

Black's Law Dictionary (11th ed. 2019) ..................................................................20

**ALAMEDA COUNTY CODE**

§ 3.32  ......................................................................................................................43

§ 3.68  ......................................................................................................................43

§ 6.120.010 ...........................................................................................15, 35, 44, 45

§ 6.120.020 ..............................................................................................................27

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

§ 6.120.030 ................................................................................................ 11, 15, 41

§ 6.120.030(A) ................................................................................................ 15, 29

§ 6.120.030(B) ................................................................................................ 26, 27

§ 6.120.030(C) ..................................................................................................... 26

§ 6.120.030(D) ................................................................................................ 16, 33, 38

§ 6.120.030(E) ...................................................................................................... 16

§ 6.120.030(F) ................................................................................................ 16, 36, 43

§ 6.120.030(F)(1) ................................................................................. 26, 34, 38, 44

§ 6.120.030(F)(3) ................................................................................................... 33

§ 6.120.040 ................................................................................................ 11, 15, 27, 41

§ 6.120.040(A) ................................................................................................ 15, 16, 44

§ 6.120.040(B) ...................................................................................................... 44

§ 6.120.040(D) ................................................................................................ 16, 33

§ 6.120.040(E) ...................................................................................................... 16

§ 6.120.060(B) ...................................................................................................... 16

§ 6.120.060(E) ...................................................................................................... 38

§ 6.120.090 ................................................................................................ 15, 23, 36

§ 6.120.090(A) ................................................................................................ 16, 32

§ 6.120.090(D) ................................................................................................ 16, 23, 33

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

**INTRODUCTION**

These related cases—*Williams v. Alameda County* and *California Apartment Association v. County of Alameda*—are merely some of the latest in a stream of attacks on the responses of local governments to the devastating COVID-19 pandemic.[1] Plaintiffs here challenge an ordinance adopted by Defendant County of Alameda that imposes a moratorium on evictions of residential tenants for the duration of the COVID-19 public health emergency.[2] They argue the Moratorium "takes" landlords' property without compensation in violation of the Fifth Amendment, impairs lease contracts in violation of the Contracts Clause, denies landlords due process, and is preempted by state law that also addresses residential evictions. In the present motions for partial summary judgment, Williams and CAA assert only facial challenges to the Moratorium.

Because a facial challenge invalidates a legislative decision in *all* of its applications, it is an especially difficult challenge to mount. Plaintiffs must show that "mere enactment" of the Ordinance—without consideration of any events occurring after enactment or the individual circumstances of any affected persons—violated the federal and state constitutions. Plaintiffs' facial *and* as-applied claims are meritless. But the stringent standard for facial challenges makes particularly quick work of their motions.

Plaintiffs' theory that a moratorium on the eviction of residential tenants can cause a per se, physical taking is not simply unprecedented, it is flatly inconsistent with the United States Supreme Court's repeated holdings that only a government-compelled invasion by *strangers* can trigger the narrow physical takings doctrine. Because landlords have invited tenants onto their properties, a moratorium on evictions is regulation of the landlord-tenant relationship, not a compulsory physical invasion. Indeed, numerous courts

---

[1] Plaintiffs in *Williams* are referred to as "Williams," and Plaintiffs in *California Apartment Association* are referred to as "CAA." Citations to the dockets in each case are made to "Wms. Dkt." and "CAA Dkt.," respectively.

[2] The Moratorium has two components: a general moratorium on residential evictions (Alameda County Code § 6.120.030) and a moratorium on residential evictions for failure to pay rent directly attributable to COVID-19 hardship (County Code § 6.120.040).

considering other COVID-19 eviction moratoria have held as much. And because of the facial challenge standard, Plaintiffs must show that the temporary Moratorium caused a taking the very day it was enacted, even if it would not outlast that day. After the Court denies these motions, Plaintiffs may attempt to prove a regulatory taking under the normal test, which requires a case-by-case evaluation of all of the circumstances surrounding the challenged regulation and each affected property. But they cannot show that the Moratorium caused a per se taking on its face.

Plaintiffs' remaining facial challenges fare no better. CAA premises its Contracts Clause argument on an erroneous claim that the Moratorium deprives landlords of any meaningful remedy to enforce lease terms. And it neglects the bulk of authority—including recent Ninth Circuit precedent—which has upheld similar COVID-19-related tenant protections under the Contracts Clause. Williams's due process challenge identifies no authority holding that mere enactment of a new affirmative defense to an eviction proceeding—as opposed to an inherently unfair adjudicatory scheme—is unconstitutional. And Plaintiffs' preemption arguments fail to recognize that the Legislature has left the County ample authority to regulate rental properties, especially during a local health emergency, or that the Moratorium does not fall within the limited areas of authority that the Legislature reserved for itself.

The County Board of Supervisors exercised its legislative judgment in concluding that a pause in residential evictions is a necessary response to the economic dislocation and public health crisis created by the virus. Since the repudiation of *Lochner v. New York*, 198 U.S. 45 (1905), courts universally recognize that those policy decisions are not open for Monday-morning quarterbacking. Plaintiffs unsurprisingly fail in their attempt to do so here.

## BACKGROUND

### I.     The State and the County COVID-19 States of Emergency.

On January 31, 2020, the United States Secretary of Health and Human Services declared a nationwide public health emergency in response to the alarming spread of the novel coronavirus ("COVID-19"). *See* Wms. Dkt. 72 (Defendants City of Oakland and

Oakland City Council's Request for Judicial Notice ("City RJN")), Ex. F, at 50-51 (Determination That A Public Health Emergency Exists (published Jan. 31, 2020)); County Defendants' Request for Judicial Notice in Support of Consolidated Opposition to Motion for Summary Judgment (filed concurrently in *CAA*) ("CAA County RJN"), Ex. B. On March 4, 2020, Governor Newsom declared a state of emergency in California. Wms. Dkt. 72, Ex. A, at 4-8 (Governor's Proclamation of a State of Emergency (March 4, 2020)); CAA County RJN, Ex. C. Six days later, the County of Alameda's Public Health Officer declared a local health emergency. Wms. Dkt. 62 (Request for Judicial Notice in Support of Plaintiffs' and Petitioners' Rule 56 Motion on Bifurcated Claims ("Williams RJN")), Ex. G, at 130; CAA Dkt. 24 (Request for Judicial Notice in Support of Plaintiffs' Motion for Summary Judgment on Facial Claims ("CAA RJN")), Ex. 15, at 182.

Since it first appeared, COVID-19 has had widespread health, economic, and social impacts to County residents. To date, the County has experienced over 340,000 cases.[3] Multiple surges of new, more infectious variants have prolonged the pandemic and its impacts.[4] Thus, the County's local health emergency, along with the federal and state States of Emergency, remains in place today. Wms. Dkt. 72, Ex. G, at 53-54 (Renewal of the Determination that a Public Health Emergency Exists (published Jul. 15, 2022), H, at 56-59 (Governor's Executive Order N-11-22 (Jul. 17, 2022); CAA County RJN, Exs. D, E.

## II.    California's renter relief legislation

Shortly after the pandemic's onset, California's Legislature acknowledged the need to stabilize the state's housing situation to "address the pandemic, protect public health, and set the stage for recovery." Wms. Dkt. 62, Ex. A, at 9; CAA Dkt. 24, Ex. 10, at 61. To mitigate the "unprecedented circumstances" brought by COVID-19 and the resulting

---

[3] *See* County of Alameda COVID-19 Data (last accessed Sep. 5, 2022), *available at* https://covid-19.acgov.org/data.page?#cases.

[4] *See* Centers for Disease Control and Prevention webpage on Variants in the United States (last access Ep. 5, 2022), *available at* https://www.cdc.gov/coronavirus/2019-ncov/variants/index.html.

1 "widespread economic and societal disruption," on August 31, 2020, the Legislature enacted

2 the Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020. Wms.

3 Dkt. 62, Ex. A, at 9; CAA Dkt. 24, Exh. 10, at 61. Among other things, this legislation codi-

4 fied the COVID-19 Tenant Relief Act. *See generally* Cal. Civ. Proc. Code §§ 1179.01 et seq.

5 The COVID-19 Tenant Relief Act generally prohibits courts from issuing a summons

6 or entering judgment in an unlawful detainer action "based, in whole or in part, on nonpay-

7 ment of rent or other charges." Cal. Civ. Proc. Code § 1179.01.5(b). A tenant may be found

8 guilty of unlawful detainer for nonpayment of rent only if (1) the tenant was guilty of un-

9 lawful detainer before March 1, 2020 or (2) the tenant failed to deliver a declaration of

10 COVID-19-related financial distress in response to a demand for payment of rental debt. *Id.*

11 § 1179.03.05. On June 28, 2021, the Legislature passed AB 832, which extended many of

12 the COVID-19 protections including the COVID-19 Tenant Relief Act, until 2025. Wms. Dkt.

13 62, Ex. B, at 53-101; CAA Dkt. 24, Ex. 12, at 122-160; Cal. Civ. Proc. Code § 1179.07.

14 AB 832 also enacted the COVID-19 Rental Housing Recovery Act. Wms. Dkt. 62, Ex.

15 B, at 78-85; CAA Dkt. 24, Ex. 12, at 142-147. This Act prohibits courts from issuing a sum-

16 mons or entering judgment in an unlawful detainer action for nonpayment of rent due to

17 COVID-19 hardship. Cal. Civ. Proc. Code § 1179.11(a). An action may only proceed if a land-

18 lord also files documentation showing that an application for government rental assistance

19 was denied, or that the tenant did not participate in a government rental assistance pro-

20 gram. *Id.* These provisions remain in effect until September 30, 2024. *Id.* § 1179.15.

