ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS, FREEDMAN & PATTERSON, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)*
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)*
SAM SPIEGELMAN (N.Y. Bar No. 5573100)*
255 South King Street, Suite 800
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org
SSpiegelman@pacificlegal.org

Attorneys for Plaintiffs and Petitioners
JOHN WILLIAMS, ROBERT VOGEL, SHEANNA ROGERS,
MICHAEL LOEB, JACQUELINE WATSON-BAKER
HOUSING PROVIDERS OF AMERICA

**ZACKS, FREEDMAN & PATTERSON, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN WILLIAMS, ROBERT VOGEL, SHEANNA ROGERS, MICHAEL LOEB, JAQUELINE WATSON-BAKER, and HOUSING PROVIDERS OF AMERICA, a 501(c)(4) non-profit Corporation,<br><br> Plaintiffs and Petitioners,<br><br> vs.<br><br>ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,<br><br> Defendants and Respondents. | Case Number:  3:22-cv-01274<br><br>**PLAINTIFFS' AND PETITIONERS' COMBINED REPLY IN SUPPORT OF RULE 56 MOTION ON BIFURCATED CLAIMS**<br><br>Date: September 29, 2022<br>Time: 9:30 a.m.<br>Dept: Courtroom B, 15th Flr<br>Judge: Hon. Laurel Beeler<br><br>Complaint filed March 1, 2022 |

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

II.   REPLY ARGUMENT .......................................................................................... 3

  A.   The Eviction Regulations Are a Physical Taking. ........................................ 3

    1.   Yee, and the Opposition Arguments Based on Yee, Do Not Apply. ............ 3

    2.   The Other Arguments in Opposition Are Unpersuasive. ............................ 12

    3.   The Regulations are Facially Unconstitutional. ......................................... 15

  B.   Defendants' Eviction Moratoria Are Preempted by the Acts and California Law. ........ 19

  C.   The Moratoria Violate California Election Code .......................................... 25

    1.   The COUNTY is Incorrect that its Moratorium Did Not "Amend" the CITY's Just
         Cause for Eviction Ordinance. ................................................................... 25

    2.   The CITY Ignores the Narrow Scope of the COUNCIL's Permissible Amendment. 26

  D.   Plaintiffs Assert Constitutional Property Interests in the Due Process Context and the
       Moratoria's Absolute Defense to Virtually All Evictions Unlawfully Allows Renters to
       be Judges in Their Own Case ..................................................................... 27

III.  CONCLUSION ................................................................................................. 29

ZACKS, **FREEDMAN & PATTERSON**, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Aiuto v. San Francisco's Mayor's Off. of Hous.*,
    No. C 09-2093 CW, 2010 WL 1532319 (N.D. Cal. Apr. 16, 2010) ................................... 29

*Alabama Association of Realtors v. HHS*, 141 S.Ct. 2485 (2021) .......................................... 1, 3

*American Financial Services Ass'n v. City of Oakland*, 34 Cal.4th 1239, 1251 (2005) ............. 25

*Apartment Ass'n of Los Angeles Cnty, Inc. v. City of Los Angeles*, 10 F.4th 905 (2021) ......... 23

*Arche v. Scallion*,
    No. 21LBUD00480, 2022 WL 3650703 (Cal. Super. Ct., App. Div., Aug. 1, 2022) ... 23, 24

*Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012) ......................... 4, 15

*Armstrong v. United States*, 364 U.S. 40 (1960) ...................................................................... 15

*Associated Home Builders etc., Inc. v. City of Livermore*, 18 Cal.3d 582 (1976) .................... 26

*Auracle Homes, LLC v. Lamont*, 478 F.Supp.3d 199 (D. Conn. 2020) ................................... 28

*Ballinger v. City of Oakland*, 24 F.4th 1287 (9th Cir. 2022) ............................................. 11, 12

*Best Supplement Guide, LLC v. Newsom*,
    No. 20-17362, 2022 WL 2703404 (9th Cir. July 12, 2022) .................................................. 29

*Big Creek Lumber Co. v. Cty. of Santa Cruz*, 38 Cal.4th 1139 (2006) .................................... 23

*Birkenfeld v. City of Berkeley*, 17 Cal.3d 129 (1976) ....................................................... 23, 24, 25

*Block & Hirsh*, 256 U.S. 135 (1921) ................................................................................. 5, 12

*Bowles v. Willingham*, 321 U.S. 503 (1944) ............................................................................ 13

*Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063 (2021) .................................................... passim

*Chrysafis v. Marks*, 141 S.Ct. 2482 (2021) .................................................................. 2, 27, 29

*City of El Centro v. Lanier*, 245 Cal.App.4th 1494 (2016) ..................................................... 22

*DeVita v. Cnty. of Napa*, 9 Cal.4th 763 (1995) ...................................................................... 26

*F.C.C. v. Fla. Power Corp.*, 480 U.S. 245 (1987) ........................................................ 8, 11, 16

*Farhoud v. Brown*, No. 3:20-CV-2226-JR, 2022 WL 326092 (D. Or. Feb. 3, 2022) ............... 28

*Fed. Home Loan Mortg. Corp. v. SFR Invs. Pool 1, LLC*, 893 F.3d 1136 (9th Cir. 2018) ....... 27

ZACKS, **FREEDMAN & PATTERSON, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,
    482 U.S. 304 (1987) ............................................................................................................ 4

*Fisher v. City of Berkeley*, 37 Cal.3d 644 (1984) ...................................................................... 24

*Fresh Pond Shopping Ctr., Inc. v. Callahan*, 464 U.S. 875 (1983) ........................................... 13

*Guggenheim v. City of Goleta*, 638 F.3d 1111 (9th Cir. 2010) ................................................. 16

*Halverson v. Skagit Cnty.*, 42 F.3d 1257 (9th Cir. 1995) .......................................................... 29

*Home Bldg. & Loan Ass 'n v. Blaisdell*, 290 U.S. 398 (1934) .................................................. 26

*Horne v. Dep't of Agric.*, 576 U.S. 350 (2015) ................................................................. passim

*Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959 (9th Cir. 2003) ................. 29

*In re Juan* C., 28 Cal.App.4th 1093 (1994) .............................................................................. 25

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) ......................................................... 4

*Larson v. CCSF*, 192 Cal.App.4th 1263 (2002) ....................................................................... 25

*Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir. 1993) ........................................... 16

*Levy Leasing Co. v. Siegel*, 258 U.S. 242 (1922) ....................................................................... 5

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ................................................................. 14

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......................... passim

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................................. 29

*Meyer v. Parobek* 119 Cal.App.2d 509 (1953) ........................................................................ 27

*Mobilepark W. Homeowners Assn. v. Escondido Mobilepark W.*,
    35 Cal.App.4th 32 (1995) .............................................................................................. 26

*Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) ....................................................... 7

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) ..................................................................... 12, 13

*Pennell v. City of San Jose*, 485 U.S. 1 (1988) ........................................................................ 13

*People ex. rel. Deukmejian v. County of Mendocino*, 36 Cal.3d 476 (1984) .......................... 23

*Roble Vista Associates v. Bacon*, 97 Cal.App.4th 335 (2002) ................................................. 22

*San Jose Parking, Inc. v. Superior Court*,
    110 Cal.App.4th 1321, *as modified on denial of reh'g* (Aug. 28, 2003) ............................. 27

*Sherwin–Williams Co. v. City of Los Angeles*, 4 Cal.4th 893 (1993) ....................................... 22

*Sierra Lake Rsrv. v. City of Rocklin*, 938 F.2d 951 (9th Cir. 1991)............................................ 29

*Tri Cnty. Apartment Assn. v. City of Mountain View*, 196 Cal.App.3d 1283 (1987) .......... 22, 23

*United States v. Causby*, 328 U.S. 256 (1946)................................................................... 12, 17

*United States v. General Motors Corp.,* 323 U.S. 373 (1945)................................................ 4, 17

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993)................................... 28, 29

*United States v. Pewee Coal Co.*, 341 U.S. 114 (1951)............................................................ 4

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ...................................... 3

*Yee v. City of Escondido,* 503 U.S. 519 (1992)......................................................... 8, 9, 10, 12

## Statutes

Cal. Civ. Code § 654........................................................................................................ 17

Cal. Civ. Code § 1946.2................................................................................................... 19

Cal. Code of Civ. Proc. § 1179.05(a)(1) ............................................................................ 23

Cal. Code of Civ. Proc. § 1179.05(b)................................................................... 19, 21, 23

Cal. Code of Civ. Proc. § 1179.05(f) ................................................................................ 21

Cal. Code of Civ. Proc. § 1946.2(g)(1)(B).......................................................................... 24

Cal. Code of Civ. Proc. § 1946.2(g)(1)(B)(ii) ..................................................................... 20

Cal. Elec. Code § 9125 .................................................................................................... 26

Cal. Elec. Code § 9217 .................................................................................................... 26

Cal. Gov. Code § 8690 .................................................................................................... 25

## Constitutional Provisions

Cal. Const., art. XI, § 7 ................................................................................................... 25

**ZACKS, FREEDMAN & PATTERSON, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

## I.   INTRODUCTION

The Supreme Court has already said what it thinks about eviction moratoriums.

