ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

(42 U.S.C § 1983; C.C.P § 1085)

**DEMAND FOR JURY TRIAL**

Action Filed: March 1, 2022
Trial Date: None set

1. Plaintiffs and Petitioners (collectively, "Plaintiffs"), hereby bring this first amended and supplemental complaint and petition for relief[1] against Defendants and Respondents ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND and OAKLAND CITY COUNCIL (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratoriums (collectively, "Moratoriums") and subsequent "phase out" regulations, and an order declaring said regulations invalid, illegal, and unenforceable.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative fact, and thus form the same case or controversy under Article III of the United States Constitution.

**DIVISIONAL ASSIGNMENT**

3. Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California and thus should be assigned to the Court's Oakland Division.

**VENUE**

4. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants/respondents reside in this judicial district and the events giving rise to the claims occurred in this district.

**PARTIES**

5. Defendant and Respondent ALAMEDA COUNTY (the "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6. Defendant and Respondent ALAMEDA COUNTY BOARD OF SUPERVISORS

[1] A blacklined comparison of the amended and supplemental complaint with the original complaint is attached hereto.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

(the "BOARD") is a policy making, legislative, and quasi-judicial administrative body of the COUNTY.

7. Defendant and Respondent CITY OF OAKLAND (the "CITY") is a municipal corporation in the State of California.

8. Defendant and Respondent OAKLAND CITY COUNCIL (the "COUNCIL") is a policy making, legislative, and quasi-judicial administrative body of the CITY.

9. Plaintiff JOHN WILLIAMS is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

10. Plaintiff ROBERT VOGEL is an individual over the age of 18 and is a housing provider and owner of real property in the COUNTY.

11. Plaintiff SHEANNA ROGERS is an individual over the age of 18 and is a housing provider and the owner of real property in the COUNTY.

12. Plaintiff MICHAEL LOEB is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

13. Plaintiff JAQUELINE WATSON-BAKER is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

14. Plaintiff HANNAH KIRK is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 4514 Fairbairn Ave, Oakland, CA.

15. Plaintiff AMI SHAH is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

16. Plaintiff AVINASH JHA is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

17. Plaintiff WILLIAM ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

18. Plaintiff MADELEEN ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Summit Street, Oakland CA.

19. Plaintiff NORMAND GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

20. Plaintiff MICHELLE GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

21. Plaintiff and Petitioner HOUSING PROVIDERS OF AMERICA ("HPOA") is a § 501(c)(4) nonprofit corporation. HPOA is a network of housing activists fighting to protect the legal rights of housing providers, including those in the CITY and the COUNTY. HPOA's members own rental housing in and throughout the CITY and the COUNTY, and have been directly and adversely affected by the CITY and COUNTY's residential eviction Moratoriums and the CITY's subsequent "phase out" regulations. All of HPOA's members are housing providers in either the CITY and/or COUNTY; all of HPOA's members have renters at their properties who are taking advantage of the CITY and COUNTY's regulations, including but not limited to, refusing to pay rent for non-Covid-19 related reasons during the time period set forth thereunder, and refusing to relinquish possession, and creating nuisances and damage to HPOA's members' properties. HPOA's members have been unable to collect rent for time periods of months and/or years with no financial relief provided by the CITY and COUNTY, and the CITY and COUNTY's complete defense against virtually all residential evictions for a period of three-plus-years have tied HPOA's members' hands. HPOA's members have suffered lost rents, devalued properties, and some face impending foreclosures and bankruptcies, as a result of the CITY and COUNTY's regulations. The harm and injury brought to HPOA's members by the regulations is current, ongoing, and concrete and particularized to all HPOA's members. HPOA's efforts to remedy these injustices are central to its purpose of fighting to protect the legal rights of housing providers, including those in the CITY and COUNTY. Neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit. HPOA has a direct and substantial interest in ensuring that Defendants' decisions are in conformity with the requirements of law, that those requirements are properly executed, and that Defendants'

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

duties are enforced.

22. Plaintiff 2355 Broadway, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2355 Broadway, Oakland CA.

23. Plaintiff 3900 Adeline, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the COUNTY located at 3900 Adeline, Emeryville CA.

24. Plaintiff Hollis Street Partners, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3250 Hollis Street, Oakland CA.

25. Plaintiff Vulcan Lofts, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4401 San Leandro Street, Oakland CA.

26. Plaintiff 1614 Campbell Street DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1614 Campbell Street, Oakland CA.

27. Plaintiff 3014 Chapman DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3030 Chapman Street, Oakland CA.

28. Plaintiff B3 Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 5200 Adeline Street, Emeryville , CA.

29. Plaintiff Bakery Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4600 Adeline Street, Emeryville, CA.

30. Plaintiff Exchange Studios DEL, LLC is a Delaware limited liability company,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

qualified to do business in California and the owner of real property in the CITY and COUNTY located at 527 23rd Avenue, Oakland, CA.

31. Plaintiff Madison Park Properties II DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1155 - 5th Street, Oakland CA.

32. Plaintiff P&D 23rd Avenue Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1080 23rd Avenue, Oakland CA.

33. Plaintiff P&D 46th St. Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 964 46th Street, Oakland CA.

34. Plaintiff Sears Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2633 Telegraph Ave, Oakland CA.

35. Plaintiff 301 Lenox, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 301 Lenox Avenue, Oakland CA.

36. Plaintiff 2228 Union Street Investors, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1438 Madison Street, Oakland CA, 7511-7527 Bancroft Avenue, Oakland CA, 8603 Hillside Street, Oakland CA, and 8701 Hillside Street, Oakland CA.

37. Plaintiff J & R Land & Cattle LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1551 Madison Street, Oakland CA and 2000 E. 30th Street, Oakland CA.

38. Plaintiff J & R Land & Cattle II LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1935-1948 E. 29th Street, Oakland CA, 1935-1945 E. 30th Street, Oakland CA, and 2032-2040

E. 30th Street, Oakland CA.

39. Plaintiff Westpark Apartments, LLC is a California limited liability company, qualified to do business in California and the owner of real properties in the CITY and COUNTY, located at 433 Perkins Street, Oakland CA, 1553 Alice Street, Oakland CA, and 4220 Montgomery Street, Oakland CA.

40. Plaintiff Westpark II, GP is a California partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1530 Harrison Street, Oakland CA and 1555 Madison Street, Oakland CA.

41. Plaintiff 685 Scofield, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 385-389 Palm Avenue, Oakland CA.

42. Plaintiff 296 Mather Street, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 296 Mather Street #7, Oakland, CA.

43. Plaintiff BayOak Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 2375 Fruitvale Ave #301, Oakland CA.

44. Plaintiff Burling Street Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, and 1704 Upper 14th Street, Oakland CA.

45. Plaintiff Rising Tide Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 722 Upper 30th Street, Oakland CA, 923-923A Apgar Street, Oakland CA, 827 30th Street Oakland, CA, 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 835 40th Street #4, Oakland CA, 860 34th Street, Oakland CA, 716-720 37th Street, Oakland, CA, 1021 Campbell Street, Oakland, CA, 1704 14th Street, Oakland, CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

46.     Plaintiff Oakland Point Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

47.     Plaintiff Truckee Zurich Place, LLC is a Delaware limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1036 62nd Street #4, Oakland CA, 2215-2217 Eighth Street, Berkeley, CA, 2839 Linden Street, Oakland CA, 1688-1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, 1704 Upper 14th Street, Oakland CA, 695-701 30th Street, Oakland CA.

48.     Plaintiff 18th & Linden, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1054 18th Street, Oakland CA.

49.     Plaintiff 220 Grand Investors, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 220 Grand Avenue, Oakland CA.

50.     Plaintiff 818 East 20th Street Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 800-818 E 20th Street, Oakland CA.

51.     Plaintiff 1130 30th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3649 Martin Luther King Jr Way, Oakland CA.

52.     Plaintiff 1701-1703 36th Avenue Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1701-1707 36th Avenue, Oakland CA.

53.     Plaintiff 1732-1744 27th Avenue, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1732-1744 27th Avenue, Oakland CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

54.    Plaintiff 1844 7th Avenue 2013, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1844 7th Avenue, Oakland CA.

55.    Plaintiff 2000 Linden Street, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2000 Linden Street, Oakland CA.

56.    Plaintiff 2019 ABD Ozone Fund, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 831 6th Avenue, Oakland CA.

57.    Plaintiff 2367 Washington, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 245 Lee Street, Oakland CA.

58.    Plaintiff 2531 East 16th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1638 47th Avenue, Oakland CA.

59.    Plaintiff 2701 High Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2701 High Street, Oakland CA.

60.    Plaintiff ABD Suites, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1008 E 23rd Street Oakland, CA and 1722 27th Avenue Oakland, CA.

61.    Plaintiff 301 Hannah Park, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2850 Hannah Street, Oakland CA.

62.    Plaintiff Oakbrook Partners, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1125-1135 E 18th Street, Oakland CA and 1221 E 20th Street, Oakland CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

63. Plaintiff Riaz Capital Ozone Fund III, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1705 Mandela Parkway, Oakland CA, 2133-2143 Dwight Way, Berkeley CA, 2618 Martin Luther King Jr Way, Berkeley CA.

64. Plaintiff Riaz Taplin, trustee of The A.R.T. Trust is an individual over the age of eighteen. The A.R.T. Trust is the owner of real properties in the CITY and COUNTY located at 1454 36th Avenue, Oakland CA, 1616 35th Avenue, Oakland CA, 1828 28th Avenue, Oakland CA, 2166 E 27th Street, Oakland CA, 2554 E 16th Street, Oakland CA, 3700 International Boulevard, Oakland CA.

65. Plaintiff 1715 FFT, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1715 High Street Oakland, CA.

66. Plaintiff 1830 6th Ave Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1830 6th Avenue Oakland, CA.

67. Plaintiffs are not aware of the identities of defendants/respondents DOES 1-10, who are responsible for the acts and omissions alleged herein and that caused damage to Plaintiff; therefore, Plaintiffs will amend this Complaint when the true identities of DOES 1-10 are ascertained.

68. Plaintiffs are informed and believe that at all times mentioned in this Complaint, all defendants/respondents were the agents or employees of their co-defendants/respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## STATEMENT OF FACTS

### A. Background: The California Governor's Order and the COVID-19 Renter Relief Act.

69. In response to the Covid-19 pandemic, Governor Newsom declared a State of

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Emergency in California on March 4, 2020, pursuant to the California Emergency Services Act (ESA), Gov. Code sec. 8550, et seq. On March 16, 2020, Governor Newsom entered an executive order, which in part permitted local governments to temporarily limit housing providers' ability to evict for nonpayment of rent due to the Covid-19 crisis. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

(Executive Order (EO) N-28-20.) The March 16, 2020 provision, permitting local government to temporarily limit Covid-19-related nonpayment evictions, expired on September 30, 2020. (EO N-71-20.)

70.     Prior to the expiration of that provision, the California Legislature enacted the "COVID-19 Renter Relief Act" and the "COVID–19 Small Housing provider and Homeowner Relief Act of 2020" via AB 3088, effective August 31, 2020. AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure section 1161 et seq., and was aimed at "**temporary emergency relief** for financially distressed renters, homeowners, and small housing providers . . . ." Among other things, AB 3088 provided statewide eviction protections during a particular time period for renters who could not pay their rent for Covid-19-related reasons. AB 3088 also directed state agencies to engage about potential strategies for relief for renters and housing providers who suffered Covid-19-related financial hardship.

71.     Notably (and consistent with the Governor's prior order), AB 3088's temporary moratorium on residential evictions was *specifically* limited to those based upon inability to pay for Covid-19-related financial distress. Even during the temporary moratorium, housing providers were still permitted to file actions for, and courts were still permitted to find renters

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

guilty of, UD for fault, and no-fault "just cause" as defined under Civil Code sec. 1946.2.[2] (CCP § 1179.03.5(a)(3).)

72. AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals ***negatively impacted*** by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect renters from eviction." (CCP § 1179.05(b), (e), (f), emph. add.) While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give carte blanche authority to do so, nor did it immunize "emergency" municipal regulations from challenges based on state law preemption.

73. The Covid-19-related nonpayment eviction protections of AB 3088 were extended thereafter through SB 91 AB 832, and AB 2179. These enactments protected affected renters from eviction during this extended time period under the UD statutes so long as they complied with the Covid-19-related financial distress requirements.

74. These enactments further clarified the State's rental assistance program. Starting October 1, 2021, and until July 1, 2022, for any Covid-19-related hardship rental debt that came due between those dates, a renter was required to show that they completed an application for rental assistance through the State program. If they did not, the housing provider could move forward with an UD action for nonpayment of rent. A housing provider could also have moved forward with a UD action if the rental assistance application was denied. (CCP § 1179.11(a), (c).)

---

[2] Civil Code sec. 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code sec. 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." (Civ. Code § 1946.2(g)(1).)

### B. The CITY's Eviction Moratorium

75. On March 9, 2020, the CITY declared a local state of emergency due to Covid-19. The CITY's local emergency was ratified on March 12, 2020, via Resolution No. 88075 C.M.S, and pursuant to the ESA, which permits municipalities to declare local emergencies under specified circumstances. (Gov. Code §§ 8558(c), 8630.) The ESA also requires a municipality to terminate the local emergency ". . . at the earliest possible date." (Gov. Code § 8630 (d).)

76. After ratifying the Local Emergency, on March 27, 2020, the CITY passed its eviction moratorium, Ordinance No. 13589. That moratorium not only prohibited evictions for nonpayment of rent due to Covid-19-related financial distress, but also *all other evictions*, with few exceptions:

> **Residential Eviction Moratorium.** Except when the renter poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (–) – (10) [excepting Ellis Act evictions] that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency.

77. Initially, the CITY's moratorium on all evictions was set to expire on May 31, 2020, "unless extended." (Ordinance No. 13589.) Subsequently, the moratorium was extended until "the Local Emergency declared on March 9, 2020 has been terminated by the City Council, or August 31, 2020, whichever comes first." (Ordinance no. 13594.) However, on July 7, 2020, the extension on the eviction moratorium was again amended to *only* expire when the local Emergency had been terminated by the COUNCIL. (Ordinance No. 13606 (Ex. 1).) The local Emergency has no stated expiration date and the CITY's position is that it has not expired.

78. After this action was filed, the CITY enacted Ordinance No. 23-0216 ("Phase Out Ordinance") on May 2, 2023, which, while providing for a "phase out" of the CITY's moratorium, also kept the "local emergency" in place. The Phase Out Ordinance provides that the CITY's moratorium shall end on July 15, 2023. However, the Phase Out Ordinance continued to prohibit evictions for virtually any reason, including non-payment, if the grounds

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

for eviction arose between March 9, 2020 and July 14, 2023. Thus, per the Phase Out Ordinance, the effect of the CITY's moratorium is still in place for that three-year-plus period . The Phase Out Ordinance also amended the CITY's Rent Ordinance, further restricting housing providers' "just cause" reasons for eviction. For example, the amendments introduced substantive hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior "unreasonable" in light of that term.

**C. <u>The COUNTY's Eviction Moratorium</u>**

79. The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which, like the CITY's moratorium, purported to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO § 6.120 (Ex. 2).) The COUNTY's moratorium applied to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.) These exceptions were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).) Like the CITY's moratorium, the COUNTY'S moratorium provided that it was an "absolute defense" to an unlawful detainer action brought during its term. (ACCO § 6.120.030(D).)

80. As enacted, the moratorium expired sixty days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the ratification of the local emergency, the local emergency "shall remain in effect until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-91.) On February 28, 2023, the COUNTY rescinded its local emergency. Accordingly, the COUNTY's moratorium expired on April 29, 2023. Notwithstanding, it is the COUNTY's position that evictions are prohibited for virtually any

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

reason, including non-payment and even if there was no Covid-19 relate financial distress, if the grounds for eviction arose between March 9, 2020 and April 28, 2023. Thus, the effect of the COUNTY's moratorium is still in place for that three-year-plus period.

**D. The COUNTY and CITY's Rent Relief Assistance Programs**

81. State law requires local governments to develop mechanisms by which housing providers and renters may file applications for, and receive if eligible, Covid-related rent relief.

82. The CITY operated a rent relief assistance program called "Oakland's Emergency Rental Assistance." At the time of filing this action, Oakland's Emergency Rental Assistance website stated: "UPDATE. PLEASE NOTE. As of January 7, the City of Oakland's Emergency Rental Assistance program is oversubscribed. Tenants and Landlords may still submit an application but will be placed on a waitlist." Currently, the website instead refers applicants to the COUNTY's rent relief assistance program, "Housing Secure." However, since this action was filed, the Housing Secure website states: "We have received more requests for funds than we have currently available."

83. Importantly, tenants in the CITY and COUNTY need not to participate in *any* rent relief program to avoid eviction under the relevant three-year-plus time frames of the Moratoria and the Phase Out Ordinance; the Moratoria and the Phase Out Ordinance's ban on evictions for the three-year-plus period prohibit evictions even for those tenants who refuse to cooperate with a landlord's request that they seek relief under these programs. This directly contradicts the purpose, intent and procedures of state law.

**E. The Moratoriums' Detrimental Impact on Plaintiffs**

84. The Moratoria, and as codified through the Phase Out Ordinance, have had devastating impacts on housing providers throughout the CITY and COUNTY, and to all Plaintiffs in this action. The following cases are but a few more detailed examples.

85. Plaintiff JOHN WILLIAMS is a housing provider in the CITY and COUNTY and owns the property at 1109 32nd Street, Oakland, CA. ("1109 32nd Street"). 1109 32nd Street is a duplex, and the rent for the property only barely covered WILLIAMS' property expenses

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

for 1109 32nd Street. The renter in the three-bedroom one-bath downstairs unit, Martina Martin, has occupied the unit for approximately twelve years, and until the Moratoria were enacted, always paid the rent for the unit, which was approximately $1,500.00 per month. After the CITY and COUNTY enacted the Moratoriums, however, the renter stopped paying rent and refused to pay through the entire duration of the CITY's Moratorium. The renter's failure to pay is not related to any Covid-19 related reason. In fact, the renter operated a moving and storage business, "Martina's Ride" out of her unit since 2017, and through much of 2021. The renter refuses to cooperate with WILLIAMS' efforts to obtain unpaid rents through the rent relief program, and therefore the CITY rejected WILLIAMS' application for noncompliance. The renter in the upper unit vacated in March of 2021. WILLIAMS was concerned that a new renter would move in and refuse to pay rent, so he kept that unit vacant after the renter left. In October of 2021, WILLIAMS was so riddled with stress caused by his non-paying renter and the very real possibility of losing 1109 32nd Street to foreclosure, he was hospitalized for panic attacks, chronic stress, and depression. To date, WILLIAMS remains disabled as a result. His disability forced him to quit his job and move into the upper unit of 1109 32nd Street—directly above his non-paying renter—to save money. WILLIAMS was also forced to take out a business loan upon exhausting his 401(k) and savings. WILLIAMS was unable to commence a nonpayment eviction against his renter as a direct result of the Moratoriums and in contravention of state law. While WILLIAMS has recently received some mortgage assistance from the State of California, he has not received any back rent payments, nor does the amount of mortgage assistance that WILLIAMS has received cover what his nonpaying tenant refused to pay. In the short term, from 2020 through 2023, WILLIAMS is owed approximately $60,000.00 in delinquent rent. As a result of same, he has been unable to pay his monthly mortgage, taxes, property maintenance, and utilities in a timely and routine manner. In the long term, the Moratoria and the CITY and COUNTY's enactment and enforcement of same have cast serious doubt on WILLIAMS future. WILLIAMS first purchased 1109 32nd Street to provide himself with housing security and reliable passive income upon hitting retirement. The occurrence of the events stemming from

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

the CITY and COUNTY's Moratoria have clouded WILLIAMS' vision of his future, as it is no longer a safe assumption that he will be able to fully enjoy his rights as a residential property owner entering into a landlord-tenant relationship with others. It has been shown from the CITY and COUNTY's course of conduct that third parties may be allowed to move into WILLIAMS property and subsequently be granted relief from paying rent based on what the CITY and COUNTY find to be acceptable excuses. WILLIAMS is now forced to solve not only the situation with his current tenant but also what to do with this valuable piece of property that he once relied upon to secure his future.

86. Plaintiff ROBERT VOGEL ("VOGEL") is a housing provider in the COUNTY and owns a rental property located 20076 Emerald Ct., Castro Valley, CA ("20076 Emerald"). 20076 Emerald is a three-bedroom, one bath, 853 sq. ft single family home. VOGEL is semi-retired and is a disabled paraplegic. VOGEL relies on the rental income from 20076 Emerald for a substantial source of retirement income. VOGEL is required to pay approximately $1,328 per month for 20076 Emerald's mortgage, taxes and insurance, garbage service, and fees for property management. The former renter at 20076 Emerald lived there for approximately twelve years, from January 1, 2011 through March 1, 2023, and her current rent was $2,000 per month, however she stopped paying any rent in September 2021, and has not paid any rent since that date and only just recently vacated. The renter's failure to pay prevented VOGEL from being able to refinance 20076 Emerald to a lower rate. The renter also stopped maintaining 20076 Emerald's landscaping and would park her car on the front yard. The renter's failure to pay was not related to any Covid-19 related reason. While the renter finally agreed to cooperate with local and state rent relief programs, VOGEL only received a portion of the unpaid back rent. Most recently, VOGEL learned that his former nonpaying renter may have been selling and/or manufacturing methamphetamine at 20076 Emerald. The renter covered all of the windows at the property, and neighbors reported strong chemical odors coming from the home. There was a "revolving door" of people making multiple, brief visits per day to the property, at all hours. When VOGEL was finally able to gain possession of 20076 Emerald, he discovered large

quantities of drug paraphernalia, including what appeared to be used meth pipes and small zip-lock baggies. A large quantity of white powder was found in an ice chest, which VOGEL's agent turned over to the police. The renter had also stopped cleaning the house, leaving food and garbage everywhere, which caused a rat infestation that VOGEL was required to remediate. The renter also had multiple dogs in the house in violation of the lease, which repeatedly urinated and defecated indoors, and scratched through areas of drywall. When 20076 Emerald was finally recovered, there were puddles of dog urine on the floors, and an extreme stench which took months and multiple cleanings to remedy. VOGEL's bank account was depleted because of having to carry all the costs of 20076 Emerald, and having to make significant repairs to the property damage caused by his nonpaying renter, and he is deeply concerned he will lose the property as the result of his inability to meet the financial obligations of ownership. In total, VOGEL endured lost rent revenue amounting to $44,484.00 from 2020 to 2023 ($4,451 in 2020; $2,683 in 2021; $1,350 in 2022; and $36,000 in 2023). As a result of the eviction moratorium, VOGEL was forced to pay his mortgage, taxes, and maintenance on the property despite the aforementioned lost rent revenue. In order to do so, he had no choice but to deplete the majority of his retirement savings. VOGEL endured additional costs in the form of $4,000 in legal fees spent trying to evict his tenant; $5,000 that he ended up having to pay his tenant in a pre-trial "cash for keys" settlement; and $19,000 in repairing the damage that his tenant caused his property to endure (broken windows, removing two dumpsters, broken doors, thrashed flooring, and damaged walls). In addition to the financial losses that VOGEL knew he was enduring, he also because extremely stressed as a result of the damage done to his property by his tenant's aforementioned illegal conduct. VOGEL developed issues with sleeping and also experienced increased blood pressure. Furthermore, as a result of the prolonged nature of the eviction moratorium, VOGEL felt completely and utterly helpless as a homeowner. He was not able to remove his tenant in order to sell his property at a higher price and in a timelier fashion. Had he been able to do so, he would have been that much more well situated for retirement, as someone already dealing with a significant physical disability. The extreme stress VOGEL suffered as a

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

result of the CITY and COUNTY's senseless moratoria showed VOGEL that investing in affordable housing is no longer a smart or safe way for one to invest their money, as government oversight can causally strip one of their rights as a landlord and cause them to suffer hundreds of thousands of dollars in lost rent revenue and unforeseen costs as a result of misguided policymaking.

87. Plaintiff SHEANNA ROGERS is a housing provider in the COUNTY and owns the property at 23243 Maud Ave., Hayward CA ("23243 Maud Ave.") At one time, ROGERS ran a small, three-bedroom, independent living facility at 23243 Maud Ave., where she & her husband cared and provided for people who needed a "helping hand" to get on their feet. Many clients had lived at this address for over 5 years. ROGERS served a vulnerable population at the living facility; her clients often had mental disabilities and no families to turn to. ROGERS was able to provide her clients with a safe living space and meals they could count on at 23243 Maud Ave. In addition to the independent living facility space, 23243 Maud Ave. has a separate studio unit. ROGERS rented this unit in 2018 for $1000 per month. That renter was never part of the independent living facility program. ROGERS depends on this supplemental rental income to support her and her family. Prior to the COUNTY'S enactment of its Moratorium, the renter began harassing ROGERS' clients in the independent living facility. The renter would scream profanities at ROGERS' clients and throw garbage from his unit into the street directly in front of the property. The renter's harassment of ROGERS' clients got so bad that ROGERS was forced to file a restraining order against the renter and commence eviction proceedings. In February 2020, ROGERS and the renter came to a settlement agreement, whereby the renter agreed to vacate the property in April of 2020. However, after the COUNTY enacted its Moratorium, in March 2020, the renter refused to leave. The renter did not pay rent for over three years. The renter's failure to pay was not related to any Covid-19 related reason. Meanwhile, the renter's harassment of ROGERS' clients persisted, and ROGERS was forced to close her business as a result. ROGERS has also suffered devastating health consequences as a result of the stress caused by her nonpaying renter. ROGERS has applied for rental assistance

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

from the COUNTY, however, because her renter will not cooperate, and his non-payment has nothing to do with Covid- 19 the COUNTY has refused to provide her with any relief. Due to ROGERS' loss of business as a direct result of her renter's harassment of her clients, causing all of them to be removed from her facility at 23243 Maud Ave., it is estimated that such abhorrent behavior by her renter caused ROGERS to lose out on $124,000 in business income from September 2021 through April 2024 ($4,000 on average per month, for 31 months.) This is in addition to the $48,000 in rent ROGERS has been deprived of pursuant to her renter's residence in 23243 Maud Ave.'s studio unit and not paying rent for same from April 2020 through April 2024 ($1,000.00 in delinquent rent for 48 months.) In addition to ROGERS suffering approximately $172,000 in losses over this period, her clients have suffered as well, as they have been forced to be placed elsewhere due to the CITY and COUNTY's allowing of ROGERS' renter to conduct himself in a bullying and threatening manner. There is no telling, at this time, whether or not ROGERS will be able to resume her once lucrative business at any point in the near future. The $172,000 she is rightfully owed may be just the start of years and years of losses that have yet to accrue – all stemming from the woefully misguided acts and omissions by the CITY and COUNTY as they relate to the Moratoria at issue here.