21 **III.    The County of Alameda's temporary eviction moratorium**

22 The County of Alameda also recognized that COVID-19's impacts would be far-reach-

23 ing. Many County residents would not receive paid sick leave if they contracted COVID-19

24 and were forced to quarantine. Wms. Dkt. 62, Ex. G, at 130-31; CAA Dkt. 24, Ex. 15, at 182-

25 83. Residents could "be forced to choose between paying housing expenses and having suffi-

26 cient funds for food, medical care or other necessities for themselves and their families."

27 Wms. Dkt. 62, Ex. G, at 131; CAA Dkt. 24, Ex. 15, at 183. Housing displacement through

28 eviction "creates undue hardship for tenants and homeowners through additional relocation

costs, stress and anxiety, and the threat of homelessness." Wms. Dkt. 62, Ex. G, at 131; CAA Dkt. 24, Ex. 15, at 183. COVID-19 also "poses a unique threat to people experiencing home-lessness, who lack resources for sanitation, stay in overcrowded [living conditions] . . ., and already have a high rate of poorly treated chronic illnesses." Wms. Dkt. 62, Ex. G, at 132; CAA Dkt. 24, Ex. 15, at 184.

Recognizing the pandemic's potentially disastrous financial implications for residents, on April 21, 2020 the County adopted Urgency Ordinance No. 2020-23, which enacted a temporary eviction moratorium. *See generally* Wms. Dkt. 62, Ex. G, at 130-142; CAA Dkt. 24, Ex. 15, at 182-94. The County extended the Moratorium on June 23, 2020, codifying it into its general code of ordinances. Wms. Dkt. 62, Ex. H, at 152-64; CAA Dkt. 24, Ex. 17, 200-12; *see* Alameda County Code of Ordinances ("County Code") §§ 6.120.010 et seq.[5] As the pandemic continued to spread, the County again extended the Moratorium. The most recent extension, enacted on August 4, 2020, terminates the Moratorium 60 days after the Board of Supervisors proclaims that the local health emergency has expired. *Id.* §§ 6.120.030(A), 6.120.040(A); CAA County RJN, Ex. A (County Ordinance No. O-2020-41); County Defendants' Request for Judicial Notice in Support of Consolidated Opposition to Motion for Summary Judgment (filed concurrently in *Williams*) ("Wms. County RJN"), Ex. A; Cal. Health & Saf. Code § 101080; City RJN, Ex. A, at 7.

The Moratorium aims "to reduce the transmission of COVID-19, to promote housing stability during the COVID-19 pandemic and to prevent avoidable homelessness." County Code  § 6.120.010. It pursues these goals through three main components: (1) a general moratorium on evictions (*id.* § 6.120.030); (2) a moratorium on evictions based on nonpayment of rent due to COVID-19-related hardship (*id.* § 6.120.040); and (3) provisions for the repayment of back rent (*id.* § 6.120.090).

---

[5] Portions of the County Code were filed with this Court as part of both the Williams RJN and CAA RJN. Wms. Dkt. 62, Ex. H, at 144-51; CAA Dkt. 24, Ex. 14, at 172-80. The full County Code is available online at https://library.municode.com/ca/ala-meda_county/codes/code_of_ordinances.

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

First, the general moratorium provides a defense to eviction notices and unlawful detainer actions. *Id.* § 6.120.030(D). A landlord or lender may not assess late fees, fines, or interest on failure to pay rent due while the Moratorium is in effect. *Id.* § 6.120.030(E). Nevertheless, evictions may proceed under any of three circumstances: (1) the landlord is removing the unit from the rental market pursuant to the Ellis Act, (2) a government or court order requires vacating the unit, or (3) "continued occupancy by the resident poses an imminent threat to health or safety." *Id.* § 6.120.030(F).

Second, the Moratorium provides a defense to unlawful detainer actions where a tenant fails "to make rent or mortgage payments" due to "substantial loss of income . . . substantial out-of-pocket medical expenses . . . or extraordinary child care needs . . . caused by COVID-19." *Id.* § 6.120.040(A), (D). As with the general moratorium, a landlord may not assess late fees, fines, or interest on late rent resulting from a qualifying loss. *Id.* § 6.120.040(E). A tenant must "document[]" any such COVID-19-related financial hardship and provide that evidence to landlords upon request. *Id.* § 6.120.060(B).

Third, the Moratorium does not relieve tenants of "liability for unpaid rent or mortgage payments." *Id.* § 6.120.090(A). It thus provides for repayment of past-due rent. If a tenant fails to repay rent that became due while the Moratorium was in effect, the "landlord may collect the back rent as any other consumer debt" after one year from when the rent became due. *Id.* § 6.120.090(D).

## IV.    Plaintiffs challenge the Moratorium and seek summary judgment on some of their facial claims.

Plaintiffs filed separate lawsuits challenging the Moratorium, which the Court subsequently ordered related. Wms. Dkt. 45 (Order Relating Cases); CAA Dkt. 11 (Order Relating Cases). Both lawsuits plead numerous as-applied and facial claims against the Moratorium. Wms. Dkt. 1 (Complaint for Damages; Petition for Writ and Request for Immediate Stay); CAA Dkt. 1 (Complaint for Damages, Injunctive, and Declaratory Relief; Petition for Writ of Mandate). On July 18, 2022, Plaintiffs filed the present motions for partial summary judgment, which are limited to facial claims. Wms. Dkt. 61 (Plaintiffs' and Petitioners'

Motion on Bifurcated Claims ("Williams")); CAA Dkt. 25 ([Corrected] Plaintiffs' Notice of Motion & Motion for Summary Judgment or Partial Summary Judgment on Facial Claims ("CAA")).

## SUMMARY JUDGMENT STANDARD

A court may grant summary judgment only if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where [it] will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Only if the moving party meets its initial burden must the opposing party show a genuine issue for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor." *Elam v. National Railroad Passenger Corporation*, 220 F.Supp.3d 996, 1001 (N.D. Cal 2016) (citing *Anderson*, 477 U.S. at 255). The court's decision must be based only on "facts that would be admissible in evidence at trial." *Id.*; *see* Fed. R. Civ. P. 56(c).

## ARGUMENT

### I.     The Moratorium on its face does not physically "take" residential rental property in the County. (Williams and CAA)

Plaintiffs contend that the Moratorium, on its face, has caused a physical taking without compensation in violation of the Fifth Amendment. Williams at 17-26; CAA at 18-25. The physical takings doctrine, a thin strand of regulatory takings jurisprudence, does not apply to the Moratorium. As numerous courts have held in upholding other COVID-19 eviction moratoria, the physical takings cases do not apply to regulation of the landlord-tenant relationship because it involves consensual use of property, not a government-compelled invasion by a stranger. Further, Plaintiffs in this motion prosecute *facial* claims, which are

1   subject to an especially stringent standard: Plaintiffs must show that mere enactment of

2   the Moratorium caused a physical taking—in all of its potential applications. They cannot

3   carry that heavy burden.

4       Denying Plaintiffs' motions will not end the matter. They still have traditional regu-

5   latory takings claims, by which they can attempt to show that the Moratorium, as applied

6   to their properties, results in a taking. But their current motions would result in a signifi-

7   cant expansion of the narrow per se physical takings test. The Court must reject it.

8   **A.   Physical takings are a small subset of regulatory takings in which**
        **government physically invades property rather than regulating its**
9       **use.**

10      The Takings Clause historically applied only to the government's direct physical ap-

11  propriation of property, but in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), the

12  Court recognized that in extreme circumstances government regulation of property could

13  also cause a taking. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2004). In the en-

14  suing century, the Court has largely eschewed "any set formula for evaluating regulatory

15  takings claims." *Id.* at 538 (internal quotation marks omitted); *see also Tahoe-Sierra Preser-*

16  *vation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 342 (2002) (Under the

17  Takings Clause, "the temptation to adopt what amount to *per se* rules in either direction

18  must be resisted.") (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor,

19  J., concurring)).

20      Instead, the doctrine involves "essentially ad hoc, factual inquiries, designed to allow

21  careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, 535 U.S.

22  at 322. The touchstone of this analysis is the multi-factor test from *Penn Central Transpor-*

23  *tation Co. v. City of New York*, 428 U.S. 104 (1978). *See Tahoe-Sierra*, 535 U.S. at 326 n.23;

24  *Lingle*, 544 U.S. at 538-39. There the Court identified three factors that courts must con-

25  sider to determine whether a taking has occurred: (1) the impact of the regulation on the

26  use or value of property, (2) the property owner's "distinct investment-backed expectations"

27  of use of the property, and (3) the "character of the governmental action." *Penn Central*, 428

28  U.S. at 124. "The goal is to determine whether regulatory actions 'are functionally

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

1  equivalent to the classic taking in which government directly appropriates private prop-

2  erty.'" *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quoting

3  *Tahoe-Sierra*, 535 U.S. at 322).

4     In contrast with this ad-hoc approach, the Court has recognized "two relatively nar-

5  row categories" of regulatory takings that are subject to per se rules. *Lingle*, 544 U.S. at

6  538. Plaintiffs' motions seek to apply one of those categories. In *Loretto v. Teleprompter*

7  *Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court held that government-

8  compelled, permanent occupation of property by a stranger is a per se taking. *Id.* at 441.