In *Alabama Association of Realtors v. HHS*, the issue was whether the CDC had the authority to impose a national eviction moratorium. In holding to the contrary, the Court instructed that "preventing [owners] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude."  141 S. Ct. 2485, 2489 (2021) (per curiam) citing *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 435 (1982).  The Court did not equivocate, nor cite to *Yee v. Escondido* as a potential escape valve.

Accordingly, for the Defendants and Intervenor to prevail they must show why an eviction moratorium is not a physical taking, when the Supreme Court clearly thinks that it is.  And they must also show why *Yee* applies, when the Supreme Court clearly thinks that it does not.  In this, the Opposition arguments fail to persuade.

The Defendants and Intervenor also face additional Supreme Court roadblocks that must be addressed and resolved in order to reach the result that they seek.

They allege that because their eviction regulations ("eviction regulations" or "Moratoria") are temporary, they are immune from a physical takings claim.  But that is in direct contradiction with the Supreme Court in *Cedar Point*.  The Court plainly stated that "a physical appropriation is a taking whether it is permanent or temporary…. The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation."  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021).

They assert that when an owner decides to rent, nothing that happens afterward can be a physical taking.  According to Defendants and Intervenor, the owner has voluntarily ceded those rights.  But, again, the Supreme Court disagrees.  In *Loretto,* the Court specifically stated that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation."  *Loretto*, 458 U.S. at 439 n.17.

Nor can the Governments' granting of physical possession to a tenant be considered a mere adjustment of the owner-tenant relationship.  Borrowing again from *Cedar Point*, such a construction "is to use words in a manner that deprives them of all their ordinary meaning" 141 S. Ct. at 2075.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

The Defendants' eviction regulations are a facial unconstitutional physical taking and contrary to the Fifth Amendment. Upon enactment, the regulations vested the right to possess and exclude in Defendants for all Oakland and Alameda County rental properties; and with that appropriated property right, Defendants then granted possession to all occupants. This transfer of one of the fundamental rights of ownership was self-executing and automatically attached to all rental properties. The owner's consent, and the tenant's compliance with the lease and the laws governing tenancies, became irrelevant. And because the regulations that vested possession and control contain no provision for just compensation, it is facially unconstitutional.

Defendants' and Intervenor's other opposition arguments fare no better. Defendants argue that the Acts do not preempt the Moratoria because those regulations are "more protective" than those Acts. But the express purpose of the Acts, and their incorporation of Cal. Civ. Code section 1946.2, was to create a reasonable balance between protecting housing providers and renters alike. The Moratoria completely upend that balance in favor of Defendants' own unjustified local agendas, thereby coming into direct and irreconcilable conflict with those laws.

Defendant Alameda County ("COUNTY") also makes the spurious claim that the California Election Code does not apply to it. It is incorrect. The COUNTY's eviction regulations plainly amend the voter-enacted Oakland Rent and Eviction Control Ordinance in violation of California law, by invalidating that ordinance all together. Defendant City of Oakland ("CITY") asserts that its eviction regulations are within the scope of permissible amendment. But the CITY fails to address its own counsel's recitation of that scope. It is narrow, and the CITY's moratorium eviscerating its Rent and Eviction Control Ordinance far exceeds the powers granted to the CITY by its voters.

Finally, Defendants and Intervenors fall short of distinguishing the due process violations identified in a similar regulation by the Supreme Court in *Chrysafis v. Marks*, 141 S.Ct. 2482 (2021). In fact, the due process violations here are tenfold worse; the Moratoria permit renters to assert an "absolute defense" to virtually all evictions, thereby unlawfully allowing them to be the "judge" in their own case.

For these reasons as are further detailed below, the motion should be granted.

## II.     REPLY ARGUMENT

### A.  The Eviction Regulations Are a Physical Taking.

The Defendants' eviction regulations vested the right to possess and exclude in Defendants, who, in turn, granted possession indefinitely to all occupants regardless of the owner's consent, the tenant's payment of rent, or the material breach of the lease.  *See* Docket No. 62 at Exhibits D, E, G and H.  From the perspective of a rental property owner, if you have no control over the possession of your own property, it is a compelled occupation.

And because this physical taking of possession contains no provision for just compensation, it is contrary to the Fifth Amendment on its face.  *Alabama Ass'n of Realtors*, 141 S. Ct. 2485. "The government does not have unlimited power to redefine property rights."  *Loretto*, 458 U.S. at 439, citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) ("a State, by *ipse dixit*, may not transform private property into public property without compensation").

### 1.  Yee, and the Opposition Arguments Based on Yee, Do Not Apply.

The Defendants and Intervenor rely heavily on *Yee* v. *Escondido* and from that case, draw upon several factors which they allege are determinative.  They contend that because the ongoing eviction prohibition is "temporary," there can be no physical taking.  Furthermore, Defendants and Intervenor assert that the act of leasing to a tenant precludes a subsequent physical takings claim regardless of the circumstances.  Lastly, that the taking of the right to possess and exclude is a mere adjustment to the owner-tenant relationship.  However, these factors that the Defendants and Intervenor attribute to *Yee*, a rent control case at heart, are not applicable.

### a.   A Temporary Physical Taking Is Still a Physical Taking.

In various ways, Defendants and Intervenor all point to the fact that the eviction regulations are temporary as means to escape constitutional liability.  However, that distinction is legally irrelevant.

In *Cedar Point*, the Supreme Court held that a temporary physical taking is on equal footing with a permanent one.  The duration of the regulation impacts damages, not constitutionality.  *Cedar Point Nursery*, 141 S. Ct. at 2074 ("To begin with, we have held that a physical appropriation is a taking whether it is permanent or temporary. Our cases establish that 'compensation is mandated when a leasehold is taken and the government occupies property for its own purposes, even though

*PLAINTIFFS' AND PETITIONERS' COMBINED REPLY IN SUPPORT OF RULE 56 MOTION ON BIFURCATED CLAIMS – CASE NO. 3-22-CV-01274*

-3-

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

that use is temporary.' The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation.") (citations omitted).

Likewise, in *Arkansas Game & Fish Commission v. United States*, the Court took note of certain temporary physical takings that arose from World War II: "Our decisions confirm that takings temporary in duration can be compensable. This principle was solidly established in the World War II era when condemnation for indefinite periods of occupancy took hold as a practical response to the uncertainties of the Government's needs in wartime. In support of the war effort, the Government took temporary possession of many properties. These exercises of government authority, the Court recognized, qualified as compensable temporary takings." 568 U.S. 23, 32–33 (2012) (citing to *United States v. Pewee Coal Co.*, 341 U.S. 114 (1951); *Kimball Laundry Co. v. United States,* 338 U.S. 1 (1949); and *United States v. General Motors Corp.,* 323 U.S. 373 (1945)).

"Ever since, we have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have worked a taking of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Id.* at 33.

In *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, the Supreme Court also found that an interim, temporary local ordinance was a compensable taking. 482 U.S. 304, 318–19 (1987) ("These cases reflect the fact that temporary takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.") (citing cases).

Accordingly, the temporary versus permanent distinction has no relevance here.

From a factual perspective, it is also worth noting that the temporariness of the eviction regulations is not the certainty that Defendants portray.

The parameters under which the Defendants can continue the Local Emergency are broad and ill-defined, tantamount to near unilateral control. *See* Docket No. 62, at Exhibits C and F. The regulations also have no formal end date and may continue as far into the future as the Defendants wish. *See* Docket No. 62 at Exhibits D, E, G and H. Under these circumstances, the bridge from a temporary regulation to a permanent one is a short one. Indeed, several of the "temporary" rent-

*PLAINTIFFS' AND PETITIONERS' COMBINED REPLY IN SUPPORT OF RULE 56 MOTION ON BIFURCATED CLAIMS – CASE NO. 3-22-CV-01274*

-4-

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

control regulations enacted to address housing shortages at the end of World War I are still in place a century later.  *See Block & Hirsh*, 256 U.S. 135 (1921) and *Levy Leasing Co. v. Siegel*, 258 U.S. 242 (1922).

To that end, Plaintiffs have submitted for Judicial Notice an item from the County of Alameda's Board of Supervisors meeting of July 19, 2022.  *See* Docket Nos. 66 and 69.  At that meeting, Supervisor and Vice President of the Board Nate Miley stated that "I, for one, feel the ordinance [sic] county counsel might not want to hear me say this, but I feel it's unconstitutional. I think it's a taking of property.  We don't have the legal authority to restrict property owners in this type of draconian measure." *See* Docket No. 66, Exhibit V, transcript page 54, lines 4–9. Nonetheless, the County Supervisors voted not to discuss the "temporary" eviction moratorium on a future agenda.  *See* Docket Nos. 66 and 69.  This effectively leaves the regulation in place indefinitely.  Putting this in perspective, the County's eviction regulation is not a physical taking simply because Supervisor Miley believes it to be so.  But in the face of his comments, the fact that the Defendant County Board of Supervisors then declined to even discuss the regulation as a future agenda item suggests that it is far closer to permanent than temporary.