88. Plaintiff JAQUELINE WATSON-BAKER is a housing provider in the CITY and COUNTY and owns the property at 1225-1227 92nd Ave Oakland, CA. ("1225-1227 92nd Ave"). 1225-1227 92nd Ave was purchased by WATSON-BAKER's mother in or about the 1950's. WATSON-BAKER's mother, who moved from to California from the Southern United States, was one of the first African Americans to own property in her East-Oakland neighborhood. 1225-1227 92nd Ave is a duplex, with a two-bedroom, two-bath front unit, and a one-bedroom one-bath back unit. The renter in the back unit, Unit 1227, originally moved into the property in 2016. Thereafter, WATSON-BAKER attempted to get access to the unit because the renter had put tinfoil over the windowpanes and had installed an air conditioner, and she was concerned about the renter's activity at the property. When WATSON-BAKER arrived at the property, the renter stated that he did "not believe that a black woman" owned the property and demanded to

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

see her identification.  WATSON-BAKER showed the renter her identification, which the renter snatched out of her hand, but the renter still refused her access to the unit.  Thereafter, the renter would insist on dropping off his rent check at WATSON-BAKER's home address, even though she asked him multiple times to mail it to a P.O. Box. WATSON-BAKER continued to see concerning signs at the property, but the renter continued to refuse her access. For example, she saw signs of rat infestation, but when she sent an exterminator, the renter would not give the exterminator access and turned his dogs loose on them. The exterminator eventually refused to go back to the property. Because the tenant refused to grant her access, and WATSON-BAKER became increasingly concerned about the unit's condition, WATSON-BAKER filed for relief in court in or about 2018.  The renter of the front unit of 1225-1227 92nd Ave Oakland left in 2019 because of the renter of the back unit's erratic behavior, and that unit has remained vacant due to the renter's behavior. WATSON-BAKER finally obtained a court date for March of 2020, which then was pushed back due to shelter in place orders.  The renter stopped paying rent just prior to this time.    The renter's failure to pay was not related to any Covid-19 related reason. WATSON-BAKER finally got access to the unit and saw that the unit was in gross disrepair. The renter put foil on all the unit's windows, there are dark yellow streaks running down the walls, and one of the unit's cabinets is hanging down from the ceiling.  The unit was infested with insects and there were feces and urine all over the bathroom of the unit, and dog feces and garbage covered the unit's backyard.  Notwithstanding the renter's damage to and perpetuation of a nuisance on her property, WATSON-BAKER was prevented from evicting the renter under the COUNTY's Moratorium.  WATSON-BAKER considered selling the property, however, was advised that the renter's actions had devalued her property by almost a third of the market value. WATSON-BAKER applied for rental assistance from the COUNTY, however, her renter initially refused to cooperate with her.  After he finally agreed to fill out an application, the COUNTY informed WATSON-BAKER that it could be up to a year until she received any rental relief funds.

89.    Plaintiff Michael Loeb is a housing provider in the CITY and COUNTY and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

owns units 2501 and 2502 at 565 Bellevue Avenue, Oakland, California (565 Bellevue Units). Loeb, a 74-year-old widower, lived with his wife in Piedmont, until she died in 2015, after nearly 46 years of marriage. After her death, and, in part, because of mobility issues resulting in back surgery, he sold his home. He purchased the 565 Bellevue Units in April, 2020, with the intent to combine and occupy them as his home, for his own use, for the remainder of his life. Renter Joshua Bloomfield (Bloomfield), a 1996 Graduate of the University of Pennsylvania, and 2000 UCLA School of Law graduate, is a successful class action lawyer with a prominent Oakland based class action law firm. Bloomfield currently pays LOEB $2,200 per month in rent for a studio apartment. LOEB has attempted to voluntarily negotiate an owner move in with Bloomfield, offering him $30,000 to move out. This is more than four times the amount of $7,116.22 required as a relocation payment under the Oakland Just Cause for Eviction Ordinance, which is codified at Oakland Municipal Code section 8.22.850. However, Bloomfield demanded that LOEB pay him more than $160,000 to vacate, telling LOEB that "it's nothing personal, just business." Multiple other comparable units became available in the same building and could have been occupied by Bloomfield. Bloomfield has not claimed any Covid-related hardship. LOEB was unable to commence an owner-move in eviction due to the Moratoriums. To date, LOEB has incurred more than $75,000 in legal fees as a direct and proximate result of the abhorrent behavior that the CITY and COUNTY have enabled Bloomfield to exhibit. In addition to the financial harm LOEB has suffered, far more concerning are the emotional and mental strains he's endured at the hands of his tenant and the CITY and COUNTY. He fears that he may never be allowed to re-occupy the property he purchased with the intention of living out his remaining years – of sound mind and body – therein. The long-lasting effects of the CITY and COUNTY's moratoriums have caused LOEB to endure irreparable mental harm, including but not limited to the harm inflicted upon him by his tenant's attempts to extort $160,000 from him.

90. Plaintiff HANNAH KIRK is a housing provider in the CITY and COUNTY and owns a single-family home at 4514 Fairbairn Ave, Oakland, CA. KIRK is a single mother and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

lived in 4514 Fairbairn Ave with her two children. KIRK's renter moved into her home in 2019, and the agreed upon rent was $800 per month. The renter shared KIRK's kitchen and bathroom at KIRK's home. KIRK's renter paid rent consistently until July 1, 2021, whereupon she stopped paying rent but did not move out of KIRK's home when asked. The renter also did not cooperate with the rental assistance programs, or return the Covid-19 declarations that KIRK provided to her, and instead accused KIRK of harassing her. Notwithstanding the renter's failure to pay rent even though no Covid-19 related reason existed, KIRK was prevented from evicting the renter under the CITY and COUNTY's Moratorium. After spending almost two years having to carry the expenses of the renter and having to face the nonpaying renter on a daily basis inside of her own home, KIRK moved out of her home due to the severe emotional distress the situation was causing her and her children. The CITY and COUNTY put KIRK in such an incredibly toxic situation that she was essentially forced to decide between paying her then-current mortgage or or paying rent at a new property – i.e., she was effectively coerced into selling her property, which she finally did in September 2023. In total, after generating an average annual net income of just under $5,000 from 2019 through 2021, KIRK's property generated $0.00 in net income from 2022 through 2023 despite being occupied by a tenant. This tenant was in default from July 2021 through August of 2023, and the total delinquent rent that accumulated in that span was approximately $20,364.80. Among the other costs that KIRK was forced to endure were legal fees to ensure that she would not get sued by her tenant for any number of frivolous causes. She also endured extreme pain and related health issues from the stress of being put in this situation.

91. Plaintiff AMI SHAH and AVINASH JHA were housing providers in the CITY and COUNTY and own a single-family home at 133 Gable Dr. Fremont CA. SHAH and JHA purchased 133 Gable Dr. in 2019, intending it to be their primary residence. However, for financial reasons, SHAH and JHA were required to rent 133 Gable Dr. until their lease obligations for their own rental were met. They did so, but after the COUNTY enacted its Moratorium, SHAH and JHA's renters paid partial rent from April 2020 through June 2020,

stopped paying rent entirely after June 2020, and refused to apply for rent relief through the state and local rent relief programs. Not only did SHAH and JHA's renters stop paying rent, but the renters physically converted 133 Gable Dr. into an "Airbnb motel" without the consent of either SHAH or JHA, renting out the individual rooms. SHAH and JHA reported the renters' unlawful activity to the Fremont police, and during the investigation it was discovered that the renters were conducting similar fraudulent rental activity with other homes as well. During the investigation, the renters abandoned the property, but the AirBnb guests did not, and refused to move out. The AirBnb guests even changed the locks. Throughout, SHAH and JHA were prevented from evicting their nonpaying and breaching renters and the AirBnb guests due to the COUNTY's Moratorium. During this time, both the renters and the AirBnb guests filed several frivolous legal actions against SHAH and JHA, most of which were later dismissed. When the AirBnb guests finally abandoned the property (which they did involuntarily and only because the City of Fremont deemed the house unsafe and therefore condemned it), SHAH and JHA were left with rental losses, legal fees and a home that was destroyed, and with a huge toll on their finances and health. In total, after receiving partial rent from April 2020 through June 2020 and then not receiving any rent from June 2020 through the day their tenants were finally evicted, SHAH and JHA collected $19,500.00 in total rent revenue and were deprived of $42,153.00 in delinquent rent. Furthermore, after enduring six months of vacancy while refurbishing the damage done to their property by the AirBnb guests vacated, total vacancy losses amounted to $22,200 from June 2021 through December 2021. Despite the delinquent rent and vacancy losses, SHAH and JHA paid $124,800 in property expenses (mortgage, property tax, insurance, and maintenance), $83,000 in repair costs, and $15,000 in legal fees. SHAH and JHA are still experiencing the long-term effects of this ordeal, as well. The AirBnb guests' unwelcome presence (and the resulting financial impact of delinquent rent and subsequent vacancy losses) made it impossible for SHAH and JHA to capitalize on historically low interest rates in 2020-2021, resulting in an estimated $450,000 in additional interest over the loan's remaining term at current rates. Additionally, due to their ongoing legal fees, dealing with harassment from the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

AirBnb guests, and the related mental stresses involved with both, SHAH and JHA missed crucial opportunities to advance their careers. (The technology sector saw an unprecedented salary boom during the pandemic, with recruiters offering $200,000 to $300,000 above SHAH and JHA's then-existing salaries.) Their combined losses amount to an estimated $400,000 in just two years, and will likely have a lasting impact on their lifetime savings. Lastly, the stressors of delinquent rent, vacancy losses, and unwelcome squatters at their home robbed SHAH and JHA of a once in a lifetime opportunity to purchase another home in 2020 – as they had planned to do – given the historically low interest rates and lower home prices in the Bay Area. As a result, SHAH and JHA missed out on an estimated $1.5M to $2.0M in potential gains from property appreciation in their neighborhood. Not only did they forgo the opportunity to purchase an investment property, but the trauma of their experience forced them to sell their condominium unit, which will likely hinder their long-term financial goals – especially as they relate to planning for their children's future. The compounded loss of all these financial setbacks continue to weigh heavily on SHAH and JHA from a financial, mental, and emotional standpoint. SHAH and JHA remain fearful to this day over the prospect of ever purchasing another property, knowing full well that local government entities have the power to effectively allow the wrongful taking of that property by wanton third party conduct.

92. In 2020, the 83-unit property commonly known as B3 Lofts and located at 5200 Adeline Street, Emeryville, CA ("B3"), owned and operated by Plaintiff B3 Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $20,791 in delinquent rent in 2020. In 2021, this number doubled to $40,500, and then shot up in 2022 and 2023, to delinquent rent amounts of $139,276 and $138,799, respectively (a four-year delinquent rent total of $339,366 from 2020 through 2023). Overall vacancy at B3 also took a hit, as it more than doubled from 4.2% in 2019 to 9.4% in 2023. B3's total value has dropped from $32.8M in 2020 to $26.96M in 2023 – a decline of $5.84M, or -17.8%. Finally, B3's internal rate of return (IRR) plummeted from a pre-COVID figure of 11.8% (from January 2018 through March of 2020) to -10.9% (from

April 2020 through June 2023). As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

93. In 2020, the 102-unit property located at 3900 Adeline, Emeryville, CA ("ADE"), owned and operated by Plaintiff 3900 Adeline, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $40,691 in delinquent rent in 2020. In 2021, this number increased to $102,020, and then increased again in 2022 to $135,838. In 2023, the delinquent rent figure recovered some, dropping to $8,971. Over that four-year span, ADE experienced total delinquent rent of $287,520. Overall vacancy at ADE also increased from 5.0% in 2019 to 6.5% in 2023. ADE's total value has dropped from $46.08M in 2020 to $36.06M in 2023 – a decline of $10.02M or -22%. Since the onset of the pandemic, from April 2020 to June 2023, ADE has seen a negative cash-on-cash return of -21.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

94. In 2020, the 76-unit property located at 4600 Adeline Street, Emeryville, CA ("BAK"), owned and operated by Plaintiff Bakery Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $36,821 in delinquent rent in 2020. In 2021, this number increased to $54,964. Over the four-year span from 2020 through 2023, BAK experienced total delinquent rent of $95,752. Overall vacancy at BAK also increased from 2.8% in 2019 to 6.5% in 2023. BAK's total value has dropped from $22.45M in 2020 to $19.32M in 2023 – a decline of $3.13M or -13.9%. Since the onset of the pandemic, from April 2020 to June 2023, BAK has seen a negative cash-on-cash return of -5.0%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

95. In 2020, the 27-unit property located at 2355 Broadway, Oakland CA ("BRO"),

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

owned and operated by Plaintiff 2355 Broadway, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $19,034 in delinquent rent in 2020. In 2021, this number was $6,163, followed by $11,174 in 2022 and $10,627 in 2023. Over the four-year span from 2020 through 2023, BRO experienced total delinquent rent of $46,998. Overall vacancy at BRO also increased from 4.1% in 2019 to 10.1% in 2023. BRO's total value has dropped from $12.68M in 2020 to $9.61M in 2023 – a decline of $3.07M or -24.2%. Since the onset of the pandemic, from April 2020 to June 2023, BRO has seen a negative cash-on-cash return of -14.5%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

96. In 2020, the 124-unit property located at 3250 Hollis Street, Oakland CA ("HOL"), owned and operated by Plaintiff Hollis Street Partners, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $86,857 in delinquent rent in 2020. In 2021, delinquent rent increased to $102,322, followed by another increase in 2022 to $307,802. In 2023, delinquent rent totaled $294,520. Over the four-year span from 2020 through 2023, HOL experienced total delinquent rent of $791,501. Overall vacancy at HOL also increased from 9.3% in 2020 to 10.3% in 2023. HOL's total value has dropped from $73.44M in 2020 to $44.13M in 2023 – a decline of $29.31M or -39.9%. Since the onset of the pandemic, from April 2020 to June 2023, HOL has seen a negative cash-on-cash return of -54.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

97. In 2020, the 27-unit property located at 1155 5th Street, Oakland, CA 94607 ("MPP2"), owned and operated by Plaintiff Madison Park Properties II DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $40,308 in delinquent rent in 2020. In 2021, delinquent rent totaled $17,374, followed by a total of $86,397 in delinquent rent in 2022.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

In 2023, delinquent rent totaled $64,212. Over the four-year span from 2020 through 2023, MPP2 experienced total delinquent rent of $208,291. Overall vacancy at MPP2 also increased from 2.4% in 2019 to 8.8% in 2023. MPP2's total value has dropped from $12.1M in 2020 to $10.15M in 2023 – a decline of $1.95M or -24.2%. Since the onset of the pandemic, from April 2020 to June 2023, MPP2 has seen a negative cash-on-cash return of -16.1%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

98. In 2020, the 36-unit property located at 964 46th Street, Oakland, CA ("PD46"), owned and operated by Plaintiff P&D 46th St. Associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, over the four-year span from 2020 through 2023, PD46 experienced total delinquent rent of $139,757. Overall vacancy at PD46 also increased from 3.5% in 2019 to 10.2% in 2022, before dropping back down to 3.5% once more in 2023. PD46's total value has dropped from $14.8M in 2020 to $12.64M in 2023 – a decline of $2.16M or -14.6%. Since the onset of the pandemic, from April 2020 to June 2023, PD46 has seen a negative cash-on-cash return of -6.8%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

99. In 2020, the 54-unit property located at 2633 Telegraph Ave, Oakland, CA ("SLO"), owned and operated by Plaintiff Sears Lofts DEL, LLC ("SLO"), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $57,389 in delinquent rent in 2020. In 2021, delinquent rent totaled $2,967, followed by a total of $34,170 in delinquent rent in 2022. In 2023, delinquent rent totaled $50,117. Over the four-year span from 2020 through 2023, SLO experienced total delinquent rent of $144,643. Overall vacancy at SLO also increased from 4.3% in 2019 to 5.6% in 2023. SLO's total value has dropped from $29.6M in 2020 to $28.16M in 2023 – a decline of $1,485,000 or -5.01%. As shown in the instant amended complaint and its

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

100. In 2020, the 27-unit property located at 1080 23rd Avenue, Oakland, CA ("1080"), owned and operated by Plaintiff P&D 23rd Avenue associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $85,713 in delinquent rent in 2020. In 2021, delinquent rent dropped down to $3,135, before shooting back up to $42,485 and $39,670 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1080 experienced total delinquent rent of $171,003. Overall vacancy at 1080 also increased from 5.2% in 2019 to 6.9% in 2023. 1080's total value has dropped from $9.20M in 2020 to $7.28M in 2023 – a decline of $1.92M or -21.1%. Since the onset of the pandemic, from April 2020 to June 2023, 1080 has seen a negative cash-on-cash return of -11.4%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

101. In 2020, the 92-unit property located at 1614 Campbell Street, Oakland, CA ("1614"), owned and operated by Plaintiff 1614 Campbell Street DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $90,412 in delinquent rent in 2020. In 2021, delinquent rent dropped slightly to $89,164, before skyrocketing up to $318,490 and $190,797 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1614 experienced total delinquent rent of $688,863. Overall vacancy at 1614 also increased from 3.0% in 2019 to 9.5% in 2023. 1614's total value has dropped from $39.1M in 2020 to $30.26M in 2023 – a decline of $8.84M or -22.61%. Since the onset of the pandemic, from April 2020 to June 2023, 1614 has seen a negative cash-on-cash return of -18.3%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

102. In 2020, the 39-unit property located at 527 23rd Avenue, Oakland, CA ("ES"),

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

owned and operated by Plaintiff Exchange Studios DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, over the four-year span from 2020 through 2023, ES experienced total delinquent rent of $39,382. Overall vacancy at ES also increased from 2.6% in 2019 to 8.5% in 2023. ES's total value has dropped from $14.1M in 2020 to $12.37M in 2023 – a decline of $1.73M or -12.27%. Since the onset of the pandemic, from April 2020 to June 2023, ES has seen a negative cash-on-cash return of -4.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

103. In 2020, the 41-unit property located at 3030 Chapman Street, Oakland, CA ("GAL"), owned and operated by Plaintiff 3014 Chapman DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $17,465 in delinquent rent in 2020. In 2021, delinquent rent shot upward to $47,679, before increasing twice more to $64,745 and $100,435 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, GAL experienced total delinquent rent of $230,324. Overall vacancy at GAL also increased from 3.3% in 2019 to 7.8% in 2023. GAL's total value has dropped from $18.2M in 2020 to $14.37M in 2023 – a decline of $3.83M or -21%. Since the onset of the pandemic, from April 2020 to June 2023, GAL has seen a negative cash-on-cash return of -15.7%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

104. In 2020, the 57-unit property located at 4401 San Leandro Street, Oakland, CA ("VUL"), owned and operated by Plaintiff Vulcan Lofts, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured significant delinquent rent over the four-year span from 2020 to 2023: $194,110 in 2020; $118,740 in 2021; $168,730 in 2022; and $176,745 in 2023 – a total of $658,325 in delinquent rent in four years. VUL's total value has dropped from $15.04M in 2020 to $13.26M in 2023 –

a decline of $1.78M or -11.8%. Since the onset of the pandemic, from April 2020 to June 2023, VUL has seen a negative cash-on-cash return of -2.6%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

105. In 2020, the multi-unit residential building commonly known as and located at 1454 36th Avenue, Oakland, CA ("1454"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1454 totaled $123,622.72. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $205,414.10 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $140,000 an impressive 65.56% ROI. From January 2020 through December 2023, ROI dropped to 49.19%. Additionally, the overall estimated property value declined from $3,542,920 at the onset of the COVID-19 pandemic in March 2020 to $1,938,892.31 in June 2023 – i.e., a -43.3% decline in value in a period of just over three years.

106. In 2020, the multi-unit residential building commonly known as and located at 1616 35th Avenue, Oakland, CA ("1616"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1616 totaled $17,574.57. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $175,967.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $60,000 an impressive 126.57% ROI. From January 2020 through December 2023, ROI dropped to 80.41%. Additionally, the overall estimated property value declined from $3,397,940 at the onset of the COVID-19 pandemic in March 2020 to

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$1,597,498.31 in June 2023 – i.e, a -52.99% decline in value in a period of just over three years.

107. In 2020, the multi-unit residential building commonly known as and located at 1701-1707 36th Avenue, Oakland, CA ("1707"), owned and operated by Plaintiff 1701-1703 36th Avenue Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1707 totaled $76,953. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $217,899.67 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,040,820.00 at the onset of the COVID-19 pandemic in March 2020 to $2,554,661.69 in June 2023 – i.e, a -36.78% decline in value in a period of just over three years.

108. In 2020, the multi-unit residential building commonly known as and located at 2166 E. 27th Street, Oakland, CA ("2166"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2166 totaled $41,752.74. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $101,307.72 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $388,464 a 21.28% ROI. From January 2020 through December 2023, ROI dropped to 12.94%. Additionally, the overall estimated property value declined from $3,985,160 at the onset of the COVID-19 pandemic in March 2020 to $1786,986 in June 2023 – i.e, a -55.16% decline in value in a three-year period.

109. In 2020, the multi-unit residential building commonly known as and located at 2554 E. 16th Street, Oakland, CA ("2554"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2554

totaled $151,114.64.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $357,896.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 53.31% ROI.  From January 2020 through December 2023, ROI dropped to 48.05%.  Additionally, the overall estimated property value declined from $6,911,740 at the onset of the COVID-19 pandemic in March 2020 to $4,975,793.23 in June 2023 – i.e, a -28.01 % decline in value in a three-year period.

110.     In 2020, the multi-unit residential building commonly known as and located at 2701 High Street, Oakland, CA ("2701"), owned and operated by Plaintiff 2701 High Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2701 totaled $374,805.56.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $656,053.62 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $200,000 an 83.14% ROI.  From January 2020 through December 2023, ROI dropped to 74.24%.  Additionally, the overall estimated property value declined from $9,164,080 at the onset of the COVID-19 pandemic in March 2020 to $4,242,292.31 in June 2023 – i.e, a -53.7% decline in value in a three-year period.

111.     In 2020, the multi-unit residential building commonly known as and located at 3700 International Boulevard, Oakland, CA ("3700"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 3700 totaled $278,320.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $456,728.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

paying tenants. Additionally, the overall estimated property value declined from $8,911,700 at the onset of the COVID-19 pandemic in March 2020 to $5,443,692.31 in June 2023 – i.e, a -38.9% decline in value in a three-year period.

112. In 2020, the multi-unit residential building commonly known as and located at 1828 28th Avenue, Oakland, CA ("1828"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1828 totaled $108,362.98. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $252,908 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 28.13% ROI. From January 2020 through December 2023, ROI dropped to 17.36%. Additionally, the overall estimated property value declined from $3,131560 at the onset of the COVID-19 pandemic in March 2020 to $1,915,512 in June 2023 – i.e, a -38.8% decline in value in a three-year period.

113. In 2020, the multi-unit residential building commonly known as and located at 1002-1008 E. 23rd Street, Oakland, CA ("1002"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1002 totaled $116,030.44. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $316,694.97 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,322,223 a 6.84% ROI. From January 2020 through December 2023, ROI dropped to 5.84%. Additionally, the overall estimated property value declined from $6,907,620 at the onset of the COVID-19 pandemic in March 2020 to $4,461,323.08 in June 2023 – i.e, a -35.4% decline in value in a three-year period.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

114.    In 2020, the multi-unit residential building commonly known as and located at 1844 7th Avenue, Oakland, CA ("1844"), owned and operated by Plaintiff 1844 7th Avenue 2013, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1844 totaled $80,123.77.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $275,123.89 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.   Additionally, the overall estimated property value declined from $7,534,560 at the onset of the COVID-19 pandemic in March 2020 to $4,452,938.46 in June 2023 – i.e, a -40.1% decline in value in a three-year period.

115.    In 2020, the multi-unit residential building commonly known as and located at 800-818 E. 20th Street, Oakland CA ("800"), owned and operated by Plaintiff 818 East 20th Street Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 800 totaled $27,069.79.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $221,196.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $559,510 a 24% ROI.  From January 2020 through December 2023, ROI dropped to 20.61%.  Additionally, the overall estimated property value declined from $5,987,940 at the onset of the COVID-19 pandemic in March 2020 to $4,504,492.31 in June 2023 – i.e, a -24.77% decline in value in a three-year period.

116.    In 2020, the multi-unit residential building commonly known as and located at 1722 27th Avenue, Oakland, CA ("1722"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1722 totaled $79,390.33.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

contributed to approximately $308,641.86 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,920,220 at the onset of the COVID-19 pandemic in March 2020 to $4,201,092.31 in June 2023 – i.e, a -14.6% decline in value in a three-year period.

117. In 2020, the multi-unit residential building commonly known as and located at 2000 Linden St., Oakland, CA ("2000"), owned and operated by Plaintiff 2000 Linden Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2000 totaled $81,209,27. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $176,331.48 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,023,500 at the onset of the COVID-19 pandemic in March 2020 to $3,438,903.69 in June 2023 – i.e, a -14.53% decline in value in a three-year period.

118. In 2020, the multi-unit residential building commonly known as and located at 1732-1744 27th Avenue, Oakland CA ("1732"), owned and operated by Plaintiff 1732-1744 27th Avenue, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1732 totaled $9,900.50. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $84,514.96 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $5,150,920 at the onset of the COVID-19 pandemic in March 2020 to $4,715,353.85 in June 2023 – i.e, a -8.5% decline in value in a three-year period.

119. In 2020, the multi-unit residential building commonly known as and located at 3649 Martin Luther King Jr. Way, Oakland CA ("3649"), owned and operated by Plaintiff 1130

30th Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 3649 totaled $19269.61. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $66,547.93 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $504,415 a -2.57% ROI.  From January 2020 to December 2023, ROI dropped to -12.67%. Additionally, the overall estimated property value declined from $810,380 at the onset of the COVID-19 pandemic in March 2020 to -$159,723.08 in June 2023 – i.e, a -119.7% decline in value in a three-year period.

120.    In 2020, the multi-unit residential building commonly known as and located at 245 Lee Street, Oakland CA ("245"), owned and operated by Plaintiff 2367 Washington, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 245 totaled $224,208.78.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $494,847.21 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

121.    In 2020, the multi-unit residential building commonly known as and located at 1638 47th Avenue, Oakland, CA ("1638"), owned and operated by 2531 East 16th Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1638 totaled $376,603.50.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $471,481.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,567,875.73 a 0.14% ROI.  From January 2020 through December 2023, ROI dropped to -5.82%.  Additionally, the overall estimated property value declined from $14,252,160 at the onset

of the COVID-19 pandemic in March 2020 to $10,665,523.08 in June 2023 – i.e, a -25.17% decline in value in a three-year period.

122. In 2020, the multi-unit residential building commonly known as and located at 2850 Hannah Street, Oakland, CA ("2850"), owned and operated by 301 Hannah Park, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2850 totaled $360,386.95. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $823,332.95 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, from January 2020 through December 2023, 2850 posted an ROI of -2.33%.