9  The city there required owners of apartment buildings to allow cable companies to install

10  cable equipment on their buildings. The Court recently reaffirmed *Loretto* in *Cedar Point*

11  *Nursery v. Hassid*, 141 S. Ct. 2063 (2021). There, California required agricultural landown-

12  ers to allow union organizers access to their properties for 120 days per year. The Court held

13  that "[t]he access regulation appropriates a right to invade the growers' property and there-

14  fore constitutes a *per se* physical taking." *Id.* at 2072.

15     As the Court emphasized in *Loretto*, this is a "very narrow" rule. 458 U.S. at 441.

16  These cases, and the cases on which they relied, solely involve regulations that interfere

17  with property owners' right to exclude *strangers*.[6] The Court did not hold, and has never

18  held, that *any* limitation on a property owner's ability to exclude others causes a physical

19  taking. The cases did not involve regulation of the landlord-tenant relationship or other

20  arrangements in which a property owner has invited others to enter or use their property.

21  Indeed, the very word "invasion," which is used throughout the physical takings cases, refers

22

23

24  _____

25  [6] *See Cedar Point*, 141 S. Ct. at 2073-74 (citing *United States v. Causby*, 320 U.S. 256 (1946)
   (overflights by government aircraft took avigation easement); *Portsmouth Harbor Land &*

26  *Hotel Co. v. United States*, 260 U.S. 327 (1922) (firing coastal defense guns across private
   property); *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (public access to private pond

27  and marina); *Loretto,* 458 U.S. at 419 (access by cable company to install cable boxes on
   apartment buildings); *Nollan v. Cal. Coastal Comm'n*, 438 U.S. 825 (1987) (exaction of pub-

28  lic access easement along private beach)).

1   to "[a] hostile or forcible encroachment on the rights of another." *Invasion,* Black's Law Dic-

2   tionary (11th ed. 2019).

3        The Supreme Court has emphasized this distinction and repeatedly refused to apply

4   per se rules where property owners have invited others onto their property. First, in *Loretto*

5   itself the Court held that its per se rule for physical occupation was based in part on the fact

6   that "an owner suffers a special kind of injury when a *stranger* directly invades and occupies

7   the owner's property." 458 U.S. at 436 (emphasis in original); *see also id.* at 439 n.17 (refer-

8   ring to "[t]he right of a property owner to exclude a stranger's physical occupation"). "[S]uch

9   an occupation is qualitatively more severe than a regulation of the use of property, even a

10  regulation that imposes affirmative duties on the owner, since the owner may have no con-

11  trol over the timing, extent, or nature of the invasion." *Id.* at 436.

12       The Court thus noted that its per se rule would not have "dire consequences for the

13  government's power to adjust landlord-tenant relationships." *Id.* at 440. It described cases

14  involving regulation of property owners' relationships with invitees as not involving "gov-

15  ernment authorize[d] . . . permanent occupation of the landlord's property *by a third party*."

16  *Id.* (emphasis added). It thus concluded, "So long as these regulations do not require the

17  landlord to suffer the physical occupation of a portion of his building by a *third party*, they

18  will be analyzed under the multifactor inquiry generally applicable to nonpossessory gov-

19  ernmental activity."[7] *Id.* (emphasis added) (citing *Penn Central,* 428 U.S. at 104).

20       In *Federal Communications Commission v. Florida Power Corp.*, 480 U.S. 245 (1987),

21  the Court reiterated that *Loretto* is inapplicable where the government has not compelled

22  the plaintiff to open its property to third parties. A utility had leased space on its poles to a

23  cable television company and challenged FCC orders setting rents for such leases. The Court

24

25  ───────────────

26  [7] In *Cedar Point*, on the same basis, the Court distinguished *PruneYard Shopping Center v.*
    *Robins*, 447 U.S. 74 (1980), in which the Court had not applied physical takings principles
    where the state constitution required private mall owners to provide access for leafletting.
27  141 S. Ct. at 2076-77. The Court held, "Limitations on how a business generally open to the
    public may treat individuals on the premises are readily distinguishable from regulations
28  granting a right to invade property closed to the public." *Id.* at 2077.

1  held that the "element of required acquiescence is at the heart of the concept of occupation"

2  as used in *Loretto*. *Id.* at 252. By contrast, the utility had invited the cable company to oc-

3  cupy space on its poles. "[I]t is the invitation, not the rent, that makes the difference. The

4  line which separates [*Florida Power*] from *Loretto* is the unambiguous distinction between

5  a . . . lessee and an interloper with a government license." *Id.* at 252-53.

6           Then in *Yee v. City of Escondido*, 503 U.S. 519 (1992), the Court applied this distinc-

7  tion between invitees and strangers to hold that residential rent control regulation—includ-

8  ing regulation of eviction—does not cause a physical taking. The plaintiffs alleged that a

9  local mobile home rent control ordinance, in combination with a state statute restricting

10 eviction of mobile home owners, made mobile home owners unwanted "perpetual tenant[s]

11 of the park" and had "transferred a discrete interest in land—the right to occupy the land

12 indefinitely at a submarket rent—from the park owner to the mobile home owner." *Id.* at

13 527.

14          The Court roundly rejected the argument. "The government effects a physical taking

15 only where it *requires* the landowner to submit to the physical occupation of his land." *Id.*

16 (citing *Fla. Power*, 480 U.S. at 252); *id.* (holding the physical takings doctrine applies only

17 to "a compelled physical invasion of property"). By contrast, the mobile home park owners

18 had "voluntarily rented their land to mobile home owners"; the "tenants were invited by [the

19 park owners], not forced upon them by the government." *Id.* at 527-28. And the park owners

20 were not compelled to continue renting their parks in perpetuity because state law allowed

21 them to evict tenants to change the use of the parks. *Id.*

22          The Ninth Circuit has concomitantly viewed a variety of regulations of the landlord-

23 tenant relationship through the lens of traditional regulatory, rather than physical, takings.

24 *See Ballinger v. City of Oakland*, 24 F.4th 1287, 1292-93 (9th Cir. 2022); *Rancho de Calis-*

25 *toga v. City of Calistoga*, 800 F.3d 1083, 1089 n.1 (9th Cir. 2015) ("The Supreme Court laid

26 to rest any argument that a mobile home rent control ordinance constitutes a physical tak-

27 ing in *Yee* . . . ."); *MHC Fin. LP v. City of San Rafael*, 714 F.3d 1118, 1126-27 (9th Cir. 2013);

28

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

1   *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc). Yet rent control

2   inevitably restricts landlords' ability to evict tenants. *See infra* Section I.B.1.

3       These cases recognize that regulation of landlords' treatment of their tenants—in-

4   cluding the circumstances in which they may dispossess those tenants—is a regulation of

5   landlords' chosen land use. *See Yee*, 503 U.S. at 528 (describing rent control regulations as

6   "merely regulat[ing the landowners'] *use* of their land by regulating the relationship be-

7   tween landlord and tenant"); *id.* at 532 (regulation "does not authorize an unwanted physi-

8   cal occupation of petitioners' property. It is a regulation of petitioners' *use* of their property,

9   and thus does not amount to a per se taking."); *Ballinger*, 24 F.4th at 1293 (same). Such use

10  regulations are subject to review under the Supreme Court's case-by-case rubric generally

11  applicable to regulation. *Loretto*, 458 U.S. at 440. As explained below, that framework, not

12  the per se physical takings framework, applies to the Moratorium.

### B.   The Moratorium regulates the use of residential rental property. *Yee* thus dictates that the Moratorium does not cause a physical taking.

#### 1.   *Yee* controls here, as numerous other courts have held when faced with similar COVID-19 eviction moratoria.

16      Plaintiffs devote most of their motions to theoretical arguments about the "right to

17  exclude." CAA at 20-23; Williams at 19-24. *Yee* is the simple answer to all of those argu-

18  ments. Not one of Plaintiffs' cases extolling the right to exclude involves persons who were

19  welcomed onto the property but overstayed that welcome. Because the County has not com-

20  pelled property owners to allow *invasion* of their properties by persons (or things) with no

21  right to be there, *Yee* dictates that the Moratorium cannot cause a physical taking. *See Yee*,

22  503 U.S. at 527; *Ballinger*, 24 F.4th at 1293-94 & n.3. Indeed, all but one of the numerous

23  courts faced with similar COVID-19 eviction moratoria have upheld them under *Yee*.

24      The cases do not hold that any limit on the right to exclude effects a physical taking.

25  As the Court pointed out in both *Loretto* and *Yee*, the law regularly restricts property own-

26  ers' discretion to exclude invitees from their properties. *See Yee*, 503 U.S. at 528-29 (citing

27  *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964), and *PruneYard Shop-

28  ping Ctr.*, 447 U.S. at 82-84); *Loretto*, 458 U.S. at 440 (citing same and others).

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

Where a property owner has leased premises to someone else, she has elected to cede, for a time, one of the three "[p]roperty rights in [the] physical thing": the right to possession. *Loretto*, 458 U.S. at 435; *see Howard v. County of Amador*, 220 Cal. App. 3d 962, 972 (1990) (a "lease gives the lessee the exclusive possession of the premises against all the world, including the owner"). Because the landlord has already given up possession, a restriction like the County Moratorium does not involve the severe interference with the right to possession that occurs where government compels a property owner to suffer a physical *invasion* and thus give up possession of that portion of the property. *Loretto*, 458 U.S. at 435.