### b.  The Act of Renting Does Not Waive a Future Physical Takings Claim.

The Defendants and Intervenor claim that no physical taking can occur because the owner, at some point in the past, decided to voluntarily rent to a tenant.  However, the use of one property right cannot be conditioned upon the waiver of a different property right.

The Supreme Court has made clear that the government cannot condition the right to lease real property upon waiver of the right to exclude.  As *Loretto* stated, "[a] landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto*, 458 U.S. at 439 n.17; *Horne v. Dep't of Agric.*, 576 U.S. 350, 364–65 (2015) ("The third question presented asks 'Whether a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking.' The answer, at least in this case, is yes.  The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

to the Government, if raisin growers don't like it, they can 'plant different crops,' or 'sell their raisin-variety grapes as table grapes or for use in juice or wine.' 'Let them sell wine' is probably not much more comforting to the raisin growers than similar retorts have been to others throughout history. In any event, the Government is wrong as a matter of law…. property rights 'cannot be so easily manipulated.'").

Accordingly, the act of allowing a tenant to take possession at lease signing does not waive all future claims that a physical taking has occurred.  A tenant's occupancy is temporary and conditional.  If it weren't, it would not be a lease.  And in leasing, a property owner does not grant the tenant a permanent or indefinite right to possess and exclude.

To hold otherwise is to disregard the legal rights of the present for the legal rights of the past.

In the past, at lease signing, the owner had the right to possess and exclude.  The owner could decide to rent and if the tenant violated the terms, the owner had the power and control to take possession and exclude the tenant.

But in the present, those owner's rights no longer exist.  The owner's right to possess and exclude have been appropriated by the Defendants.  The owner's consent to the tenant's possession is now irrelevant, replaced by the Defendants' regulations which permit occupancy irrespective of the payment of rent or adherence to the lease.

Put differently, the owner's "voluntariness" is moot because the owner could not exercise the right to possess or exclude even if he or she wanted to.

The Defendants' and Intervenor's focus on whether the occupants are "tenants," "strangers" or "intruders" also misses the key point.  It is not about the classification of the occupant but the taking of the property right.

For example, assume that a government entity invaded private property without the owner's consent, demolished a structure, and then erected a government-run Covid-19 testing site.  Clearly, that is a physical taking.  And the inevitable finding that this act was a constitutional violation does not depend on whether the property was commercial, residential, or industrial.  Nor does it depend on whether the evicted occupants were owners, tenants, sub-tenants, licensees, or squatters.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

In other words, whether or not there was an unconstitutional physical taking is based upon the act.  A Fifth Amendment violation occurs when the government takes a property right without the payment of just compensation.  Who was impacted by that act, and how, determines the measure of damages, not the vesting of the property right.

Here, the regulations vested in Defendants the right to possess and exclude for all rental properties.  That it impacts rental property owners and tenants is simply the product of which type of property the vesting applies to.  But who it impacts does not obviate the fact that a property right was taken in the first place.

### c.   The Defendants' Grant of Physical Possession Is Not a Mere Adjustment of the Landlord-Tenant Relationship.

The eviction regulations do not adjust how much rent is to be paid or pertain to issues of notice or timetables.  They are an outright taking possession and control.  They preclude owners from possessing their property for an indefinite period, subject only to the Defendants' discretion.

Physical takings of an owner's rights to possess and exclude violate "one of the most treasured rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Cedar Point Nursery*, 141 S. Ct. at 2072.  It is "perhaps the most serious form of invasion of an owner's property interests."  *Loretto*, 458 U.S. at 435.

Thus, as the Court similarly stated in *Cedar Point*, "[s]aying that appropriation of a three hour per day, 120 day per year right to invade the growers' premises 'does not constitute a taking of a property interest but rather . . . a mere restriction on its use, is to use words in a manner that deprives them of all their ordinary meaning.'"  *Cedar Point Nursery*, 141 S. Ct. at 2075; quoting *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather a mere restriction on its use is to use words in a manner that deprives them of all their ordinary meaning."); *see Horne*, 576 U.S. at 364–65 (2015) (the government cannot manipulate an owner's property rights by contending that a physical taking linked to a particular property use is not a physical taking).

Therefore,

> We cannot agree that the right to exclude is an empty formality, subject to modification at the government's pleasure. On the contrary, it is a fundamental element of the property right, that cannot be balanced away. Our cases establish that appropriations of a right to invade are per se physical takings, not use restrictions subject to *Penn Central*…. And while *Kaiser Aetna* may have referred to the test from *Penn Central*, the Court concluded categorically that the government must pay just compensation for physical invasions…. With regard to the complexities of modern society, we think they only reinforce the importance of safeguarding the basic property rights that help preserve individual liberty, as the Founders explained.

*Cedar Point Nursery*, 141 S. Ct. at 2077–78

### d.  *Yee* Is Only Relevant to Rent Control Disputes.

The arguments of Defendants and Intervenor regarding voluntariness, the ostensibly temporary nature of the regulations, and the "mere adjustment" of the owner-tenant relationship, all stem from their interpretation of *Yee*.  But *Yee* is not a physical taking case.  It is a rent control case and it has no place here.

At issue in *Yee v. City of Escondido* was a local rent control ordinance that limited how much a property owner could charge in rent for the land beneath tenants' mobile homes.  503 U.S. 519 (1992)  The Yees, who ran a mobile home park, argued that the rent cap was a regulatory taking.

The owners did not object to the tenant's occupancy or allege that a tenant failed to pay the required rent, or that the tenant violated any of the material terms of the lease.  Nor did the owners seek to evict them.  The principal dispute was about money and how the forced rent reduction damaged the property owners.

But undoing rent control is an uphill battle.  Earlier cases had effectively foreclosed a claim that a profitable use of property, albeit less so than the owner wanted, was an unconstitutional taking. *See e.g.*, *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 253 (1987); *Loretto*, 458 U.S. at 440.

The owner's proposed solution was a work-around, contending not that rent control devalued their land, but that the regulation effected a physical taking of "a discrete interest in land — the right to occupy land indefinitely at a submarket rent."  *Yee,* 503 U.S. at 527.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

The work-around did not succeed.  The Court in *Yee* held that the physical taking doctrine was not the correct theory to challenge a rent control regulation.  *Id.* at 528.  It also found that this transfer of wealth (such that the rent control regulation made the tenant's interest more valuable and the owner's interest less valuable) was not unconstitutional.  *Id.* at 529.

"Ordinary rent control often transfers wealth from landlords to tenants by reducing the landlords' income and the tenants' monthly payments, although it does not cause a one-time transfer of value as occurs with mobile homes . . . .  The mobile home owner's ability to sell the mobile home at a premium may make this wealth transfer more *visible* than in the ordinary case, but the existence of the transfer in itself does not convert regulation into physical invasion."  *Id.* at 529–30.

Conversely, the *Yee* Court may have looked at things differently had the rent control statute precluded eviction.  The Court noted, "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy."  *Id.*, at 528.  "Had the city required such an occupation, of course, petitioners would have a right to compensation, and the city might then lack the power to condition petitioners' ability to run mobile home parks on their waiver of this right."  *Id.* at 531–32.

But this was not the case in *Yee*.  The owners were free to evict the tenant on numerous grounds.  *Id.*, at 524 (permissible reasons to evict included "the nonpayment of rent, the mobile home owner's violation of law or park rules, and the park owner's desire to change the use of his land"); *id.*, at 527–28 ("[a]t least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so").

Accordingly, *Yee* is a rent control case and inapplicable to the Defendants' taking of the right to possess and exclude.

The Opposition's argument to the contrary is largely based on one particular quote from *Yee*.  In discussing the rent control statute, the Court offered that it "does not convert regulation into the unwanted physical occupation of land.  Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals."  *Id.* at 531.  The Defendants and Intervenor use that language to assert that

**ZACKS, FREEDMAN & PATTERSON, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1  because property owners voluntarily rented to tenants, they are foreclosed from asserting a physical

2  takings claim.

3       The fault in this argument lies in the separation of the quote from the context.

4       Besides limiting the amount of rent that could be charged, the statute also precluded a

5  property owner from disapproving of a mobile home tenant so long as the tenant had the ability to

6  pay the rent.  *Id.* at 524.  The owners complained that this improperly deprived them of the right to

7  choose their tenants.

8       But the statutory distinction between this case and *Yee* is that Escondido's rent-control

9  ordinance left the owners with their right to evict tenants who failed to make rent, defaulted, or

10  otherwise violated the contractual terms.  *Id.* at 524, 527–28.  Nor did the owners allege that they

11  had any cause for eviction or that they wished to withdraw their property from the rental business

12  altogether.