123. In 2020, the two-unit duplex property commonly known as and located at 716-720 37th Street, Oakland, CA ("720"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, 720's fair market rent was $7,279.16, plus a utility fee of $179.56, for a market Total Operating Income of $7,458.72 per month or $89,504.64 per year. In 2020, 720 generated just $44,962.70 in rent revenue – roughly half its annual market rent. Accounting for an additional $992.80 in utility payments, 720's Total Operating Income of $45,955.50 represented $43,549.14 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 720's Total Operating Income was $7,463.24 less than its annual fair market rent of $89,504.64, and after a slight recovery in 2022, 720's 2023 Total Operating Income underperformed to the tune of $11,924.54. From 2020 through 2023, therefore, 720 lost $53,694.30 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 720 experienced a dramatic -45.50% decrease in overall property value from pre-COVID 2019 to 2020 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value plummeted from $1.18M to $643,377 year over year. And though the property partially recovered from 2021

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

through 2023, its overall drop in property value from 2019 to 2023 was still a significant -8.0% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

124.    In 2020, the twelve-unit property commonly known as and located at 296 Mather Street, Oakland, CA ("296 Mather"), owned and operated by Plaintiff 296 Mather Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the twelve-unit building's combined fair market rent was $39,920, plus a utility fee of $1,250, for a market Total Operating Income of $41,170 per month or $494,040 per year.  In 2020, 296 Mather generated just $421,489.89 in rent revenue – roughly 85% of its annual market rent.  Accounting for an additional $12,811.67 in utility payments, 296 Mather's Total Operating Income of $434,918 represented $59,122 in lost income directly attributable to the CITY and COUNTY's moratoriums.  In 2021, 296 Mather's Total Operating Income was $93,784 less than its annual market rent of $494,040, and its 2022 and 2023 Total Operating Incomes missed their mark by $110,488 and 93,608, respectively.  From 2020 through 2023, therefore, 296 Mather lost $357,002 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 296 Mather experienced a -17.8% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $6.5M in 2019 to just under $5.37M in 2022.  And though the property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -14.2% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

125.    In 2020, the twelve-unit property commonly known as and located at 695-701 30th Street, Oakland CA ("695"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the four-unit building's combined fair market rent was $14,170, plus a utility fee of $319, for a market Total Operating Income of $14,489 per month or

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$173,864 per year. In 2020, 695 generated just $76,843 in rent revenue – roughly 44% of its annual market rent. Accounting for an additional $1,618 in utility payments, 695's Total Operating Income of $78,461 represented $95,402 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 695's Total Operating Income recovered slightly, but its 2022 and 2023 Total Operating Incomes missed their mark by $109,375 and $108,284, respectively. From 2020 through 2023, therefore, 695 lost $299,353 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 695 experienced a -62.49% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just under $903,000 in 2022. And though the property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -61.86% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

126. In 2020, the two-unit property commonly known as and located at 722 Upper 30th Street, Oakland CA ("722"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit building's combined fair market rent was $7,230, plus a utility fee of $208, for a market Total Operating Income of $7,438 per month or $89,256 per year. In 2020, 722generated just $50,563 in rent revenue – roughly 57% of its annual market rent. Accounting for an additional $1,672 in utility payments, 722's Total Operating Income of $52,235 represented $37,021 in lost income directly attributable to the CITY and COUNTY's moratoriums. Subsequently, 722's Total Operating Income for 2021, 2022, and 2023 missed its marks by $80,454, $89,256, and $20,675, respectively. From 2020 through 2023, therefore, 722 lost $227,406 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 722 experienced a -20.04% decrease in overall

property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just over $960,000 in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

127.    In 2020, the two-unit property commonly known as and located at 827 30th Street, Oakland CA ("827"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit building's combined fair market rent was $5,522, plus a utility fee of $410, for a market Total Operating Income of $5,932 per month or $71,184 per year. In 2021, 827 generated just $37,964 in rent revenue – roughly 53% of its annual market rent. Accounting for an additional $2,475 in utility payments, 827's Total Operating Income of $40,439 represented $30,745 in lost income directly attributable to the CITY and COUNTY's moratoriums. 827's Total Operating Income in 2022 and 2023 missed its mark by $69,734 and $52,182, respectively. From 2020 through 2023, therefore, 827 lost $152,661 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 827 experienced a -67.18% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $810,520 in 2019 to $266,028 in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

128.    In 2020, the four-unit property commonly known as and located at 1688-1692 12th Street, Oakland CA ("1688"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the four-unit building's combined fair market rent was $7,518.39, plus a utility fee of $90, for a market Total Operating Income of $7,608.39 per month or $91,300.68 per year. In 2020, 1688 generated just $73,353.95 in rent revenue – roughly 80%

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

of its annual market rent. Accounting for an additional $840 in utility payments, 1688's Total Operating Income of $74,193.95 represented $17,107 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1688's Total Operating Income in 2021 and 2022 missed its mark by $49,081 and $19,428, respectively, before a slight recovery in 2023. From 2020 through 2023, therefore, 1688 lost $75,431 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1688 experienced a -9.99% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.18M in 2019 to $1.006M in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

129. In 2020, the single-family home commonly known as and located at 860 34th Street, Oakland, CA ("860"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the single-family home's combined fair market rent was $4,350, plus a utility fee of $40, for a market Total Operating Income of $4,390 per month or $52,680 per year. In 2020, 860 generated just $35,662 in rent revenue – roughly 68% of its annual market rent. Accounting for an additional $360 in utility payments, 860's Total Operating Income of $36,022 represented $16,658 in lost income directly attributable to the CITY and COUNTY's moratoriums. 860's Total Operating Income in 2021 and 2022 missed its mark by $32,519 and $51,680, respectively, before a slight recovery in 2023. From 2020 through 2023, therefore, 860 lost $89,704 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 860 experienced a -97.88% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just under $662,000 in 2019 to $14,000 in 2022. This drop in value is reflective of reduced net operating

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

income stemming from moratorium-enabled delinquencies.

130. In 2020, the two-unit property commonly known as and located at 1021 Campbell Street, Oakland, CA ("1021"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit property's combined fair market rent was $5,772.39, plus a utility fee of $440, for a market Total Operating Income of $6,212.39 per month or $74,548.68 per year. In 2020, 1021 generated just $45,120.84 in rent revenue – roughly 60% of its annual market rent. Accounting for an additional $4,080 in utility payments, 1021's Total Operating Income of $49,200.84 represented $25,348 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1021's Total Operating Income missed its mark in 2021 and 2023 by $45,102 and $4,653, respectively, with a slight recovery occurring in 2022. From 2020 through 2023, therefore, 1021 lost $49,355 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1021 experienced a -57.98% decrease in overall property value from pre-COVID 2019 to 2021 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just over $981,000 in 2019 to just over $412,000 in 2021. And despite its recovery in 2022, the overall property value in 2023 was still down from its pre-COVID figure from 2019. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

131. In 2020, the two-unit property commonly known as and located at 1704 14th Street, Oakland, CA ("1704"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the single-family home's combined fair market rent was $5,940, plus a utility fee of $310, for a market Total Operating Income of $6,250 per month or $75,000 per year. In 2020, 1704 generated just $43,725 in rent revenue – roughly 58% of its annual market rent. Accounting for an additional $2,325 in utility payments, 1704's Total

Operating Income of $46,050 represented $28,950 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1704's Total Operating Income missed its mark in 2021 and 2022 by $39,600 and $37,800, respectively, with a slight recovery occurring in 2023. From 2020 through 2023, therefore, 1704 lost $101,956 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1704 experienced a -50.40% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.05M in 2019 to $520,800 in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

132. In 2020, the property located at 2215-2217 Eighth Street, Berkeley, CA ("2217"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the property's combined fair market rent was $8,800, plus a utility fee of $75, for a market Total Operating Income of $8,875 per month or $106,500 per year. In 2020, 2217 generated just $79,868.70 in rent revenue – roughly 75% of its annual market rent. Accounting for an additional $750 in utility payments, 2217's Total Operating Income of $80,618.70 represented $25,881 in lost income directly attributable to the CITY and COUNTY's moratoriums. 2217's Total Operating Income missed its mark in 2021, 2022, and 2023 by $95,816, $42,527, and $19,500, respectively. From 2020 through 2023, therefore, 2217 lost $183,724 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 2217 experienced a -18.93% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.5M in 2019 to $1.218M in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

133. The 28-unit property located at and commonly known as 385-389 Palm Avenue,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Oakland, CA ("385 Palm"), owned and operated by Plaintiff 685 Scofield, LLC, generated $429,559.68 of total revenue in pre-COVID 2019, followed by $436,373.51 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -7.5% but total repairs and maintenance at the property totaled over $100,000 as pandemic-induced vacancy prompted management to make sweeping repairs to vacant units and under-utilized common areas. The drop in revenue and increase in operating expenses led to a 2021 NOI of -$37,688.31 after positive NOI in 2019 and 2020 of $108,887.11 and $166,54, respectively. Cash flow in 2021 was -$18,734.31. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

134. The 25-unit property located at and commonly known as 398 Euclid Avenue, Oakland, CA ("398 Euclid"), owned and operated by Plaintiff Normand Groleau, generated $435,963.81 of total revenue in pre-COVID 2019, followed by $444,272.39 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -12%, but costs related to property maintenance and unit turnover both spiked, leading to a YoY increase in property operating expenses from $265,575.46 in 2020 to $361,629.62 in 2021 – a 36.2% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $29,276.56 after NOI in 2019 and 2020 of $186,796.61 and $178,696.93, respectively. Cash flow in 2021 was just $15,772.58. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

135. The 30-unit property located at and commonly known as 433 Perkins Street, Oakland, CA ("433 Perkins"), owned and operated by Plaintiff Westpark Apartments, LLC, generated $501,207.97 of total revenue in pre-COVID 2019, followed by $519,550.59 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -4%, but costs related to property maintenance and unit turnover both increased, leading to a YoY increase in property operating expenses from $282,337.92 to $295,531.75 – a

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

4.7% increase.  The drop in revenue and increase in operating expenses led to a 2021 NOI of just $203,195.04 after the property generated $233,567.03 in 2020 (a -13% decrease).  This also led to 433 Perkins' 2021 cash flow coming in at -$44,647.13.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

136.    The 34-unit property located at and commonly known as 1438 Madison Street, Oakland, CA ("1438 Madison"), owned and operated by Plaintiff 2228 Union Street Investors, LP, generated $496,695.06 of total revenue in pre-COVID 2019, followed by a drop in 2020 down to $437,753.09.  In 2021, not only did total revenue drop further – this time by approximately -4.2% - but increases in repair costs contributed to a YoY increase in 1438's operating expenses from $297,346.42 to $316,071.80 (a 6.3% increase).  The drop in revenue and increase in operating expenses led to a 2021 NOI of just $103,188.51 following 2020 which, despite the pandemic, still saw the property generate $140,406.67 in NOI.  In fact, not until 2023 did 1438 Mason post an NOI that met or exceeded its pre-pandemic level.  This trend is once again directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

137.    The 24-unit property located at and commonly known as 1530 Harrison Street, Oakland, CA ("1530 Harrison"), owned and operated by Plaintiff Westpark II, GP, was uniquely affected by the pandemic in terms of the capital expenditures and operating expenses that brought down its bottom line in 2021.  After a strong 2020 in which it generated $108,939.73 in NOI and $45,491.74 in total cash flow, costs in 2021 rose, particularly those relating to maintenance, unit turnover, and repairs.  As a result, 1530 Harrison's total operating expenses increased from $186,985.05 in 2020 to $279,130.44 in 2021 (a 49.3% increase), yielding just $15,606.84 in NOI and turning cash flow red to the tune of -$36,926.16.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

138.    The 69-unit property located at and commonly known as 1551 Madison Street,

Oakland, CA ("1551 Madison"), owned and operated by Plaintiff J & R Land & Cattle LP, generated $1,388,274.26 in total revenue in pre-COVID 2019. This figure dropped to $1,283,390.88 in 2020 and then again to $1,259,057.03 in 2021 – an approximately 6% drop from its pre-COVID baseline. Simultaneously, total operating expenses at 1551 Madison increased by approximately 3.4% from 2020 to 2021, due primarily to a 24% YoY increase in maintenance costs and a 23% increase in monthly services. These increases contributed to property NOI dropping by 9.5% from 2020-2021 as well as the property's annual cash flow dropping from a positive $92,888.61 in 2020 to -$59,954.28 in 2021. Years later, in 2023, 1551 Madison was still feeling the effects of the pandemic as its dramatic spike in unit turnover expenses (up from $51,043.94 in 2022 to $134,897.95 in 2023) dragged down its NOI and yielded a total property cash flow of -$123,204.55. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

139. The 84-unit property located at and commonly known as 1553 Alice Street, Oakland, CA ("1553 Alice"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums. 1553 Alice has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by a 20% decline from $1.51M in 2019 to $1.21M in 2023. This slide coincided with an increase in total operating expenses during that same time period, from $948,541.01 to $1,020,380.22 (a 7.5% increase). As a result of the narrowing margin between total revenue and total operating expenses over that five-year period, 1553 Alice posted a 2023 NOI of just $186,634.66, following a four-year stretch in which the property's annual NOI never dipped below $537,000. 1553 Alice's total cash flow in 2023 was negative, to the tune of -$212,201.34, following a three-year streak of positive annual cash flow of at least $47,000. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

140. The 27-unit property located at and commonly known as 1555 Madison Street, Oakland, CA ("1555 Madison"), owned and operated by Plaintiff Westpark II, GP, has been greatly affected by the early onset of the COVID-19 pandemic and its lasting effects – especially in terms of the eviction moratoriums imposed by the CITY and COUNTY over the last several years. From 2019 to 2021, 1555 Madison's total revenue plummeted from $520,423.40 to $480,064.83 to $417,773.79, marking a 19.7% drop in revenue from 2019 to 2021. Simultaneously, the property endured $344,606.23 in operating expenses in 2021, marking a sharp 31% increase YoY from 2020. As a result, 1555 Madison's NOI in 2021 of just $73,167.56 drastically underperformed its previous marks of $216,427.61 and $172,950.19 from 2020 and 2019, respectively. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

141. The 70-unit property located at and commonly known as 1935-1948 E. 29th Street, Oakland, CA ("1948 E. 29th"), owned and operated by Plaintiff J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 1948 E. 29th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 8.2% decrease from $959,875.45 in 2019 to $881,248.88 in 2023. Additionally, as a direct result of pandemic-induced vacancy, 1948 E. 29th has experienced a gradual rise in unit turnover expenses, which have risen from $22,902.56 in 2019 to $35,411.43 in 2023. 1948 E. 29th was hit hardest by the lasting effects of the CITY and COUNTY's response to COVID-19 in 2022, when its $1.18M in total operating expenses dragged down its NOI and annual cash flows to -$237,064.07 and -$196,314.07, respectively. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

142. The 37-unit property located at and commonly known as 2000 E. 30th Street, Oakland, CA ("2000 E. 30th"), owned and operated by Plaintiff J & R Land & Cattle LP, has

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 2000 E. 30th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 11.6% decrease from $512,611.05 in 2019 to $452,834.98 in 2023. In order to combat unit turnover, 2000 E. 30th expended nearly $360,000 in marketing costs from 2020 through 2022, while also experiencing rising maintenance costs from 2020 through 2022. After generating positive NOI from 2019 through 2021, the delayed onset effects of the pandemic-era eviction moratoriums finally took hold in 2022 and 2023, as 2000 E. 30th posted NOIs of -$126,787.69 and -$23,143.08, respectively, with a combined cash flow during that period of -$84,767.88. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

143. The 37-unit property located at and commonly known as 2032-2040 E. 30th Street, Oakland, CA ("2032 E. 30th"), owned and operated by J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs expended from 2019 through 2023. Total maintenance costs at the property have risen with increased vacancies, from a 2019 total of $43,628.24 up to an annual cost of $65,679.03 in 2023 (a 50% increase). Total unit turnover costs increased from $24,827.29 in 2019 and $18,813.94 in 2020 up to $39,032.28 in 2023. Zooming out, the effects of these increased costs have impacted 2032 E. 30th's bottom line, as the property has generated both negative NOI and negative cash flow in three of the last five years. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

144. The 30-unit property located at and commonly known as 4220 Montgomery Street, Oakland, CA ("4220 Montgomery"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

expended from 2019 through 2023, which have cut into the property's bottom line. In light of COVID-induced vacancies, 4220 Montgomery undertook more repairs in 2022 than it had in all of 2019 through 2021 combined. These costs of repairs helped contribute to rising total operating expenses at 4220 Montgomery from 2019 through 2023, which grew from annual figures of $294,796.36 on the low end to $397,489.06 on the high end. As a result of these downswings in net operating income, 4220 Montgomery has generated negative annual cash flow in three of the past five years, including a low mark of -$84,788.60 in 2023. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

145. The 100-unit property located at and commonly known as 2801 Summit Street, Oakland, CA ("2801 Summit"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of costs related to unit turnover and repairs made therein, which have cut into the property's bottom line over the course of the last five years. In light of COVID-induced vacancies, 2801 Summit's costs of repairs in 2023 nearly matched the total amount of repair costs it had expended from 2019 through 2022 combined. This figure contributed to 2801's 2023 total operating expenses hitting a five-year high in 2023 ($1,147,194.93). As a result, and despite generating $1,674,809.50, 2801 Summit's 2023 NOI was its second lowest in the period of 2019 through 2023, as its 2023 cash flow also turned red to the tune of -$89,391.72. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

146. The 23-unit property located at and commonly known as 125 Moss Avenue, Oakland, CA ("125 Moss"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has also been impacted by the CITY and COUNTY's COVID-19 related moratoriums imposed against residential property owners. As a result of substantial costs related to unit turnover, unit and common area repairs and maintenance, and make-ready expenses, 125 Moss'

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

NOI decreased from $308,102.97 in 2021 and $311,310.95 in 2021 and 2022 to just $276,519.82 in 2023. As a result, 125 Moss' annual cash flow in 2023 came in at -$26,582.64 for the second consecutive year. As shown in the instant amended complaint and its attachments, such inferior performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

147. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 have suffered devasting financial losses because of the Moratoria and Phase Out Ordinance. As alleged herein, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 own real property in either the COUNTY or the CITY or both. All Plaintiffs' properties listed in Paragraphs Nos. 17-20 and 22-66 are rental properties and/or contain rental units, and Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 are housing providers of these rental properties.

148. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 purchased all of these rental properties prior to the Moratoria being enacted with objective reasonable investment backed expectations based upon the regulatory environment in place at the time of purchase. When determining whether their purchase of these rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the same longstanding property law principles that other market participants would have relied on, namely, that a housing provider-renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter complied with the material terms of the lease. When determining whether their purchase of the rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the COUNTY and CITY just cause eviction ordinances then in place, including but not limited to, the ability to evict a renter who failed to pay rent or otherwise violated the material terms of the lease but was still in possession of their property. Prior to the Moratoria being enacted, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's rental properties were profitable businesses, all of which yielded an average of many thousands of dollars a year in profit.

149. All properties listed in Paragraphs Nos. 17-20 and 22-66 have been occupied by

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

renters during the Moratoria. Since the Moratoria were enacted, and through the Moratoria's duration, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have had renters at these properties who have refused or failed to pay rent for their units or otherwise violated the material terms of their leases. Many of the renters that occupy the properties listed in in Paragraphs Nos. 17-20 and 22-66 did not cooperate with Plaintiffs' efforts to assist them in obtaining rental assistance through the CITY and COUNTY programs, resulting in Plaintiffs' inability to mitigate their lost rental profits. Other renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 did not qualify for rental assistance because their income level was too high and/or because they were not impacted by a Covid-19 related reason, resulting in Plaintiffs' inability to mitigate their lost rental profits. Plaintiffs' renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 also committed acts that damaged these properties during the time the Moratoria were in effect, which further devalued their properties.

150. Despite the above acts, the blanket Moratoria and the Phase Out Ordinance prohibited Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 from evicting these renters during the time the Moratoria were in place. Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have seen significant losses in property values as a direct result of the Moratoria enabling renters to fail to pay rent for any reason at all, to damage these properties without consequence, and to violate the material terms of their leases with impunity. These rental properties have lost many millions of dollars in property value and income as a direct result of the Moratoria and Phase Out Ordinance. Moreover, as a result of the CITY and COUNTY Moratoria and Phase Out Ordinance, Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66's collective losses in rent and property damages, and other damages are in excess of tens of millions of dollars.

151. The COUNTY and CITY are aware that the Moratoria and Phase Out Ordinance solely target housing providers in favor of renters, by allowing renters carte blanche to refuse to pay rent without basis, and permit renters to cause damage to housing providers' properties and otherwise violate their leases without consequence. Despite the significant harm the Moratoria and Phase Out Ordinance has caused housing providers, COUNTY and CITY have refused to

amend these regulations.  Accordingly, the character of the Moratoria and Phase Out Ordinance placed a severe and disproportionate regulatory burden upon Plaintiffs and forced Plaintiffs to carry the cost of a public program.  These regulations were the functional equivalent of a classic taking in which government directly appropriates private property or ousts the owner from his or her domain.

152.    With respect to each and every Plaintiff above, each Plaintiff suffered additional and further economic losses as detailed by the Declaration of Richard Marchitelli, MAI, CRE, ("Marchitelli Decl.," a true and correct copy of which is attached hereto as **Exhibit A**).  The Marchitelli Decl. (and any exhibits attached thereto) is incorporated into this Second Amended Complaint in full.

153.    Richard Marchitelli is a licensed real estate appraiser and a Member of the Appraisal Institute (MAI), and is the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC. (Marchitelli Decl., ¶ 2.)  Prior to this position, he served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield. (*Id.*)  His practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices.  (Marchitelli Decl., ¶ 3.)  He has prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. (*Id.*)

154.    As Marchitelli has determined, each and every fee property has suffered a substantial impairment of value, economic loss and economic use as a direct result of the COUNTY'S eviction band and/or of the CITY'S eviction ban. (Marchitelli Decl., ¶ 16.)   The severe and burdensome requirements of those ordinances, plus the uncertain and unpredictable end date, significantly increased the risk profile of these properties on a permanent basis and caused continuing negative harm to the economic value of each and every property. (*Id.*)

155.    Marchitelli has estimated that, based on his knowledge and experience, as a direct

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

result of the restrictions imposed by the CITY and/or COUNTY, the capitalization rates of each and every of these properties increased by at least 200 to 300 basis points, depending upon the individual characteristics of each property. (Marchitelli Decl., ¶ 24.) As detailed in the Marchitelli Decl., that increase in capitalization rate results in a corresponding decrease in economic value and economic use. (Marchitelli Decl., ¶¶ 7-10.)

156. The full scope of the economic impact for each and every property and Plaintiff herein shall be determined by the preparation of expert reports, determining the respective values before and after, in accordance with FRCP 26(a)). (Marchitelli Decl., ¶ 25.)

157. With respect to each and every Plaintiff above, each Plaintiff had a reasonable investment backed expectation to operate its respective property, and benefit from its full economic use, consistent with the land use regulations that were in place at the time of the property's purchase and that were in place prior to the enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

158. Each Plaintiff did not, and could not, reasonably expect the subsequent enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

159. Each Plaintiff did not, and could not, reasonably expect the substantial duration of the COUNTY’s eviction moratorium and/or the CITY’s eviction moratorium.

160. Each Plaintiff did not, and could not, reasonably expect the severe impact and disproportionate burden that the government forced them to bear as a result of the COUNTY’s eviction moratorium and/or the CITY’s eviction moratorium.

161. As a result of all of the above, the reasonable investment backed expectations of each and every Plaintiff were destroyed as a result of the COUNTY’s eviction moratorium and/or the CITY’s eviction moratorium.

//

**FIRST CLAIM[3]**

**(Violation of the 5th Amendment to the U.S. Constitution – Against All Defendants (42 U.S.C. § 1983))**

162. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 96 of this Complaint.

163. By enacting the Moratoriums and the Phase Out Ordinance, the COUNTY and the CITY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratoriums and the Phase Out Ordinance violate the Fifth Amendment of the United States Constitution on their face and as applied to Plaintiffs.

164. Defendants' Moratoriums and the Phase Out Ordinance purport to prohibit Plaintiffs from evicting any renter in the CITY and COUNTY for virtually any reason, with few exceptions under the three-year-plus timeframes thereunder. The Moratoriums and the Phase Out Ordinance perpetrate physical takings by illegally nullifying Plaintiffs and other housing providers' right to occupy their properties without just compensation; the Moratoriums and the Phase Out Ordinance *eliminate* renters' rent obligations and sanction renters' trespassing on Plaintiffs' properties. Preventing housing providers "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." (*Alabama Association of Realtors v. Department of Health and Human Services* (2021) 141 S.Ct. 2485, 2489; also see, *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435; *Cedar Point Nursery v. Hassid* (2021) 141 S. Ct 2063; *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 655 [Physical taking occurs when a regulation "effectively extinguish[es] plaintiffs' right to occupy substantial portions of their property"].)

165. The COUNTY and the CITY's moratoriums and the Phase Out Ordinance also

[3] Per the Court's Order on Motions to Dismiss, filed September 3, 2024, the Court granted Defendants' motions with respect to dismissal of HPOA and "with prejudice as to all claims except the regulatory-takings claims, which are dismissed without prejudice." Plaintiffs reasserts claims and parties dismissed with prejudice herein to preserve Plaintiffs' right to appeal.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

unreasonably and substantially interfered with Plaintiffs' investment-backed expectations, singled out Plaintiffs to bear the full cost of public benefits, and result in either a substantial or total deprivation of the economic value of Plaintiffs' properties. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104.)  The Moratoriums devalued properties by prohibiting Plaintiffs from recovering possession of their properties—even for their personal use—and even despite renters perpetuating ongoing nuisances and/or committing material violation(s) of the lease.  The Moratoriums and the Phase Out Ordinance further devalue properties by prohibiting eviction for *continued* nonpayment of rents for over a period of three years.  Plaintiffs have suffered significant financial losses due to the Moratoriums, and continue to suffer these losses under the Phase Out Ordinance, notwithstanding the expiration of the Moratoria, because the current government "relief" programs in place, have resulted in little to no relief.  Plaintiffs' "investment-backed expectations" have been violated as a matter of law.  (*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles* (C.D. Cal. 2020) 500 F. Supp. 3d 1088, 1096, *aff'd*, (9th Cir. 2021) 10 F.4th 905.) This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606.)

166.    For the foregoing reasons, the Moratoriums and the Phase Out Ordinance constitute takings without just compensation, and thus violates Plaintiffs' rights protected by the United States Constitution.   An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.  (28 U.S.C. § 2201.)

167.    As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.  Plaintiffs also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

//

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**SECOND CLAIM**

**(Inverse Condemnation – Violation of Article I, Section 19 of the California Constitution)**

168. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 102 of this Complaint.

169. The Moratoriums and the Phase Out Ordinance violate Article I, Section 19 of the California Constitution on their face and as applied to Plaintiffs, for all the reasons alleged herein.

170. The Moratoriums and the Phase Out Ordinance therefore constitute takings without just compensation, and thus violate Plaintiffs' rights protected by the California Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.

171. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.

**THIRD CLAIM**

**(Violation of Due Process (42 U.S.C. § 1983))**

172. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 106 of this Complaint.

173. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. (*Lockary v. Kayfetz* (9th Cir. 1990) 917 F.2d 1150, 1155; *Weinberg v. Whatcom County* (9th Cir. 2001) 241 F.3d 746, 752-755.) The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive due process rights on their face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' imposition of the blanket Moratoriums and the Phase Out Ordinance for that three-plus year time period are irrational and lacking in a legitimate government interest because there is no justification for such extreme measures. Indeed, California's COVID-19 Renter Relief Act never imposed such draconian restrictions. Further, the Bay Area saw

significant improvement in circumstances relating to the pandemic since March of 2020, has a high rate of vaccinations, and federal and state officials recognized during the period of time the Moratoria were in place that Covid-19 was either in, or moving to, an endemic stage. The pandemic should not have been used as a "cursory" justification for what would otherwise be an illegal law. (See, *Texas v. United States* (S.D. Tex. Aug. 19, 2021) No. 6:21-CV-00016, 2021 WL 3683913, at *45; *Chrysafis v. Marks* (2021) 141 S.Ct. 2482; *Tandon v. Newsom* (2021)141 S.Ct. 1294.) Defendants therefore have no rational basis for the Moratoriums and the Phase Out Ordinance, and any offered is plainly pretext. The Moratoriums and the Phase Out Ordinance violate procedural due process because they, in effect, deprive Plaintiffs of *any* procedure to recover their properties under most cases under the time period set forth thereunder.

174. The aforesaid acts, and as further alleged herein, therefore constitute violations of Plaintiff's procedural and substantive due process rights. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

175. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, emotional distress, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs are also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**(Violation of Equal Protection (42 U.S.C. § 1983))**

176. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 110 of this Complaint.

177. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the laws, on their face and as applied. The purpose of the Moratoriums and the Phase Out Ordinance is to unlawfully single out, penalize, and target Plaintiffs, and all housing providers in the CITY and COUNTY, by preventing them from lawfully exercising their property rights to receive rents, occupy their properties, exclude others from their properties, and protect their

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

properties from nuisance and damage. The "emergency" under which the Moratoriums were enacted no longer existed during their imposition; the Bay Area was open for business, has a high rate of vaccinations, and federal and state officials recognized that Covid-19 was either in, or moving to, and endemic stage. Thus, any stated rational government purpose to the contrary is pretext.

178. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the law, and as a result, Plaintiffs have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.) Plaintiffs have also entitled to recover their attorneys' fees under 42 U.S.C. § 1983.

**FIFTH CLAIM**
**(Writ of Mandate (CCP §§ 1085 or 1094.5))**

179. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 113 of this Complaint.

180. Code of Civil Procedure §§ 1094.5 or 1085 authorizes Plaintiffs to seek a writ of mandate/mandamus, and which authorizes the Court to review and set aside public agency decisions involving a prejudicial abuse of discretion or error of law.

181. Plaintiffs request the Court issue a declaration, and/or writ of mandate or mandamus, setting aside and voiding the effect of the Moratoriums and the Phase Out Ordinance as set forth hereunder. Plaintiffs also seek an immediate stay to enjoin Defendants from enforcing the Phase Out Ordinance and the Moratoria's ban on virtually all evictions during that three-year period, as such enforcement would further harm Plaintiffs by violating their statutory and constitutional rights as alleged herein, and the issuance of such a stay would not be against the public interest.

182. In enacting the Moratoriums and Phase Out Ordinance, Defendants exceeded their

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

jurisdiction, prevented Plaintiffs from having a fair trial, failed to proceed as required by law, and prejudicially abused their discretion because:

a. The Moratoriums and Phase Out Ordinance are preempted by the State's Covid-19 Renter Relief Act (the "Act"), both expressly and impliedly, because they conflict with the Act by depriving housing providers of the UD process altogether by prohibiting repossession of their properties in almost all circumstances under the timeframes set forth thereunder, thereby conflicting with that law. Because the Moratoriums and Phase Out Ordinance conflict with the Act, they are preempted and void.

b. The Moratoriums and Phase Out Ordinance unlawfully amend the CITY's Just Cause for Eviction Ordinance, which was enacted via voter initiative. (Oak. Mun. Code § 8.22.310.) While the COUNCIL is permitted to amend the Just Cause for Eviction Ordinance to a limited extent (see, Oak. Muni. Code § 8.22.360(F); City of Oakland Measure Y), the COUNTY is not, and the COUNCIL's moratorium and Phase Out Ordinance significantly surpasses the permissible scope of amendment permitted by the voters. Thus, these regulations are invalid.

c. The Phase Out Ordinance introduces substantive unlawful hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, allowing some renters to potentially stop paying rent altogether, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior, "unreasonable."

183. Moreover, as alleged herein, Defendants' aforesaid acts constitute unconstitutional per se, regulatory, de facto, and physical takings of Plaintiffs' properties without just compensation under the U.S. Constitution and violate Plaintiffs' constitutional rights to equal protection and due process, and any purported legitimate and/or rational basis for the same is pretext.

184. Because these are questions of law and implicate constitutional rights, the standard

of review falls under the independent judgment test/de novo review.

185.    To the extent Plaintiffs were required to exhaust any administrative remedies, they have, as alleged herein.

186.    As alleged herein, Plaintiffs have a beneficial interest in ensuring that the effect of the now-expired Moratoriums and current Phase Out Ordinance are struck down so that Plaintiffs statutory and constitutional rights are not infringed upon.  Plaintiffs do not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary to compel Defendants to correct their actions, which are unlawful and in excess of their authority.

187.    Plaintiffs are entitled to recover attorneys' fees under Cal. Civ. Code § 1021.5, and because the Moratoriums are arbitrary and capricious, lacking any reasonable basis, and/or discriminatory and illegal, Plaintiffs are additionally entitled to attorneys' fees under Govt. Code § 800(a).

WHEREFORE, Plaintiffs demand judgment against Defendants for the following:

**For Claims One, Two, Three and Four**:

1.    A preliminary and permanent injunction preventing enforcement of the Phase Out Ordinance;

2.    A declaratory judgment determining that Defendants' Moratoriums and Phase Out Ordinance constitute a taking under the United States and California Constitutions, and violate Plaintiffs' right to due process and equal protection;

3.    For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained;

4.    For general damages according to proof, in an amount that is yet to be ascertained;

5.    For an award of attorneys' fees and costs as allowed by law; and

6.    For any other relief that the Court deems just and proper.

**For Claim Five**:

1.    For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Phase Out Ordinance for all of

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

the reasons alleged above;

2. For a judgment that the Moratoriums and Phase Out Ordinance constitute unlawful takings on their face and/or as applied, and have prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation;

3. For a judgment that Defendants have violated Plaintiffs' equal protection and due process rights;

4. For an immediate stay or preliminary injunction, and permanent injunction enjoining Defendants from enforcing the Phase Out Ordinance pending the determination of the merits;

5. For costs of suit herein, including attorneys' fees;

6. For any other relief that the Court deems just and proper.

Dated: March 3, 2025

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all claims (other than the petition for writ of mandate) as stated herein.

Dated: March 3, 2025

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**VERIFICATION**

I, Emily L. Brough, am an attorney representing all Plaintiffs and Petitioners (collectively, "Plaintiffs") in this action. I have personal knowledge of the matters attested to in the fifth cause of action for writ of mandate (CCP § 1085), which are primarily questions of law, and it is for this reason that I, and not Plaintiffs, are verifying the fifth cause of action, only. I have read the cause of action for writ of mandate and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true. On this basis, I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge and that this verification was executed on March 3, 2025, in Soquel, California.

Emily L. Brough

# EXHIBIT A

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98122
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**DECLARATION OF RICHARD MARCHITELLI IN SUPPORT OF FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

Action Filed: March 1, 2022
Trial Date: None set

I, Richard Marchitelli, declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the following facts discussed below and would testify truthfully thereto if called to do so.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

2. I am the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC. Prior to my current position, I served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield.

3. My practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices. I have prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. I have served as a sole arbitrator and as a member of arbitration panels.

4. I currently serve as Chair of the Body of Knowledge Committee of the Appraisal Institute. I have formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICs, and Chair of Americas Valuation Standards Board of RICs.

5. A true and correct copy of my curriculum vitae ("CV") is attached hereto as **Exhibit B**.

6. I reviewed the temporary ordinances enacted by the City of Oakland[1] and Alameda County[2] in response to the COVID-19 pandemic. I also inspected the exterior of properties in Oakland located at 125 Moss Avenue, 1553 Alice Street, 1692-1694 12th Street, 2000 E. 30th Street, 3629 West Street, 3700 International Boulevard, and 8603 Hillside Street.

7. The market value of a rental property is determined by dividing the property's net operating income (income after expenses but before debt service) by a capitalization rate.[3] If a property's net operating income is $100,000 and 10% is the appropriate capitalization rate, its value is

---

1 Oakland City Ordinance No. 13606.

2 Alameda County Ordinance No. 2020-32.

3 The 7th edition of *The Dictionary of Real Estate Apprisal* published by the Appraisal Institute defines capitalization rate as "A ratio on one year's income provided by an asset to the value of the asset; used to convert income into value in the income capitalization approach."

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

calculated by dividing $100,000 by 10% or 100,000/.10 = 1,000,000. In this example, the indicated property value is $1,000,000. Proof of this calculation is demonstrated by multiplying the property's $100,000 income by a factor of 10 or 100,000 x 10 = $1,000,000.

8.  The capitalization rate is a basic tool used by buyers and sellers, investment analysts, mortgage underwriters, brokers, appraisers, and other real estate market participants to convert income into value. The capitalization rate reflects the risk of investing in a property. Capitalization rates are higher when the investment risk is greater because investors demand a higher return as compensation for accepting more uncertainty. The opposite is also true. The less the risk, the lower the capitalization rate.

9.  Using the above example, if the investment risk were greater, the 10% capitalization rate might be 13%. In such a situation, the $100,000 net income, which remains the same, would be divided by a 13% capitalization rate and the indicated property value would be $769,230 (100,000/.13 = 769,230). Conversely, if the investment risk were low and 7% is the appropriate capitalization rate, the property value would be $1,428,571 (100,000/.07 = 1,428,571).

10. In summary, the higher the capitalization rate, the lower the value; the lower the capitalization rate, the higher the value.

11. Situs RERC, a respected vendor of real estate data, publishes quarterly surveys of capitalization rates. Such surveys are aggregated by quarter, property type, capitalization rate, and region of the country. The following table reflects capitalization rate data of apartment buildings in the western United States. Because capitalization rates vary by the quality of the asset, RERC divides properties into the three categories:  Tier 1, being new or newer quality construction in prime to good locations; Tier 2, being aging, former first-tier properties, in good to average locations; and Tier 3, being older properties with functional inadequacies and/or in marginal locations.

12. A true and correct copy of Situs RERC's Reported Capitalization Rates Second and Third Tier Properties from first quarter 2020 through second quarter 2023 (the "Table") is attached hereto as **Exhibit A**.

13. Tier 1 properties are properties often purchased by pension funds, insurance companies, and sovereign wealth funds. I did not include Tier 1 capitalization rates in the Table because they are not relevant to this discussion.

14. The buildings I inspected were clearly Tier 3 properties. Nevertheless, the Table is useful to provide context and perspective by showing the gradation or differences in the capitalization rates between Tier 2 and 3 properties.

15. The Table's first column from the left is the quarter of each year from the beginning of 2020 through third quarter 2023. The second column from the left is the year. The Table reflects the low, average, and high capitalization rates reported by RERC each quarter for Tier 2 and Tier 3 properties. The column at the far right represents the quarterly difference in the capitalization rates between Tier 2 and Tier 3 properties. Beginning in first quarter 2021 the differences between Tier 2 and Tier 3 property capitalization rates appear to have widened.

16. The market value of properties in the City of Oakland and throughout Alameda County were adversely impacted by the city and county ordinances beginning on the dates they were adopted despite the expectation that, although unknown, the moratoriums were likely to be rescinded sometime in the future. This uncertainty substantially increased the risk profile of properties affected by the moratoriums, making such properties less desirable to prospective purchasers.

17. The risk profile of such properties was further increased by the various terms imposed by the moratoriums such as prohibiting eviction of certain residential tenants for non-payment of rent, landlords not being able to impose late charges, and landlords being forced to work out payment plans over time for back rent. There was also uncertainty as to whether 100% of the rents would be collected and whether some rents would be collected at all despite legal remedies available to landlords, which although available might not make economic sense to pursue.

18. Value is the anticipation of future benefits. Existing properties were faced with the economic reality that there was great uncertainty regarding the timing of when income would be received and the amount of income that would actually be collected. Timing and durability of income are major factors in the decision-making process of investors in determining the price to pay for property.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

19. In addition to the unpredictability of when the moratoriums would end and the realization that the effects of the moratoriums would not end immediately when they were rescinded, such as the difficulty of collecting rents, the regulations caused irreparable future harm to property values by reinforcing the perception of residential property investors that Oakland and Alameda County were not favorable places to do business and should be avoided.

20. There is no question that the risk profile of properties discussed above increased substantially and that the value of such properties was seriously impaired on the dates the moratoriums were adopted.

21. Below I have demonstrated potential effects of the moratoriums on the value of a property with a $100,000 net income by increasing the capitalization rate of a Tier 3 property to reflect the considerable uncertainty and risk associated with such properties.

22. I adjusted Tier 3 base capitalization rate of 6.5% upward in increments of 50 basis points. Applying an unadjusted base Tier 3 capitalization rate of 6.5% to a $100,000 income results in value of $1,538,000 (rounded).

23. Adding 200, 250, and 300 basis points to a Tier 3 capitalization rate of 6.5%, results in adjusted capitalization rates of 8.5%, 9.0%, and 9.5%, respectively. Applying those rates to an income of $100,000 results in the following:

100,000/.085 = 1,176, 470 or rounded value of $1,176,000

100,000/.09 = 1,111,111 or rounded value of $1,100,000

100,000/.09.5 = 1,052,631 or rounded value of $1,052,000

24. Based on my knowledge and experience, as a direct result of the restrictions imposed by the City of Oakland and Alameda County, the capitalization rates of these properties increased by at least 200 to 300 basis points, and likely more, possibly substantially more, depending upon the individual characteristics of each property.

25. The exact economic loss will be determined by an appraisal report to be prepared in the future in connection with this litigation.

I declare under the penalty of perjury that the foregoing is true and correct, and this declaration was executed March __3__, 2025 in the City of Charlotte, North Carolina.

Richard Marchitelli, MAI, CRE

**[Notary Public Verification on Following Page]**

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

Sworn to and subscribed before me this 3rd day of March, 2025, by Richard Marchitelli.

______________________________

______________________________, Notary Public

My Commission Expires: 5/11/2027

[Notary Seal]

TRACEY MARCHITELLI
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires May 11, 2027

# EXHIBIT A

| Situs RERC - Reported Capitalization Rates Second and Third Tier Properties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Apartments | | West Region 2nd Tier | | | West Region 3rd Tier | | | Difference 2nd vs. 3rd |
| Quarter | Year | Low | High | Average | Low | High | Average | (Basis Points) |
| Q1 | 2020 | 4.00% | 7.00% | **5.60%** | 4.80% | 8.00% | **6.20%** | **60** |
| Q2 | 2020 | 4.00% | 7.50% | **5.80%** | 5.00% | 7.80% | **6.30%** | **50** |
| Q3 | 2020 | 4.50% | 7.80% | **5.80%** | 5.00% | 9.80% | **6.50%** | **70** |
| Q4 | 2020 | 5.00% | 7.00% | **5.80%** | 5.30% | 8.00% | **6.30%** | **50** |
| Q1 | 2021 | 5.00% | 7.50% | **6.10%** | 5.50% | 8.50% | **6.80%** | **70** |
| Q2 | 2021 | 4.50% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q3 | 2021 | 4.80% | 7.50% | **5.90%** | 5.30% | 8.50% | **6.50%** | **60** |
| Q4 | 2021 | 4.80% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q1 | 2022 | 4.50% | 7.50% | **5.70%** | 5.30% | 8.50% | **6.60%** | **90** |
| Q2 | 2022 | 5.00% | 7.00% | **6.10%** | 5.50% | 8.50% | **6.90%** | **80** |
| Q3 | 2022 | 4.80% | 10.00% | **6.20%** | 5.00% | 12.00% | **7.00%** | **80** |
| Q4 | 2022 | 5.00% | 7.50% | **6.30%** | 5.50% | 8.50% | **7.10%** | **80** |
| Q1 | 2023 | 4.00% | 7.80% | **6.10%** | 4.30% | 11.00% | **7.00%** | **90** |
| Q2 | 2023 | 5.00% | 8.00% | **6.50%** | 5.50% | 8.80% | **7.20%** | **70** |

# EXHIBIT B

CURRICULUM VITAE

# Richard Marchitelli, MAI, CRE

*Senior Managing Director, Newmark Valuation & Advisory, LLC*
*Leader Litigation Support Practice*

## Professional History

**Newmark Valuation & Advisory, LLC**
Senior Managing Director
Leader Litigation Support Practice
Charlotte, North Carolina
201-421-5308
richard.marchitelli@nmrk.com
2024 - Present

**Cushman & Wakefield**
Executive Managing Director
Americas Leader Dispute Analysis & Litigation Support Practice
New York, New York/Charlotte, North Carolina
2003 - 2024

**PricewaterhouseCoopers**
Director, Real Estate Practice
Leader Real Estate Litigation Support Practice
New York, New York
2000 - 2003

**Marchitelli Barnes & Company**
Founding Partner
New York, New York
1973 – 2000

## Experience

Mr. Marchitelli's practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices. Mr. Marchitelli has prepared expert reports in matters involving economic damages, breach of contract and breach of fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. Additionally, he has served as a sole arbitrator and as a member of arbitration panels.

Mr. Marchitelli has provided consulting and valuation services involving challenging and unusual properties such as the High Line, an elevated rail corridor in Manhattan that has been converted into an urban park; development restrictions on properties surrounding McCarran Airport in Las Vegas; the Trans Alaska Pipeline; a mixed-use development site in Lima, Peru; the Hancock Center Observation Deck in Chicago; an 1,800-mile rail corridor and over 900 separate underground pipeline easements extending through six western states from Texas to Oregon and Nevada; a submarine maintenance and manufacturing facility in Groton, Connecticut; regulatory takings cases; the Northrop Grumman former military aircraft manufacturing property in Bethpage, New York; BP headquarters building in Houston; an oil drill site on



the North Slope of Alaska; luxury condominium resort on St. John in the U.S. Virgin Islands; mixed-use development properties in Guadalajara and Puerto Vallarta, Mexico; the Ritz Carlton Condominiums, Washington, DC.; an office industrial complex in Dublin, Ireland; and environmental contamination matters throughout the U.S. involving groundwater, radioactive waste, and airborne particulates.

Mr. Marchitelli has testified in arbitration proceedings at the International Centre for Settlement of Investment Disputes in Washington, DC, and has qualified as an expert witness in United States District Court, United States Tax Court, United States District Court of Federal Claims, United States Bankruptcy Court, and in various state and local courts, including Alaska, California, Georgia, Florida, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin. He has also been a court-appointed third-party expert in matters involving the valuation of real property.

Mr. Marchitelli is a former Adjunct Assistant Professor of Real Estate at New York University in the Master of Real Estate program where he taught post graduate courses in real estate valuation principles and concepts and marketability and feasibility studies. For 20 years, he taught courses nationally on the Uniform Standards of Professional Appraisal Practice.

Mr. Marchitelli has authored articles published in The Appraisal Journal, Real Estate Issues, Real Estate Forum, Appraisal Digest, and The Canadian Appraiser. He was a reviewer of the 9th, 10th, 11th, 12th, 13th, 14th, and 15th editions of *The Appraisal of Real Estate* and, as a subject matter expert, supervised publication of the 9th and 13th editions of that text. He was a reviewer of the 1st through 6th editions of *The Dictionary of Real Estate Appraisal* and supervised production of the 1st and 5th editions. In addition, Mr. Marchitelli has served as a reviewer of various other texts and monographs published by the Appraisal Institute and as a reviewer of several courses developed by that organization. He is also co-author of a chapter on the valuation of pipeline corridors in *Corridor Valuation: An Overview and New Alternatives* published in 2019 by the Appraisal Institute, International Right of Way Association, and Appraisal Institute of Canada.

**Education**

Belmont Abbey College, Belmont, North Carolina
Degree: Bachelor of Arts, Political Science
*Who's Who in American Universities and Colleges*

**Professional Affiliations**

Appraisal Institute (MAI Designation)
The Counselors of Real Estate (CRE Designation)
American Bar Association (Associate Member)

Mr. Marchitelli currently serves as Chair of the Body of Knowledge Committee of the Appraisal Institute. He formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICS, and Chair of Americas Valuation Standards Board of RICS. In addition, Mr. Marchitelli is a past Editor-in-Chief of The Appraisal Journal and former Editor-in-Chief of Real Estate Issues. He served as Chair of the New York Metropolitan Chapter of The Counselors of Real Estate, President of the Metropolitan New York Chapter of the Appraisal Institute, President of the Long Island Chapter of the Appraisal Institute, and President of the New York Condemnation Conference. Mr. Marchitelli is also licensed as a general real estate appraiser in several states.



### Special Awards

Mr. Marchitelli was awarded the George L. Schmutz Memorial Award by the Appraisal Institute for his assistance in the publication of *The Dictionary of Real Estate Appraisal.* He received the Wagner Award from the Appraisal Institute, which is presented to individuals in recognition of their contribution to the advancement of valuation knowledge and education, and he was also a recipient of the Lum Award presented annually by the Appraisal Institute to individuals for furtherance of the ideals of the real estate valuation profession.

### Select Presentations

"Property Markets – Past Present and Future", Duane Morris Fall Conference, Boca Raton

"Appraisal Myths and Market Realities", International Association of Assessing Officers, Salt Lake City

"How To – And How Not to – Develop Cap Rates in Fee Simple Market Valuation", Institute for Property Taxation – American Bar Association, New Orleans

"Experts Beware: Calculating Damages Attributable to Environmental Impairment and Detrimental Conditions", Appraisal Institute, Las Vegas

"Environmental Impairment and Damages Models: Distinguishing Real Science from Junk Science," Connecticut Legal Conference, Connecticut Bar Association, Hartford

"Plaintiff Damages Theories in Property Valuation Diminution Cases," Defense Research Institute, New Orleans

"The Challenge of Temporary Damages", International Right of Way Association, Hickory, NC

"Problems in Valuation – Working Beyond the Obvious," American Law Institute, Scottsdale

"Property Rights Symposium," Appraisal Institute, Chicago

"Power Plant Decommissioning, Retirement & Remediation – Providing Assistance in the Decision-Making Process: Buy, Sell, or Hold," Marcus Evans, Nashville

"Outside the Box: The Wide World Beyond Appraisal Opinions," Appraisal Institute, Nashville

"Evidentiary and Other Problems in Developing Post-Event Damage Estimates," New York County Lawyers' Association, New York

"Corridor Valuation and Depreciation Theory: Controversies – Alternative Approaches – Differing Perspectives," the 44th Annual Wichita Program, Wichita State University

"Corridor Valuation: Alternative Approaches/Differing Perspectives," International Right of Way Association, Hartford



"Expert – Attorney Communication:  Defining the Scope of Work," National Association of Property Tax Attorneys, Las Vegas

"Project Influence", American Law Institute, Irvington, VA

"Fee Simple and Leased Fee Valuations:  Distinctions with Real and Subtle Meanings" ABT/IPT Advanced Property Tax Conference, New Orleans

"How to Simplify Valuation in the Courtroom", American Law Institute, San Francisco

"How Real Estate Valuers Have Abdicated Their Role in Commercial Litigation," Southern California Chapter of the Appraisal Institute, Los Angeles

"Ask the Valuation Experts," International Association of Assessing Officers, Sacramento

"Tracking Property Value Diminution through Market Cycles: Theory & Evidence", Moderator, Appraisal Institute, Austin

"The Value of Design:  Why Do Developers Hire Name Architects?" Los Angeles Chapter of the American Institute of Architects, Los Angeles

"The Role of an Arbitrator," Urban Land Institute, Denver

"Going Concern:  Differing Perspectives on Real Property and Valuation Issues" Moderator, RICS Summit, Toronto

"Complex Commercial Litigation – Taking Valuation Skills to the Next Level," Appraisal Institute, Indianapolis

"Use of First and Second-Generation Rents, Changes in Highest and Best Use, and Maintaining Distinctions Between Fee Simple and Leased Fee Valuations," New York County Lawyers' Association, New York

"Valuation of Real Property and Intangibles: Market Realities," Moderator, RICS Summit, Miami

"Analyzing Market Trends and Comparable Selection in a Declining Market" – Webinar – Appraisal Institute

"Appropriate (Inappropriate) Use of Fee Simple and Leased Fee Data and First and Second-Generation Rents," National Association of Property Tax Attorneys, New York

"Valuation of Real Estate in Distressed Markets," The Counselors of Real Estate, Philadelphia

"A New Paradigm for Valuation", Valuation Colloquium, Clemson University

"Assessment and Valuation Issues Surrounding Retail Properties," Institute for Professionals in Taxation, Austin



"Preparing for Deposition Testimony and Presentations at Trial," American Law Institute, Irvington, VA

"Trial Issues and Presentations" American Law Institute, Scottsdale

"The Recession and Its Causes: Where Do We Go from Here", International Association of Assessing Officers", Louisville

"Valuing and Pricing Distressed Properties," Buying Distressed Commercial Loans and Property, Summit East, New York

"Follow Up: Corridors and Rights of Way and Policy Issues", Appraisal Institute and Appraisal Institute of Canada, Ottawa

"Corridor and Rights of Way II: Valuation Policy", Moderator, Centre for Advanced Property Economics and International Right of Way Association, San Diego

"Right of Way: Valuation Policy Issues", Moderator, American Bar Association, Centre for Advanced Property Economics, Appraisal Institute, and International Right of Way Association, Washington, DC

"Elements of an Expert Report," CLE International, Richmond

"Contemporary Valuation Issues," Valuation & Legal Issues Shared Interest Group, Appraisal Institute, Washington, DC

"Issues Related to Real Estate in Dispute Resolution," Association for Conflict Resolution of Greater New York, New York

"Property Valuation: Problems & Issues in Litigation," New York City Law Department, New York

"An Introduction to Damages Models," Valuation & Legal Services Shared Interest Group of the Appraisal Institute, Chicago

"Do You Know a Ground Lease from a Leasehold?" Association for Conflict Resolution – Greater New York Chapter, New York

"Data Reliability," National Conference of State Tax Court Judges, Lincoln Land Institute, Chicago

# ATTACHMENT

# (Red-lined Complaint)

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
~~SAM SPIEGELMAN (N.Y. Bar No. 5573100)~~
~~255 South King Street, Suite 800~~1425 Broadway, #429
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org
~~SSpiegelman@pacificlegal.org~~

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

**ZACKS & FREEDMAN, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**~~FIRST~~ SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

(42 U.S.C § 1983; C.C.P § 1085)

**DEMAND FOR JURY TRIAL**

Action Filed: March 1, 2022
Trial Date: None set

1. Plaintiffs and Petitioners (collectively, "Plaintiffs"), hereby bring this first amended and supplemental complaint and petition for relief[1] against Defendants and Respondents ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND and OAKLAND CITY COUNCIL (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratoriums (collectively, "Moratoriums") and subsequent "phase out" regulations, and an order declaring said regulations invalid, illegal, and unenforceable.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative fact, and thus form the same case or controversy under Article III of the United States Constitution.

**DIVISIONAL ASSIGNMENT**

3. Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California and thus should be assigned to the Court's Oakland Division.

**VENUE**

4. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants/respondents reside in this judicial district and the events giving rise to the claims occurred in this district.

**PARTIES**

5. Defendant and Respondent ALAMEDA COUNTY (the "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6. Defendant and Respondent ALAMEDA COUNTY BOARD OF SUPERVISORS

[1] A blacklined comparison of the amended and supplemental complaint with the original complaint is attached hereto ~~as **Exhibit A**~~.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

(the "BOARD") is a policy making, legislative, and quasi-judicial administrative body of the COUNTY.

7. Defendant and Respondent CITY OF OAKLAND (the "CITY") is a municipal corporation in the State of California.

8. Defendant and Respondent OAKLAND CITY COUNCIL (the "COUNCIL") is a policy making, legislative, and quasi-judicial administrative body of the CITY.

9. Plaintiff JOHN WILLIAMS is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

10. Plaintiff ROBERT VOGEL is an individual over the age of 18 and is a housing provider and owner of real property in the COUNTY.

11. Plaintiff SHEANNA ROGERS is an individual over the age of 18 and is a housing provider and the owner of real property in the COUNTY.