The Moratorium also does not impair the second of the "rights in [the] physical thing" emphasized by *Loretto*: the right to use the property. The landlord's use of leased property is nonpossessory; she exchanges possession for rent. Invasion by a stranger deprives the owner of any such nonpossessory use of the property invaded because the owner cannot collect rent from the stranger. *Loretto*, 458 U.S. at 436. But under the Moratorium, the tenant's continued possession does not preclude the landlord's nonpossessory use. The Moratorium expressly preserves the tenant's obligation to pay rent. County Code § 6.120.090. It also expressly preserves a landlord's other remedies to obtain rent owed. *Id.* § 6.120.090(D); *see also Hong Sang Market, Inc. v. Peng*, 20 Cal. App. 5th 474, 491 (2018) (landlords may maintain action for back rent independent of unlawful detainer). It thus protects the landlord's revenue-generating use of the property. *See Gallo v. District of Columbia*, --- F. Supp. 3d ---, 2022 WL 2208934, at *10 (D.D.C. June 21, 2022).

Unsurprisingly, nearly every court to consider eviction moratoria adopted in response to COVID-19 has held that a landlord who invites tenants to rent her property does not suffer a physical invasion when the government temporarily restricts her ability to evict those tenants. *See id.* at *8–9; *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 WL 326092, at *10 (D. Or. Feb. 3, 2022); *Jevons v. Inslee*, 561 F. Supp. 3d 1082, 1106 (E.D. Wash. 2021); *El Papel LLC v. Durkan*, No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *16 (W.D. Wash. Sep. 15, 2021); *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 865–66 (S.D. Cal. 2021); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020); *Auracle*

*Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220 (D. Conn. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162–64 (S.D.N.Y. 2020). *Yee*, not the physical invasion cases, governed these decisions. The same is true here.

Plaintiffs believe the outlier holding in *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022), outweighs this mountain of authority. Williams at 23-24; CAA at 21-23. But that case "misreads" *Yee*. *Heights Apartments, LLC v. Walz*, 39 F.4th 479, 480 (8th Cir. 2022) (Colloton, J., dissenting from denial of rehearing en banc). The panel relied on the "mistaken premise" that the landlords in *Yee* sought only to exclude future tenants, when in fact they also complained that the ordinance restricted their ability to evict current tenants. *Id.*; *see also Gallo*, 2022 WL 2208934, at *9 (also noting that mistake). The Eighth Circuit panel "never addressed why the scheme in *Yee* that allowed a landlord to evict existing tenants only for limited reasons after up to 12 months' notice did not constitute a *per se* taking, while a temporary eviction moratorium during a pandemic ostensibly does." 39 F.4th at 480 (Colloton, J., dissenting from denial of rehearing en banc). *Heights Apartments* accordingly does not undermine the Moratorium.

Try as they might, Plaintiffs cannot dodge *Yee*—and the cases applying it to almost exactly these facts. First, they contend that *Yee* addressed only a limit on rent. Williams at 24; CAA at 22 n.9. But the state statute there also prohibited eviction, 503 U.S. at 524, and the plaintiffs' arguments were premised on their inability to evict, *id.* at 526 ("park owners may no longer set rents or decide who their tenants will be"); *id.* at 526-27 ("the park owner cannot evict a mobile home owner or easily convert the property to other uses"); *id.* at 527 (mobile home owner "is effectively a perpetual tenant of the park"); *id.* (mobile home owner has "the right to occupy a pad at below-market rent indefinitely").

Indeed, restricting eviction is an integral part of rent control regimes like that in *Yee*. To function, rent control must preclude landlords from both raising rents to excessive levels *and* evicting tenants who decline to pay those rents. "Without such controls, the security of tenure objectives of rent control laws could be undermined and the threat of eviction could be used to nullify the operation of rent regulations." *Fisher v. City of Berkeley*, 37 Cal. 3d

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

644, 693 (1984) (quotation marks omitted), *aff'd*, 475 U.S. 260 (1986); *see Block v. Hirsh*, 256 U.S. 135, 157-58 (1921) (Holmes, J.) ("If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's [rent] demands would fail."); *Parker v. Fleming*, 329 U.S. 531, 536-37 (1947); *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 148 (1976). These programs allow existing tenants to remain in their homes indefinitely if they continue to abide by the regulated leases, despite the landlord's wish to "exclude" them in favor of other tenants. These ordinary eviction limits are not physical takings, and neither is the County Moratorium. Yet in *Yee* and elsewhere, the Supreme Court has recognized that "a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . does not constitute a categorical taking." *Tahoe-Sierra*, 535 U.S. at 322-23 (citing *Hirsh*).

Plaintiffs also argue, at length, that this case is unlike *Yee* because the Moratorium allows tenants to remain in possession despite failing to pay rent or engaging in other bad behavior. Williams at 20, 25; CAA at 22. The prevalence of that behavior might be relevant to a traditional regulatory takings analysis, which focuses on the totality of the regulation's impact to the use and value of property, but it does not mean the regulation results in a physical invasion. These behaviors hardly convert a tenant into a stranger or continued occupancy into an "invasion."[8]

Nonpayment of rent cannot convert a landlord-tenant regulation into a physical taking. The Supreme Court has rejected the argument that causing a wealth transfer from landlords to tenants effects such a taking. Such transfers of value from one party to another are an inevitable byproduct of many land use regulations, and "the existence of the transfer in itself does not convert regulation into physical invasion."[9] *Yee*, 503 U.S. at 529-30; *see*

---

[9] In the same vein, Williams complains that the moratorium "reflect[s] a governmental preference to favor occupants over owners." Williams at 23. Even if that were true, it would be beside the point given *Yee*'s holding that a transfer of wealth from landlords to tenants is not a physical taking.

*also Ballinger*, 24 F.4th at 1293. "[I]t is the invitation, not the rent, that makes the difference." *Fla. Power Corp.*, 480 U.S. at 252, *quoted in Yee*, 503 U.S. at 532. In *Florida Power*, the Court thus rejected the plaintiffs' physical taking argument although lessees were able to remain in possession at regulated rents far below those they had negotiated. 480 U.S. at 252 (negotiated rent of $7.15 reduced to $1.79).

In any event, the Moratorium preserves the tenant's obligation to pay rent and the landlord's remedies, other than unlawful detainer, for failure to pay rent.[10] *See supra.* Rather, the Moratorium only limits the judicial remedies a landlord may employ for the breach of a lease. *See* County Code §§ 6.120.030(B), (C) (providing covered tenants with a defense to an unlawful detainer action).

This fact clearly distinguishes the physical takings cases. In all of those cases, because there was no contractual relationship between the property owners and the invaders they were required to accept, the compelled invasion eliminated *any* remedy the property owner had. In *Cedar Point*, for example, the agricultural land owners affected by the labor-organizing statute could not sue to eject the organizers or to obtain damages. The preexisting relationship between landlords and tenants changes everything.

Plaintiffs further argue that the Moratorium allows tenants to "forcibly exclude[] the owners of the real property itself." Williams at 22; *see also* CAA at 22. Again, the Moratorium only applies to property owners who have already chosen to allow others to occupy their properties and by doing give up the right to possession. *See Howard*, 220 Cal. App. 3d at 972. Regardless, those landlords may reoccupy their properties at any time. The Moratorium expressly allows eviction where "[a] Landlord is taking the residential unit off of the residential rental market in accordance with Government Code Section 7060, et seq. (Ellis Act)." County Code § 6.120.030(F)(1). "The Ellis Act . . . sets forth the procedure by which a

---

[10] Plaintiffs argue that some tenants are judgment-proof. Williams at 22; CAA at 23. But because Plaintiffs mount a *facial* challenge to the moratorium, the fact that some tenants may be judgment-proof cannot invalidate the entirety of the Moratorium. *See infra* Section I.B.2.

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

landlord may go out of business by removing rental units from the market." *Drouet v. Superior Ct.*, 31 Cal. 4th 583, 589 (2003). It prohibits local governments from "compel[ling] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease." Cal. Gov't Code § 7060(a). Accordingly, the Moratorium does not exclude landlords from their own properties.

CAA contends that the County has provided no Ellis Act exemption from the Moratorium that applies to a COVID-19-related failure to pay rent, County Code § 6.120.040. *See* CAA at 22, 33-35. But such an exemption would be superfluous because that portion of the Moratorium, by its terms, does not apply to owner-occupancy evictions in the first instance. It applies only to evictions for *failure to pay rent*, not evictions to reoccupy property. *See infra* Section IV.B.

Finally, Williams repeatedly insists that the Moratorium prohibits property owners from evicting "squatters." Williams at 10, 17, 20, 25. *But see* CAA at 20 (acknowledging that the moratorium does not require housing of "homeless strangers"). The argument is bizarre and baseless.[11] (It is also an implicit acknowledgment that the physical takings cases are limited to occupation by strangers.) The Moratorium prohibits only eviction of "residents." County Code § 6.120.030(B) ("No landlord or lender may evict a *resident*, or otherwise require a *resident* to vacate a residential unit, or retaliate against a *resident*, while this section is in effect." (emphases added)). "'Resident' shall mean a tenant, homeowner or their household." *Id.* § 6.120.020. And tenant, in turn, means "a residential tenant, subtenant, lessee, sublessee, or any other person *entitled* by written or oral rental agreement, or by sufferance, to use or occupancy of a residential unit."[12] *Id.* (emphasis added). The Moratorium regulates

---

[11] Because Williams provides no supporting explanation or analysis of the ordinance's text, one can only wonder why he believes this. This is an egregious example of Williams's repeated refusal to engage with the ordinance's text. He repeatedly cites the ordinance in its entirety, without specifying which of the many provisions he means to refer to.