13       A hypothetical shows the deficiency in the owners' claim.  Assume that Potential Tenant A

14  is a lease abiding, rent paying tenant.  And that Potential Tenant B is also a lease abiding, rent paying

15  tenant.  And that the owner wishes to remain in the rental business and will rent to one of them.

16       An ordinance that requires the owner to rent to Tenant A, because Tenant A was there first,

17  is not a physical taking.  When the property is going to be rented regardless, and when the owner

18  retains the right to possess and to exclude should that tenant ever violate the lease or the law, an

19  ordinance directed only at the choice of tenant does not facially implicate the right to possess.  This

20  was the context in which the Court stated, "because they voluntarily open their property to

21  occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability

22  to exclude particular individuals."  *Id.* at 531.

23       But in the context of this case—where property owners have been affirmatively stripped of

24  the right to possess and exclude and are forced to submit to a tenant's possession regardless of the

25  owner's consent to continue renting, the expiration of the lease, or the tenant's compliance with the

26  lease or the law—the above quote from *Yee* is inapplicable.

27       On a similar basis, the Defendants' and Intervenor's references to *Florida Power* and

28  *Ballinger* are unavailing.  *Florida Power* was also a rent control case.  There, certain utility

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

companies voluntarily leased space on their poles to cable companies.  *F.C.C. v. Fla. Power Corp.*, 480 U.S. at 247.  The terms of the agreement were typical of such arrangements.  *Id.*  However, to prevent overcharging due to the utility companies' monopoly on utility poles, the Federal Communications Commission established rent controls.  *Id.* at 247–48.  The Court held that these rent control regulations were not a taking.  *Id.* at 250–51.

As applicable here, the utility companies were free to divest themselves of the cable companies' use of their utility poles.  "For, while the statute we considered in *Loretto* specifically *required* landlords to permit permanent occupation of their property by cable companies, nothing in the Pole Attachments Act . . . gives cable companies any right to occupy space on utility poles or prohibits utility companies from refusing to enter into attachment agreements with cable operators."  *Id.* at 251.

Yet had forced physical occupation been required by law, the outcome may have been different.  *Id.* at 252 n.6  ("We do not decide today what the application of [*Loretto*] would be if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements.").

In *Ballinger*, the central issue was not the taking of real property, but the taking of money.  Eviction was not precluded, nor were the owners prevented from taking possession of the real property that they owned.  Rather, the dispute pertained to a local statute that requires an owner to pay certain relocation expenses to a tenant before the owner could move back into their home.  *Ballinger v. City of Oakland*, 24 F.4th 1287, 1290–91 (9th Cir. 2022), *cert. denied sub nom. Ballinger v. City of Oakland, California*, 142 S. Ct. 2777 (2022).  The court of appeals held that this "transaction cost" was a permissible regulation of this owner-tenant relationship.  *Id.* at 1293.  The owners did not have taken "a specific and identifiable pool of money," *id.* at 1294, but instead were required to pay what was akin to a tax or a user fee.  *Id.* at 1296.

But what *Ballinger* did note was that the owners "voluntarily chose to lease their property and to evict under the Ordinance—conduct that required them to pay the relocation fee, which they would not be compelled to pay if they continued to rent their property. 'A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his

property or to refrain in perpetuity from terminating a tenancy.'" *Id.* at 1293–94 (quoting *Yee*, 503 U.S. at 528).

### 2.   The Other Arguments in Opposition Are Unpersuasive.

The Defendants and Intervenor contend that the eviction regulations pertain to tenants, but not squatters.  That is not necessarily the case.  If a tenant allows an unauthorized third-party to take residence, that third-party can be considered an illegal squatter.  So, too, can a tenant that refuses to pay rent.  But regardless of how the occupants are classified, the result remains a physical taking with respect to rental properties.  No matter which group of third parties the Governments grant access, it is still a physical invasion.  In *Cedar Point*, the physical taking only pertained to union organizers and only for certain time periods.  *Cedar Point Nursery*, 141 S. Ct. at 2069.   In *Loretto*, the physical taking was respect to a cable from a cable company.  *Loretto*, 458 U.S. at 421–22.  And in *Causby*, the physical invasion was by military aircraft.  *United States v. Causby*, 328 U.S. 256, 258 (1946).  For each of these matters, the owner maintained the right to exclude for all but that one specific group.  Nevertheless, so long as "the government has physically taken property for itself or someone else," "a per se taking has occurred."  *Cedar Point Nursery*, 141 S. Ct. at 2072.

The Defendants and Intervenor cite to the 1921 *Block* case (*Block v. Hirsh*, 256 U.S. 135 ) and the Intervenor also specifically questioned why the Plaintiffs did not.  This is because when the *Block* case was decided, regulatory takings law had yet to be fully formed and *Block* does not meet the current standard.

*Mahon*, which was issued one year later, is oft credited as the progenitor of our modern jurisprudence with its famous (at least in regulatory takings circles) holding that "the general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  And with respect to the law of regulatory takings, *Mahon* explicitly stated that *Block* "fell far short" of what was required:

> We are in danger of forgetting that a strong public desire to improve the public
> condition is not enough to warrant achieving the desire by a shorter cut than the
> constitutional way of paying for the change. As we already have said this is a
> question of degree-and therefore cannot be disposed of by general propositions. But
> we regard this as going beyond any of the cases decided by this Court. The late
> decisions upon laws dealing with the congestion of Washington and New York,

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

caused by the war, dealt with laws intended to meet a temporary emergency and providing for compensation determined to be reasonable by an impartial board. They were to the verge of the law but fell far short of the present act. **Block & Hirsh, 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165**; Marcus Brown Holding Co. v. Feldman, 256 U. S. 170, 41 Sup. Ct. 465, 65 L. Ed. 877; Levy Leasing Co. v. Siegel, 258 U. S. 242, 42 Sup. Ct. 289, 66 L. Ed. 595, March 20, 1922.

*Mahon*, 260 U.S. at 415–16 (emph. add.).

*Block,* besides its shortcomings, is also primarily viewed as a rent control case, not a physical takings case.  *Pennell v. City of San Jose*, 485 U.S. 1, 12 (1988); *Loretto*, 458 U.S. at 440; *Bowles v. Willingham*, 321 U.S. 503, 517 (1944).  Moreover, because the Defendants' regulations continue with no end in sight and no defined parameters for when the Local Emergency will end, this matter is outside of the purview of *Block*.  *Fresh Pond Shopping Ctr., Inc. v. Callahan*, 464 U.S. 875 (1983) (Rehnquist, J., dissenting from dismissal of the appeal) ("It might also be argued that the rent control provisions are justified by the emergency housing shortage in Cambridge, but the very fact that there is no foreseeable end to the emergency takes this case outside the Court's holding in *Block v. Hirsh*.").

Contrary to the assertion of the Defendant County, the fact that rental property owners may be able to retake possession under California's Ellis Act does not obviate the fact that the regulations are a physical taking.  This issue was squarely addressed in *Loretto*.  As the Court stated:

> Appellees raise a series of objections to application of the traditional rule here. Teleprompter notes that the law applies only to buildings used as rental property, and draws the conclusion that the law is simply a permissible regulation of the use of real property. We fail to see, however, why a physical occupation of one type of property but not another type is any less a physical occupation. Insofar as Teleprompter means to suggest that this is not a permanent physical invasion, we must differ. So long as the property remains residential and a CATV company wishes to retain the installation, the landlord must permit it.

*Loretto*, 458 U.S. at 438–39.

The Court continued:

> It is true that the landlord could avoid the requirements of [the regulation] by ceasing to rent the building to tenants. But a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation. Teleprompter's broad "use-dependency" argument proves too much.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices. The right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated.

*Id.* at 439; *Horne*, 576 U.S. at 365 ("The Government contends that the reserve requirement is not a taking because raisin growers voluntarily choose to participate in the raisin market. According to the Government, if raisin growers don't like it, they can 'plant different crops,' or 'sell their raisin-variety grapes as table grapes or for use in juice or wine'…. the Government is wrong as a matter of law…. As [*Loretto*] concluded, property rights cannot be so easily manipulated.").

Intervenor ACCEA argues that a finding in Plaintiffs' favor will negatively affect government's ability to function in the future. *See* Opposition Brief of ACCEA at 19, *et seq.* It is noteworthy that none of the Government Defendants make the same argument.

Nonetheless, ACCEA's concern for laws pertaining to eviction notice requirements is unfounded. A reasonable notice requirement prior to eviction is not a physical taking. Nor is it analogous to what is happening here. The Defendants' eviction regulations do not delay evictions for a reasonable and defined period; they preclude evictions for an indefinite and unknown timespan, and at the sole discretion of the Defendants. Therein lies the difference.