12. Plaintiff MICHAEL LOEB is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

13. Plaintiff JAQUELINE WATSON-BAKER is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

14. Plaintiff HANNAH KIRK is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 4514 Fairbairn Ave, Oakland, CA.

15. Plaintiff AMI SHAH is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

16. Plaintiff AVINASH JHA is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

17. Plaintiff WILLIAM ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

18. Plaintiff MADELEEN ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Summit Street, Oakland CA.

19. Plaintiff NORMAND GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

20. Plaintiff MICHELLE GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

21. Plaintiff and Petitioner HOUSING PROVIDERS OF AMERICA ("HPOA") is a § 501(c)(4) nonprofit corporation. HPOA is a network of housing activists fighting to protect the legal rights of housing providers, including those in the CITY and the COUNTY. HPOA's members own rental housing in and throughout the CITY and the COUNTY, and have been directly and adversely affected by the CITY and COUNTY's residential eviction Moratoriums and the CITY's subsequent "phase out" regulations. All of HPOA's members are housing providers in either the CITY and/or COUNTY; all of HPOA's members have renters at their properties who are taking advantage of the CITY and COUNTY's regulations, including but not limited to, refusing to pay rent for non-Covid-19 related reasons during the time period set forth thereunder, and refusing to relinquish possession, and creating nuisances and damage to HPOA's members' properties. HPOA's members have been unable to collect rent for time periods of months and/or years with no financial relief provided by the CITY and COUNTY, and the CITY and COUNTY's complete defense against virtually all residential evictions for a period of three-plus-years have tied HPOA's ~~members~~members' hands. HPOA's members have suffered lost rents, devalued properties, and some face impending foreclosures and bankruptcies, as a result of the CITY and COUNTY's regulations. The harm and injury brought to HPOA's members by the regulations is current, ongoing, and concrete and particularized to all HPOA's members. HPOA's efforts to remedy these injustices are central to its purpose of fighting to protect the legal rights of housing providers, including those in the CITY and COUNTY. Neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit. HPOA has a direct and substantial interest in ensuring that Defendants' decisions are in conformity with the requirements of law, that those requirements are properly executed, and that Defendants'

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

duties are enforced.

22. Plaintiff 2355 Broadway, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2355 Broadway, Oakland CA.

23. Plaintiff 3900 Adeline, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the COUNTY located at 3900 Adeline, Emeryville CA.

24. Plaintiff Hollis Street Partners, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3250 Hollis Street, Oakland CA.

25. Plaintiff Vulcan Lofts, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4401 San Leandro Street, Oakland CA.

26. Plaintiff 1614 Campbell Street DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1614 Campbell Street, Oakland CA.

27. Plaintiff 3014 Chapman DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3030 Chapman Street, Oakland CA.

28. Plaintiff B3 Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 5200 Adeline Street, Emeryville , CA.

29. Plaintiff Bakery Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4600 Adeline Street, Emeryville, CA.

30. Plaintiff Exchange Studios DEL, LLC is a Delaware limited liability company,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

qualified to do business in California and the owner of real property in the CITY and COUNTY located at 527 23rd Avenue, Oakland, CA.

31. Plaintiff Madison Park Properties II DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1155 - 5th Street, Oakland CA.

32. Plaintiff P&D 23rd Avenue Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1080 23rd Avenue, Oakland CA.

33. Plaintiff P&D 46th St. Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 964 46th Street, Oakland CA.

34. Plaintiff Sears Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2633 Telegraph Ave, Oakland CA.

35. Plaintiff 301 Lenox, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 301 Lenox Avenue, Oakland CA.

36. Plaintiff 2228 Union Street Investors, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1438 Madison Street, Oakland CA, 7511-7527 Bancroft Avenue, Oakland CA, 8603 Hillside Street, Oakland CA, and 8701 Hillside Street, Oakland CA.

37. Plaintiff J & R Land & Cattle LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1551 Madison Street, Oakland CA and 2000 E. 30th Street, Oakland CA.

38. Plaintiff J & R Land & Cattle II LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1935-1948 E. 29th Street, Oakland CA, 1935-1945 E. 30th Street, Oakland CA, and 2032-2040

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E. 30th Street, Oakland CA.

39. Plaintiff Westpark Apartments, LLC is a California limited liability company, qualified to do business in California and the owner of real properties in the CITY and COUNTY, located at 433 Perkins Street, Oakland CA, 1553 Alice Street, Oakland CA, and 4220 Montgomery Street, Oakland CA.

40. Plaintiff Westpark II, GP is a California partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1530 Harrison Street, Oakland CA and 1555 Madison Street, Oakland CA.

41. Plaintiff 685 Scofield, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 385-389 Palm Avenue, Oakland CA.

42. Plaintiff 296 Mather Street, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 296 Mather Street #7, Oakland, CA.

43. Plaintiff BayOak Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 2375 Fruitvale Ave #301, Oakland CA.

44. Plaintiff Burling Street Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, and 1704 Upper 14th Street, Oakland CA.

45. Plaintiff Rising Tide Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 722 Upper 30th Street, Oakland CA, 923-923A Apgar Street, Oakland CA, 827 30th Street Oakland, CA, 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 835 40th Street #4, Oakland CA, 860 34th Street, Oakland CA, 716-720 37th Street, Oakland, CA, 1021 Campbell Street, Oakland, CA, 1704 14th Street, Oakland, CA.

46.    Plaintiff Oakland Point Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

47.    Plaintiff Truckee Zurich Place, LLC is a Delaware limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1036 62nd Street #4, Oakland CA, 2215-2217 Eighth Street, Berkeley, CA~~2215 Eighth Street, Berkeley CA~~, 2839 Linden Street, Oakland CA, 1688-1692 12th Street, Oakland CA~~1692 12th Street, Oakland CA~~, 1694 12th Street, Oakland CA, 1704 Upper 14th Street, Oakland CA, 695-701 30th Street, Oakland CA.

48.    Plaintiff 18th & Linden, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1054 18th Street, Oakland CA.

49.    Plaintiff 220 Grand Investors, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 220 Grand Avenue, Oakland CA.

50.    Plaintiff 818 East 20th Street Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 800-818 E 20th Street, Oakland CA.

51.    Plaintiff 1130 30th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3649 Martin Luther King Jr Way, Oakland CA.

52.    Plaintiff 1701-1703 36th Avenue Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1701-1707 36th Avenue, Oakland CA.

53.    Plaintiff 1732-1744 27th Avenue, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1732-1744 27th Avenue, Oakland CA.

54.    Plaintiff 1844 7th Avenue 2013, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1844 7th Avenue, Oakland CA.

55.    Plaintiff 2000 Linden Street, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2000 Linden Street, Oakland CA.

56.    Plaintiff 2019 ABD Ozone Fund, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 831 6th Avenue, Oakland CA.

57.    Plaintiff 2367 Washington, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 245 Lee Street, Oakland CA.

58.    Plaintiff 2531 East 16th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1638 47th Avenue, Oakland CA.

59.    Plaintiff 2701 High Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2701 High Street, Oakland CA.

60.    Plaintiff ABD Suites, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1008 E 23rd Street Oakland, CA and 1722 27th Avenue Oakland, CA.

61.    Plaintiff 301 Hannah Park, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2850 Hannah Street, Oakland CA.

62.    Plaintiff Oakbrook Partners, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1125-1135 E 18th Street, Oakland CA and 1221 E 20th Street, Oakland CA.

63. Plaintiff Riaz Capital Ozone Fund III, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1705 Mandela Parkway, Oakland CA, 2133-2143 Dwight Way, Berkeley CA, 2618 Martin Luther King Jr Way, Berkeley CA.

64. Plaintiff Riaz Taplin, trustee of The A.R.T. Trust is an individual over the age of eighteen. The A.R.T. Trust is the owner of real properties in the CITY and COUNTY located at 1454 36th Avenue, Oakland CA, 1616 35th Avenue, Oakland CA, 1828 28th Avenue, Oakland CA, 2166 E 27th Street, Oakland CA, 2554 E 16th Street, Oakland CA, 3700 International Boulevard, Oakland CA.

65. Plaintiff 1715 FFT, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1715 High Street Oakland, CA.

66. Plaintiff 1830 6th Ave Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1830 6th Avenue Oakland, CA.

67. Plaintiffs are not aware of the identities of defendants/respondents DOES 1-10, who are responsible for the acts and omissions alleged herein and that caused damage to Plaintiff; therefore, Plaintiffs will amend this Complaint when the true identities of DOES 1-10 are ascertained.

68. Plaintiffs are informed and believe that at all times mentioned in this Complaint, all defendants/respondents were the agents or employees of their co-defendants/respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## STATEMENT OF FACTS

### A. Background: The California Governor's Order and the COVID-19 Renter Relief Act.

69. In response to the Covid-19 pandemic, Governor Newsom declared a State of Emergency in California on March 4, 2020, pursuant to the California Emergency Services Act (ESA), Gov. Code sec. 8550, et seq. On March 16, 2020, Governor Newsom entered an executive order, which in part permitted local governments to temporarily limit housing providers' ability to evict for nonpayment of rent due to the Covid-19 crisis. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

(Executive Order (EO) N-28-20.) The March 16, 2020 provision, permitting local government to temporarily limit Covid-19-related nonpayment evictions, expired on September 30, 2020. (EO N-71-20.)

70. Prior to the expiration of that provision, the California Legislature enacted the "COVID-19 Renter Relief Act" and the "COVID–19 Small Housing provider and Homeowner Relief Act of 2020" via AB 3088, effective August 31, 2020. AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure section 1161 et seq., and was aimed at "**temporary emergency relief** for financially distressed renters, homeowners, and small housing providers . . . ." Among other things, AB 3088 provided statewide eviction protections during a particular time period for renters who could not pay their rent for Covid-19-related reasons. AB 3088 also directed state agencies to engage about potential strategies for relief for renters and housing providers who suffered Covid-19-related financial hardship.

71. Notably (and consistent with the Governor's prior order), AB 3088's temporary moratorium on residential evictions was *specifically* limited to those based upon inability to pay for Covid-19-related financial distress. Even during the temporary moratorium, housing providers were still permitted to file actions for, and courts were still permitted to find renters

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

guilty of, UD for fault, and no-fault "just cause" as defined under Civil Code sec. 1946.2.[2] (CCP § 1179.03.5(a)(3).)

72.     AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals ***negatively impacted*** by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect renters from eviction." (CCP § 1179.05(b), (e), (f), emph. add.)  While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give carte blanche authority to do so, nor did it immunize "emergency" municipal regulations from challenges based on state law preemption.

73.     The Covid-19-related nonpayment eviction protections of AB 3088 were extended thereafter through SB 91 AB 832, and AB 2179.  These enactments protected affected renters from eviction during this extended time period under the UD statutes so long as they complied with the Covid-19-related financial distress requirements.

74.     These enactments further clarified the State's rental assistance program.  Starting October 1, 2021, and until July 1, 2022, for any Covid-19-related hardship rental debt that came due between those dates, a renter was required to show that they completed an application for rental assistance through the State program.  If they did not, the housing provider could move forward with an UD action for nonpayment of rent.   A housing provider could also have moved forward with a UD action if the rental assistance application was denied.  (CCP § 1179.11(a), (c).)

---

[2] Civil Code sec. 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code sec. 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." (Civ. Code § 1946.2(g)(1).)

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**B. The CITY's Eviction Moratorium**

75. On March 9, 2020, the CITY declared a local state of emergency due to Covid-19. The CITY's local emergency was ratified on March 12, 2020, via Resolution No. 88075 C.M.S, and pursuant to the ESA, which permits municipalities to declare local emergencies under specified circumstances. (Gov. Code §§ 8558(c), 8630.) The ESA also requires a municipality to terminate the local emergency ". . . at the earliest possible date." (Gov. Code § 8630 (d).)

76. After ratifying the Local Emergency, on March 27, 2020, the CITY passed its eviction moratorium, Ordinance No. 13589. That moratorium not only prohibited evictions for nonpayment of rent due to Covid-19-related financial distress, but also *all other evictions*, with few exceptions:

> **Residential Eviction Moratorium.** Except when the renter poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (–) – (10) [excepting Ellis Act evictions] that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency.

77. Initially, the CITY's moratorium on all evictions was set to expire on May 31, 2020, "unless extended." (Ordinance No. 13589.) Subsequently, the moratorium was extended until "the Local Emergency declared on March 9, 2020 has been terminated by the City Council, or August 31, 2020, whichever comes first." (Ordinance no. 13594.) However, on July 7, 2020, the extension on the eviction moratorium was again amended to *only* expire when the local Emergency had been terminated by the COUNCIL. (Ordinance No. 13606 (Ex. 1).) The local Emergency has no stated expiration date and the CITY's position is that it has not expired.

78. After this action was filed, the CITY enacted Ordinance No. 23-0216 ("Phase Out Ordinance") on May 2, 2023, which, while providing for a "phase out" of the CITY's moratorium, also kept the "local emergency" in place. The Phase Out Ordinance provides that the CITY's moratorium shall end on July 15, 2023. However, the Phase Out Ordinance

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

continued to prohibit evictions for virtually any reason, including non-payment, if the grounds for eviction arose between March 9, 2020 and July 14, 2023. Thus, per the Phase Out Ordinance, the effect of the CITY's moratorium is still in place for that three-year-plus period . The Phase Out Ordinance also amended the CITY's Rent Ordinance, further restricting housing providers' "just cause" reasons for eviction. For example, the amendments introduced substantive hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior "unreasonable" in light of that term.

**C. The COUNTY's Eviction Moratorium**

79. The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which, like the CITY's moratorium, purported to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO § 6.120 (Ex. 2).) The COUNTY's moratorium applied to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.) These exceptions were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).) Like the CITY's moratorium, the COUNTY'S moratorium provided that it was an "absolute defense" to an unlawful detainer action brought during its term. (ACCO § 6.120.030(D).)

80. As enacted, the moratorium expired sixty days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the ratification of the local emergency, the local emergency "shall remain in effect until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-91.) On February 28, 2023, the COUNTY rescinded its local emergency. Accordingly, the COUNTY's moratorium expired on April 29, 2023.

Notwithstanding, it is the COUNTY's position that evictions are prohibited for virtually any reason, including non-payment and even if there was no Covid-19 relate financial distress, if the grounds for eviction arose between March 9, 2020 and April 28, 2023. Thus, the effect of the COUNTY's moratorium is still in place for that three-year-plus period.

**D. <u>The COUNTY and CITY's Rent Relief Assistance Programs</u>**

81. State law requires local governments to develop mechanisms by which housing providers and renters may file applications for, and receive if eligible, Covid-related rent relief.

82. The CITY operated a rent relief assistance program called "Oakland's Emergency Rental Assistance."[3] At the time of filing this action, Oakland's Emergency Rental Assistance website stated: "UPDATE. PLEASE NOTE. As of January 7, the City of Oakland's Emergency Rental Assistance program is oversubscribed. Tenants and Landlords may still submit an application but will be placed on a waitlist." Currently, the website instead refers applicants to the COUNTY's rent relief assistance program, "Housing Secure." However, since this action was filed, the Housing Secure website stateds: "We have received more requests for funds than we have currently available."[4]

83. Importantly, tenants in the CITY and COUNTY need not to participate in *any* rent relief program to avoid eviction under the relevant three-year-plus time frames of the Moratoria and the Phase Out Ordinance; the Moratoria and the Phase Out Ordinance's ban on evictions for the three-year-plus period prohibit evictions even for those tenants who refuse to cooperate with a landlord's request that they seek relief under these programs. This directly contradicts the purpose, intent and procedures of state law.

**E. <u>The Moratoriums' Detrimental Impact on Plaintiffs</u>**

84. The Moratoria, and as codified through the Phase Out Ordinance, have had devastating impacts on housing providers throughout the CITY and COUNTY, and to all

[3] ~~https://www.oaklandca.gov/departments/department-of-housing-and-community-development~~

[4] ~~https://www.ac-housingsecure.org/?locale=en~~

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Plaintiffs in this action. The following cases are but a few more detailed examples.

85. Plaintiff JOHN WILLIAMS is a housing provider in the CITY and COUNTY and owns the property at 1109 32nd Street, Oakland, CA. ("1109 32nd Street"). 1109 32nd Street is a duplex, and the rent for the property only barely covered WILLIAMS' property expenses for 1109 32nd Street. The renter in the three-bedroom one-bath downstairs unit, Martina Martin, has occupied the unit for approximately twelve years, and until the Moratoria were enacted, always paid the rent for the unit, which was approximately $1,500.00 per month. After the CITY and COUNTY enacted the Moratoriums, however, the renter stopped paying rent and refused to pay through the entire duration of the CITY's Moratorium. The renter's failure to pay is not related to any Covid-19 related reason. In fact, the renter operated a moving and storage business, "Martina's Ride" out of her unit since 2017, and through much of 2021. The renter refuses to cooperate with WILLIAMS' efforts to obtain unpaid rents through the rent relief program, and therefore the CITY rejected WILLIAMS' application for noncompliance. The renter in the upper unit vacated in March of 2021. WILLIAMS was concerned that a new renter would move in and refuse to pay rent, so he kept that unit vacant after the renter left. In October of 2021, WILLIAMS was so riddled with stress caused by his non-paying renter and the very real possibility of losing 1109 32nd Street to foreclosure, he was hospitalized ~~and~~for panic attacks, chronic stress, and depression. To~~, to~~ date, WILLIAMS remains disabled as a result. His disability forced him to quit his job and move into the upper unit of 1109 32nd Street—directly above his non-paying renter—to save money. WILLIAMS was also forced to take out a business loan upon exhausting his 401(k) and savings. WILLIAMS was unable to commence a nonpayment eviction against his renter as a direct result of the Moratoriums and in contravention of state law. While WILLIAMS has recently received some mortgage assistance from the State of California, he has not received any back rent payments, nor does the amount of mortgage assistance that WILLIAMS has received cover what his nonpaying tenant refused to pay. In the short term, from 2020 through 2023, WILLIAMS is owed approximately $60,000.00 in delinquent rent. As a result of same, he has been unable to pay his monthly mortgage, taxes,

property maintenance, and utilities in a timely and routine manner. In the long term, the Moratoria and the CITY and COUNTY's enactment and enforcement of same have cast serious doubt on WILLIAMS future. WILLIAMS first purchased 1109 32nd Street to provide himself with housing security and reliable passive income upon hitting retirement. The occurrence of the events stemming from the CITY and COUNTY's Moratoria have clouded WILLIAMS' vision of his future, as it is no longer a safe assumption that he will be able to fully enjoy his rights as a residential property owner entering into a landlord-tenant relationship with others. It has been shown from the CITY and COUNTY's course of conduct that third parties may be allowed to move into WILLIAMS property and subsequently be granted relief from paying rent based on what the CITY and COUNTY find to be acceptable excuses. WILLIAMS is now forced to solve not only the situation with his current tenant but also what to do with this valuable piece of property that he once relied upon to secure his future.

86. Plaintiff ROBERT VOGEL ("VOGEL") is a housing provider in the COUNTY and owns a rental property located 20076 Emerald Ct., Castro Valley, CA ("20076 Emerald"). 20076 Emerald is a three-bedroom, one bath, 853 sq. ft single family home. VOGEL is semi-retired and is a disabled paraplegic. VOGEL relies on the rental income from 20076 Emerald for a substantial source of retirement income. VOGEL is required to pay approximately $1,328 per month for 20076 Emerald's mortgage, taxes and insurance, garbage service, and fees for property management. The former renter at 20076 Emerald lived there for approximately twelve years, from January 1, 2011 through March 1, 2023, and her current rent was $2,000 per month, however she stopped paying any rent in September 2021, and has not paid any rent since that date and only just recently vacated. The renter's failure to pay prevented VOGEL from being able to refinance 20076 Emerald to a lower rate. The renter also stopped maintaining 20076 Emerald's landscapinge and would park her car on the front yard. The renter's failure to pay was not related to any Covid-19 related reason. While the renter finally agreed to cooperate with the local and state rent relief programs, VOGEL only received a portion of the unpaid back rent. Most recently, VOGEL learned that his former nonpaying renter may have been selling

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

and/or manufacturing methamphetamine at 20076 Emerald. The renter covered all of the windows at the property, and neighbors reported strong chemical odors coming from the home. There was a "revolving door" of people making multiple, brief visits per day to the property, at all hours. When VOGEL was finally able to gain possession of 20076 Emerald, he discovered large quantities of drug paraphernalia, including what appeared to be used meth pipes and small zip-lock baggies. A large quantity of white powder was found in an ice chest, which VOGEL's agent turned over to the police. The renter had also stopped cleaning the house, leaving food and garbage everywhere, which caused a rat infestation that VOGEL was required to remediate. The renter also had multiple dogs in the house in violation of the lease, which repeatedly urinated and defecated indoors, and scratched through areas of drywall. When 20076 Emerald was finally recovered, there were puddles of dog urine on the floors, and an extreme stench which took months and multiple cleanings to remedy. VOGEL's bank account was depleted because of having to carry all the costs of 20076 Emerald, and having to make significant repairs to the property damage caused by his nonpaying renter, and he is deeply concerned he will lose the property as the result of his inability to meet the financial obligations of ownership. In total, VOGEL endured lost rent revenue amounting to $44,484.00 from 2020 to 2023 ($4,451 in 2020; $2,683 in 2021; $1,350 in 2022; and $36,000 in 2023). As a result of the eviction moratorium, VOGEL was forced to pay his mortgage, taxes, and maintenance on the property despite the aforementioned lost rent revenue. In order to do so, he had no choice but to deplete the majority of his retirement savings. VOGEL endured additional costs in the form of $4,000 in legal fees spent trying to evict his tenant; $5,000 that he ended up having to pay his tenant in a pre-trial "cash for keys" settlement; and $19,000 in repairing the damage that his tenant caused his property to endure (broken windows, removing two dumpsters, broken doors, thrashed flooring, and damaged walls). In addition to the financial losses that VOGEL knew he was enduring, he also because extremely stressed as a result of the damage done to his property by his tenant's aforementioned illegal conduct. VOGEL developed issues with sleeping and also experienced increased blood pressure. Furthermore, as a result of the prolonged nature of the eviction

moratorium, VOGEL felt completely and utterly helpless as a homeowner. He was not able to remove his tenant in order to sell his property at a higher price and in a timelier fashion. Had he been able to do so, he would have been that much more well situated for retirement, as someone already dealing with a significant physical disability. The extreme stress VOGEL suffered as a result of the CITY and COUNTY's senseless moratoria showed VOGEL that investing in affordable housing is no longer a smart or safe way for one to invest their money, as government oversight can causally strip one of their rights as a landlord and cause them to suffer hundreds of thousands of dollars in lost rent revenue and unforeseen costs as a result of misguided policymaking.

87. Plaintiff SHEANNA ROGERS is a housing provider in the COUNTY and owns the property at 23243 Maud Ave., Hayward CA ("23243 Maud Ave.") At one time, ROGERS ran a small, three-bedroom, independent living facility at 23243 Maud Ave., where she & her husband cared and provided for people who needed a "helping hand" to get on their feet. Many clients had lived at this address for over 5 years. ROGERS served a vulnerable population at the living facility; her clients often had mental disabilities and no families to turn to. ROGERS was able to provide her clients with a safe living space and meals they could count on at 23243 Maud Ave. In addition to the independent living facility space, 23243 Maud Ave. has a separate studio unit. ROGERS rented this unit in 2018 for $1000 per month. That renter was never part of the independent living facility program. ROGERS depends on this supplemental rental income to support her and her family. Prior to the COUNTY'S enactment of its Moratorium, the renter began harassing ROGERS' ~~'s~~ clients in the independent living facility. The renter would scream profanities at ROGERS' clients and throw garbage from his unit into the street directly in front of the property. The renter's harassment of ROGERS' clients got so bad that ROGERS was forced to file a restraining order against the renter and commence eviction proceedings. In February 2020, ROGERS and the renter came to a settlement agreement, whereby the renter agreed to vacate the property in April of 2020. However, after the COUNTY enacted its Moratorium, in March 2020, the renter refused to leave. The renter did not pay rent

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

for over three years. The renter's failure to pay was not related to any Covid-19 related reason. Meanwhile, the renter's harassment of ROGERS' clients persisted, and ROGERS was forced to close her business as a result. ROGERS has also suffered devastating health consequences as a result of the stress caused by her nonpaying renter.  ROGERS has applied for rental assistance from the COUNTY, however, because her renter will not cooperate, and his non-payment has nothing to do with Covid- 19 the COUNTY has refused to provide her with any relief.  Due to ROGERS' loss of business as a direct result of her renter's harassment of her clients, causing all of them to be removed from her facility at 23243 Maud Ave., it is estimated that such abhorrent behavior by her renter caused ROGERS to lose out on $124,000 in business income from September 2021 through April 2024 ($4,000 on average per month, for 31 months.)  This is in addition to the $48,000 in rent ROGERS has been deprived of pursuant to her renter's residence in 23243 Maud Ave.'s studio unit and not paying rent for same from April 2020 through April 2024 ($1,000.00 in delinquent rent for 48 months.)  In addition to ROGERS suffering approximately $172,000 in losses over this period, her clients have suffered as well, as they have been forced to be placed elsewhere due to the CITY and COUNTY's allowing of ROGERS' renter to conduct himself in a bullying and threatening manner.  There is no telling, at this time, whether or not ROGERS will be able to resume her once lucrative business at any point in the near future.  The $172,000 she is rightfully owed may be just the start of years and years of losses that have yet to accrue – all stemming from the woefully misguided acts and omissions by the CITY and COUNTY as they relate to the Moratoria at issue here.

88.    Plaintiff JAQUELINE WATSON-BAKER is a housing provider in the CITY and COUNTY and owns the property at 1225-1227 92nd Ave Oakland, CA. ("1225-1227 92nd Ave"). 1225-1227 92nd Ave was purchased by WATSON-BAKER's mother in or about the 1950's. WATSON-BAKER's mother, who moved from to California from the Southern United States, was one of the first African Americans to own property in her East-Oakland neighborhood. 1225-1227 92nd Ave is a duplex, with a two-bedroom, two-bath front unit, and a one-bedroom one-bath back unit.  The renter in the back unit, Unit 1227, originally moved into the property in

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

2016.  Thereafter, WATSON-BAKER attempted to get access to the unit because the renter had put tinfoil over the windowpanes and had installed an air conditioner, and she was concerned about the renter's activity at the property.  When WATSON-BAKER arrived at the property, the renter stated that he did "not believe that a black woman" owned the property and demanded to see her identification.  WATSON-BAKER showed the renter her identification, which the renter snatched out of her hand, but the renter still refused her access to the unit.  Thereafter, the renter would insist on dropping off his rent check at WATSON-BAKER's home address, even though she asked him multiple times to mail it to a P.O. Box. WATSON-BAKER continued to see concerning signs at the property, but the renter continued to refuse her access. For example, she saw signs of rat infestation, but when she sent an exterminator, the renter would not give the exterminator access and turned his dogs loose on them. The exterminator eventually refused to go back to the property. Because the tenant refused to grant her access, and WATSON-BAKER became increasingly concerned about the unit's condition, WATSON-BAKER filed for relief in court in or about 2018.  The renter of the front unit of 1225-1227 92nd Ave Oakland left in 2019 because of the renter of the back unit's erratic behavior, and that unit has remained ~~vacant since~~vacant due to the renter's behavior. WATSON-BAKER finally obtained a court date for March of 2020, which then was pushed back due to shelter in place orders.  The renter stopped paying rent just prior to this time.    The renter's failure to pay was not related to any Covid-19 related reason. WATSON-BAKER finally got access to the unit and saw that the unit was in gross disrepair.  The renter put foil on all the unit's windows, there are dark yellow streaks running down the walls, and one of the unit's cabinets is hanging down from the ceiling.  The unit was infested with insects and there ~~was~~were feces and urine all over the bathroom of the unit, and dog feces and garbage covered the unit's backyard.  Notwithstanding the renter's damage to and perpetuation of a nuisance on her property, WATSON-BAKER was prevented from evicting the renter under the COUNTY's Moratorium.     WATSON-BAKER considered selling the property, however, was advised that the renter's actions had devalued her property by almost a third of the market value. WATSON-BAKER applied for rental assistance from the

COUNTY, however, her renter initially refused to cooperate with her. After he finally agreed to fill out an application, the COUNTY informed WATSON-BAKER that it could be up to a year until she received any rental relief funds.