[12] If Williams reads tenants by "sufferance" as referring to squatters, he misunderstands the word. It refers to "[a] tenant for a fixed term who holds over beyond the term," *Colyear v. Tobriner*, 7 Cal. 2d 735, 742 (1936), not a stranger to the property.

eviction only of persons "entitled" to occupy property: those who have lawfully occupied their homes—with permission from their landlords.

### 2. Given the "mere enactment" standard applicable to facial takings claims, Plaintiffs cannot assume that the Moratorium will last forever.

To prevail on their facial takings claims—the *only* claims presently before the Court—Plaintiffs must demonstrate that the Moratorium would cause a taking regardless of its eventual duration. Instead, Plaintiffs improperly imply that the Moratorium could be in effect in perpetuity. They must also show that it takes *all* residential rental property, regardless of individual tenant or landlord circumstances.

They rely in part on language in *Yee* where the Court stated, "A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property *or to refrain in perpetuity from terminating a tenancy*." 503 U.S. at 528 (emphasis added); *see* Williams at 25, 25; CAA at 24-25. This is dictum. *See United States v. Scrivner*, 189 F.3d 825, 828 (9th Cir. 1999) (statement addressing hypothetical is dictum). But even assuming the Court's musing about a "different case" could be the basis for a physical takings claim, it does not support the *facial* claims here.

Plaintiffs asserting facial takings claims must show that "mere enactment" of the challenged regulation effected a taking. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297 (1981). As Williams recognizes (at 26), facial takings claims are thus premised on the occurrence of "a single harm, measurable and compensable *when the statute is passed*." *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993) (emphasis added). Accordingly, for such a challenge, "the only time that matters is the time the ordinance was adopted." *Guggenheim*, 638 F.3d at 1119. This standard forces plaintiffs into an "uphill battle." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987).

The hill gets steeper. To prevail on their facial challenges, Plaintiffs must show that "no set of circumstances exists under which the [Moratorium] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Duncan v. Bonta*, 19 F.4th 1087, 1111 (9th Cir. 2021) (en banc) (rejecting facial physical takings claim under the *Salerno* standard), *vacated*

28

*and remanded on other grounds*, 142 S. Ct. 2895 (2022).[13] As if facial challenges were not already difficult enough to win, the Court has held that they are "disfavored" due to the risk of invalidating state action with potentially valid applications. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008); *accord FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990).

The facial challenge standard dictates that Plaintiffs cannot prevail by assuming that the Moratorium will last forever. Plaintiffs cannot show that the Moratorium—on its face— forces landlords to "refrain in perpetuity from terminating a tenancy." *Yee*, 503 U.S. at 528. By its terms, the Moratorium is *temporary*: it remains in effect only as long as the local health emergency does. County Code § 6.120.030(A). As of the time of enactment, it could not be known whether the emergency would last a day or a year or a decade. The actual duration of the Moratorium here cannot be considered on a facial challenge because it cannot be determined at the point of enactment—"the only time that matters." *Guggenheim*, 638 F.3d at 1119; *see also Levald*, 998 F.2d at 688 (circumstances arising after enactment could be relevant to an as-applied challenge but "are not relevant to a claim that the very enactment of the statute effected a taking"). At enactment, on its face, the moratorium did not require a landlord to forever rent her property to the then-current tenant.[14]

Accordingly, the mere possibility that the emergency could last forever (or even many years) cannot be a basis for a facial claim. *Wash. State Grange*, 552 U.S. at 450 (in considering facial challenge, court may not indulge in speculation about "'hypothetical' or 'imaginary'" scenarios). Again, there must be *"no set of circumstances* . . . under which the

---

[13] In *Duncan*, the Ninth Circuit rejected a facial takings challenge to a California law restricting large-capacity gun magazines, as well as a Second Amendment challenge. The Supreme Court granted certiorari on the Second Amendment claim and then vacated and remanded the decision based on its decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). *See* 142 S. Ct. at 2895. The Ninth Circuit's Fifth Amendment analysis played no role in the High Court's vacatur order.

[14] The Moratorium on its face also does not "compel a landowner over objection to rent his property." *Yee*, 503 U.S. at 528. As noted above, it does nothing to prevent them from leaving the rental market. *See supra* Section I.B.1 (discussing the Ellis Act).

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

[Moratorium] would be valid." *Salerno*, 481 U.S. at 745 (emphasis added). Accordingly, Plaintiffs must show that the Moratorium caused a taking on its first day and would do so even if it turned out to be in effect *only for one day*.

Moreover, Plaintiffs must show that the Moratorium effected a taking of *all* residential rental property in the County on the date of enactment. The particular circumstances of the individual Plaintiffs (or their members) or other landlords and tenants are thus wholly irrelevant. *See Carson Harbor Vill., Ltd. v. City of Carson*, 37 F.3d 468, 473–74 (9th Cir. 1994) ("A facial challenge involves a claim that the mere enactment of a statute constitutes a taking, while an as-applied challenge involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation."); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 773 (9th Cir. 2000) (in a facial challenge a court "look[s] only to the regulation's general scope and dominant features, rather than to the effect of the application of the regulation in specific circumstances"), *aff'd* 535 U.S. 302 (2002). Accordingly, Plaintiffs' allegations about some tenants' failure to pay rent or other tenants' causing damage to their properties or the inability of landlords to collect some rental debts cannot show that the Moratorium is invalid *in its entirety*.

In sum, Plaintiffs cannot base their facial challenge on the dictum from *Yee*. Accordingly, *Yee*'s holding controls here. Plaintiffs cannot show that the County's regulation of tenant eviction causes a facial, physical taking.

## C.   Plaintiffs' as-applied, regulatory takings claims supply the appropriate rubric for evaluating the Moratorium under the Takings Clause.

That the physical takings doctrine is unavailable to Plaintiffs does not mean they are immediately out of court. Plaintiffs' complaints also allege traditional regulatory takings claims under *Penn Central Transportation Co. v. City of New York*. Wms. Dkt. 1 ¶ 40; CAA Dkt. 1 ¶ 55. As explained above, the multi-factor, ad-hoc test set forth in *Penn Central* represents the core test under the Takings Clause. *Lingle*, 544 U.S. at 539. Per se tests, like

that applicable to physical invasions by strangers, are the exception rather than the rule in takings cases. *See supra* Section I.A.

So long as regulation "does not require the landlord to suffer the physical occupation of a portion of his building by a third party, [it] will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity": *Penn Central*. *Loretto*, 458 U.S. at 440. *Penn Central* is the "polestar" of regulatory takings jurisprudence. *Tahoe-Sierra*, 535 U.S. at 326 n.23 (quoting *Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring)).

That is the appropriate framework to apply in a case, like this one, in which regulation adjusts the relationship between parties to a commercial transaction involving property rather than requiring a property owner to suffer a stranger's physical invasion. The *Penn Central* test allows the court to consider the totality of circumstances to assess "the severity of the burden that government imposes upon private property rights." *Lingle*, 544 U.S. at 539. In litigating their *Penn Central* claims, Plaintiffs may put on relevant evidence of the Moratorium's impact given their "particular circumstances" (*Penn Central*, 428 U.S. at 124)—evidence that is outside the highly restrictive scope of the facial, physical invasion claim they have chosen to privilege in their motions. Unlike for their current claims, for example, "the duration of the restriction" may be relevant to an as-applied claim under *Penn Central*. *Tahoe Sierra*, 535 U.S. at 342 (rejecting a facial, per se challenge to temporary development moratorium); *see also Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (under non-physical takings analysis, "time is indeed a factor in determining the existence *vel non* of a compensable taking").

The Court should accordingly decline Plaintiffs' invitation to greatly expand the physical takings doctrine. Although their *Penn Central* claims will be similarly unsuccessful, they present the only regulatory takings test with any potential applicability here.

## II. The Moratorium on its face does not unconstitutionally impair contracts. (CAA)

Although the Contracts Clause prohibits some laws "impairing the Obligation of Contracts" (U.S. Const. art. I, § 10, cl. 1), "not all laws affecting pre-existing contracts violate

the Clause" (*Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018)). The Contracts Clause "does not . . . obliterate" the government's "sovereign right . . . to protect the lives, health, morals, comfort and general welfare of the people," which is "paramount to any rights under contracts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) (quotation marks omitted). Thus, the Supreme Court has construed the Clause "narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively." *Matsuda v. City & Cnty. of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008).

Every Contracts Clause claim must survive an exacting two-step inquiry. A plaintiff must first establish that the challenged law substantially impairs a contractual relationship. *Sveen*, 138 S. Ct. at 1821-22. If it has, then the plaintiff must further prove that the law is not "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id*. Additionally, a facial challenge under the Contracts Clause must show that a law's "mere enactment" violated the Clause in every potential application. *See Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) (applying *Salerno* to facial Contracts Clause claim). CAA cannot clear this high hurdle.

### A.   The Moratorium does not substantially impair contracts between landlords and tenants.

To substantially impair a contract, a law must (1) "undermine[] the contractual bargain," (2) "interfere[] with a party's reasonable expectations," and (3) "prevent[] the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. CAA does not directly address these factors. Instead, it misconstrues the Moratorium, incorrectly claiming that it "effectively relieves tenants of the need to pay any rent" and landlords cannot "enforce other material lease terms." CAA at 27.