Nor would a finding for Plaintiffs impact the Governments' ability to respond to an emergency. The Governments retain that power, as any government always will. The Plaintiffs' position is simply that when the use of governmental power results in the taking of private property without just compensation, it is obligated to pay. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ("As its text makes plain, the Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.' In other words, it 'is designed not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.'"). In this way, "[t]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public

burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Therefore, as the Court poignantly stated in *Arkansas Game & Fish*,

> The slippery slope argument, we note, is hardly novel or unique to flooding cases. Time and again in Takings Clause cases, the Court has heard the prophecy that recognizing a just compensation claim would unduly impede the government's ability to act in the public interest. *Causby*, 328 U.S., at 275, 66 S.Ct. 1062 (Black, J., dissenting); *Loretto*, 458 U.S., at 455, 102 S.Ct. 3164 (Blackmun, J., dissenting). We have rejected this argument when deployed to urge blanket exemptions from the Fifth Amendment's instruction. While we recognize the importance of the public interests the Government advances in this case, we do not see them as categorically different from the interests at stake in myriad other Takings Clause cases. The sky did not fall after *Causby*, and today's modest decision augurs no deluge of takings liability.

*Ark. Game & Fish Comm'n*, 568 U.S. at 36–37.

Lastly, ACCEA misunderstands why the impact on rental property owners as a class is relevant to a facial claim.  *See* Opposition Brief of ACCEA at 17, *et seq.*  It has nothing to do with *Penn Central*. Rather, the quintessence of a takings claim is that certain property owners are singled out to bear a public burden.  That is exactly what has happened to rental property owners, now a disfavored class in the eyes of the Defendants.  In addition to the loss of the right to possess and exclude, the owner must also pay the mortgage, taxes and utilities and maintain the premises, even if the occupants decline to pay rent or cause damage to the property.  It is not about *Penn Central* but recognizing that property owners are to be protected from shouldering the burden of public benefits.  *Armstrong*, 364 U.S. at 49.

### 3.  The Regulations are Facially Unconstitutional.

The Defendants and Intervenor err in asserting that the eviction prohibitions are not facially unconstitutional.

A regulation is facially unconstitutional under the Fifth Amendment if it transfers a property right from property owners to the Government without a provision for the payment of just compensation. *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1119 (9th Cir. 2010) ("[I]n the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

of the property or has effected a transfer of a property interest.") (quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993)).

Starting with the obvious, the Defendants' regulations have no provision for just compensation.

And with respect to the first part of the analysis, the right to possess and exclude vested in Defendants for all rental properties upon the enactment of the Defendants' regulations. The transfer of ownership and control were self-executing. Apart from the regulations' enaction, nothing was else required.

Tantamount to an easement (or tenancy in common), the regulations endowed the Defendants with control over who may possess rental property and who may be excluded from it. Conversely, the property owner's consent, the lease, and the law of unlawful detainer, are now irrelevant.

For example, if tomorrow a homeowner decides to live elsewhere and rent his or her home, the instant that the property is rented the Defendants control the duration and circumstances under which the tenant can retain possession. And the Defendants' regulations supersede the lease, any local law to the contrary, and the owner's consent. In order for this to happen, no documents or notices need to be filed and no action is required by the Defendant Governments, the owner, or the renter. The Defendants' control was self-executing and automatically attached to the property.

Thus, the Government has taken a self-executing easement in every current and future rental property, granting Defendants instantaneous control over how long a tenant can possess and under what circumstances the occupant can be excluded. This easement applies to every rental property in the Defendants' jurisdictions regardless of any individual facts and circumstances. And rental property owners are forced to succumb to a tenant's occupation on the Defendants' terms and conditions. *Fla. Power Corp.*, 480 U.S. at 252 ("This element of required acquiescence is at the heart of the concept of occupation.").

No rental properties are excepted. Not even other government entities are spared. *See* Docket No. 66, Plaintiffs' Request for Judicial Notice (*City of Alameda v. Superior Court of the State of California, For the County of Alameda*, Court of Appeal of the State of California, First Appellate District, Case No. A165610 (July 14, 2022), wherein the City of Alameda, an owner of

Zacks, Freedman & Patterson, PC
1970 Broadway, Suite 1270
Oakland, CA 94612

residential properties, seeks relief from the Defendant County's eviction moratorium which prevents the City from evicting certain non-paying tenants).

The Defendants' eviction regulations are mutable. Reflecting the vested ownership of the right to possess and exclude, Defendants can unilaterally change the terms and conditions on which tenants can possess rental property. At present, and for the foreseeable future, the Defendants grant possession to all tenants, for an indefinite period of time, irrespective of whether they are still paying rent or otherwise abiding by the lease. To the extent that this grant of possession and exclusion changes in the future, it will only be because the Defendants, as the owners of this fundamental property right, have decided to do so. *See* Cal. Civ. Code § 654 ("The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property."); *see also Horne,* 576 U.S. at 362 ("The Government's actual taking of possession and control of the reserve raisins gives rise to a taking as clearly as if the Government held full title and ownership, as it essentially does.") (cleaned up*); Gen. Motors Corp.*, 323 U.S. at 378 ("When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership.").

The fact that the Defendants' regulations impact only rental properties, as opposed to every type of property that exists, does not negate it from being facially unconstitutional. It need only impact the affected class of properties. *See* Brief in Opposition of COUNTY, at 28 (Plaintiffs "must show that it takes all residential rental property"); *Loretto*, 458 U.S. at 439 ("[w]e fail to see, however, why a physical occupation of one type of property but not another type is any less a physical occupation.").

Nor must the regulation take the entirety of the owner's right to possess; but, rather, just a portion of it. *See Cedar Point Nursery*, 141 S. Ct. at 2069 (a physical taking granting possession only to union organizers and only for certain time periods); *Loretto*, 458 U.S. at 421–22 (a physical taking only with respect to cable companies); *Causby*, 328 U.S. at 258 (a physical taking only with respect to miliary aircraft); *see also Horne*, 576 U.S. at 363 ("The fact that the growers retain a contingent interest of indeterminate value does not mean there has been no physical taking,

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

particularly since the value of the interest depends on the discretion of the taker, and may be worthless, as it was for one of the two years at issue here.").

The physical taking also need not be continuous. *Cedar Point Nursery*, 141 S. Ct. at 2075 ("[W]e have recognized that physical invasions constitute takings even if they are intermittent as opposed to continuous. *Causby* held that overflights of private property effected a taking, even though they occurred on only 4% of takeoffs and 7% of landings at the nearby airport. And while *Nollan* happened to involve a legally continuous right of access, we have no doubt that the Court would have reached the same conclusion if the easement demanded by the Commission had lasted for only 364 days per year. After all, the easement was hardly continuous as a practical matter.") (citations omitted).

As a final note, whether a regulation is facially unconstitutional is about the taking of a property right, not the exercise of it. *See Cedar Point Nursery*, 141 S. Ct. at 2075 ("As Justice Brennan observed in dissent [*in Nollan*], given the shifting tides, 'public passage for a portion of the year would either be impossible or would not occur on [the Nollans'] property.' What matters is not that the easement notionally ran round the clock, but that the government had taken a right to physically invade the Nollans' land. And when the government physically takes an interest in property, it must pay for the right to do so. The fact that a right to take access is exercised only from time to time does not make it any less a physical taking.") (citations omitted).

It is irrelevant whether rental property owners have a specific need or desire to take possession and exclude tenants. Regardless of what they want, they can't—as you cannot exercise a right that you do not own. Here, regardless of the individual circumstances, the property owner does not own the right to possess and exclude. That right is now owned and controlled by Defendants.

Whether or not a specific owner would have exercised the right to possess and exclude under any particular facts and circumstances—had the owner still owned that right—only implicates the measure of damages for the property right taken, not whether the property right was taken in the first place.

Considering the above, the arguments in Opposition by the Defendants and Intervenor are unpersuasive and inapplicable to the determination of whether these eviction regulations are a facial physical taking.

*Yee* has no relevance here.  The signing of a lease did not insulate the Defendants from the consequences of taking fundamental property rights.  Nor does the alleged temporary nature of the Defendants' regulations preclude them from being facially unconstitutional.  As discussed above, a temporary physical taking and a permanent physical taking are both still takings.  If a wayward local government were to pass a law stating that it could take possession of any private property it wanted, for any reason it wanted, for free, it would be facially unconstitutional whether that law lasted a year or a single day.

The Defendants' regulations are self-executing and immediately vested in the Defendants the fundamental property right to possess and exclude for all rental property, now and in the future. And as the Defendants' regulations do not provide for just compensation, they are facially unconstitutional and contrary to the Fifth Amendment.

**B.  Defendants' Eviction Moratoria Are Preempted by the Acts and California Law.**

In opposition to Plaintiffs' preemption argument, Defendants assert that "the Acts expressly recognize that local governments regulate landlord-tenant relationships and will enact such local regulation in response to COVID-19."  Brief in Opposition of COUNTY p. 42.  This generalized proclamation is true, as far as it goes.  However, the Acts do not permit local governments to enact regulations in contradiction to those laws, which has occurred here.