89. Plaintiff Michael Loeb is a housing provider in the CITY and COUNTY and owns units 2501 and 2502 at 565 Bellevue Avenue, Oakland, California (565 Bellevue Units). Loeb, a 74 year-old74-year-old widower, lived with his wife in Piedmont, until she died in 2015, after nearly 46 years of marriage. After her death, and, in part, because of mobility issues resulting in back surgery, he sold his home. He purchased the 565 Bellevue Units in April, 2020, with the intent to combine and occupy them as his home, for his own use, for the remainder of his life. Renter Joshua Bloomfield (Bloomfield), a 1996 Graduate of the University of Pennsylvania, and 2000 UCLA School of Law graduate, is a successful class action lawyer with a prominent Oakland based class action law firm. Bloomfield currently pays LOEB $2,200 per month in rent for a studio apartment. LOEB has attempted to voluntarily negotiate an owner move in with Bloomfield, offering him $30,000 to move out. This is more than four times the amount of $7,116.22 required as a relocation payment under the Oakland Just Cause for Eviction Ordinance, which is codified at Oakland Municipal Code section 8.22.850. However, Bloomfield demanded that LOEB pay him more than $160,000 to vacate, telling LOEB that "it's nothing personal, just business." Multiple other comparable units became available in the same building and could have been occupied by Bloomfield. Bloomfield has not claimed any Covid--related hardship. LOEB was unable to commence an owner-move in eviction due to the Moratoriums. To date, LOEB has incurred more than $75,000 in legal fees as a direct and proximate result of the abhorrent behavior that the CITY and COUNTY have enabled Bloomfield to exhibit. In addition to the financial harm LOEB has suffered, far more concerning are the emotional and mental strains he's endured at the hands of his tenant and the CITY and COUNTY. He fears that he may never be allowed to re-occupy the property he purchased with the intention of living out his remaining years – of sound mind and body – therein. The long-lasting effects of the CITY and COUNTY's moratoriums have caused LOEB

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

to endure irreparable mental harm, including but not limited to the harm inflicted upon him by his tenant's attempts to extort $160,000 from him.

90. Plaintiff HANNAH KIRK is a housing provider in the CITY and COUNTY and owns a single-family home at 4514 Fairbairn Ave, Oakland, CA. KIRK is a single mother and lived in 4514 Fairbairn Ave with her two children. KIRK's renter moved into her home in 2019, and the agreed upon rent was $800 per month. The renter shared KIRK's kitchen and bathroom at KIRK's home. KIRK's renter paid rent consistently until July 1, 2021, whereupon she stopped paying rent but did not move out of KIRK's home when asked. The renter also did not cooperate with the rental assistance programs, or return the Covid-19 declarations that KIRK provided to her, and instead accused KIRK of harassing her. Notwithstanding the renter's failure to pay rent even though no Covid-19 related reason existed, KIRK was prevented from evicting the renter under the CITY and COUNTY's Moratorium. After spending almost two years having to carry the expenses of the renter and having to face the nonpaying renter on a daily basis inside of her own home, KIRK moved out of her home due to the severe emotional distress the situation was causing her and her children. The CITY and COUNTY put KIRK in such an incredibly toxic situation that she was essentially forced to decide between paying her then-current mortgage or or paying rent at a new property – i.e., she was effectively coerced into selling her property, which she finally did in September 2023. In total, after generating an average annual net income of just under $5,000 from 2019 through 2021, KIRK's property generated $0.00 in net income from 2022 through 2023 despite being occupied by a tenant. This tenant was in default from July 2021 through August of 2023, and the total delinquent rent that accumulated in that span was approximately $20,364.80. Among the other costs that KIRK was forced to endure were legal fees to ensure that she would not get sued by her tenant for any number of frivolous causes. She also endured extreme pain and related health issues from the stress of being put in this situation.

~~90.~~91. ~~KIRK has not been able to pay her mortgage for approximately eight months and fears she will lose her home.~~

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Plaintiff AMI SHAH and AVINASH JHA were housing providers in the CITY and COUNTY and own a single-family home at 133 Gable Dr. Fremont CA. SHAH and JHA purchased 133 Gable Dr. in 2019, intending it to be their primary residence. However, for financial reasons, SHAH and JHA were required to rent 133 Gable Dr. until their lease obligations for their own rental were met. They did so, but after the COUNTY enacted its Moratorium, SHAH and JHA's renters paid partial rent from April 2020 through June 2020, stopped paying rent entirely after June June 2020, and refused to apply for rent relief through the state and local rent relief programs. Not only did SHAH and JHA's renters stop paying rent, but the renters physically converted 133 Gable Dr. into an "Airbnb motel," without the consent of either SHAH or JHA, renting out the individual rooms. SHAH and JHA reported the renters' unlawful activity to the Fremont police, and during the investigation it was discovered that the renters were conducting similar fraudulent rental activity with other homes as well. During the investigation, the renters abandoned the property, but the AirBnb guests did not, and refused to move out. The AirBnb guests even changed the locks Throughout, SHAH and JHA were prevented from evicting their nonpaying and breaching renters and the AirBnb guests due to the COUNTY's Moratorium. During this time, both the renters and the AirBbnb guests filed several frivolous legal actions against SHAH and JHA, most of which were later dismissed. When the AirBbnb guests finally abandoned the property (which they did involuntarily and only because the City of Fremont deemed the house unsafe and therefore condemned it), SHAH and JHA were left with rental losses, legal fees and a home that was destroyed, and with a huge toll on their finances and health. In total, after receiving partial rent from April 2020 through June 2020 and then not receiving any rent from June 2020 through the day their tenants were finally evicted, SHAH and JHA collected $19,500.00 in total rent revenue and were deprived of $42,153.00 in delinquent rent. Furthermore, after enduring six months of vacancy while refurbishing the damage done to their property by the AirBnb guests vacated, total vacancy losses amounted to $22,200 from June 2021 through December 2021. Despite the delinquent rent and vacancy losses, SHAH and JHA paid $124,800 in property expenses (mortgage, property tax, insurance, and maintenance),

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$83,000 in repair costs, and $15,000 in legal fees. SHAH and JHA are still experiencing the long-term effects of this ordeal, as well. The AirBnb guests' unwelcome presence (and the resulting financial impact of delinquent rent and subsequent vacancy losses) made it impossible for SHAH and JHA to capitalize on historically low interest rates in 2020-2021, resulting in an estimated $450,000 in additional interest over the loan's remaining term at current rates. Additionally, due to their ongoing legal fees, dealing with harassment from the AirBnb guests, and the related mental stresses involved with both, SHAH and JHA missed crucial opportunities to advance their careers. (The technology sector saw an unprecedented salary boom during the pandemic, with recruiters offering $200,000 to $300,000 above SHAH and JHA's then-existing salaries.) Their combined losses amount to an estimated $400,000 in just two years, and will likely have a lasting impact on their lifetime savings. Lastly, the stressors of delinquent rent, vacancy losses, and unwelcome squatters at their home robbed SHAH and JHA of a once in a lifetime opportunity to purchase another home in 2020 – as they had planned to do – given the historically low interest rates and lower home prices in the Bay Area. As a result, SHAH and JHA missed out on an estimated $1.5M to $2.0M in potential gains from property appreciation in their neighborhood. Not only did they forgo the opportunity to purchase an investment property, but the trauma of their experience forced them to sell their condominium unit, which will likely hinder their long-term financial goals – especially as they relate to planning for their children's future. The compounded loss of all these financial setbacks continue to weigh heavily on SHAH and JHA from a financial, mental, and emotional standpoint. SHAH and JHA remain fearful to this day over the prospect of ever purchasing another property, knowing full well that local government entities have the power to effectively allow the wrongful taking of that property by wanton third party conduct.

92.    In 2020, the 83-unit property commonly known as B3 Lofts and located at 5200 Adeline Street, Emeryville, CA ("B3"), owned and operated by Plaintiff B3 Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and

COUNTY. Specifically, the property endured a total of $20,791 in delinquent rent in 2020. In 2021, this number doubled to $40,500, and then shot up in 2022 and 2023, to delinquent rent amounts of $139,276 and $138,799, respectively (a four-year delinquent rent total of $339,366 from 2020 through 2023). Overall vacancy at B3 also took a hit, as it more than doubled from 4.2% in 2019 to 9.4% in 2023. B3's total value has dropped from $32.8M in 2020 to $26.96M in 2023 – a decline of $5.84M, or -17.8%. Finally, B3's internal rate of return (IRR) plummeted from a pre-COVID figure of 11.8% (from January 2018 through March of 2020) to -10.9% (from April 2020 through June 2023). As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

93. In 2020, the 102-unit property located at 3900 Adeline, Emeryville, CA ("ADE"), owned and operated by Plaintiff 3900 Adeline, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $40,691 in delinquent rent in 2020. In 2021, this number increased to $102,020, and then increased again in 2022 to $135,838. In 2023, the delinquent rent figure recovered some, dropping to $8,971. Over that four-year span, ADE experienced total delinquent rent of $287,520. Overall vacancy at ADE also increased from 5.0% in 2019 to 6.5% in 2023. ADE's total value has dropped from $46.08M in 2020 to $36.06M in 2023 – a decline of $10.02M or -22%. Since the onset of the pandemic, from April 2020 to June 2023, ADE has seen a negative cash-on-cash return of -21.2%.]]] As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

94. In 2020, the 76-unit property located at 4600 Adeline Street, Emeryville, CA ("BAK"), owned and operated by Plaintiff Bakery Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $36,821 in delinquent rent in 2020. In 2021, this number increased to $54,964. Over the four-year span from 2020 through 2023, BAK experienced total delinquent

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

rent of $95,752.  Overall vacancy at BAK also increased from 2.8% in 2019 to 6.5% in 2023. BAK's total value has dropped from $22.45M in 2020 to $19.32M in 2023 – a decline of $3.13M or -13.9%.  Since the onset of the pandemic, from April 2020 to June 2023, BAK has seen a negative cash-on-cash return of -5.0%.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

95.    In 2020, the 27-unit property located at 2355 Broadway, Oakland CA ("BRO"), owned and operated by Plaintiff 2355 Broadway, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $19,034 in delinquent rent in 2020.  In 2021, this number was $6,163, followed by $11,174 in 2022 and $10,627 in 2023. Over the four-year span from 2020 through 2023, BRO experienced total delinquent rent of $46,998.  Overall vacancy at BRO also increased from 4.1% in 2019 to 10.1% in 2023.  BRO's total value has dropped from $12.68M in 2020 to $9.61M in 2023 – a decline of $3.07M or -24.2%.  Since the onset of the pandemic, from April 2020 to June 2023, BRO has seen a negative cash-on-cash return of -14.5%.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

96.    In 2020, the 124-unit property located at 3250 Hollis Street, Oakland CA ("HOL"), owned and operated by Plaintiff Hollis Street Partners, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $86,857 in delinquent rent in 2020.  In 2021, delinquent rent increased to $102,322, followed by another increase in 2022 to $307,802. In 2023, delinquent rent totaled $294,520. Over the four-year span from 2020 through 2023, HOL experienced total delinquent rent of $791,501.  Overall vacancy at HOL also increased from 9.3% in 2020 to 10.3% in 2023. HOL's total value has dropped from $73.44M in 2020 to $44.13M in 2023 – a decline of $29.31M or -39.9%.  Since the onset of the pandemic, from April 2020 to June 2023, HOL has seen a negative cash-on-cash return of -54.2%.  As shown in the instant amended complaint and its

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

97.    In 2020, the 27-unit property located at 1155 5th Street, Oakland, CA 94607 ("MPP2"), owned and operated by Plaintiff Madison Park Properties II DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $40,308 in delinquent rent in 2020.  In 2021, delinquent rent totaled $17,374, followed by a total of $86,397 in delinquent rent in 2022. In 2023, delinquent rent totaled $64,212. Over the four-year span from 2020 through 2023, MPP2 experienced total delinquent rent of $208,291.  Overall vacancy at MPP2 also increased from 2.4% in 2019 to 8.8% in 2023.  MPP2's total value has dropped from $12.1M in 2020 to $10.15M in 2023 – a decline of $1.95M or -24.2%.  Since the onset of the pandemic, from April 2020 to June 2023, MPP2 has seen a negative cash-on-cash return of -16.1%.]]]  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

98.    In 2020, the 36-unit property located at 964 46th Street, Oakland, CA ("PD46"), owned and operated by Plaintiff P&D 46th St. Associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, over the four-year span from 2020 through 2023, PD46 experienced total delinquent rent of $139,757.  Overall vacancy at PD46 also increased from 3.5% in 2019 to 10.2% in 2022, before dropping back down to 3.5% once more in 2023.  PD46's total value has dropped from $14.8M in 2020 to $12.64M in 2023 – a decline of $2.16M or -14.6%.  Since the onset of the pandemic, from April 2020 to June 2023, PD46 has seen a negative cash-on-cash return of -6.8%.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

99.    In 2020, the 54-unit property located at 2633 Telegraph Ave, Oakland, CA

("SLO"), owned and operated by Plaintiff Sears Lofts DEL, LLC ("SLO"), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $57,389 in delinquent rent in 2020. In 2021, delinquent rent totaled $2,967, followed by a total of $34,170 in delinquent rent in 2022. In 2023, delinquent rent totaled $50,117. Over the four-year span from 2020 through 2023, SLO experienced total delinquent rent of $144,643. Overall vacancy at SLO also increased from 4.3% in 2019 to 5.6% in 2023. SLO's total value has dropped from $29.6M in 2020 to $28.16M in 2023 – a decline of $1,485,000 or -5.01%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

100. In 2020, the 27-unit property located at 1080 23rd Avenue, Oakland, CA ("1080"), owned and operated by Plaintiff P&D 23rd Avenue associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $85,713 in delinquent rent in 2020. In 2021, delinquent rent dropped down to $3,135, before shooting back up to $42,485 and $39,670 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1080 experienced total delinquent rent of $171,003. Overall vacancy at 1080 also increased from 5.2% in 2019 to 6.9% in 2023. 1080's total value has dropped from $9.20M in 2020 to $7.28M in 2023 – a decline of $1.92M or -21.1%. Since the onset of the pandemic, from April 2020 to June 2023, 1080 has seen a negative cash-on-cash return of -11.4%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

101. In 2020, the 92-unit property located at 1614 Campbell Street, Oakland, CA ("1614"), owned and operated by Plaintiff 1614 Campbell Street DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $90,412 in delinquent rent in 2020. In 2021, delinquent rent dropped slightly to $89,164, before skyrocketing up to $318,490 and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$190,797 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1614 experienced total delinquent rent of $688,863. Overall vacancy at 1614 also increased from 3.0% in 2019 to 9.5% in 2023. 1614's total value has dropped from $39.1M in 2020 to $30.26M in 2023 – a decline of $8.84M or -22.61%. Since the onset of the pandemic, from April 2020 to June 2023, 1614 has seen a negative cash-on-cash return of -18.3%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

102.    In 2020, the 39-unit property located at 527 23rd Avenue, Oakland, CA ("ES"), owned and operated by Plaintiff Exchange Studios DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, over the four-year span from 2020 through 2023, ES experienced total delinquent rent of $39,382. Overall vacancy at ES also increased from 2.6% in 2019 to 8.5% in 2023. ES's total value has dropped from $14.1M in 2020 to $12.37M in 2023 – a decline of $1.73M or -12.27%. Since the onset of the pandemic, from April 2020 to June 2023, ES has seen a negative cash-on-cash return of -4.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

103.    In 2020, the 41-unit property located at 3030 Chapman Street, Oakland, CA ("GAL"), owned and operated by Plaintiff 3014 Chapman DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $17,465 in delinquent rent in 2020. In 2021, delinquent rent shot upward to $47,679, before increasing twice more to $64,745 and $100,435 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, GAL experienced total delinquent rent of $230,324. Overall vacancy at GAL also increased from 3.3% in 2019 to 7.8% in 2023. GAL's total value has dropped from $18.2M in 2020 to $14.37M in 2023 – a decline of $3.83M or -21%. Since the onset of the pandemic, from April 2020 to June 2023, GAL has seen a negative cash-on-cash return of -15.7%. As shown in the instant amended complaint and its attachments,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

104. In 2020, the 57-unit property located at 4401 San Leandro Street, Oakland, CA ("VUL"), owned and operated by Plaintiff Vulcan Lofts, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured significant delinquent rent over the four-year span from 2020 to 2023: $194,110 in 2020; $118,740 in 2021; $168,730 in 2022; and $176,745 in 2023 – a total of $658,325 in delinquent rent in four years. VUL's total value has dropped from $15.04M in 2020 to $13.26M in 2023 – a decline of $1.78M or -11.8%. Since the onset of the pandemic, from April 2020 to June 2023, VUL has seen a negative cash-on-cash return of -2.6%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

105. In 2020, the multi-unit residential building commonly known as and located at 1454 36th Avenue, Oakland, CA ("1454"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1454 totaled $123,622.72. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $205,414.10 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $140,000 an impressive 65.56% ROI. From January 2020 through December 2023, ROI dropped to 49.19%. Additionally, the overall estimated property value declined from $3,542,920 at the onset of the COVID-19 pandemic in March 2020 to $1,938,892.31 in June 2023 – i.e., a -43.3% decline in value in a period of just over three years.

106. In 2020, the multi-unit residential building commonly known as and located at 1616 35th Avenue, Oakland, CA ("1616"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1616 totaled $17,574.57.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $175,967.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $60,000 an impressive 126.57% ROI.  From January 2020 through December 2023, ROI dropped to 80.41%.  Additionally, the overall estimated property value declined from $3,397,940 at the onset of the COVID-19 pandemic in March 2020 to $1,597,498.31 in June 2023 – i.e, a -52.99% decline in value in a period of just over three years.

107.    In 2020, the multi-unit residential building commonly known as and located at 1701-1707 36th Avenue, Oakland, CA ("1707"), owned and operated by Plaintiff 1701-1703 36th Avenue Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1707 totaled $76,953.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $217,899.67 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  Additionally, the overall estimated property value declined from $4,040,820.00 at the onset of the COVID-19 pandemic in March 2020 to $2,554,661.69 in June 2023 – i.e, a -36.78% decline in value in a period of just over three years.

108.    In 2020, the multi-unit residential building commonly known as and located at 2166 E. 27th Street, Oakland, CA ("2166"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2166 totaled $41,752.74.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $101,307.72 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on

Plaintiff's initial investment of $388,464 a 21.28% ROI. From January 2020 through December 2023, ROI dropped to 12.94%. Additionally, the overall estimated property value declined from $3,985,160 at the onset of the COVID-19 pandemic in March 2020 to $1786,986 in June 2023 – i.e, a -55.16% decline in value in a three-year period.

109.    In 2020, the multi-unit residential building commonly known as and located at 2554 E. 16th Street, Oakland, CA ("2554"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2554 totaled $151,114.64. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $357,896.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 53.31% ROI. From January 2020 through December 2023, ROI dropped to 48.05%. Additionally, the overall estimated property value declined from $6,911,740 at the onset of the COVID-19 pandemic in March 2020 to $4,975,793.23 in June 2023 – i.e, a -28.01 % decline in value in a three-year period.

110.    In 2020, the multi-unit residential building commonly known as and located at 2701 High Street, Oakland, CA ("2701"), owned and operated by Plaintiff 2701 High Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2701 totaled $374,805.56. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $656,053.62 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $200,000 an 83.14% ROI. From January 2020 through December 2023, ROI dropped to 74.24%. Additionally, the overall estimated property value declined from $9,164,080 at the onset of the COVID-19 pandemic in March 2020 to $4,242,292.31 in June 2023 – i.e, a -53.7% decline in

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

value in a three-year period.

111.    In 2020, the multi-unit residential building commonly known as and located at 3700 International Boulevard, Oakland, CA ("3700"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 3700 totaled $278,320.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $456,728.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  Additionally, the overall estimated property value declined from $8,911,700 at the onset of the COVID-19 pandemic in March 2020 to $5,443,692.31 in June 2023 – i.e, a -38.9% decline in value in a three-year period.

112.    In 2020, the multi-unit residential building commonly known as and located at 1828 28th Avenue, Oakland, CA ("1828"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1828 totaled $108,362.98.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $252,908 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 28.13% ROI.  From January 2020 through December 2023, ROI dropped to 17.36%.  Additionally, the overall estimated property value declined from $3,131560 at the onset of the COVID-19 pandemic in March 2020 to $1,915,512 in June 2023 – i.e, a -38.8% decline in value in a three-year period.

113.    In 2020, the multi-unit residential building commonly known as and located at 1002-1008 E. 23rd Street, Oakland, CA ("1002"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1002 totaled $116,030.44.  This figure,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $316,694.97 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,322,223 a 6.84% ROI. From January 2020 through December 2023, ROI dropped to 5.84%. Additionally, the overall estimated property value declined from $6,907,620 at the onset of the COVID-19 pandemic in March 2020 to $4,461,323.08 in June 2023 – i.e, a -35.4% decline in value in a three-year period.

114. In 2020, the multi-unit residential building commonly known as and located at 1844 7th Avenue, Oakland, CA ("1844"), owned and operated by Plaintiff 1844 7th Avenue 2013, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1844 totaled $80,123.77. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $275,123.89 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $7,534,560 at the onset of the COVID-19 pandemic in March 2020 to $4,452,938.46 in June 2023 – i.e, a -40.1% decline in value in a three-year period.

115. In 2020, the multi-unit residential building commonly known as and located at 800-818 E. 20th Street, Oakland CA ("800"), owned and operated by Plaintiff 818 East 20th Street Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 800 totaled $27,069.79. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $221,196.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $559,510 a 24% ROI. From January 2020 through December 2023, ROI dropped to 20.61%.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Additionally, the overall estimated property value declined from $5,987,940 at the onset of the COVID-19 pandemic in March 2020 to $4,504,492.31 in June 2023 – i.e, a -24.77% decline in value in a three-year period.

116.    In 2020, the multi-unit residential building commonly known as and located at 1722 27th Avenue, Oakland, CA ("1722"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1722 totaled $79,390.33.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $308,641.86 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.   Additionally, the overall estimated property value declined from $4,920,220 at the onset of the COVID-19 pandemic in March 2020 to $4,201,092.31 in June 2023 – i.e, a -14.6% decline in value in a three-year period.

117.    In 2020, the multi-unit residential building commonly known as and located at 2000 Linden St., Oakland, CA ("2000"), owned and operated by Plaintiff 2000 Linden Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2000 totaled $81,209,27.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $176,331.48 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.   Additionally, the overall estimated property value declined from $4,023,500 at the onset of the COVID-19 pandemic in March 2020 to $3,438,903.69 in June 2023 – i.e, a -14.53% decline in value in a three-year period.

118.    In 2020, the multi-unit residential building commonly known as and located at 1732-1744 27th Avenue, Oakland CA ("1732"), owned and operated by Plaintiff 1732-1744 27th Avenue, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1732 totaled $9,900.50.  This

figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $84,514.96 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  Additionally, the overall estimated property value declined from $5,150,920 at the onset of the COVID-19 pandemic in March 2020 to $4,715,353.85 in June 2023 – i.e, a -8.5% decline in value in a three-year period.

119.    In 2020, the multi-unit residential building commonly known as and located at 3649 Martin Luther King Jr. Way, Oakland CA ("3649"), owned and operated by Plaintiff 1130 30th Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 3649 totaled $19269.61. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $66,547.93 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $504,415 a -2.57% ROI.  From January 2020 to December 2023, ROI dropped to -12.67%. Additionally, the overall estimated property value declined from $810,380 at the onset of the COVID-19 pandemic in March 2020 to -$159,723.08 in June 2023 – i.e, a -119.7% decline in value in a three-year period.

120.    In 2020, the multi-unit residential building commonly known as and located at 245 Lee Street, Oakland CA ("245"), owned and operated by Plaintiff 2367 Washington, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 245 totaled $224,208.78.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $494,847.21 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

121.    In 2020, the multi-unit residential building commonly known as and located at 1638 47th Avenue, Oakland, CA ("1638"), owned and operated by 2531 East 16th Street, LP,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1638 totaled $376,603.50. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $471,481.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,567,875.73 a 0.14% ROI. From January 2020 through December 2023, ROI dropped to -5.82%. Additionally, the overall estimated property value declined from $14,252,160 at the onset of the COVID-19 pandemic in March 2020 to $10,665,523.08 in June 2023 – i.e, a -25.17% decline in value in a three-year period.

122. In 2020, the multi-unit residential building commonly known as and located at 2850 Hannah Street, Oakland, CA ("2850"), owned and operated by 301 Hannah Park, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2850 totaled $360,386.95. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $823,332.95 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, from January 2020 through December 2023, 2850 posted an ROI of -2.33%.

123. In 2020, the two-unit duplex property commonly known as and located at 716-720 37th Street, Oakland, CA ("720"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, 720's fair market rent was $7,279.16, plus a utility fee of $179.56, for a market Total Operating Income of $7,458.72 per month or $89,504.64 per year. In 2020, 720 generated just $44,962.70 in rent revenue – roughly half its annual market rent. Accounting for an additional $992.80 in utility payments, 720's Total Operating Income of $45,955.50 represented $43,549.14 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 720's Total Operating Income was $7,463.24 less than its

annual fair market rent of $89,504.64, and after a slight recovery in 2022, 720's 2023 Total Operating Income underperformed to the tune of $11,924.54. From 2020 through 2023, therefore, 720 lost $53,694.30 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 720 experienced a dramatic -45.50% decrease in overall property value from pre-COVID 2019 to 2020 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value plummeted from $1.18M to $643,377 year over year. And though the property partially recovered from 2021 through 2023, its overall drop in property value from 2019 to 2023 was still a significant -8.0% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

124.    In 2020, the twelve-unit property commonly known as and located at 296 Mather Street, Oakland, CA ("296 Mather"), owned and operated by Plaintiff 296 Mather Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the twelve-unit building's combined fair market rent was $39,920, plus a utility fee of $1,250, for a market Total Operating Income of $41,170 per month or $494,040 per year. In 2020, 296 Mather generated just $421,489.89 in rent revenue – roughly 85% of its annual market rent. Accounting for an additional $12,811.67 in utility payments, 296 Mather's Total Operating Income of $434,918 represented $59,122 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 296 Mather's Total Operating Income was $93,784 less than its annual market rent of $494,040, and its 2022 and 2023 Total Operating Incomes missed their mark by $110,488 and 93,608, respectively. From 2020 through 2023, therefore, 296 Mather lost $357,002 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 296 Mather experienced a -17.8% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $6.5M in 2019 to just under $5.37M in 2022. And though the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -14.2% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

125.    In 2020, the twelve-unit property commonly known as and located at 695-701 30th Street, Oakland CA ("695"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the four-unit building's combined fair market rent was $14,170, plus a utility fee of $319, for a market Total Operating Income of $14,489 per month or $173,864 per year.  In 2020, 695 generated just $76,843 in rent revenue – roughly 44% of its annual market rent.  Accounting for an additional $1,618 in utility payments, 695's Total Operating Income of $78,461 represented $95,402 in lost income directly attributable to the CITY and COUNTY's moratoriums.  In 2021, 695's Total Operating Income recovered slightly, but its 2022 and 2023 Total Operating Incomes missed their mark by $109,375 and $108,284, respectively.  From 2020 through 2023, therefore, 695 lost $299,353 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 695 experienced a -62.49% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just under $903,000 in 2022.  And though the property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -61.86% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

126.    In 2020, the two-unit property commonly known as and located at 722 Upper 30th Street, Oakland CA ("722"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the two-unit building's combined fair market rent was $7,230, plus a utility fee of $208, for a market Total Operating Income of $7,438 per month or

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$89,256 per year. In 2020, 722generated just $50,563 in rent revenue – roughly 57% of its annual market rent. Accounting for an additional $1,672 in utility payments, 722's Total Operating Income of $52,235 represented $37,021 in lost income directly attributable to the CITY and COUNTY's moratoriums. Subsequently, 722's Total Operating Income for 2021, 2022, and 2023 missed its marks by $80,454, $89,256, and $20,675, respectively. From 2020 through 2023, therefore, 722 lost $227,406 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 722 experienced a -20.04% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just over $960,000 in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

127. In 2020, the two-unit property commonly known as and located at 827 30th Street, Oakland CA ("827"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit building's combined fair market rent was $5,522, plus a utility fee of $410, for a market Total Operating Income of $5,932 per month or $71,184 per year. In 2021, 827 generated just $37,964 in rent revenue – roughly 53% of its annual market rent. Accounting for an additional $2,475 in utility payments, 827's Total Operating Income of $40,439 represented $30,745 in lost income directly attributable to the CITY and COUNTY's moratoriums. 827's Total Operating Income in 2022 and 2023 missed its mark by $69,734 and $52,182, respectively. From 2020 through 2023, therefore, 827 lost $152,661 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 827 experienced a -67.18% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $810,520 in 2019 to $266,028 in 2023.