The Moratorium does not undermine existing rental agreements by eliminating tenants' obligations to pay rent. In fact, it explicitly states that "[n]othing in this chapter relieves an affected resident of liability for unpaid rent or mortgage payments." County Code § 6.120.090(A). Although the Moratorium temporarily limits landlords' ability to seek one remedy for past-due rent, "a landlord may collect the back rent as any other consumer debt"

one year after the rent becomes due. *Id.* § 6.120.090(D). In nearly identical challenges to local eviction moratoria, courts have held "[m]ere delay is insufficient to materially alter the lease agreements in a manner that violates the Contracts Clause." *Jevons*, 561 F. Supp. 3d at 1098; *Gallo*, 2022 WL 2208934, at *6; *Auracle Homes, LLC*, 478 F. Supp. 3d at 227.[15]

Furthermore, because "landlords operate in a highly regulated industry," the Moratorium does not interfere with parties' reasonable expectations. *S. Cal. Rental Hous. Ass'n*, 550 F. Supp. 3d at 861. Existing state and local laws regulate numerous aspects of the landlord-tenant relationship. *See, e.g.,* Cal. Gov't Code §§ 12900 et seq.; Cal. Civ. Code. §§ 1941 et seq., 1946.2; Cal. Health & Saf. Code §§ 17910 et seq., 26147-48. Therefore, despite the pandemic's unprecedented nature, "pervasive regulation in this field has placed [landlords] on notice that they may face further government intervention." *Jevons*, 561 F. Supp. 3d at 1099; *accord S. Cal. Rental Hous. Ass'n*, 550 F. Supp. 3d at 862; *see also Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983) (Courts properly consider "whether the industry the complaining party has entered has been regulated in the past.").

Nor does the Moratorium prevent landlords from safeguarding or reinstating their rights. The Moratorium provides a defense only to specified unlawful detainer or possession actions. County Code §§ 6.120.030(D), 6.120.040(D). Landlords retain other remedies for lease violations: they may enforce nonpayment of rent after a year (*id.* § 6.120.090(D)); a tenant cannot pose an imminent threat to health or safety (*id.* § 6.120.030(F)(3)); and landlords may still recover damages under common law for breaches of lease covenants and waste (*Walt v. Superior Court*, 8 Cal.App.4th 1667, 1670, 1678 (1992) ("The lessor's right to recover damages for loss of the benefits of the lease *should be independent* of his right to bring an action for unlawful detainer.")). Landlords also retain the right to repossess the

---

[15] CAA does not address these cases but instead relies heavily on the Eighth Circuit's holding in *Heights Apartments*. That decision "conflicts with a recent decision of the Ninth Circuit and decisions of every federal district court to consider" whether eviction moratoria violate the Contracts Clause. *Heights Apartments*, 39 F.4th at 481 (Colloton, J. dissenting from denial of rehearing en banc) (citing *Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles* ("*Apartment Ass'n*"), 10 F.4th 905 (9th Cir. 2021)).

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

property by removing the property from the rental market under the Ellis Act. County Code § 6.120.030(F)(1); *see supra* Section I.B.1. At most the Moratorium delays landlords' "use of particular tools to enforce certain contractual obligations"; it does not nullify landlords' rights to collect rents or tenants' obligations to pay them. *Jevons*, 561 F. Supp. 3d at 1100. Temporarily modifying landlords' potential remedies in this way does not "substantially" impair existing leases. *See id.*; *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 430 (1934) ("Without impairing the obligation of the contract, the remedy may certainly be modified . . . it is competent for [governments] to change the form of the remedy") (quotation marks omitted); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 20 n.17 (1977) ("[A] reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement.").

### B. The Moratorium appropriately and reasonably advances a significant and legitimate public purpose.

Even if the Moratorium did substantially impair existing lease agreements, it would nonetheless be an "appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822. "A legitimate public purpose is one whose goal is to alleviate important general social or economic problems." *S. Cal. Rental Hous. Ass'n*, 550 F. Supp. 3d at 863 (citing *Energy Reserves Group, Inc.*, 459 U.S. at 411-12). The Moratorium must be upheld if its "adjustment of the rights . . . is based upon reasonable conditions and is . . . appropriate to the public purpose." *Energy Reserves Group, Inc.*, 459 U.S. at 412 (citation omitted). When the government is not the contracting party, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Apartment Ass'n*, 10 F.4th at 913 (quoting *Energy Reserves Group, Inc.*, 459 U.S. at 413). As the objecting party, CAA bears the burden of showing that the Moratorium is unreasonable on its face. *In re Seltzer*, 104 F.3d 234, 236 (9th Cir. 1996).

CAA does not argue that the Moratorium's purposes were not significant and legitimate when it was enacted. Rather, it claims that "the rationale for [the Moratorium's] continued maintenance is . . . less sustainable" now. CAA at 28.

34

1    CAA's argument cannot support its facial challenge. It must show that "*mere enact-*
2    *ment*" of the Moratorium violated the Contracts Clause. *Cranley*, 318 F.3d at 110 (emphasis
3    added); *see also supra* Section I.B.2. Whether the circumstances supporting the County's
4    enactment of the Moratorium have evolved over time is irrelevant to such a challenge. No-
5    tably, CAA does not attempt to and cannot show that the Moratorium was invalid at the
6    time of adoption. That failure is fatal to its facial challenge.

7    Even if subsequent events were relevant, they would not support CAA's claim: the
8    Moratorium continues to advance a legitimate public purpose. The Moratorium aims to "re-
9    duce the transmission of COVID-19, to promote housing stability during the COVID-19 pan-
10   demic and to prevent avoidable homelessness." County Code § 6.120.010; *see also Roman*
11   *Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of
12   COVID-19 is unquestionably a compelling interest"); *Jevons*, 561 F. Supp. 3d at 1100 (ap-
13   plying the finding in *Roman Catholic Diocese of Brooklyn* to a Contracts Clause claim).
14   Courts continue to reaffirm that promoting housing stability and reducing COVID-19 trans-
15   mission are significant and legitimate public purposes. *See Apartment Ass'n*, 10 F.4th at
16   913; *Tatoma, Inc. v. Newsom*, No. 3:21-CV-098-BEN-JLB, 2022 WL 686965, at *3 (S.D. Cal.
17   Mar. 8, 2022); *El Papel LLC*, 2021 WL 4272424; *Jevons*, 561 F. Supp. 3d at 1100.

18   The Moratorium appropriately and reasonably addresses these public purposes. The
19   County is entitled to "considerable deference" when assessing the Moratorium's "reasona-
20   bleness." *Apartment Ass'n*, 10 F.4th at 916. It is CAA's burden to overcome this deference
21   and show that the Moratorium is unreasonable. *In re Seltzer*, 104 F.3d at 236. Here, the
22   Moratorium's limits on eviction "fairly tie[]" the Moratorium to its stated purposes of pro-
23   moting housing stability and reducing COVID-19 transmission during an ongoing and ever-
24   changing global pandemic. *Apartment Ass'n*, 10 F.4th at 914. As the Board of Supervisors
25   found, evictions destabilize tenants' living situations, and "COVID-19 poses a unique threat
26   to people experiencing homelessness" as long as there is an active local health emergency.
27   CAA Dkt. 24, Ex. 17, 202-03; CAA County RJN, Ex. A. Therefore, the Moratorium limits
28   evictions in order to increase housing stability and help control an ongoing pandemic.

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

In *Apartment Association*, the Ninth Circuit upheld a nearly identical eviction moratorium against a Contracts Clause challenge. 10 F.4th at 914. The court held that moratorium, by limiting evictions, made "reasonable attempts" to address its stated purpose of avoiding housing displacement during a pandemic. *Id.* CAA has not met its burden of showing that the Moratorium's eviction limits are unreasonable.

CAA's attempts to distinguish *Apartment Association* (CAA at 31-32) are unavailing. That *Apartment Association* was decided earlier in the pandemic is irrelevant. Although timing may be relevant to an as-applied challenge, it does not bear on CAA's *facial* challenge, as explained above. In any event, the Board determined that limiting evictions reasonably serves a public purpose as long as the public health emergency persists. Accordingly, the Board conditioned the Moratorium's expiration on that of the local emergency. Again, this legislative judgment is entitled to "considerable deference." CAA baldly states that "almost two years have passed" and "[w]e are in a far different world now," but fails explain why this passage of time has rendered the Moratorium unreasonable. *See Apartment Ass'n*, 10 F.4th at 916. Thus, even if timing were relevant to CAA's facial challenge, CAA fails to meet its burden to show that the Moratorium is unreasonable.

Without any citation to the ordinance, CAA argues that the Moratorium "free[s]" tenants of "virtually all their obligations under the lease" regardless of their financial status while requiring landlords to "tolerate" undesirable tenants. CAA at 29. The assertion inexplicably ignores that the Moratorium plainly *preserves* residents' liability for unpaid rent and allows landlords to recover it. County Code § 6.120.090. The Moratorium does not prevent landlords from bringing claims for breach of lease. It also allows evictions where the landlord is taking the unit off the rental market, a court or government order requires eviction, or continued occupancy poses an imminent threat to health or safety. *Id.* § 6.120.030(F). The County's determination that these provisions strike the appropriate balance between landlord and tenant interests is both reasonable and entitled to deference. *Apartment Ass'n*, 10 F.4th at 916; *see also Energy Reserves Group, Inc.*, 459 U.S. at 412-13.

1  CAA also argues that the Moratorium is not appropriate and reasonable because it

2  does not distinguish between tenants based on ability to pay. CAA at 31-32. However, even

3  if the Moratorium were overinclusive as to some circumstances, that would not render it

4  unconstitutional. *Home Bldg. & Loan Ass'n*, 290 U.S. at 444-45 ("[i]t does not matter that

5  there are, or may be, individual cases of another aspect"). Mass eviction nonetheless reduces

6  housing stability and increases the transmission of COVID-19. The Moratorium is reasona-

7  bly crafted to avoid this extreme result by generally limiting evictions regardless of a ten-

8  ant's ability to pay. *See Jevons*, 561 F. Supp. 3d at 1101 (rejecting the argument that an

9  eviction moratorium was unreasonable because it applied regardless of a tenant's ability to

10  pay); *El Papel LLC*, 2021 WL 4272424, at *11-12 (rejecting an argument that an eviction

11  moratorium could have used more moderate means to achieve the same ends).