As Defendants concede, the Acts only permit local government to enact or amend ordinances that require "just cause for termination of a residential tenancy, ***consistent with*** subdivision (g) of Section 1946.2 . . . ."  Cal. Code of Civ. Proc. § 1179.05(b) (emph. add.).  In support of their argument that the Moratoria are allegedly consistent with Cal. Civ. Code section 1946.2 ("§ 1946.2"), Defendants rely on AB 1482, a 2019 bill that enacted statewide rent control and the just cause for eviction protections under § 1946.2.  Docket No. 72 at Exhibits D & E.  But AB 1482 in fact supports Plaintiffs, not Defendants.  The express purpose of that bill was to prevent landlords "from dramatically raising their tenants' rent," and to "strike a ***reasonable balance*** for landlords in cases

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

where they must evict a tenant," by providing a statewide baseline for these matters.  Docket No. 72 at Exhibits D p. 2 & E p. 6 (emph. add.).  The author further opined that the bill protected tenants "***without diminishing property owners' ability to make a fair return on their investment or placing an undue burden on their ability to manage their property***."  Docket No. 72 at Exhibit D p. 3 (emph. add.).  Thus, to ensure that this statewide rent control and "just cause" baseline was met, the authors of AB 1482 determined that local ordinances that were "at least as protective of tenants as the bill" were not preempted by that law.

The authors of AB 1482 did not contemplate, and could not have contemplated, that the next year, Alameda COUNTY and the CITY of Oakland would enact Moratoria banning virtually all just cause reasons for evictions, and keep that ban in place for more than two years (and—as recently confirmed by the Alameda Board of Supervisors—indefinitely).  Docket No. 69 at Exhibit V.  The authors of AB 1482 did not contemplate, and could not have contemplated, that Alameda COUNTY and the CITY of Oakland would permit nonpaying renters, breaching renters, and renters who reside in units that housing providers seek to occupy as their own, to occupy housing providers properties for an indefinite period without housing providers' consent.  This action thwarts the Legislature's intent to protect tenants "***without*** diminishing property owners' ability to make a fair return on their investment or placing an undue burden on their ability to manage their property."  Docket No. 72 at Exhibit D p. 3.

In short, Defendants are incorrect that the Legislature's purpose in limiting evictions via § 1946.2, by requiring a "just cause" basis, equates to tacit approval of banning all just causes with an extremely limited exception, as the Moratoria has done here.  *Also see* Cal. Code of Civ. Proc. § 1946.2(g)(1)(B)(ii) [local ordinances' additional tenant protections may not be "prohibited by any other provision of law"].  The eviction regulations interfere with the "reasonable balance" contemplated by the Legislature in enacting § 1946.2 via AB 1482, by expressly conflicting with the

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

purpose and intent of that law, and as subsequently incorporated by the Acts.[1]  Cal. Code of Civ. Proc. § 1179.05(b).

Further, the Acts' express purpose "is to protect individuals negatively impacted by the COVID-19 pandemic."  Cal. Code of Civ. Proc. § 1179.05(f).  Thus, the Acts set forth a statewide scheme to protect housing providers from the unquestionable harm inflicted by the nonpaying tenants allegedly affected by Covid-19.  As explained by the Legislature:

> At their core, those [Acts'] policies now consist of two components: (1) legal protections against eviction for nonpayment of rent; and (2) an emergency rental assistance program (ERAP) to compensate landlords for that unpaid rent. Since October 2021, these two components have been linked: landlords may proceed to evict tenants who have failed to pay rent, but only after properly demonstrating to the court that they unsuccessfully attempted to obtain emergency rental assistance to cover the debt owed to them.

Docket No. 72 at Exhibit C p. 1.  The Moratoria's reach goes *far* beyond protecting individuals negatively impacted by the pandemic.  Indeed, the Moratoria is completely untethered to Covid-19 and the emergency that it caused.  Renters and occupants in the CITY and COUNTY need not show *any* Covid-19 related financial distress to qualify for protection from eviction.  Moreover, in conflict with California law, those individuals that might qualify for protection need not participate in any rent relief program to avoid eviction for nonpayment under the Moratoria.  Docket No. 62 Exhibits E pp. 4-5 and H [ACCO § 6.120.030].  The Moratoria also protect non-Covid-19 affected renters and occupants from eviction even when they damage, and commit nuisances on, housing providers' properties.  *Ibid.*

And contrary to Defendants, the Covid-19 evictions controls are a "statewide concern," as expressly provided by the Acts.  That the legislative statement is made in the context of applying the Acts to charter cities, only amplifies this point; the "home rule" of charter cities only prevails over state law when that issue is a municipal concern.  *See e.g.*, *City of El Centro v. Lanier*, 245

---

[1] Simply because the COUNTY placed their moratorium in the text of Alameda's health and safety administrative code, rather than in another section (the COUNTY doesn't even have a rent control ordinance), does not mean they can avoid the Acts' preemptive effect—neither do they cite any authority that would support this specious claim.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1   Cal.App.4th 1494, 1501 (2016).  If it is a statewide concern, as the Covid-19 eviction controls

2   expressly are here, the "home rule" does not apply, and the state law controls over the local law.

3   *Ibid.*

4       Defendants additionally argue that eviction controls need not be regulated with "statewide

5   uniformity," citing *Roble Vista Associates v. Bacon,* 97 Cal.App.4th 335 (2002).  First, Plaintiffs

6   have not and do not argue that such controls must be "uniform" statewide.  Instead, Plaintiffs'

7   position is that the adverse effect of the Moratoria "on the transient citizens of the state outweighs

8   the possible benefit to the locality."  *Sherwin–Williams Co. v. City of Los Angeles,* 4 Cal.4th 893,

9   898 (1993).  As explained in Plaintiffs' opening papers, the Moratoria penalize and damage housing

10   providers throughout the state that own rental properties in the CITY and COUNTY.  Defendants

11   do not provide any viable justification for why Oakland and Alameda County require such onerous

12   measures to control Covid-19, as opposed to other urban areas of the state (where no such controls

13   exist).

14       Governor Newsom recently confirmed through his June 2022 Executive Order that

15   conditions related to the pandemic have vastly improved, rolling back even further prior Covid-19

16   Executive Orders, and essentially leaving testing, vaccination, and support for hospitals as priorities

17   in California's SMARTER Plan.[2]  Docket No. 72 at Exhibit H.  The damage done to the transient

18   citizens of California via the Moratoria's crushing burden on the state's housing providers (including

19   those in the COUNTY and the CITY) therefore heavily outweighs any benefit to Defendants.

20       Second, the local ordinance in *Roble Vista Associates* was not preempted by state law

21   because it governed terms of leases and there was no state statute that governed that same subject

22   matter.  *Roble Vista Associates,* Cal.App.4th at 341-343.  Thus, the Court held it was neither

23   expressly nor impliedly preempted.  *Ibid.*  Here, in stark contrast, there is a state statute scheme

24   specifically regulating eviction controls.  "The [implied preemption] test is the breadth of the area

25   which the Legislature sought to preempt by its own comprehensive scheme of regulation" and local

26   regulation may be preempted when it "changes the statewide chronology to suit its own agenda."

27

28     [2]  https://www.gov.ca.gov/2022/06/17/governor-newsom-continues-to-roll-back-covid-19-executive-orders/

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

*Tri Cnty. Apartment Assn. v. City of Mountain View*, 196 Cal.App.3d 1283, 1296 (1987) (inter. quot. omit.).  As detailed above, the eviction regulations conflict with the California Legislature's intent to strike a careful balance between protecting housing providers and renters alike, "to suit [Defendants'] own agenda."  *Ibid.*

Defendants next claim that the Acts' section expressly preempting certain categories of ordinances based on dates of enactment, means that the Moratoria cannot be impliedly preempted.  *See e.g.,* Cal. Code of Civ. Proc. § 1179.05(a)(1).  But they gloss over the fact that the Acts that also expressly state that local ordinances *must* be consistent with § 1946.2.  Cal. Civ. Code § 1179.05(b).  As explained above, the Moratoria are not.  Moreover, the cases Defendants rely upon support Plaintiffs, not Defendants.  For example, in *Big Creek Lumber Co. v. Cty. of Santa Cruz,* 38 Cal.4th 1139 (2006) ("*Big Creek Lumber*") the Court confirmed that: "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme." *Big Creek Lumber,* 38 Cal.4th at 1157 (intern. quot. omit).  Here, the eviction regulations plainly conflict with that legislative scheme by upsetting the balance the Legislature intended to create through §1946.2 and the Acts' incorporation of that section.