This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

128. In 2020, the four-unit property commonly known as and located at 1688-1692 12th Street, Oakland CA ("1688"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the four-unit building's combined fair market rent was $7,518.39, plus a utility fee of $90, for a market Total Operating Income of $7,608.39 per month or $91,300.68 per year. In 2020, 1688 generated just $73,353.95 in rent revenue – roughly 80% of its annual market rent. Accounting for an additional $840 in utility payments, 1688's Total Operating Income of $74,193.95 represented $17,107 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1688's Total Operating Income in 2021 and 2022 missed its mark by $49,081 and $19,428, respectively, before a slight recovery in 2023. From 2020 through 2023, therefore, 1688 lost $75,431 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1688 experienced a -9.99% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.18M in 2019 to $1.006M in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

129. In 2020, the single-family home commonly known as and located at 860 34th Street, Oakland, CA ("860"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the single-family home's combined fair market rent was $4,350, plus a utility fee of $40, for a market Total Operating Income of $4,390 per month or $52,680 per year. In 2020, 860 generated just $35,662 in rent revenue – roughly 68% of its annual market rent. Accounting for an additional $360 in utility payments, 860's Total Operating Income of $36,022 represented $16,658 in lost income directly attributable to the CITY and COUNTY's

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

moratoriums. 860's Total Operating Income in 2021 and 2022 missed its mark by $32,519 and $51,680, respectively, before a slight recovery in 2023. From 2020 through 2023, therefore, 860 lost $89,704 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 860 experienced a -97.88% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just under $662,000 in 2019 to $14,000 in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

130. In 2020, the two-unit property commonly known as and located at 1021 Campbell Street, Oakland, CA ("1021"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit property's combined fair market rent was $5,772.39, plus a utility fee of $440, for a market Total Operating Income of $6,212.39 per month or $74,548.68 per year. In 2020, 1021 generated just $45,120.84 in rent revenue – roughly 60% of its annual market rent. Accounting for an additional $4,080 in utility payments, 1021's Total Operating Income of $49,200.84 represented $25,348 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1021's Total Operating Income missed its mark in 2021 and 2023 by $45,102 and $4,653, respectively, with a slight recovery occurring in 2022. From 2020 through 2023, therefore, 1021 lost $49,355 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1021 experienced a -57.98% decrease in overall property value from pre-COVID 2019 to 2021 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just over $981,000 in 2019 to just over $412,000 in 2021. And despite its recovery in 2022, the overall property value in 2023 was still down from its pre-COVID figure from 2019. This drop in value is reflective of reduced net operating income stemming from moratorium-

enabled delinquencies.

131.    In 2020, the two-unit property commonly known as and located at 1704 14th Street, Oakland, CA ("1704"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the single-family home's combined fair market rent was $5,940, plus a utility fee of $310, for a market Total Operating Income of $6,250 per month or $75,000 per year.  In 2020, 1704 generated just $43,725 in rent revenue – roughly 58% of its annual market rent.  Accounting for an additional $2,325 in utility payments, 1704's Total Operating Income of $46,050 represented $28,950 in lost income directly attributable to the CITY and COUNTY's moratoriums.  1704's Total Operating Income missed its mark in 2021 and 2022 by $39,600 and $37,800, respectively, with a slight recovery occurring in 2023.  From 2020 through 2023, therefore, 1704 lost $101,956 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 1704 experienced a -50.40% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.05M in 2019 to $520,800 in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

132.    In 2020, the property located at 2215-2217 Eighth Street, Berkeley, CA ("2217"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the property's combined fair market rent was $8,800, plus a utility fee of $75, for a market Total Operating Income of $8,875 per month or $106,500 per year.  In 2020, 2217 generated just $79,868.70 in rent revenue – roughly 75% of its annual market rent.  Accounting for an additional $750 in utility payments, 2217's Total Operating Income of $80,618.70 represented $25,881 in lost income directly attributable to the CITY and COUNTY's moratoriums.  2217's Total Operating Income missed its mark in 2021, 2022, and 2023 by $95,816, $42,527, and $19,500,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

respectively. From 2020 through 2023, therefore, 2217 lost $183,724 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 2217 experienced a -18.93% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.5M in 2019 to $1.218M in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

133. The 28-unit property located at and commonly known as 385-389 Palm Avenue, Oakland, CA ("385 Palm"), owned and operated by Plaintiff 685 Scofield, LLC, generated $429,559.68 of total revenue in pre-COVID 2019, followed by $436,373.51 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -7.5% but total repairs and maintenance at the property totaled over $100,000 as pandemic-induced vacancy prompted management to make sweeping repairs to vacant units and under-utilized common areas. The drop in revenue and increase in operating expenses led to a 2021 NOI of -$37,688.31 after positive NOI in 2019 and 2020 of $108,887.11 and $166,54, respectively. Cash flow in 2021 was -$18,734.31. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

134. The 25-unit property located at and commonly known as 398 Euclid Avenue, Oakland, CA ("398 Euclid"), owned and operated by Plaintiff Normand Groleau, generated $435,963.81 of total revenue in pre-COVID 2019, followed by $444,272.39 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -12%, but costs related to property maintenance and unit turnover both spiked, leading to a YoY increase in property operating expenses from $265,575.46 in 2020 to $361,629.62 in 2021 – a 36.2% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $29,276.56 after NOI in 2019 and 2020 of $186,796.61 and $178,696.93, respectively. Cash flow in 2021 was just $15,772.58. As shown in the instant amended complaint and its

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

135. The 30-unit property located at and commonly known as 433 Perkins Street, Oakland, CA ("433 Perkins"), owned and operated by Plaintiff Westpark Apartments, LLC, generated $501,207.97 of total revenue in pre-COVID 2019, followed by $519,550.59 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -4%, but costs related to property maintenance and unit turnover both increased, leading to a YoY increase in property operating expenses from $282,337.92 to $295,531.75 – a 4.7% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $203,195.04 after the property generated $233,567.03 in 2020 (a -13% decrease). This also led to 433 Perkins' 2021 cash flow coming in at -$44,647.13. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

136. The 34-unit property located at and commonly known as 1438 Madison Street, Oakland, CA ("1438 Madison"), owned and operated by Plaintiff 2228 Union Street Investors, LP, generated $496,695.06 of total revenue in pre-COVID 2019, followed by a drop in 2020 down to $437,753.09. In 2021, not only did total revenue drop further – this time by approximately -4.2% - but increases in repair costs contributed to a YoY increase in 1438's operating expenses from $297,346.42 to $316,071.80 (a 6.3% increase). The drop in revenue and increase in operating expenses led to a 2021 NOI of just $103,188.51 following 2020 which, despite the pandemic, still saw the property generate $140,406.67 in NOI. In fact, not until 2023 did 1438 Mason post an NOI that met or exceeded its pre-pandemic level. This trend is once again directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

137. The 24-unit property located at and commonly known as 1530 Harrison Street, Oakland, CA ("1530 Harrison"), owned and operated by Plaintiff Westpark II, GP, was uniquely affected by the pandemic in terms of the capital expenditures and operating expenses that brought

down its bottom line in 2021. After a strong 2020 in which it generated $108,939.73 in NOI and $45,491.74 in total cash flow, costs in 2021 rose, particularly those relating to maintenance, unit turnover, and repairs. As a result, 1530 Harrison's total operating expenses increased from $186,985.05 in 2020 to $279,130.44 in 2021 (a 49.3% increase), yielding just $15,606.84 in NOI and turning cash flow red to the tune of -$36,926.16. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

138. The 69-unit property located at and commonly known as 1551 Madison Street, Oakland, CA ("1551 Madison"), owned and operated by Plaintiff J & R Land & Cattle LP, generated $1,388,274.26 in total revenue in pre-COVID 2019. This figure dropped to $1,283,390.88 in 2020 and then again to $1,259,057.03 in 2021 – an approximately 6% drop from its pre-COVID baseline. Simultaneously, total operating expenses at 1551 Madison increased by approximately 3.4% from 2020 to 2021, due primarily to a 24% YoY increase in maintenance costs and a 23% increase in monthly services. These increases contributed to property NOI dropping by 9.5% from 2020-2021 as well as the property's annual cash flow dropping from a positive $92,888.61 in 2020 to -$59,954.28 in 2021. Years later, in 2023, 1551 Madison was still feeling the effects of the pandemic as its dramatic spike in unit turnover expenses (up from $51,043.94 in 2022 to $134,897.95 in 2023) dragged down its NOI and yielded a total property cash flow of -$123,204.55. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

139. The 84-unit property located at and commonly known as 1553 Alice Street, Oakland, CA ("1553 Alice"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums. 1553 Alice has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by a 20% decline from $1.51M in 2019 to $1.21M in 2023. This slide coincided with an increase in total operating expenses during that same time period, from

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$948,541.01 to $1,020,380.22 (a 7.5% increase). As a result of the narrowing margin between total revenue and total operating expenses over that five-year period, 1553 Alice posted a 2023 NOI of just $186,634.66, following a four-year stretch in which the property's annual NOI never dipped below $537,000. 1553 Alice's total cash flow in 2023 was negative, to the tune of -$212,201.34, following a three-year streak of positive annual cash flow of at least $47,000. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

140.    The 27-unit property located at and commonly known as 1555 Madison Street, Oakland, CA ("1555 Madison"), owned and operated by Plaintiff Westpark II, GP, has been greatly affected by the early onset of the COVID-19 pandemic and its lasting effects – especially in terms of the eviction moratoriums imposed by the CITY and COUNTY over the last several years. From 2019 to 2021, 1555 Madison's total revenue plummeted from $520,423.40 to $480,064.83 to $417,773.79, marking a 19.7% drop in revenue from 2019 to 2021. Simultaneously, the property endured $344,606.23 in operating expenses in 2021, marking a sharp 31% increase YoY from 2020. As a result, 1555 Madison's NOI in 2021 of just $73,167.56 drastically underperformed its previous marks of $216,427.61 and $172,950.19 from 2020 and 2019, respectively. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

141.    The 70-unit property located at and commonly known as 1935-1948 E. 29th Street, Oakland, CA ("1948 E. 29th"), owned and operated by Plaintiff J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 1948 E. 29th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 8.2% decrease from $959,875.45 in 2019 to $881,248.88 in 2023. Additionally, as a direct result of pandemic-induced vacancy, 1948 E. 29th has experienced a gradual rise in unit turnover expenses, which have risen

from $22,902.56 in 2019 to $35,411.43 in 2023. 1948 E. 29th was hit hardest by the lasting effects of the CITY and COUNTY's response to COVID-19 in 2022, when its $1.18M in total operating expenses dragged down its NOI and annual cash flows to -$237,064.07 and -$196,314.07, respectively. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

142. The 37-unit property located at and commonly known as 2000 E. 30th Street, Oakland, CA ("2000 E. 30th"), owned and operated by Plaintiff J & R Land & Cattle LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 2000 E. 30th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 11.6% decrease from $512,611.05 in 2019 to $452,834.98 in 2023. In order to combat unit turnover, 2000 E. 30th expended nearly $360,000 in marketing costs from 2020 through 2022, while also experiencing rising maintenance costs from 2020 through 2022. After generating positive NOI from 2019 through 2021, the delayed onset effects of the pandemic-era eviction moratoriums finally took hold in 2022 and 2023, as 2000 E. 30th posted NOIs of -$126,787.69 and -$23,143.08, respectively, with a combined cash flow during that period of -$84,767.88. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

143. The 37-unit property located at and commonly known as 2032-2040 E. 30th Street, Oakland, CA ("2032 E. 30th"), owned and operated by J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs expended from 2019 through 2023. Total maintenance costs at the property have risen with increased vacancies, from a 2019 total of $43,628.24 up to an annual cost of $65,679.03 in 2023 (a 50% increase). Total unit turnover costs increased from $24,827.29 in 2019 and $18,813.94 in 2020 up to $39,032.28 in 2023. Zooming out, the effects of these increased costs have impacted 2032

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E. 30th's bottom line, as the property has generated both negative NOI and negative cash flow in three of the last five years. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

144. The 30-unit property located at and commonly known as 4220 Montgomery Street, Oakland, CA ("4220 Montgomery"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs expended from 2019 through 2023, which have cut into the property's bottom line. In light of COVID-induced vacancies, 4220 Montgomery undertook more repairs in 2022 than it had in all of 2019 through 2021 combined. These costs of repairs helped contribute to rising total operating expenses at 4220 Montgomery from 2019 through 2023, which grew from annual figures of $294,796.36 on the low end to $397,489.06 on the high end. As a result of these downswings in net operating income, 4220 Montgomery has generated negative annual cash flow in three of the past five years, including a low mark of -$84,788.60 in 2023. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

145. The 100-unit property located at and commonly known as 2801 Summit Street, Oakland, CA ("2801 Summit"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of costs related to unit turnover and repairs made therein, which have cut into the property's bottom line over the course of the last five years. In light of COVID-induced vacancies, 2801 Summit's costs of repairs in 2023 nearly matched the total amount of repair costs it had expended from 2019 through 2022 combined. This figure contributed to 2801's 2023 total operating expenses hitting a five-year high in 2023 ($1,147,194.93). As a result, and despite generating $1,674,809.50, 2801 Summit's 2023 NOI was its second lowest in the period of 2019 through 2023, as its 2023 cash

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

flow also turned red to the tune of -$89,391.72. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

146. The 23-unit property located at and commonly known as 125 Moss Avenue, Oakland, CA ("125 Moss"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has also been impacted by the CITY and COUNTY's COVID-19 related moratoriums imposed against residential property owners. As a result of substantial costs related to unit turnover, unit and common area repairs and maintenance, and make-ready expenses, 125 Moss' NOI decreased from $308,102.97 in 2021 and $311,310.95 in 2021 and 2022 to just $276,519.82 in 2023. As a result, 125 Moss' annual cash flow in 2023 came in at -$26,582.64 for the second consecutive year. As shown in the instant amended complaint and its attachments, such inferior performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

~~87.~~147. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 have ~~also~~ suffered devasting financial losses because of the Moratoria and Phase Out Ordinance. As alleged herein, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 own real property in either the COUNTY or the CITY or both. All Plaintiffs' properties listed in Paragraphs Nos. 17-20 and 22-66 are rental properties and/or contain rental units, and Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 are housing providers of these rental properties.

~~88.~~148. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 purchased all of these rental properties prior to the Moratoria being enacted with objective reasonable investment backed expectations based upon the regulatory environment in place at the time of purchase. When determining whether their purchase of these rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the same longstanding property law principles that other market participants would have relied on, namely, that a housing provider-renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter complied with the material terms of the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

lease. When determining whether their purchase of the rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the COUNTY and CITY just cause eviction ordinances then in place, including but not limited to, the ability to evict a renter who failed to pay rent or otherwise violated the material terms of the lease but was still in possession of their property. Prior to the Moratoria being enacted, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's rental properties were profitable businesses, all of which yielded an average of many thousands of dollars a year in profit.

~~89.~~149. All properties listed in Paragraphs Nos. 17-20 and 22-66 have been occupied by renters during the Moratoria. Since the Moratoria were enacted, and through the Moratoria's duration, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have had renters at these properties who have refused or failed to pay rent for their units or otherwise violated the material terms of their leases. Many of the renters that occupy the properties listed in in Paragraphs Nos. 17-20 and 22-66 did not cooperate with Plaintiffs' efforts to assist them in obtaining rental assistance through the CITY and COUNTY programs, resulting in Plaintiffs' inability to mitigate their lost rental profits. Other renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 did not qualify for rental assistance because their income level was too high and/or because they were not impacted by a Covid-19 related reason, resulting in Plaintiffs' inability to mitigate their lost rental profits. Plaintiffs' renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 also committed acts that damaged these properties during the time the Moratoria were in effect, which further devalued their properties.

~~90.~~150. Despite the above acts, the blanket Moratoria and the Phase Out Ordinance prohibited Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 from evicting these renters during the time the Moratoria were in place. Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have seen significant losses in property values as a direct result of the Moratoria enabling renters to fail to pay rent for any reason at all, to damage these properties without consequence, and to violate the material terms of their leases with impunity. These rental properties have lost many millions of dollars in property value and income as a direct result of the Moratoria and Phase Out

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Ordinance.  Moreover, as a result of the CITY and COUNTY Moratoria and Phase Out Ordinance, Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66's collective losses in rent and property damages, and other damages are in excess of tens of millions of dollars.

151.   The COUNTY and CITY are aware that the Moratoria and Phase Out Ordinance solely target housing providers in favor of renters, by allowing renters carte blanche to refuse to pay rent without basis, and permit renters to cause damage to housing providers' properties and otherwise violate their leases without consequence. Despite the significant harm the Moratoria and Phase Out Ordinance has caused housing providers, COUNTY and CITY have refused to amend these regulations.  Accordingly, the character of the Moratoria and Phase Out Ordinance placed a severe and disproportionate regulatory burden upon Plaintiffs and forced Plaintiffs to carry the cost of a public program.  These regulations were the functional equivalent of a classic taking in which government directly appropriates private property or ousts the owner from his or her domain.

152.    With respect to each and every Plaintiff above, each Plaintiff suffered additional and further economic losses as detailed by the Declaration of Richard Marchitelli, MAI, CRE, ("Marchitelli Decl.," a true and correct copy of which is attached hereto as **Exhibit A**).  The Marchitelli Decl. (and any exhibits attached thereto) is incorporated into this Second Amended Complaint in full.

153.   Richard Marchitelli is a licensed real estate appraiser and a Member of the Appraisal Institute (MAI), and is the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC. (Marchitelli Decl., ¶ 2.)  Prior to this position, he served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield. (*Id.*)  His practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices.  (Marchitelli Decl., ¶ 3.)  He has prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class

certification, and lender liability. (*Id.*)

154. As Marchitelli has determined, each and every fee property has suffered a substantial impairment of value, economic loss and economic use as a direct result of the COUNTY'S eviction band and/or of the CITY'S eviction ban. (Marchitelli Decl., ¶ 16.) The severe and burdensome requirements of those ordinances, plus the uncertain and unpredictable end date, significantly increased the risk profile of these properties on a permanent basis and caused continuing negative harm to the economic value of each and every property. (*Id.*)

155. Marchitelli has estimated that, based on his knowledge and experience, as a direct result of the restrictions imposed by the CITY and/or COUNTY, the capitalization rates of each and every of these properties increased by at least 200 to 300 basis points, depending upon the individual characteristics of each property. (Marchitelli Decl., ¶ 24.) As detailed in the Marchitelli Decl., that increase in capitalization rate results in a corresponding decrease in economic value and economic use. (Marchitelli Decl., ¶¶ 7-10.)

156. The full scope of the economic impact for each and every property and Plaintiff herein shall be determined by the preparation of expert reports, determining the respective values before and after, in accordance with FRCP 26(a)). (Marchitelli Decl., ¶ 25.)

157.

With respect to each and every Plaintiff above, each Plaintiff had a reasonable investment backed expectation to operate its respective property, and benefit from its full economic use, consistent with the land use regulations that were in place at the time of the property's purchase and that were in place prior to the enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

158. - Each Plaintiff did not, and could not, reasonably expect the subsequent enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

159. Each Plaintiff did not, and could not, reasonably expect the substantial duration of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

160. Each Plaintiff did not, and could not, reasonably expect the severe impact and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

disproportionate burden that the government forced them to bear as a result of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

161. As a result of all of the above, the reasonable investment backed expectations of each and every Plaintiff were destroyed as a result of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

~~91.~~

**FIRST CLAIM**[5]

**(Violation of the 5th Amendment to the U.S. Constitution – Against All Defendants (42 U.S.C. § 1983))**

~~92.~~162. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 96 of this Complaint.

~~93.~~163. By enacting the Moratoriums and the Phase Out Ordinance, the COUNTY and the CITY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratoriums and the Phase Out Ordinance violate the Fifth Amendment of the United States Constitution on their face and as applied to Plaintiffs.

~~94.~~164. Defendants' Moratoriums and the Phase Out Ordinance purport to prohibit Plaintiffs from evicting any renter in the CITY and COUNTY for virtually any reason, with few exceptions under the three-year-plus timeframes thereunder. The Moratoriums and the Phase Out Ordinance perpetrate physical takings by illegally nullifying Plaintiffs and other housing providers' right to occupy their properties without just compensation; the Moratoriums and the Phase Out Ordinance *eliminate* renters' rent obligations and sanction renters' trespassing on Plaintiffs' properties. Preventing housing providers "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to

---

[5] Per the Court's Order on Motions to Dismiss, filed September 3, 2024, the Court granted Defendants' motions with respect to dismissal of HPOA and "with prejudice as to all claims except the regulatory-takings claims, which are dismissed without prejudice." Plaintiffs reasserts claims and parties dismissed with prejudice herein to preserve Plaintiffs' right to appeal.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

exclude." (*Alabama Association of Realtors v. Department of Health and Human Services* (2021) 141 S.Ct. 2485, 2489; also see, *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435; *Cedar Point Nursery v. Hassid* (2021) 141 S. Ct 2063; *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 655 [Physical taking occurs when a regulation "effectively extinguish[es] plaintiffs' right to occupy substantial portions of their property"].)

~~95.~~165.        The COUNTY and the CITY's moratoriums and the Phase Out Ordinance also unreasonably and substantially interfered with Plaintiffs' investment-backed expectations, singled out Plaintiffs to bear the full cost of public benefits, and result in either a substantial or total deprivation of the economic value of Plaintiffs' properties. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104.)   The Moratoriums devalued properties by prohibiting Plaintiffs from recovering possession of their properties—even for their personal use—and even despite renters perpetuating ongoing nuisances and/or committing material violation(s) of the lease.  The Moratoriums and the Phase Out Ordinance further devalue properties by prohibiting eviction for *continued* nonpayment of rents for over a period of three years.  Plaintiffs have suffered significant financial losses due to the Moratoriums, and continue to suffer these losses under the Phase Out Ordinance, notwithstanding the expiration of the Moratoria, because the current government "relief" programs in place, have resulted in little to no relief.  Plaintiffs' "investment-backed expectations" have been violated as a matter of law. (*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles* (C.D. Cal. 2020) 500 F. Supp. 3d 1088, 1096, *aff'd*, (9th Cir. 2021) 10 F.4th 905.) This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606.)

~~96.~~166.        For the foregoing reasons, the Moratoriums and the Phase Out Ordinance constitute takings without just compensation, and thus violates Plaintiffs' rights protected by the United States Constitution.   An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

making a declaratory judgment necessary. (28 U.S.C. § 2201.)

~~97.~~167. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**SECOND CLAIM**
**(Inverse Condemnation – Violation of Article I, Section 19 of the California Constitution)**

~~98.~~168. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 102 of this Complaint.

~~99.~~169. The Moratoriums and the Phase Out Ordinance violate Article I, Section 19 of the California Constitution on their face and as applied to Plaintiffs, for all the reasons alleged herein.

~~100.~~170. The Moratoriums and the Phase Out Ordinance therefore constitute takings without just compensation, and thus violate Plaintiffs' rights protected by the California Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.

~~101.~~171. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.

**THIRD CLAIM**
**(Violation of Due Process (42 U.S.C. § 1983))**

~~102.~~172. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 106 of this Complaint.

~~103.~~173. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. (*Lockary v. Kayfetz* (9th Cir. 1990) 917 F.2d 1150, 1155; *Weinberg v. Whatcom County* (9th Cir. 2001) 241 F.3d 746, 752-755.) The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive due

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

process rights on their face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' imposition of the blanket Moratoriums and the Phase Out Ordinance for that three-plus year time period are irrational and lacking in a legitimate government interest because there is no justification for such extreme measures. Indeed, California's COVID-19 Renter Relief Act never imposed such draconian restrictions. Further, the Bay Area saw significant improvement in circumstances relating to the pandemic since March of 2020, has a high rate of vaccinations, and federal and state officials recognized during the period of time the Moratoria were in place that Covid-19 was either in, or moving to, an endemic stage. The pandemic should not have been used as a "cursory" justification for what would otherwise be an illegal law. (See, *Texas v. United States* (S.D. Tex. Aug. 19, 2021) No. 6:21-CV-00016, 2021 WL 3683913, at *45; *Chrysafis v. Marks* (2021) 141 S.Ct. 2482; *Tandon v. Newsom* (2021)141 S.Ct. 1294.) Defendants therefore have no rational basis for the Moratoriums and the Phase Out Ordinance, and any offered is plainly pretext. The Moratoriums and the Phase Out Ordinance violate procedural due process because they, in effect, deprive Plaintiffs of *any* procedure to recover their properties under most cases under the time period set forth thereunder.

~~104.~~174. The aforesaid acts, and as further alleged herein, therefore constitute violations of Plaintiff's procedural and substantive due process rights. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

~~105.~~175. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, emotional distress, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs are also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**(Violation of Equal Protection (42 U.S.C. § 1983))**

~~106.~~176. Plaintiffs incorporate here by reference the allegations contained in

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Paragraphs 1 through 110 of this Complaint.

~~107.~~177. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the laws, on their face and as applied. The purpose of the Moratoriums and the Phase Out Ordinance is to unlawfully single out, penalize, and target Plaintiffs, and all housing providers in the CITY and COUNTY, by preventing them from lawfully exercising their property rights to receive rents, occupy their properties, exclude others from their properties, and protect their properties from nuisance and damage. The "emergency" under which the Moratoriums were enacted no longer existed during their imposition; the Bay Area was open for business, has a high rate of vaccinations, and federal and state officials recognized that Covid-19 was either in, or moving to, and endemic stage. Thus, any stated rational government purpose to the contrary is pretext.

~~108.~~178. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the law, and as a result, Plaintiffs have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.) Plaintiffs have also entitled to recover their attorneys' fees under 42 U.S.C. § 1983.

**FIFTH CLAIM**
**(Writ of Mandate (CCP §§ 1085 or 1094.5))**

~~109.~~179. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 113 of this Complaint.

~~110.~~180. Code of Civil Procedure §§ 1094.5 or 1085 authorizes Plaintiffs to seek a writ of mandate/mandamus, and which authorizes the Court to review and set aside public agency decisions involving a prejudicial abuse of discretion or error of law.