12  In sum, CAA has failed to show that the Moratorium does not appropriately and rea-

13  sonably advance its legitimate purposes of promoting housing stability and stemming the

14  spread of COVID-19.

15  **III.    The County Moratorium does not violate due process. (Williams)**

16  Williams contends that the Moratorium violates procedural due process under the

17  Fourteenth Amendment by providing absolute defenses in eviction proceedings. Williams at

18  32. However, the Moratorium merely establishes a substantive defense to an eviction action;

19  it does not create a new process for eviction.

20  Generally, due process requires notice and "some form of hearing." *Matthews v. El-*

21  *dridge*, 424 U.S. 319, 333 (1976).[16] To succeed on this facial challenge, Williams must "es-

22  tablish that "no set of circumstances exists under which the [Moratorium] would be valid."

23  *William Jefferson & Co. v. Bd. of Assessment Appeals No. 3 ex rel. Orange Cnty.*, 695 F.3d

24  960, 963 (9th Cir. 2012) (quoting *Salerno*, 481 U.S. at 745).

25

26

27  [16] Williams fails to establish that procedural due process requirements are even applicable here. Procedural due process only applies when the action at issue is adjudicative and that action deprived the plaintiff of a protected property (or liberty) interest. *Harris v. County of*

28  *Riverside*, 904 F.2d 497, 501 (9th Cir. 1990).

Williams cannot show that the Moratorium deprives landlords of adequate process. The Moratorium does not establish a new eviction process; it merely provides additional defenses that tenants may raise in a judicial unlawful detainer proceeding. County Code § 6.120.030(D). Williams does not contend that unlawful detainer proceedings fail to afford landlords due process. The Moratorium changes nothing about the *process* in those proceedings. *Cf. Birkenfeld,* 17 Cal. 3d at 149 (eviction limitation in rent control program created "substantive ground of defense in unlawful detainer proceedings" as compared to "procedural" requirements of unlawful detainer statute).

Williams relies almost exclusively on the Supreme Court's inapposite decision in *Chrysafis v. Marks*, 141 S. Ct. 2482 (2021). Williams at 31-32. *Chrysafis* involved a New York state law that allowed tenants to "self-certify" financial hardship in an eviction proceeding without affording a landlord any opportunity to contest that certification. 141 S. Ct. at 2482. The Supreme Court held this "scheme violate[d] the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case.'" *Id*.

The Moratorium enacts no such scheme. It does not allow tenants to self-certify financial hardship or otherwise establish irrebuttable facts.[17] Landlords may still file unlawful detainer actions, or breach of contract actions, and courts retain authority to decide whether the Moratorium's defense applies.[18] The Moratorium does not allow tenants to "be a judge" in unlawful detainer actions.

---

[17] For evictions covered by section 6.120.040, tenants must provide documentation of financial hardship due to COVID-19 upon a landlord's request. County Code § 6.120.060(D). Qualifying documentation creates a *rebuttable* presumption that the resident has suffered financial hardship. *Id.* § 6.120.060(E).

[18] Williams hyperbolically claims that a "renter can damage the housing provider's property and perform criminal acts" or "refuse to move out . . . even when the housing provider desperately needs that property for his own personal residence." Williams at 32. But such actions do not affect the *process* available to landlords. These hypothetical factual situations are also irrelevant to a facial challenge. *See supra*. And the assertion about landlords' inability to occupy their own properties is mistaken. *See* County Code § 6.120.030(F)(1) (Ellis Act exemption).

38

Finally, to the extent Williams complains about the process of adopting the Moratorium, that claim must also fail. Governmental actions "affect[ing] large areas and . . . not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements" because they are "legislative in nature." *Halverson v. Skagit County*, 42 F.3d 1257, 1260-61 (9th Cir. 1994). The Moratorium is an ordinance adopted by the County Board of Supervisors that is not "directed at one or a few individuals" and is thus a legislative action. *Id.* at 1261; *see also Aiuto v. S.F. Mayor's Office of Hous.*, No. C-09-2093-CW, 2010 WL 1532319, at *8 (N.D. Cal. Apr. 16, 2010).

## IV.    State law does not preempt the Moratorium. (Williams and CAA)

The California Constitution authorizes a county to "make and enforce within its limits all local police, sanitary, and other ordinances and regulations not in conflict with general laws" enacted by the Legislature. Cal. Const. art. XI, § 7. Such local legislation conflicts with general law only where it duplicates, contradicts, or enters an area fully occupied by general law. *Big Creek Lumber Co. v. County of Santa Cruz*, 38 Cal. 4th 1139, 1150 (2006). There is a strong presumption against preemption in areas where local governments have traditionally exercised control (*id.* at 1161), and preemption "should not be found when the statutory scheme recognizes local regulations" (*id.* at 1157 (citation omitted)). Additionally, if it is "reasonably possible" to comply with both state and local law, there is no preemption. *Id.* at 1161. The party claiming preemption has the burden of proof. *Id.* at 1150 n.7.

Williams alleges that the state Tenant Relief Act and COVID-19 Rental Housing Recovery Act preempt Moratorium section 6.120.030 because the Moratorium does not require tenants to participate in state rent-relief programs and because "COVID-19 eviction controls are not a municipal affair." Williams at 26-29. As discussed below, these arguments fail to recognize that the Legislature anticipated local agencies would adopt further tenant protections and did not displace local regulation.

Williams also appears to argue that Civil Code section 1946.2 preempts the Moratorium because the County failed to expressly find that the Moratorium is more protective than section 1946.2. Williams at 28. However, section 1946.2 is unrelated to local COVID-

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

19 eviction protections. Even if section 1946.2 is somehow applicable to the Moratorium, the statute expressly acknowledges local regulation and does not require an express finding.

CAA separately argues that the Ellis Act preempts Moratorium section 6.120.040 because that section does not include an express exemption for evictions brought pursuant to the Ellis Act. CAA at 32-35. But section 6.120.040 affects only evictions for non-payment of rent, not Ellis Act evictions. And section 6.120.030's broader eviction moratorium expressly exempts Ellis Act evictions.

Plaintiffs' claims are meritless.

## A.    The state renter relief statutes do not preempt the Moratorium. (Williams)

Williams first argues that the Moratorium conflicts with state Tenant Relief Act and COVID-19 Rental Housing Recovery Act (together, the "Acts"), which also provide COVID-19-related eviction protections. Williams contends that the Acts supply California's exclusive COVID-19-related eviction protections, thereby preventing localities from protecting tenants who have not participated in the State's rent relief program. Williams at 27-28 (citing Cal. Civ. Proc. Code §§ 1179.03.5(a)(3), 1179.05(b), 1179.11(a), (c)).

These arguments fundamentally misconstrue the state law. Nothing in the Acts suggest that their eviction protections are exclusive and prevent local governments from offering additional protections. The Acts do not require local eviction moratoria to allow the same just cause evictions as the State, or include participation in the State's rent relief program as a prerequisite to receiving eviction protection. *See id.* §§ 1179.03.5(a)(3), 1179.11(a)(2), (c)(1)(B). To the contrary, the Acts recognize that local jurisdictions may adopt additional eviction protections beyond the State's. *See id.* § 1179.05(f) (Tenant Relief Act "does not provide the Legislature's understanding of the legal validity on any specific ordinance . . . adopted by a city, county, or city and county in response to the COVID-19 pandemic to protect tenants from eviction").

Just last month, a state court rejected a nearly identical preemption theory. *Arche v. Scallon*, --- Cal. Rptr. 3d ---, 2022 WL 3650703 (Cal. App. Dep't Super. Ct. Aug. 1, 2022).

1   There, the plaintiff argued that the Tenant Relief Act preempted Los Angeles County's

2   COVID-19 Eviction Moratorium, which prohibits no-fault evictions that state law would

3   otherwise allow. After reviewing the Act's statutory text and legislative history, *Arche* held

4   that the Act did not preempt Los Angeles County's broader eviction moratorium. *Id.* at *4.

5   In doing so, the court noted that "[t]o the extent there is ambiguity . . . the Legislative Coun-

6   sel's Digest . . . points to an intent that only rental repayment ordinances were preempted."

7   *Id.* at *4.

8       The County Moratorium is valid for similar reasons. It "does not prohibit what the

9   [state law] commands or command what it prohibits." *Big Creek Lumber Co.*, 38 Cal. 4th at

10  1161. The Moratorium prohibits evictions that state law merely allows, not evictions that

11  state law *requires*, and thus it does not conflict with state law. The mere fact that the Mor-

12  atorium "imposes restraints which the State law does not," by narrowing the universe of

13  potential eviction proceedings in ways different from the state law, "does not spell out a

14  conflict between State and local law." *Fisher*, 37 Cal. 3d at 707.[19]

15      Williams also contends that the Acts "impliedly" preempt the Moratorium, presuma-

16  bly by occupying the field of COVID-19-related eviction controls. Williams at 28-29 (citing

17  field preemption standard in *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893,

18  898 (1993)). But courts do not find field preemption where "the Legislature has expressed

19  its intent to permit local regulations" or where "the statutory scheme recognizes local regu-

20  lations." *People ex. rel. Deukmejian v. County of Mendocino*, 36 Cal. 3d 476 485 (1984).