Defendants' reliance on a Los Angeles Superior Court's Appellate Division case, *Arche v. Scallion*, No. 21LBUD00480, at *4-7 (Cal. Super. Ct., App. Div., Aug. 1, 2022), is also unavailing.  That case only focused on whether a local ordinance that temporarily prohibited "no fault" evictions was preempted by the Acts—the focus was *not* on all evictions, for an indefinite period of time, like here.  (More importantly, that appellate division case is not binding on this Court or any Court other than the Los Angeles County trial courts.)  The other cases Defendants cite are similarly distinguishable; they do not discuss the preemptive effect of local government banning virtually all evictions for more than two years, with no end in sight based on an emergency where the regulations extend far beyond the current state of that emergency.  *See e.g.* Brief in Opposition of COUNTY pp. 42, citing *Apartment Ass'n of Los Angeles Cnty, Inc. v. City of Los Angeles*, 10 F.4th 905 (2021) [contracts clause analysis only]; *Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 152 (1976) [local requirement that a landlord obtain a "certificate of eviction" preempted by unlawful detainer statutes]; *People ex rel. Deukmejian v. County of Mendocino*, 36 Cal.3d 476 (1984) [analysis of

whether local regulation of aerial application of herbicides was preempted]; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644 [local regulation did not conflict with state statute simply because it imposed restraints that state statute did not].

And these cases certainly do not support the extension of local authority that has occurred here. For example, *Birkenfeld* only addressed elimination of grounds for eviction for those tenants who were "**in good standing.**" *Birkenfeld,* 17 Cal.3d at 136, 148, 152 (emph. add.). When the Court in *Birkenfeld* made this distinction, it confirmed that the Berkeley rent ordinance contained "most if not all of the grounds [for eviction] **that would otherwise be available** . . . ." *Birkenfeld,* 17 Cal.3d at 148 (emph. add.). That is, if the tenant remained in good standing, there was no substantive basis to evict. Under the Moratoria, this rationale no longer applies. Removing all just causes from eviction but for a narrow exception is neither permitted nor contemplated by any of Defendants' case law.

Finally, the COUNTY claims that it complied with § 1946.2(g)'s requirement that "[t]he local government has made a binding finding within their local ordinance that the ordinance is more protective than the provisions of this section" through a generalized, cursory statement in its eviction regulations. Brief in Opposition of COUNTY pp. 43-44. This statement falls short of the requirement under § 1946.2, and the COUNTY's reliance on *Arche*, 2022 WL 3650703, at *4-5 does not save it from complying with this subdivision. The local government in *Arche* made express findings during its legislative enactment of the ordinance at issue that it was more protective than § 1946.2. *Arche*, 2022 WL 3650703, at *4-5. Thus, the Court in *Arche* held that these findings were implied in the actual ordinance. *Ibid.* Here, the COUNTY fails to point to any such findings—either in the legislative process or the actual language of its eviction regulations. Thus, § 1946.2 controls over the COUNTY's regulations for this additional reason. Code of Civ. Proc. § 1946.2(g)(1)(B).

In sum, the Moratoria's ban on virtually all evictions—for cause and not for cause—expressly and impliedly conflict with Acts' requirement that a local ordinance be consistent with § 1946.2 and its careful scheme set forth to balance the potential harm to housing providers because of their renters'

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1  nonpayment of rent.[3]  It is therefore not "reasonably possible to comply with both the state and local

2  laws."  The Court should therefore find the Moratoria preempted.  *American Financial Services Ass'n*

3  *v. City of Oakland*, 34 Cal.4th 1239 (2005); *also see Larson v. CCSF*, 192 Cal.App.4th 1263, 1280

4  (2002).

5    **C. The Moratoria Violate the California Election Code.**

6    **1.  The COUNTY is Incorrect that its Moratorium Did Not "Amend" the CITY's Just**
7    **Cause for Eviction Ordinance.**

8          In claiming that its eviction regulations did not amend the CITY's Just Cause for Eviction

9  Ordinance, the COUNTY asserts it had the police power to enact its moratorium under the Emergency

10  Services Act ("ESA").  But the COUNTY's emergency powers under the ESA require the COUNTY

11  to terminate the local emergency "at the earliest possible date that conditions warrant."  Cal. Gov.

12  Code § 8690.  The COUNTY has refused to do so—even though it admits conditions related to the

13  pandemic have vastly improved.  Docket No. 62 Exhibits J ¶ 48 and K ¶ 48; *In re Juan* C. (1994) 28

14  Cal.App.4th 1093, 1101 [finding local curfew imposed under ESA constitutional because it was

15  imposed "only so long as an emergency exists"]; *also see* Docket No. 72 at Exhibit H [Executive

16  order describing California's SMARTER plan, and rolling back even further protections related to

17  Covid-19.].

18          Further, the COUNTY's police power under the ESA or otherwise does not permit it to regulate

19  in conflict with state law.  Cal. Const., art. XI, § 7. *Birkenfeld,* 17 Cal.3d at 140.

20          Emergency does not create power. Emergency does not increase granted power or
21          remove or diminish the restrictions imposed upon power granted or reserved ....
           What power was thus granted and what limitations were thus imposed are questions
22          which have always been, and always will be, the subject of close examination under
           our constitutional system.

23  *Home Bldg. & Loan Ass 'n v. Blaisdell* 290 U.S. 398, 425-26 (1934).  The COUNTY has unlawfully

24  eviscerated the voters' Just Cause for Eviction Ordinance on the basis of a 2020 emergency, which

25

26  ─────────────────

27  [3] The County's repeated reference to non-payment evictions covered by Alameda County Code
   section 6.120.040 are misleading. This section has no affect during the County's blanket
28  moratorium under section 6.120.030, which prohibits evictions for nonpayment all together.
   Docket No. 62 Exhibit H.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

no longer resembles the current state of affairs.  Docket No. 62 Exhibits J ¶ 48 and K ¶ 48; Docket No. 72 at Exhibit H.

The COUNTY is incorrect in claiming that state election law does not apply to it.  *DeVita v. Cnty. of Napa,* 9 Cal.4th 763, 789 (1995) [Because of the presumption in favor of the right of initiative, "restrictions on the right are not read into the statutes."]; Cal. Elec. Code §§ 9125, 9217. Courts are bound to liberally construe the voters' rights under the state Election Code, because these are "one of the most precious rights of our democratic process." *Associated Home Builders etc., Inc. v. City of Livermore*, 18 Cal.3d 582, 591 (1976).

The COUNTY separately argues that its moratorium "doesn't purport to amend" the CITY'S Just Cause for Eviction Ordinance.  But neither is this inquiry as literal as the COUNTY would have it.  "One does not determine whether an act amends existing law solely by the title, or by statements in the new act that it amends existing law. Rather, one must examine and compare the provisions of the new law with existing law." *Mobilepark W. Homeowners Assn. v. Escondido Mobilepark W.,* 35 Cal.App.4th 32, 40 (1995).  The County's ongoing and indefinite ban on virtually all evictions plainly prohibits any housing provider in the CITY from evicting a renter for just cause under OMC § 8.22.360, and therefore violates rights created by that ordinance and state election law.

### 2.   The CITY Ignores the Narrow Scope of the COUNCIL's Permissible Amendment.

While the CITY claims its moratorium lawfully amended its Just Cause for Eviction Ordinance within the permissible scope, it fails to address the narrow description of that scope.  As indicated by the CITY's legal counsel, acceptable types of eviction limitations imposed by the COUNCIL are things such as "providing proper notice," and mandating compliance with other such "rules and standards."  Docket No. 62 at Exhibit M.  The CITY's moratorium far surpasses what the voters could possibly have contemplated by striking its Just Cause for Eviction Ordinance altogether.

The Court should therefore find the Moratoria unlawfully amends a voter enacted initiative ordinance and is therefore void on this basis.  The Court should issue a writ and declaration ordering the same.

//

**D. Plaintiffs Assert Constitutional Property Interests in the Due Process Context and the Moratoria's Absolute Defense to Virtually All Evictions Unlawfully Allows Renters to be Judges in Their Own Case.**

Defendants' attempt to distinguish this case from *Chrysafis v. Marks*, 141 S.Ct. 2482 (2021) ("*Chrysafis*") is unpersuasive.  First, Plaintiffs have not "voluntarily ceded" their property and rights attendant thereto to renters, as explained above in section A.  Indeed, the Supreme Court's holding in *Chrysafis* directly contradicts this contention.  Second, the CITY's claim that Plaintiffs and housing providers do not have a protected property interest in their real property, or the rents they receive for that property, is absurd.  The CITY's case for this position, *Fed. Home Loan Mortg. Corp. v. SFR Invs. Pool 1, LLC*, 893 F.3d 1136, 1147 (9th Cir. 2018), is not on point.  *Fed. Home Loan Mortg. Corp.* involved a claimed property interest in purchasing foreclosed properties at these sales "with free and clear title" pursuant to a state statute that allegedly required so.  Rejecting that argument, the Court held that not only did that state statute *not* require a purchaser receive free and clear title, but that statute was preempted by federal law.  Thus, there was no protected property interest at stake.

Here, Plaintiffs and housing providers throughout the CITY and COUNTY already own their properties, and rented them in reliance on the right to continue receiving rents prior to the Moratoria's enactment.[4]  Both rental income and real property are undisputedly protected property interests in the due process context, and Defendants make no effort to distinguish Plaintiffs' authority, which is directly on point:

> The Government does not, and could not, dispute that the seizure of [defendant's] home and 4-acre parcel deprived him of property interests protected by the Due Process Clause . . . .
> [T]he seizure of his home deprived [defendant] of valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents. All that the seizure left him, by the Government's own submission, was the right to bring a claim for the return of title at some unscheduled future hearing . . . .