~~111.~~181. Plaintiffs request the Court issue a declaration, and/or writ of mandate or mandamus, setting aside and voiding the effect of the Moratoriums and the Phase Out Ordinance

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

as set forth hereunder. Plaintiffs also seek an immediate stay to enjoin Defendants from enforcing the Phase Out Ordinance and the Moratoria's ban on virtually all evictions during that three-year period, as such enforcement would further harm Plaintiffs by violating their statutory and constitutional rights as alleged herein, and the issuance of such a stay would not be against the public interest.

~~112.~~182. In enacting the Moratoriums and Phase Out Ordinance, Defendants exceeded their jurisdiction, prevented Plaintiffs from having a fair trial, failed to proceed as required by law, and prejudicially abused their discretion because:

a. The Moratoriums and Phase Out Ordinance are preempted by the State's Covid-19 Renter Relief Act (the "Act"), both expressly and impliedly, because they conflict with the Act by depriving housing providers of the UD process altogether by prohibiting repossession of their properties in almost all circumstances under the timeframes set forth thereunder, thereby conflicting with that law. Because the Moratoriums and Phase Out Ordinance conflict with the Act, they are preempted and void.

b. The Moratoriums and Phase Out Ordinance unlawfully amend the CITY's Just Cause for Eviction Ordinance, which was enacted via voter initiative. (Oak. Mun. Code § 8.22.310.) While the COUNCIL is permitted to amend the Just Cause for Eviction Ordinance to a limited extent (see, Oak. Muni. Code § 8.22.360(F); City of Oakland Measure Y), the COUNTY is not, and the COUNCIL's moratorium and Phase Out Ordinance significantly surpasses the permissible scope of amendment permitted by the voters. Thus, these regulations are invalid.

~~c.~~ The Phase Out Ordinance introduces substantive unlawful hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, allowing some renters to potentially stop paying rent altogether, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior, "unreasonable."

c.

~~113.~~183. Moreover, as alleged herein, Defendants' aforesaid acts constitute unconstitutional per se, regulatory, de facto, and physical takings of Plaintiffs' properties without just compensation under the U.S. Constitution and violate Plaintiffs' constitutional rights to equal protection and due process, and any purported legitimate and/or rational basis for the same is pretext.

~~114.~~184. Because these are questions of law and implicate constitutional rights, the standard of review falls under the independent judgment test/de novo review.

~~115.~~185. To the extent Plaintiffs were required to exhaust any administrative remedies, they have, as alleged herein.

~~116.~~186. As alleged herein, Plaintiffs have a beneficial interest in ensuring that the effect of the now-expired Moratoriums and current Phase Out Ordinance are struck down so that Plaintiffs statutory and constitutional rights are not infringed upon. Plaintiffs do not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary to compel Defendants to correct their actions, which are unlawful and in excess of their authority.

~~117.~~187. Plaintiffs are entitled to recover attorneys' fees under Cal. Civ. Code § 1021.5, and because the Moratoriums are arbitrary and capricious, lacking any reasonable basis, and/or discriminatory and illegal, Plaintiffs are additionally entitled to attorneys' fees under Govt. Code § 800(a).

WHEREFORE, Plaintiffs demand judgment against Defendants for the following:

**For Claims One, Two, Three and Four:**

1. A preliminary and permanent injunction preventing enforcement of the Phase Out Ordinance;

2. A declaratory judgment determining that Defendants' Moratoriums and Phase Out Ordinance constitute a taking under the United States and California Constitutions, and violate Plaintiffs' right to due process and equal protection;

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

3. For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained;

4. For general damages according to proof, in an amount that is yet to be ascertained;

5. For an award of attorneys' fees and costs as allowed by law; and

6. For any other relief that the Court deems just and proper.

**<u>For Claim Five</u>**:

1. For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Phase Out Ordinance for all of the reasons alleged above;

2. For a judgment that the Moratoriums and Phase Out Ordinance constitute unlawful takings on their face and/or as applied, and have prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation;

3. For a judgment that Defendants have violated Plaintiffs' equal protection and due process rights;

4. For an immediate stay or preliminary injunction, and permanent injunction enjoining Defendants from enforcing the Phase Out Ordinance pending the determination of the merits;

5. For costs of suit herein, including attorneys' fees;

6. For any other relief that the Court deems just and proper.

Dated: ~~September~~ March 3~~20~~, 2025~~3~~

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all claims (other than the petition for writ of mandate) as stated herein.

Dated: ~~September~~ March 3~~20~~, 202~~3~~5

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*
By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**VERIFICATION**

I, Emily L. Brough, am an attorney representing all Plaintiffs and Petitioners (collectively, "Plaintiffs") in this action. I have personal knowledge of the matters attested to in the fifth cause of action for writ of mandate (CCP § 1085), which are primarily questions of law, and it is for this reason that I, and not Plaintiffs, are verifying the fifth cause of action, only. I have read the cause of action for writ of mandate and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true. On this basis, I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge and that this verification was executed on ____________, 2025~~3~~, in Soquel, California.

______________________________
Emily L. Brough

# EXHIBIT A

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98122
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**DECLARATION OF RICHARD MARCHITELLI IN SUPPORT OF FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

Action Filed: March 1, 2022
Trial Date: None set

I, Richard Marchitelli, declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the following facts discussed below and would testify truthfully thereto if called to do so.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

2. I am the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC. Prior to my current position, I served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield.

3. My practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices. I have prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. I have served as a sole arbitrator and as a member of arbitration panels.

4. I currently serve as Chair of the Body of Knowledge Committee of the Appraisal Institute. I have formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICs, and Chair of Americas Valuation Standards Board of RICs.

5. A true and correct copy of my curriculum vitae ("CV") is attached hereto as **Exhibit B**.

6. I reviewed the temporary ordinances enacted by the City of Oakland[1] and Alameda County[2] in response to the COVID-19 pandemic. I also inspected the exterior of properties in Oakland located at 125 Moss Avenue, 1553 Alice Street, 1692-1694 12th Street, 2000 E. 30th Street, 3629 West Street, 3700 International Boulevard, and 8603 Hillside Street.

7. The market value of a rental property is determined by dividing the property's net operating income (income after expenses but before debt service) by a capitalization rate.[3] If a property's net operating income is $100,000 and 10% is the appropriate capitalization rate, its value is

---

1 Oakland City Ordinance No. 13606.

2 Alameda County Ordinance No. 2020-32.

3 The 7th edition of *The Dictionary of Real Estate Apprisal* published by the Appraisal Institute defines capitalization rate as "A ratio on one year's income provided by an asset to the value of the asset; used to convert income into value in the income capitalization approach."

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

calculated by dividing $100,000 by 10% or 100,000/.10 = 1,000,000. In this example, the indicated property value is $1,000,000. Proof of this calculation is demonstrated by multiplying the property's $100,000 income by a factor of 10 or 100,000 x 10 = $1,000,000.

8. The capitalization rate is a basic tool used by buyers and sellers, investment analysts, mortgage underwriters, brokers, appraisers, and other real estate market participants to convert income into value. The capitalization rate reflects the risk of investing in a property. Capitalization rates are higher when the investment risk is greater because investors demand a higher return as compensation for accepting more uncertainty. The opposite is also true. The less the risk, the lower the capitalization rate.

9. Using the above example, if the investment risk were greater, the 10% capitalization rate might be 13%. In such a situation, the $100,000 net income, which remains the same, would be divided by a 13% capitalization rate and the indicated property value would be $769,230 (100,000/.13 = 769,230). Conversely, if the investment risk were low and 7% is the appropriate capitalization rate, the property value would be $1,428,571 (100,000/.07 = 1,428,571).

10. In summary, the higher the capitalization rate, the lower the value; the lower the capitalization rate, the higher the value.

11. Situs RERC, a respected vendor of real estate data, publishes quarterly surveys of capitalization rates. Such surveys are aggregated by quarter, property type, capitalization rate, and region of the country. The following table reflects capitalization rate data of apartment buildings in the western United States. Because capitalization rates vary by the quality of the asset, RERC divides properties into the three categories: Tier 1, being new or newer quality construction in prime to good locations; Tier 2, being aging, former first-tier properties, in good to average locations; and Tier 3, being older properties with functional inadequacies and/or in marginal locations.

12. A true and correct copy of Situs RERC's Reported Capitalization Rates Second and Third Tier Properties from first quarter 2020 through second quarter 2023 (the "Table") is attached hereto as **Exhibit A**.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

13. Tier 1 properties are properties often purchased by pension funds, insurance companies, and sovereign wealth funds. I did not include Tier 1 capitalization rates in the Table because they are not relevant to this discussion.

14. The buildings I inspected were clearly Tier 3 properties. Nevertheless, the Table is useful to provide context and perspective by showing the gradation or differences in the capitalization rates between Tier 2 and 3 properties.

15. The Table's first column from the left is the quarter of each year from the beginning of 2020 through third quarter 2023. The second column from the left is the year. The Table reflects the low, average, and high capitalization rates reported by RERC each quarter for Tier 2 and Tier 3 properties. The column at the far right represents the quarterly difference in the capitalization rates between Tier 2 and Tier 3 properties. Beginning in first quarter 2021 the differences between Tier 2 and Tier 3 property capitalization rates appear to have widened.

16. The market value of properties in the City of Oakland and throughout Alameda County were adversely impacted by the city and county ordinances beginning on the dates they were adopted despite the expectation that, although unknown, the moratoriums were likely to be rescinded sometime in the future. This uncertainty substantially increased the risk profile of properties affected by the moratoriums, making such properties less desirable to prospective purchasers.

17. The risk profile of such properties was further increased by the various terms imposed by the moratoriums such as prohibiting eviction of certain residential tenants for non-payment of rent, landlords not being able to impose late charges, and landlords being forced to work out payment plans over time for back rent. There was also uncertainty as to whether 100% of the rents would be collected and whether some rents would be collected at all despite legal remedies available to landlords, which although available might not make economic sense to pursue.

18. Value is the anticipation of future benefits. Existing properties were faced with the economic reality that there was great uncertainty regarding the timing of when income would be received and the amount of income that would actually be collected. Timing and durability of income are major factors in the decision-making process of investors in determining the price to pay for property.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

19. In addition to the unpredictability of when the moratoriums would end and the realization that the effects of the moratoriums would not end immediately when they were rescinded, such as the difficulty of collecting rents, the regulations caused irreparable future harm to property values by reinforcing the perception of residential property investors that Oakland and Alameda County were not favorable places to do business and should be avoided.

20. There is no question that the risk profile of properties discussed above increased substantially and that the value of such properties was seriously impaired on the dates the moratoriums were adopted.

21. Below I have demonstrated potential effects of the moratoriums on the value of a property with a $100,000 net income by increasing the capitalization rate of a Tier 3 property to reflect the considerable uncertainty and risk associated with such properties.

22. I adjusted Tier 3 base capitalization rate of 6.5% upward in increments of 50 basis points. Applying an unadjusted base Tier 3 capitalization rate of 6.5% to a $100,000 income results in value of $1,538,000 (rounded).

23. Adding 200, 250, and 300 basis points to a Tier 3 capitalization rate of 6.5%, results in adjusted capitalization rates of 8.5%, 9.0%, and 9.5%, respectively. Applying those rates to an income of $100,000 results in the following:

100,000/.085 = 1,176, 470 or rounded value of $1,176,000

100,000/.09 = 1,111,111 or rounded value of $1,100,000

100,000/.09.5 = 1,052,631 or rounded value of $1,052,000

24. Based on my knowledge and experience, as a direct result of the restrictions imposed by the City of Oakland and Alameda County, the capitalization rates of these properties increased by at least 200 to 300 basis points, and likely more, possibly substantially more, depending upon the individual characteristics of each property.

25. The exact economic loss will be determined by an appraisal report to be prepared in the future in connection with this litigation.

I declare under the penalty of perjury that the foregoing is true and correct, and this declaration was executed March 3, 2025 in the City of Charlotte, North Carolina.

ZACKS & FREEDMAN, PC
180 Montgomery Street, Suite 1950
San Francisco, California 94104

Richard Marchitelli, MAI, CRE

**[Notary Public Verification on Following Page]**

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

Sworn to and subscribed before me this 3rd day of March, 2025, by Richard Marchitelli.

______________________________

Tracey Marchitelli, Notary Public

My Commission Expires: 5/11/2027

[Notary Seal]

TRACEY MARCHITELLI
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires May 11, 2027

# EXHIBIT A

| Situs RERC - Reported Capitalization Rates Second and Third Tier Properties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Apartments | | | West Region 2nd Tier | | | West Region 3rd Tier | | Difference 2nd vs. 3rd |
| Quarter | Year | Low | High | Average | Low | High | Average | (Basis Points) |
| Q1 | 2020 | 4.00% | 7.00% | **5.60%** | 4.80% | 8.00% | **6.20%** | **60** |
| Q2 | 2020 | 4.00% | 7.50% | **5.80%** | 5.00% | 7.80% | **6.30%** | **50** |
| Q3 | 2020 | 4.50% | 7.80% | **5.80%** | 5.00% | 9.80% | **6.50%** | **70** |
| Q4 | 2020 | 5.00% | 7.00% | **5.80%** | 5.30% | 8.00% | **6.30%** | **50** |
| Q1 | 2021 | 5.00% | 7.50% | **6.10%** | 5.50% | 8.50% | **6.80%** | **70** |
| Q2 | 2021 | 4.50% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q3 | 2021 | 4.80% | 7.50% | **5.90%** | 5.30% | 8.50% | **6.50%** | **60** |
| Q4 | 2021 | 4.80% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q1 | 2022 | 4.50% | 7.50% | **5.70%** | 5.30% | 8.50% | **6.60%** | **90** |
| Q2 | 2022 | 5.00% | 7.00% | **6.10%** | 5.50% | 8.50% | **6.90%** | **80** |
| Q3 | 2022 | 4.80% | 10.00% | **6.20%** | 5.00% | 12.00% | **7.00%** | **80** |
| Q4 | 2022 | 5.00% | 7.50% | **6.30%** | 5.50% | 8.50% | **7.10%** | **80** |
| Q1 | 2023 | 4.00% | 7.80% | **6.10%** | 4.30% | 11.00% | **7.00%** | **90** |
| Q2 | 2023 | 5.00% | 8.00% | **6.50%** | 5.50% | 8.80% | **7.20%** | **70** |

# EXHIBIT B

# CURRICULUM VITAE

**Richard Marchitelli, MAI, CRE**
*Senior Managing Director, Newmark Valuation & Advisory, LLC*
*Leader Litigation Support Practice*

**Professional History**

**Newmark Valuation & Advisory, LLC**
Senior Managing Director
Leader Litigation Support Practice
Charlotte, North Carolina
201-421-5308
richard.marchitelli@nmrk.com
2024 - Present

**Cushman & Wakefield**
Executive Managing Director
Americas Leader Dispute Analysis & Litigation Support Practice
New York, New York/Charlotte, North Carolina
2003 - 2024

**PricewaterhouseCoopers**
Director, Real Estate Practice
Leader Real Estate Litigation Support Practice
New York, New York
2000 - 2003

**Marchitelli Barnes & Company**
Founding Partner
New York, New York
1973 – 2000

**Experience**

Mr. Marchitelli's practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices. Mr. Marchitelli has prepared expert reports in matters involving economic damages, breach of contract and breach of fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. Additionally, he has served as a sole arbitrator and as a member of arbitration panels.

Mr. Marchitelli has provided consulting and valuation services involving challenging and unusual properties such as the High Line, an elevated rail corridor in Manhattan that has been converted into an urban park; development restrictions on properties surrounding McCarran Airport in Las Vegas; the Trans Alaska Pipeline; a mixed-use development site in Lima, Peru; the Hancock Center Observation Deck in Chicago; an 1,800-mile rail corridor and over 900 separate underground pipeline easements extending through six western states from Texas to Oregon and Nevada; a submarine maintenance and manufacturing facility in Groton, Connecticut; regulatory takings cases; the Northrop Grumman former military aircraft manufacturing property in Bethpage, New York; BP headquarters building in Houston; an oil drill site on



the North Slope of Alaska; luxury condominium resort on St. John in the U.S. Virgin Islands; mixed-use development properties in Guadalajara and Puerto Vallarta, Mexico; the Ritz Carlton Condominiums, Washington, DC.; an office industrial complex in Dublin, Ireland; and environmental contamination matters throughout the U.S. involving groundwater, radioactive waste, and airborne particulates.

Mr. Marchitelli has testified in arbitration proceedings at the International Centre for Settlement of Investment Disputes in Washington, DC, and has qualified as an expert witness in United States District Court, United States Tax Court, United States District Court of Federal Claims, United States Bankruptcy Court, and in various state and local courts, including Alaska, California, Georgia, Florida, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin. He has also been a court-appointed third-party expert in matters involving the valuation of real property.

Mr. Marchitelli is a former Adjunct Assistant Professor of Real Estate at New York University in the Master of Real Estate program where he taught post graduate courses in real estate valuation principles and concepts and marketability and feasibility studies. For 20 years, he taught courses nationally on the Uniform Standards of Professional Appraisal Practice.

Mr. Marchitelli has authored articles published in The Appraisal Journal, Real Estate Issues, Real Estate Forum, Appraisal Digest, and The Canadian Appraiser. He was a reviewer of the 9th, 10th, 11th, 12th, 13th, 14th, and 15th editions of *The Appraisal of Real Estate* and, as a subject matter expert, supervised publication of the 9th and 13th editions of that text. He was a reviewer of the 1st through 6th editions of *The Dictionary of Real Estate Appraisal* and supervised production of the 1st and 5th editions. In addition, Mr. Marchitelli has served as a reviewer of various other texts and monographs published by the Appraisal Institute and as a reviewer of several courses developed by that organization. He is also co-author of a chapter on the valuation of pipeline corridors in *Corridor Valuation: An Overview and New Alternatives* published in 2019 by the Appraisal Institute, International Right of Way Association, and Appraisal Institute of Canada.

## Education

Belmont Abbey College, Belmont, North Carolina
Degree: Bachelor of Arts, Political Science
*Who's Who in American Universities and Colleges*

## Professional Affiliations

Appraisal Institute (MAI Designation)
The Counselors of Real Estate (CRE Designation)
American Bar Association (Associate Member)

Mr. Marchitelli currently serves as Chair of the Body of Knowledge Committee of the Appraisal Institute. He formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICS, and Chair of Americas Valuation Standards Board of RICS. In addition, Mr. Marchitelli is a past Editor-in-Chief of The Appraisal Journal and former Editor-in-Chief of Real Estate Issues. He served as Chair of the New York Metropolitan Chapter of The Counselors of Real Estate, President of the Metropolitan New York Chapter of the Appraisal Institute, President of the Long Island Chapter of the Appraisal Institute, and President of the New York Condemnation Conference. Mr. Marchitelli is also licensed as a general real estate appraiser in several states.



### Special Awards

Mr. Marchitelli was awarded the George L. Schmutz Memorial Award by the Appraisal Institute for his assistance in the publication of *The Dictionary of Real Estate Appraisal.* He received the Wagner Award from the Appraisal Institute, which is presented to individuals in recognition of their contribution to the advancement of valuation knowledge and education, and he was also a recipient of the Lum Award presented annually by the Appraisal Institute to individuals for furtherance of the ideals of the real estate valuation profession.

### Select Presentations

"Property Markets – Past Present and Future", Duane Morris Fall Conference, Boca Raton

"Appraisal Myths and Market Realities", International Association of Assessing Officers, Salt Lake City

"How To – And How Not to – Develop Cap Rates in Fee Simple Market Valuation", Institute for Property Taxation – American Bar Association, New Orleans

"Experts Beware: Calculating Damages Attributable to Environmental Impairment and Detrimental Conditions", Appraisal Institute, Las Vegas

"Environmental Impairment and Damages Models: Distinguishing Real Science from Junk Science," Connecticut Legal Conference, Connecticut Bar Association, Hartford

"Plaintiff Damages Theories in Property Valuation Diminution Cases," Defense Research Institute, New Orleans

"The Challenge of Temporary Damages", International Right of Way Association, Hickory, NC

"Problems in Valuation – Working Beyond the Obvious," American Law Institute, Scottsdale

"Property Rights Symposium," Appraisal Institute, Chicago

"Power Plant Decommissioning, Retirement & Remediation – Providing Assistance in the Decision-Making Process: Buy, Sell, or Hold," Marcus Evans, Nashville

"Outside the Box: The Wide World Beyond Appraisal Opinions," Appraisal Institute, Nashville

"Evidentiary and Other Problems in Developing Post-Event Damage Estimates," New York County Lawyers' Association, New York

"Corridor Valuation and Depreciation Theory: Controversies – Alternative Approaches – Differing Perspectives," the 44th Annual Wichita Program, Wichita State University

"Corridor Valuation: Alternative Approaches/Differing Perspectives," International Right of Way Association, Hartford



"Expert – Attorney Communication: Defining the Scope of Work," National Association of Property Tax Attorneys, Las Vegas

"Project Influence", American Law Institute, Irvington, VA

"Fee Simple and Leased Fee Valuations: Distinctions with Real and Subtle Meanings" ABT/IPT Advanced Property Tax Conference, New Orleans

"How to Simplify Valuation in the Courtroom", American Law Institute, San Francisco

"How Real Estate Valuers Have Abdicated Their Role in Commercial Litigation," Southern California Chapter of the Appraisal Institute, Los Angeles

"Ask the Valuation Experts," International Association of Assessing Officers, Sacramento

"Tracking Property Value Diminution through Market Cycles: Theory & Evidence", Moderator, Appraisal Institute, Austin

"The Value of Design: Why Do Developers Hire Name Architects?" Los Angeles Chapter of the American Institute of Architects, Los Angeles

"The Role of an Arbitrator," Urban Land Institute, Denver

"Going Concern: Differing Perspectives on Real Property and Valuation Issues" Moderator, RICS Summit, Toronto

"Complex Commercial Litigation – Taking Valuation Skills to the Next Level," Appraisal Institute, Indianapolis

"Use of First and Second-Generation Rents, Changes in Highest and Best Use, and Maintaining Distinctions Between Fee Simple and Leased Fee Valuations," New York County Lawyers' Association, New York

"Valuation of Real Property and Intangibles: Market Realities," Moderator, RICS Summit, Miami

"Analyzing Market Trends and Comparable Selection in a Declining Market" – Webinar – Appraisal Institute

"Appropriate (Inappropriate) Use of Fee Simple and Leased Fee Data and First and Second-Generation Rents," National Association of Property Tax Attorneys, New York

"Valuation of Real Estate in Distressed Markets," The Counselors of Real Estate, Philadelphia

"A New Paradigm for Valuation", Valuation Colloquium, Clemson University

"Assessment and Valuation Issues Surrounding Retail Properties," Institute for Professionals in Taxation, Austin



"Preparing for Deposition Testimony and Presentations at Trial," American Law Institute, Irvington, VA

"Trial Issues and Presentations" American Law Institute, Scottsdale

"The Recession and Its Causes: Where Do We Go from Here", International Association of Assessing Officers", Louisville

"Valuing and Pricing Distressed Properties," Buying Distressed Commercial Loans and Property, Summit East, New York

"Follow Up: Corridors and Rights of Way and Policy Issues", Appraisal Institute and Appraisal Institute of Canada, Ottawa

"Corridor and Rights of Way II: Valuation Policy", Moderator, Centre for Advanced Property Economics and International Right of Way Association, San Diego

"Right of Way: Valuation Policy Issues", Moderator, American Bar Association, Centre for Advanced Property Economics, Appraisal Institute, and International Right of Way Association, Washington, DC

"Elements of an Expert Report," CLE International, Richmond

"Contemporary Valuation Issues," Valuation & Legal Issues Shared Interest Group, Appraisal Institute, Washington, DC

"Issues Related to Real Estate in Dispute Resolution," Association for Conflict Resolution of Greater New York, New York

"Property Valuation: Problems & Issues in Litigation," New York City Law Department, New York

"An Introduction to Damages Models," Valuation & Legal Services Shared Interest Group of the Appraisal Institute, Chicago

"Do You Know a Ground Lease from a Leasehold?" Association for Conflict Resolution – Greater New York Chapter, New York

"Data Reliability," National Conference of State Tax Court Judges, Lincoln Land Institute, Chicago

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**PROOF OF SERVICE**

United States District Court—Northern District of California- Case No.: 3:22-cv-01274-LB
Case No.: 3:22-cv-02705-LB (related)

I, Valeria Bentorkia-Moran, declare that:

I am employed in the County of San Francisco, State of California. I am over the age of 18 and am not a party to this action. My business address is 180 Montgomery Street, Suite 1950, San Francisco, California 94104.

On March 3, 2025, I served:

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY (42 U.S.C § 1983; C.C.P § 1085) DEMAND FOR JURY TRIAL**

in said cause addressed as follows:

| | |
|---|---|
| PACIFIC LEGAL FOUNDATION<br>JONATHAN HOUGHTON (NJ Bar No. 369652021)<br>3100 Clarendon Blvd., Suite 610<br>Arlington, VA 22201<br>BRIAN HODGES (WA Bar No. 31976)<br>SAM SPIEGELMAN (NY Bar No. 5573100)<br>255 South King Street, Suite 800<br>Seattle, WA 98104<br>Email: JHoughton@pacificlegal.org<br>Email: BHodges@pacificlegal.org<br>Email: SSpiegelman@pacificlegal.org<br><br>*Attorney for John Williams, Robert Vogel, Sheanna Rogers, Michael Loeb, Jacqueline Watson-Baker, Housing Providers of America* | MARC SELTZER<br>KRYSTA K. PACHMAN<br>GLENN C. BRIDGMAN<br>NICHOLAS N. SPEAR<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067-6029<br>Email: mseltzer@susmangodfrey.com<br>Email: kpachman@susmangodfrey.com<br>Email: gbridgman@susmangodfrey.com<br>Email: nspear@susmangodfrey.com<br><br>*Attorneys for Intervenor-Defendant Alliance of Californians for Community Empowerment Action* |
| MATTHEW D. ZINN<br>EDWARD T. SCHEXNAYDER<br>MINDY K. JIAN<br>SHUTE, MIHALY & WEINBERGER LLP<br>396 Hayes Street<br>San Francisco, CA 94102<br>Email: Zinn@smwlaw.com<br>Email: Schexnayder@smwlaw.com<br>Email: mjian@smwlaw.com<br><br>*Attorney for Alameda County and Alameda County Board of Supervisors* | BARBARA J. PARKER<br>MARIA BEE<br>ALLISON EHLERT<br>One Frank H. Ogawa Plaza, 6th Floor<br>Oakland, CA 94612<br>E-Mail:aehlert@oaklandcityattorney.org<br>*Attorney for City of Oakland and Oakland City Council* |

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

| | |
|---|---|
| CHRISTOPHER E. SKINNELL<br>HILARY J. GIBSON<br>NIELSEN MERKSAMER<br>PARRINELLO GROSS & LEONI LLP<br>2350 Kerner Boulevard, Suite 250<br>San Rafael, CA 94941<br>Email: cskinnell@nmgovlaw.com<br>Email: hgibson@nmgovlaw.com<br>*Attorneys for Plaintiffs and Petitioners California Apartment Association Stephen Lin, Lakesh and Tripti Jain, Alison Mitchell, Michael Hagerty, H. Alex, Dannie Alvarez* | |

**/XX/ (BY ELECTRONIC SERVICE)** Based on a court order or an agreement of the parties to accept electronic service, I caused the said document to be served electronically through the CM/ECS System.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 3, 2025 at San Francisco, California.

VALERIA BENTORKIA-MORAN