21

22

---

23  [19] Williams does not challenge the Moratorium's eviction protections for nonpayment of rent
24  caused by COVID-19 in section 6.120.040 (*see* Williams at 15 (citing only to County Code §
    6.120.030 in describing the Moratorium); Wms. Dkt 1 at 7-8) likely because any such chal-
25  lenge would fail. The Tenant Relief Act preempts only the "extension, expansion, renewal,
    reenactment, or new adoption" of non-payment eviction protections adopted "between Au-
26  gust 19, 2020, and June 30, 2022." Cal. Civ. Proc. Code § 1179.05(a); *see Arche*, 2022 WL
    3650703 at *4. The Moratorium's most recent extension was adopted on August 4, 2020.
27  Wms. County RJN, Ex. A. Thus, the Moratorium's prohibitions on eviction based on non-
28  payment of rent do not fall within the scope of the Act's preemption.

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

1    Here, the Acts expressly recognize that local governments regulate landlord-tenant

2    relationships and will enact such local regulation in response to COVID-19. In addition to

3    California Code of Civil Procedure section 1179.05(f), the Tenant Relief Act states that it

4    "does not alter a city, county, or city and county's authority to extend, expand, renew, reen-

5    act, or newly adopt an ordinance that requires just cause for termination of a residential

6    tenancy or amend existing ordinances." Cal. Civ. Proc. Code § 1179.05(b). The Acts clearly

7    acknowledge that local governments have authority to regulate evictions.

8    Williams suggests field preemption applies because the Legislature "has expressly

9    declared [COVID-19 eviction controls] a 'matter of statewide concern.'" Williams at 29. This

10   is misleading. The Legislature declares matters of statewide concern so that state statutes

11   addressing those matters will apply in charter cities. *City & County of San Francisco v.*

12   *Regents of Univ. of Cal.*, 7 Cal. 5th 536, 555 (2019). For this reason, the Legislative declara-

13   tion Williams cites expressly applies the Tenant Relief Act "to all cities, including charter

14   cities." *See* Cal. Civ. Proc. Code § 1179.05(e). This language does not suggest that the Leg-

15   islature has fully occupied the field of COVID-19 eviction regulations.

16   Preemption—whether conflict or field—is especially inappropriate here because the

17   Moratorium regulates an area where local governments have traditionally exercised control.

18   *See Big Creek Lumber Co.*, 38 Cal. 4th at 1149-50. Courts have long recognized local author-

19   ity to regulate rental properties, including by limiting evictions. *See Apartment Ass'n*, 10

20   F.4th at 917 (upholding city eviction moratorium); *Birkenfeld*, 17 Cal. 3d at 152 (local regu-

21   lation limiting eviction is a proper means of enforcing maximum rent limits). There is also

22   a "long tradition of local regulation . . . to preserve and protect the public health." *People ex.*

23   *rel. Deukmejian*, 36 Cal. 3d at 484 (1984). The Acts do not purport to upend this regulatory

24   balance by divesting the County of regulatory authority that local agencies have historically

25   enjoyed.

26   Finally, Williams cursorily asserts that the Moratorium does not comply with a 2019

27   statute that establishes a statewide prohibition on terminating a residential tenancy with-

28   out "just cause." Williams at 28 (citing Cal. Civ. Code § 1946.2). But in doing so, the statute

expressly allows localities to adopt just-cause ordinances that are "more protective" than the statewide prohibition. Cal. Civ. Code § 1946.2(g)(1)(B). A local agency may extend additional protections to tenants if it makes "a binding finding within their local ordinance that the ordinance is more protective than the provisions of" section 1946.2. *Id*. § 1946.2(g)(1)(B)(iii). Williams contends that the County did not make an "express" finding that the Moratorium was "more protective" than section 1946.2. Williams at 28.

However, section 1946.2(g) only applies to "local ordinance[s] requiring just cause for termination of a residential tenancy." The Moratorium does not require just-cause for eviction; it temporarily *prohibits* eviction. Wms. Dkt. 61 at 144. This distinction is made even clearer by the fact that the Moratorium was adopted under the County Code's Health and Safety title. By contrast, ordinances that permanently regulate the landlord-tenant relationship are adopted under the County Code's Business Licenses and Regulations title. *See* County Code chapters 3.32 (Mobilehome Park Rent Review Procedures), 3.68 (Notification of Rent Mediation Services). Nor does the statute purport to prohibit local agencies from adopting temporary eviction moratoria in response to a public health emergency, and it is highly unlikely that the Legislature even contemplated such a possibility.

Even assuming section 1946.2 applies here, it does not require the "express" finding that Williams claims. Rather, a "more protective" finding may be implied from an ordinance's enactment. *See Arche*, 2022 WL 3650703, at *4-5. Here, it is undisputed that the Moratorium was enacted to give residents greater protection from eviction than state law provides.[20] Though the Moratorium includes exceptions where necessary to avoid conflict with state law (e.g., the exception for Ellis Act evictions), it does not include exceptions for just cause as defined by section 1946.2. *See* County Code § 6.120.030(F) (exceptions to general Moratorium). The County explicitly acknowledged that it enacted the Moratorium to "enable tenants, homeowners, and mobilehome owners . . . to be temporarily protected from

---

[20] Indeed, Williams's lawsuit is predicated on the burdens that the County Moratorium allegedly imposes on landlords. He is attacking the Moratorium precisely *because* it is more protective of tenants than the status quo ante created by the state statute.

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

eviction." *Id.* § 6.120.010. Thus, the County clearly intended that the Moratorium would protect tenants where state law otherwise would not. *See Arche*, 2022 WL 3650703 at *4 (ordinance's prohibition of evictions allowed by state law combined with intent to enact tenant protections was sufficient to comply with section 1946.2). This satisfies section 1946.2's requirement for a "more protective" finding. *See id.* at *4-5.

### B.   The Ellis Act does not preempt the Moratorium. (CAA)

Separately, CAA argues that the Ellis Act preempts the Moratorium because the Moratorium supposedly "prohibits" the owner-move-in evictions allowed by the Act. CAA at 34. The Moratorium does no such thing.

The general Moratorium explicitly *exempts* all Ellis Act evictions from its scope. *See* County Code § 6.120.030(F)(1) ("[t]he provisions of this section *shall not apply* . . . [when a] Landlord is taking the residential unit off of the residential rental market in accordance with . . . [the] Ellis Act") (emphasis added). That express exemption apparently misled CAA into believing that the more limited Moratorium in County Code section 6.120.040 does not allow Ellis Act evictions because it includes no comparable express exemption. But no such exemption is necessary. That section prohibits certain evictions "for nonpayment of rent or mortgage payments or for nonpayment of late fees, fines, or interest based on nonpayment," County Code § 6.120.040(B), "resulting from a substantial loss of income, substantial out-of-pocket medical expenses, or extraordinary child care needs, any of which are caused by COVID-19," *id.* § 6.120.040(A). Nothing in section 6.120.040 affects a landlord's ability to remove a unit from the rental market. Because section 6.120.040 simply has no effect on Ellis Act evictions, CAA's preemption claim fails.

### V.   The Moratorium does not "amend" the City's Just Cause for Eviction Ordinance.  (Williams)

Williams also theorizes that the *County's* Moratorium unlawfully amends the *City's* Just Cause for Eviction Ordinance ("City Ordinance"). Williams at 29-31. This contention does not withstand even a cursory review.

---

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB

State law provides the County authority to adopt temporary moratoria like the one challenged here. Counties may proclaim local emergencies (Cal. Gov't Code § 8630), and, during a local emergency, the Board of Supervisors "may promulgate orders and regulations necessary to provide for the protection of life and property." *Id.* § 8634. A county's local emergency proclamation and emergency regulations apply to both cities and unincorporated areas within a county. 62 Cal. Op. Att'y Gen. 701 (1979).

By exercising this authority, the County does not create a conflict with state or local law. The temporary Moratorium does not purport to amend the City Ordinance, municipal code, or otherwise change the City's permanent eviction protections. County Code § 6.120.010.

Nor does the City Ordinance suggest that such a moratorium cannot take effect in the City. Oakland's voters adopted the City Ordinance to *protect* City residents from evictions. Wms. Dkt. 62, Ex. L, at 215. In doing so, they did not purport to prohibit the County from adopting additional eviction protections on a temporary basis.

The authority Williams cites does not help him. *See* Williams at 30. Nothing on the face of the City Ordinance limits the County's authority to enact emergency regulations. Elections Code section 9217 does not apply to counties at all. Cal. Elec. Code § 9217 (an ordinance adopted by initiative "shall become a valid and binding ordinance *of the city*") (emphasis added). And Article II, Section 10 of the California Constitution applies to statewide initiatives, not local initiatives like the City Ordinance. Cal. Const. art. II, § 10 ("[a]n initiative statute . . . takes effect on the fifth day after the Secretary of State files the statement"). Williams's claim is simply unsupported.

## CONCLUSION

For the foregoing reasons, the Court should deny Williams's and CAA's Motions for Summary Judgment.

1   DATED:  September 6, 2022          SHUTE, MIHALY & WEINBERGER LLP

2

3

4                                     By: _____
                                          MATTHEW D. ZINN
5                                         EDWARD T. SCHEXNAYDER
                                          MINDY K. JIAN
6

7                                     Attorneys for Defendants and Respondents
                                      Alameda County and Alameda County Board of
8                                     Supervisors

9
    1554487.17
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNTY DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
Case No. 3:22-cv-01274-LB