---

[4] A housing provider's right to rent is central to the landlord-tenant relationship. *Meyer v. Parobek* 119 Cal.App.2d 509, 513 (1953); *San Jose Parking, Inc. v. Superior Court*, 110 Cal.App.4th 1321, 1328, *as modified on denial of reh'g* (Aug. 28, 2003) ["fundamental attribute of a lease" is "the payment of rent"].

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

> The constitutional limitations we enforce in this case apply to real property in general, not simply to residences . . .

*U.S. v. James Daniel Good Real Prop.*, 510 U.S. 43, 49, 54-55, 61 (1993).

The Moratoria deprive Plaintiffs and housing providers of these protected property rights without due process by giving renters an "absolute defense" to virtually all eviction proceedings—for any reason that renter decides at all. And contrary to Defendants, this is a far cry from the "temporary" deprivation described in the Connecticut District Court case *Auracle Homes, LLC v. Lamont*, 478 F.Supp.3d 199 (D. Conn. 2020). The eviction moratorium analyzed in *Auracle Homes, LLC* was in place for six months, from March 2020 to August 2020. *Auracle Homes, LLC,* 478 F. Supp. 3d at 227 ["the Executive Orders only delay Plaintiffs' ability to initiate evictions . . . ."]; *also see Farhoud v. Brown*, No. 3:20-CV-2226-JR, 2022 WL 326092, at *12 (D. Or. Feb. 3, 2022) [describing eviction controls as only causing "delay"].

Here, we are now approaching 2023, and despite the pandemic now being considered endemic, the COUNTY'S Board of Supervisors recently refused to ***even consider*** revising or repealing its moratorium. *See* Docket Nos. 66 and 69. The logical inference of the Board's refusal to reconsider the scope of its moratorium is that it is indefinite. The CITY has also refused to consider modifying its moratorium. That is, the Moratoria will only end at the political whims of the administrative bodies that control them. In short—the Moratoria are not temporary and they do not just "delay" Plaintiffs and housing providers rights; they have been in place for over two years, and there is no end in sight. *Auracle Homes, LLC,* 478 F. Supp. 3d at 227 [distinguishing a moratorium that might "eradicate all future opportunity for Plaintiffs to pursue evictions"].

Next, Defendants claim the Moratoria will not "create[] any risk of erroneous deprivation" of the property interests. This is incorrect. As detailed in Plaintiffs' opening papers, the Moratoria's "absolute defense" to virtually all evictions unlawfully permits renters to be the "judge" in their own case, and housing providers are left without any judicial mechanism to challenge that determination. *Also see* Docket No. 66 at Exhibit U. Defendants' attempt to distinguish *Chrysafis* from this case, by claiming the Moratoria's "absolute defense" is substantively different from *Chrysafis'* "irrebuttable presumption" similarly fails. In all cases where housing providers seek to evict—for nonpayment, nuisance, or otherwise—they are barred from any process; the renter is given the sole

authority to control this process.  That result is an erroneous deprivation of procedural due process as a matter of law, because the Moratoria "are shaped by the risk of error inherent in the truth-finding process . . . ."  *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976); *also see Chrysafis v. Marks*, 141 S. Ct. 2482 (2021).

Finally, Defendants' alternatively claim that Plaintiffs do not have a right to challenge the Moratoria on due process grounds on the basis that the Moratoria affects a "large" area.  This also fails under *Chrysafis*; the enjoined eviction controls in that case affected the entire state of New York.  *Chrysafis*, 141 S.Ct. at 2482 [citing *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53, confirming that controls at issue were enjoined on the basis that "due process generally requires a hearing"].  Defendants' cases for this point are distinguishable because Plaintiffs do not challenge "the process by which" the Moratoria were reached; they challenge the substance of the Moratoria themselves.  *See* Briefs in Opposition of Defendants and Intervenor, citing *Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1260 (9th Cir. 1995) [plaintiffs challenged process by which decision was reached, not the substance of the decision itself]; *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 970 (9th Cir. 2003) [same]; *Sierra Lake Rsrv. v. City of Rocklin*, 938 F.2d 951, 957 (9th Cir. 1991) [same]; *Aiuto v. San Francisco's Mayor's Off. of Hous.*, No. C 09-2093 CW, 2010 WL 1532319, at *8 (N.D. Cal. Apr. 16, 2010) [same]; *Best Supplement Guide, LLC v. Newsom*, No. 20-17362, 2022 WL 2703404, at *2 (9th Cir. July 12, 2022) [same].[5]

The Moratoria deprive housing providers of a hearing for virtually any type of eviction, in violation of their due process.  The Court should therefore enjoin the Moratoria.  *Chrysafis,* 141 S. Ct. at 2482.

## III.    CONCLUSION

Pursuant to the above, the Court should grant this motion and (1) issue a declaration finding the Moratoria are an unconstitutional physical takings and/or a violation of procedural due process, and allow Defendants the opportunity to rescind the Moratoria to mitigate their damages; (2) preliminary or permanently enjoin the Moratoria as violations of procedural due process; and/or (3)

---

[5] Defendants' reliance on *Block* is also not on point, as is detailed above in section A.

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

issue an order and writ of mandate under Cal. Civ. Proc. Code § 1085 finding the Moratoria inconsistent with, and in violation of, California law.

Dated:     September 13, 2022     ZACKS, FREEDMAN & PATTERSON, PC

   _/s/  Andrew M. Zacks_____
ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS, FREEDMAN & PATTERSON, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION

   _/s/ Jonathan M. Houghton_____
PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)*
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)*
SAM SPIEGELMAN (N.Y. Bar No. 5573100)*
255 South King Street, Suite 800
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org
SSpiegelman@pacificlegal.org

* Pro hac vice

Attorneys for Plaintiffs and Petitioners
JOHN WILLIAMS
ROBERT VOGEL
SHEANNA ROGERS
MICHAEL LOEB
JACQUELINE WATSON-BAKER
HOUSING PROVIDERS OF AMERICA

ZACKS, FREEDMAN & PATTERSON, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**PROOF OF SERVICE**

United States District Court—Northern District of California- Case No.: 3:22-cv-01274-LB

I, Angelica Nguyen, declare that:

I am employed in the County of San Francisco, State of California. I am over the age of 18, and am not a party to this action.  My business address is 601 Montgomery Street, Suite 400, San Francisco, California 94111.

On September 13, 2022, I served:

**PLAINTIFFS' AND PETITIONERS' COMBINED REPLY IN SUPPORT OF RULE 56 MOTION ON BIFURCATED CLAIMS**

in said cause addressed as follows:

| | |
|---|---|
| PACIFIC LEGAL FOUNDATION<br>JONATHAN HOUGHTON (NJ Bar No. 369652021)<br>3100 Clarendon Blvd., Suite 610<br>Arlington, VA 22201<br>BRIAN HODGES (WA Bar No. 31976)<br>SAM SPIEGELMAN (NY Bar No. 5573100)<br>255 South King Street, Suite 800<br>Seattle, WA 98104<br>Email: JHoughton@pacificlegal.org<br>Email: BHodges@pacificlegal.org<br>Email: SSpiegelman@pacificlegal.org<br>*Attorney for John Williams, Robert Vogel, Sheanna Rogers, Michael Loeb, Jacqueline Watson-Baker, Housing Providers of America* | MARC SELTZER<br>KRYSTA K. PACHMAN<br>GLENN C. BRIDGMAN<br>NICHOLAS N. SPEAR<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067-6029<br>Email: mseltzer@susmangodfrey.com<br>Email: kpachman@susmangodfrey.com<br>Email: gbridgman@susmangodfrey.com<br>Email: nspear@susmangodfrey.com<br>*Attorneys for Intervenor-Defendant Alliance of Californians for Community Empowerment Action* |
| MATTHEW D. ZINN<br>EDWARD T. SCHEXNAYDER<br>MINDY K. JIAN<br>SHUTE, MIHALY & WEINBERGER LLP<br>396 Hayes Street<br>San Francisco, CA 94102<br>Email: Zinn@smwlaw.com<br>Email: Schexnayder@smwlaw.com<br>Email: mjian@smwlaw.com<br>*Attorney for Alameda County and Alameda County Board of Supervisors* | BARBARA J. PARKER<br>MARIA BEE<br>CYNTHIA STEIN<br>KACEY READ<br>One Frank H. Ogawa Plaza, 6th Floor<br>Oakland, CA 94612<br>E-Mail: CStein@oaklandcityattorney.org<br>E-Mail: KRead@oaklandcityattorney.org<br>*Attorney for City of Oakland and Oakland City Council* |

**/XX/    (BY ELECTRONIC SERVICE)** Based on a court order or an agreement of the parties to accept electronic service, I caused the said document to be served electronically through the CM/ECS System.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on September 13, 2022 at San Francisco, California.

_____
ANGELICA NGUYEN