ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zfplaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98112
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

**ZACKS & FREEDMAN, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents,

ALLIANCE OF CALIFORNIANS FOR COMMUNITY EMPOWERMENT ACTION,

Defendant-Intervenor

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

Date: August 14, 2025
Time: 9:30 a.m.
Place: Courtroom B
450 Golden Gate Avenue
San Francisco, CA
Judge: Hon. Laurel Beeler

Action Filed: March 1, 2022
Trial Date: None set

Plaintiffs and Petitioners respectfully request that the Court take judicial notice of the following court records, state, county and city legislative acts, and public records pursuant to Federal Rule of Evidence, Rule 201 (also see, *California ex rel. RoNo, LLC v. Altus Finance S.A.*, 344 F.3d 920, 931 (9th Cir. 2003) ["requests for judicial notice are GRANTED to the extent that they are compatible with Federal Rule of Evidence 201 and do not require the acceptance of facts 'subject to reasonable dispute.'"]):

A. CA LEGIS 37 (2020), 2020 Cal. Legis. Serv. Ch. 37 (A.B. 3088).

B. Oakland Ordinance No. 13606.

C. Oakland Ordinance No. 23-0216 / 13737.

D. *Williams et al. v. Alameda County et al.*, U.S. District Court for the Northern District of California, Case No. 3:22-cv-01274, FIRST AMEDNED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY, filed September 20, 2023.

E. *Williams et al. v. Alameda County et al.*, U.S. District Court for the Northern District of California, Case No. 3:22-cv-01274, SECOND AMEDNED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY, filed March 3, 2025.

Dated: July 14, 2025

ZACKS & FREEDMAN, PC

*/s/ Emily L. Brough*
ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zfplaw.com

PACIFIC LEGAL FOUNDATION

*/s/ Jonathan M. Houghton*
JONATHAN M. HOUGHTON
(N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98112
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

# EXHIBIT A

2020 Cal. Legis. Serv. Ch. 37 (A.B. 3088) (WEST)

CALIFORNIA 2020 LEGISLATIVE SERVICE

2020 Portion of 2019-2020 Regular Session

Additions are indicated by **Text**; deletions by
* * * .
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~**Text**~~ .

# CHAPTER 37
# A.B. No. 3088

AN ACT to amend Sections 1946.2, 1947.12, and 1947.13 of, to amend, repeal, and add Sections 798.56, 1942.5, 2924.15 of, to add Title 19 (commencing with Section 3273.01) to Part 4 of Division 3 of, and to add and repeal Section 789.4 of, the Civil Code, and to amend, repeal, and add Sections 1161 and 1161.2 of, to add Section 1161.2.5 to, to add and repeal Section 116.223 of, and to add and repeal Chapter 5 (commencing with Section 1179.01) of Title 3 of Part 3 of, the Code of Civil Procedure, relating to COVID–19 relief, and declaring the urgency thereof, to take effect immediately.

[Filed with Secretary of State August 31, 2020.]

**LEGISLATIVE COUNSEL'S DIGEST**

AB 3088, Chiu. Tenancy: rental payment default: mortgage forbearance: state of emergency: COVID–19.

Existing law prescribes various requirements to be satisfied before the exercise of a power of sale under a mortgage or deed of trust. Existing law requires that a notice of default and a notice of sale be recorded and that specified periods of time elapse between the recording and the sale. Existing law establishes certain requirements in connection with foreclosures on mortgages and deeds of trust, including restrictions on the actions mortgage servicers may take while a borrower is attempting to secure a loan modification or has submitted a loan modification application. Existing law applies certain of those requirements only to a first lien mortgage or deed of trust that is secured by owner-occupied residential real property containing no more than four dwelling units.

This bill, the Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020, would, among other things, until January 1, 2023, additionally apply those protections to a first lien mortgage or deed of trust that is secured by residential real property that is occupied by a tenant, contains no more than four dwelling units, and meets certain criteria, including that a tenant occupying the property is unable to pay rent due to a reduction in income resulting from the novel coronavirus.

The bill would also enact the COVID–19 Small Landlord and Homeowner Relief Act of 2020 (Homeowner Act), which would require a mortgage servicer, as defined, to provide a specified written notice to a borrower, as defined, if the mortgage servicer denies forbearance during the effective time period, as defined, that states the reasons for that denial if the borrower was both current on payments as of February 1, 2020, and is experiencing a financial hardship that prevents the borrower from making timely payments on the mortgage obligation due, directly or indirectly, to the COVID–19 emergency. The Homeowner Act would also require a mortgage servicer to comply with applicable federal guidance regarding borrower options following a COVID–19 related forbearance.

Existing law provides that a tenant is guilty of unlawful detainer if the tenant continues to possess the property without permission of the landlord after the tenant defaults on rent or fails to perform a condition or covenant of the lease under which the property is held, among other reasons. Existing law requires a tenant be served a 3 days' notice in writing to cure a default or perform a condition of the lease, or return possession of the property to the landlord, as specified. Existing law, the Mobilehome Residency Law, prohibits a tenancy from being terminated unless specified conditions are met, including that the tenant fails to pay rent, utility charges, or reasonable incidental service charges, and 3 days' notice in writing is provided to the tenant, as specified.

This bill would, until February 1, 2025, enact the COVID–19 Tenant Relief Act of 2020 (Tenant Act). The Tenant Act would require that any 3 days' notice that demands payment of COVID–19 rental debt that is served on a tenant during the covered time period meet specified criteria, including that the notice include an unsigned copy of a declaration of COVID–19–related financial distress and that the notice advise the tenant that the tenant will not be evicted for failure to comply with the notice if the tenant delivers a signed declaration of COVID–19–related financial distress to the landlord, as specified. The Tenant Act would define "covered time period" for purposes of these provisions to mean the time between March 1, 2020, and January 31, 2021. The Tenant Act would deem a 3 days' notice that fails to comply with this criteria void and insufficient to support a judgment for unlawful detainer or to terminate a tenancy under the Mobilehome Residency Law. The Tenant Act would prohibit a tenant that delivers a declaration, under penalty of perjury, of COVID–19–related financial distress pursuant to these provisions from being deemed in default with regard to the COVID–19 rental debt, as specified. By expanding the crime of perjury, this bill would create a state-mandated local program. The Tenant Act would prohibit a court from finding a tenant guilty of an unlawful detainer before February 1, 2021, subject to certain exceptions, including if the tenant was guilty of the unlawful detainer before March 1, 2020. The bill would prohibit, before October 5, 2020, a court from taking specified actions with respect to unlawful detainer actions, including issuing a summons on a complaint for unlawful detainer in any action that seeks possession of residential real property and that is based, in whole or in part, on nonpayment of rent or other charges.

The Tenant Act would also authorize a landlord to require a high-income tenant, as defined, to additionally submit documentation supporting the claim that the tenant has suffered COVID–19–related financial distress if the landlord has proof of income showing the tenant is a high-income tenant.

The Tenant Act would preempt an ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect tenants from eviction based on nonpayment of rental payments, as specified.

The bill would require the Business, Consumer Services and Housing Agency to, in consultation with the Department of Finance, engage with residential tenants, landlords, property owners, deed-restricted affordable housing providers, and financial sector stakeholders about strategies and approaches to direct potential future federal stimulus funding to most effectively and efficiently provide relief to distressed tenants, landlords, and property owners, as specified.

Existing law prohibits a landlord from taking specified actions with intent to terminate the occupancy under any lease or other tenancy or estate at will, however created, of property used by a tenant as the tenant's residence. Existing law makes a violator of those provisions subject to certain damages in a civil action.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

This bill would, until February 1, 2021, make a violator of those provisions whose tenant has provided to that violator the declaration of COVID–19–related financial distress described above liable for damages in an amount between $1,000 and $2,500.

Existing law, The Small Claims Act, grants jurisdiction to a small claims court in cases where the amount demanded does not exceed $5,000, as specified, and prohibits a person from filing more than 2 small claims actions in which the amount demanded exceeds $2,500 anywhere in the state in any calendar year.

This bill would instead, until February 1, 2025, provide that a small claims court has jurisdiction in any action for recovery of COVID–19 rental debt, as defined, regardless of the amount demanded and would provide that a claim for recovery of a COVID–19 rental debt is exempt from the prohibition on filing more than 2 small claims actions described above.

Existing law, the Tenant Protection Act of 2019, prohibits, with certain exceptions, an owner of residential real property from increasing the gross rental rate for a dwelling or unit more than 5% plus the "percentage change in the cost of living," as defined, or 10%, whichever is lower, of the lowest gross rental rate charged for the immediately preceding 12 months, subject to specified conditions. The act exempts certain types of residential real properties, including dormitories constructed and maintained in connection with any higher education institution within the state for use and occupancy by students in attendance at the institution and housing that has been issued a certificate of occupancy within the previous 15 years.

This bill would revise and recast those exemptions to exempt dormitories owned and operated by an institution of higher education or a kindergarten and grades 1 to 12, inclusive, school. The bill would also make clarifying changes to the definition of "percentage change in the cost of living."

This bill would also make clarifying and conforming changes.

The bill would include findings that changes proposed by this bill address a matter of statewide concern rather than a municipal affair and, therefore, apply to all cities, including charter cities.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

This bill would declare that it is to take effect immediately as an urgency statute.

The people of the State of California do enact as follows:

SECTION 1. This act shall be known, and may be cited, as the Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020.

SEC. 2. The Legislature finds and declares all of the following:

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(a) On March 4, 2020, Governor Gavin Newsom proclaimed a state of emergency in response to the COVID–19 pandemic. Measures necessary to contain the spread of COVID–19 have brought about widespread economic and societal disruption, placing the state in unprecedented circumstances.

(b) At the end of 2019, California already faced a housing affordability crisis. United States Census data showed that a majority of California tenant households qualified as "rent-burdened," meaning that 30 percent or more of their income was used to pay rent. Over one-quarter of California tenant households were "severely rent-burdened," meaning that they were spending over one-half of their income on rent alone.

(c) Millions of Californians are unexpectedly, and through no fault of their own, facing new public health requirements and unable to work and cover many basic expenses, creating tremendous uncertainty for California tenants, small landlords, and homeowners. While the Judicial Council's Emergency Rule 1, effective April 6, 2020, temporarily halted evictions and stabilized housing for distressed Californians in furtherance of public health goals, the Judicial Council voted on August 14, 2020, to extend these protections through September 1, 2020, to allow the Legislature time to act before the end of the 2019–20 Legislative Session.

(d) There are strong indications that large numbers of California tenants will soon face eviction from their homes based on an inability to pay the rent or other financial obligations. Even if tenants are eventually able to pay their rent, small landlords will continue to face challenges covering their expenses, including mortgage payments in the ensuing months, placing them at risk of default and broader destabilization of the economy.

(e) There are strong indications that many homeowners will also lose their homes to foreclosure. While temporary forbearance is available to homeowners with federally backed mortgages pursuant to the CARES Act, and while some other lenders have voluntarily agreed to provide borrowers with additional time to pay, not all mortgages are covered.

(f) Stabilizing the housing situation for tenants and landlords is to the mutual benefit of both groups and will help the state address the pandemic, protect public health, and set the stage for recovery. It is, therefore, the intent of the Legislature and the State of California to establish through statute a framework for all impacted parties to negotiate and avoid as many evictions and foreclosures as possible.

(g) This bill shall not relieve tenants, homeowners, or landlords of their financial and contractual obligations, but rather it seeks to forestall massive social and public health harm by preventing unpaid rental debt from serving as a cause of action for eviction or foreclosure during this historic and unforeseeable period and from unduly burdening the recovery through negative credit reporting. This framework for temporary emergency relief for financially distressed tenants, homeowners, and small landlords seeks to help stabilize Californians through the state of emergency in protection of their health and without the loss of their homes and property.

SEC. 3. Section 789.4 is added to the Civil Code, to read:

<< CA CIVIL § 789.4 >>

789.4. (a) In addition to the damages provided in subdivision (c) of Section 789.3 of the Civil Code, a landlord who violates Section 789.3 of the Civil Code, if the tenant has provided a declaration of COVID–19 financial distress pursuant to Section 1179.03 of the Code of Civil Procedure, shall be liable for damages in an amount that is at least one thousand dollars ($1,000) but not more than two thousand five hundred dollars ($2,500), as determined by the trier of fact.

(b) This section shall remain in effect until February 1, 2021, and as of that date is repealed.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

SEC. 4. Section 798.56 of the Civil Code is amended to read:

<< CA CIVIL § 798.56 >>

798.56. A tenancy shall be terminated by the management only for one or more of the following reasons:

(a) Failure of the homeowner or resident to comply with a local ordinance or state law or regulation relating to mobilehomes within a reasonable time after the homeowner receives a notice of noncompliance from the appropriate governmental agency.

(b) Conduct by the homeowner or resident, upon the park premises, that constitutes a substantial annoyance to other homeowners or residents.

(c)(1) Conviction of the homeowner or resident for prostitution, for a violation of subdivision (d) of Section 243, paragraph (2) of subdivision (a), or subdivision (b), of Section 245, Section 288, or Section 451, of the Penal Code, or a felony controlled substance offense, if the act resulting in the conviction was committed anywhere on the premises of the mobilehome park, including, but not limited to, within the homeowner's mobilehome.

(2) However**,** the tenancy may not be terminated for the reason specified in this subdivision if the person convicted of the offense has permanently vacated, and does not subsequently reoccupy, the mobilehome.

(d) Failure of the homeowner or resident to comply with a reasonable rule or regulation of the park that is part of the rental agreement or any amendment thereto.

No act or omission of the homeowner or resident shall constitute a failure to comply with a reasonable rule or regulation unless and until the management has given the homeowner written notice of the alleged rule or regulation violation and the homeowner or resident has failed to adhere to the rule or regulation within seven days. However, if a homeowner has been given a written notice of an alleged violation of the same rule or regulation on three or more occasions within a 12–month period after the homeowner or resident has violated that rule or regulation, no written notice shall be required for a subsequent violation of the same rule or regulation.

Nothing in this subdivision shall relieve the management from its obligation to demonstrate that a rule or regulation has in fact been violated.

(e)(1) ~~* * *~~ **Except as provided for in the COVID–19 Tenant Relief Act of 2020 (Chapter 5 (commencing with Section 1179.01) of Title 3 of Part 3 of the Code of Civil Procedure), nonpayment** of rent, utility charges, or reasonable incidental service charges; provided that the amount due has been unpaid for a period of at least five days from its due date, and provided that the homeowner shall be given a three-day written notice subsequent to that five-day period to pay the amount due or to vacate the tenancy. For purposes of this subdivision, the five-day period does not include the date the payment is due. The three-day written notice shall be given to the homeowner in the manner prescribed by Section 1162 of the Code of Civil Procedure. A copy of this notice shall be sent to the persons or entities specified in subdivision (b) of Section 798.55 within 10 days after notice is delivered to the homeowner. If the homeowner cures the default, the notice need not be sent. The notice may be given at the same time as the 60 days' notice required for termination of the tenancy. A three-day notice given pursuant to this subdivision shall contain the following provisions printed in at least 12–point boldface type at the top of the notice, with the appropriate number written in the blank:

“Warning: This notice is the (insert number) three-day notice for nonpayment of rent, utility charges, or other reasonable incidental services that has been served upon you in the last 12 months. Pursuant to Civil Code Section 798.56 (e) (5),[1] if you have been given a three-day notice to either pay rent, utility charges, or other reasonable incidental services or to vacate your

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

tenancy on three or more occasions within a 12–month period, management is not required to give you a further three-day period to pay rent or vacate the tenancy before your tenancy can be terminated."
(2) Payment by the homeowner prior to the expiration of the three-day notice period shall cure a default under this subdivision. If the homeowner does not pay prior to the expiration of the three-day notice period, the homeowner shall remain liable for all payments due up until the time the tenancy is vacated.

(3) Payment by the legal owner, as defined in Section 18005.8 of the Health and Safety Code, any junior lienholder, as defined in Section 18005.3 of the Health and Safety Code, or the registered owner, as defined in Section 18009.5 of the Health and Safety Code, if other than the homeowner, on behalf of the homeowner prior to the expiration of 30 calendar days following the mailing of the notice to the legal owner, each junior lienholder, and the registered owner provided in subdivision (b) of Section 798.55, shall cure a default under this subdivision with respect to that payment.

(4) Cure of a default of rent, utility charges, or reasonable incidental service charges by the legal owner, any junior lienholder, or the registered owner, if other than the homeowner, as provided by this subdivision, may not be exercised more than twice during a 12–month period.

(5) If a homeowner has been given a three-day notice to pay the amount due or to vacate the tenancy on three or more occasions within the preceding 12–month period and each notice includes the provisions specified in paragraph (1), no written three-day notice shall be required in the case of a subsequent nonpayment of rent, utility charges, or reasonable incidental service charges.

In that event, the management shall give written notice to the homeowner in the manner prescribed by Section 1162 of the Code of Civil Procedure to remove the mobilehome from the park within a period of not less than 60 days, which period shall be specified in the notice. A copy of this notice shall be sent to the legal owner, each junior lienholder, and the registered owner of the mobilehome, if other than the homeowner, as specified in paragraph (b) of Section 798.55, by certified or registered mail, return receipt requested, within 10 days after notice is sent to the homeowner.

(6) When a copy of the 60 days' notice described in paragraph (5) is sent to the legal owner, each junior lienholder, and the registered owner of the mobilehome, if other than the homeowner, the default may be cured by any of them on behalf of the homeowner prior to the expiration of 30 calendar days following the mailing of the notice, if all of the following conditions exist:

(A) A copy of a three-day notice sent pursuant to subdivision (b) of Section 798.55 to a homeowner for the nonpayment of rent, utility charges, or reasonable incidental service charges was not sent to the legal owner, junior lienholder, or registered owner, of the mobilehome, if other than the homeowner, during the preceding 12–month period.

(B) The legal owner, junior lienholder, or registered owner of the mobilehome, if other than the homeowner, has not previously cured a default of the homeowner during the preceding 12–month period.

(C) The legal owner, junior lienholder or registered owner, if other than the homeowner, is not a financial institution or mobilehome dealer.

If the default is cured by the legal owner, junior lienholder, or registered owner within the 30–day period, the notice to remove the mobilehome from the park described in paragraph (5) shall be rescinded.

(f) Condemnation of the park.

(g) Change of use of the park or any portion thereof, provided:

(1) The management gives the homeowners at least 15 days' written notice that the management will be appearing before a local governmental board, commission, or body to request permits for a change of use of the mobilehome park.

(2) After all required permits requesting a change of use have been approved by the local governmental board, commission, or body, the management shall give the homeowners six months' or more written notice of termination of tenancy.

If the change of use requires no local governmental permits, then notice shall be given 12 months or more prior to the management's determination that a change of use will occur. The management in the notice shall disclose and describe in detail the nature of the change of use.

(3) The management gives each proposed homeowner written notice thereof prior to the inception of ~~* * *~~ **the homeowner's** tenancy that the management is requesting a change of use before local governmental bodies or that a change of use request has been granted.

(4) The notice requirements for termination of tenancy set forth in Sections 798.56 and 798.57 shall be followed if the proposed change actually occurs.

(5) A notice of a proposed change of use given prior to January 1, 1980, that conforms to the requirements in effect at that time shall be valid. The requirements for a notice of a proposed change of use imposed by this subdivision shall be governed by the law in effect at the time the notice was given.

(h) The report required pursuant to subdivisions (b) and (i) of Section 65863.7 of the Government Code shall be given to the homeowners or residents at the same time that notice is required pursuant to subdivision (g) of this section.

(i) For purposes of this section, "financial institution" means a state or national bank, state or federal savings and loan association or credit union, or similar organization, and mobilehome dealer as defined in Section 18002.6 of the Health and Safety Code or any other organization that, as part of its usual course of business, originates, owns, or provides loan servicing for loans secured by a mobilehome.

**(j) This section remain in effect until February 1, 2025, and as of that date is repealed.**

SEC. 5. Section 798.56 is added to the Civil Code, to read:

<< CA CIVIL § 798.56 >>

798.56. A tenancy shall be terminated by the management only for one or more of the following reasons:

(a) Failure of the homeowner or resident to comply with a local ordinance or state law or regulation relating to mobilehomes within a reasonable time after the homeowner receives a notice of noncompliance from the appropriate governmental agency.

(b) Conduct by the homeowner or resident, upon the park premises, that constitutes a substantial annoyance to other homeowners or residents.

(c)(1) Conviction of the homeowner or resident for prostitution, for a violation of subdivision (d) of Section 243, paragraph (2) of subdivision (a), or subdivision (b), of Section 245, Section 288, or Section 451, of the Penal Code, or a felony controlled substance offense, if the act resulting in the conviction was committed anywhere on the premises of the mobilehome park, including, but not limited to, within the homeowner's mobilehome.

(2) However, the tenancy may not be terminated for the reason specified in this subdivision if the person convicted of the offense has permanently vacated, and does not subsequently reoccupy, the mobilehome.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(d) Failure of the homeowner or resident to comply with a reasonable rule or regulation of the park that is part of the rental agreement or any amendment thereto.

No act or omission of the homeowner or resident shall constitute a failure to comply with a reasonable rule or regulation unless and until the management has given the homeowner written notice of the alleged rule or regulation violation and the homeowner or resident has failed to adhere to the rule or regulation within seven days. However, if a homeowner has been given a written notice of an alleged violation of the same rule or regulation on three or more occasions within a 12–month period after the homeowner or resident has violated that rule or regulation, no written notice shall be required for a subsequent violation of the same rule or regulation.

Nothing in this subdivision shall relieve the management from its obligation to demonstrate that a rule or regulation has in fact been violated.

(e)(1) Nonpayment of rent, utility charges, or reasonable incidental service charges; provided that the amount due has been unpaid for a period of at least five days from its due date, and provided that the homeowner shall be given a three-day written notice subsequent to that five-day period to pay the amount due or to vacate the tenancy. For purposes of this subdivision, the five-day period does not include the date the payment is due. The three-day written notice shall be given to the homeowner in the manner prescribed by Section 1162 of the Code of Civil Procedure. A copy of this notice shall be sent to the persons or entities specified in subdivision (b) of Section 798.55 within 10 days after notice is delivered to the homeowner. If the homeowner cures the default, the notice need not be sent. The notice may be given at the same time as the 60 days' notice required for termination of the tenancy. A three-day notice given pursuant to this subdivision shall contain the following provisions printed in at least 12–point boldface type at the top of the notice, with the appropriate number written in the blank:

"Warning: This notice is the (insert number) three-day notice for nonpayment of rent, utility charges, or other reasonable incidental services that has been served upon you in the last 12 months. Pursuant to Civil Code Section 798.56 (e) (5),[2] if you have been given a three-day notice to either pay rent, utility charges, or other reasonable incidental services or to vacate your tenancy on three or more occasions within a 12–month period, management is not required to give you a further three-day period to pay rent or vacate the tenancy before your tenancy can be terminated."

(2) Payment by the homeowner prior to the expiration of the three-day notice period shall cure a default under this subdivision. If the homeowner does not pay prior to the expiration of the three-day notice period, the homeowner shall remain liable for all payments due up until the time the tenancy is vacated.

(3) Payment by the legal owner, as defined in Section 18005.8 of the Health and Safety Code, any junior lienholder, as defined in Section 18005.3 of the Health and Safety Code, or the registered owner, as defined in Section 18009.5 of the Health and Safety Code, if other than the homeowner, on behalf of the homeowner prior to the expiration of 30 calendar days following the mailing of the notice to the legal owner, each junior lienholder, and the registered owner provided in subdivision (b) of Section 798.55, shall cure a default under this subdivision with respect to that payment.

(4) Cure of a default of rent, utility charges, or reasonable incidental service charges by the legal owner, any junior lienholder, or the registered owner, if other than the homeowner, as provided by this subdivision, may not be exercised more than twice during a 12–month period.

(5) If a homeowner has been given a three-day notice to pay the amount due or to vacate the tenancy on three or more occasions within the preceding 12–month period and each notice includes the provisions specified in paragraph (1), no written three-day notice shall be required in the case of a subsequent nonpayment of rent, utility charges, or reasonable incidental service charges.

In that event, the management shall give written notice to the homeowner in the manner prescribed by Section 1162 of the Code of Civil Procedure to remove the mobilehome from the park within a period of not less than 60 days, which period shall be

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

specified in the notice. A copy of this notice shall be sent to the legal owner, each junior lienholder, and the registered owner of the mobilehome, if other than the homeowner, as specified in paragraph (b) of Section 798.55, by certified or registered mail, return receipt requested, within 10 days after notice is sent to the homeowner.

(6) When a copy of the 60 days' notice described in paragraph (5) is sent to the legal owner, each junior lienholder, and the registered owner of the mobilehome, if other than the homeowner, the default may be cured by any of them on behalf of the homeowner prior to the expiration of 30 calendar days following the mailing of the notice, if all of the following conditions exist:

(A) A copy of a three-day notice sent pursuant to subdivision (b) of Section 798.55 to a homeowner for the nonpayment of rent, utility charges, or reasonable incidental service charges was not sent to the legal owner, junior lienholder, or registered owner, of the mobilehome, if other than the homeowner, during the preceding 12–month period.

(B) The legal owner, junior lienholder, or registered owner of the mobilehome, if other than the homeowner, has not previously cured a default of the homeowner during the preceding 12–month period.

(C) The legal owner, junior lienholder or registered owner, if other than the homeowner, is not a financial institution or mobilehome dealer.

If the default is cured by the legal owner, junior lienholder, or registered owner within the 30–day period, the notice to remove the mobilehome from the park described in paragraph (5) shall be rescinded.

(f) Condemnation of the park.

(g) Change of use of the park or any portion thereof, provided:

(1) The management gives the homeowners at least 15 days' written notice that the management will be appearing before a local governmental board, commission, or body to request permits for a change of use of the mobilehome park.

(2) After all required permits requesting a change of use have been approved by the local governmental board, commission, or body, the management shall give the homeowners six months' or more written notice of termination of tenancy.

If the change of use requires no local governmental permits, then notice shall be given 12 months or more prior to the management's determination that a change of use will occur. The management in the notice shall disclose and describe in detail the nature of the change of use.

(3) The management gives each proposed homeowner written notice thereof prior to the inception of the homeowner's tenancy that the management is requesting a change of use before local governmental bodies or that a change of use request has been granted.

(4) The notice requirements for termination of tenancy set forth in Sections 798.56 and 798.57 shall be followed if the proposed change actually occurs.

(5) A notice of a proposed change of use given prior to January 1, 1980, that conforms to the requirements in effect at that time shall be valid. The requirements for a notice of a proposed change of use imposed by this subdivision shall be governed by the law in effect at the time the notice was given.

(h) The report required pursuant to subdivisions (b) and (i) of Section 65863.7 of the Government Code shall be given to the homeowners or residents at the same time that notice is required pursuant to subdivision (g) of this section.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(i) For purposes of this section, "financial institution" means a state or national bank, state or federal savings and loan association or credit union, or similar organization, and mobilehome dealer as defined in Section 18002.6 of the Health and Safety Code or any other organization that, as part of its usual course of business, originates, owns, or provides loan servicing for loans secured by a mobilehome.

(j) This section shall become operative on February 1, 2025.

SEC. 6. Section 1942.5 of the Civil Code is amended to read:

<< CA CIVIL § 1942.5 >>

1942.5. (a) If the lessor retaliates against the lessee because of the exercise by the lessee of ~~* * *~~ **the lessee's** rights under this chapter or because of ~~* * *~~ **the lessee's** complaint to an appropriate agency as to tenantability of a dwelling, and if the lessee of a dwelling is not in default as to the payment of ~~* * *~~ rent, the lessor may not recover possession of a dwelling in any action or proceeding, cause the lessee to quit involuntarily, increase the rent, or decrease any services within 180 days of any of the following:

(1) After the date upon which the lessee, in good faith, has given notice pursuant to Section 1942, has provided notice of a suspected bed bug infestation, or has made an oral complaint to the lessor regarding tenantability.

(2) After the date upon which the lessee, in good faith, has filed a written complaint, or an oral complaint which is registered or otherwise recorded in writing, with an appropriate agency, of which the lessor has notice, for the purpose of obtaining correction of a condition relating to tenantability.

(3) After the date of an inspection or issuance of a citation, resulting from a complaint described in paragraph (2) of which the lessor did not have notice.

(4) After the filing of appropriate documents commencing a judicial or arbitration proceeding involving the issue of tenantability.

(5) After entry of judgment or the signing of an arbitration award, if any, when in the judicial proceeding or arbitration the issue of tenantability is determined adversely to the lessor.

In each instance, the 180–day period shall run from the latest applicable date referred to in paragraphs (1) to (5), inclusive.

(b) A lessee may not invoke subdivision (a) more than once in any 12–month period.

(c) To report, or to threaten to report, the lessee or individuals known to the landlord to be associated with the lessee to immigration authorities is a form of retaliatory conduct prohibited under subdivision (a). This subdivision shall in no way limit the definition of retaliatory conduct prohibited under this section.

(d) Notwithstanding subdivision (a), it is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit involuntarily, bring an action to recover possession, or threaten to do any of those acts, for the purpose of retaliating against the lessee because ~~* * *~~ **the lessee** has lawfully organized or participated in a lessees' association or an organization advocating lessees' rights or has lawfully and peaceably exercised any rights under the law. **It is also unlawful for a lessor to bring an action for unlawful detainer based on a cause of action other than nonpayment of COVID–19 rental debt, as defined in Section 1179.02 of the Code of Civil Procedure, for the purpose of retaliating against the lessee because the lessee has a COVID–19 rental debt.** In an action brought by or against the lessee pursuant to this subdivision, the lessee shall bear the burden of producing evidence that the lessor's conduct was, in fact, retaliatory.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(e) To report, or to threaten to report, the lessee or individuals known to the landlord to be associated with the lessee to immigration authorities is a form of retaliatory conduct prohibited under subdivision (d). This subdivision shall in no way limit the definition of retaliatory conduct prohibited under this section.

(f) This section does not limit in any way the exercise by the lessor of ~~* * *~~ **the lessor's** rights under any lease or agreement or any law pertaining to the hiring of property or ~~* * *~~ **the lessor's** right to do any of the acts described in subdivision (a) or (d) for any lawful cause. Any waiver by a lessee of ~~* * *~~ **the lessee's** rights under this section is void as contrary to public policy.

(g) Notwithstanding subdivisions (a) to (f), inclusive, a lessor may recover possession of a dwelling and do any of the other acts described in subdivision (a) within the period or periods prescribed therein, or within subdivision (d), if the notice of termination, rent increase, or other act, and any pleading or statement of issues in an arbitration, if any, states the ground upon which the lessor, in good faith, seeks to recover possession, increase rent, or do any of the other acts described in subdivision (a) or (d). If the statement is controverted, the lessor shall establish its truth at the trial or other hearing.

(h) Any lessor or agent of a lessor who violates this section shall be liable to the lessee in a civil action for all of the following:

(1) The actual damages sustained by the lessee.

(2) Punitive damages in an amount of not less than one hundred dollars ($100) nor more than two thousand dollars ($2,000) for each retaliatory act where the lessor or agent has been guilty of fraud, oppression, or malice with respect to that act.

(i) In any action brought for damages for retaliatory eviction, the court shall award reasonable attorney's fees to the prevailing party if either party requests attorney's fees upon the initiation of the action.

(j) The remedies provided by this section shall be in addition to any other remedies provided by statutory or decisional law.

(k) A lessor does not violate subdivision (c) or (e) by complying with any legal obligation under any federal government program that provides for rent limitations or rental assistance to a qualified tenant.

**(*l*) This section shall remain in effect until February 1, 2021, and as of that date is repealed.**

SEC. 7. Section 1942.5 is added to the Civil Code, to read:

<< CA CIVIL § 1942.5 >>

1942.5. (a) If the lessor retaliates against the lessee because of the exercise by the lessee of the lessee's rights under this chapter or because of the lessee's complaint to an appropriate agency as to tenantability of a dwelling, and if the lessee of a dwelling is not in default as to the payment of rent, the lessor may not recover possession of a dwelling in any action or proceeding, cause the lessee to quit involuntarily, increase the rent, or decrease any services within 180 days of any of the following:

(1) After the date upon which the lessee, in good faith, has given notice pursuant to Section 1942, has provided notice of a suspected bed bug infestation, or has made an oral complaint to the lessor regarding tenantability.

(2) After the date upon which the lessee, in good faith, has filed a written complaint, or an oral complaint which is registered or otherwise recorded in writing, with an appropriate agency, of which the lessor has notice, for the purpose of obtaining correction of a condition relating to tenantability.

(3) After the date of an inspection or issuance of a citation, resulting from a complaint described in paragraph (2) of which the lessor did not have notice.

(4) After the filing of appropriate documents commencing a judicial or arbitration proceeding involving the issue of tenantability.

(5) After entry of judgment or the signing of an arbitration award, if any, when in the judicial proceeding or arbitration the issue of tenantability is determined adversely to the lessor.

In each instance, the 180–day period shall run from the latest applicable date referred to in paragraphs (1) to (5), inclusive.

(b) A lessee may not invoke subdivision (a) more than once in any 12–month period.

(c) To report, or to threaten to report, the lessee or individuals known to the landlord to be associated with the lessee to immigration authorities is a form of retaliatory conduct prohibited under subdivision (a). This subdivision shall in no way limit the definition of retaliatory conduct prohibited under this section.

(d) Notwithstanding subdivision (a), it is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit involuntarily, bring an action to recover possession, or threaten to do any of those acts, for the purpose of retaliating against the lessee because the lessee has lawfully organized or participated in a lessees' association or an organization advocating lessees' rights or has lawfully and peaceably exercised any rights under the law. In an action brought by or against the lessee pursuant to this subdivision, the lessee shall bear the burden of producing evidence that the lessor's conduct was, in fact, retaliatory.

(e) To report, or to threaten to report, the lessee or individuals known to the landlord to be associated with the lessee to immigration authorities is a form of retaliatory conduct prohibited under subdivision (d). This subdivision shall in no way limit the definition of retaliatory conduct prohibited under this section.

(f) This section does not limit in any way the exercise by the lessor of the lessor's rights under any lease or agreement or any law pertaining to the hiring of property or the lessor's right to do any of the acts described in subdivision (a) or (d) for any lawful cause. Any waiver by a lessee of the lessee's rights under this section is void as contrary to public policy.

(g) Notwithstanding subdivisions (a) to (f), inclusive, a lessor may recover possession of a dwelling and do any of the other acts described in subdivision (a) within the period or periods prescribed therein, or within subdivision (d), if the notice of termination, rent increase, or other act, and any pleading or statement of issues in an arbitration, if any, states the ground upon which the lessor, in good faith, seeks to recover possession, increase rent, or do any of the other acts described in subdivision (a) or (d). If the statement is controverted, the lessor shall establish its truth at the trial or other hearing.

(h) Any lessor or agent of a lessor who violates this section shall be liable to the lessee in a civil action for all of the following:

(1) The actual damages sustained by the lessee.

(2) Punitive damages in an amount of not less than one hundred dollars ($100) nor more than two thousand dollars ($2,000) for each retaliatory act where the lessor or agent has been guilty of fraud, oppression, or malice with respect to that act.

(i) In any action brought for damages for retaliatory eviction, the court shall award reasonable attorney's fees to the prevailing party if either party requests attorney's fees upon the initiation of the action.

(j) The remedies provided by this section shall be in addition to any other remedies provided by statutory or decisional law.

(k) A lessor does not violate subdivision (c) or (e) by complying with any legal obligation under any federal government program that provides for rent limitations or rental assistance to a qualified tenant.

(*l*) This section shall become operative on February 1, 2021.

SEC. 8. Section 1946.2 of the Civil Code is amended to read:

<< CA CIVIL § 1946.2 >>

1946.2. (a) Notwithstanding any other law, after a tenant has continuously and lawfully occupied a residential real property for 12 months, the owner of the residential real property shall not terminate the tenancy without just cause, which shall be stated in the written notice to terminate tenancy. If any additional adult tenants are added to the lease before an existing tenant has continuously and lawfully occupied the residential real property for 24 months, then this subdivision shall only apply if either of the following are satisfied:

(1) All of the tenants have continuously and lawfully occupied the residential real property for 12 months or more.

(2) One or more tenants have continuously and lawfully occupied the residential real property for 24 months or more.

(b) For purposes of this section, "just cause" includes either of the following:

(1) At–fault just cause, which is any of the following:

(A) Default in the payment of rent.

(B) A breach of a material term of the lease, as described in paragraph (3) of Section 1161 of the Code of Civil Procedure, including, but not limited to, violation of a provision of the lease after being issued a written notice to correct the violation.

(C) Maintaining, committing, or permitting the maintenance or commission of a nuisance as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(D) Committing waste as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(E) The tenant had a written lease that terminated on or after January 1, 2020, and after a written request or demand from the owner, the tenant has refused to execute a written extension or renewal of the lease for an additional term of similar duration with similar provisions, provided that those terms do not violate this section or any other provision of law.

(F) Criminal activity by the tenant on the residential real property, including any common areas, or any criminal activity or criminal threat, as defined in subdivision (a) of Section 422 of the Penal Code, on or off the residential real property, that is directed at any owner or agent of the owner of the residential real property.

(G) Assigning or subletting the premises in violation of the tenant's lease, as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(H) The tenant's refusal to allow the owner to enter the residential real property as authorized by Sections 1101.5 and 1954 of this code, and Sections 13113.7 and 17926.1 of the Health and Safety Code.

(I) Using the premises for an unlawful purpose as described in paragraph (4) of Section 1161 of the Code of Civil Procedure.

(J) The employee, agent, or licensee's failure to vacate after their termination as an employee, agent, or a licensee as described in paragraph (1) of Section 1161 of the Code of Civil Procedure.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(K) When the tenant fails to deliver possession of the residential real property after providing the owner written notice as provided in Section 1946 of the tenant's intention to terminate the hiring of the real property, or makes a written offer to surrender that is accepted in writing by the landlord, but fails to deliver possession at the time specified in that written notice as described in paragraph (5) of Section 1161 of the Code of Civil Procedure.

(2) No–fault just cause, which includes any of the following:

(A)(i) Intent to occupy the residential real property by the owner or their spouse, domestic partner, children, grandchildren, parents, or grandparents.

(ii) For leases entered into on or after July 1, 2020, clause (i) shall apply only if the tenant agrees, in writing, to the termination, or if a provision of the lease allows the owner to terminate the lease if the owner, or their spouse, domestic partner, children, grandchildren, parents, or grandparents, unilaterally decides to occupy the residential real property. Addition of a provision allowing the owner to terminate the lease as described in this clause to a new or renewed rental agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1).

(B) Withdrawal of the residential real property from the rental market.

(C)(i) The owner complying with any of the following:

(I) An order issued by a government agency or court relating to habitability that necessitates vacating the residential real property.

(II) An order issued by a government agency or court to vacate the residential real property.

(III) A local ordinance that necessitates vacating the residential real property.

(ii) If it is determined by any government agency or court that the tenant is at fault for the condition or conditions triggering the order or need to vacate under clause (i), the tenant shall not be entitled to relocation assistance as outlined in paragraph (3) of subdivision (d).

(D)(i) Intent to demolish or to substantially remodel the residential real property.

(ii) For purposes of this subparagraph, "substantially remodel" means the replacement or substantial modification of any structural, electrical, plumbing, or mechanical system that requires a permit from a governmental agency, or the abatement of hazardous materials, including lead-based paint, mold, or asbestos, in accordance with applicable federal, state, and local laws, that cannot be reasonably accomplished in a safe manner with the tenant in place and that requires the tenant to vacate the residential real property for at least 30 days. Cosmetic improvements alone, including painting, decorating, and minor repairs, or other work that can be performed safely without having the residential real property vacated, do not qualify as substantial rehabilitation.

(c) Before an owner of residential real property issues a notice to terminate a tenancy for just cause that is a curable lease violation, the owner shall first give notice of the violation to the tenant with an opportunity to cure the violation pursuant to paragraph (3) of Section 1161 of the Code of Civil Procedure. If the violation is not cured within the time period set forth in the notice, a three-day notice to quit without an opportunity to cure may thereafter be served to terminate the tenancy.

(d)(1) For a tenancy for which just cause is required to terminate the tenancy under subdivision (a), if an owner of residential real property issues a termination notice based on a no-fault just cause described in paragraph (2) of subdivision (b), the owner shall, regardless of the tenant's income, at the owner's option, do one of the following:

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(A) Assist the tenant to relocate by providing a direct payment to the tenant as described in paragraph (3).

(B) Waive in writing the payment of rent for the final month of the tenancy, prior to the rent becoming due.

(2) If an owner issues a notice to terminate a tenancy for no-fault just cause, the owner shall notify the tenant of the tenant's right to relocation assistance or rent waiver pursuant to this section. If the owner elects to waive the rent for the final month of the tenancy as provided in subparagraph (B) of paragraph (1), the notice shall state the amount of rent waived and that no rent is due for the final month of the tenancy.

(3)(A) The amount of relocation assistance or rent waiver shall be equal to one month of the tenant's rent that was in effect when the owner issued the notice to terminate the tenancy. Any relocation assistance shall be provided within 15 calendar days of service of the notice.

(B) If a tenant fails to vacate after the expiration of the notice to terminate the tenancy, the actual amount of any relocation assistance or rent waiver provided pursuant to this subdivision shall be recoverable as damages in an action to recover possession.

(C) The relocation assistance or rent waiver required by this subdivision shall be credited against any other relocation assistance required by any other law.

(4) An owner's failure to strictly comply with this subdivision shall render the notice of termination void.

(e) This section shall not apply to the following types of residential real properties or residential circumstances:

(1) Transient and tourist hotel occupancy as defined in subdivision (b) of Section 1940.

(2) Housing accommodations in a nonprofit hospital, religious facility, extended care facility, licensed residential care facility for the elderly, as defined in Section 1569.2 of the Health and Safety Code, or an adult residential facility, as defined in Chapter 6 of Division 6 of Title 22 of the Manual of Policies and Procedures published by the State Department of Social Services.

(3) Dormitories owned and operated by an institution of higher education or a kindergarten and grades 1 to 12, inclusive, school.

(4) Housing accommodations in which the tenant shares bathroom or kitchen facilities with the owner who maintains their principal residence at the residential real property.

(5) Single–family owner-occupied residences, including a residence in which the owner-occupant rents or leases no more than two units or bedrooms, including, but not limited to, an accessory dwelling unit or a junior accessory dwelling unit.

(6) A ~~* * *~~ **property containing two separate dwelling units within a single structure** in which the owner occupied one of the units as the owner's principal place of residence at the beginning of the tenancy, so long as the owner continues in occupancy**, and neither unit is an accessory dwelling unit or a junior accessory dwelling unit**.

(7) Housing that has been issued a certificate of occupancy within the previous 15 years.

(8) Residential real property that is alienable separate from the title to any other dwelling unit, provided that both of the following apply:

(A) The owner is not any of the following:

(i) A real estate investment trust, as defined in Section 856 of the Internal Revenue Code.[3]

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(ii) A corporation.

(iii) A limited liability company in which at least one member is a corporation.

(B)(i) The tenants have been provided written notice that the residential property is exempt from this section using the following statement:

"This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12 (d)(5) and 1946.2 (e)(8) of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation."
(ii) For a tenancy existing before July 1, 2020, the notice required under clause (i) may, but is not required to, be provided in the rental agreement.

(iii) For any tenancy commenced or renewed on or after July 1, 2020, the notice required under clause (i) must be provided in the rental agreement.

(iv) Addition of a provision containing the notice required under clause (i) to any new or renewed rental agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1) of subdivision (b).

(9) Housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(f) An owner of residential real property subject to this section shall provide notice to the tenant as follows:

(1) For any tenancy commenced or renewed on or after July 1, 2020, as an addendum to the lease or rental agreement, or as a written notice signed by the tenant, with a copy provided to the tenant.

(2) For a tenancy existing prior to July 1, 2020, by written notice to the tenant no later than August 1, 2020, or as an addendum to the lease or rental agreement.

(3) The notification or lease provision shall be in no less than 12–point type, and shall include the following:

"California law limits the amount your rent can be increased. See Section 1947.12 of the Civil Code for more information. California law also provides that after all of the tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the tenants has continuously and lawfully occupied the property for 24 months or more, a landlord must provide a statement of cause in any notice to terminate a tenancy. See Section 1946.2 of the Civil Code for more information."
The provision of the notice shall be subject to Section 1632.
(g)(1) This section does not apply to the following residential real property:

(A) Residential real property subject to a local ordinance requiring just cause for termination of a residential tenancy adopted on or before September 1, 2019, in which case the local ordinance shall apply.

(B) Residential real property subject to a local ordinance requiring just cause for termination of a residential tenancy adopted or amended after September 1, 2019, that is more protective than this section, in which case the local ordinance shall apply. For purposes of this subparagraph, an ordinance is “more protective” if it meets all of the following criteria:

(i) The just cause for termination of a residential tenancy under the local ordinance is consistent with this section.

(ii) The ordinance further limits the reasons for termination of a residential tenancy, provides for higher relocation assistance amounts, or provides additional tenant protections that are not prohibited by any other provision of law.

(iii) The local government has made a binding finding within their local ordinance that the ordinance is more protective than the provisions of this section.

(2) A residential real property shall not be subject to both a local ordinance requiring just cause for termination of a residential tenancy and this section.

(3) A local ordinance adopted after September 1, 2019, that is less protective than this section shall not be enforced unless this section is repealed.

(h) Any waiver of the rights under this section shall be void as contrary to public policy.

(i) For the purposes of this section, the following definitions shall apply:

(1) “Owner” and “residential real property” have the same meaning as those terms are defined in Section 1954.51.

(2) “Tenancy” means the lawful occupation of residential real property and includes a lease or sublease.

(j) This section shall remain in effect only until January 1, 2030, and as of that date is repealed.

SEC. 9. Section 1947.12 of the Civil Code is amended to read:

<< CA CIVIL § 1947.12 >>

1947.12. (a)(1) Subject to subdivision (b), an owner of residential real property shall not, over the course of any 12–month period, increase the gross rental rate for a dwelling or a unit more than 5 percent plus the percentage change in the cost of living, or 10 percent, whichever is lower, of the lowest gross rental rate charged for that dwelling or unit at any time during the 12 months prior to the effective date of the increase. In determining the lowest gross rental amount pursuant to this section, any rent discounts, incentives, concessions, or credits offered by the owner of such unit of residential real property and accepted by the tenant shall be excluded. The gross per-month rental rate and any owner-offered discounts, incentives, concessions, or credits shall be separately listed and identified in the lease or rental agreement or any amendments to an existing lease or rental agreement.

(2) If the same tenant remains in occupancy of a unit of residential real property over any 12–month period, the gross rental rate for the unit of residential real property shall not be increased in more than two increments over that 12–month period, subject to the other restrictions of this subdivision governing gross rental rate increase.

(b) For a new tenancy in which no tenant from the prior tenancy remains in lawful possession of the residential real property, the owner may establish the initial rental rate not subject to subdivision (a). Subdivision (a) is only applicable to subsequent increases after that initial rental rate has been established.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(c) A tenant of residential real property subject to this section shall not enter into a sublease that results in a total rent for the premises that exceeds the allowable rental rate authorized by subdivision (a). Nothing in this subdivision authorizes a tenant to sublet or assign the tenant's interest where otherwise prohibited.

(d) This section shall not apply to the following residential real properties:

(1) Housing restricted by deed, regulatory restriction contained in an agreement with a government agency, or other recorded document as affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code, or subject to an agreement that provides housing subsidies for affordable housing for persons and families of very low, low, or moderate income, as defined in Section 50093 of the Health and Safety Code or comparable federal statutes.

(2) Dormitories **owned** and ~~* * *~~ **operated by an institution of** higher education ~~* * *~~ **or a kindergarten and grades 1 to 12, inclusive, school**.

(3) Housing subject to rent or price control through a public entity's valid exercise of its police power consistent with Chapter 2.7 (commencing with Section 1954.50) that restricts annual increases in the rental rate to an amount less than that provided in subdivision (a).

(4) Housing that has been issued a certificate of occupancy within the previous 15 years.

(5) Residential real property that is alienable separate from the title to any other dwelling unit, provided that both of the following apply:

(A) The owner is not any of the following:

(i) A real estate investment trust, as defined in Section 856 of the Internal Revenue Code.[4]

(ii) A corporation.

(iii) A limited liability company in which at least one member is a corporation.

(B)(i) The tenants have been provided written notice that the residential real property is exempt from this section using the following statement:

"This property is not subject to the rent limits imposed by Section 1947.12 of the Civil Code and is not subject to the just cause requirements of Section 1946.2 of the Civil Code. This property meets the requirements of Sections 1947.12 **(d)(5)** and 1946.2 **(e)(8)** of the Civil Code and the owner is not any of the following: (1) a real estate investment trust, as defined by Section 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation."

(ii) For a tenancy existing before July 1, 2020, the notice required under clause (i) may, but is not required to, be provided in the rental agreement.

(iii) For a tenancy commenced or renewed on or after July 1, 2020, the notice required under clause (i) must be provided in the rental agreement.

(iv) Addition of a provision containing the notice required under clause (i) to any new or renewed rental agreement or fixed-term lease constitutes a similar provision for the purposes of subparagraph (E) of paragraph (1) of subdivision (b) of Section 1946.2.

(6) A ~~* * *~~ **property containing two separate dwelling units within a single structure** in which the owner occupied one of the units as the owner's principal place of residence at the beginning of the tenancy, so long as the owner continues in occupancy**, and neither unit is an accessory dwelling unit or a junior accessory dwelling unit**.

(e) An owner shall provide notice of any increase in the rental rate, pursuant to subdivision (a), to each tenant in accordance with Section 827.

(f)(1) On or before January 1, 2030, the Legislative Analyst's Office shall report to the Legislature regarding the effectiveness of this section and Section 1947.13. The report shall include, but not be limited to, the impact of the rental rate cap pursuant to subdivision (a) on the housing market within the state.

(2) The report required by paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

(g) For the purposes of this section, the following definitions shall apply:

**(1) "Consumer Price Index for All Urban Consumers for All Items" means the following:**

**(A) The Consumer Price Index for All Urban Consumers for All Items (CPI–U) for the metropolitan area in which the property is located, as published by the United States Bureau of Labor Statistics, which are as follows:**

**(i) The CPI–U for the Los Angeles–Long Beach–Anaheim metropolitan area covering the Counties of Los Angeles and Orange.**

**(ii) The CPI–U for the Riverside–San Bernardo–Ontario metropolitan area covering the Counties of Riverside and San Bernardino.**

**(iii) The CPI–U for the San Diego–Carlsbad metropolitan area covering the County of San Diego.**

**(iv) The CPI–U for the San Francisco–Oakland–Hayward metropolitan area covering the Counties of Alameda, Contra Costa, Marin, San Francisco, and San Mateo.**

**(v) Any successor metropolitan area index to any of the indexes listed in clauses (i) to (iv), inclusive.**

**(B) If the United States Bureau of Labor Statistics does not publish a CPI–U for the metropolitan area in which the property is located, the California Consumer Price Index for All Urban Consumers for All Items as published by the Department of Industrial Relations.**

**(C) On or after January 1, 2021, if the United States Bureau of Labor Statistics publishes a CPI–U index for one or more metropolitan areas not listed in subparagraph (A), that CPI–U index shall apply in those areas with respect to rent increases that take effect on or after August 1 of the calendar year in which the 12–month change in that CPI–U, as described in subparagraph (B) of paragraph (3), is first published.**

**(2)** "Owner" and "residential real property" shall have the same meaning as those terms are defined in Section 1954.51.

**(3)(A)** "Percentage change in the cost of living" means the percentage change ~~* * *~~ **, computed pursuant to subparagraph (B), in the applicable, as determined pursuant to paragraph (1),** Consumer Price Index for All Urban Consumers for ~~* * *~~ **All Items**.

**(B)(i) For rent increases that take effect before August 1 of any calendar year, the following shall apply:**

**(I) The percentage change shall be the percentage change in the amount published for April of the immediately preceding calendar year and April of the year before that.**

**(II) If there is not an amount published in April for the applicable geographic area, the percentage change shall be the percentage change in the amount published for March of the immediately preceding calendar year and March of the year before that.**

**(ii) For rent increases that take effect on or after August 1 of any calendar year, the following shall apply:**

**(I) The percentage change shall be the percentage change in the amount published for April of that calendar year and April of the immediately preceding calendar year.**

**(II) If there is not an amount published in April for the applicable geographic area, the percentage change shall be the percentage change in the amount published for March of that calendar year and March of the immediately preceding calendar year.**

**(iii) The percentage change shall be rounded to the nearest one-tenth of 1 percent.**

**(4)** "Tenancy" means the lawful occupation of residential real property and includes a lease or sublease.

(h)(1) This section shall apply to all rent increases subject to subdivision (a) occurring on or after March 15, 2019. * * *

(2) In the event that an owner has increased the rent by more than the amount permissible under subdivision (a) between March 15, 2019, and January 1, 2020, both of the following shall apply:

(A) The applicable rent on January 1, 2020, shall be the rent as of March 15, 2019, plus the maximum permissible increase under subdivision (a).

(B) An owner shall not be liable to the tenant for any corresponding rent overpayment.

(3) An owner of residential real property subject to subdivision (a) who increased the rental rate on that residential real property on or after March 15, 2019, but prior to January 1, 2020, by an amount less than the rental rate increase permitted by subdivision (a) shall be allowed to increase the rental rate twice, as provided in paragraph (2) of subdivision (a), within 12 months of March 15, 2019, but in no event shall that rental rate increase exceed the maximum rental rate increase permitted by subdivision (a).

(i) Any waiver of the rights under this section shall be void as contrary to public policy.

(j) This section shall remain in effect until January 1, 2030, and as of that date is repealed.

(k)(1) The Legislature finds and declares that the unique circumstances of the current housing crisis require a statewide response to address rent gouging by establishing statewide limitations on gross rental rate increases.

(2) It is the intent of the Legislature that this section should apply only for the limited time needed to address the current statewide housing crisis, as described in paragraph (1). This section is not intended to expand or limit the authority of local governments to establish local policies regulating rents consistent with Chapter 2.7 (commencing with Section 1954.50), nor is it a statement regarding the appropriate, allowable rental rate increase when a local government adopts a policy regulating rent that is otherwise consistent with Chapter 2.7 (commencing with Section 1954.50).

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(3) Nothing in this section authorizes a local government to establish limitations on any rental rate increases not otherwise permissible under Chapter 2.7 (commencing with Section 1954.50), or affects the existing authority of a local government to adopt or maintain rent controls or price controls consistent with that chapter.

SEC. 10. Section 1947.13 of the Civil Code is amended to read:

<< CA CIVIL § 1947.13 >>

1947.13. (a) Notwithstanding **subdivision (a) of** Section 1947.12, upon the expiration of rental restrictions, the following shall apply:

(1) The owner of an assisted housing development who demonstrates, under penalty of perjury, compliance with all applicable provisions of Sections 65863.10, 65863.11, and 65863.13 of the Government Code and any other applicable **federal, state, or local** law or regulation ~~* * *~~ may establish the initial unassisted rental rate for units in the applicable housing development. Any subsequent rent increase in the development shall be subject to Section 1947.12.

(2) The owner of a deed-restricted affordable housing unit or an affordable housing unit subject to a regulatory restriction contained in an agreement with a government agency limiting rental rates that is not within an assisted housing development may**, subject to any applicable federal, state, or local law or regulation,** establish the initial rental rate for the unit upon the expiration of the restriction. Any subsequent rent increase for the unit shall be subject to Section 1947.12.

(b) For purposes of this section:

(1) "Assisted housing development" has the same meaning as defined in paragraph (3) of subdivision (a) of Section 65863.10 of the Government Code.

(2) "Expiration of rental restrictions" has the same meaning as defined in paragraph (5) of subdivision (a) of Section 65863.10 of the Government Code.

(c) This section shall remain in effect until January 1, 2030, and as of that date is repealed.

(d) Any waiver of the rights under this section shall be void as contrary to public policy.

**(e) This section shall not be construed to preempt any local law.**

SEC. 11. Section 2924.15 of the Civil Code is amended to read:

<< CA CIVIL § 2924.15 >>

2924.15. **(a)** Unless otherwise provided, paragraph (5) of subdivision (a) of Section 2924, and Sections 2923.5, 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, and 2924.18 shall apply only to **a** first lien **mortgage** or **deed** of trust that ~~* * *~~ **meets either of the following criteria:**

**(1)(A) The first lien mortgage or deed of trust is** secured by owner-occupied residential real property containing no more than four dwelling units.

**(B)** For ~~* * *~~ purposes **of this paragraph**, "owner-occupied" means that the property is the principal residence of the borrower and is security for a loan made for personal, family, or household purposes.

**(2) The first lien mortgage or deed of trust is secured by residential real property that is occupied by a tenant, contains no more than four dwelling units, and meets all of the conditions described in subparagraph (B).**

**(A) For the purposes of this paragraph:**

**(i) "Applicable lease" means a lease entered pursuant to an arm's length transaction before, and in effect on, March 4, 2020.**

**(ii) "Arm's length transaction" means a lease entered into in good faith and for valuable consideration that reflects the fair market value in the open market between informed and willing parties.**

**(iii) "Occupied by a tenant" means that the property is the principal residence of a tenant.**

**(B) To meet the conditions of this subdivision, a first lien mortgage or deed of trust shall have all of the following characteristics:**

**(i) The property is owned by an individual who owns no more than three residential real properties, or by one or more individuals who together own no more than three residential real properties, each of which contains no more than four dwelling units.**

**(ii) The property is occupied by a tenant pursuant to an applicable lease.**

**(iii) A tenant occupying the property is unable to pay rent due to a reduction in income resulting from the novel coronavirus.**

**(C) Relief shall be available pursuant to subdivision (a) of Section 2924 and Sections 2923.5, 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, and 2924.18 for so long as the property remains occupied by a tenant pursuant to a lease entered in an arm's length transaction.**

**(b) This section shall remain in effect until January 1, 2023, and as of that date is repealed.**

SEC. 12. Section 2924.15 is added to the Civil Code, to read:

<< CA CIVIL § 2924.15 >>

2924.15. (a) Unless otherwise provided, paragraph (5) of subdivision (a) of Section 2924 and Sections 2923.5, 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, and 2924.18 shall apply only to a first lien mortgage or deed of trust that is secured by owner-occupied residential real property containing no more than four dwelling units.

(b) As used in this section, "owner-occupied" means that the property is the principal residence of the borrower and is security for a loan made for personal, family, or household purposes.

(c) This section shall become operative on January 1, 2023.

SEC. 13. Title 19 (commencing with Section 3273.01) is added to Part 4 of Division 3 of the Civil Code, to read:

d. 3 pt. 4 t. 19 pr. § 3273.01

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

TITLE 19. COVID–19 SMALL LANDLORD AND HOMEOWNER RELIEF ACT

d. 3 pt. 4 t. 19 ch. 1 pr. § 3273.01

Chapter 1. Title and Definitions

<< CA CIVIL § 3273.01 >>

3273.01. This title is known, and may be cited, as the "COVID–19 Small Landlord and Homeowner Relief Act of 2020."

<< CA CIVIL § 3273.1 >>

3273.1. For purposes of this title:

(a)(1) "Borrower" means any of the following:

(A) A natural person who is a mortgagor or trustor or a confirmed successor in interest, as defined in Section 1024.31 of Title 12 of the Code of Federal Regulations.

(B) An entity other than a natural person only if the secured property contains no more than four dwelling units and is currently occupied by one or more residential tenants.

(2) "Borrower" shall not include an individual who has surrendered the secured property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, trustee, beneficiary, or authorized agent.

(3) Unless the property securing the mortgage contains one or more deed-restricted affordable housing units or one or more affordable housing units subject to a regulatory restriction limiting rental rates that is contained in an agreement with a government agency, the following mortgagors shall not be considered a "borrower":

(A) A real estate investment trust, as defined in Section 856 of the Internal Revenue Code.[5]

(B) A corporation.

(C) A limited liability company in which at least one member is a corporation.

(4) "Borrower" shall also mean a person who holds a power of attorney for a borrower described in paragraph (1).

(b) "Effective time period" means the time period between the operational date of this title and April 1, 2021.

(c)(1) "Mortgage servicer" or "lienholder" means a person or entity who directly services a loan or who is responsible for interacting with the borrower, managing the loan account on a daily basis, including collecting and crediting periodic loan payments, managing any escrow account, or enforcing the note and security instrument, either as the current owner of the promissory note or as the current owner's authorized agent.

(2) "Mortgage servicer" or "lienholder" also means a subservicing agent to a master servicer by contract.

(3) "Mortgage servicer" shall not include a trustee, or a trustee's authorized agent, acting under a power of sale pursuant to a deed of trust.

<< CA CIVIL § 3273.2 >>

3273.2. (a) The provisions of this title apply to a mortgage or deed of trust that is secured by residential property containing no more than four dwelling units, including individual units of condominiums or cooperatives, and that was outstanding as of the enactment date of this title.

(b) The provisions of this title shall apply to a depository institution chartered under federal or state law, a person covered by the licensing requirements of Division 9 (commencing with Section 22000) or Division 20 (commencing with Section 50000) of the Financial Code, or a person licensed pursuant to Part 1 (commencing with Section 10000) of Division 4 of the Business and Professions Code.

d. 3 pt. 4 t. 19 ch. 2 pr. § 3273.10

Chapter 2. Mortgages

<< CA CIVIL § 3273.10 >>

3273.10. (a) If a mortgage servicer denies a forbearance request made during the effective time period, the mortgage servicer shall provide written notice to the borrower that sets forth the specific reason or reasons that forbearance was not provided, if both of the following conditions are met:

(1) The borrower was current on payment as of February 1, 2020.

(2) The borrower is experiencing a financial hardship that prevents the borrower from making timely payments on the mortgage obligation due, directly or indirectly, to the COVID–19 emergency.

(b) If the written notice in subdivision (a) cites any defect in the borrower's request, including an incomplete application or missing information, that is curable, the mortgage servicer shall do all of the following:

(1) Specifically identify any curable defect in the written notice.

(2) Provide 21 days from the mailing date of the written notice for the borrower to cure any identified defect.

(3) Accept receipt of the borrower's revised request for forbearance before the aforementioned 21–day period lapses.

(4) Respond to the borrower's revised request within five business days of receipt of the revised request.

(c) If a mortgage servicer denies a forbearance request, the declaration required by subdivision (b) of Section 2923.5 shall include the written notice together with a statement as to whether forbearance was or was not subsequently provided.

(d) A mortgage servicer, mortgagee, or beneficiary of the deed of trust, or an authorized agent thereof, who, with respect to a borrower of a federally backed mortgage, complies with the relevant provisions regarding forbearance in Section 4022 of the federal Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) (Public Law 116–136),[6] including any amendments or revisions to those provisions, shall be deemed to be in compliance with this section. A mortgage servicer of a nonfederally backed mortgage that provides forbearance that is consistent with the requirements of the CARES Act for federally backed mortgages shall be deemed to be in compliance with this section.

<< CA CIVIL § 3273.11 >>

3273.11. (a) A mortgage servicer shall comply with applicable federal guidance regarding borrower options following a COVID–19 related forbearance.

(b) Any mortgage servicer, mortgagee, or beneficiary of the deed of trust, or authorized agent thereof, who, with respect to a borrower of a federally backed loan, complies with the guidance to mortgagees regarding borrower options following a COVID–19–related forbearance provided by the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the Federal Housing Administration of the United States Department of Housing and Urban Development, the United States Department of Veterans Affairs, or the Rural Development division of the United States Department of Agriculture, including any amendments, updates, or revisions to that guidance, shall be deemed to be in compliance with this section.

(c) With respect to a nonfederally backed loan, any mortgage servicer, mortgagee, or beneficiary of the deed of trust, or authorized agent thereof, who, regarding borrower options following a COVID–19 related forbearance, reviews a customer for a solution that is consistent with the guidance to servicers, mortgagees, or beneficiaries provided by Fannie Mae, Freddie Mac, the Federal Housing Administration of the Department of Housing and Urban Development, the Department of Veterans Affairs, or the Rural Development division of the Department of Agriculture, including any amendments, updates or revisions to such guidance, shall be deemed to be in compliance with this section.

<< CA CIVIL § 3273.12 >>

3273.12. It is the intent of the Legislature that a mortgage servicer offer a borrower a postforbearance loss mitigation option that is consistent with the mortgage servicer's contractual or other authority.

<< CA CIVIL § 3273.14 >>

3273.14. A mortgage servicer shall communicate about forbearance and postforbearance options described in this article in the borrower's preferred language when the mortgage servicer regularly communicates with any borrower in that language.

<< CA CIVIL § 3273.15 >>

3273.15. (a) A borrower who is harmed by a material violation of this title may bring an action to obtain injunctive relief, damages, restitution, and any other remedy to redress the violation.

(b) A court may award a prevailing borrower reasonable attorney's fees and costs in any action based on any violation of this title in which injunctive relief against a sale, including a temporary restraining order, is granted. A court may award a prevailing borrower reasonable attorney's fees and costs in an action for a violation of this article in which relief is granted but injunctive relief against a sale is not granted.

(c) The rights, remedies, and procedures provided to borrowers by this section are in addition to and independent of any other rights, remedies, or procedures under any other law. This section shall not be construed to alter, limit, or negate any other rights, remedies, or procedures provided to borrowers by law.

<< CA CIVIL § 3273.16 >>

3273.16. Any waiver by a borrower of the provisions of this article is contrary to public policy and shall be void.

SEC. 14. Section 116.223 is added to the Code of Civil Procedure, to read:

<< CA CIV PRO § 116.223 >>

116.223. (a) The Legislature hereby finds and declares as follows:

(1) There is anticipated to be an unprecedented number of claims arising out of nonpayment of residential rent that occurred between March 1, 2020, and January 31, 2021, related to the COVID–19 pandemic.

(2) These disputes are of special importance to the parties and of significant social and economic consequence collectively as the people of the State of California grapple with the health, economic, and social impacts of the COVID–19 pandemic.

(3) It is essential that the parties have access to a judicial forum to resolve these disputes expeditiously, inexpensively, and fairly.

(4) It is the intent of the Legislature that landlords of residential real property and their tenants have the option to litigate disputes regarding rent which is unpaid for the time period between March 1, 2020, and January 31, 2021, in the small claims court. It is the intent of the Legislature that the jurisdictional limits of the small claims court not apply to these disputes over COVID–19 rental debt.

(b)(1) Notwithstanding paragraph (1) of subdivision (a) Section 116.220, Section 116.221, or any other law, the small claims court has jurisdiction in any action for recovery of COVID–19 rental debt, as defined in Section 1179.02, and any defenses thereto, regardless of the amount demanded.

(2) In an action described in paragraph (1), the court shall reduce the damages awarded for any amount of COVID–19 rental debt sought by payments made to the landlord to satisfy the COVID–19 rental debt, including payments by the tenant, rental assistance programs, or another third party pursuant to paragraph (3) of subdivision (a) of Section 1947.3 of the Civil Code.

(3) An action to recover COVID–19 rental debt, as defined in Section 1179.02, brought pursuant to this subdivision shall not be commenced before March 1, 2021.

(c) Any claim for recovery of COVID–19 rental debt, as defined in Section 1179.02, shall not be subject to Section 116.231, notwithstanding the fact that a landlord of residential rental property may have brought two or more small claims actions in which the amount demanded exceeded two thousand five hundred dollars ($2,500) in any calendar year.

(d) This section shall remain in effect until February 1, 2025, and as of that date is repealed.

SEC. 15. Section 1161 of the Code of Civil Procedure is amended to read:

<< CA CIV PRO § 1161 >>

1161. A tenant of real property, for a term less than life, or the executor or administrator of ~~* * *~~ **the tenant's** estate heretofore qualified and now acting or hereafter to be qualified and act, is guilty of unlawful detainer:

1. When ~~* * *~~ **the tenant** continues in possession, in person or by subtenant, of the property, or any part thereof, after the expiration of the term for which it is let to ~~* * *~~ **the tenant**; provided the expiration is of a nondefault nature however brought about without the permission of ~~* * *~~ **the** landlord, or the successor in estate of ~~* * *~~ **the** landlord, if applicable; including the case where the person to be removed became the occupant of the premises as a servant, employee, agent, or licensee and the relation of master and servant, or employer and employee, or principal and agent, or licensor and licensee, has been lawfully

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

terminated or the time fixed for occupancy by the agreement between the parties has expired; but nothing in this subdivision shall be construed as preventing the removal of the occupant in any other lawful manner; but in case of a tenancy at will, it **shall** first be terminated by notice, as prescribed in the Civil Code.

2. When ~~* * *~~ **the tenant** continues in possession, in person or by subtenant, without the permission of ~~* * *~~ **the** landlord, or the successor in estate of ~~* * *~~ **the** landlord, if applicable, after default in the payment of rent, pursuant to the lease or agreement under which the property is held, and three days' notice, excluding Saturdays and Sundays and other judicial holidays, in writing, requiring its payment, stating the amount **that** is due, the name, telephone number, and address of the person to whom the rent payment shall be made, and, if payment may be made personally, the usual days and hours that person will be available to receive the payment (provided that, if the address does not allow for personal delivery, then it shall be conclusively presumed that upon the mailing of any rent or notice to the owner by the tenant to the name and address provided, the notice or rent is deemed received by the owner on the date posted, if the tenant can show proof of mailing to the name and address provided by the owner), or the number of an account in a financial institution into which the rental payment may be made, and the name and street address of the institution (provided that the institution is located within five miles of the rental property), or if an electronic funds transfer procedure has been previously established, that payment may be made pursuant to that procedure, or possession of the property, shall have been served upon ~~* * *~~ **the tenant** and if there is a subtenant in actual occupation of the premises, also upon the subtenant.

The notice may be served at any time within one year after the rent becomes due. In all cases of tenancy upon agricultural lands, **if** the tenant has held over and retained possession for more than 60 days after the expiration of the term without any demand of possession or notice to quit by the landlord or the successor in estate of ~~* * *~~ **the** landlord, if applicable, ~~* * *~~ **the tenant** shall be deemed to be holding by permission of the landlord or successor in estate of ~~* * *~~ **the** landlord, if applicable, and shall be entitled to hold under the terms of the lease for another full year, and shall not be guilty of an unlawful detainer during that year, and the holding over for that period shall be taken and construed as a consent on the part of a tenant to hold for another year.

**An unlawful detainer action under this paragraph shall be subject to the COVID–19 Tenant Relief Act of 2020 (Chapter 5 (commencing with Section 1179.01)) if the default in the payment of rent is based upon the COVID–19 rental debt.**

3. When ~~* * *~~ **the tenant** continues in possession, in person or by subtenant, after a neglect or failure to perform other conditions or covenants of the lease or agreement under which the property is held, including any covenant not to assign or sublet, than the one for the payment of rent, and three days' notice, excluding Saturdays and Sundays and other judicial holidays, in writing, requiring the performance of **those** conditions or covenants, or the possession of the property, shall have been served upon ~~* * *~~ **the tenant**, and if there is a subtenant in actual occupation of the premises, also, upon the subtenant. Within three days, excluding Saturdays and Sundays and other judicial holidays, after the service of the notice, the tenant, or any subtenant in actual occupation of the premises, or any mortgagee of the term, or other person interested in its continuance, may perform the conditions or covenants of the lease or pay the stipulated rent, as the case may be, and thereby save the lease from forfeiture; provided, if the conditions and covenants of the lease, violated by the lessee, cannot afterward be performed, then no notice, as last prescribed herein, need be given to the lessee or ~~* * *~~ **the** subtenant, demanding the performance of the violated conditions or covenants of the lease.

A tenant may take proceedings, similar to those prescribed in this chapter, to obtain possession of the premises let to a subtenant or held by a servant, employee, agent, or licensee, in case of ~~* * *~~ **that person's** unlawful detention of the premises underlet to ~~* * *~~ or held by ~~* * *~~ **that person**.

**An unlawful detainer action under this paragraph shall be subject to the COVID–19 Tenant Relief Act of 2020 (Chapter 5 (commencing with Section 1179.01)) if the neglect or failure to perform other conditions or covenants of the lease or agreement is based upon the COVID–19 rental debt.**

4. Any tenant, subtenant, or executor or administrator of ~~* * *~~ **that person's** estate heretofore qualified and now acting, or hereafter to be qualified and act, assigning or subletting or committing waste upon the demised premises, contrary to the conditions or covenants of ~~* * *~~ **the** lease, or maintaining, committing, or permitting the maintenance or commission of a nuisance upon the demised premises or using the premises for an unlawful purpose, thereby terminates the lease, and the landlord, or ~~* * *~~ **the landlord's** successor in estate, shall upon service of three days' notice to quit upon the person or persons in possession, be entitled to restitution of possession of the demised premises under this chapter. For purposes of this subdivision, a person who commits or maintains a public nuisance as described in Section 3482.8 of the Civil Code, or who commits an offense described in subdivision (c) of Section 3485 of the Civil Code, or subdivision (c) of Section 3486 of the Civil Code, or uses the premises to further the purpose of that offense shall be deemed to have committed a nuisance upon the premises.

5. When ~~* * *~~ **the tenant** gives written notice as provided in Section 1946 of the Civil Code of ~~* * *~~ **the tenant's** intention to terminate the hiring of the real property, or makes a written offer to surrender which is accepted in writing by the landlord, but fails to deliver possession at the time specified in that written notice, without the permission of ~~* * *~~ **the** landlord, or the successor in estate of the landlord, if applicable.

**6.** As used in this section ~~* * *~~ **:**

**"COVID–19 rental debt" has the same meaning as defined in Section 1179.02.**

**"Tenant"** includes any person who hires real property except those persons whose occupancy is described in subdivision (b) of Section 1940 of the Civil Code.

**7. This section shall remain in effect until February 1, 2025, and as of that date is repealed.**

SEC. 16. Section 1161 is added to the Code of Civil Procedure, to read:

<< CA CIV PRO § 1161 >>

1161. A tenant of real property, for a term less than life, or the executor or administrator of the tenant's estate heretofore qualified and now acting or hereafter to be qualified and act, is guilty of unlawful detainer:

1. When the tenant continues in possession, in person or by subtenant, of the property, or any part thereof, after the expiration of the term for which it is let to the tenant; provided the expiration is of a nondefault nature however brought about without the permission of the landlord, or the successor in estate of the landlord, if applicable; including the case where the person to be removed became the occupant of the premises as a servant, employee, agent, or licensee and the relation of master and servant, or employer and employee, or principal and agent, or licensor and licensee, has been lawfully terminated or the time fixed for occupancy by the agreement between the parties has expired; but nothing in this subdivision shall be construed as preventing the removal of the occupant in any other lawful manner; but in case of a tenancy at will, it shall first be terminated by notice, as prescribed in the Civil Code.

2. When the tenant continues in possession, in person or by subtenant, without the permission of the landlord, or the successor in estate of the landlord, if applicable, after default in the payment of rent, pursuant to the lease or agreement under which the property is held, and three days' notice, excluding Saturdays and Sundays and other judicial holidays, in writing, requiring its payment, stating the amount that is due, the name, telephone number, and address of the person to whom the rent payment shall be made, and, if payment may be made personally, the usual days and hours that person will be available to receive the payment (provided that, if the address does not allow for personal delivery, then it shall be conclusively presumed that upon the mailing of any rent or notice to the owner by the tenant to the name and address provided, the notice or rent is deemed received by the owner on the date posted, if the tenant can show proof of mailing to the name and address provided by the owner), or the number of an account in a financial institution into which the rental payment may be made, and the name and street address of

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

the institution (provided that the institution is located within five miles of the rental property), or if an electronic funds transfer procedure has been previously established, that payment may be made pursuant to that procedure, or possession of the property, shall have been served upon the tenant and if there is a subtenant in actual occupation of the premises, also upon the subtenant.

The notice may be served at any time within one year after the rent becomes due. In all cases of tenancy upon agricultural lands, if the tenant has held over and retained possession for more than 60 days after the expiration of the term without any demand of possession or notice to quit by the landlord or the successor in estate of the landlord, if applicable, the tenant shall be deemed to be holding by permission of the landlord or successor in estate of the landlord, if applicable, and shall be entitled to hold under the terms of the lease for another full year, and shall not be guilty of an unlawful detainer during that year, and the holding over for that period shall be taken and construed as a consent on the part of a tenant to hold for another year.

3. When the tenant continues in possession, in person or by subtenant, after a neglect or failure to perform other conditions or covenants of the lease or agreement under which the property is held, including any covenant not to assign or sublet, than the one for the payment of rent, and three days' notice, excluding Saturdays and Sundays and other judicial holidays, in writing, requiring the performance of those conditions or covenants, or the possession of the property, shall have been served upon the tenant, and if there is a subtenant in actual occupation of the premises, also, upon the subtenant. Within three days, excluding Saturdays and Sundays and other judicial holidays, after the service of the notice, the tenant, or any subtenant in actual occupation of the premises, or any mortgagee of the term, or other person interested in its continuance, may perform the conditions or covenants of the lease or pay the stipulated rent, as the case may be, and thereby save the lease from forfeiture; provided, if the conditions and covenants of the lease, violated by the lessee, cannot afterward be performed, then no notice, as last prescribed herein, need be given to the lessee or the subtenant, demanding the performance of the violated conditions or covenants of the lease.

A tenant may take proceedings, similar to those prescribed in this chapter, to obtain possession of the premises let to a subtenant or held by a servant, employee, agent, or licensee, in case of that person's unlawful detention of the premises underlet to or held by that person.

4. Any tenant, subtenant, or executor or administrator of that person's estate heretofore qualified and now acting, or hereafter to be qualified and act, assigning or subletting or committing waste upon the demised premises, contrary to the conditions or covenants of the lease, or maintaining, committing, or permitting the maintenance or commission of a nuisance upon the demised premises or using the premises for an unlawful purpose, thereby terminates the lease, and the landlord, or the landlord's successor in estate, shall upon service of three days' notice to quit upon the person or persons in possession, be entitled to restitution of possession of the demised premises under this chapter. For purposes of this subdivision, a person who commits or maintains a public nuisance as described in Section 3482.8 of the Civil Code, or who commits an offense described in subdivision (c) of Section 3485 of the Civil Code, or subdivision (c) of Section 3486 of the Civil Code, or uses the premises to further the purpose of that offense shall be deemed to have committed a nuisance upon the premises.

5. When the tenant gives written notice as provided in Section 1946 of the Civil Code of the tenant's intention to terminate the hiring of the real property, or makes a written offer to surrender which is accepted in writing by the landlord, but fails to deliver possession at the time specified in that written notice, without the permission of the landlord, or the successor in estate of the landlord, if applicable.

6. As used in this section, “tenant” includes any person who hires real property except those persons whose occupancy is described in subdivision (b) of Section 1940 of the Civil Code.

7. This section shall become operative on February 1, 2025.

SEC. 17. Section 1161.2 of the Code of Civil Procedure is amended to read:

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

<< CA CIV PRO § 1161.2 >>

1161.2. (a)(1) The clerk shall allow access to limited civil case records filed under this chapter, including the court file, index, and register of actions, only as follows:

(A) To a party to the action, including a party's attorney.

(B) To a person who provides the clerk with the names of at least one plaintiff and one defendant and the address of the premises, including the apartment or unit number, if any.

(C) To a resident of the premises who provides the clerk with the name of one of the parties or the case number and shows proof of residency.

(D) To a person by order of the court, which may be granted ex parte, on a showing of good cause.

(E) ~~* * *~~ **Except as provided in subparagraph (G), to** any person by order of the court if judgment is entered for the plaintiff after trial more than 60 days since the filing of the complaint. The court shall issue the order upon issuing judgment for the plaintiff.

(F) Except as provided in subparagraph (G), to any other person 60 days after the complaint has been filed if the plaintiff prevails in the action within 60 days of the filing of the complaint, in which case the clerk shall allow access to any court records in the action. If a default or default judgment is set aside more than 60 days after the complaint has been filed, this section shall apply as if the complaint had been filed on the date the default or default judgment is set aside.

(G)**(i)** In the case of a complaint involving residential property based on Section 1161a as indicated in the caption of the complaint, as required in subdivision (c) of Section 1166, to any other person, if 60 days have elapsed since the complaint was filed with the court, and, as of that date, judgment against all defendants has been entered for the plaintiff, after a trial.

**(ii) Subparagraphs (E) and (F) shall not apply if the plaintiff filed the action between March 4, 2020, and January 31, 2021, and the action is based on an alleged default in the payment of rent.**

(2) This section shall not be construed to prohibit the court from issuing an order that bars access to the court record in an action filed under this chapter if the parties to the action so stipulate.

(b)(1) For purposes of this section, “good cause” includes, but is not limited to, both of the following:

(A) The gathering of newsworthy facts by a person described in Section 1070 of the Evidence Code.

(B) The gathering of evidence by a party to an unlawful detainer action solely for the purpose of making a request for judicial notice pursuant to subdivision (d) of Section 452 of the Evidence Code.

(2) It is the intent of the Legislature that a simple procedure be established to request the ex parte order described in subparagraph (D) of paragraph (1) of subdivision (a).

(c) Upon the filing of a case so restricted, the court clerk shall mail notice to each defendant named in the action. The notice shall be mailed to the address provided in the complaint. The notice shall contain a statement that an unlawful detainer complaint (eviction action) has been filed naming that party as a defendant, and that access to the court file will be delayed for 60 days except to a party, an attorney for one of the parties, or any other person who (1) provides to the clerk the names of at least one plaintiff and one defendant in the action and provides to the clerk the address, including any applicable apartment, unit,

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

or space number, of the subject premises, or (2) provides to the clerk the name of one of the parties in the action or the case number and can establish through proper identification that ~~* * *~~ **the person** lives at the subject premises. The notice shall also contain a statement that access to the court index, register of actions, or other records is not permitted until 60 days after the complaint is filed, except pursuant to an order upon a showing of good cause for access. The notice shall contain on its face the following information:

(1) The name and telephone number of the county bar association.

(2) The name and telephone number of any entity that requests inclusion on the notice and demonstrates to the satisfaction of the court that it has been certified by the State Bar of California as a lawyer referral service and maintains a panel of attorneys qualified in the practice of landlord-tenant law pursuant to the minimum standards for a lawyer referral service established by the State Bar of California and Section 6155 of the Business and Professions Code.

(3) The following statement:

"The State Bar of California certifies lawyer referral services in California and publishes a list of certified lawyer referral services organized by county. To locate a lawyer referral service in your county, go to the State Bar's ~~* * *~~ **internet website** at www.calbar.ca.gov or call 1–866–442–2529."

(4) The name and telephone number of an office or offices funded by the federal Legal Services Corporation or qualified legal services projects that receive funds distributed pursuant to Section 6216 of the Business and Professions Code that provide legal services to low-income persons in the county in which the action is filed. The notice shall state that these telephone numbers may be called for legal advice regarding the case. The notice shall be issued between 24 and 48 hours of the filing of the complaint, excluding weekends and holidays. One copy of the notice shall be addressed to "all occupants" and mailed separately to the subject premises. The notice shall not constitute service of the summons and complaint.

(d) Notwithstanding any other law, the court shall charge an additional fee of fifteen dollars ($15) for filing a first appearance by the plaintiff. This fee shall be added to the uniform filing fee for actions filed under this chapter.

(e) This section does not apply to a case that seeks to terminate a mobilehome park tenancy if the statement of the character of the proceeding in the caption of the complaint clearly indicates that the complaint seeks termination of a mobilehome park tenancy.

(f) This section does not alter any provision of the Evidence Code.

**(g) This section shall remain in effect until February 1, 2021, and as of that date is repealed.**

SEC. 18. Section 1161.2 is added to the Code of Civil Procedure, to read:

<< CA CIV PRO § 1161.2 >>

1161.2. (a)(1) The clerk shall allow access to limited civil case records filed under this chapter, including the court file, index, and register of actions, only as follows:

(A) To a party to the action, including a party's attorney.

(B) To a person who provides the clerk with the names of at least one plaintiff and one defendant and the address of the premises, including the apartment or unit number, if any.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(C) To a resident of the premises who provides the clerk with the name of one of the parties or the case number and shows proof of residency.

(D) To a person by order of the court, which may be granted ex parte, on a showing of good cause.

(E) To any person by order of the court if judgment is entered for the plaintiff after trial more than 60 days since the filing of the complaint. The court shall issue the order upon issuing judgment for the plaintiff.

(F) Except as provided in subparagraph (G), to any other person 60 days after the complaint has been filed if the plaintiff prevails in the action within 60 days of the filing of the complaint, in which case the clerk shall allow access to any court records in the action. If a default or default judgment is set aside more than 60 days after the complaint has been filed, this section shall apply as if the complaint had been filed on the date the default or default judgment is set aside.

(G) In the case of a complaint involving residential property based on Section 1161a as indicated in the caption of the complaint, as required in subdivision (c) of Section 1166, to any other person, if 60 days have elapsed since the complaint was filed with the court, and, as of that date, judgment against all defendants has been entered for the plaintiff, after a trial.

(2) This section shall not be construed to prohibit the court from issuing an order that bars access to the court record in an action filed under this chapter if the parties to the action so stipulate.

(b)(1) For purposes of this section, "good cause" includes, but is not limited to, both of the following:

(A) The gathering of newsworthy facts by a person described in Section 1070 of the Evidence Code.

(B) The gathering of evidence by a party to an unlawful detainer action solely for the purpose of making a request for judicial notice pursuant to subdivision (d) of Section 452 of the Evidence Code.

(2) It is the intent of the Legislature that a simple procedure be established to request the ex parte order described in subparagraph (D) of paragraph (1) of subdivision (a).

(c) Upon the filing of a case so restricted, the court clerk shall mail notice to each defendant named in the action. The notice shall be mailed to the address provided in the complaint. The notice shall contain a statement that an unlawful detainer complaint (eviction action) has been filed naming that party as a defendant, and that access to the court file will be delayed for 60 days except to a party, an attorney for one of the parties, or any other person who (1) provides to the clerk the names of at least one plaintiff and one defendant in the action and provides to the clerk the address, including any applicable apartment, unit, or space number, of the subject premises, or (2) provides to the clerk the name of one of the parties in the action or the case number and can establish through proper identification that the person lives at the subject premises. The notice shall also contain a statement that access to the court index, register of actions, or other records is not permitted until 60 days after the complaint is filed, except pursuant to an order upon a showing of good cause for access. The notice shall contain on its face the following information:

(1) The name and telephone number of the county bar association.

(2) The name and telephone number of any entity that requests inclusion on the notice and demonstrates to the satisfaction of the court that it has been certified by the State Bar of California as a lawyer referral service and maintains a panel of attorneys qualified in the practice of landlord-tenant law pursuant to the minimum standards for a lawyer referral service established by the State Bar of California and Section 6155 of the Business and Professions Code.

(3) The following statement:

"The State Bar of California certifies lawyer referral services in California and publishes a list of certified lawyer referral services organized by county. To locate a lawyer referral service in your county, go to the State Bar's internet website at www.calbar.ca.gov or call 1–866–442–2529."

(4) The name and telephone number of an office or offices funded by the federal Legal Services Corporation or qualified legal services projects that receive funds distributed pursuant to Section 6216 of the Business and Professions Code that provide legal services to low-income persons in the county in which the action is filed. The notice shall state that these telephone numbers may be called for legal advice regarding the case. The notice shall be issued between 24 and 48 hours of the filing of the complaint, excluding weekends and holidays. One copy of the notice shall be addressed to "all occupants" and mailed separately to the subject premises. The notice shall not constitute service of the summons and complaint.

(d) Notwithstanding any other law, the court shall charge an additional fee of fifteen dollars ($15) for filing a first appearance by the plaintiff. This fee shall be added to the uniform filing fee for actions filed under this chapter.

(e) This section does not apply to a case that seeks to terminate a mobilehome park tenancy if the statement of the character of the proceeding in the caption of the complaint clearly indicates that the complaint seeks termination of a mobilehome park tenancy.

(f) This section does not alter any provision of the Evidence Code.

(g) This section shall become operative on February 1, 2021.

SEC. 19. Section 1161.2.5 is added to the Code of Civil Procedure, to read:

<< CA CIV PRO § 1161.2.5 >>

1161.2.5. (a)(1) Except as provided in Section 1161.2, the clerk shall allow access to civil case records for actions seeking recovery of COVID–19 rental debt, as defined in Section 1179.02, including the court file, index, and register of actions, only as follows:

(A) To a party to the action, including a party's attorney.

(B) To a person who provides the clerk with the names of at least one plaintiff and one defendant.

(C) To a resident of the premises for which the COVID–19 rental debt is owed who provides the clerk with the name of one of the parties or the case number and shows proof of residency.

(D) To a person by order of the court, which may be granted ex parte, on a showing of good cause.

(2) To give the court notice that access to the records in an action is limited, any complaint or responsive pleading in a case subject to this section shall include on either the first page of the pleading or a cover page, the phrase "ACTION FOR RECOVERY OF COVID–19 RENTAL DEBT AS DEFINED UNDER SECTION 1179.02" in bold, capital letters, in 12 point or larger font.

(b)(1) For purposes of this section, "good cause" includes, but is not limited to, both of the following:

(A) The gathering of newsworthy facts by a person described in Section 1070 of the Evidence Code.

(B) The gathering of evidence by a party to a civil action solely for the purpose of making a request for judicial notice pursuant to subdivision (d) of Section 452 of the Evidence Code.

(2) It is the intent of the Legislature that a simple procedure be established to request the ex parte order described in subparagraph (D) of paragraph (1) of subdivision (a).

(c) This section does not alter any provision of the Evidence Code.

(d) This section shall remain in effect until February 1, 2021, and as of that date is repealed.

SEC. 20. Chapter 5 (commencing with Section 1179.01) is added to Title 3 of Part 3 of the Code of Civil Procedure, to read:

pt. 3 t. 3 ch. 5 pr. § 1179.01

Chapter 5. COVID–19 Tenant Relief Act of 2020

<< CA CIV PRO § 1179.01 >>

1179.01. This chapter is known, and may be cited, as the COVID–19 Tenant Relief Act of 2020.

<< CA CIV PRO § 1179.01.5 >>

1179.01.5. (a) It is the intent of the Legislature that the Judicial Council and the courts have adequate time to prepare to implement the new procedures resulting from this chapter, including educating and training judicial officers and staff.

(b) Notwithstanding any other law, before October 5, 2020, a court shall not do any of the following:

(1) Issue a summons on a complaint for unlawful detainer in any action that seeks possession of residential real property and that is based, in whole or in part, on nonpayment of rent or other charges.

(2) Enter a default or a default judgment for restitution in an unlawful detainer action that seeks possession of residential real property and that is based, in whole or in part, on nonpayment of rent or other charges.

(c)(1) A plaintiff in an unlawful detainer action shall file a cover sheet in the form specified in paragraph (2) that indicates both of the following:

(A) Whether the action seeks possession of residential real property.

(B) If the action seeks possession of residential real property, whether the action is based, in whole or part, on an alleged default in payment of rent or other charges.

(2) The cover sheet specified in paragraph (1) shall be in the following form:

“UNLAWFUL DETAINER SUPPLEMENTAL COVER SHEET

1. This action seeks possession of real property that is:

a. [ ] Residential

b. [ ] Commercial

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2. (Complete only if paragraph 1(a) is checked) This action is based, in whole or in part, on an alleged default in payment of rent or other charges.

a. [ ] Yes

b. [ ] No

Date:__________________

..............................................................................................................................................................................

______________________________________________________________________________

Type Or Print Name Signature Of Party Or Attorney For Party”

(3) The cover sheet required by this subdivision shall be in addition to any civil case cover sheet or other form required by law, the California Rules of Court, or a local court rule.

(4) The Judicial Council may develop a form for mandatory use that includes the information in paragraph (2).

(d) This section does not prevent a court from issuing a summons or entering default in an unlawful detainer action that seeks possession of residential real property and that is not based, in whole or in part, on nonpayment of rent or other charges.

<< CA CIV PRO § 1179.02 >>

1179.02. For purposes of this chapter:

(a) “Covered time period” means the time period between March 1, 2020, and January 31, 2021.

(b) “COVID–19–related financial distress” means any of the following:

(1) Loss of income caused by the COVID–19 pandemic.

(2) Increased out-of-pocket expenses directly related to performing essential work during the COVID–19 pandemic.

(3) Increased expenses directly related to the health impact of the COVID–19 pandemic.

(4) Childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member directly related to the COVID–19 pandemic that limit a tenant's ability to earn income.

(5) Increased costs for childcare or attending to an elderly, disabled, or sick family member directly related to the COVID–19 pandemic.

(6) Other circumstances related to the COVID–19 pandemic that have reduced a tenant's income or increased a tenant's expenses.

(c) “COVID–19 rental debt” means unpaid rent or any other unpaid financial obligation of a tenant under the tenancy that came due during the covered time period.

(d) “Declaration of COVID–19–related financial distress” means the following written statement:

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

I am currently unable to pay my rent or other financial obligations under the lease in full because of one or more of the following:

1. Loss of income caused by the COVID–19 pandemic.

2. Increased out-of-pocket expenses directly related to performing essential work during the COVID–19 pandemic.

3. Increased expenses directly related to health impacts of the COVID–19 pandemic.

4. Childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member directly related to the COVID–19 pandemic that limit my ability to earn income.

5. Increased costs for childcare or attending to an elderly, disabled, or sick family member directly related to the COVID–19 pandemic.

6. Other circumstances related to the COVID–19 pandemic that have reduced my income or increased my expenses.

Any public assistance, including unemployment insurance, pandemic unemployment assistance, state disability insurance (SDI), or paid family leave, that I have received since the start of the COVID–19 pandemic does not fully make up for my loss of income and/or increased expenses.

Signed under penalty of perjury:

Dated:

(e) “Landlord” includes all of the following or the agent of any of the following:

(1) An owner of residential real property.

(2) An owner of a residential rental unit.

(3) An owner of a mobilehome park.

(4) An owner of a mobilehome park space or lot.

(f) “Protected time period” means the time period between March 1, 2020, and August 31, 2020.

(g) “Rental payment” means rent or any other financial obligation of a tenant under the tenancy.

(h) “Tenant” means any natural person who hires real property except any of the following:

(1) Tenants of commercial property, as defined in subdivision (c) of Section 1162 of the Civil Code.

(2) Those persons whose occupancy is described in subdivision (b) of Section 1940 of the Civil Code.

(i) “Transition time period” means the time period between September 1, 2020, and January 31, 2021.

<< CA CIV PRO § 1179.02.5 >>

1179.02.5. (a) For purposes of this section:

(1)(A) "High–income tenant" means a tenant with an annual household income of 130 percent of the median income, as published by the Department of Housing and Community Development in the Official State Income Limits for 2020, for the county in which the residential rental property is located.

(B) For purposes of this paragraph, all lawful occupants of the residential rental unit, including minor children, shall be considered in determining household size.

(C) "High–income tenant" shall not include a tenant with a household income of less than one hundred thousand dollars ($100,000).

(2) "Proof of income" means any of the following:

(A) A tax return.

(B) A W–2.

(C) A written statement from a tenant's employer that specifies the tenant's income.

(D) Pay stubs.

(E) Documentation showing regular distributions from a trust, annuity, 401k, pension, or other financial instrument.

(F) Documentation of court-ordered payments, including, but not limited to, spousal support or child support.

(G) Documentation from a government agency showing receipt of public assistance benefits, including, but not limited to, social security, unemployment insurance, disability insurance, or paid family leave.

(H) A written statement signed by the tenant that states the tenant's income, including, but not limited to, a rental application.

(b)(1) This section shall apply only if the landlord has proof of income in the landlord's possession before the service of the notice showing that the tenant is a high-income tenant.

(2) This section does not do any of the following:

(A) Authorize a landlord to demand proof of income from the tenant.

(B) Require the tenant to provide proof of income for the purposes of determining whether the tenant is a high-income tenant.

(C)(i) Entitle a landlord to obtain, or authorize a landlord to attempt to obtain, confidential financial records from a tenant's employer, a government agency, financial institution, or any other source.

(ii) Confidential information described in clause (i) shall not constitute valid proof of income unless it was lawfully obtained by the landlord with the tenant's consent during the tenant screening process.

(3) Paragraph (2) does not alter a party's rights under Title 4 (commencing with Section 2016.010), Chapter 4 (commencing with Section 708.010) of Title 9, or any other law.

(c) A landlord may require a high-income tenant that is served a notice pursuant to subdivision (b) or (c) of Section 1179.03 to submit, in addition to and together with a declaration of COVID–19–related financial distress, documentation supporting the claim that the tenant has suffered COVID–19–related financial distress. Any form of objectively verifiable documentation that demonstrates the COVID–19–related financial distress the tenant has experienced is sufficient to satisfy the requirements of this subdivision, including the proof of income, as defined in subparagraphs (A) to (G), inclusive, of paragraph (2) of subdivision (a), a letter from an employer, or an unemployment insurance record.

(d) A high-income tenant is required to comply with the requirements of subdivision (c) only if the landlord has included the following language on the notice served pursuant to subdivision (b) or (c) of Section 1179.03 in at least 12–point font:

"Proof of income on file with your landlord indicates that your household makes at least 130 percent of the median income for the county where the rental property is located, as published by the Department of Housing and Community Development in the Official State Income Limits for 2020. As a result, if you claim that you are unable to pay the amount demanded by this notice because you have suffered COVID–19–related financial distress, you are required to submit to your landlord documentation supporting your claim together with the completed declaration of COVID–19–related financial distress provided with this notice. If you fail to submit this documentation together with your declaration of COVID–19–related financial distress, and you do not either pay the amount demanded in this notice or deliver possession of the premises back to your landlord as required by this notice, you will not be covered by the eviction protections enacted by the California Legislature as a result of the COVID–19 pandemic, and your landlord can begin eviction proceedings against you as soon as this 15–day notice expires."

(e) A high-income tenant that fails to comply with subdivision (c) shall not be subject to the protections of subdivision (g) of Section 1179.03.

(f)(1) A landlord shall be required to plead compliance with this section in any unlawful detainer action based upon a notice that alleges that the tenant is a high-income tenant. If that allegation is contested, the landlord shall be required to submit to the court the proof of income upon which the landlord relied at the trial or other hearing, and the tenant shall be entitled to submit rebuttal evidence.

(2) If the court in an unlawful detainer action based upon a notice that alleges that the tenant is a high-income tenant determines that at the time the notice was served the landlord did not have proof of income establishing that the tenant is a high-income tenant, the court shall award attorney's fees to the prevailing tenant.

<< CA CIV PRO § 1179.03 >>

1179.03. (a)(1) Any notice that demands payment of COVID–19 rental debt served pursuant to subdivision (e) of Section 798.56 of the Civil Code or paragraph (2) or (3) of Section 1161 shall be modified as required by this section. A notice which does not meet the requirements of this section, regardless of when the notice was issued, shall not be sufficient to establish a cause of action for unlawful detainer or a basis for default judgment.

(2) Any case based solely on a notice that demands payment of COVID–19 rental debt served pursuant to subdivision (e) of Section 798.56 of the Civil Code or paragraph (2) or (3) of Section 1161 may be dismissed if the notice does not meet the requirements of this section, regardless of when the notice was issued.

(3) Notwithstanding paragraphs (1) and (2), this section shall have no effect if the landlord lawfully regained possession of the property or obtained a judgment for possession of the property before the operative date of this section.

(b) If the notice demands payment of rent that came due during the protected time period, as defined in Section 1179.02, the notice shall comply with all of the following:

(1) The time period in which the tenant may pay the amount due or deliver possession of the property shall be no shorter than 15 days, excluding Saturdays, Sundays, and other judicial holidays.

(2) The notice shall set forth the amount of rent demanded and the date each amount became due.

(3) The notice shall advise the tenant that the tenant cannot be evicted for failure to comply with the notice if the tenant delivers a signed declaration of COVID–19–related financial distress to the landlord on or before the date that the notice to pay rent or quit or notice to perform covenants or quit expires, by any of the methods specified in subdivision (f).

(4) The notice shall include the following text in at least 12–point font:

"NOTICE FROM THE STATE OF CALIFORNIA: If you are unable to pay the amount demanded in this notice, and have decreased income or increased expenses due to COVID–19, your landlord will not be able to evict you for this missed payment if you sign and deliver the declaration form included with your notice to your landlord within 15 days, excluding Saturdays, Sundays, and other judicial holidays, but you will still owe this money to your landlord. If you do not sign and deliver the declaration within this time period, you may lose the eviction protections available to you. You must return this form to be protected. You should keep a copy or picture of the signed form for your records.

You will still owe this money to your landlord and can be sued for the money, but you cannot be evicted from your home if you comply with these requirements. You should keep careful track of what you have paid and any amount you still owe to protect your rights and avoid future disputes. Failure to respond to this notice may result in an unlawful detainer action (eviction) being filed against you.

For information about legal resources that may be available to you, visit lawhelpca.org."

(c) If the notice demands payment of rent that came due during the transition time period, as defined in Section 1179.02, the notice shall comply with all of the following:

(1) The time period in which the tenant may pay the amount due or deliver possession of the property shall be no shorter than 15 days, excluding Saturdays, Sundays, and other judicial holidays.

(2) The notice shall set forth the amount of rent demanded and the date each amount became due.

(3) The notice shall advise the tenant that the tenant will not be evicted for failure to comply with the notice, except as allowed by this chapter, if the tenant delivers a signed declaration of COVID–19–related financial distress to the landlord on or before the date the notice to pay rent or quit or notice to perform covenants or quit expires, by any of the methods specified in subdivision (f).

(4) The notice shall include the following text in at least 12–point font:

"NOTICE FROM THE STATE OF CALIFORNIA: If you are unable to pay the amount demanded in this notice, and have decreased income or increased expenses due to COVID–19, you may sign and deliver the declaration form included with your notice to your landlord within 15 days, excluding Saturdays, Sundays, and other judicial holidays, and your landlord will not be able to evict you for this missed payment so long as you make the minimum payment (see below). You will still owe this money to your landlord. You should keep a copy or picture of the signed form for your records.

If you provide the declaration form to your landlord as described above AND, on or before January 31, 2021, you pay an amount that equals at least 25 percent of each rental payment that came due or will come due during the period between September 1, 2020, and January 31, 2021, that you were unable to pay as a result of decreased income or increased expenses due to COVID–

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

19, your landlord cannot evict you. Your landlord may require you to submit a new declaration form for each rental payment that you do not pay that comes due between September 1, 2020, and January 31, 2021.

For example, if you provided a declaration form to your landlord regarding your decreased income or increased expenses due to COVID–19 that prevented you from making your rental payment in September and October of 2020, your landlord could not evict you if, on or before January 31, 2021, you made a payment equal to 25 percent of September's and October's rental payment (i.e., half a month's rent). If you were unable to pay any of the rental payments that came due between September 1, 2020, and January 31, 2021, and you provided your landlord with the declarations in response to each 15–day notice your landlord sent to you during that time period, your landlord could not evict you if, on or before January 31, 2021, you paid your landlord an amount equal to 25 percent of all the rental payments due from September through January (i.e., one and a quarter month's rent).

You will still owe the full amount of the rent to your landlord, but you cannot be evicted from your home if you comply with these requirements. You should keep careful track of what you have paid and any amount you still owe to protect your rights and avoid future disputes. Failure to respond to this notice may result in an unlawful detainer action (eviction) being filed against you.

For information about legal resources that may be available to you, visit lawhelpca.org."

(d) An unsigned copy of a declaration of COVID–19–related financial distress shall accompany each notice delivered to a tenant to which subdivision (b) or (c) is applicable. If the landlord was required, pursuant to Section 1632 of the Civil Code, to provide a translation of the rental contract or agreement in the language in which the contract or agreement was negotiated, the landlord shall also provide the unsigned copy of a declaration of COVID–19–related financial distress to the tenant in the language in which the contract or agreement was negotiated. The Department of Real Estate shall make available an official translation of the text required by paragraph (4) of subdivision (b) and paragraph (4) of subdivision (c) in the languages specified in Section 1632 of the Civil Code by no later than September 15, 2020.

(e) If a tenant owes a COVID–19 rental debt to which both subdivisions (b) and (c) apply, the landlord shall serve two separate notices that comply with subdivisions (b) and (c), respectively.

(f) A tenant may deliver the declaration of COVID–19–related financial distress to the landlord by any of the following methods:

(1) In person, if the landlord indicates in the notice an address at which the declaration may be delivered in person.

(2) By electronic transmission, if the landlord indicates an email address in the notice to which the declaration may be delivered.

(3) Through United States mail to the address indicated by the landlord in the notice. If the landlord does not provide an address pursuant to subparagraph (1), then it shall be conclusively presumed that upon the mailing of the declaration by the tenant to the address provided by the landlord, the declaration is deemed received by the landlord on the date posted, if the tenant can show proof of mailing to the address provided by the landlord.

(4) Through any of the same methods that the tenant can use to deliver the payment pursuant to the notice if delivery of the declaration by that method is possible.

(g) Except as provided in Section 1179.02.5, the following shall apply to a tenant who, within 15 days of service of the notice specified in subdivision (b) or (c), excluding Saturdays, Sundays, and other judicial holidays, demanding payment of COVID–19 rental debt delivers a declaration of COVID–19–related financial distress to the landlord by any of the methods provided in subdivision (f):

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

(1) With respect to a notice served pursuant to subdivision (b), the tenant shall not then or thereafter be deemed to be in default with regard to that COVID–19 rental debt for purposes of subdivision (e) of Section 798.56 of the Civil Code or paragraphs (2) and (3) of Section 1161.

(2) With respect to a notice served pursuant to subdivision (c), the following shall apply:

(A) Except as provided by subparagraph (B), the landlord may not initiate an unlawful detainer action before February 1, 2021.

(B) A tenant shall not be guilty of unlawful detainer, now or in the future, based upon nonpayment of COVID–19 rental debt that came due during the transition period if, on or before January 31, 2021, the tenant tenders one or more payments that, when taken together, are of an amount equal to or not less than 25 percent of each transition period rental payment demanded in one or more notices served pursuant to subsection (c) and for which the tenant complied with this subdivision by timely delivering a declaration of COVID–19–related financial distress to the landlord.

(h)(1)(A) Within the time prescribed in Section 1167, a tenant shall be permitted to file a signed declaration of COVID–19–related financial distress with the court.

(B) If the tenant files a signed declaration of COVID–19–related financial distress with the court pursuant to this subdivision, the court shall dismiss the case, pursuant to paragraph (2), if the court finds, after a noticed hearing on the matter, that the tenant's failure to return a declaration of COVID–19–related financial distress within the time required by subdivision (g) was the result of mistake, inadvertence, surprise, or excusable neglect, as those terms have been interpreted under subdivision (b) of Section 473.

(C) The noticed hearing required by this paragraph shall be held with not less than five days' notice and not more than 10 days' notice, to be given by the court, and may be held separately or in conjunction with any regularly noticed hearing in the case, other than a trial.

(2) If the court dismisses the case pursuant to paragraph (1), that dismissal shall be without prejudice as follows:

(A) If the case was based in whole or in part upon a notice served pursuant to subdivision (b), the court shall dismiss any cause of action based on the notice served pursuant to subdivision (b).

(B) Before February 1, 2021, if the case is based in whole or in part on a notice served pursuant to subdivision (c), the court shall dismiss any cause of action based on the notice served pursuant to subdivision (c).

(C) On or after February 1, 2021, if the case is based in whole or in part on a notice served pursuant to subdivision (c), the court shall dismiss any cause of action based upon the notice served pursuant to subdivision (c) if the tenant, within five days of the court's order to do so, makes the payment required by subparagraph (B) of paragraph (1) of subdivision (g), provided that if the fifth day falls on a Saturday, Sunday, or judicial holiday the last day to pay shall be extended to the next court day.

(3) If the court dismisses the case pursuant to this subdivision, the tenant shall not be considered the prevailing party for purposes of Section 1032, any attorney's fee provision appearing in contract or statute, or any other law.

(i) Notwithstanding any other law, a notice which is served pursuant to subdivision (b) or (c) that complies with the requirements of this chapter and subdivision (e) of Section 798.56 of the Civil Code or paragraphs (2) and (3) of Section 1161, as applicable, need not include specific language required by any ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

<< CA CIV PRO § 1179.03.5 >>

1179.03.5. (a) Before February 1, 2021, a court may not find a tenant guilty of an unlawful detainer unless it finds that one of the following applies:

(1) The tenant was guilty of the unlawful detainer before March 1, 2020.

(2) In response to service of a notice demanding payment of COVID–19 rental debt pursuant to subdivision (e) of Section 798.56 of the Civil Code or paragraph (2) or (3) of Section 1161, the tenant failed to comply with the requirements of Section 1179.03.

(3)(A) The unlawful detainer arises because of a termination of tenancy for any of the following:

(i) An at-fault just cause, as defined in paragraph (1) of subdivision (b) of Section 1946.2 of the Civil Code.

(ii)(I) A no-fault just cause, as defined in paragraph (2) of subdivision (b) of Section 1946.2 of the Civil Code, other than intent to demolish or to substantially remodel the residential real property, as defined in subparagraph (D) of paragraph (2) of subdivision (b) of Section 1946.2.

(II) Notwithstanding subclause (I), termination of a tenancy based on intent to demolish or to substantially remodel the residential real property shall be permitted if necessary to maintain compliance with the requirements of Section 1941.1 of the Civil Code, Section 17920.3 or 17920.10 of the Health and Safety Code, or any other applicable law governing the habitability of residential rental units.

(iii) The owner of the property has entered into a contract for the sale of that property with a buyer who intends to occupy the property, and all the requirements of paragraph (8) of subdivision (e) of Section 1946.2 of the Civil Code have been satisfied.

(B) In an action under this paragraph, other than an action to which paragraph (2) also applies, the landlord shall be precluded from recovering COVID–19 rental debt in connection with any award of damages.

(b)(1) This section does not require a landlord to assist the tenant to relocate through the payment of relocation costs if the landlord would not otherwise be required to do so pursuant to Section 1946.2 of the Civil Code or any other law.

(2) A landlord who is required to assist the tenant to relocate pursuant to Section 1946.2 of the Civil Code or any other law, may offset the tenant's COVID–19 rental debt against their obligation to assist the tenant to relocate.

<< CA CIV PRO § 1179.04 >>

1179.04. (a) On or before September 30, 2020, a landlord shall provide, in at least 12–point font, the following notice to tenants who, as of September 1, 2020, have not paid one or more rental payments that came due during the protected time period:

“NOTICE FROM THE STATE OF CALIFORNIA: The California Legislature has enacted the COVID–19 Tenant Relief Act of 2020 which protects renters who have experienced COVID–19–related financial distress from being evicted for failing to make rental payments due between March 1, 2020, and January 31, 2021.

“COVID–19–related financial distress” means any of the following:

1. Loss of income caused by the COVID–19 pandemic.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2. Increased out-of-pocket expenses directly related to performing essential work during the COVID–19 pandemic.

3. Increased expenses directly related to the health impact of the COVID–19 pandemic.

4. Childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member directly related to the COVID–19 pandemic that limit your ability to earn income.

5. Increased costs for childcare or attending to an elderly, disabled, or sick family member directly related to the COVID–19 pandemic.

6. Other circumstances related to the COVID–19 pandemic that have reduced your income or increased your expenses.

This law gives you the following protections:

1. If you failed to make rental payments due between March 1, 2020, and August 31, 2020, because you had decreased income or increased expenses due to the COVID–19 pandemic, as described above, you cannot be evicted based on this nonpayment.

2. If you are unable to pay rental payments that come due between September 1, 2020, and January 31, 2021, because of decreased income or increased expenses due to the COVID–19 pandemic, as described above, you cannot be evicted if you pay 25 percent of the rental payments missed during that time period on or before January 31, 2021.

You must provide, to your landlord, a declaration under penalty of perjury of your COVID–19–related financial distress attesting to the decreased income or increased expenses due to the COVID–19 pandemic to be protected by the eviction limitations described above. Before your landlord can seek to evict you for failing to make a payment that came due between March 1, 2020, and January 31, 2021, your landlord will be required to give you a 15–day notice that informs you of the amounts owed and includes a blank declaration form you can use to comply with this requirement.

If your landlord has proof of income on file which indicates that your household makes at least 130 percent of the median income for the county where the rental property is located, as published by the Department of Housing and Community Development in the Official State Income Limits for 2020, your landlord may also require you to provide documentation which shows that you have experienced a decrease in income or increase in expenses due to the COVID–19 pandemic. Your landlord must tell you in the 15–day notice whether your landlord is requiring that documentation. Any form of objectively verifiable documentation that demonstrates the financial impact you have experienced is sufficient, including a letter from your employer, an unemployment insurance record, or medical bills, and may be provided to satisfy the documentation requirement.

It is very important you do not ignore a 15–day notice to pay rent or quit or a notice to perform covenants or quit from your landlord. If you are served with a 15–day notice and do not provide the declaration form to your landlord before the 15–day notice expires, you could be evicted. You could also be evicted beginning February 1, 2021, if you owe rental payments due between September 1, 2020, and January 31, 2021, and you do not pay an amount equal to at least 25 percent of the payments missed for that time period.

For information about legal resources that may be available to you, visit lawhelpca.org.”

(b) The landlord may provide the notice required by subdivision (a) in the manner prescribed by Section 1162 or by mail.

(c)(1) A landlord may not serve a notice pursuant to subdivision (b) or (c) of Section 1179.03 before the landlord has provided the notice required by subdivision (a).

(2) The notice required by subdivision (a) may be provided to a tenant concurrently with a notice pursuant to subdivision (b) or (c) of Section 1179.03 that is served on or before September 30, 2020.

<< CA CIV PRO § 1179.05 >>

1179.05. (a) Any ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect tenants from eviction is subject to all of the following:

(1) Any extension, expansion, renewal, reenactment, or new adoption of a measure, however delineated, that occurs between August 19, 2020, and January 31, 2021, shall have no effect before February 1, 2021.

(2) Any provision which allows a tenant a specified period of time in which to repay COVID–19 rental debt shall be subject to all of the following:

(A) If the provision in effect on August 19, 2020, required the repayment period to commence on a specific date on or before March 1, 2021, any extension of that date made after August 19, 2020, shall have no effect.

(B) If the provision in effect on August 19, 2020, required the repayment period to commence on a specific date after March 1, 2021, or conditioned commencement of the repayment period on the termination of a proclamation of state of emergency or local emergency, the repayment period is deemed to begin on March 1, 2021.

(C) The specified period of time during which a tenant is permitted to repay COVID–19 rental debt may not extend beyond the period that was in effect on August 19, 2020. In addition, a provision may not permit a tenant a period of time that extends beyond March 31, 2022, to repay COVID–19 rental debt.

(b) This section does not alter a city, county, or city and county's authority to extend, expand, renew, reenact, or newly adopt an ordinance that requires just cause for termination of a residential tenancy or amend existing ordinances that require just cause for termination of a residential tenancy, consistent with subdivision (g) of Section 1946.2, provided that a provision enacted or amended after August 19, 2020, shall not apply to rental payments that came due between March 1, 2020, and January 31, 2021.

(c) The one-year limitation provided in subdivision (2) of Section 1161 is tolled during any time period that a landlord is or was prohibited by any ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect tenants from eviction based on nonpayment of rental payments from serving a notice that demands payment of COVID–19 rental debt pursuant to subdivision (e) of Section 798.56 of the Civil Code or paragraph (2) of Section 1161.

(d) It is the intent of the Legislature that this section be applied retroactively to August 19, 2020.

(e) The Legislature finds and declares that this section addresses a matter of statewide concern rather than a municipal affair as that term is used in Section 5 of Article XI of the California Constitution. Therefore, this section applies to all cities, including charter cities.

(f) It is the intent of the Legislature that the purpose of this section is to protect individuals negatively impacted by the COVID–19 pandemic, and that this section does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect tenants from eviction.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

<< CA CIV PRO § 1179.06 >>

1179.06. Any provision of a stipulation, settlement agreement, or other agreement entered into on or after the effective date of this chapter, including a lease agreement, that purports to waive the provisions of this chapter is prohibited and is void as contrary to public policy.

<< CA CIV PRO § 1179.07 >>

1179.07. This chapter shall remain in effect until February 1, 2025, and as of that date is repealed.

SEC. 21. (a) The Business, Consumer Services and Housing Agency shall, in consultation with the Department of Finance, engage with residential tenants, landlords, property owners, deed restricted affordable housing providers, and financial sector stakeholders about strategies and approaches to direct potential future federal stimulus funding to most effectively and efficiently provide relief to distressed tenants, landlords, and property owners, including exploring strategies to create access to liquidity in partnership with financial institutions or other financial assistance. Subject to availability of funds and other budget considerations, and only upon appropriation by the Legislature, these strategies should inform implementation of the funds. In creating these strategies, special focus shall be given to low-income tenants, small property owners, and affordable housing providers who have suffered direct financial hardship as a result of the COVID-19 pandemic.

(b) For the purposes of this section, "future federal stimulus funding" does not include funding identified in the 2020 Budget Act.

SEC. 22. The provisions of this act are severable. If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

SEC. 23. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

SEC. 24. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or

safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are:
To avert economic and social harm by providing a structure for temporary relief to financially distressed tenants, homeowners, and small landlords during the public health emergency, and to ensure that landlords and tenants are able to calculate the maximum allowable rental rate increase within a 12–month period at the earliest possible time, it is necessary that this act take effect immediately.

Footnotes

1 So in enrolled bill.

2 So in enrolled bill.

3 Internal Revenue Code sections are in Title 26 of the U.S.C.A.

4 Internal Revenue Code sections are in Title 26 of the U.S.C.A.

5 Internal Revenue Code sections are in Title 26 of the U.S.C.A.

6 For public law sections classified to the U.S.C.A., see USCA–Tables.

**End of Document**                                                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

APPROVED AS TO FORM AND LEGALITY

INTRODUCED BY COUNCILMEMBER NIKKI FORTUNATO BAS, COUNCIL PRESIDENT PRO TEMPORE DAN KALB, AND CITY ATTORNEY BARBARA J. PARKER

CITY ATTORNEY'S OFFICE

# OAKLAND CITY COUNCIL

## ORDINANCE NO. 13606 C.M.S.

**6 Affirmative Votes Required**

---

**EMERGENCY ORDINANCE AMENDING ORDINANCE NOS. 13589 C.M.S. AND 13594 C.M.S. TO EXTEND THE MORATORIUM ON RESIDENTIAL EVICTIONS DURING THE LOCAL EMERGENCY PROCLAIMED IN RESPONSE TO THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC**

**WHEREAS,** COVID-19 is a respiratory disease which was first detected in China and has now spread across the globe, with multiple confirmed cases in California, including the Bay Area; and

**WHEREAS,** On March 1, 2020, Alameda County Interim Health Officer Erica Pan, MD, MPH, FAAP declared a Local Health Emergency, and

**WHEREAS**, on March 4, 2020, California Governor Gavin Newsom proclaimed that a State of Emergency exists in California as a result of the threat of COVID-19; and

**WHEREAS,** Oakland is experiencing a severe housing affordability crisis and 60 percent of Oakland residents are renters, who would not be able to locate affordable housing within the City if they lose their housing; and

**WHEREAS**, in the City of Oakland, more than 4000 of our community members are homeless and live outdoors, in tents or in vehicles; and

**WHEREAS**, because homelessness can exacerbate vulnerability to COVID-19, it is necessary to take measures to preserve and increase housing security for Oakland residents; and

**WHEREAS**, the World Health Organization announced on March 11, 2020, that it has characterized COVID-19 as a pandemic; and

**WHEREAS,** on March 9, 2020, the Oakland City Administrator issued a proclamation of Local Emergency which was ratified by the Oakland City Council on March 12, 2020; and

**WHEREAS,** at the City Council's Special Meeting on March 12, 2020, numerous members of the public gave commentary about the need to prevent residential evictions during the COVID-19 crisis; and

**WHEREAS,** on March 16, 2020, Alameda County Interim Health Officer Erica Pan, MD, MPH, FAAP issued a Shelter-in-Place Order, requiring all Alameda County Residents to stay in their homes and leave only for specified essential purposes; and

**WHEREAS,** the following California cities have enacted emergency eviction moratoriums: San Francisco, Berkeley, Emeryville, Alameda, San Jose, Los Angeles and San Diego, among others; and

**WHEREAS,** many Oakland residents are experiencing substantial losses of income as a result of business closures, the loss of hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with rent payments; and

**WHEREAS,** many Oakland businesses are suffering economic losses related to COVID-19, in particular since the March 16, 2020, Shelter in Place Order; and

**WHEREAS,** pursuant to Oakland Municipal Code Section 8.22.360F, the City Council may add limitations to a landlord's right to evict under the Just Cause for Eviction Ordinance; and

**WHEREAS,** during this state of emergency, and in the interests of protecting the public health and preventing transmission of the COVID-19, it is essential to avoid unnecessary displacement and homelessness; and

**WHEREAS,** on March 16, 2020, California Governor Gavin Newsom issued Executive Order N-28-20, which, among other things, suspended any provision of state law that would preempt or otherwise restrict a local government's exercise of its police power to impose substantive limitations on commercial evictions, if the basis for eviction was nonpayment of rent, or foreclosure, arising out of a substantial decrease in income or substantial out-of-pocket medical expenses caused by the COVID-19 pandemic, or a government agency's response to it, and is documented; and requests that financial institutions implement an immediate moratorium on foreclosures and related evictions that arise due to a substantial loss of household/business income, or substantial out-of-pocket medical expenses, due to COVID-19; and

**WHEREAS,** on May 29, 2020, Governor Newsom issued Executive Order N-66-20, which among other things, extended these provisions of Executive Order N-28-20 until July 28, 2020; and

**WHEREAS,** on June 30, 2020, Governor Newsom issued Executive Order N-71-20, which among other things, extended these provisions of Executive Order N-28-20 until September 30, 2020; and

**WHEREAS,** on March 19, 2020, California Governor Gavin Newsom issued Executive Order N-33-20, ordering, with limited exceptions, all individuals living in the state of California to stay at home or at their place of residence, until further notice; and

**WHEREAS,** on March 27, 2020, the City Council approved Ordinance No. 13589 C.M.S., which imposed an eviction moratorium on residential evictions until May 31, 2020 and a moratorium on commercial evictions based on nonpayment of rent that became due during the Local Emergency when tenant suffered a substantial loss of income due to COVID-19 until May 31, 2020; and

**WHEREAS,** on April 6, 2020, the Judicial Council adopted emergency rules to suspend evictions and judicial foreclosures until 90 days after the Governor declares that the state of emergency related to the COVID-19 pandemic has been lifted; and

**WHEREAS,** on April 29, 2020, Alameda County Interim Health Officer Erica Pan, MD, MPH, FAAP extended the Shelter-in-Place Order, requiring all Alameda County Residents to stay in their homes and leave only for specified essential purposes, through end of May 2020; and

**WHEREAS,** on May 19, 2020, the City Council approved Ordinance No. 13594 C.M.S., which extended the moratorium on residential evictions until August 31, 2020 and the moratorium on commercial evictions until the expiration of the relevant provisions of Executive Order N-28-20; and

**WHEREAS**, on June 5, 2020, Alameda County Interim Health Officer Erica Pan, MD, MPH, FAAP extended the Shelter-in-Place Order, until it is rescinded, superseded, or amended; and

**WHEREAS**, according to the 2018 City of Oakland Equity Indicators Report 74 percent of African American residents are renters, 69 percent of Latinx residents are renters, and 48 percent of Asian residents are renters; and 58 percent of African American and 53 percent of Latino residents are rent burdened in Oakland, and African American residents are twice as likely to receive an eviction notice than all residents; and

**WHEREAS,** this Ordinance will serve justice and promote racial equity for African American and Latinx renters; and

**WHEREAS,** pursuant to City Charter Section 213, the City Council may introduce and adopt an emergency ordinance at the same City Council meeting by six affirmative votes; and

**WHEREAS,** pursuant to City Charter Section 213 the City Council must state the reasons constituting the necessity of an emergency ordinance in order to preserve the public peace, health or safety of the City in an emergency; and

**WHEREAS,** based on the findings above, the City desires to further the public peace, health, safety and welfare to prevent transmission of the coronavirus by avoiding unnecessary displacement and homelessness; and

**WHEREAS,** if the Council does not enact an emergency ordinance implementing the above measures, the City's announcement of its intent to act would create an incentive for landlords to evict tenants after provisions of the existing eviction moratorium that expire on August 31, 2020 despite the clear intent of the City to protect such tenants to promote the health, welfare, and safety of the City; and

**WHEREAS,** in the time after a non-emergency ordinance was introduced, received a second reading, and became effective, many tenants could be subject to displacement, furthering the need for the Council to enact an emergency ordinance that is effective immediately; and

**WHEREAS,** the City Council finds that it is necessary to enact an emergency ordinance pursuant to the powers that City Charter Section 213 grants to the City Council to preserve the public health and safety which is threatened by COVID-19; and

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF OAKLAND DOES ORDAIN AS FOLLOWS:**

**SECTION 1. Recitals.** The City Council finds the foregoing recitals to be true and correct and hereby incorporates such findings into this ordinance.

**SECTION 2. Purpose and Intent.** The purpose and intent of this ordinance is to prevent displacement, reduce transmission of the novel Coronavirus (COVID-19), and promote the stability and the health and safety of the residents and businesses of Oakland during the Local Emergency declared by the City Administrator on March 9, 2020, and ratified by the Oakland City Council on March 12, 2020, in response to the COVID-19 pandemic (hereinafter, "Local Emergency").

**SECTION 3. Residential Eviction Moratorium Extension.** Section 3 of Ordinance No. 13589 C.M.S., as amended by Ordinance No. 13594 C.M.S., is hereby repealed and reenacted with amendments, as set forth below (additions are shown as double underline and deletions are shown as ~~strikethrough~~).

**Residential Eviction Moratorium.** Except when the tenant poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (1) – (10) that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency. Any notice served pursuant to Oakland Municipal Code 8.22.360A (1) - (10) on a tenant during the Local Emergency shall include the following statement in bold underlined 12-point font: "**Except to protect the health and safety of other occupants of the property, you may not be evicted during the Local**

**<u>Emergency declared by the City of Oakland in response to the COVID-19 pandemic. This does not relieve you of the obligation to pay back rent in the future. You may contact the Rent Adjustment Program at (510) 238–3721 for additional information and referrals.</u>**" This section shall remain in effect until the Local Emergency declared on March 9, 2020, has been terminated by the City Council~~, or August 31, 2020, whichever comes first~~.

**SECTION 4. CEQA.** This ordinance is exempt from the California Environmental Quality Act (CEQA) under CEQA Guidelines Sections 15060(c)(2) (no direct or reasonably foreseeable indirect physical change in the environment),15061(b)(3) (no environmental impact),15269(c) (specific actions necessary to mitigate an emergency), and 15378 (regulatory actions). In response to the COVID-19 crisis, which has been declared a national, state, and local emergency, this ordinance implements rent stabilization measures and an eviction moratorium for existing residential units in the City with tenants who have been negatively impacted by the emergency.

The ordinance is necessary to mitigate an emergency and contains no provisions modifying the physical design, development, or construction of residential or nonresidential structures. Accordingly, it can be seen with certainty that there is no possibility that the ordinance may have a significant effect on the environment and result in no physical changes to the environment.

**SECTION 5. Severability.** If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of the Chapter. The City Council hereby declares that it would have passed this Ordinance and each section, subsection, clause or phrase thereof irrespective of the fact that one or more other sections, subsections, clauses or phrases may be declared invalid or unconstitutional.

**SECTION 6. Effective Date.** This ordinance shall become effective immediately if it receives six or more affirmative votes.

IN COUNCIL, OAKLAND, CALIFORNIA, JUL 21 2020

PASSED BY THE FOLLOWING VOTE:

AYES - FORTUNATO BAS, GALLO, GIBSON MCELHANEY, KALB, REID, TAYLOR, THAO AND PRESIDENT KAPLAN — 8

NOES – Ø
ABSENT – Ø
ABSTENTION – Ø

ATTEST: ______________________
ASHA REED
Acting City Clerk and Clerk of the Council
of the City of Oakland, California

Date of Attestation: July 23, 2020

**NOTICE AND DIGEST**

**EMERGENCY ORDINANCE AMENDING ORDINANCE NOS. 13589 C.M.S. AND 13594 C.M.S. TO EXTEND THE MORATORIUM ON RESIDENTIAL EVICTIONS DURING THE LOCAL EMERGENCY PROCLAIMED IN RESPONSE TO THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC**

This Ordinance amends Ordinance Nos. 13589 C.M.S. and 13594 C.M.S. to extend the moratorium on residential evictions during the local emergency proclaimed in response to the novel coronavirus (COVID-19) pandemic.

# EXHIBIT C

# MISSING EXECUTED LEGISLATION FORM

Resolution / Ordinance Number: 13737

City Council Meeting Date: MAY 2 2023

Agenda Item No.: 6.10

Recorded Vote: 7 Ayes, 1 No Gallo

**Status of Resolution/Ordinance:**

☐ Filed without signature ☐ No signed version will be filed

☐ Council amended legislation ☐ No signed version will be filed

*

**Author Contact Information:**

Department: Council Office / Kalb & Bas

Contact Person/Ext.: C Ramos Munoz / 7246

Notes (if any)

* Please Send a Clean Copy of The Final Revised legislation

2023 APR 24 PM 2:48

FILED
OFFICE OF THE CITY CLERK
OAKLAND

APPROVED AS TO FORM AND LEGALITY

INTRODUCED BY COUNCIL PRESIDENT NIKKI FORTUNATO BAS
AND COUNCILMEMBER DAN KALB

CITY ATTORNEY'S OFFICE

**As revised by the City Council at the April 18, 2023 City Council meeting**

# OAKLAND CITY COUNCIL

## ORDINANCE NO. ______________ C.M.S.

**ORDINANCE ESTABLISHING A TIMELINE FOR TERMINATION OF THE MORATORIUM ON RESIDENTIAL EVICTIONS, RENT INCREASES, AND LATE FEES ENACTED IN RESPONSE TO THE COVID-19 PANDEMIC (ORDINANCE NOS. 13589 C.M.S., 13594 C.M.S., 13606 C.M.S.); AND AMENDING THE JUST CAUSE FOR EVICTION ORDINANCE TO: (1) PERMANENTLY CODIFY CERTAIN PROTECTIONS ESTABLISHED BY THE MORATORIUM; (2) PROHIBIT EVICTIONS BASED ON NON-PAYMENT OF RENT WHERE THE AMOUNT DEMANDED IS LESS THAN ONE MONTH OF HUD FAIR MARKET RENT; (3CONFORM OCCUPANCY LIMITATIONS TO STATE LAW; AND (4) MAKE OTHER NON-SUBSTANTIVE CLARIFYING AMENDMENTS**

**WHEREAS**, on March 27, 2020, the City Council approved Ordinance No. 13589 C.M.S., which imposed a moratorium on most residential evictions and on rent increases above CPI in response to the COVID-19 pandemic; and

**WHEREAS**, on May 19, 2020, the City Council approved Ordinance No. 13594 C.M.S., which extended the residential eviction moratorium until August 31, 2020; and

**WHEREAS**, on July 21, 2020, the City Council approved Ordinance No. 13606 C.M.S., which extended the residential eviction moratorium until the end of the Local COVID-19 Emergency declared by City Council on March 9, 2020; and

**WHEREAS**, on February 21, 2023, the City Council approved Resolution No. 89600 C.M.S., which renewed and continued the City Council's Declaration of a Local Emergency due to COVID-19; and

**WHEREAS**, on March 21, 2023, the City Council approved Ordinance No. 13729 C.M.S., which amended Oakland Municipal Code Chapter 8.50 (Emergency Services

Organization and Disaster Council) to require Council to review the need for continuing a local emergency at least once every 60 days, in conformance with state law; and

**WHEREAS**, the residential eviction moratorium and rent increase moratorium were enacted in response to the COVID-19 pandemic to, among other things, promote housing stability, encourage compliance with shelter-in-place orders, prevent transmission of COVID-19, account for significant financial losses incurred as a result of closures and lost wages, avoid unnecessary displacement and increased homelessness, and otherwise promote public health and safety during a time of unprecedented economic hardship and uncertainty; and

**WHEREAS**, although the COVID-19 pandemic is not over, significant progress has been made since the moratoriums were first enacted to ameliorate negative impacts of the pandemic, such as through the development of vaccines, the lifting of shelter-in-place orders, and businesses and schools re-opening; and

**WHEREAS**, the City seeks to establish a timeline for ending the moratoriums, rather than leaving their expiration dates tied to the end of the Local Emergency, the date for which remains uncertain; and

**WHEREAS**, establishing a set timeline for the termination of the moratoriums will benefit both tenants and landlords by providing advanced notice and predictability as to the future of evictions and rent increases in Oakland; and

**WHEREAS**, on November 5, 2002, Oakland voters passed the Just Cause for Eviction Ordinance (Measure EE), codified in Chapter 8.22, Article II of the Oakland Municipal Code, establishing various tenant protections and procedures pertaining to residential evictions in Oakland; and

**WHEREAS**, the Just Cause for Eviction Ordinance plays a crucial role in the City's ongoing efforts to slow, reduce, and prevent displacement and homelessness within the City of Oakland; and

**WHEREAS**, the Just Cause for Eviction Ordinance applies to most residential rental units in Oakland, with the main exceptions being units constructed within the past 10 years and owner-occupied properties where the owner shares use of kitchen or bath facilities with tenants; and

**WHEREAS**, the Just Cause for Eviction Ordinance authorizes City Council to modify the Ordinance for the purpose of adding limitations on a landlord's right to evict (O.M.C. 8.22.360F); and

**WHEREAS**, since the Just Cause for Eviction Ordinance was passed in 2002, voters and City Council have on numerous occasions recognized the need to expand coverage of the Ordinance by adding additional protections and removing exemptions, and that doing so is in the best interest of the City; and

**WHEREAS**, Oakland continues to experience a severe housing shortage and an unprecedented number of unhoused or marginally housed residents; and

**WHEREAS**, the City Council finds that reasonable regulation of aspects of the landlord-tenant relationship is necessary to foster constructive communication, maintain an adequate supply of a variety of rental housing options, and protect the health, safety, and general welfare of the public; and

**WHEREAS**, forfeiture of a rental agreement is a drastic legal remedy that should be pursued only in drastic circumstances; and

**WHEREAS**, by limiting evictions for nonpayment of less than one month of rent, City Council seeks to deter actions seeking forfeiture based on a relatively small amount of money to allow tenants an opportunity to become current and maintain their housing; and

**WHEREAS**, the rental market in the Bay Area is one of the most expensive in the country, and lower income residents frequently need to live together with roommates or family members in order to stay housed and afford rent; to the extent that state law occupancy limits are not exceeded, tenants should be able to live together with others without facing eviction for doing so; and

**WHEREAS**, a study by Princeton University's Eviction Lab found that the two years after local, state and federal eviction moratoriums were enacted saw the largest drop, nationally, in eviction filings on record, and Oakland's Rent Adjustment Program shows similar data — 6,714 eviction notices were received in FY 2018-19, 4,696 in FY 2019-20, 881 in FY 2020-21, and 807 in FY 2021-22; and

**WHEREAS**, nearly $220 million in emergency rental assistance has been committed in Alameda County, including nearly $60 million in Oakland (Alameda County Housing and Community Development, All City Call presentation, March 17, 2023); and

**WHEREAS**, the California Housing Finance Agency of the U.S. Department of the Treasury provides assistance for homeowners facing COVID-19 related financial hardships including, mortgage relief up to $80,000 and property tax assistance up to $20,000 (https://camortgagerelief.org/); and

**WHEREAS**, robust outreach, education, and support to tenants and property owners about the provisions of this legislation is necessary which requires that the Administration prioritize filling budgeted, vacant positions in the Housing and Community Development Department's Rental Adjustment Program to provide services to promote housing stability; and

**WHEREAS**, continued advocacy of County, State, and Federal government partners is necessary to secure additional resources to address the economic and housing impacts of COVID-19 on tenants and property owners; and

**WHEREAS**, the City Council finds that the Just Cause for Eviction Ordinance is consistent with Civil Code Section 1946.2 (as enacted by the Tenant Protection Act of 2019), and, in comparison to Civil Code Section 1946.2, further limits the reasons for termination of residential tenancy, provides additional tenant protections, and, in conjunction with other City ordinances, provides for higher relocation assistance amounts; and

**WHEREAS**, the City Council finds that the Just Cause for Eviction Ordinance as amended herein is more protective than the provisions of Civil Code Section 1946.2; and

**WHEREAS,** this action is exempt from the California Environmental Quality Act ("CEQA") pursuant to sections of the CEQA Guidelines, taken together and each as a separate and independent basis, including but not limited to: Section 15378 (regulatory actions), Section 15060(c)(2) (no direct or reasonably foreseeable indirect physical change in the environment), Section 15061(b)(3) (no significant environmental impact), and Section 15183 (consistent with the general plan or zoning); and

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF OAKLAND DOES ORDAIN AS FOLLOWS:**

**SECTION 1. Recitals.** The City Council finds the foregoing recitals to be true and correct and hereby incorporates such findings into this ordinance.

**SECTION 2. Purpose and Intent.** The purpose and intent of this Ordinance is to establish a phasing out of the moratorium on residential evictions, rent increases, and late fees that was enacted in March of 2020 in response to the COVID-19 pandemic. By setting forth a timeline and incremental revocation of the moratorium, the City seeks to provide adequate notice to residential tenants and landlords of the impending termination of the moratorium and to revoke the moratorium in phases to avoid a surge of evictions. The Ordinance also permanently codifies certain protections from the moratorium within the Just Cause For Eviction Ordinance, along with other eviction protections.

**SECTION 3. Residential Eviction Moratorium.** Section 3 of Ordinance No. 13589 C.M.S., as amended by Ordinance Nos. 13594 C.M.S. and 13606 C.M.S., is hereby repealed and reenacted with amendments, as set forth below (additions are shown as double underline and deletions are shown as ~~strikethrough~~).

**Residential Eviction Moratorium.** Except when the tenant poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (1) - (10) that the notice was served or expired, or that the complaint was filed or served, between March 9, 2020, and July 14, 2023. ~~during the Local Emergency. Any notice served pursuant to Oakland Municipal Code 8.22.360A (1) - (10) on a tenant during the Local Emergency shall include the following statement in bold underlined 12-point font: "**Except to protect the health and safety of other occupants of the property, you may**~~

3258377v2/BXS

~~**not be evicted during the Local Emergency declared by the City of Oakland in response to the COVID-19 pandemic. This does not relieve you of the obligation to pay back rent in the future. You may contact the Rent Adjustment Program at (510) 238-3721 for additional information and referrals.**" This section shall remain in effect until the Local Emergency declared on March 9, 2020, has been terminated by the City Council.~~

**SECTION 4. Rent Increase Moratorium.** Section 4 of Ordinance No. 13589 C.M.S., as amended by Ordinance Nos. 13594 C.M.S. and 13606 C.M.S., is hereby repealed and reenacted with amendments, as set forth below (additions are shown as double underline and deletions are shown as ~~strikethrough~~).

**Rent Increase Moratorium.** For rental units regulated by Oakland Municipal Code 8.22.010 et seq, any notice of rent increase in excess of the CPI Rent Adjustment, as defined in Oakland Municipal Code Section 8.22.020, shall be void and unenforceable if the notice is served or has an effective date between March 9, 2020, and June 30, 2024 ~~during the Local Emergency~~, unless required to provide a fair return. ~~Any notice of rent increase served during the Local Emergency include the following statement in bold underlined 12-point font: **"During the Local Emergency declared by the City of Oakland in response to the COVID-19 pandemic, your rent may not be increased in excess of the CPI Rent Adjustment (3.5% until June 30, 2020), unless required for the landlord to obtain a fair return. You may contact the Rent Adjustment Program at (510) 238-3721 for additional information and referrals."**~~

**SECTION 5. Late Fee Moratorium.** Section 5 of Ordinance No. 13589 C.M.S., as amended by Ordinance Nos. 13594 C.M.S. and 13606 C.M.S., is hereby repealed and reenacted with amendments, as set forth below (additions are shown as double underline and deletions are shown as ~~strikethrough~~).

**Late Fee Moratorium.** Notwithstanding any lease provision to the contrary, for residential tenancies, no late fees may be imposed for rent that became due between March 9, 2020, and July 14, 2023 ~~during the Local Emergency~~ if the rent was late for reasons resulting from the COVID-19 pandemic. This includes, but is not limited to (1) the tenant was sick or incapacitated due to COVID-19, or was complying with a recommendation from a governmental agency to self-quarantine, (2) the tenant suffered a substantial reduction in household income because of a loss of employment or a reduction in hours, or because they were unable to work because they were caring for their child(ren) who were out of school or a household or family member who was sick with COVID-19, or because they were complying with a recommendation from a government agency to self-quarantine, and (3) the tenant incurred substantial out-of-pocket medical expenses caused by COVID-19. ~~Any notice demanding late fees for rent that became due during the Local Emergency shall include the following statement in bold underlined 12-point font: **"You are not required to pay late fees for rent that became due during the Local Emergency declared by the City of Oakland in response to the COVID-19 pandemic if the rent was late for reasons related to the**~~

~~**pandemic. You may contact the Rent Adjustment Program at (510) 238-3721 for additional information and referrals.”**~~

**SECTION 6. Evictions for Nonpayment of Rent.** Section 7 of Ordinance No. 13589 C.M.S., as amended by Ordinance Nos. 13594 C.M.S. and 13606 C.M.S., is hereby repealed and reenacted with amendments, as set forth below (additions are shown as double underline and deletions are shown as ~~strikethrough~~).

**No Residential Eviction for Nonpayment of Rent that Became Due During the Local Emergency.** In any action for unlawful detainer filed under Oakland Municipal Code 8.22.360.A.1, it shall be a defense that the unpaid rent became due between March 9, 2020, and July 14, 2023 ~~during the Local Emergency~~ and was unpaid because of a substantial reduction in household income or substantial increase in expenses resulting from the Coronavirus pandemic. This includes, but is not limited to, where, as a result of the Coronavirus pandemic, the tenant suffered a loss of employment or a reduction in hours, or was unable to work because their children were out of school, or was unable to work because they were sick with COVID-19 or caring for a household or family member who was sick with COVID-19, or they were complying with a recommendation from a government agency to self-quarantine, or they incurred substantial out of pocket medical expenses due to COVID-19. ~~Any notice served on a residential tenant demanding rent that became due during the Local Emergency shall include the following statement in bold underlined 12-point type:~~ ~~**“You may not be evicted for rent that became due during the Local Emergency if the rent was unpaid because of a substantial reduction in household income or a substantial increase in expenses related to the Coronavirus pandemic. This does not relieve you of the obligation to pay back rent in the future. You may contact the Rent Adjustment Program at (510) 238-3721 for additional information and referrals.”**~~ Nothing in this subsection shall relieve the tenant of liability for the unpaid rent.

**SECTION 7. Amendments to Section 6 of the Just Cause for Eviction Ordinance (Measure EE) (O.M.C. Section 8.22.360).** Added text is shown as double underlined type; deleted text is shown as ~~strikethrough~~ type.

**8.22.360- Good cause required for eviction.**

A. No landlord shall endeavor to recover possession, issue a notice terminating tenancy, or recover possession of a rental unit in the city of Oakland unless the landlord is able to prove the existence of one of the following grounds:

1. The tenant has failed to pay rent to which the landlord is legally entitled pursuant to the lease or rental agreement and under provisions of state or local law, and said failure has continued after service on the tenant of a written notice correctly stating the amount of rent then due and requiring its payment within a period, stated in the notice, of not less than three days. However, this subsection shall not constitute grounds for eviction where tenant has withheld rent pursuant to applicable law or where the amount of rent demanded is less than one month of fair market rent for a unit of equivalent size

in the Oakland metro area as determined by the U.S. Department of Housing and Urban Development.

2. The tenant has continued, after written notice to cease, to substantially violate a material term of the tenancy other than the obligation to surrender possession on proper notice as required by law. To establish a substantial violation of a material term of the tenancy, the landlord must demonstrate that the term of tenancy is reasonable, legal, and was accepted in writing by the tenant.

   a. Notwithstanding any lease provision to the contrary, a landlord shall not endeavor to recover possession of a rental unit as a result of subletting of the rental unit by the tenant if the landlord has unreasonably withheld the right to sublet following a written request by the tenant, so long as the tenant continues to reside in the rental unit and the sublet constitutes a one-for-one replacement of the departing tenant(s). If the landlord fails to respond to the tenant in writing within fourteen (14) days of receipt of the tenant's written request, the tenant's request shall be deemed approved by the landlord.

   b. Notwithstanding any lease provision to the contrary, a landlord shall not endeavor to recover possession of a rental unit based on the addition of occupants to the rental unit if the landlord has unreasonably refused a written request by the tenant to add such occupant(s) to the unit, so long as the maximum number of occupants does not exceed the lesser of the amounts allowed by Subsection (i) or (ii) of this Section 8.22.360A.2.b. If the landlord fails to respond in writing with a description of the reasons for the denial of the request within fourteen (14) days of receipt of the tenant's written request, the tenant's request shall be deemed approved by the landlord. However, for units restricted as affordable housing as defined by O.M.C. Section 15.72.030, a written resident request to add an occupant shall be deemed incomplete and inadequate until such resident has provided all documentation required for qualification of such additional occupant and the household after the addition of such occupant under the rules restricting the housing. A landlord's reasonable refusal of the tenant's written request may not be based on either of the following: (1) the proposed additional occupant's lack of creditworthiness, if that person will not be legally obligated to pay some or all of the rent to the landlord, or (2) the number of occupants allowed by the rental agreement or lease. With the exception of the restrictions stated in the preceding sentence, a landlord's reasonable refusal of the tenant's written request may be based on, but is not limited to, the ground that the landlord resides in the same unit as the tenant or the ground that the total number of occupants in a unit exceeds (or with the proposed additional occupant(s) would exceed) ~~the lesser of (i) or (ii):~~

   ~~(i) Two persons in a studio unit, three persons in a one-bedroom unit, four persons in a two-bedroom unit, six persons in a three-bedroom unit, or eight persons in a four-bedroom unit;~~

   ~~(ii) The~~ the maximum number permitted in the unit under state law and/or other local codes such as the Building, Fire, Housing and Planning Codes.

This Subsection 8.22.360 A.2.b. is not intended by itself to establish a direct landlord-tenant relationship between the additional occupant and the landlord or to limit a landlord's rights under the Costa-Hawkins Rental Housing Act, California Civil Code Section 1954.50 et seq. (as it may be amended from time to time). Nothing in this subsection authorizes an occupancy that would result in either transient habitation commercial activity as defined by O.M.C. Section 17.10.440 or semi-transient commercial activity as defined by O.M.C. Section 17.10.120.

c. Before endeavoring to recover possession based on the violation of a lawful obligation or covenant of tenancy regarding subletting or limits on the number of occupants in the rental unit, the landlord shall serve the tenant a written notice of the violation that provides the tenant with a minimum of fourteen (14) days opportunity to cure the violation. The tenant may cure the violation by making a written request to add occupants referenced in Subsection a or b of Section 8.22.360 A.2. or by using other reasonable means to cure the violation, including, without limitation, the removal of any additional or unapproved occupant. Nothing in this Section 8.22.360 A.2.c. is intended to limit any other rights or remedies that the law otherwise provides to landlords or tenants.

3. Reserved.

4. The tenant has willfully caused substantial damage to the premises beyond normal wear and tear and, after written notice, has refused to cease damaging the premises, or has refused to either make satisfactory correction or to pay the reasonable costs of repairing such damage over a reasonable period of time.

5. The tenant has continued, following written notice to cease, to be so disorderly as to destroy the peace and quiet of other tenants at the property.

6. The tenant has used the rental unit or the common areas of the premises for an illegal purpose including the manufacture, sale, or use of illegal drugs. Residing in a rental unit that lacks a certificate of occupancy, has not been approved by the city for residential use, or that has been cited for housing, building, or planning code violations does not constitute use of the premises for an illegal purpose.

7. The tenant has, after written notice to cease, continued to deny landlord access to the unit as required by state law.

8. The owner of record seeks in good faith, without ulterior reasons and with honest intent, to recover possession of the rental unit for their own occupancy as a principal residence where the owner has previously occupied the rental unit as their principal residence and has the right to recover possession for their occupancy as a principal residence under a written rental agreement with the current tenants.

9. The owner of record seeks in good faith, without ulterior reasons and with honest intent, to recover possession for their own use and occupancy as their principal residence, or for the use and occupancy as a principal residence by the owner of record's spouse, domestic partner, child, parent, or grandparent.

a. Where the owner of record recovers possession under this Subsection (9) [Paragraph 8.22.360 A.9], and where continuous occupancy for the purpose of recovery is less than thirty-six (36) months, such recovery of the residential unit shall be a presumed violation of this Chapter.

b. The owner of record may not recover possession pursuant to this subsection more than once in any thirty-six (36) month period,

c. The owner must move in to unit within three (3) months of the tenant's vacation of the premises. Such time period may be extended for good cause upon application to, and approval by, the Rent Adjustment Program.

d. Reserved.

e. A landlord may not recover possession of a unit from a tenant under Subsection 6(A)(9) [8.22.360 A.9], if the landlord has or receives notice, any time before recovery of possession, that any tenant in the rental unit:

  i. Has been residing in the unit for five (5) years or more; and

    (a) Is sixty (60) years of age or older; or

    (b) Is a disabled tenant as defined in the California Fair Employment and Housing Act (California Government Code § 12926); or

  ii. Has been residing in the unit for five (5) years or more, and is a catastrophically ill tenant, defined as a person who is disabled as defined by Subsection (e)(i)(b) [8.22.360 A.9.e.i.b]] and who suffers from a life threatening illness as certified by their primary care physician.

f. The provisions of Subsection (e) [8.22.360 A.9.e] above shall not apply where the landlord's qualified relative who will move into the unit is 60 years of age or older, disabled or catastrophically ill as defined by Subsection (e) [8.22.360 A.9.e], and where every rental unit owned by the landlord is occupied by a tenant otherwise protected from eviction by Subsection (e) [8.22.360 A.9.e].

g. A tenant who claims to be a member of one of the classes protected by Subsection 6(A)(9)(e) [8.22.360 A.9.e] must submit a statement, with supporting evidence, to the landlord. A landlord may challenge a tenant's claim of protected status by requesting a hearing with the Rent Board. In the Rent Board hearing, the tenant shall have the burden of proof to show protected status. No civil or criminal liability shall be imposed upon a landlord for challenging a tenant's claim of protected status. The Rent Board shall adopt rules and regulations to implement the hearing procedure.

h. Once a landlord has successfully recovered possession of a rental unit pursuant to Subsection 6(A)(9) [8.22.360 A.9], no other current landlords may recover possession of any other rental unit in the building under Subsection 6(A)(9) [8.22.360 A.9]. Only one specific unit per building may undergo a Subsection 6(A)(9) [8.22.360 A.9] eviction. Any future evictions taking place in the same building under Subsection 6(A)(9) [8.22.360 A.9] must be of that same unit, provided that a landlord may file a petition with the Rent Board or, at the

landlord's option, commence eviction proceedings, claiming that disability or other similar hardship prevents the landlord from occupying a unit which was previously the subject of a Subsection 6(A)(9) [8.22.360 A.9] eviction. The Rent Board shall adopt rules and regulations to implement the application procedure.

i. A notice terminating tenancy under this Subsection must contain, in addition to the provisions required under Subsection 6(B)(6) [8.22.360B.6] ~~6(B)(5) [8.22.360 B.5]~~:

   i. A listing of all property owned by the intended future occupant(s).

   ii. The address of the real property, if any, on which the intended future occupant(s) claims a homeowner's property tax exemption.

j. If the owner or relative specified on the notice terminating tenancy fails to occupy the rental unit for at least a consecutive thirty-six month period, or fails to occupy the rental unit within ninety days after the tenant vacates, absent Subsection (c), the owner shall do the following:

   i. Offer the unit to the tenant who vacated it at the same rent in effect at the time the tenant vacated; and

   ii. Pay to said tenant all reasonable expenses incurred in returning to the unit, including lease termination fees, if any. This subsection does not limit any other remedies a tenant may have under this Chapter or other applicable law.

10. The owner of record, after having obtained all necessary permits from the City of Oakland on or before the date upon which notice to vacate is given, seeks in good faith to undertake substantial repairs that cannot safely be completed while the unit is occupied, and that are necessary either to bring the property into compliance with applicable codes and laws affecting health and safety of tenants of the building, or under an outstanding notice of code violations affecting the health and safety of tenants of the building.

   a. As soon as the tenant vacates the rental unit, the owner of record shall proceed without unreasonable delay to complete the needed repairs. The tenant shall not be required to vacate pursuant to this section, for a period in excess of three months; provided, however, that such time period may be extended ~~by the Rent Board upon application by the landlord~~ for good cause upon application to, and approval by, the Rent Adjustment Program. The Rent Board shall adopt rules and regulations to implement the application procedure.

   b. Upon completion of the needed repairs, the owner of record shall offer the tenant the first right to return to the premises at the same rent and pursuant to the same terms of the rental agreement in effect as of the date of the notice to vacate, subject to the owner of record's right to petition the Rent Adjustment Program for a rent increase as provided by the Residential Rent Adjustment Ordinance.

   c. A notice to vacate under this Subsection 6(A)(10) [8.22.360 A.10] must include the following information:

      i. A statement informing tenants as to their right to payment under the Oakland Relocation Ordinance.

ii. A statement that "When the needed repairs are completed on your unit, the landlord must offer you the opportunity to return to your unit with a rental agreement containing the same terms as your original one and with the same rent (although landlord may be able to obtain a rent increase under the Oakland Residential Rent Arbitration Ordinance [O.M.C. Chapter 8.22, Article I)."

iii. A list of the code violations necessitating substantial repairs, a detailed description of the work to be performed, the permit numbers of any and all permits obtained to affect the required repairs, and a copy of the City-issued notice of code violations, if any.

iv. A good faith estimate of the time required to complete the repairs and the date upon which it is expected that the unit will be ready for habitation.

11. The owner of record seeks to remove the property from the rental market in accordance with the terms of the Ellis Act (California Government Code Section 7060 et seq.).

B. The following additional provisions shall apply to a landlord who seeks to recover a rental unit pursuant to Subsection 6(A) [8.22.360 A]:

1. The burden of proof shall be on the landlord in any eviction action to which this order is applicable to prove compliance with Section 6 [8.22.360].

2. A landlord shall not endeavor to recover possession of a rental unit unless at least one of the grounds enumerated in Subsection 6(A) [8.22.360 A] above is stated in the notice and that ground is the landlord's dominant motive for recovering possession and the landlord acts in good faith in seeking to recover possession.

3. Where a landlord seeks to evict a tenant under a just cause ground specified in Subsections 6(A)(7, 8, 9, 10, 11) [8.22.360 A.7, 8, 9, 10, 11], the landlord must do so according to the process established in CCC § 1946 (or successor provisions providing for a 30 or 60 day notice period); where a landlord seeks to evict a tenant for the grounds specified in Subsections 6(A)(1, 2, 3, 4, 5, 6) [8.22.360 A.1, 2, 3, 4, 5, 6], the landlord must do so according to the process established in CCP § 1161 (or successor provisions providing for 3 day notice period).

4. Any written notice as described in Subsection 6(A)(2, 3, 4, 5, 7) [8.22.360 A.2, 3, 4, 7] shall be served by the landlord prior to a notice to terminate tenancy and shall include a provision informing tenant that a failure to cure may result in the initiation of eviction proceedings.

5. Subsection 6(B)(3) [8.22.360 B.3] shall not be construed to obviate the need for a notice terminating tenancy to be stated in the alternative where so required under CCP § 1161.

6. A notice terminating tenancy must additionally include the following:

a. A statement setting forth the basis for eviction, as described in Subsections 6(A)(1) [8.22.360 A.1] through 6(A)(11) [8.22.360 A.11];

    b. A statement that advice regarding the notice terminating tenancy is available from the ~~Rent Board~~ Rent Adjustment Program (RAP), along with information about how the tenant may seek assistance, including the RAP phone number and email address.

c. Where an eviction is based on the ground specified in Subsection 6(A)(9) [8.22.360 A.9], the notice must additionally contain the provisions specified in Subsection 6(A)(9)(i) [8.22.360 A.9.i] and a statement informing tenants of the limitations on evictions as set forth in Subsection 6(D)(8) [8.22.360D.8].

d. Where an eviction is based on the ground specified in Subsection 6(A)(10) [8.22.360 A.10], the notice must additionally contain the provisions specified in Subsection 6(A)(10)(c) [8.22.360 A.10] and a statement informing tenants of the limitations on evictions as set forth in Subsection 6(D)(8) [8.22.360D.8].

e. Failure to include any of the required statements in the notice shall be a defense to any unlawful detainer action.

7. Within ten (10) days of service of a notice terminating tenancy upon a tenant, a copy of the same notice and any accompanying materials must be filed with the Rent Board. Each notice shall be indexed by property address and by the name of the landlord. Such notices shall constitute public records of the City of Oakland, and shall be maintained by the Rent Board and made available for inspection during normal business hours. Failure to file the notice within ten (10) days of service shall be a defense to any unlawful detainer action.

C. Reserved.

D. Substantive limitations on landlord's right to evict. This Subsection 8.22.360 D. is intended as both a substantive and procedural limitation on a landlord's right to evict.

1. In any action to recover possession of a rental unit pursuant to Section 6 [8.22.360], a landlord must allege and prove the following:

a. the basis for eviction, as set forth in Subsection 6(A)(1) through 6(A)(11) [8.22.360 A.1 ~~though~~ through 8.22.360 A.11] above, was set forth in the notice of termination of tenancy or notice to quit; and

b. that the landlord seeks to recover possession of the unit with good faith, honest intent and with no ulterior motive;

2. If landlord claims the unit is exempt from this ordinance, landlord must allege and prove that the unit is covered by one of the exceptions enumerated in Section 5 [8.22.350] of this Chapter. Such allegations must appear both in the notice of termination of tenancy or notice to quit, and in the complaint to recover possession, and must specify on what grounds exemption is claimed. Failure to make such allegations in the notice shall be a defense to any unlawful detainer action.

3. A landlord's failure to comply with the obligations described in Subsections (D)(1) or (2) ~~[*sic*]~~ [8.22.360 D.1. or 8.22.360 D.2.] shall be a defense to any action for possession of a rental unit.

4. In any action to recover possession of a rental unit filed under subsection 8.22.360 A.1, it shall be a defense if the landlord impeded the tenant's effort to pay rent by refusing to accept rent paid on behalf of the tenant from a third party, or refusing to provide a W-9 form or other necessary documentation for the tenant to receive rental assistance from a government agency, non-profit organization, or other third party. Acceptance of rental payments made on behalf of the tenant by a third party shall not create a tenancy between the landlord and the third party as long as either the landlord or the tenant provide written notice that no new tenancy is intended.

5. A landlord's failure to fully comply with any applicable law requiring payment of relocation benefits to the tenant, such as those provided by Articles III, VII, and VIII of this Chapter and Chapter 15.60 of the Oakland Municipal Code, including but not limited to required notice, amount, timing, and any other requirement necessary to withdraw or repair a unit shall be a defense to any action for possession of a rental unit.

6. Notwithstanding any change in the terms of a tenancy pursuant to Civil Code Section 827, a tenant may not be evicted for a violation of a covenant or obligation that was not included in the tenant's written or oral rental agreement at the inception of the tenancy unless: (1) the change in the terms of the tenancy is authorized by the Rent Ordinance or California Civil Code Sections 1947.5 or 1947.12, or required by federal, state, or local law, or regulatory agreement with a government agency; or (2) the change in the terms of the tenancy was accepted in writing by the tenant after receipt of written notice from the landlord that the tenant need not accept such new term as part of the rental agreement and in exchange for valid consideration.

7. In any action to recover possession of a rental unit filed under Subsections 8.22.360 A.1.—10., it shall be a defense if the landlord was not in compliance with ~~failed to substantially comply with~~ O.M.C. 8.22.510 at the time the notice terminating tenancy was served.

8. When a landlord seeks to evict a tenant under Subsection 6(A)(9) or (10) [8.22.360 A.9, 10], it shall be an affirmative defense if any child under the age of 18 enrolled in a school or any educator resides in the unit, the child or educator is a tenant in the unit or has a custodial or family relationship with a tenant in the unit, the tenant has resided in the unit for at least 90 days, and the effective date of the notice of termination of tenancy falls during the regular school year of the Oakland Unified School District.

    a. For purposes of this Section, the following terms shall have the following meanings:

        i. "Custodial relationship" means that the person is a legal guardian of the child, has a court-recognized caregiver authorization affidavit for the child, or has provided full-time custodial care of the child pursuant to an agreement with the child's legal guardian or court-recognized caregiver and has been providing that care for at least one year or half of the child's lifetime, whichever is less.

ii. "Educator" means any person who works on-site at a school in Oakland as an employee of the school or of the Oakland Unified School District, including, without limitation, all teachers, classroom and student support providers, school administrators and administrative staff, counselors, social workers, school health services workers, speech pathologists, custodial or maintenance workers, nutrition and/or food services workers, library services workers, child welfare workers, and attendance liaisons.

iii. "Family relationship" means that the person is the parent, grandparent, sibling, niece, nephew, aunt, or uncle of the child or educator, or the spouse or domestic partner of such relation.

iv. "School" for purposes of this Section means any state-licensed child care center, state-licensed family child care home, accredited community or junior college, and/or any public, private, or parochial institution that provides educational instruction for students in any or all of the grades from kindergarten through twelfth grade.

9. Nonpayment of rent during COVID-19 pandemic. In an any unlawful detainer action based on nonpayment of rent or late fees that accrued between March 9, 2020, and July 14, 2023, it shall be a defense that the rent was late or unpaid because of a substantial reduction in household income or substantial increase in expenses resulting from the Coronavirus pandemic. Any notice demanding rent or late fees that accrued during this time period must:

a. be served together with a form developed by the Rent Adjustment Program that, among other things, allows the tenant to indicate that the financial hardship defense applies; and

b. include the following statement in bold underlined 12-point font: "If you were unable to pay the rent or other fees demanded in this notice due to a substantial reduction in household income or substantial increase in expenses as a result of the COVID-19 pandemic, you may raise this as a defense to any eviction action based on this notice."

E. In the event that new state or federal legislation confers a right upon landlords to evict tenants for a reason not stated herein, evictions proceeding under such legislation shall conform to the specifications set out in this Chapter [O.M.C. Chapter 8.22, Article II].

F. The City Council is authorized to modify the Just Cause for Eviction Ordinance (Measure EE, O.M.C., Chapter 8, Article II (8.22.300 et seq.)) for the purpose of adding limitations on a landlord's right to evict, but the City Council may not modify any exemption from the ordinance from which this section is derived contained in Section 8.22.350.

**SECTION 8. Outreach.** City Council directs the City Administrator to conduct robust outreach, education, and support to tenants and property owners about the provisions of this legislation.

**SECTION 9. Direction to the City Administrator.** City Council directs the City Administrator to prioritize the filling of vacant, budgeted positions in the Housing and Community Development Department that help ensure services to promote housing stability. These vacant, budgeted positions include: the following positions in the Rental Adjustment Program — one (1) Rental Adjustment Program Assistant Manager, two (2) Program Analysts II, one (1) Administrative Analyst I, and one (1) Administrative Assistant, as well as one (1) Monitoring Supervisory and Program Analyst II in the Community Development and Engagement unit. These positions are supported by dedicated funds, not the General Purpose Fund. City Council also directs the City Administrator to seek additional financial resources to address the economic and housing impacts of COVID-19 on tenants and property owners.

**SECTION 10. Severability.** If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of the Chapter. The City Council hereby declares that it would have passed this Ordinance and each section, subsection, clause or phrase thereof irrespective of the fact that one or more other sections, subsections, clauses or phrases may be declared invalid or unconstitutional.

**SECTION 11. Effective Date.** This ordinance shall become effective immediately on final adoption if it receives six or more affirmative votes; otherwise it shall become effective upon the seventh day after final adoption.

**SECTION 12. Directions to Rent Board.** The City Council directs the City Administrator to work with the Rent Board to revise the Just Cause for Eviction Ordinance Regulations to implement the newly-added Just Cause provisions.

IN COUNCIL, OAKLAND, CALIFORNIA,

PASSED BY THE FOLLOWING VOTE:

AYES – FIFE, GALLO, JENKINS, KALB, KAPLAN, RAMACHANDRAN, REID, AND PRESIDENT FORTUNATO BAS

NOES –
ABSENT –
ABSTENTION –

ATTEST: ______________________________
ASHA REED
City Clerk and Clerk of the Council of the
City of Oakland, California

Date of Attestation: ______________________________

**NOTICE AND DIGEST**

**ORDINANCE ESTABLISHING A TIMELINE FOR TERMINATION OF THE MORATORIUM ON RESIDENTIAL EVICTIONS, RENT INCREASES, AND LATE FEES ENACTED IN RESPONSE TO THE COVID-19 PANDEMIC (ORDINANCE NOS. 13589 C.M.S., 13594 C.M.S., 13606 C.M.S.); AND AMENDING THE JUST CAUSE FOR EVICTION ORDINANCE TO: (1) PERMANENTLY CODIFY CERTAIN PROTECTIONS ESTABLISHED BY THE MORATORIUM; (2) PROHIBIT EVICTIONS BASED ON NON-PAYMENT OF RENT WHERE THE AMOUNT DEMANDED IS LESS THAN ONE MONTH OF HUD FAIR MARKET RENT; (3) CONFORM OCCUPANCY LIMITATIONS TO STATE LAW; (4) MAKE OTHER NON-SUBSTANTIVE CLARIFYING AMENDMENTS**

This Ordinance would establish a timeline for ending the moratorium on residential evictions, rent increases, and late fees that has been in effect since March 27, 2020, in response to the COVID-19 pandemic. The current eviction moratorium prohibits most forms of residential evictions and is scheduled to end when the Local Emergency is terminated by City Council—a date that remains uncertain. This Ordinance would terminate the eviction and late fee moratoriums as of July 15, 2023. The Ordinance would terminate the rent increase moratorium as of July 1, 2024. Permanent amendments to the Just Cause for Eviction Ordinance (O.M.C. 8.22.300 et seq.) include: codification of the defense for nonpayment of rent accrued during the moratorium that was unpaid due to pandemic-related reasons; limiting nonpayment evictions where the amount demanded is less than one month of HUD fair market rent; conformity of occupancy standards to state law; and other non-substantive clarifications.

# EXHIBIT D

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
SAM SPIEGELMAN (N.Y. Bar No. 5573100)
255 South King Street, Suite 800
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org
SSpiegelman@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

(42 U.S.C § 1983; C.C.P § 1085)

**DEMAND FOR JURY TRIAL**

Action Filed: March 1, 2022
Trial Date: None set

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1. Plaintiffs and Petitioners (collectively, "Plaintiffs"), hereby bring this first amended and supplemental complaint and petition for relief[1] against Defendants and Respondents ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND and OAKLAND CITY COUNCIL (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratoriums (collectively, "Moratoriums") and subsequent "phase out" regulations, and an order declaring said regulations invalid, illegal, and unenforceable.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative fact, and thus form the same case or controversy under Article III of the United States Constitution.

**DIVISIONAL ASSIGNMENT**

3. Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California and thus should be assigned to the Court's Oakland Division.

**VENUE**

4. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants/respondents reside in this judicial district and the events giving rise to the claims occurred in this district.

**PARTIES**

5. Defendant and Respondent ALAMEDA COUNTY (the "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6. Defendant and Respondent ALAMEDA COUNTY BOARD OF SUPERVISORS

[1] A blacklined comparison of the amended and supplemental complaint with the original complaint is attached hereto as **Exhibit A**.

Case 3:22-cv-01274-LB Document 143 Filed 07/20/23 Page 3 of 73

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

(the "BOARD") is a policy making, legislative, and quasi-judicial administrative body of the COUNTY.

7. Defendant and Respondent CITY OF OAKLAND (the "CITY") is a municipal corporation in the State of California.

8. Defendant and Respondent OAKLAND CITY COUNCIL (the "COUNCIL") is a policy making, legislative, and quasi-judicial administrative body of the CITY.

9. Plaintiff JOHN WILLIAMS is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

10. Plaintiff ROBERT VOGEL is an individual over the age of 18 and is a housing provider and owner of real property in the COUNTY.

11. Plaintiff SHEANNA ROGERS is an individual over the age of 18 and is a housing provider and the owner of real property in the COUNTY.

12. Plaintiff MICHAEL LOEB is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

13. Plaintiff JAQUELINE WATSON-BAKER is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

14. Plaintiff HANNAH KIRK is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 4514 Fairbairn Ave, Oakland, CA.

15. Plaintiff AMI SHAH is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

16. Plaintiff AVINASH JHA is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

17. Plaintiff WILLIAM ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

18. Plaintiff MADELEEN ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801

Case 3:22-cv-01274-LB Document 143 Filed 07/20/23 Page 4 of 315

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Summit Street, Oakland CA.

19. Plaintiff NORMAND GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

20. Plaintiff MICHELLE GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

21. Plaintiff and Petitioner HOUSING PROVIDERS OF AMERICA ("HPOA") is a § 501(c)(4) nonprofit corporation. HPOA is a network of housing activists fighting to protect the legal rights of housing providers, including those in the CITY and the COUNTY. HPOA's members own rental housing in and throughout the CITY and the COUNTY, and have been directly and adversely affected by the CITY and COUNTY's residential eviction Moratoriums and the CITY's subsequent "phase out" regulations. All of HPOA's members are housing providers in either the CITY and/or COUNTY; all of HPOA's members have renters at their properties who are taking advantage of the CITY and COUNTY's regulations, including but not limited to, refusing to pay rent for non-Covid-19 related reasons during the time period set forth thereunder, and refusing to relinquish possession, and creating nuisances and damage to HPOA's members' properties. HPOA's members have been unable to collect rent for time periods of months and/or years with no financial relief provided by the CITY and COUNTY, and the CITY and COUNTY's complete defense against virtually all residential evictions for a period of three-plus-years have tied HPOA's members hands. HPOA's members have suffered lost rents, devalued properties, and some face impending foreclosures and bankruptcies, as a result of the CITY and COUNTY's regulations. The harm and injury brought to HPOA's members by the regulations is current, ongoing, and concrete and particularized to all HPOA's members. HPOA's efforts to remedy these injustices are central to its purpose of fighting to protect the legal rights of housing providers, including those in the CITY and COUNTY. Neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit. HPOA has a direct and substantial interest in ensuring that Defendants' decisions are in conformity with the requirements of law, that those requirements are properly executed, and that Defendants'

duties are enforced.

22.     Plaintiff 2355 Broadway, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2355 Broadway, Oakland CA.

23.     Plaintiff 3900 Adeline, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the COUNTY located at 3900 Adeline, Emeryville CA.

24.     Plaintiff Hollis Street Partners, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3250 Hollis Street, Oakland CA.

25.     Plaintiff Vulcan Lofts, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4401 San Leandro Street, Oakland CA.

26.     Plaintiff 1614 Campbell Street DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1614 Campbell Street, Oakland CA.

27.     Plaintiff 3014 Chapman DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3030 Chapman Street, Oakland CA.

28.     Plaintiff B3 Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 5200 Adeline Street, Emeryville , CA.

29.     Plaintiff Bakery Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4600 Adeline Street, Emeryville, CA.

30.     Plaintiff Exchange Studios DEL, LLC is a Delaware limited liability company,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Case 3:22-cv-01274-LB Document 143 Filed 09/12/23 Page 6 of 71

qualified to do business in California and the owner of real property in the CITY and COUNTY located at 527 23rd Avenue, Oakland, CA.

31. Plaintiff Madison Park Properties II DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1155 - 5th Street, Oakland CA.

32. Plaintiff P&D 23rd Avenue Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1080 23rd Avenue, Oakland CA.

33. Plaintiff P&D 46th St. Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 964 46th Street, Oakland CA.

34. Plaintiff Sears Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2633 Telegraph Ave, Oakland CA.

35. Plaintiff 301 Lenox, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 301 Lenox Avenue, Oakland CA.

36. Plaintiff 2228 Union Street Investors, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1438 Madison Street, Oakland CA, 7511-7527 Bancroft Avenue, Oakland CA, 8603 Hillside Street, Oakland CA, and 8701 Hillside Street, Oakland CA.

37. Plaintiff J & R Land & Cattle LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1551 Madison Street, Oakland CA and 2000 E. 30th Street, Oakland CA.

38. Plaintiff J & R Land & Cattle II LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1935-1948 E. 29th Street, Oakland CA, 1935-1945 E. 30th Street, Oakland CA, and 2032-2040

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E. 30th Street, Oakland CA.

39. Plaintiff Westpark Apartments, LLC is a California limited liability company, qualified to do business in California and the owner of real properties in the CITY and COUNTY, located at 433 Perkins Street, Oakland CA, 1553 Alice Street, Oakland CA, and 4220 Montgomery Street, Oakland CA.

40. Plaintiff Westpark II, GP is a California partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1530 Harrison Street, Oakland CA and 1555 Madison Street, Oakland CA.

41. Plaintiff 685 Scofield, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 385-389 Palm Avenue, Oakland CA.

42. Plaintiff 296 Mather Street, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 296 Mather Street #7, Oakland, CA.

43. Plaintiff BayOak Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 2375 Fruitvale Ave #301, Oakland CA.

44. Plaintiff Burling Street Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, and 1704 Upper 14th Street, Oakland CA.

45. Plaintiff Rising Tide Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 722 Upper 30th Street, Oakland CA, 923-923A Apgar Street, Oakland CA, 827 30th Street Oakland, CA, 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 835 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

46. Plaintiff Oakland Point Properties, LLC is a California limited liability company,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

47. Plaintiff Truckee Zurich Place, LLC is a Delaware limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1036 62nd Street #4, Oakland CA, 2215 Eighth Street, Berkeley CA, 2839 Linden Street, Oakland CA, 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, 1704 Upper 14th Street, Oakland CA.

48. Plaintiff 18th & Linden, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1054 18th Street, Oakland CA.

49. Plaintiff 220 Grand Investors, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 220 Grand Avenue, Oakland CA.

50. Plaintiff 818 East 20th Street Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 800-818 E 20th Street, Oakland CA.

51. Plaintiff 1130 30th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3649 Martin Luther King Jr Way, Oakland CA.

52. Plaintiff 1701-1703 36th Avenue Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1701-1707 36th Avenue, Oakland CA.

53. Plaintiff 1732-1744 27th Avenue, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1732-1744 27th Avenue, Oakland CA.

54. Plaintiff 1844 7th Avenue 2013, LLC is a California limited liability company,

qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1844 7th Avenue, Oakland CA.

55. Plaintiff 2000 Linden Street, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2000 Linden Street, Oakland CA.

56. Plaintiff 2019 ABD Ozone Fund, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 831 6th Avenue, Oakland CA.

57. Plaintiff 2367 Washington, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 245 Lee Street, Oakland CA.

58. Plaintiff 2531 East 16th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1638 47th Avenue, Oakland CA.

59. Plaintiff 2701 High Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2701 High Street, Oakland CA.

60. Plaintiff ABD Suites, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1008 E 23rd Street Oakland, CA and 1722 27th Avenue Oakland, CA.

61. Plaintiff 301 Hannah Park, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2850 Hannah Street, Oakland CA.

62. Plaintiff Oakbrook Partners, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1125-1135 E 18th Street, Oakland CA and 1221 E 20th Street, Oakland CA.

63. Plaintiff Riaz Capital Ozone Fund III, LP is a California limited partnership,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1705 Mandela Parkway, Oakland CA, 2133-2143 Dwight Way, Berkeley CA, 2618 Martin Luther King Jr Way, Berkeley CA.

64. Plaintiff Riaz Taplin, trustee of The A.R.T. Trust is an individual over the age of eighteen. The A.R.T. Trust is the owner of real properties in the CITY and COUNTY located at 1454 36th Avenue, Oakland CA, 1616 35th Avenue, Oakland CA, 1828 28th Avenue, Oakland CA, 2166 E 27th Street, Oakland CA, 2554 E 16th Street, Oakland CA, 3700 International Boulevard, Oakland CA.

65. Plaintiff 1715 FFT, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1715 High Street Oakland, CA.

66. Plaintiff 1830 6th Ave Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1830 6th Avenue Oakland, CA.

67. Plaintiffs are not aware of the identities of defendants/respondents DOES 1-10, who are responsible for the acts and omissions alleged herein and that caused damage to Plaintiff; therefore, Plaintiffs will amend this Complaint when the true identities of DOES 1-10 are ascertained.

68. Plaintiffs are informed and believe that at all times mentioned in this Complaint, all defendants/respondents were the agents or employees of their co-defendants/respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## STATEMENT OF FACTS

### A. Background: The California Governor's Order and the COVID-19 Renter Relief Act.

69. In response to the Covid-19 pandemic, Governor Newsom declared a State of Emergency in California on March 4, 2020, pursuant to the California Emergency Services Act

(ESA), Gov. Code sec. 8550, et seq.  On March 16, 2020, Governor Newsom entered an executive order, which in part permitted local governments to temporarily limit housing providers' ability to evict for nonpayment of rent due to the Covid-19 crisis.  In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

(Executive Order (EO) N-28-20.)  The March 16, 2020 provision, permitting local government to temporarily limit Covid-19-related nonpayment evictions, expired on September 30, 2020. (EO N-71-20.)

70.     Prior to the expiration of that provision, the California Legislature enacted the "COVID-19 Renter Relief Act" and the "COVID–19 Small Housing provider and Homeowner Relief Act of 2020" via AB 3088, effective August 31, 2020.  AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure section 1161 et seq., and was aimed at "**temporary emergency relief** for financially distressed renters, homeowners, and small housing providers . . . ."  Among other things, AB 3088 provided statewide eviction protections during a particular time period for renters who could not pay their rent for Covid-19-related reasons.  AB 3088 also directed state agencies to engage about potential strategies for relief for renters and housing providers who suffered Covid-19-related financial hardship.

71.     Notably (and consistent with the Governor's prior order), AB 3088's temporary moratorium on residential evictions was *specifically* limited to those based upon inability to pay for Covid-19-related financial distress.  Even during the temporary moratorium, housing providers were still permitted to file actions for, and courts were still permitted to find renters

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

guilty of, UD for fault, and no-fault "just cause" as defined under Civil Code sec. 1946.2.[2] (CCP § 1179.03.5(a)(3).)

72. AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals ***negatively impacted*** by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect renters from eviction." (CCP § 1179.05(b), (e), (f), emph. add.) While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give carte blanche authority to do so, nor did it immunize "emergency" municipal regulations from challenges based on state law preemption.

73. The Covid-19-related nonpayment eviction protections of AB 3088 were extended thereafter through SB 91 AB 832, and AB 2179. These enactments protected affected renters from eviction during this extended time period under the UD statutes so long as they complied with the Covid-19-related financial distress requirements.

74. These enactments further clarified the State's rental assistance program. Starting October 1, 2021, and until July 1, 2022, for any Covid-19-related hardship rental debt that came due between those dates, a renter was required to show that they completed an application for rental assistance through the State program. If they did not, the housing provider could move forward with an UD action for nonpayment of rent. A housing provider could also have moved forward with a UD action if the rental assistance application was denied. (CCP § 1179.11(a), (c).)

[2] Civil Code sec. 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code sec. 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." (Civ. Code § 1946.2(g)(1).)

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**B. The CITY's Eviction Moratorium**

75. On March 9, 2020, the CITY declared a local state of emergency due to Covid-19. The CITY's local emergency was ratified on March 12, 2020, via Resolution No. 88075 C.M.S, and pursuant to the ESA, which permits municipalities to declare local emergencies under specified circumstances. (Gov. Code §§ 8558(c), 8630.) The ESA also requires a municipality to terminate the local emergency ". . . at the earliest possible date." (Gov. Code § 8630 (d).)

76. After ratifying the Local Emergency, on March 27, 2020, the CITY passed its eviction moratorium, Ordinance No. 13589. That moratorium not only prohibited evictions for nonpayment of rent due to Covid-19-related financial distress, but also *all other evictions*, with few exceptions:

> **Residential Eviction Moratorium.** Except when the renter poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (–) – (10) [excepting Ellis Act evictions] that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency.

77. Initially, the CITY's moratorium on all evictions was set to expire on May 31, 2020, "unless extended." (Ordinance No. 13589.) Subsequently, the moratorium was extended until "the Local Emergency declared on March 9, 2020 has been terminated by the City Council, or August 31, 2020, whichever comes first." (Ordinance no. 13594.) However, on July 7, 2020, the extension on the eviction moratorium was again amended to *only* expire when the local Emergency had been terminated by the COUNCIL. (Ordinance No. 13606 (Ex. 1).) The local Emergency has no stated expiration date and the CITY's position is that it has not expired.

78. After this action was filed, the CITY enacted Ordinance No. 23-0216 ("Phase Out Ordinance") on May 2, 2023, which, while providing for a "phase out" of the CITY's moratorium, also kept the "local emergency" in place. The Phase Out Ordinance provides that the CITY's moratorium shall end on July 15, 2023. However, the Phase Out Ordinance

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

continued to prohibit evictions for virtually any reason, including non-payment, if the grounds for eviction arose between March 9, 2020 and July 14, 2023. Thus, per the Phase Out Ordinance, the effect of the CITY's moratorium is still in place for that three-year-plus period . The Phase Out Ordinance also amended the CITY's Rent Ordinance, further restricting housing providers' "just cause" reasons for eviction. For example, the amendments introduced substantive hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior "unreasonable" in light of that term.

**C. The COUNTY's Eviction Moratorium**

79. The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which, like the CITY's moratorium, purported to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO § 6.120 (Ex. 2).) The COUNTY's moratorium applied to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.) These exceptions were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).) Like the CITY's moratorium, the COUNTY'S moratorium provided that it was an "absolute defense" to an unlawful detainer action brought during its term. (ACCO § 6.120.030(D).)

80. As enacted, the moratorium expired sixty days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the ratification of the local emergency, the local emergency "shall remain in effect until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-91.) On February 28, 2023, the COUNTY rescinded its local emergency. Accordingly, the COUNTY's moratorium expired on April 29, 2023.

Notwithstanding, it is the COUNTY's position that evictions are prohibited for virtually any reason, including non-payment and even if there was no Covid-19 relate financial distress, if the grounds for eviction arose between March 9, 2020 and April 28, 2023. Thus, the effect of the COUNTY's moratorium is still in place for that three-year-plus period.

**D. The COUNTY and CITY's Rent Relief Assistance Programs**

81. State law requires local governments to develop mechanisms by which housing providers and renters may file applications for, and receive if eligible, Covid-related rent relief.

82. The CITY operated a rent relief assistance program called "Oakland's Emergency Rental Assistance."[3] At the time of filing this action, Oakland's Emergency Rental Assistance website stated: "UPDATE. PLEASE NOTE. As of January 7, the City of Oakland's Emergency Rental Assistance program is oversubscribed. Tenants and Landlords may still submit an application but will be placed on a waitlist." Currently, the website instead refers applicants to the COUNTY's rent relief assistance program, "Housing Secure." However, since this action was filed, the Housing Secure website states: "We have received more requests for funds than we have currently available." [4]

83. Importantly, tenants in the CITY and COUNTY need not to participate in *any* rent relief program to avoid eviction under the relevant three-year-plus time frames of the Moratoria and the Phase Out Ordinance; the Moratoria and the Phase Out Ordinance's ban on evictions for the three-year-plus period prohibit evictions even for those tenants who refuse to cooperate with a landlord's request that they seek relief under these programs. This directly contradicts the purpose, intent and procedures of state law.

**E. The Moratoriums' Detrimental Impact on Plaintiffs**

84. The Moratoria, and as codified through the Phase Out Ordinance, have had devastating impacts on housing providers throughout the CITY and COUNTY, and to all

[3] https://www.oaklandca.gov/departments/department-of-housing-and-community-development

[4] https://www.ac-housingsecure.org/?locale=en

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Plaintiffs in this action. The following cases are but a few more detailed examples.

85. Plaintiff JOHN WILLIAMS is a housing provider in the CITY and COUNTY and owns the property at 1109 32nd Street, Oakland, CA. ("1109 32nd Street"). 1109 32nd Street is a duplex, and the rent for the property only barely covered WILLIAMS' property expenses for 1109 32nd Street. The renter in the three-bedroom one-bath downstairs unit, Martina Martin, has occupied the unit for approximately twelve years, and until the Moratoria were enacted, always paid the rent for the unit, which was approximately $1,500.00 per month. After the CITY and COUNTY enacted the Moratoriums, however, the renter stopped paying rent and refused to pay through the entire duration of the CITY's Moratorium. The renter's failure to pay is not related to any Covid-19 related reason. In fact, the renter operated a moving and storage business, "Martina's Ride" out of her unit since 2017, and through much of 2021. The renter refuses to cooperate with WILLIAMS' efforts to obtain unpaid rents through the rent relief program, and therefore the CITY rejected WILLIAMS' application for noncompliance. The renter in the upper unit vacated in March of 2021. WILLIAMS was concerned that a new renter would move in and refuse to pay rent, so he kept that unit vacant after the renter left. In October of 2021, WILLIAMS was so riddled with stress caused by his non-paying renter and the very real possibility of losing 1109 32nd Street to foreclosure, he was hospitalized and, to date, remains disabled as a result. His disability forced him to quit his job and move into the upper unit of 1109 32nd Street—directly above his non-paying renter—to save money. WILLIAMS was unable to commence a nonpayment eviction against his renter as a direct result of the Moratoriums and in contravention of state law. While WILLIAMS has recently received some mortgage assistance from the State of California, he has not received any back rent payments, nor does the amount of mortgage assistance that WILLIAMS has received cover what his nonpaying tenant refused to pay.

86. Plaintiff ROBERT VOGEL ("VOGEL") is a housing provider in the COUNTY and owns a rental property located 20076 Emerald Ct., Castro Valley, CA ("20076 Emerald"). 20076 Emerald is a three-bedroom, one bath, 853 sq. ft single family home. VOGEL is semi-

retired and is a disabled paraplegic. VOGEL relies on the rental income from 20076 Emerald for a substantial source of retirement income. VOGEL is required to pay approximately $1,328 per month for 20076 Emerald's mortgage, taxes and insurance, garbage service, and fees for property management. The former renter at 20076 Emerald lived there for approximately twelve years, and her current rent was $2,000 per month, however she stopped paying any rent in September 2021, and has not paid any rent since that date and only just recently vacated. The renter's failure to pay prevented VOGEL from being able to refinance 20076 Emerald to a lower rate. The renter also stopped maintaining 20076 Emerald's landscape and would park her car on the front yard. The renter's failure to pay was not related to any Covid-19 related reason. While the renter finally agreed to cooperate with the local and state rent relief programs, VOGEL only received a portion of the unpaid back rent. Most recently, VOGEL learned that his former nonpaying renter may have been selling and/or manufacturing methamphetamine at 20076 Emerald. The renter covered all of the windows at the property, and neighbors reported strong chemical odors coming from the home. There was a "revolving door" of people making multiple, brief visits per day to the property, at all hours. When VOGEL was finally able to gain possession of 20076 Emerald, he discovered large quantities of drug paraphernalia, including what appeared to be used meth pipes and small zip-lock baggies. A large quantity of white powder was found in an ice chest, which VOGEL's agent turned over to the police. The renter had also stopped cleaning the house, leaving food and garbage everywhere, which caused a rat infestation that VOGEL was required to remediate. The renter also had multiple dogs in the house in violation of the lease, which repeatedly urinated and defecated indoors, and scratched through areas of drywall. When 20076 Emerald was finally recovered, there were puddles of dog urine on the floors, and an extreme stench which took months and multiple cleanings to remedy. VOGEL's bank account was depleted because of having to carry all the costs of 20076 Emerald, and having to make significant repairs to the property damage caused by his nonpaying renter, and he is deeply concerned he will lose the property as the result of his inability to meet the financial obligations of ownership.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

87. Plaintiff SHEANNA ROGERS is a housing provider in the COUNTY and owns the property at 23243 Maud Ave., Hayward CA ("23243 Maud Ave.") At one time, ROGERS ran a small, three-bedroom, independent living facility at 23243 Maud Ave., where she & her husband cared and provided for people who needed a "helping hand" to get on their feet. Many clients had lived at this address for over 5 years. ROGERS served a vulnerable population at the living facility; her clients often had mental disabilities and no families to turn to. ROGERS was able to provide her clients with a safe living space and meals they could count on at 23243 Maud Ave. In addition to the independent living facility space, 23243 Maud Ave. has a separate studio unit. ROGERS rented this unit in 2018 for $1000 per month. That renter was never part of the independent living facility program. ROGERS depends on this supplemental rental income to support her and her family. Prior to the COUNTY'S enactment of its Moratorium, the renter began harassing ROGER's clients in the independent living facility. The renter would scream profanities at ROGERS' clients and throw garbage from his unit into the street directly in front of the property. The renter's harassment of ROGERS' clients got so bad that ROGERS was forced to file a restraining order against the renter and commence eviction proceedings. In February 2020, ROGERS and the renter came to a settlement agreement, whereby the renter agreed to vacate the property in April of 2020. However, after the COUNTY enacted its Moratorium, in March 2020, the renter refused to leave. The renter did not pay rent for over three years. The renter's failure to pay was not related to any Covid-19 related reason. Meanwhile, the renter's harassment of ROGERS' clients persisted, and ROGERS was forced to close her business as a result. ROGERS has also suffered devastating health consequences as a result of the stress caused by her nonpaying renter. ROGERS has applied for rental assistance from the COUNTY, however, because her renter will not cooperate, and his non-payment has nothing to do with Covid- 19 the COUNTY has refused to provide her with any relief.

88. Plaintiff JAQUELINE WATSON-BAKER is a housing provider in the CITY and COUNTY and owns the property at 1225-1227 92nd Ave Oakland, CA. ("1225-1227 92nd Ave"). 1225-1227 92nd Ave was purchased by WATSON-BAKER's mother in or about the 1950's.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

WATSON-BAKER's mother, who moved from to California from the Southern United States, was one of the first African Americans to own property in her East-Oakland neighborhood. 1225-1227 92nd Ave is a duplex, with a two-bedroom, two-bath front unit, and a one-bedroom one-bath back unit.  The renter in the back unit, Unit 1227, originally moved into the property in 2016.  Thereafter, WATSON-BAKER attempted to get access to the unit because the renter had put tinfoil over the windowpanes and had installed an air conditioner, and she was concerned about the renter's activity at the property.  When WATSON-BAKER arrived at the property, the renter stated that he did "not believe that a black woman" owned the property and demanded to see her identification.  WATSON-BAKER showed the renter her identification, which the renter snatched out of her hand, but the renter still refused her access to the unit.  Thereafter, the renter would insist on dropping off his rent check at WATSON-BAKER's home address, even though she asked him multiple times to mail it to a P.O. Box. WATSON-BAKER continued to see concerning signs at the property, but the renter continued to refuse her access. For example, she saw signs of rat infestation, but when she sent an exterminator, the renter would not give the exterminator access and turned his dogs loose on them. The exterminator eventually refused to go back to the property. Because the tenant refused to grant her access, and WATSON-BAKER became increasingly concerned about the unit's condition, WATSON-BAKER filed for relief in court in or about 2018.  The renter of the front unit of 1225-1227 92nd Ave Oakland left in 2019 because of the renter of the back unit's erratic behavior, and that unit has remained vacant since due to the renter's behavior. WATSON-BAKER finally obtained a court date for March of 2020, which then was pushed back due to shelter in place orders.  The renter stopped paying rent just prior to this time.    The renter's failure to pay was not related to any Covid-19 related reason. WATSON-BAKER finally got access to the unit and saw that the unit was in gross disrepair. The renter put foil on all the unit's windows, there are dark yellow streaks running down the walls, and one of the unit's cabinets is hanging down from the ceiling.  The unit was infested with insects and there was feces and urine all over the bathroom of the unit, and dog feces and garbage covered the unit's backyard.  Notwithstanding the renter's damage to and perpetuation

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

of a nuisance on her property, WATSON-BAKER was prevented from evicting the renter under the COUNTY's Moratorium. WATSON-BAKER considered selling the property, however, was advised that the renter's actions had devalued her property by almost a third of the market value. WATSON-BAKER applied for rental assistance from the COUNTY, however, her renter initially refused to cooperate with her. After he finally agreed to fill out an application, the COUNTY informed WATSON-BAKER that it could be up to a year until she received any rental relief funds.

89. Plaintiff Michael Loeb is a housing provider in the CITY and COUNTY and owns units 2501 and 2502 at 565 Bellevue Avenue, Oakland, California (565 Bellevue Units). Loeb, a 74 year-old widower, lived with his wife in Piedmont, until she died in 2015, after nearly 46 years of marriage. After her death, and, in part, because of mobility issues resulting in back surgery, he sold his home. He purchased the 565 Bellevue Units in April, 2020, with the intent to combine and occupy them as his home, for his own use, for the remainder of his life. Renter Joshua Bloomfield (Bloomfield), a 1996 Graduate of the University of Pennsylvania, and 2000 UCLA School of Law graduate, is a successful class action lawyer with a prominent Oakland based class action law firm. Bloomfield currently pays LOEB $2,200 per month in rent for a studio apartment. LOEB has attempted to voluntarily negotiate an owner move in with Bloomfield, offering him $30,000 to move out. This is more than four times the amount of $7,116.22 required as a relocation payment under the Oakland Just Cause for Eviction Ordinance, which is codified at Oakland Municipal Code section 8.22.850. However, Bloomfield demanded that LOEB pay him more than $160,000 to vacate, telling LOEB that "it's nothing personal, just business." Multiple other comparable units became available in the same building and could have been occupied by Bloomfield. Bloomfield has not claimed any Covid related hardship. LOEB was unable to commence an owner-move in eviction due to the Moratoriums.

90. Plaintiff HANNAH KIRK is a housing provider in the CITY and COUNTY and owns a single-family home at 4514 Fairbairn Ave, Oakland, CA. KIRK is a single mother and

lived in 4514 Fairbairn Ave with her two children. KIRK's renter moved into her home in 2019, and the agreed upon rent was $800 per month. The renter shared KIRK's kitchen and bathroom at KIRK's home. KIRK's renter paid rent consistently until July 1, 2021, whereupon she stopped paying rent but did not move out of KIRK's home when asked. The renter also did not cooperate with the rental assistance programs, or return the Covid-19 declarations that KIRK provided to her, and instead accused KIRK of harassing her. Notwithstanding the renter's failure to pay rent even though no Covid-19 related reason existed, KIRK was prevented from evicting the renter under the CITY and COUNTY's Moratorium. After spending almost two years having to carry the expenses of the renter and having to face the nonpaying renter on a daily basis inside of her own home, KIRK moved out of her home due to the severe emotional distress the situation was causing her and her children. KIRK has not been able to pay her mortgage for approximately eight months and fears she will lose her home.

91. Plaintiff AMI SHAH and AVINASH JHA were housing providers in the CITY and COUNTY and own a single-family home at 133 Gable Dr. Fremont CA. SHAH and JHA purchased 133 Gable Dr. in 2019, intending it to be their primary residence. However, for financial reasons, SHAH and JHA were required to rent 133 Gable Dr. until their lease obligations for their own rental were met. They did so, but after the COUNTY enacted its Moratorium, SHAH and JHA's renters stopped paying rent, and refused to apply for rent relief through the state and local rent relief programs. Not only did SHAH and JHA's renters stop paying rent, but the renters physically converted 133 Gable Dr. into an "Airbnb motel," renting out the individual rooms. SHAH and JHA reported the renters' unlawful activity to the Fremont police, and during the investigation it was discovered that the renters were conducting similar fraudulent rental activity with other homes as well. During the investigation, the renters abandoned the property, but the AirBnb guests did not, and refused to move out. Throughout, SHAH and JHA were prevented from evicting their nonpaying and breaching renters and the AirBnb guests due to the COUNTY's Moratorium. During this time, both the renters and the Airbnb guests filed several frivolous legal actions against SHAH and JHA, most of which were later dismissed. When the

Airbnb guests finally abandoned the property, SHAH and JHA were left with rental losses, legal fees and a home that was destroyed, and with a huge toll on their finances and health.

92. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 have also suffered devasting financial losses because of the Moratoria and Phase Out Ordinance. As alleged herein, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 own real property in either the COUNTY or the CITY or both. All Plaintiffs' properties listed in Paragraphs Nos. 17-20 and 22-66 are rental properties and/or contain rental units, and Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 are housing providers of these rental properties.

93. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 purchased all of these rental properties prior to the Moratoria being enacted with objective reasonable investment backed expectations based upon the regulatory environment in place at the time of purchase. When determining whether their purchase of these rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the same longstanding property law principles that other market participants would have relied on, namely, that a housing provider-renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter complied with the material terms of the lease. When determining whether their purchase of the rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the COUNTY and CITY just cause eviction ordinances then in place, including but not limited to, the ability to evict a renter who failed to pay rent or otherwise violated the material terms of the lease but was still in possession of their property. Prior to the Moratoria being enacted, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's rental properties were profitable businesses, all of which yielded an average of many thousands of dollars a year in profit.

94. All properties listed in Paragraphs Nos. 17-20 and 22-66 have been occupied by renters during the Moratoria. Since the Moratoria were enacted, and through the Moratoria's duration, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have had renters at these properties who have refused or failed to pay rent for their units or otherwise violated the material

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

terms of their leases. Many of the renters that occupy the properties listed in in Paragraphs Nos. 17-20 and 22-66 did not cooperate with Plaintiffs' efforts to assist them in obtaining rental assistance through the CITY and COUNTY programs, resulting in Plaintiffs' inability to mitigate their lost rental profits. Other renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 did not qualify for rental assistance because their income level was too high and/or because they were not impacted by a Covid-19 related reason, resulting in Plaintiffs' inability to mitigate their lost rental profits. Plaintiffs' renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 also committed acts that damaged these properties during the time the Moratoria were in effect, which further devalued their properties.

95.     Despite the above acts, the blanket Moratoria and the Phase Out Ordinance prohibited Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 from evicting these renters during the time the Moratoria were in place. Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have seen significant losses in property values as a direct result of the Moratoria enabling renters to fail to pay rent for any reason at all, to damage these properties without consequence, and to violate the material terms of their leases with impunity. These rental properties have lost many millions of dollars in property value and income as a direct result of the Moratoria and Phase Out Ordinance. Moreover, as a result of the CITY and COUNTY Moratoria and Phase Out Ordinance, Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66's collective losses in rent and property damages, and other damages are in excess of tens of millions of dollars.

96.     The COUNTY and CITY are aware that the Moratoria and Phase Out Ordinance solely target housing providers in favor of renters, by allowing renters carte blanche to refuse to pay rent without basis, and permit renters to cause damage to housing providers' properties and otherwise violate their leases without consequence. Despite the significant harm the Moratoria and Phase Out Ordinance has caused housing providers, COUNTY and CITY have refused to amend these regulations. Accordingly, the character of the Moratoria and Phase Out Ordinance placed a severe and disproportionate regulatory burden upon Plaintiffs and forced Plaintiffs to carry the cost of a public program. These regulations were the functional equivalent of a classic

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

taking in which government directly appropriates private property or ousts the owner from his or her domain.

**FIRST CLAIM**

**(Violation of the 5th Amendment to the U.S. Constitution – Against All Defendants (42 U.S.C. § 1983))**

97. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 96 of this Complaint.

98. By enacting the Moratoriums and the Phase Out Ordinance, the COUNTY and the CITY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratoriums and the Phase Out Ordinance violate the Fifth Amendment of the United States Constitution on their face and as applied to Plaintiffs.

99. Defendants' Moratoriums and the Phase Out Ordinance purport to prohibit Plaintiffs from evicting any renter in the CITY and COUNTY for virtually any reason, with few exceptions under the three-year-plus timeframes thereunder. The Moratoriums and the Phase Out Ordinance perpetrate physical takings by illegally nullifying Plaintiffs and other housing providers' right to occupy their properties without just compensation; the Moratoriums and the Phase Out Ordinance *eliminate* renters' rent obligations and sanction renters' trespassing on Plaintiffs' properties. Preventing housing providers "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." (*Alabama Association of Realtors v. Department of Health and Human Services* (2021) 141 S.Ct. 2485, 2489; also see, *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435; *Cedar Point Nursery v. Hassid* (2021) 141 S. Ct 2063; *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 655 [Physical taking occurs when a regulation "effectively extinguish[es] plaintiffs' right to occupy substantial portions of their property"].)

100. The COUNTY and the CITY's moratoriums and the Phase Out Ordinance also unreasonably and substantially interfered with Plaintiffs' investment-backed expectations, singled out Plaintiffs to bear the full cost of public benefits, and result in either a substantial or

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

total deprivation of the economic value of Plaintiffs' properties. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104.) The Moratoriums devalued properties by prohibiting Plaintiffs from recovering possession of their properties—even for their personal use—and even despite renters perpetuating ongoing nuisances and/or committing material violation(s) of the lease. The Moratoriums and the Phase Out Ordinance further devalue properties by prohibiting eviction for *continued* nonpayment of rents for over a period of three years. Plaintiffs have suffered significant financial losses due to the Moratoriums, and continue to suffer these losses under the Phase Out Ordinance, notwithstanding the expiration of the Moratoria, because the current government "relief" programs in place, have resulted in little to no relief. Plaintiffs' "investment-backed expectations" have been violated as a matter of law. (*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles* (C.D. Cal. 2020) 500 F. Supp. 3d 1088, 1096, *aff'd*, (9th Cir. 2021) 10 F.4th 905.) This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606.)

101. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance constitute takings without just compensation, and thus violates Plaintiffs' rights protected by the United States Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

102. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**SECOND CLAIM**
**(Inverse Condemnation – Violation of Article I, Section 19 of the California Constitution)**

103. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

through 102 of this Complaint.

104. The Moratoriums and the Phase Out Ordinance violate Article I, Section 19 of the California Constitution on their face and as applied to Plaintiffs, for all the reasons alleged herein.

105. The Moratoriums and the Phase Out Ordinance therefore constitute takings without just compensation, and thus violate Plaintiffs' rights protected by the California Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.

106. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.

**THIRD CLAIM**
**(Violation of Due Process (42 U.S.C. § 1983))**

107. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 106 of this Complaint.

108. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. (*Lockary v. Kayfetz* (9th Cir. 1990) 917 F.2d 1150, 1155; *Weinberg v. Whatcom County* (9th Cir. 2001) 241 F.3d 746, 752-755.) The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive due process rights on their face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' imposition of the blanket Moratoriums and the Phase Out Ordinance for that three-plus year time period are irrational and lacking in a legitimate government interest because there is no justification for such extreme measures. Indeed, California's COVID-19 Renter Relief Act never imposed such draconian restrictions. Further, the Bay Area saw significant improvement in circumstances relating to the pandemic since March of 2020, has a high rate of vaccinations, and federal and state officials recognized during the period of time the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Moratoria were in place that Covid-19 was either in, or moving to, an endemic stage. The pandemic should not have been used as a "cursory" justification for what would otherwise be an illegal law. (See, *Texas v. United States* (S.D. Tex. Aug. 19, 2021) No. 6:21-CV-00016, 2021 WL 3683913, at *45; *Chrysafis v. Marks* (2021) 141 S.Ct. 2482; *Tandon v. Newsom* (2021)141 S.Ct. 1294.) Defendants therefore have no rational basis for the Moratoriums and the Phase Out Ordinance, and any offered is plainly pretext. The Moratoriums and the Phase Out Ordinance violate procedural due process because they, in effect, deprive Plaintiffs of *any* procedure to recover their properties under most cases under the time period set forth thereunder.

109. The aforesaid acts, and as further alleged herein, therefore constitute violations of Plaintiff's procedural and substantive due process rights. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

110. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, emotional distress, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs are also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**(Violation of Equal Protection (42 U.S.C. § 1983))**

111. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 110 of this Complaint.

112. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the laws, on their face and as applied. The purpose of the Moratoriums and the Phase Out Ordinance is to unlawfully single out, penalize, and target Plaintiffs, and all housing providers in the CITY and COUNTY, by preventing them from lawfully exercising their property rights to receive rents, occupy their properties, exclude others from their properties, and protect their properties from nuisance and damage. The "emergency" under which the Moratoriums were enacted no longer existed during their imposition; the Bay Area was open for business, has a high

rate of vaccinations, and federal and state officials recognized that Covid-19 was either in, or moving to, and endemic stage. Thus, any stated rational government purpose to the contrary is pretext.

113. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the law, and as a result, Plaintiffs have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.) Plaintiffs have also entitled to recover their attorneys' fees under 42 U.S.C. § 1983.

**FIFTH CLAIM**
**(Writ of Mandate (CCP §§ 1085 or 1094.5))**

114. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 113 of this Complaint.

115. Code of Civil Procedure §§ 1094.5 or 1085 authorizes Plaintiffs to seek a writ of mandate/mandamus, and which authorizes the Court to review and set aside public agency decisions involving a prejudicial abuse of discretion or error of law.

116. Plaintiffs request the Court issue a declaration, and/or writ of mandate or mandamus, setting aside and voiding the effect of the Moratoriums and the Phase Out Ordinance as set forth hereunder. Plaintiffs also seeks an immediate stay to enjoin Defendants from enforcing the Phase Out Ordinance and the Moratoria's ban on virtually all evictions during that three-year period, as such enforcement would further harm Plaintiffs by violating their statutory and constitutional rights as alleged herein, and the issuance of such a stay would not be against the public interest.

117. In enacting the Moratoriums and Phase Out Ordinance, Defendants exceeded their jurisdiction, prevented Plaintiffs from having a fair trial, failed to proceed as required by law, and prejudicially abused their discretion because:

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

a. The Moratoriums and Phase Out Ordinance are preempted by the State's Covid-19 Renter Relief Act (the "Act"), both expressly and impliedly, because they conflict with the Act by depriving housing providers of the UD process altogether by prohibiting repossession of their properties in almost all circumstances under the timeframes set forth thereunder, thereby conflicting with that law. Because the Moratoriums and Phase Out Ordinance conflict with the Act, they are preempted and void.

b. The Moratoriums and Phase Out Ordinance unlawfully amend the CITY's Just Cause for Eviction Ordinance, which was enacted via voter initiative. (Oak. Mun. Code § 8.22.310.) While the COUNCIL is permitted to amend the Just Cause for Eviction Ordinance to a limited extent (see, Oak. Muni. Code § 8.22.360(F); City of Oakland Measure Y), the COUNTY is not, and the COUNCIL's moratorium and Phase Out Ordinance significantly surpasses the permissible scope of amendment permitted by the voters. Thus, these regulations are invalid.

c. The Phase Out Ordinance introduces substantive unlawful hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, allowing some renters to potentially stop paying rent altogether, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior, "unreasonable."

118. Moreover, as alleged herein, Defendants' aforesaid acts constitute unconstitutional per se, regulatory, de facto, and physical takings of Plaintiffs' properties without just compensation under the U.S. Constitution and violate Plaintiffs' constitutional rights to equal protection and due process, and any purported legitimate and/or rational basis for the same is pretext.

119. Because these are questions of law and implicate constitutional rights, the standard of review falls under the independent judgment test/de novo review.

**ZACKS & FREEDMAN, PC**
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

120.    To the extent Plaintiffs were required to exhaust any administrative remedies, they have, as alleged herein.

121.    As alleged herein, Plaintiffs have a beneficial interest in ensuring that the effect of the now-expired Moratoriums and current Phase Out Ordinance are struck down so that Plaintiffs statutory and constitutional rights are not infringed upon.  Plaintiffs do not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary to compel Defendants to correct their actions, which are unlawful and in excess of their authority.

122.    Plaintiffs are entitled to recover attorneys' fees under Cal. Civ. Code § 1021.5, and because the Moratoriums are arbitrary and capricious, lacking any reasonable basis, and/or discriminatory and illegal, Plaintiffs are additionally entitled to attorneys' fees under Govt. Code § 800(a).

WHEREFORE, Plaintiffs' demand judgment against Defendants for the following:

**For Claims One, Two, Three and Four**:

1.    A preliminary and permanent injunction preventing enforcement of the Phase Out Ordinance;

2.    A declaratory judgment determining that Defendants' Moratoriums and Phase Out Ordinance constitute a taking under the United States and California Constitutions, and violate Plaintiffs' right to due process and equal protection;

3.    For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained;

4.    For general damages according to proof, in an amount that is yet to be ascertained;

5.    For an award of attorneys' fees and costs as allowed by law; and

6.    For any other relief that the Court deems just and proper.

**For Claim Five**:

1.    For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Phase Out Ordinance for all of the reasons alleged above;

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

2. For a judgment that the Moratoriums and Phase Out Ordinance constitute unlawful takings on their face and/or as applied, and have prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation;

3. For a judgment that Defendants have violated Plaintiffs' equal protection and due process rights;

4. For an immediate stay or preliminary injunction, and permanent injunction enjoining Defendants from enforcing the Phase Out Ordinance pending the determination of the merits;

5. For costs of suit herein, including attorneys' fees;

6. For any other relief that the Court deems just and proper.

Dated: September 20, 2023

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Case 3:22-cv-01274-LB Document 143 Filed 09/20/23 Page 32 of 33

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all claims (other than the petition for writ of mandate) as stated herein.

Dated: September 20, 2023

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**VERIFICATION**

I, Emily L. Brough, am an attorney representing all Plaintiffs and Petitioners (collectively, "Plaintiffs") in this action. I have personal knowledge of the matters attested to in the fifth cause of action for writ of mandate (CCP § 1085), which are primarily questions of law, and it is for this reason that I, and not Plaintiffs, are verifying the fifth cause of action, only. I have read the cause of action for writ of mandate and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true. On this basis, I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge and that this verification was executed on September 20, 2023, in Soquel, California.

Emily L. Brough

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

# EXHIBIT A

Case 3:22-cv-01274-LB Document 143 Filed 09/20/23 Page 35 of 315

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
SAM SPIEGELMAN (N.Y. Bar No. 5573100)
255 South King Street, Suite 800
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org
SSpiegelman@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, ~~ROBERT VOGEL, SHEANNA ROGERS, MICHAEL LOEB, JAQUELINE WATSON-BAKER, and HOUSING PROVIDERS OF AMERICA, a 501(c)(4) non-profit Corporation~~et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

(42 U.S.C § 1983; C.C.P § 1085)

**DEMAND FOR JURY TRIAL**

Action Filed: March 1, 2022
Trial Date: None set



ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Defendants and Respondents.

1. Plaintiffs and Petitioners JOHN WILLIAMS, ROBERT VOGEL, SHEANNA ROGERS, MICHAEL LOEB, JAQUELINE WATSON-BAKER, and HOUSING PROVIDERS OF AMERICA (collectively, "Plaintiffs"), hereby bring this first amended and supplemental complaint and petition for relief[1] against Defendants and Respondents ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND and OAKLAND CITY COUNCIL (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratoriums (collectively, "Moratoriums") and subsequent "phase out" regulations, and an order declaring said Moratoriums regulations invalid, illegal, and unenforceable. Plaintiffs also request an immediate stay, and injunction against the enforcement of the Moratoriums.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative fact, and thus form the same case or controversy under Article III of the United States Constitution.

**DIVISIONAL ASSIGNMENT**

3. Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California and thus should be assigned to the Court's Oakland Division.

**VENUE**

[1] A blacklined comparison of the amended and supplemental complaint with the original complaint is attached hereto as **Exhibit A**.

4. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants/respondents reside in this judicial district and the events giving rise to the claims occurred in this district.

**PARTIES**

5. Defendant and Respondent ALAMEDA COUNTY (the "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6. Defendant and Respondent ALAMEDA COUNTY BOARD OF SUPERVISORS (the "BOARD") is a policy making, legislative, and quasi-judicial administrative body of the COUNTY.

7. Defendant and Respondent CITY OF OAKLAND (the "CITY") is a municipal corporation in the State of California.

8. Defendant and Respondent OAKLAND CITY COUNCIL (the "COUNCIL") is a policy making, legislative, and quasi-judicial administrative body of the CITY.

9. Plaintiff JOHN WILLIAMS is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

10. Plaintiff ROBERT VOGEL is an individual over the age of 18 and is a housing provider and owner of real property in the COUNTY.

11. Plaintiff SHEANNA ROGERS is an individual over the age of 18 and is a housing provider and the owner of real property in the COUNTY.

12. Plaintiff MICHAEL LOEB is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

13. Plaintiff JAQUELINE WATSON-BAKER is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

14. Plaintiff HANNAH KIRK is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 4514 Fairbairn Ave, Oakland, CA.

15. Plaintiff AMI SHAH is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

16. Plaintiff AVINASH JHA is an individual over the age of 18 and the owner of real

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

17. Plaintiff WILLIAM ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

18. Plaintiff MADELEEN ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

19. Plaintiff NORMAND GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

20. Plaintiff MICHELLE GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

~~13.~~21.

~~14.~~ Plaintiff and Petitioner HOUSING PROVIDERS OF AMERICA ("HPOA") is a § 501(c)(4) nonprofit corporation. HPOA is a network of housing activists fighting to protect the legal rights of housing providers, including those in the CITY and the COUNTY. HPOA's members own rental housing in and throughout the CITY and the COUNTY, and have been directly and adversely affected by the CITY and COUNTY's residential eviction Moratoriums and the CITY's subsequent "phase out" regulations. All of HPOA's members are housing providers in either the CITY and/or COUNTY; all of HPOA's members have renters at their properties who are taking advantage of the CITY and COUNTY's ~~Moratoriums~~regulations, including but not limited to, refusing to pay rent for non-Covid-19 related reasons during the time period set forth thereunder, and refusing to relinquish possession, and creating nuisances and damage to HPOA's members' properties. HPOA's members have been unable to collect rent for time periods of months ~~on end~~and/or years with no financial relief provided by the CITY and COUNTY, and ~~Moratoriums'~~ the CITY and COUNTY's complete defense against virtually all residential evictions for a period of three-plus-years have tied HPOA's members hands. HPOA's members have suffered lost rents, devalued properties, and some face impending foreclosures and

bankruptcies, as a result of the CITY and COUNTY's regulations~~Moratoriums.~~ The harm and injury brought to HPOA's members by the ~~Moratoriums~~ regulations is current, ongoing, and concrete and particularized to all HPOA's members. HPOA's efforts to remedy these injustices are central to its purpose of fighting to protect the legal rights of housing providers, including those in the CITY and COUNTY. Neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit. HPOA has a direct and substantial interest in ensuring that Defendants' decisions are in conformity with the requirements of law, that those requirements are properly executed, and that Defendants' duties are enforced.

22. Plaintiff 2355 Broadway, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2355 Broadway, Oakland CA.

23. Plaintiff 3900 Adeline, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the COUNTY located at 3900 Adeline, Emeryville CA.

24. Plaintiff Hollis Street Partners, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3250 Hollis Street, Oakland CA.

25. Plaintiff Vulcan Lofts, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4401 San Leandro Street, Oakland CA.

26. Plaintiff 1614 Campbell Street DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1614 Campbell Street, Oakland CA.

27. Plaintiff 3014 Chapman DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3030 Chapman Street, Oakland CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

28. Plaintiff B3 Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 5200 Adeline Street, Emeryville , CA.

29. Plaintiff Bakery Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4600 Adeline Street, Emeryville, CA.

30. Plaintiff Exchange Studios DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 527 23rd Avenue, Oakland, CA.

31. Plaintiff Madison Park Properties II DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1155 - 5th Street, Oakland CA.

32. Plaintiff P&D 23rd Avenue Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1080 23rd Avenue, Oakland CA.

33. Plaintiff P&D 46th St. Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 964 46th Street, Oakland CA.

34. Plaintiff Sears Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2633 Telegraph Ave, Oakland CA.

35. Plaintiff 301 Lenox, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 301 Lenox Avenue, Oakland CA.

36. Plaintiff 2228 Union Street Investors, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

located at 1438 Madison Street, Oakland CA, 7511-7527 Bancroft Avenue, Oakland CA, 8603 Hillside Street, Oakland CA, and 8701 Hillside Street, Oakland CA.

37. Plaintiff J & R Land & Cattle LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1551 Madison Street, Oakland CA and 2000 E. 30th Street, Oakland CA.

38. Plaintiff J & R Land & Cattle II LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1935-1948 E. 29th Street, Oakland CA, 1935-1945 E. 30th Street, Oakland CA, and 2032-2040 E. 30th Street, Oakland CA.

39. Plaintiff Westpark Apartments, LLC is a California limited liability company, qualified to do business in California and the owner of real properties in the CITY and COUNTY, located at 433 Perkins Street, Oakland CA, 1553 Alice Street, Oakland CA, and 4220 Montgomery Street, Oakland CA.

40. Plaintiff Westpark II, GP is a California partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1530 Harrison Street, Oakland CA and 1555 Madison Street, Oakland CA.

41. Plaintiff 685 Scofield, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 385-389 Palm Avenue, Oakland CA.

42. Plaintiff 296 Mather Street, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 296 Mather Street #7, Oakland, CA.

43. Plaintiff BayOak Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 2375 Fruitvale Ave #301, Oakland CA.

44. Plaintiff Burling Street Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

located at 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, and 1704 Upper 14th Street, Oakland CA.

45. Plaintiff Rising Tide Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 722 Upper 30th Street, Oakland CA, 923-923A Apgar Street, Oakland CA, 827 30th Street Oakland, CA, 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 835 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

46. Plaintiff Oakland Point Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

47. Plaintiff Truckee Zurich Place, LLC is a Delaware limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1036 62nd Street #4, Oakland CA, 2215 Eighth Street, Berkeley CA, 2839 Linden Street, Oakland CA, 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, 1704 Upper 14th Street, Oakland CA.

48. Plaintiff 18th & Linden, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1054 18th Street, Oakland CA.

49. Plaintiff 220 Grand Investors, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 220 Grand Avenue, Oakland CA.

50. Plaintiff 818 East 20th Street Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 800-818 E 20th Street, Oakland CA.

51. Plaintiff 1130 30th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3649

Martin Luther King Jr Way, Oakland CA.

52. Plaintiff 1701-1703 36th Avenue Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1701-1707 36th Avenue, Oakland CA.

53. Plaintiff 1732-1744 27th Avenue, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1732-1744 27th Avenue, Oakland CA.

54. Plaintiff 1844 7th Avenue 2013, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1844 7th Avenue, Oakland CA.

55. Plaintiff 2000 Linden Street, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2000 Linden Street, Oakland CA.

56. Plaintiff 2019 ABD Ozone Fund, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 831 6th Avenue, Oakland CA.

57. Plaintiff 2367 Washington, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 245 Lee Street, Oakland CA.

58. Plaintiff 2531 East 16th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1638 47th Avenue, Oakland CA.

59. Plaintiff 2701 High Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2701 High Street, Oakland CA.

60. Plaintiff ABD Suites, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1008

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E 23rd Street Oakland, CA and 1722 27th Avenue Oakland, CA.

61. Plaintiff 301 Hannah Park, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2850 Hannah Street, Oakland CA.

62. Plaintiff Oakbrook Partners, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1125-1135 E 18th Street, Oakland CA and 1221 E 20th Street, Oakland CA.

63. Plaintiff Riaz Capital Ozone Fund III, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1705 Mandela Parkway, Oakland CA, 2133-2143 Dwight Way, Berkeley CA, 2618 Martin Luther King Jr Way, Berkeley CA.

64. Plaintiff Riaz Taplin, trustee of The A.R.T. Trust is an individual over the age of eighteen. The A.R.T. Trust is the owner of real properties in the CITY and COUNTY located at 1454 36th Avenue, Oakland CA, 1616 35th Avenue, Oakland CA, 1828 28th Avenue, Oakland CA, 2166 E 27th Street, Oakland CA, 2554 E 16th Street, Oakland CA, 3700 International Boulevard, Oakland CA.

65. Plaintiff 1715 FFT, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1715 High Street Oakland, CA.

66. Plaintiff 1830 6th Ave Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1830 6th Avenue Oakland, CA.

~~15.~~67. Plaintiffs are not aware of the identities of defendants/respondents DOES 1-10, who are responsible for the acts and omissions alleged herein and that caused damage to Plaintiff; therefore, Plaintiffs will amend this Complaint when the true identities of DOES 1-10 are ascertained.

~~16.~~68. Plaintiffs are informed and believe that at all times mentioned in this Complaint,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

all defendants/respondents were the agents or employees of their co-defendants/respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## STATEMENT OF FACTS

### A. Background: The California Governor's Order and the COVID-19 Renter Relief Act.

~~17.~~69. In response to the Covid-19 pandemic, Governor Newsom declared a State of Emergency in California on March 4, 2020, pursuant to the California Emergency Services Act (ESA), Gov. Code sec. 8550, et seq. On March 16, 2020, Governor Newsom entered an executive order, which in part permitted local governments to temporarily limit housing providers' ability to evict for nonpayment of rent due to the Covid-19 crisis. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

(Executive Order (EO) N-28-20.) ~~California's State of Emergency is still in place, currently set to expire on March 31, 2022. (EO No. N-21-21). However,~~ The March 16, 2020 provision, permitting local government to temporarily limit Covid-19-related nonpayment evictions, expired on September 30, 2020. (EO N-71-20.)

~~18.~~70. Prior to the expiration of that provision, the California Legislature enacted the "COVID-19 Renter Relief Act" and the "COVID–19 Small Housing provider and Homeowner Relief Act of 2020" via AB 3088, effective August 31, 2020. AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure section 1161 et seq., and was aimed at "**temporary emergency relief** for financially distressed renters, homeowners, and small housing providers . . . ." Among other things, AB 3088 provided statewide eviction protections during ~~the "covered time period"~~a particular time period ~~(initially March 20, 2020~~

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

~~through January 31, 2021)~~ for renters who could not pay their rent for Covid-19-related reasons. AB 3088 also directed state agencies to engage about potential strategies for relief for renters and housing providers who suffered Covid-19-related financial hardship.

~~19.~~71. Notably (and consistent with the Governor's prior order), AB 3088's temporary moratorium on residential evictions was *specifically* limited to those based upon inability to pay for Covid-19-related financial distress. Even during the temporary moratorium, housing providers were still permitted to file actions for, and courts were still permitted to find renters guilty of, UD for fault, and no-fault "just cause" as defined under Civil Code sec. 1946.2.[2] (CCP § 1179.03.5(a)(3).)

~~20.~~72. AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals ***negatively impacted*** by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect renters from eviction." (CCP § 1179.05(b), (e), (f), emph. add.) While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give carte blanche authority to do so, nor ~~does it~~did it immunize "emergency" municipal regulations from challenges based on state law preemption.

~~21.~~73. The Covid-19-related nonpayment eviction protections of AB 3088 were extended ~~twice~~ thereafter~~, once to June 30, 2021 (~~ through SB 91~~), and a last time to September 30, 2021 (through~~ AB 832, and AB 2179~~)~~. ~~SB 91 and AB 832~~These enactments protected affected renters from eviction during this extended ~~"covered~~ time period~~,"~~ under the UD statutes

[2] Civil Code sec. 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code sec. 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." (Civ. Code § 1946.2(g)(1).)

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

so long as they complied with the Covid-19-related financial distress requirements.

22.74. SB 91 and AB 832These enactments further clarified the State's rental assistance program. Starting October 1, 2021, and until March 31July 1, 2022, for any Covid-19-related hardship rental debt that came due between those dates, a renter wasis required to show that they completed an application for rental assistance through the State program. If they did not, the housing provider couldan move forward with an unlawful detainer ("UD") action for nonpayment of rent. A housing provider may could also have moved forward with a UD action if the rental assistance application was denied. (CCP § 1179.11(a), (c).)

**B. The CITY's Eviction Moratorium**

23.75. On March 9, 2020, the CITY declared a local state of emergency due to Covid-19. The CITY's local emergency was ratified on March 12, 2020, via Resolution No. 88075 C.M.S, and pursuant to the ESA, which permits municipalities to declare local emergencies under specified circumstances. (Gov. Code §§ 8558(c)©, 8630.) The ESA also requires a municipality to terminate the local emergency ". . . at the earliest possible date." (Gov. Code § 8630 (d).)

24.76. After ratifying the Local Emergency, on March 27, 2020, the CITY passed its eviction moratorium, Ordinance No. 13589. That moratorium not only prohibited evictions for nonpayment of rent due to Covid-19-related financial distress, but also *all other evictions*, with few exceptions:

> **Residential Eviction Moratorium.** Except when the renter poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (–) – (10) [excepting Ellis Act evictions] that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency.

77. Initially, the CITY's moratorium on all evictions was set to expire on May 31, 2020, "unless extended." (Ordinance No. 13589.) Subsequently, the moratorium was extended

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

until "the Local Emergency declared on March 9, 2020 has been terminated by the City Council, or August 31, 2020, whichever comes first." (Ordinance no. 13594.) However, on July 7, 2020, the extension on the eviction moratorium was again amended to *only* expire when the local Emergency had been terminated by the COUNCIL. (Ordinance No. 13606 (Ex. 1).) The local Emergency has no stated expiration date, and the CITY's position is that it has not expired.

~~25.~~78. After this action was filed, the CITY enacted Ordinance No. 23-0216 ("Phase Out Ordinance") on May 2, 2023, which, while providing for a "phase out" of the CITY's moratorium, also kept the "local emergency" in place. The Phase Out Ordinance provides that the CITY's moratorium shall end on July 15, 2023. However, the Phase Out Ordinance continued to prohibit evictions for virtually any reason, including non-payment, if the grounds for eviction arose between March 9, 2020 and July 14, 2023. Thus, per the Phase Out Ordinance, the effect of the CITY's moratorium is still in place for that three-year-plus period ~~The blanket moratorium on evictions therefore remains in effect~~. The Phase Out Ordinance also amended the CITY's Rent Ordinance, further restricting housing providers' "just cause" reasons for eviction. For example, the amendments introduced substantive hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior "unreasonable" in light of that term.

**C. The COUNTY's Eviction Moratorium**

~~26.~~79. The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which, like the CITY's moratorium, purported~~s~~ to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO § 6.120 (Ex. 2).) The COUNTY's moratorium applied~~s~~ to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.)

Case 3:22-cv-01274-LB Document 43 Filed 07/20/23 Page 49 of 73

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

These exceptions wer~~ar~~e (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).) Like the CITY's moratorium, the COUNTY'S moratorium provided~~s~~ that it was~~is~~ an "absolute defense" to an unlawful detainer action brought during its term. (ACCO § 6.120.030(D).)

~~27.~~80. As enacted, ~~The~~ the moratorium expired~~s~~ sixty days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the ratification of the local emergency, the local emergency "shall remain in effect until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-91.) ~~The COUNTY's position is that it has not expired, and the blanket moratorium on evictions therefore remains in effect~~On February 28, 2023, the COUNTY rescinded its local emergency. Accordingly, the COUNTY's moratorium expired on April 29, 2023. Notwithstanding, it is the COUNTY's position that evictions are prohibited for virtually any reason, including non-payment and even if there was no Covid-19 relate financial distress, if the grounds for eviction arose between March 9, 2020 and April 28, 2023. Thus, the effect of the COUNTY's moratorium is still in place for that three-year-plus period.

**D. The COUNTY and CITY's Rent Relief Assistance Programs**

~~28.~~81. State law requires local governments to develop mechanisms by which housing providers and renters may file applications for, and receive if eligible, Covid-related rent relief.

~~29. The COUNTY operates a rent relief assistance program called "Housing Secure."[3] The Housing Secure website currently states: "NOTICE: We have received more requests for funds than we have currently available."~~

~~30.~~82. The CITY ~~also~~ operated~~s~~ a rent relief assistance program called "Oakland's Emergency Rental Assistance."[4] At the time of filing this action, ~~The~~ Oakland's Emergency Rental Assistance website ~~currently~~ stated~~s~~: "UPDATE. PLEASE NOTE. As of January 7, the

[3] ~~https://www.ac-housingsecure.org/?locale=en~~

[4] https://www.oaklandca.gov/departments/department-of-housing-and-community-development

City of Oakland's Emergency Rental Assistance program is oversubscribed. Tenants and Landlords may still submit an application but will be placed on a waitlist." Currently, the website instead refers applicants to the COUNTY's rent relief assistance program, "Housing Secure." However, since this action was filed, the Housing Secure website states: "We have received more requests for funds than we have currently available." [5]

31. 83. Importantly, tenants in the CITY and COUNTY need not to participate in *any* rent relief program to avoid eviction under the relevant three-year-plus time frames of the Moratoria and the Phase Out Ordinance; the Moratoriums Moratoria and the Phase Out Ordinance's ban on evictions for the three-year-plus period prohibit evictions even for those tenants who refuse to cooperate with a landlord's request that they seek relief under these programs. This directly contradicts the purpose, intent and procedures of state law.

**E. The Moratoriums' Detrimental Impact on Plaintiffs**

84. The Moratoria, and as codified through the Phase Out Ordinance, have had devastating impacts on housing providers throughout the CITY and COUNTY, and to all Plaintiffs in this action. The following cases are but a few more detailed examples.

32. Plaintiff JOHN WILLIAMS is a housing provider in the CITY and COUNTY and owns the property at 1109 32nd Street, Oakland, CA. ("1109 32nd Street"). 1109 32nd Street is a duplex, and the rent for the property only barely covereds WILLIAMS' property expenses for 1109 32nd Street. The current renter in the three-bedroom one-bath downstairs unit, Martina Martin, has occupied the unit for approximately ten twelve years, and until the past two yearsMoratoria were enacted, has always paid the rent for the unit, which is was approximately $1,500.00 per month. After the CITY and COUNTY enacted the Moratoriums, however, the renter stopped paying rent and has not paid sincerefused to pay through the entire duration of the CITY's Moratorium. The renter's failure to pay is not related to any Covid-19 related reason. In fact, the renter operated a moving and storage business, "Martina's Ride" out of her unit since

[5] https://www.ac-housingsecure.org/?locale=en

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

2017, and through much of 2021. The renter refuses to cooperate with WILLIAMS' efforts to obtain unpaid rents through the rent relief program, and therefore the CITY rejected WILLIAMS' application for noncompliance. The renter in the upper unit vacated in March of 2021. WILLIAMS was~~is~~ concerned that a new renter would~~ill~~ move in and refuse to pay rent, so he ~~has~~ kept that unit vacant after the renter left. ~~WILLIAMS is concerned he will lose the property; he applied for and received three months of mortgage forbearance, but the forbearance expires soon, and only delays his obligation to pay his mortgage. He also attempted to sell the property, but the nonpaying renter has made it virtually unsalable for any reasonable value.~~ In October of 2021, WILLIAMS was so riddled with stress caused by his non-paying renter and the very real possibility of losing 1109 32nd Street to foreclosure, he was hospitalized and, to date, remains disabled as a result. His disability forced him to quit his job and move into the upper unit of 1109 32nd Street—directly above his non-paying renter—to save money. WILLIAMS wa~~i~~s unable to commence a nonpayment eviction against his renter as a direct result of the Moratoriums and in contravention of state law. While WILLIAMS has recently received some mortgage assistance from the State of California, he has not received any back rent payments, nor does the amount of mortgage assistance that WILLIAMS has received cover what his nonpaying tenant refused to pay.

~~33.~~ 86. Plaintiff ROBERT VOGEL ("VOGEL") is a housing provider in the COUNTY and owns a rental property located 20076 Emerald Ct., Castro Valley, CA ("20076 Emerald"). 20076 Emerald is a three-bedroom, one bath, 853 sq. ft single family home. VOGEL is semi-retired and is a disabled paraplegic. VOGEL relies on the rental income from 20076 Emerald for ~~his only~~a substantial source of retirement income. VOGEL is required to pay approximately $1,328 per month for 20076 Emerald's mortgage, taxes and insurance, garbage service, and fees for property management. ~~Maintenance expenses for the property over the last two years have approximated $12,000.~~ The former renter at 20076 Emerald ~~has~~ lived there for approximately twelve years, and her current rent wa~~i~~s $2,000 per month, however she stopped paying any rent in September 2021, and has not paid any rent since that date and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

only just recently vacated. The renter's failure to pay prevented VOGEL from being able to refinance 20076 Emerald to a lower rate. The renter ~~has~~ also stopped maintaining 20076 Emerald's landscape and would park her car on the front yard. The renter's failure to pay wa~~i~~s not related to any Covid-19 related reason. ~~VOGEL and the renter have applied for rental assistance through the COUNTY, however, there has been no response from the COUNTY whatsoever, and the COUNTY's rental relief website states that there is no money available. There was also a second renter at the property temporarily that applied for rental assistance, despite working full time. The second tenant died in December 2021, yet there is mechanism to update or change the application process. The amount of monetary savings that~~ While the renter finally agreed to cooperate with the local and state rent relief programs, VOGEL only received a portion of the unpaid back rent. Most recently, VOGEL learned that his former nonpaying renter may have been selling and/or manufacturing methamphetamine at 20076 Emerald. The renter covered all of the windows at the property, and neighbors reported strong chemical odors coming from the home. There was a "revolving door" of people making multiple, brief visits per day to the property, at all hours. When VOGEL was finally able to gain possession of 20076 Emerald, he discovered large quantities of drug paraphernalia, including what appeared to be used meth pipes and small zip-lock baggies. A large quantity of white powder was found in an ice chest, which VOGEL's agent turned over to the police. The renter had also stopped cleaning the house, leaving food and garbage everywhere, which caused a rat infestation that VOGEL was required to remediate. The renter also had multiple dogs in the house in violation of the lease, which repeatedly urinated and defecated indoors, and scratched through areas of drywall. When 20076 Emerald was finally recovered, there were puddles of dog urine on the floors, and an extreme stench which took months and multiple cleanings to remedy. VOGEL's ~~has in his~~ bank account ~~is being~~was depleted because of having to carry all the costs of 20076 Emerald, and having to make significant repairs to the property damage caused by his nonpaying renter, and he is deeply concerned he will lose the property as the result of his inability to meet the financial obligations of ownership.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

~~34.~~87. Plaintiff SHEANNA ROGERS is a housing provider in the COUNTY and owns the property at 23243 Maud Ave., Hayward CA ("23243 Maud Ave.") At one time, ROGERS ran a small, three-bedroom, independent living facility at 23243 Maud Ave., where she & her husband cared and provided for people who needed a "helping hand" to get on their feet. Many clients had lived at this address for over 5 years. ROGERS served a vulnerable population at the living facility; her clients often had mental disabilities and no families to turn to. ROGERS was able to provide her clients with a safe living space and meals they could count on at 23243 Maud Ave. In addition to the independent living facility space, 23243 Maud Ave. has a separate studio unit. ROGERS rented this unit in 2018 ~~-~~for ~~to the current renter, who paid~~ $1000 per month. That renter was never part of the independent living facility program. ROGERS depends on this supplemental rental income to support her and her family. Prior to the COUNTY'S enactment of its Moratorium, the renter began harassing ROGER's clients in the independent living facility. The renter would scream profanities at ROGERS' clients and throw garbage from his unit into the street directly in front of the property. The renter's harassment of ROGERS' clients got so bad that ROGERS was forced to file a restraining order against the renter and commence eviction proceedings. In February 2020, ROGERS and the renter came to a settlement agreement, whereby the renter agreed to vacate the property in April of 2020. However, after the COUNTY enacted its Moratorium, in March 2020, the renter refused to leave. The renter ~~is currently still occupying the property and has not paid~~did not pay rent for over three~~two~~ years. The renter's failure to pay wa~~i~~s not related to any Covid-19 related reason. Meanwhile, the renter's harassment of ROGERS' clients persisted, and ROGERS was forced to close her business as a result. ROGERS has also suffered devastating health consequences as a result of the stress caused by her nonpaying renter. ROGERS has applied for rental assistance from the COUNTY, however, because her renter will not cooperate, and his non-payment has nothing to do with Covid- 19 the COUNTY has refused to provide her with any relief. ~~-~~

~~35.~~88. Plaintiff JAQUELINE WATSON-BAKER is a housing provider in the CITY and COUNTY and owns the property at 1225-1227 92nd Ave Oakland, CA. ("1225-1227 92nd Ave").

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1225-1227 92nd Ave was purchased by WATSON-BAKER's mother in or about the 1950's. WATSON-BAKER's mother, who moved from to California from the Southern United States, was one of the first African ~~-~~Americans to own property in her East-Oakland neighborhood. 1225-1227 92nd Ave is a duplex, with a two-bedroom, two-bath front unit, and a one-bedroom one-bath back unit. The renter in the back unit, Unit 1227, originally moved into the property in 2016. Thereafter, WATSON-BAKER attempted to get access to the unit because the renter had put tinfoil over the windowpanes and had installed an air conditioner, and she was concerned about the renter's activity at the property. When WATSON-BAKER arrived at the property, the renter stated that he did "not believe that a black woman" owned the property and demanded to see her identification. WATSON-BAKER showed the renter her identification, which the renter snatched out of her hand, but the renter still refused her access to the unit. Thereafter, the renter would insist on dropping off his rent check at WATSON-BAKER's home address, even though she asked him multiple times to mail it to a P.O. Box. WATSON-BAKER continued to see concerning signs at the property, but the renter continued to refuse her access. For example, she saw signs of rat infestation, but when she sent an exterminator, the renter would not give the exterminator access and turned his dogs loose on them. The exterminator eventually refused to go back to the property. Because the tenant refused to grant her access, and WATSON-BAKER became increasingly concerned about the unit's condition, WATSON-BAKER filed for relief in court in or about 2018. The renter of the front unit of 1225-1227 92nd Ave Oakland left in 2019 because of the renter of the back unit's erratic behavior, and that unit has remained vacant since due to the renter's behavior. WATSON-BAKER finally obtained a court date for March of 2020, which then was pushed back due to shelter in place orders. The renter stopped paying rent just prior to this time. ~~The renter still occupies the unit to date and is currently approximately $5,000 in debt to her.~~ The renter's failure to pay wa~~i~~s not related to any Covid-19 related reason. WATSON-BAKER finally got access to the unit ~~several months ago~~ and saw that the unit was~~is~~ in gross disrepair. The renter put foil on all the unit's windows, there are dark yellow streaks running down the walls, and one of the unit's cabinets is hanging down from the ceiling. The

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

unit ~~is~~ was infested with insects and there was~~is~~ feces and urine all over the bathroom of the unit, and dog feces and garbage covered the unit's backyard. Notwithstanding the renter's damage to and perpetuation of a nuisance on her property, WATSON-BAKER was~~is~~ prevented from evicting the renter under the COUNTY's Moratorium. WATSON-BAKER considered selling the property, however, was advised that the renter's actions had devalued her property by almost a third of the market value. WATSON-BAKER applied for rental assistance from the COUNTY, however, her renter initially refused to cooperate with her. After he finally agreed to fill out an application, the COUNTY informed WATSON-BAKER that it could be up to a year until she received~~s~~ any rental relief funds.

89. Plaintiff Michael Loeb is a housing provider in the CITY and COUNTY and owns units 2501 and 2502 at 565 Bellevue Avenue, Oakland, California (565 Bellevue Units). Loeb, a 74 year-old widower, lived with his wife in Piedmont, until she died in 2015, after nearly 46 years of marriage. After her death, and, in part, because of mobility issues resulting in back surgery, he sold his home. He purchased the 565 Bellevue Units in April, 2020, with the intent to combine and occupy them as his home, for his own use, for the remainder of his life. Renter Joshua Bloomfield (Bloomfield), a 1996 Graduate of the University of Pennsylvania, and 2000 UCLA School of Law graduate, is a successful class action lawyer with a prominent Oakland based class action law firm. Bloomfield currently pays LOEB $2,200 per month in rent for a studio apartment. LOEB has attempted to voluntarily negotiate an owner move in with Bloomfield, offering him $30,000 to move out. This is more than four times the amount of $7,116.22 required as a relocation payment under the Oakland Just Cause for Eviction Ordinance, which is codified at Oakland Municipal Code section 8.22.850. However, Bloomfield ~~has~~ demanded that LOEB pay him more than $160,000 to vacate, telling LOEB that "it's nothing personal, just business." Multiple other comparable units ~~have~~ beca~~o~~me available in the same building and could have been occupied by Bloomfield. Bloomfield has not claimed any Covid related hardship. LOEB ~~has been~~was unable to commence an owner-move in eviction due to the Moratoriums.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

90.     Plaintiff HANNAH KIRK is a housing provider in the CITY and COUNTY and owns a single-family home at 4514 Fairbairn Ave, Oakland, CA.  KIRK is a single mother and lived in 4514 Fairbairn Ave with her two children.  KIRK's renter moved into her home in 2019, and the agreed upon rent was $800 per month.  The renter shared KIRK's kitchen and bathroom at KIRK's home.  KIRK's renter paid rent consistently until July 1, 2021, whereupon she stopped paying rent but did not move out of KIRK's home when asked.  The renter also did not cooperate with the rental assistance programs, or return the Covid-19 declarations that KIRK provided to her, and instead accused KIRK of harassing her.  Notwithstanding the renter's failure to pay rent even though no Covid-19 related reason existed, KIRK was prevented from evicting the renter under the CITY and COUNTY's Moratorium.  After spending almost two years having to carry the expenses of the renter and having to face the nonpaying renter on a daily basis inside of her own home, KIRK moved out of her home due to the severe emotional distress the situation was causing her and her children.  KIRK has not been able to pay her mortgage for approximately eight months and fears she will lose her home.

91.     Plaintiff AMI SHAH and AVINASH JHA were housing providers in the CITY and COUNTY and own a single-family home at 133 Gable Dr. Fremont CA.  SHAH and JHA purchased 133 Gable Dr. in 2019, intending it to be their primary residence.  However, for financial reasons, SHAH and JHA were required to rent 133 Gable Dr. until their lease obligations for their own rental were met.  They did so, but after the COUNTY enacted its Moratorium, SHAH and JHA's renters stopped paying rent, and refused to apply for rent relief through the state and local rent relief programs.  Not only did SHAH and JHA's renters stop paying rent, but the renters physically converted 133 Gable Dr. into an "Airbnb motel," renting out the individual rooms.  SHAH and JHA reported the renters' unlawful activity to the Fremont police, and during the investigation it was discovered that the renters were conducting similar fraudulent rental activity with other homes as well.  During the investigation, the renters abandoned the property, but the AirBnb guests did not, and refused to move out.  Throughout, SHAH and JHA were prevented from evicting their nonpaying and breaching renters and the AirBnb guests due to the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

COUNTY's Moratorium. During this time, both the renters and the Airbnb guests filed several frivolous legal actions against SHAH and JHA, most of which were later dismissed. When the Airbnb guests finally abandoned the property, SHAH and JHA were left with rental losses, legal fees and a home that was destroyed, and with a huge toll on their finances and health.

92. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 have also suffered devasting financial losses because of the Moratoria and Phase Out Ordinance. As alleged herein, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 own real property in either the COUNTY or the CITY or both. All Plaintiffs' properties listed in Paragraphs Nos. 17-20 and 22-66 are rental properties and/or contain rental units, and Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 are housing providers of these rental properties.

93. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 purchased all of these rental properties prior to the Moratoria being enacted with objective reasonable investment backed expectations based upon the regulatory environment in place at the time of purchase. When determining whether their purchase of these rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the same longstanding property law principles that other market participants would have relied on, namely, that a housing provider-renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter complied with the material terms of the lease. When determining whether their purchase of the rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the COUNTY and CITY just cause eviction ordinances then in place, including but not limited to, the ability to evict a renter who failed to pay rent or otherwise violated the material terms of the lease but was still in possession of their property. Prior to the Moratoria being enacted, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's rental properties were profitable businesses, all of which yielded an average of many thousands of dollars a year in profit.

94. All properties listed in Paragraphs Nos. 17-20 and 22-66 have been occupied by renters during the Moratoria. Since the Moratoria were enacted, and through the Moratoria's

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

duration, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have had renters at these properties who have refused or failed to pay rent for their units or otherwise violated the material terms of their leases. Many of the renters that occupy the properties listed in in Paragraphs Nos. 17-20 and 22-66 did not cooperate with Plaintiffs' efforts to assist them in obtaining rental assistance through the CITY and COUNTY programs, resulting in Plaintiffs' inability to mitigate their lost rental profits. Other renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 did not qualify for rental assistance because their income level was too high and/or because they were not impacted by a Covid-19 related reason, resulting in Plaintiffs' inability to mitigate their lost rental profits. Plaintiffs' renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 also committed acts that damaged these properties during the time the Moratoria were in effect, which further devalued their properties.

95. Despite the above acts, the blanket Moratoria and the Phase Out Ordinance prohibited Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 from evicting these renters during the time the Moratoria were in place. Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have seen significant losses in property values as a direct result of the Moratoria enabling renters to fail to pay rent for any reason at all, to damage these properties without consequence, and to violate the material terms of their leases with impunity. These rental properties have lost many millions of dollars in property value and income as a direct result of the Moratoria and Phase Out Ordinance. Moreover, as a result of the CITY and COUNTY Moratoria and Phase Out Ordinance, Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66's collective losses in rent and property damages, and other damages are in excess of tens of millions of dollars.

96. The COUNTY and CITY are aware that the Moratoria and Phase Out Ordinance solely target housing providers in favor of renters, by allowing renters carte blanche to refuse to pay rent without basis, and permit renters to cause damage to housing providers' properties and otherwise violate their leases without consequence. Despite the significant harm the Moratoria and Phase Out Ordinance has caused housing providers, COUNTY and CITY have refused to amend these regulations. Accordingly, the character of the Moratoria and Phase Out Ordinance

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

placed a severe and disproportionate regulatory burden upon Plaintiffs and forced Plaintiffs to carry the cost of a public program. These regulations were the functional equivalent of a classic taking in which government directly appropriates private property or ousts the owner from his or her domain.

36.

**FIRST CLAIM**
**(Violation of the 5th Amendment to the U.S. Constitution – Against All Defendants (42 U.S.C. § 1983))**

37.97. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 36 96 of this Complaint.

38.98. By enacting the Moratoriums and the Phase Out Ordinance, the COUNTY and the CITY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratoriums and the Phase Out Ordinance violate the Fifth Amendment of the United States Constitution on their face and as applied to Plaintiffs.

39.99. Defendants' Moratoriums and the Phase Out Ordinance purport to prohibit Plaintiffs from evicting any renter in the CTYCITY and COUNTY for virtually any reason, with few exceptions under the three-year-plus timeframes thereunder. The Moratoriums, which have no end dates, and the Phase Out Ordinance perpetrate physical takings by illegally nullifying Plaintiffs and other housing providers' right to occupy their properties without just compensation; the Moratoriums and the Phase Out Ordinance *eliminate* renters' rent obligations and sanction renters' trespassing on Plaintiffs' properties. Preventing housing providers "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." (*Alabama Association of Realtors v. Department of Health and Human Services* (2021) 141 S.Ct. 2485, 2489; also see, *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435; *Cedar Point Nursery v. Hassid* (2021) 141 S. Ct 2063; *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 655 [Physical taking occurs when a regulation "effectively extinguish[es] plaintiffs' right to occupy substantial

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

portions of their property"].)

~~40.~~100. The COUNTY and the CITY's moratoriums and the Phase Out Ordinance also unreasonably and substantially interfered with Plaintiffs' investment-backed expectations, singled out Plaintiffs to bear the full cost of public benefits, ~~-~~and result in either a substantial or total deprivation of the economic value of Plaintiffs' properties. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104.) The Moratoriums ~~are devaluing~~ devalued properties by prohibiting Plaintiffs from recovering possession of their properties—even for their personal use—and even despite renters perpetuating ongoing nuisances and/or committing material violation(s) of the lease. The Moratoriums and the Phase Out Ordinance further devalue properties by prohibiting eviction for~~and~~ *continued* nonpayment of rents for over a period of three years. Plaintiffs have suffered significant financial losses due to the Moratoriums, and continue to suffer these losses under the Phase Out Ordinance, notwithstanding the expiration of the Moratoria, because t~~t~~he current government "relief" programs in place, ~~which~~ have resulted in little to no relief. Plaintiffs' "investment-backed expectations" have been violated as a matter of law. (*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles* (C.D. Cal. 2020) 500 F. Supp. 3d 1088, 1096, *aff'd*, (9th Cir. 2021) 10 F.4th 905.) This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606.)

~~41.~~101. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance constitute takings without just compensation, and thus violates Plaintiffs' rights protected by the United States Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

~~42.~~102. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs also entitled to recover

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

attorneys' fees under 42 U.S.C. § 1983.

**SECOND CLAIM**
**(Inverse Condemnation – Violation of Article I, Section 19 of the California Constitution)**

~~43.~~103. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through ~~42~~ 102 of this Complaint.

~~44.~~104. The Moratoriums and the Phase Out Ordinance violate ~~the~~ Article I, Section 19 of the California Constitution on their face and as applied to Plaintiffs, for all the reasons alleged herein.

~~45.~~105. The Moratoriums and the Phase Out Ordinance therefore constitute takings without just compensation, and thus violate Plaintiffs' rights protected by the California Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.

~~46.~~106. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.

**THIRD CLAIM**
**(Violation of Due Process (42 U.S.C. § 1983))**

~~47.~~107. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through ~~46~~106 of this Complaint.

~~48.~~108. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. (*Lockary v. Kayfetz* (9th Cir. 1990) 917 F.2d 1150, 1155; *Weinberg v. Whatcom County* (9th Cir. 2001) 241 F.3d 746, 752-755.) The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive due process rights on their face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' ~~continued~~ imposition of the blanket Moratoriums and the Phase Out Ordinance for that three-plus year time period are irrational and lacking in a legitimate government interest because there is no justification for such extreme measures. Indeed,



ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

California's COVID-19 Renter Relief Act never imposed such draconian restrictions. Further, the Bay Area ~~has seen~~saw significant improvement in circumstances relating to the pandemic since March of 2020, has a high rate of vaccinations, and federal and state officials ~~have~~ recognized during the period of time the Moratoria were in place that Covid-19 ~~is~~ was either in, or moving to, an endemic stage. The pandemic should not have been used as a "cursory" justification for what would otherwise be an illegal law. (See, *Texas v. United States* (S.D. Tex. Aug. 19, 2021) No. 6:21-CV-00016, 2021 WL 3683913, at *45; *Chrysafis v. Marks* (2021) 141 S.Ct. 2482; *Tandon v. Newsom* (2021)141 S.Ct. 1294.) Defendants therefore have no rational basis for the Moratoriums and the Phase Out Ordinance, and any offered is plainly pretext. The Moratoriums and the Phase Out Ordinance violate procedural due process because they, in effect, deprive Plaintiffs of *any* procedure to recover their properties under most cases under the time period set forth thereunder.

~~49.~~109. The aforesaid acts, and as further alleged herein, therefore constitute violations of Plaintiff's procedural and substantive due process rights. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

~~50.~~110. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, emotional distress, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs are also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**(Violation of Equal Protection (42 U.S.C. § 1983))**

~~51.~~111. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through ~~49~~110 of this Complaint.

~~52.~~112. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the laws, on their face and as applied. The purpose of the Moratoriums and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

the Phase Out Ordinance is to unlawfully single out, penalize, and target Plaintiffs, and all housing providers in the CITY and COUNTY, by preventing them from lawfully exercising their property rights to receive rents, occupy their properties, exclude others from their properties, and protect their properties from nuisance and damage. The "emergency" under which the Moratoriums were enacted no longer existed during their impositions; the Bay Area is was open for business, has a high rate of vaccinations, and federal and state officials have recognized that Covid-19 wasis either in, or moving to, and endemic stage. Thus, any stated rational government purpose to the contrary is pretext.

53.113. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the law, and as a result, Plaintiffs have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.) Plaintiffs have also entitled to recover their attorneys' fees under 42 U.S.C. § 1983.

**FIFTH CLAIM**
**(Writ of Mandate (CCP §§ 1085 or 1094.5))**

54.114. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 113 53 of this Complaint.

55.115. Code of Civil Procedure §§ 1094.5 or 1085 authorizes Plaintiffs to seek a writ of mandate/mandamus, and which authorizes the Court to review and set aside public agency decisions involving a prejudicial abuse of discretion or error of law.

56.116. Plaintiffs requests the Court issue a declaration, and/or writ of mandate or mandamus, setting aside and voiding the effect of the Moratoriums and the Phase Out Ordinance as set forth hereunder. Plaintiffs also seeks an immediate stay to enjoin Defendants from enforcing the Phase Out Ordinance and the Moratoria's ban on virtually all evictions during that three-year periodMoratoriums, as such enforcement would further harm Plaintiffs by violating

their statutory and constitutional rights as alleged herein, and the issuance of such a stay would not be against the public interest.

~~57.~~117. In enacting the Moratoriums and Phase Out Ordinance, Defendants exceeded their jurisdiction, prevented Plaintiffs from having a fair trial, failed to proceed as required by law, and prejudicially abused their discretion because:

a. The Moratoriums and Phase Out Ordinance are preempted by the State's Covid-19 Renter Relief Act (the "Act"), both expressly and impliedly, because they conflict with the Act by depriving housing providers of the UD process altogether by prohibiting repossession of their properties in almost all circumstances under the timeframes set forth thereunder, thereby conflicting with that law. Because the Moratoriums and Phase Out Ordinance conflict with the Act, they are preempted and void.

b. T~~t~~he Moratoriums and Phase Out Ordinance unlawfully amend the CITY's Just Cause for Eviction Ordinance, which was enacted via voter initiative. (Oak. Mun. Code § 8.22.310.) While the COUNCIL is permitted to amend the Just Cause for Eviction Ordinance to a limited extent (see, Oak. Muni. Code § 8.22.360(F); City of Oakland Measure Y), the COUNTY is not, and the COUNCIL's moratorium and Phase Out Ordinance significantly surpasses the permissible scope of amendment permitted by the voters. Thus, ~~the Moratoriums~~these regulations are invalid.

c. The Phase Out ~~-~~Ordinance introduces substantive unlawful hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, allowing some renters to potentially stop paying rent altogether, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior, "unreasonable."

~~b.~~

~~58.~~118. Moreover, as alleged herein, Defendants' aforesaid acts constitute unconstitutional per se, regulatory, de facto, and physical takings of Plaintiffs' properties without

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

just compensation under the U.S. Constitution and violate Plaintiff's' constitutional rights to equal protection and due process, and any purported legitimate and/or rational basis for the same is pretext.

~~59.~~119. Because these are questions of law and implicate constitutional rights, the standard of review falls under the independent judgment test/de novo review.

~~60.~~120. To the extent Plaintiffs were required to exhaust any administrative remedies, they have, as alleged herein.

~~61.~~121. As alleged herein, Plaintiffs have a beneficial interest in ensuring that the effect of the now-expired Moratoriums and current Phase Out Ordinance are struck down so that Plaintiffs statutory and constitutional rights are not infringed upon. Plaintiffs do not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary to compel Defendants to correct their actions, which are unlawful and in excess of their authority.

~~62.~~122. Plaintiffs are entitled to recover attorneys' fees under Cal. Civ. Code § 1021.5, and because the Moratoriums are arbitrary and capricious, lacking any reasonable basis, and/or discriminatory and illegal, Plaintiffs are additionally entitled to attorneys' fees under Govt. Code § 800(a).

WHEREFORE, Plaintiffs' demand judgment against Defendants for the following:

**For Claims One, Two, Three and Four**:

1. A preliminary and permanent injunction preventing enforcement of the ~~Moratoriums~~Phase Out Ordinance;

2. A declaratory judgment determining that Defendants' Moratoriums and Phase Out Ordinance constitute a taking under the United States and California Constitutions, and violate Plaintiffs' right to due process and equal protection;

3. For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained;

4. For general damages according to proof, in an amount that is yet to be ascertained;

5. For an award of attorneys' fees and costs as allowed by law; and

6. For any other relief that the Court deems just and proper.

**For Claim Five**:

1. For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Phase Out OrdinanceMoratoriums for all of the reasons alleged above;

2. For a judgment that the Moratoriums and Phase Out Ordinance constitute unlawful takings on their face and/or as applied, and have prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation; and upon such judgment, give Defendants the opportunity to revoke Moratoriums and mitigate its damages in Plaintiff's inverse condemnation and 5th amendment takings action against Defendants;

3. For a judgment that Defendants have violated Plaintiffs' equal protection and due process rights;

4. For an immediate stay or preliminary injunction, and permanent injunction enjoining Defendants from enforcing the Phase Out OrdinanceMoratoriums pending the determination of the merits;

5. For costs of suit herein, including attorneys' fees;

6. For any other relief that the Court deems just and proper.

Dated: March 1, 2022 ______, 2023

ZACKS &, FREEDMAN & PATTERSON, PC

/s/ Andrew M. Zacks

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners
JOHN WILLIAMS
ROBERT VOGEL
SHEANNA ROGERS
MICHAEL LOEB
JAQUELINE WATSON-BAKER

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Case 3:22-cv-01274-LB Document 143 Filed 09/14/23 Page 174 of 315

~~HOUSING PROVIDERS OF AMERICA~~

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all claims (other than the petition for writ of mandate) as stated herein.

Dated: ~~March 1, 2022~~

ZACKS &, FREEDMAN ~~& PATTERSON~~, PC

*/s/ Andrew M. Zacks*
By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners
JOHN WILLIAMS
ROBERT VOGEL
SHEANNA ROGERS
MICHAEL LOEB
JAQUELINE WATSON-BAKER
HOUSING PROVIDERS OF AMERICA

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**VERIFICATION**

I, ~~Andrew M. Zacks~~Emily L. Brough, am an attorney representing all Plaintiffs and Petitioners (collectively, "Plaintiffs") in this action. I have personal knowledge of the matters attested to in the fifth cause of action for writ of mandate (CCP § 1085), which are primarily questions of law, and it is for this reason that I, and not Plaintiffs, are verifying the fifth cause of action, only. I have read the cause of action for writ of mandate and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true. On this basis, I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge and that this verification was executed on _____________, 2023~~2~~, in ~~Oakland~~Soquel, California.

_______________________________

Case 3:22-cv-01274-LB Document 143 Filed 07/14/23 Page 61 of 315

~~Andrew M. Zacks~~Emily L. Brough

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**PROOF OF SERVICE**

United States District Court—Northern District of California- Case No.: 3:22-cv-01274-LB

I, Angelica Nguyen, declare that:

I am employed in the County of San Francisco, State of California. I am over the age of 18, and am not a party to this action. My business address is 601 Montgomery Street, Suite 400, San Francisco, California 94111.

On September 20, 2023, I served:

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY; DEMAND FOR JURY TRIAL**

in said cause addressed as follows:

| | |
|---|---|
| PACIFIC LEGAL FOUNDATION<br>JONATHAN HOUGHTON (NJ Bar No. 369652021)<br>3100 Clarendon Blvd., Suite 610<br>Arlington, VA 22201<br>BRIAN HODGES (WA Bar No. 31976)<br>SAM SPIEGELMAN (NY Bar No. 5573100)<br>255 South King Street, Suite 800<br>Seattle, WA 98104<br>Email: JHoughton@pacificlegal.org<br>Email: BHodges@pacificlegal.org<br>Email: SSpiegelman@pacificlegal.org<br>*Attorney for John Williams, Robert Vogel, Sheanna Rogers, Michael Loeb, Jacqueline Watson-Baker, Housing Providers of America* | MARC SELTZER<br>KRYSTA K. PACHMAN<br>GLENN C. BRIDGMAN<br>NICHOLAS N. SPEAR<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067-6029<br>Email: mseltzer@susmangodfrey.com<br>Email: kpachman@susmangodfrey.com<br>Email: gbridgman@susmangodfrey.com<br>Email: nspear@susmangodfrey.com<br>*Attorneys for Intervenor-Defendant Alliance of Californians for Community Empowerment Action* |
| MATTHEW D. ZINN<br>EDWARD T. SCHEXNAYDER<br>MINDY K. JIAN<br>SHUTE, MIHALY & WEINBERGER LLP<br>396 Hayes Street<br>San Francisco, CA 94102<br>Email: Zinn@smwlaw.com<br>Email: Schexnayder@smwlaw.com<br>Email: mjian@smwlaw.com<br>*Attorney for Alameda County and Alameda County Board of Supervisors* | BARBARA J. PARKER<br>MARIA BEE<br>ALLISON EHLERT<br>One Frank H. Ogawa Plaza, 6th Floor<br>Oakland, CA 94612<br>E-Mail:aehlert@oaklandcityattorney.org<br>*Attorney for City of Oakland and Oakland City Council* |
| // | |

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

CHRISTOPHER E. SKINNELL
HILARY J. GIBSON
NIELSEN MERKSAMER
PARRINELLO GROSS & LEONI LLP
2350 Kerner Boulevard, Suite 250
San Rafael, CA 94941
Email: cskinnell@nmgovlaw.com
Email: hgibson@nmgovlaw.com
*Attorneys for Plaintiffs and Petitioners California Apartment Association Stephen Lin, Lakesh and Tripti Jain, Alison Mitchell, Michael Hagerty, H. Alex, Dannie Alvarez*

**/XX/ (BY ELECTRONIC SERVICE)** Based on a court order or an agreement of the parties to accept electronic service, I caused the said document to be served electronically through the CM/ECS System.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 20, 2023 at San Francisco, California.

ANGELICA NGUYEN

# EXHIBIT E

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

(42 U.S.C § 1983; C.C.P § 1085)

**DEMAND FOR JURY TRIAL**

Action Filed: March 1, 2022
Trial Date: None set

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1. Plaintiffs and Petitioners (collectively, "Plaintiffs"), hereby bring this first amended and supplemental complaint and petition for relief[1] against Defendants and Respondents ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND and OAKLAND CITY COUNCIL (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratoriums (collectively, "Moratoriums") and subsequent "phase out" regulations, and an order declaring said regulations invalid, illegal, and unenforceable.

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative fact, and thus form the same case or controversy under Article III of the United States Constitution.

**DIVISIONAL ASSIGNMENT**

3. Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California and thus should be assigned to the Court's Oakland Division.

**VENUE**

4. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants/respondents reside in this judicial district and the events giving rise to the claims occurred in this district.

**PARTIES**

5. Defendant and Respondent ALAMEDA COUNTY (the "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6. Defendant and Respondent ALAMEDA COUNTY BOARD OF SUPERVISORS

[1] A blacklined comparison of the amended and supplemental complaint with the original complaint is attached hereto.

(the "BOARD") is a policy making, legislative, and quasi-judicial administrative body of the COUNTY.

7. Defendant and Respondent CITY OF OAKLAND (the "CITY") is a municipal corporation in the State of California.

8. Defendant and Respondent OAKLAND CITY COUNCIL (the "COUNCIL") is a policy making, legislative, and quasi-judicial administrative body of the CITY.

9. Plaintiff JOHN WILLIAMS is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

10. Plaintiff ROBERT VOGEL is an individual over the age of 18 and is a housing provider and owner of real property in the COUNTY.

11. Plaintiff SHEANNA ROGERS is an individual over the age of 18 and is a housing provider and the owner of real property in the COUNTY.

12. Plaintiff MICHAEL LOEB is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

13. Plaintiff JAQUELINE WATSON-BAKER is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

14. Plaintiff HANNAH KIRK is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 4514 Fairbairn Ave, Oakland, CA.

15. Plaintiff AMI SHAH is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

16. Plaintiff AVINASH JHA is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

17. Plaintiff WILLIAM ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

18. Plaintiff MADELEEN ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Summit Street, Oakland CA.

19.     Plaintiff NORMAND GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

20.     Plaintiff MICHELLE GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

21.     Plaintiff and Petitioner HOUSING PROVIDERS OF AMERICA ("HPOA") is a § 501(c)(4) nonprofit corporation. HPOA is a network of housing activists fighting to protect the legal rights of housing providers, including those in the CITY and the COUNTY. HPOA's members own rental housing in and throughout the CITY and the COUNTY, and have been directly and adversely affected by the CITY and COUNTY's residential eviction Moratoriums and the CITY's subsequent "phase out" regulations. All of HPOA's members are housing providers in either the CITY and/or COUNTY; all of HPOA's members have renters at their properties who are taking advantage of the CITY and COUNTY's regulations, including but not limited to, refusing to pay rent for non-Covid-19 related reasons during the time period set forth thereunder, and refusing to relinquish possession, and creating nuisances and damage to HPOA's members' properties. HPOA's members have been unable to collect rent for time periods of months and/or years with no financial relief provided by the CITY and COUNTY, and the CITY and COUNTY's complete defense against virtually all residential evictions for a period of three-plus-years have tied HPOA's members' hands. HPOA's members have suffered lost rents, devalued properties, and some face impending foreclosures and bankruptcies, as a result of the CITY and COUNTY's regulations. The harm and injury brought to HPOA's members by the regulations is current, ongoing, and concrete and particularized to all HPOA's members. HPOA's efforts to remedy these injustices are central to its purpose of fighting to protect the legal rights of housing providers, including those in the CITY and COUNTY. Neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit. HPOA has a direct and substantial interest in ensuring that Defendants' decisions are in conformity with the requirements of law, that those requirements are properly executed, and that Defendants'

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

duties are enforced.

22.     Plaintiff 2355 Broadway, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2355 Broadway, Oakland CA.

23.     Plaintiff 3900 Adeline, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the COUNTY located at 3900 Adeline, Emeryville CA.

24.     Plaintiff Hollis Street Partners, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3250 Hollis Street, Oakland CA.

25.     Plaintiff Vulcan Lofts, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4401 San Leandro Street, Oakland CA.

26.     Plaintiff 1614 Campbell Street DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1614 Campbell Street, Oakland CA.

27.     Plaintiff 3014 Chapman DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3030 Chapman Street, Oakland CA.

28.     Plaintiff B3 Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 5200 Adeline Street, Emeryville , CA.

29.     Plaintiff Bakery Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4600 Adeline Street, Emeryville, CA.

30.     Plaintiff Exchange Studios DEL, LLC is a Delaware limited liability company,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

qualified to do business in California and the owner of real property in the CITY and COUNTY located at 527 23rd Avenue, Oakland, CA.

31. Plaintiff Madison Park Properties II DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1155 - 5th Street, Oakland CA.

32. Plaintiff P&D 23rd Avenue Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1080 23rd Avenue, Oakland CA.

33. Plaintiff P&D 46th St. Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 964 46th Street, Oakland CA.

34. Plaintiff Sears Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2633 Telegraph Ave, Oakland CA.

35. Plaintiff 301 Lenox, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 301 Lenox Avenue, Oakland CA.

36. Plaintiff 2228 Union Street Investors, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1438 Madison Street, Oakland CA, 7511-7527 Bancroft Avenue, Oakland CA, 8603 Hillside Street, Oakland CA, and 8701 Hillside Street, Oakland CA.

37. Plaintiff J & R Land & Cattle LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1551 Madison Street, Oakland CA and 2000 E. 30th Street, Oakland CA.

38. Plaintiff J & R Land & Cattle II LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1935-1948 E. 29th Street, Oakland CA, 1935-1945 E. 30th Street, Oakland CA, and 2032-2040

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E. 30th Street, Oakland CA.

39.     Plaintiff Westpark Apartments, LLC is a California limited liability company, qualified to do business in California and the owner of real properties in the CITY and COUNTY, located at 433 Perkins Street, Oakland CA, 1553 Alice Street, Oakland CA, and 4220 Montgomery Street, Oakland CA.

40.     Plaintiff Westpark II, GP is a California partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1530 Harrison Street, Oakland CA and 1555 Madison Street, Oakland CA.

41.     Plaintiff 685 Scofield, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 385-389 Palm Avenue, Oakland CA.

42.     Plaintiff 296 Mather Street, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 296 Mather Street #7, Oakland, CA.

43.     Plaintiff BayOak Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 2375 Fruitvale Ave #301, Oakland CA.

44.     Plaintiff Burling Street Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, and 1704 Upper 14th Street, Oakland CA.

45.     Plaintiff Rising Tide Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 722 Upper 30th Street, Oakland CA, 923-923A Apgar Street, Oakland CA, 827 30th Street Oakland, CA, 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 835 40th Street #4, Oakland CA, 860 34th Street, Oakland CA, 716-720 37th Street, Oakland, CA, 1021 Campbell Street, Oakland, CA, 1704 14th Street, Oakland, CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

46.     Plaintiff Oakland Point Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

47.     Plaintiff Truckee Zurich Place, LLC is a Delaware limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1036 62nd Street #4, Oakland CA, 2215-2217 Eighth Street, Berkeley, CA, 2839 Linden Street, Oakland CA, 1688-1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, 1704 Upper 14th Street, Oakland CA, 695-701 30th Street, Oakland CA.

48.     Plaintiff 18th & Linden, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1054 18th Street, Oakland CA.

49.     Plaintiff 220 Grand Investors, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 220 Grand Avenue, Oakland CA.

50.     Plaintiff 818 East 20th Street Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 800-818 E 20th Street, Oakland CA.

51.     Plaintiff 1130 30th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3649 Martin Luther King Jr Way, Oakland CA.

52.     Plaintiff 1701-1703 36th Avenue Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1701-1707 36th Avenue, Oakland CA.

53.     Plaintiff 1732-1744 27th Avenue, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1732-1744 27th Avenue, Oakland CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

54. Plaintiff 1844 7th Avenue 2013, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1844 7th Avenue, Oakland CA.

55. Plaintiff 2000 Linden Street, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2000 Linden Street, Oakland CA.

56. Plaintiff 2019 ABD Ozone Fund, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 831 6th Avenue, Oakland CA.

57. Plaintiff 2367 Washington, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 245 Lee Street, Oakland CA.

58. Plaintiff 2531 East 16th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1638 47th Avenue, Oakland CA.

59. Plaintiff 2701 High Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2701 High Street, Oakland CA.

60. Plaintiff ABD Suites, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1008 E 23rd Street Oakland, CA and 1722 27th Avenue Oakland, CA.

61. Plaintiff 301 Hannah Park, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2850 Hannah Street, Oakland CA.

62. Plaintiff Oakbrook Partners, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1125-1135 E 18th Street, Oakland CA and 1221 E 20th Street, Oakland CA.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

63. Plaintiff Riaz Capital Ozone Fund III, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1705 Mandela Parkway, Oakland CA, 2133-2143 Dwight Way, Berkeley CA, 2618 Martin Luther King Jr Way, Berkeley CA.

64. Plaintiff Riaz Taplin, trustee of The A.R.T. Trust is an individual over the age of eighteen. The A.R.T. Trust is the owner of real properties in the CITY and COUNTY located at 1454 36th Avenue, Oakland CA, 1616 35th Avenue, Oakland CA, 1828 28th Avenue, Oakland CA, 2166 E 27th Street, Oakland CA, 2554 E 16th Street, Oakland CA, 3700 International Boulevard, Oakland CA.

65. Plaintiff 1715 FFT, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1715 High Street Oakland, CA.

66. Plaintiff 1830 6th Ave Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1830 6th Avenue Oakland, CA.

67. Plaintiffs are not aware of the identities of defendants/respondents DOES 1-10, who are responsible for the acts and omissions alleged herein and that caused damage to Plaintiff; therefore, Plaintiffs will amend this Complaint when the true identities of DOES 1-10 are ascertained.

68. Plaintiffs are informed and believe that at all times mentioned in this Complaint, all defendants/respondents were the agents or employees of their co-defendants/respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## STATEMENT OF FACTS

### A. Background: The California Governor's Order and the COVID-19 Renter Relief Act.

69. In response to the Covid-19 pandemic, Governor Newsom declared a State of

Emergency in California on March 4, 2020, pursuant to the California Emergency Services Act (ESA), Gov. Code sec. 8550, et seq. On March 16, 2020, Governor Newsom entered an executive order, which in part permitted local governments to temporarily limit housing providers' ability to evict for nonpayment of rent due to the Covid-19 crisis. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

(Executive Order (EO) N-28-20.) The March 16, 2020 provision, permitting local government to temporarily limit Covid-19-related nonpayment evictions, expired on September 30, 2020. (EO N-71-20.)

70. Prior to the expiration of that provision, the California Legislature enacted the "COVID-19 Renter Relief Act" and the "COVID–19 Small Housing provider and Homeowner Relief Act of 2020" via AB 3088, effective August 31, 2020. AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure section 1161 et seq., and was aimed at "**temporary emergency relief** for financially distressed renters, homeowners, and small housing providers . . . ." Among other things, AB 3088 provided statewide eviction protections during a particular time period for renters who could not pay their rent for Covid-19-related reasons. AB 3088 also directed state agencies to engage about potential strategies for relief for renters and housing providers who suffered Covid-19-related financial hardship.

71. Notably (and consistent with the Governor's prior order), AB 3088's temporary moratorium on residential evictions was *specifically* limited to those based upon inability to pay for Covid-19-related financial distress. Even during the temporary moratorium, housing providers were still permitted to file actions for, and courts were still permitted to find renters

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

guilty of, UD for fault, and no-fault "just cause" as defined under Civil Code sec. 1946.2.[2] (CCP § 1179.03.5(a)(3).)

72. AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals ***negatively impacted*** by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect renters from eviction." (CCP § 1179.05(b), (e), (f), emph. add.) While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give carte blanche authority to do so, nor did it immunize "emergency" municipal regulations from challenges based on state law preemption.

73. The Covid-19-related nonpayment eviction protections of AB 3088 were extended thereafter through SB 91 AB 832, and AB 2179. These enactments protected affected renters from eviction during this extended time period under the UD statutes so long as they complied with the Covid-19-related financial distress requirements.

74. These enactments further clarified the State's rental assistance program. Starting October 1, 2021, and until July 1, 2022, for any Covid-19-related hardship rental debt that came due between those dates, a renter was required to show that they completed an application for rental assistance through the State program. If they did not, the housing provider could move forward with an UD action for nonpayment of rent. A housing provider could also have moved forward with a UD action if the rental assistance application was denied. (CCP § 1179.11(a), (c).)

---

[2] Civil Code sec. 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code sec. 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." (Civ. Code § 1946.2(g)(1).)

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**B. The CITY's Eviction Moratorium**

75. On March 9, 2020, the CITY declared a local state of emergency due to Covid-19. The CITY's local emergency was ratified on March 12, 2020, via Resolution No. 88075 C.M.S, and pursuant to the ESA, which permits municipalities to declare local emergencies under specified circumstances. (Gov. Code §§ 8558(c), 8630.) The ESA also requires a municipality to terminate the local emergency ". . . at the earliest possible date." (Gov. Code § 8630 (d).)

76. After ratifying the Local Emergency, on March 27, 2020, the CITY passed its eviction moratorium, Ordinance No. 13589. That moratorium not only prohibited evictions for nonpayment of rent due to Covid-19-related financial distress, but also *all other evictions*, with few exceptions:

> **Residential Eviction Moratorium.** Except when the renter poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (–) – (10) [excepting Ellis Act evictions] that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency.

77. Initially, the CITY's moratorium on all evictions was set to expire on May 31, 2020, "unless extended." (Ordinance No. 13589.) Subsequently, the moratorium was extended until "the Local Emergency declared on March 9, 2020 has been terminated by the City Council, or August 31, 2020, whichever comes first." (Ordinance no. 13594.) However, on July 7, 2020, the extension on the eviction moratorium was again amended to *only* expire when the local Emergency had been terminated by the COUNCIL. (Ordinance No. 13606 (Ex. 1).) The local Emergency has no stated expiration date and the CITY's position is that it has not expired.

78. After this action was filed, the CITY enacted Ordinance No. 23-0216 ("Phase Out Ordinance") on May 2, 2023, which, while providing for a "phase out" of the CITY's moratorium, also kept the "local emergency" in place. The Phase Out Ordinance provides that the CITY's moratorium shall end on July 15, 2023. However, the Phase Out Ordinance continued to prohibit evictions for virtually any reason, including non-payment, if the grounds

for eviction arose between March 9, 2020 and July 14, 2023. Thus, per the Phase Out Ordinance, the effect of the CITY's moratorium is still in place for that three-year-plus period . The Phase Out Ordinance also amended the CITY's Rent Ordinance, further restricting housing providers' "just cause" reasons for eviction. For example, the amendments introduced substantive hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior "unreasonable" in light of that term.

**C. The COUNTY's Eviction Moratorium**

79. The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which, like the CITY's moratorium, purported to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO § 6.120 (Ex. 2).) The COUNTY's moratorium applied to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.) These exceptions were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).) Like the CITY's moratorium, the COUNTY'S moratorium provided that it was an "absolute defense" to an unlawful detainer action brought during its term. (ACCO § 6.120.030(D).)

80. As enacted, the moratorium expired sixty days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the ratification of the local emergency, the local emergency "shall remain in effect until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-91.) On February 28, 2023, the COUNTY rescinded its local emergency. Accordingly, the COUNTY's moratorium expired on April 29, 2023. Notwithstanding, it is the COUNTY's position that evictions are prohibited for virtually any

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

reason, including non-payment and even if there was no Covid-19 relate financial distress, if the grounds for eviction arose between March 9, 2020 and April 28, 2023. Thus, the effect of the COUNTY's moratorium is still in place for that three-year-plus period.

**D. <u>The COUNTY and CITY's Rent Relief Assistance Programs</u>**

81. State law requires local governments to develop mechanisms by which housing providers and renters may file applications for, and receive if eligible, Covid-related rent relief.

82. The CITY operated a rent relief assistance program called "Oakland's Emergency Rental Assistance." At the time of filing this action, Oakland's Emergency Rental Assistance website stated: "UPDATE. PLEASE NOTE. As of January 7, the City of Oakland's Emergency Rental Assistance program is oversubscribed. Tenants and Landlords may still submit an application but will be placed on a waitlist." Currently, the website instead refers applicants to the COUNTY's rent relief assistance program, "Housing Secure." However, since this action was filed, the Housing Secure website states: "We have received more requests for funds than we have currently available."

83. Importantly, tenants in the CITY and COUNTY need not to participate in *any* rent relief program to avoid eviction under the relevant three-year-plus time frames of the Moratoria and the Phase Out Ordinance; the Moratoria and the Phase Out Ordinance's ban on evictions for the three-year-plus period prohibit evictions even for those tenants who refuse to cooperate with a landlord's request that they seek relief under these programs. This directly contradicts the purpose, intent and procedures of state law.

**E. <u>The Moratoriums' Detrimental Impact on Plaintiffs</u>**

84. The Moratoria, and as codified through the Phase Out Ordinance, have had devastating impacts on housing providers throughout the CITY and COUNTY, and to all Plaintiffs in this action. The following cases are but a few more detailed examples.

85. Plaintiff JOHN WILLIAMS is a housing provider in the CITY and COUNTY and owns the property at 1109 32nd Street, Oakland, CA. ("1109 32nd Street"). 1109 32nd Street is a duplex, and the rent for the property only barely covered WILLIAMS' property expenses

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

for 1109 32nd Street. The renter in the three-bedroom one-bath downstairs unit, Martina Martin, has occupied the unit for approximately twelve years, and until the Moratoria were enacted, always paid the rent for the unit, which was approximately $1,500.00 per month. After the CITY and COUNTY enacted the Moratoriums, however, the renter stopped paying rent and refused to pay through the entire duration of the CITY's Moratorium. The renter's failure to pay is not related to any Covid-19 related reason. In fact, the renter operated a moving and storage business, "Martina's Ride" out of her unit since 2017, and through much of 2021. The renter refuses to cooperate with WILLIAMS' efforts to obtain unpaid rents through the rent relief program, and therefore the CITY rejected WILLIAMS' application for noncompliance. The renter in the upper unit vacated in March of 2021. WILLIAMS was concerned that a new renter would move in and refuse to pay rent, so he kept that unit vacant after the renter left. In October of 2021, WILLIAMS was so riddled with stress caused by his non-paying renter and the very real possibility of losing 1109 32nd Street to foreclosure, he was hospitalized for panic attacks, chronic stress, and depression. To date, WILLIAMS remains disabled as a result. His disability forced him to quit his job and move into the upper unit of 1109 32nd Street—directly above his non-paying renter—to save money. WILLIAMS was also forced to take out a business loan upon exhausting his 401(k) and savings. WILLIAMS was unable to commence a nonpayment eviction against his renter as a direct result of the Moratoriums and in contravention of state law. While WILLIAMS has recently received some mortgage assistance from the State of California, he has not received any back rent payments, nor does the amount of mortgage assistance that WILLIAMS has received cover what his nonpaying tenant refused to pay. In the short term, from 2020 through 2023, WILLIAMS is owed approximately $60,000.00 in delinquent rent. As a result of same, he has been unable to pay his monthly mortgage, taxes, property maintenance, and utilities in a timely and routine manner. In the long term, the Moratoria and the CITY and COUNTY's enactment and enforcement of same have cast serious doubt on WILLIAMS future. WILLIAMS first purchased 1109 32nd Street to provide himself with housing security and reliable passive income upon hitting retirement. The occurrence of the events stemming from

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

the CITY and COUNTY's Moratoria have clouded WILLIAMS' vision of his future, as it is no longer a safe assumption that he will be able to fully enjoy his rights as a residential property owner entering into a landlord-tenant relationship with others. It has been shown from the CITY and COUNTY's course of conduct that third parties may be allowed to move into WILLIAMS property and subsequently be granted relief from paying rent based on what the CITY and COUNTY find to be acceptable excuses. WILLIAMS is now forced to solve not only the situation with his current tenant but also what to do with this valuable piece of property that he once relied upon to secure his future.

86. Plaintiff ROBERT VOGEL ("VOGEL") is a housing provider in the COUNTY and owns a rental property located 20076 Emerald Ct., Castro Valley, CA ("20076 Emerald"). 20076 Emerald is a three-bedroom, one bath, 853 sq. ft single family home. VOGEL is semi-retired and is a disabled paraplegic. VOGEL relies on the rental income from 20076 Emerald for a substantial source of retirement income. VOGEL is required to pay approximately $1,328 per month for 20076 Emerald's mortgage, taxes and insurance, garbage service, and fees for property management. The former renter at 20076 Emerald lived there for approximately twelve years, from January 1, 2011 through March 1, 2023, and her current rent was $2,000 per month, however she stopped paying any rent in September 2021, and has not paid any rent since that date and only just recently vacated. The renter's failure to pay prevented VOGEL from being able to refinance 20076 Emerald to a lower rate. The renter also stopped maintaining 20076 Emerald's landscaping and would park her car on the front yard. The renter's failure to pay was not related to any Covid-19 related reason. While the renter finally agreed to cooperate with local and state rent relief programs, VOGEL only received a portion of the unpaid back rent. Most recently, VOGEL learned that his former nonpaying renter may have been selling and/or manufacturing methamphetamine at 20076 Emerald. The renter covered all of the windows at the property, and neighbors reported strong chemical odors coming from the home. There was a "revolving door" of people making multiple, brief visits per day to the property, at all hours. When VOGEL was finally able to gain possession of 20076 Emerald, he discovered large

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

quantities of drug paraphernalia, including what appeared to be used meth pipes and small zip-lock baggies. A large quantity of white powder was found in an ice chest, which VOGEL's agent turned over to the police. The renter had also stopped cleaning the house, leaving food and garbage everywhere, which caused a rat infestation that VOGEL was required to remediate. The renter also had multiple dogs in the house in violation of the lease, which repeatedly urinated and defecated indoors, and scratched through areas of drywall. When 20076 Emerald was finally recovered, there were puddles of dog urine on the floors, and an extreme stench which took months and multiple cleanings to remedy. VOGEL's bank account was depleted because of having to carry all the costs of 20076 Emerald, and having to make significant repairs to the property damage caused by his nonpaying renter, and he is deeply concerned he will lose the property as the result of his inability to meet the financial obligations of ownership. In total, VOGEL endured lost rent revenue amounting to $44,484.00 from 2020 to 2023 ($4,451 in 2020; $2,683 in 2021; $1,350 in 2022; and $36,000 in 2023). As a result of the eviction moratorium, VOGEL was forced to pay his mortgage, taxes, and maintenance on the property despite the aforementioned lost rent revenue. In order to do so, he had no choice but to deplete the majority of his retirement savings. VOGEL endured additional costs in the form of $4,000 in legal fees spent trying to evict his tenant; $5,000 that he ended up having to pay his tenant in a pre-trial "cash for keys" settlement; and $19,000 in repairing the damage that his tenant caused his property to endure (broken windows, removing two dumpsters, broken doors, thrashed flooring, and damaged walls). In addition to the financial losses that VOGEL knew he was enduring, he also because extremely stressed as a result of the damage done to his property by his tenant's aforementioned illegal conduct. VOGEL developed issues with sleeping and also experienced increased blood pressure. Furthermore, as a result of the prolonged nature of the eviction moratorium, VOGEL felt completely and utterly helpless as a homeowner. He was not able to remove his tenant in order to sell his property at a higher price and in a timelier fashion. Had he been able to do so, he would have been that much more well situated for retirement, as someone already dealing with a significant physical disability. The extreme stress VOGEL suffered as a

result of the CITY and COUNTY's senseless moratoria showed VOGEL that investing in affordable housing is no longer a smart or safe way for one to invest their money, as government oversight can causally strip one of their rights as a landlord and cause them to suffer hundreds of thousands of dollars in lost rent revenue and unforeseen costs as a result of misguided policymaking.

87.     Plaintiff SHEANNA ROGERS is a housing provider in the COUNTY and owns the property at 23243 Maud Ave., Hayward CA ("23243 Maud Ave.") At one time, ROGERS ran a small, three-bedroom, independent living facility at 23243 Maud Ave., where she & her husband cared and provided for people who needed a "helping hand" to get on their feet. Many clients had lived at this address for over 5 years. ROGERS served a vulnerable population at the living facility; her clients often had mental disabilities and no families to turn to. ROGERS was able to provide her clients with a safe living space and meals they could count on at 23243 Maud Ave. In addition to the independent living facility space, 23243 Maud Ave. has a separate studio unit. ROGERS rented this unit in 2018 for $1000 per month. That renter was never part of the independent living facility program. ROGERS depends on this supplemental rental income to support her and her family. Prior to the COUNTY'S enactment of its Moratorium, the renter began harassing ROGERS' clients in the independent living facility. The renter would scream profanities at ROGERS' clients and throw garbage from his unit into the street directly in front of the property. The renter's harassment of ROGERS' clients got so bad that ROGERS was forced to file a restraining order against the renter and commence eviction proceedings. In February 2020, ROGERS and the renter came to a settlement agreement, whereby the renter agreed to vacate the property in April of 2020. However, after the COUNTY enacted its Moratorium, in March 2020, the renter refused to leave. The renter did not pay rent for over three years. The renter's failure to pay was not related to any Covid-19 related reason. Meanwhile, the renter's harassment of ROGERS' clients persisted, and ROGERS was forced to close her business as a result. ROGERS has also suffered devastating health consequences as a result of the stress caused by her nonpaying renter.  ROGERS has applied for rental assistance

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

from the COUNTY, however, because her renter will not cooperate, and his non-payment has nothing to do with Covid- 19 the COUNTY has refused to provide her with any relief. Due to ROGERS' loss of business as a direct result of her renter's harassment of her clients, causing all of them to be removed from her facility at 23243 Maud Ave., it is estimated that such abhorrent behavior by her renter caused ROGERS to lose out on $124,000 in business income from September 2021 through April 2024 ($4,000 on average per month, for 31 months.) This is in addition to the $48,000 in rent ROGERS has been deprived of pursuant to her renter's residence in 23243 Maud Ave.'s studio unit and not paying rent for same from April 2020 through April 2024 ($1,000.00 in delinquent rent for 48 months.) In addition to ROGERS suffering approximately $172,000 in losses over this period, her clients have suffered as well, as they have been forced to be placed elsewhere due to the CITY and COUNTY's allowing of ROGERS' renter to conduct himself in a bullying and threatening manner. There is no telling, at this time, whether or not ROGERS will be able to resume her once lucrative business at any point in the near future. The $172,000 she is rightfully owed may be just the start of years and years of losses that have yet to accrue – all stemming from the woefully misguided acts and omissions by the CITY and COUNTY as they relate to the Moratoria at issue here.

88. Plaintiff JAQUELINE WATSON-BAKER is a housing provider in the CITY and COUNTY and owns the property at 1225-1227 92nd Ave Oakland, CA. ("1225-1227 92nd Ave"). 1225-1227 92nd Ave was purchased by WATSON-BAKER's mother in or about the 1950's. WATSON-BAKER's mother, who moved from to California from the Southern United States, was one of the first African Americans to own property in her East-Oakland neighborhood. 1225-1227 92nd Ave is a duplex, with a two-bedroom, two-bath front unit, and a one-bedroom one-bath back unit. The renter in the back unit, Unit 1227, originally moved into the property in 2016. Thereafter, WATSON-BAKER attempted to get access to the unit because the renter had put tinfoil over the windowpanes and had installed an air conditioner, and she was concerned about the renter's activity at the property. When WATSON-BAKER arrived at the property, the renter stated that he did "not believe that a black woman" owned the property and demanded to

see her identification. WATSON-BAKER showed the renter her identification, which the renter snatched out of her hand, but the renter still refused her access to the unit. Thereafter, the renter would insist on dropping off his rent check at WATSON-BAKER's home address, even though she asked him multiple times to mail it to a P.O. Box. WATSON-BAKER continued to see concerning signs at the property, but the renter continued to refuse her access. For example, she saw signs of rat infestation, but when she sent an exterminator, the renter would not give the exterminator access and turned his dogs loose on them. The exterminator eventually refused to go back to the property. Because the tenant refused to grant her access, and WATSON-BAKER became increasingly concerned about the unit's condition, WATSON-BAKER filed for relief in court in or about 2018. The renter of the front unit of 1225-1227 92nd Ave Oakland left in 2019 because of the renter of the back unit's erratic behavior, and that unit has remained vacant due to the renter's behavior. WATSON-BAKER finally obtained a court date for March of 2020, which then was pushed back due to shelter in place orders. The renter stopped paying rent just prior to this time.    The renter's failure to pay was not related to any Covid-19 related reason. WATSON-BAKER finally got access to the unit and saw that the unit was in gross disrepair. The renter put foil on all the unit's windows, there are dark yellow streaks running down the walls, and one of the unit's cabinets is hanging down from the ceiling. The unit was infested with insects and there were feces and urine all over the bathroom of the unit, and dog feces and garbage covered the unit's backyard. Notwithstanding the renter's damage to and perpetuation of a nuisance on her property, WATSON-BAKER was prevented from evicting the renter under the COUNTY's Moratorium. WATSON-BAKER considered selling the property, however, was advised that the renter's actions had devalued her property by almost a third of the market value. WATSON-BAKER applied for rental assistance from the COUNTY, however, her renter initially refused to cooperate with her. After he finally agreed to fill out an application, the COUNTY informed WATSON-BAKER that it could be up to a year until she received any rental relief funds.

89.    Plaintiff Michael Loeb is a housing provider in the CITY and COUNTY and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

owns units 2501 and 2502 at 565 Bellevue Avenue, Oakland, California (565 Bellevue Units). Loeb, a 74-year-old widower, lived with his wife in Piedmont, until she died in 2015, after nearly 46 years of marriage. After her death, and, in part, because of mobility issues resulting in back surgery, he sold his home. He purchased the 565 Bellevue Units in April, 2020, with the intent to combine and occupy them as his home, for his own use, for the remainder of his life. Renter Joshua Bloomfield (Bloomfield), a 1996 Graduate of the University of Pennsylvania, and 2000 UCLA School of Law graduate, is a successful class action lawyer with a prominent Oakland based class action law firm. Bloomfield currently pays LOEB $2,200 per month in rent for a studio apartment. LOEB has attempted to voluntarily negotiate an owner move in with Bloomfield, offering him $30,000 to move out. This is more than four times the amount of $7,116.22 required as a relocation payment under the Oakland Just Cause for Eviction Ordinance, which is codified at Oakland Municipal Code section 8.22.850. However, Bloomfield demanded that LOEB pay him more than $160,000 to vacate, telling LOEB that "it's nothing personal, just business." Multiple other comparable units became available in the same building and could have been occupied by Bloomfield. Bloomfield has not claimed any Covid-related hardship. LOEB was unable to commence an owner-move in eviction due to the Moratoriums. To date, LOEB has incurred more than $75,000 in legal fees as a direct and proximate result of the abhorrent behavior that the CITY and COUNTY have enabled Bloomfield to exhibit. In addition to the financial harm LOEB has suffered, far more concerning are the emotional and mental strains he's endured at the hands of his tenant and the CITY and COUNTY. He fears that he may never be allowed to re-occupy the property he purchased with the intention of living out his remaining years – of sound mind and body – therein. The long-lasting effects of the CITY and COUNTY's moratoriums have caused LOEB to endure irreparable mental harm, including but not limited to the harm inflicted upon him by his tenant's attempts to extort $160,000 from him.

90. Plaintiff HANNAH KIRK is a housing provider in the CITY and COUNTY and owns a single-family home at 4514 Fairbairn Ave, Oakland, CA. KIRK is a single mother and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

lived in 4514 Fairbairn Ave with her two children. KIRK's renter moved into her home in 2019, and the agreed upon rent was $800 per month. The renter shared KIRK's kitchen and bathroom at KIRK's home. KIRK's renter paid rent consistently until July 1, 2021, whereupon she stopped paying rent but did not move out of KIRK's home when asked. The renter also did not cooperate with the rental assistance programs, or return the Covid-19 declarations that KIRK provided to her, and instead accused KIRK of harassing her. Notwithstanding the renter's failure to pay rent even though no Covid-19 related reason existed, KIRK was prevented from evicting the renter under the CITY and COUNTY's Moratorium. After spending almost two years having to carry the expenses of the renter and having to face the nonpaying renter on a daily basis inside of her own home, KIRK moved out of her home due to the severe emotional distress the situation was causing her and her children. The CITY and COUNTY put KIRK in such an incredibly toxic situation that she was essentially forced to decide between paying her then-current mortgage or or paying rent at a new property – i.e., she was effectively coerced into selling her property, which she finally did in September 2023. In total, after generating an average annual net income of just under $5,000 from 2019 through 2021, KIRK's property generated $0.00 in net income from 2022 through 2023 despite being occupied by a tenant. This tenant was in default from July 2021 through August of 2023, and the total delinquent rent that accumulated in that span was approximately $20,364.80. Among the other costs that KIRK was forced to endure were legal fees to ensure that she would not get sued by her tenant for any number of frivolous causes. She also endured extreme pain and related health issues from the stress of being put in this situation.

91. Plaintiff AMI SHAH and AVINASH JHA were housing providers in the CITY and COUNTY and own a single-family home at 133 Gable Dr. Fremont CA. SHAH and JHA purchased 133 Gable Dr. in 2019, intending it to be their primary residence. However, for financial reasons, SHAH and JHA were required to rent 133 Gable Dr. until their lease obligations for their own rental were met. They did so, but after the COUNTY enacted its Moratorium, SHAH and JHA's renters paid partial rent from April 2020 through June 2020,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

stopped paying rent entirely after June 2020, and refused to apply for rent relief through the state and local rent relief programs. Not only did SHAH and JHA's renters stop paying rent, but the renters physically converted 133 Gable Dr. into an "Airbnb motel" without the consent of either SHAH or JHA, renting out the individual rooms. SHAH and JHA reported the renters' unlawful activity to the Fremont police, and during the investigation it was discovered that the renters were conducting similar fraudulent rental activity with other homes as well. During the investigation, the renters abandoned the property, but the AirBnb guests did not, and refused to move out. The AirBnb guests even changed the locks. Throughout, SHAH and JHA were prevented from evicting their nonpaying and breaching renters and the AirBnb guests due to the COUNTY's Moratorium. During this time, both the renters and the AirBnb guests filed several frivolous legal actions against SHAH and JHA, most of which were later dismissed. When the AirBnb guests finally abandoned the property (which they did involuntarily and only because the City of Fremont deemed the house unsafe and therefore condemned it), SHAH and JHA were left with rental losses, legal fees and a home that was destroyed, and with a huge toll on their finances and health. In total, after receiving partial rent from April 2020 through June 2020 and then not receiving any rent from June 2020 through the day their tenants were finally evicted, SHAH and JHA collected $19,500.00 in total rent revenue and were deprived of $42,153.00 in delinquent rent. Furthermore, after enduring six months of vacancy while refurbishing the damage done to their property by the AirBnb guests vacated, total vacancy losses amounted to $22,200 from June 2021 through December 2021. Despite the delinquent rent and vacancy losses, SHAH and JHA paid $124,800 in property expenses (mortgage, property tax, insurance, and maintenance), $83,000 in repair costs, and $15,000 in legal fees. SHAH and JHA are still experiencing the long-term effects of this ordeal, as well. The AirBnb guests' unwelcome presence (and the resulting financial impact of delinquent rent and subsequent vacancy losses) made it impossible for SHAH and JHA to capitalize on historically low interest rates in 2020-2021, resulting in an estimated $450,000 in additional interest over the loan's remaining term at current rates. Additionally, due to their ongoing legal fees, dealing with harassment from the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

AirBnb guests, and the related mental stresses involved with both, SHAH and JHA missed crucial opportunities to advance their careers.  (The technology sector saw an unprecedented salary boom during the pandemic, with recruiters offering $200,000 to $300,000 above SHAH and JHA's then-existing salaries.)  Their combined losses amount to an estimated $400,000 in just two years, and will likely have a lasting impact on their lifetime savings.  Lastly, the stressors of delinquent rent, vacancy losses, and unwelcome squatters at their home robbed SHAH and JHA of a once in a lifetime opportunity to purchase another home in 2020 – as they had planned to do – given the historically low interest rates and lower home prices in the Bay Area.  As a result, SHAH and JHA missed out on an estimated $1.5M to $2.0M in potential gains from property appreciation in their neighborhood.  Not only did they forgo the opportunity to purchase an investment property, but the trauma of their experience forced them to sell their condominium unit, which will likely hinder their long-term financial goals – especially as they relate to planning for their children's future.  The compounded loss of all these financial setbacks continue to weigh heavily on SHAH and JHA from a financial, mental, and emotional standpoint.  SHAH and JHA remain fearful to this day over the prospect of ever purchasing another property, knowing full well that local government entities have the power to effectively allow the wrongful taking of that property by wanton third party conduct.

92.    In 2020, the 83-unit property commonly known as B3 Lofts and located at 5200 Adeline Street, Emeryville, CA ("B3"), owned and operated by Plaintiff B3 Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $20,791 in delinquent rent in 2020.  In 2021, this number doubled to $40,500, and then shot up in 2022 and 2023, to delinquent rent amounts of $139,276 and $138,799, respectively (a four-year delinquent rent total of $339,366 from 2020 through 2023).  Overall vacancy at B3 also took a hit, as it more than doubled from 4.2% in 2019 to 9.4% in 2023.  B3's total value has dropped from $32.8M in 2020 to $26.96M in 2023 – a decline of $5.84M, or -17.8%.  Finally, B3's internal rate of return (IRR) plummeted from a pre-COVID figure of 11.8% (from January 2018 through March of 2020)  to -10.9% (from

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

April 2020 through June 2023). As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

93. In 2020, the 102-unit property located at 3900 Adeline, Emeryville, CA ("ADE"), owned and operated by Plaintiff 3900 Adeline, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $40,691 in delinquent rent in 2020. In 2021, this number increased to $102,020, and then increased again in 2022 to $135,838. In 2023, the delinquent rent figure recovered some, dropping to $8,971. Over that four-year span, ADE experienced total delinquent rent of $287,520. Overall vacancy at ADE also increased from 5.0% in 2019 to 6.5% in 2023. ADE's total value has dropped from $46.08M in 2020 to $36.06M in 2023 – a decline of $10.02M or -22%. Since the onset of the pandemic, from April 2020 to June 2023, ADE has seen a negative cash-on-cash return of -21.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

94. In 2020, the 76-unit property located at 4600 Adeline Street, Emeryville, CA ("BAK"), owned and operated by Plaintiff Bakery Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $36,821 in delinquent rent in 2020. In 2021, this number increased to $54,964. Over the four-year span from 2020 through 2023, BAK experienced total delinquent rent of $95,752. Overall vacancy at BAK also increased from 2.8% in 2019 to 6.5% in 2023. BAK's total value has dropped from $22.45M in 2020 to $19.32M in 2023 – a decline of $3.13M or -13.9%. Since the onset of the pandemic, from April 2020 to June 2023, BAK has seen a negative cash-on-cash return of -5.0%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

95. In 2020, the 27-unit property located at 2355 Broadway, Oakland CA ("BRO"),

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

owned and operated by Plaintiff 2355 Broadway, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $19,034 in delinquent rent in 2020.  In 2021, this number was $6,163, followed by $11,174 in 2022 and $10,627 in 2023. Over the four-year span from 2020 through 2023, BRO experienced total delinquent rent of $46,998.  Overall vacancy at BRO also increased from 4.1% in 2019 to 10.1% in 2023.  BRO's total value has dropped from $12.68M in 2020 to $9.61M in 2023 – a decline of $3.07M or -24.2%.  Since the onset of the pandemic, from April 2020 to June 2023, BRO has seen a negative cash-on-cash return of -14.5%.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

96.     In 2020, the 124-unit property located at 3250 Hollis Street, Oakland CA ("HOL"), owned and operated by Plaintiff Hollis Street Partners, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $86,857 in delinquent rent in 2020.  In 2021, delinquent rent increased to $102,322, followed by another increase in 2022 to $307,802. In 2023, delinquent rent totaled $294,520. Over the four-year span from 2020 through 2023, HOL experienced total delinquent rent of $791,501.  Overall vacancy at HOL also increased from 9.3% in 2020 to 10.3% in 2023. HOL's total value has dropped from $73.44M in 2020 to $44.13M in 2023 – a decline of $29.31M or -39.9%.  Since the onset of the pandemic, from April 2020 to June 2023, HOL has seen a negative cash-on-cash return of -54.2%.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

97.     In 2020, the 27-unit property located at 1155 5th Street, Oakland, CA 94607 ("MPP2"), owned and operated by Plaintiff Madison Park Properties II DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $40,308 in delinquent rent in 2020.  In 2021, delinquent rent totaled $17,374, followed by a total of $86,397 in delinquent rent in 2022.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

In 2023, delinquent rent totaled $64,212. Over the four-year span from 2020 through 2023, MPP2 experienced total delinquent rent of $208,291. Overall vacancy at MPP2 also increased from 2.4% in 2019 to 8.8% in 2023. MPP2's total value has dropped from $12.1M in 2020 to $10.15M in 2023 – a decline of $1.95M or -24.2%. Since the onset of the pandemic, from April 2020 to June 2023, MPP2 has seen a negative cash-on-cash return of -16.1%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

98. In 2020, the 36-unit property located at 964 46th Street, Oakland, CA ("PD46"), owned and operated by Plaintiff P&D 46th St. Associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, over the four-year span from 2020 through 2023, PD46 experienced total delinquent rent of $139,757. Overall vacancy at PD46 also increased from 3.5% in 2019 to 10.2% in 2022, before dropping back down to 3.5% once more in 2023. PD46's total value has dropped from $14.8M in 2020 to $12.64M in 2023 – a decline of $2.16M or -14.6%. Since the onset of the pandemic, from April 2020 to June 2023, PD46 has seen a negative cash-on-cash return of -6.8%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

99. In 2020, the 54-unit property located at 2633 Telegraph Ave, Oakland, CA ("SLO"), owned and operated by Plaintiff Sears Lofts DEL, LLC ("SLO"), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $57,389 in delinquent rent in 2020. In 2021, delinquent rent totaled $2,967, followed by a total of $34,170 in delinquent rent in 2022. In 2023, delinquent rent totaled $50,117. Over the four-year span from 2020 through 2023, SLO experienced total delinquent rent of $144,643. Overall vacancy at SLO also increased from 4.3% in 2019 to 5.6% in 2023. SLO's total value has dropped from $29.6M in 2020 to $28.16M in 2023 – a decline of $1,485,000 or -5.01%. As shown in the instant amended complaint and its

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

100. In 2020, the 27-unit property located at 1080 23rd Avenue, Oakland, CA ("1080"), owned and operated by Plaintiff P&D 23rd Avenue associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $85,713 in delinquent rent in 2020. In 2021, delinquent rent dropped down to $3,135, before shooting back up to $42,485 and $39,670 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1080 experienced total delinquent rent of $171,003. Overall vacancy at 1080 also increased from 5.2% in 2019 to 6.9% in 2023. 1080's total value has dropped from $9.20M in 2020 to $7.28M in 2023 – a decline of $1.92M or -21.1%. Since the onset of the pandemic, from April 2020 to June 2023, 1080 has seen a negative cash-on-cash return of -11.4%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

101. In 2020, the 92-unit property located at 1614 Campbell Street, Oakland, CA ("1614"), owned and operated by Plaintiff 1614 Campbell Street DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $90,412 in delinquent rent in 2020. In 2021, delinquent rent dropped slightly to $89,164, before skyrocketing up to $318,490 and $190,797 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1614 experienced total delinquent rent of $688,863. Overall vacancy at 1614 also increased from 3.0% in 2019 to 9.5% in 2023. 1614's total value has dropped from $39.1M in 2020 to $30.26M in 2023 – a decline of $8.84M or -22.61%. Since the onset of the pandemic, from April 2020 to June 2023, 1614 has seen a negative cash-on-cash return of -18.3%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

102. In 2020, the 39-unit property located at 527 23rd Avenue, Oakland, CA ("ES"),

owned and operated by Plaintiff Exchange Studios DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, over the four-year span from 2020 through 2023, ES experienced total delinquent rent of $39,382. Overall vacancy at ES also increased from 2.6% in 2019 to 8.5% in 2023. ES's total value has dropped from $14.1M in 2020 to $12.37M in 2023 – a decline of $1.73M or -12.27%. Since the onset of the pandemic, from April 2020 to June 2023, ES has seen a negative cash-on-cash return of -4.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

103.    In 2020, the 41-unit property located at 3030 Chapman Street, Oakland, CA ("GAL"), owned and operated by Plaintiff 3014 Chapman DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $17,465 in delinquent rent in 2020. In 2021, delinquent rent shot upward to $47,679, before increasing twice more to $64,745 and $100,435 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, GAL experienced total delinquent rent of $230,324. Overall vacancy at GAL also increased from 3.3% in 2019 to 7.8% in 2023. GAL's total value has dropped from $18.2M in 2020 to $14.37M in 2023 – a decline of $3.83M or -21%. Since the onset of the pandemic, from April 2020 to June 2023, GAL has seen a negative cash-on-cash return of -15.7%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

104.    In 2020, the 57-unit property located at 4401 San Leandro Street, Oakland, CA ("VUL"), owned and operated by Plaintiff Vulcan Lofts, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured significant delinquent rent over the four-year span from 2020 to 2023: $194,110 in 2020; $118,740 in 2021; $168,730 in 2022; and $176,745 in 2023 – a total of $658,325 in delinquent rent in four years. VUL's total value has dropped from $15.04M in 2020 to $13.26M in 2023 –

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

a decline of $1.78M or -11.8%. Since the onset of the pandemic, from April 2020 to June 2023, VUL has seen a negative cash-on-cash return of -2.6%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

105. In 2020, the multi-unit residential building commonly known as and located at 1454 36th Avenue, Oakland, CA ("1454"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1454 totaled $123,622.72. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $205,414.10 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $140,000 an impressive 65.56% ROI. From January 2020 through December 2023, ROI dropped to 49.19%. Additionally, the overall estimated property value declined from $3,542,920 at the onset of the COVID-19 pandemic in March 2020 to $1,938,892.31 in June 2023 – i.e., a -43.3% decline in value in a period of just over three years.

106. In 2020, the multi-unit residential building commonly known as and located at 1616 35th Avenue, Oakland, CA ("1616"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1616 totaled $17,574.57. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $175,967.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $60,000 an impressive 126.57% ROI. From January 2020 through December 2023, ROI dropped to 80.41%. Additionally, the overall estimated property value declined from $3,397,940 at the onset of the COVID-19 pandemic in March 2020 to

$1,597,498.31 in June 2023 – i.e, a -52.99% decline in value in a period of just over three years.

107.     In 2020, the multi-unit residential building commonly known as and located at 1701-1707 36th Avenue, Oakland, CA ("1707"), owned and operated by Plaintiff 1701-1703 36th Avenue Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 1707 totaled $76,953.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $217,899.67 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,040,820.00 at the onset of the COVID-19 pandemic in March 2020 to $2,554,661.69 in June 2023 – i.e, a -36.78% decline in value in a period of just over three years.

108.     In 2020, the multi-unit residential building commonly known as and located at 2166 E. 27th Street, Oakland, CA ("2166"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2166 totaled $41,752.74.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $101,307.72 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $388,464 a 21.28% ROI.  From January 2020 through December 2023, ROI dropped to 12.94%.  Additionally, the overall estimated property value declined from $3,985,160 at the onset of the COVID-19 pandemic in March 2020 to $1786,986 in June 2023 – i.e, a -55.16% decline in value in a three-year period.

109.     In 2020, the multi-unit residential building commonly known as and located at 2554 E. 16th Street, Oakland, CA ("2554"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2554

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

totaled $151,114.64.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $357,896.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 53.31% ROI.  From January 2020 through December 2023, ROI dropped to 48.05%.  Additionally, the overall estimated property value declined from $6,911,740 at the onset of the COVID-19 pandemic in March 2020 to $4,975,793.23 in June 2023 – i.e, a -28.01 % decline in value in a three-year period.

110.    In 2020, the multi-unit residential building commonly known as and located at 2701 High Street, Oakland, CA ("2701"), owned and operated by Plaintiff 2701 High Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2701 totaled $374,805.56.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $656,053.62 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $200,000 an 83.14% ROI.  From January 2020 through December 2023, ROI dropped to 74.24%.  Additionally, the overall estimated property value declined from $9,164,080 at the onset of the COVID-19 pandemic in March 2020 to $4,242,292.31 in June 2023 – i.e, a -53.7% decline in value in a three-year period.

111.    In 2020, the multi-unit residential building commonly known as and located at 3700 International Boulevard, Oakland, CA ("3700"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 3700 totaled $278,320.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $456,728.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

paying tenants. Additionally, the overall estimated property value declined from $8,911,700 at the onset of the COVID-19 pandemic in March 2020 to $5,443,692.31 in June 2023 – i.e, a -38.9% decline in value in a three-year period.

112. In 2020, the multi-unit residential building commonly known as and located at 1828 28th Avenue, Oakland, CA ("1828"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1828 totaled $108,362.98. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $252,908 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 28.13% ROI. From January 2020 through December 2023, ROI dropped to 17.36%. Additionally, the overall estimated property value declined from $3,131560 at the onset of the COVID-19 pandemic in March 2020 to $1,915,512 in June 2023 – i.e, a -38.8% decline in value in a three-year period.

113. In 2020, the multi-unit residential building commonly known as and located at 1002-1008 E. 23rd Street, Oakland, CA ("1002"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1002 totaled $116,030.44. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $316,694.97 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,322,223 a 6.84% ROI. From January 2020 through December 2023, ROI dropped to 5.84%. Additionally, the overall estimated property value declined from $6,907,620 at the onset of the COVID-19 pandemic in March 2020 to $4,461,323.08 in June 2023 – i.e, a -35.4% decline in value in a three-year period.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

114. In 2020, the multi-unit residential building commonly known as and located at 1844 7th Avenue, Oakland, CA ("1844"), owned and operated by Plaintiff 1844 7th Avenue 2013, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1844 totaled $80,123.77. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $275,123.89 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $7,534,560 at the onset of the COVID-19 pandemic in March 2020 to $4,452,938.46 in June 2023 – i.e, a -40.1% decline in value in a three-year period.

115. In 2020, the multi-unit residential building commonly known as and located at 800-818 E. 20th Street, Oakland CA ("800"), owned and operated by Plaintiff 818 East 20th Street Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 800 totaled $27,069.79. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $221,196.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $559,510 a 24% ROI. From January 2020 through December 2023, ROI dropped to 20.61%. Additionally, the overall estimated property value declined from $5,987,940 at the onset of the COVID-19 pandemic in March 2020 to $4,504,492.31 in June 2023 – i.e, a -24.77% decline in value in a three-year period.

116. In 2020, the multi-unit residential building commonly known as and located at 1722 27th Avenue, Oakland, CA ("1722"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1722 totaled $79,390.33. This figure, along with increased operating expenses having to do with legal fees and tenant turnover,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

contributed to approximately $308,641.86 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,920,220 at the onset of the COVID-19 pandemic in March 2020 to $4,201,092.31 in June 2023 – i.e, a -14.6% decline in value in a three-year period.

117. In 2020, the multi-unit residential building commonly known as and located at 2000 Linden St., Oakland, CA ("2000"), owned and operated by Plaintiff 2000 Linden Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2000 totaled $81,209,27. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $176,331.48 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,023,500 at the onset of the COVID-19 pandemic in March 2020 to $3,438,903.69 in June 2023 – i.e, a -14.53% decline in value in a three-year period.

118. In 2020, the multi-unit residential building commonly known as and located at 1732-1744 27th Avenue, Oakland CA ("1732"), owned and operated by Plaintiff 1732-1744 27th Avenue, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1732 totaled $9,900.50. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $84,514.96 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $5,150,920 at the onset of the COVID-19 pandemic in March 2020 to $4,715,353.85 in June 2023 – i.e, a -8.5% decline in value in a three-year period.

119. In 2020, the multi-unit residential building commonly known as and located at 3649 Martin Luther King Jr. Way, Oakland CA ("3649"), owned and operated by Plaintiff 1130

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

30th Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 3649 totaled $19269.61. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $66,547.93 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $504,415 a -2.57% ROI. From January 2020 to December 2023, ROI dropped to -12.67%. Additionally, the overall estimated property value declined from $810,380 at the onset of the COVID-19 pandemic in March 2020 to -$159,723.08 in June 2023 – i.e, a -119.7% decline in value in a three-year period.

120. In 2020, the multi-unit residential building commonly known as and located at 245 Lee Street, Oakland CA ("245"), owned and operated by Plaintiff 2367 Washington, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 245 totaled $224,208.78. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $494,847.21 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

121. In 2020, the multi-unit residential building commonly known as and located at 1638 47th Avenue, Oakland, CA ("1638"), owned and operated by 2531 East 16th Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1638 totaled $376,603.50. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $471,481.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,567,875.73 a 0.14% ROI. From January 2020 through December 2023, ROI dropped to -5.82%. Additionally, the overall estimated property value declined from $14,252,160 at the onset

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

of the COVID-19 pandemic in March 2020 to $10,665,523.08 in June 2023 – i.e, a -25.17% decline in value in a three-year period.

122.     In 2020, the multi-unit residential building commonly known as and located at 2850 Hannah Street, Oakland, CA ("2850"), owned and operated by 301 Hannah Park, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, delinquent rents at 2850 totaled $360,386.95.  This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $823,332.95 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  Additionally, from January 2020 through December 2023, 2850 posted an ROI of -2.33%.

123.     In 2020, the two-unit duplex property commonly known as and located at 716-720 37th Street, Oakland, CA ("720"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, 720's fair market rent was $7,279.16, plus a utility fee of $179.56, for a market Total Operating Income of $7,458.72 per month or $89,504.64 per year.  In 2020, 720 generated just $44,962.70 in rent revenue – roughly half its annual market rent. Accounting for an additional $992.80 in utility payments, 720's Total Operating Income of $45,955.50 represented $43,549.14 in lost income directly attributable to the CITY and COUNTY's moratoriums.  In 2021, 720's Total Operating Income was $7,463.24 less than its annual fair market rent of $89,504.64, and after a slight recovery in 2022, 720's 2023 Total Operating Income underperformed to the tune of $11,924.54. From 2020 through 2023, therefore, 720 lost $53,694.30 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 720 experienced a dramatic -45.50% decrease in overall property value from pre-COVID 2019 to 2020 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value plummeted from $1.18M to $643,377 year over year.  And though the property partially recovered from 2021

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

through 2023, its overall drop in property value from 2019 to 2023 was still a significant -8.0% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

124. In 2020, the twelve-unit property commonly known as and located at 296 Mather Street, Oakland, CA ("296 Mather"), owned and operated by Plaintiff 296 Mather Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the twelve-unit building's combined fair market rent was $39,920, plus a utility fee of $1,250, for a market Total Operating Income of $41,170 per month or $494,040 per year. In 2020, 296 Mather generated just $421,489.89 in rent revenue – roughly 85% of its annual market rent. Accounting for an additional $12,811.67 in utility payments, 296 Mather's Total Operating Income of $434,918 represented $59,122 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 296 Mather's Total Operating Income was $93,784 less than its annual market rent of $494,040, and its 2022 and 2023 Total Operating Incomes missed their mark by $110,488 and 93,608, respectively. From 2020 through 2023, therefore, 296 Mather lost $357,002 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 296 Mather experienced a -17.8% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $6.5M in 2019 to just under $5.37M in 2022. And though the property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -14.2% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

125. In 2020, the twelve-unit property commonly known as and located at 695-701 30th Street, Oakland CA ("695"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the four-unit building's combined fair market rent was $14,170, plus a utility fee of $319, for a market Total Operating Income of $14,489 per month or

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$173,864 per year. In 2020, 695 generated just $76,843 in rent revenue – roughly 44% of its annual market rent. Accounting for an additional $1,618 in utility payments, 695's Total Operating Income of $78,461 represented $95,402 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 695's Total Operating Income recovered slightly, but its 2022 and 2023 Total Operating Incomes missed their mark by $109,375 and $108,284, respectively. From 2020 through 2023, therefore, 695 lost $299,353 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 695 experienced a -62.49% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just under $903,000 in 2022. And though the property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -61.86% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

126. In 2020, the two-unit property commonly known as and located at 722 Upper 30th Street, Oakland CA ("722"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit building's combined fair market rent was $7,230, plus a utility fee of $208, for a market Total Operating Income of $7,438 per month or $89,256 per year. In 2020, 722generated just $50,563 in rent revenue – roughly 57% of its annual market rent. Accounting for an additional $1,672 in utility payments, 722's Total Operating Income of $52,235 represented $37,021 in lost income directly attributable to the CITY and COUNTY's moratoriums. Subsequently, 722's Total Operating Income for 2021, 2022, and 2023 missed its marks by $80,454, $89,256, and $20,675, respectively. From 2020 through 2023, therefore, 722 lost $227,406 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 722 experienced a -20.04% decrease in overall

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just over $960,000 in 2023.  This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

127.     In 2020, the two-unit property commonly known as and located at 827 30th Street, Oakland CA ("827"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the two-unit building's combined fair market rent was $5,522, plus a utility fee of $410, for a market Total Operating Income of $5,932 per month or $71,184 per year.  In 2021, 827 generated just $37,964 in rent revenue – roughly 53% of its annual market rent.  Accounting for an additional $2,475 in utility payments, 827's Total Operating Income of $40,439 represented $30,745 in lost income directly attributable to the CITY and COUNTY's moratoriums.  827's Total Operating Income in 2022 and 2023 missed its mark by $69,734 and $52,182, respectively.  From 2020 through 2023, therefore, 827 lost $152,661 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 827 experienced a -67.18% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $810,520 in 2019 to $266,028 in 2023.  This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

128.     In 2020, the four-unit property commonly known as and located at 1688-1692 12th Street, Oakland CA ("1688"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the four-unit building's combined fair market rent was $7,518.39, plus a utility fee of $90, for a market Total Operating Income of $7,608.39 per month or $91,300.68 per year.  In 2020, 1688 generated just $73,353.95 in rent revenue – roughly 80%

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

of its annual market rent.  Accounting for an additional $840 in utility payments, 1688's Total Operating Income of $74,193.95 represented $17,107 in lost income directly attributable to the CITY and COUNTY's moratoriums.  1688's Total Operating Income in 2021 and 2022 missed its mark by $49,081 and $19,428, respectively, before a slight recovery in 2023.  From 2020 through 2023, therefore, 1688 lost $75,431 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 1688 experienced a -9.99% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.18M in 2019 to $1.006M in 2022.  This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

129.    In 2020, the single-family home commonly known as and located at 860 34th Street, Oakland, CA ("860"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the single-family home's combined fair market rent was $4,350, plus a utility fee of $40, for a market Total Operating Income of $4,390 per month or $52,680 per year.  In 2020, 860 generated just $35,662 in rent revenue – roughly 68% of its annual market rent.  Accounting for an additional $360 in utility payments, 860's Total Operating Income of $36,022 represented $16,658 in lost income directly attributable to the CITY and COUNTY's moratoriums.  860's Total Operating Income in 2021 and 2022 missed its mark by $32,519 and $51,680, respectively, before a slight recovery in 2023.  From 2020 through 2023, therefore, 860 lost $89,704 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 860 experienced a -97.88% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just under $662,000 in 2019 to $14,000 in 2022.  This drop in value is reflective of reduced net operating

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

income stemming from moratorium-enabled delinquencies.

130.     In 2020, the two-unit property commonly known as and located at 1021 Campbell Street, Oakland, CA ("1021"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the two-unit property's combined fair market rent was $5,772.39, plus a utility fee of $440, for a market Total Operating Income of $6,212.39 per month or $74,548.68 per year.  In 2020, 1021 generated just $45,120.84 in rent revenue – roughly 60% of its annual market rent.  Accounting for an additional $4,080 in utility payments, 1021's Total Operating Income of $49,200.84 represented $25,348 in lost income directly attributable to the CITY and COUNTY's moratoriums.  1021's Total Operating Income missed its mark in 2021 and 2023 by $45,102 and $4,653, respectively, with a slight recovery occurring in 2022.  From 2020 through 2023, therefore, 1021 lost $49,355 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 1021 experienced a -57.98% decrease in overall property value from pre-COVID 2019 to 2021 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just over $981,000 in 2019 to just over $412,000 in 2021.  And despite its recovery in 2022, the overall property value in 2023 was still down from its pre-COVID figure from 2019.  This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

131.     In 2020, the two-unit property commonly known as and located at 1704 14th Street, Oakland, CA ("1704"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the single-family home's combined fair market rent was $5,940, plus a utility fee of $310, for a market Total Operating Income of $6,250 per month or $75,000 per year.  In 2020, 1704 generated just $43,725 in rent revenue – roughly 58% of its annual market rent.  Accounting for an additional $2,325 in utility payments, 1704's Total

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Operating Income of $46,050 represented $28,950 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1704's Total Operating Income missed its mark in 2021 and 2022 by $39,600 and $37,800, respectively, with a slight recovery occurring in 2023. From 2020 through 2023, therefore, 1704 lost $101,956 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1704 experienced a -50.40% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.05M in 2019 to $520,800 in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

132. In 2020, the property located at 2215-2217 Eighth Street, Berkeley, CA ("2217"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the property's combined fair market rent was $8,800, plus a utility fee of $75, for a market Total Operating Income of $8,875 per month or $106,500 per year. In 2020, 2217 generated just $79,868.70 in rent revenue – roughly 75% of its annual market rent. Accounting for an additional $750 in utility payments, 2217's Total Operating Income of $80,618.70 represented $25,881 in lost income directly attributable to the CITY and COUNTY's moratoriums. 2217's Total Operating Income missed its mark in 2021, 2022, and 2023 by $95,816, $42,527, and $19,500, respectively. From 2020 through 2023, therefore, 2217 lost $183,724 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 2217 experienced a -18.93% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.5M in 2019 to $1.218M in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

133. The 28-unit property located at and commonly known as 385-389 Palm Avenue,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Oakland, CA ("385 Palm"), owned and operated by Plaintiff 685 Scofield, LLC, generated $429,559.68 of total revenue in pre-COVID 2019, followed by $436,373.51 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -7.5% but total repairs and maintenance at the property totaled over $100,000 as pandemic-induced vacancy prompted management to make sweeping repairs to vacant units and under-utilized common areas. The drop in revenue and increase in operating expenses led to a 2021 NOI of -$37,688.31 after positive NOI in 2019 and 2020 of $108,887.11 and $166,54, respectively. Cash flow in 2021 was -$18,734.31. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

134. The 25-unit property located at and commonly known as 398 Euclid Avenue, Oakland, CA ("398 Euclid"), owned and operated by Plaintiff Normand Groleau, generated $435,963.81 of total revenue in pre-COVID 2019, followed by $444,272.39 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -12%, but costs related to property maintenance and unit turnover both spiked, leading to a YoY increase in property operating expenses from $265,575.46 in 2020 to $361,629.62 in 2021 – a 36.2% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $29,276.56 after NOI in 2019 and 2020 of $186,796.61 and $178,696.93, respectively. Cash flow in 2021 was just $15,772.58. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

135. The 30-unit property located at and commonly known as 433 Perkins Street, Oakland, CA ("433 Perkins"), owned and operated by Plaintiff Westpark Apartments, LLC, generated $501,207.97 of total revenue in pre-COVID 2019, followed by $519,550.59 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -4%, but costs related to property maintenance and unit turnover both increased, leading to a YoY increase in property operating expenses from $282,337.92 to $295,531.75 – a

4.7% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $203,195.04 after the property generated $233,567.03 in 2020 (a -13% decrease). This also led to 433 Perkins' 2021 cash flow coming in at -$44,647.13. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

136. The 34-unit property located at and commonly known as 1438 Madison Street, Oakland, CA ("1438 Madison"), owned and operated by Plaintiff 2228 Union Street Investors, LP, generated $496,695.06 of total revenue in pre-COVID 2019, followed by a drop in 2020 down to $437,753.09. In 2021, not only did total revenue drop further – this time by approximately -4.2% - but increases in repair costs contributed to a YoY increase in 1438's operating expenses from $297,346.42 to $316,071.80 (a 6.3% increase). The drop in revenue and increase in operating expenses led to a 2021 NOI of just $103,188.51 following 2020 which, despite the pandemic, still saw the property generate $140,406.67 in NOI. In fact, not until 2023 did 1438 Mason post an NOI that met or exceeded its pre-pandemic level. This trend is once again directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

137. The 24-unit property located at and commonly known as 1530 Harrison Street, Oakland, CA ("1530 Harrison"), owned and operated by Plaintiff Westpark II, GP, was uniquely affected by the pandemic in terms of the capital expenditures and operating expenses that brought down its bottom line in 2021. After a strong 2020 in which it generated $108,939.73 in NOI and $45,491.74 in total cash flow, costs in 2021 rose, particularly those relating to maintenance, unit turnover, and repairs. As a result, 1530 Harrison's total operating expenses increased from $186,985.05 in 2020 to $279,130.44 in 2021 (a 49.3% increase), yielding just $15,606.84 in NOI and turning cash flow red to the tune of -$36,926.16. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

138. The 69-unit property located at and commonly known as 1551 Madison Street,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Oakland, CA ("1551 Madison"), owned and operated by Plaintiff J & R Land & Cattle LP, generated $1,388,274.26 in total revenue in pre-COVID 2019. This figure dropped to $1,283,390.88 in 2020 and then again to $1,259,057.03 in 2021 – an approximately 6% drop from its pre-COVID baseline. Simultaneously, total operating expenses at 1551 Madison increased by approximately 3.4% from 2020 to 2021, due primarily to a 24% YoY increase in maintenance costs and a 23% increase in monthly services. These increases contributed to property NOI dropping by 9.5% from 2020-2021 as well as the property's annual cash flow dropping from a positive $92,888.61 in 2020 to -$59,954.28 in 2021. Years later, in 2023, 1551 Madison was still feeling the effects of the pandemic as its dramatic spike in unit turnover expenses (up from $51,043.94 in 2022 to $134,897.95 in 2023) dragged down its NOI and yielded a total property cash flow of -$123,204.55. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

139. The 84-unit property located at and commonly known as 1553 Alice Street, Oakland, CA ("1553 Alice"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums. 1553 Alice has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by a 20% decline from $1.51M in 2019 to $1.21M in 2023. This slide coincided with an increase in total operating expenses during that same time period, from $948,541.01 to $1,020,380.22 (a 7.5% increase). As a result of the narrowing margin between total revenue and total operating expenses over that five-year period, 1553 Alice posted a 2023 NOI of just $186,634.66, following a four-year stretch in which the property's annual NOI never dipped below $537,000. 1553 Alice's total cash flow in 2023 was negative, to the tune of -$212,201.34, following a three-year streak of positive annual cash flow of at least $47,000. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

140.     The 27-unit property located at and commonly known as 1555 Madison Street, Oakland, CA ("1555 Madison"), owned and operated by Plaintiff Westpark II, GP, has been greatly affected by the early onset of the COVID-19 pandemic and its lasting effects – especially in terms of the eviction moratoriums imposed by the CITY and COUNTY over the last several years.  From 2019 to 2021, 1555 Madison's total revenue plummeted from $520,423.40 to $480,064.83 to $417,773.79, marking a 19.7% drop in revenue from 2019 to 2021. Simultaneously, the property endured $344,606.23 in operating expenses in 2021, marking a sharp 31% increase YoY from 2020.  As a result, 1555 Madison's NOI in 2021 of just $73,167.56 drastically underperformed its previous marks of $216,427.61 and $172,950.19 from 2020 and 2019, respectively.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

141.     The 70-unit property located at and commonly known as 1935-1948 E. 29th Street, Oakland, CA ("1948 E. 29th"), owned and operated by Plaintiff J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners.  1948 E. 29th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 8.2% decrease from $959,875.45 in 2019 to $881,248.88 in 2023.  Additionally, as a direct result of pandemic-induced vacancy, 1948 E. 29th has experienced a gradual rise in unit turnover expenses, which have risen from $22,902.56 in 2019 to $35,411.43 in 2023.  1948 E. 29th was hit hardest by the lasting effects of the CITY and COUNTY's response to COVID-19 in 2022, when its $1.18M in total operating expenses dragged down its NOI and annual cash flows to -$237,064.07 and -$196,314.07, respectively.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

142.     The 37-unit property located at and commonly known as 2000 E. 30th Street, Oakland, CA ("2000 E. 30th"), owned and operated by Plaintiff J & R Land & Cattle LP, has

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 2000 E. 30th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 11.6% decrease from $512,611.05 in 2019 to $452,834.98 in 2023. In order to combat unit turnover, 2000 E. 30th expended nearly $360,000 in marketing costs from 2020 through 2022, while also experiencing rising maintenance costs from 2020 through 2022. After generating positive NOI from 2019 through 2021, the delayed onset effects of the pandemic-era eviction moratoriums finally took hold in 2022 and 2023, as 2000 E. 30th posted NOIs of -$126,787.69 and -$23,143.08, respectively, with a combined cash flow during that period of -$84,767.88. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

143. The 37-unit property located at and commonly known as 2032-2040 E. 30th Street, Oakland, CA ("2032 E. 30th"), owned and operated by J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs expended from 2019 through 2023. Total maintenance costs at the property have risen with increased vacancies, from a 2019 total of $43,628.24 up to an annual cost of $65,679.03 in 2023 (a 50% increase). Total unit turnover costs increased from $24,827.29 in 2019 and $18,813.94 in 2020 up to $39,032.28 in 2023. Zooming out, the effects of these increased costs have impacted 2032 E. 30th's bottom line, as the property has generated both negative NOI and negative cash flow in three of the last five years. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

144. The 30-unit property located at and commonly known as 4220 Montgomery Street, Oakland, CA ("4220 Montgomery"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

expended from 2019 through 2023, which have cut into the property's bottom line. In light of COVID-induced vacancies, 4220 Montgomery undertook more repairs in 2022 than it had in all of 2019 through 2021 combined. These costs of repairs helped contribute to rising total operating expenses at 4220 Montgomery from 2019 through 2023, which grew from annual figures of $294,796.36 on the low end to $397,489.06 on the high end. As a result of these downswings in net operating income, 4220 Montgomery has generated negative annual cash flow in three of the past five years, including a low mark of -$84,788.60 in 2023. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

145. The 100-unit property located at and commonly known as 2801 Summit Street, Oakland, CA ("2801 Summit"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of costs related to unit turnover and repairs made therein, which have cut into the property's bottom line over the course of the last five years. In light of COVID-induced vacancies, 2801 Summit's costs of repairs in 2023 nearly matched the total amount of repair costs it had expended from 2019 through 2022 combined. This figure contributed to 2801's 2023 total operating expenses hitting a five-year high in 2023 ($1,147,194.93). As a result, and despite generating $1,674,809.50, 2801 Summit's 2023 NOI was its second lowest in the period of 2019 through 2023, as its 2023 cash flow also turned red to the tune of -$89,391.72. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

146. The 23-unit property located at and commonly known as 125 Moss Avenue, Oakland, CA ("125 Moss"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has also been impacted by the CITY and COUNTY's COVID-19 related moratoriums imposed against residential property owners. As a result of substantial costs related to unit turnover, unit and common area repairs and maintenance, and make-ready expenses, 125 Moss'

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

NOI decreased from $308,102.97 in 2021 and $311,310.95 in 2021 and 2022 to just $276,519.82 in 2023. As a result, 125 Moss' annual cash flow in 2023 came in at -$26,582.64 for the second consecutive year. As shown in the instant amended complaint and its attachments, such inferior performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

147.    Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 have suffered devasting financial losses because of the Moratoria and Phase Out Ordinance. As alleged herein, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 own real property in either the COUNTY or the CITY or both. All Plaintiffs' properties listed in Paragraphs Nos. 17-20 and 22-66 are rental properties and/or contain rental units, and Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 are housing providers of these rental properties.

148.    Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 purchased all of these rental properties prior to the Moratoria being enacted with objective reasonable investment backed expectations based upon the regulatory environment in place at the time of purchase. When determining whether their purchase of these rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the same longstanding property law principles that other market participants would have relied on, namely, that a housing provider-renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter complied with the material terms of the lease. When determining whether their purchase of the rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the COUNTY and CITY just cause eviction ordinances then in place, including but not limited to, the ability to evict a renter who failed to pay rent or otherwise violated the material terms of the lease but was still in possession of their property. Prior to the Moratoria being enacted, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's rental properties were profitable businesses, all of which yielded an average of many thousands of dollars a year in profit.

149.    All properties listed in Paragraphs Nos. 17-20 and 22-66 have been occupied by

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

renters during the Moratoria. Since the Moratoria were enacted, and through the Moratoria's duration, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have had renters at these properties who have refused or failed to pay rent for their units or otherwise violated the material terms of their leases. Many of the renters that occupy the properties listed in in Paragraphs Nos. 17-20 and 22-66 did not cooperate with Plaintiffs' efforts to assist them in obtaining rental assistance through the CITY and COUNTY programs, resulting in Plaintiffs' inability to mitigate their lost rental profits. Other renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 did not qualify for rental assistance because their income level was too high and/or because they were not impacted by a Covid-19 related reason, resulting in Plaintiffs' inability to mitigate their lost rental profits. Plaintiffs' renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 also committed acts that damaged these properties during the time the Moratoria were in effect, which further devalued their properties.

150. Despite the above acts, the blanket Moratoria and the Phase Out Ordinance prohibited Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 from evicting these renters during the time the Moratoria were in place. Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have seen significant losses in property values as a direct result of the Moratoria enabling renters to fail to pay rent for any reason at all, to damage these properties without consequence, and to violate the material terms of their leases with impunity. These rental properties have lost many millions of dollars in property value and income as a direct result of the Moratoria and Phase Out Ordinance. Moreover, as a result of the CITY and COUNTY Moratoria and Phase Out Ordinance, Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66's collective losses in rent and property damages, and other damages are in excess of tens of millions of dollars.

151. The COUNTY and CITY are aware that the Moratoria and Phase Out Ordinance solely target housing providers in favor of renters, by allowing renters carte blanche to refuse to pay rent without basis, and permit renters to cause damage to housing providers' properties and otherwise violate their leases without consequence. Despite the significant harm the Moratoria and Phase Out Ordinance has caused housing providers, COUNTY and CITY have refused to

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

amend these regulations.  Accordingly, the character of the Moratoria and Phase Out Ordinance placed a severe and disproportionate regulatory burden upon Plaintiffs and forced Plaintiffs to carry the cost of a public program.  These regulations were the functional equivalent of a classic taking in which government directly appropriates private property or ousts the owner from his or her domain.

152.    With respect to each and every Plaintiff above, each Plaintiff suffered additional and further economic losses as detailed by the Declaration of Richard Marchitelli, MAI, CRE, ("Marchitelli Decl.," a true and correct copy of which is attached hereto as **Exhibit A**).  The Marchitelli Decl. (and any exhibits attached thereto) is incorporated into this Second Amended Complaint in full.

153.    Richard Marchitelli is a licensed real estate appraiser and a Member of the Appraisal Institute (MAI), and is the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC. (Marchitelli Decl., ¶ 2.)  Prior to this position, he served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield. (*Id.*)  His practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices.  (Marchitelli Decl., ¶ 3.)  He has prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. (*Id.*)

154.    As Marchitelli has determined, each and every fee property has suffered a substantial impairment of value, economic loss and economic use as a direct result of the COUNTY'S eviction band and/or of the CITY'S eviction ban. (Marchitelli Decl., ¶ 16.)   The severe and burdensome requirements of those ordinances, plus the uncertain and unpredictable end date, significantly increased the risk profile of these properties on a permanent basis and caused continuing negative harm to the economic value of each and every property. (*Id.*)

155.    Marchitelli has estimated that, based on his knowledge and experience, as a direct

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

result of the restrictions imposed by the CITY and/or COUNTY, the capitalization rates of each and every of these properties increased by at least 200 to 300 basis points, depending upon the individual characteristics of each property. (Marchitelli Decl., ¶ 24.) As detailed in the Marchitelli Decl., that increase in capitalization rate results in a corresponding decrease in economic value and economic use. (Marchitelli Decl., ¶¶ 7-10.)

156. The full scope of the economic impact for each and every property and Plaintiff herein shall be determined by the preparation of expert reports, determining the respective values before and after, in accordance with FRCP 26(a)). (Marchitelli Decl., ¶ 25.)

157. With respect to each and every Plaintiff above, each Plaintiff had a reasonable investment backed expectation to operate its respective property, and benefit from its full economic use, consistent with the land use regulations that were in place at the time of the property's purchase and that were in place prior to the enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

158. Each Plaintiff did not, and could not, reasonably expect the subsequent enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

159. Each Plaintiff did not, and could not, reasonably expect the substantial duration of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

160. Each Plaintiff did not, and could not, reasonably expect the severe impact and disproportionate burden that the government forced them to bear as a result of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

161. As a result of all of the above, the reasonable investment backed expectations of each and every Plaintiff were destroyed as a result of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

//

**FIRST CLAIM**[3]

**(Violation of the 5th Amendment to the U.S. Constitution – Against All Defendants (42 U.S.C. § 1983))**

162. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 96 of this Complaint.

163. By enacting the Moratoriums and the Phase Out Ordinance, the COUNTY and the CITY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratoriums and the Phase Out Ordinance violate the Fifth Amendment of the United States Constitution on their face and as applied to Plaintiffs.

164. Defendants' Moratoriums and the Phase Out Ordinance purport to prohibit Plaintiffs from evicting any renter in the CITY and COUNTY for virtually any reason, with few exceptions under the three-year-plus timeframes thereunder. The Moratoriums and the Phase Out Ordinance perpetrate physical takings by illegally nullifying Plaintiffs and other housing providers' right to occupy their properties without just compensation; the Moratoriums and the Phase Out Ordinance *eliminate* renters' rent obligations and sanction renters' trespassing on Plaintiffs' properties. Preventing housing providers "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." (*Alabama Association of Realtors v. Department of Health and Human Services* (2021) 141 S.Ct. 2485, 2489; also see, *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435; *Cedar Point Nursery v. Hassid* (2021) 141 S. Ct 2063; *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 655 [Physical taking occurs when a regulation "effectively extinguish[es] plaintiffs' right to occupy substantial portions of their property"].)

165. The COUNTY and the CITY's moratoriums and the Phase Out Ordinance also

[3] Per the Court's Order on Motions to Dismiss, filed September 3, 2024, the Court granted Defendants' motions with respect to dismissal of HPOA and "with prejudice as to all claims except the regulatory-takings claims, which are dismissed without prejudice." Plaintiffs reasserts claims and parties dismissed with prejudice herein to preserve Plaintiffs' right to appeal.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

unreasonably and substantially interfered with Plaintiffs' investment-backed expectations, singled out Plaintiffs to bear the full cost of public benefits, and result in either a substantial or total deprivation of the economic value of Plaintiffs' properties. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104.) The Moratoriums devalued properties by prohibiting Plaintiffs from recovering possession of their properties—even for their personal use—and even despite renters perpetuating ongoing nuisances and/or committing material violation(s) of the lease. The Moratoriums and the Phase Out Ordinance further devalue properties by prohibiting eviction for *continued* nonpayment of rents for over a period of three years. Plaintiffs have suffered significant financial losses due to the Moratoriums, and continue to suffer these losses under the Phase Out Ordinance, notwithstanding the expiration of the Moratoria, because the current government "relief" programs in place, have resulted in little to no relief. Plaintiffs' "investment-backed expectations" have been violated as a matter of law. (*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles* (C.D. Cal. 2020) 500 F. Supp. 3d 1088, 1096, *aff'd*, (9th Cir. 2021) 10 F.4th 905.) This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606.)

166. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance constitute takings without just compensation, and thus violates Plaintiffs' rights protected by the United States Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

167. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

//

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**SECOND CLAIM**
**(Inverse Condemnation – Violation of Article I, Section 19 of the California Constitution)**

168. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 102 of this Complaint.

169. The Moratoriums and the Phase Out Ordinance violate Article I, Section 19 of the California Constitution on their face and as applied to Plaintiffs, for all the reasons alleged herein.

170. The Moratoriums and the Phase Out Ordinance therefore constitute takings without just compensation, and thus violate Plaintiffs' rights protected by the California Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.

171. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.

**THIRD CLAIM**
**(Violation of Due Process (42 U.S.C. § 1983))**

172. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 106 of this Complaint.

173. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. (*Lockary v. Kayfetz* (9th Cir. 1990) 917 F.2d 1150, 1155; *Weinberg v. Whatcom County* (9th Cir. 2001) 241 F.3d 746, 752-755.) The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive due process rights on their face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' imposition of the blanket Moratoriums and the Phase Out Ordinance for that three-plus year time period are irrational and lacking in a legitimate government interest because there is no justification for such extreme measures. Indeed, California's COVID-19 Renter Relief Act never imposed such draconian restrictions. Further, the Bay Area saw

significant improvement in circumstances relating to the pandemic since March of 2020, has a high rate of vaccinations, and federal and state officials recognized during the period of time the Moratoria were in place that Covid-19 was either in, or moving to, an endemic stage. The pandemic should not have been used as a "cursory" justification for what would otherwise be an illegal law. (See, *Texas v. United States* (S.D. Tex. Aug. 19, 2021) No. 6:21-CV-00016, 2021 WL 3683913, at *45; *Chrysafis v. Marks* (2021) 141 S.Ct. 2482; *Tandon v. Newsom* (2021)141 S.Ct. 1294.) Defendants therefore have no rational basis for the Moratoriums and the Phase Out Ordinance, and any offered is plainly pretext. The Moratoriums and the Phase Out Ordinance violate procedural due process because they, in effect, deprive Plaintiffs of *any* procedure to recover their properties under most cases under the time period set forth thereunder.

174. The aforesaid acts, and as further alleged herein, therefore constitute violations of Plaintiff's procedural and substantive due process rights. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

175. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, emotional distress, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs are also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**(Violation of Equal Protection (42 U.S.C. § 1983))**

176. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 110 of this Complaint.

177. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the laws, on their face and as applied. The purpose of the Moratoriums and the Phase Out Ordinance is to unlawfully single out, penalize, and target Plaintiffs, and all housing providers in the CITY and COUNTY, by preventing them from lawfully exercising their property rights to receive rents, occupy their properties, exclude others from their properties, and protect their

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

properties from nuisance and damage. The "emergency" under which the Moratoriums were enacted no longer existed during their imposition; the Bay Area was open for business, has a high rate of vaccinations, and federal and state officials recognized that Covid-19 was either in, or moving to, and endemic stage. Thus, any stated rational government purpose to the contrary is pretext.

178. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the law, and as a result, Plaintiffs have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.) Plaintiffs have also entitled to recover their attorneys' fees under 42 U.S.C. § 1983.

**FIFTH CLAIM**
**(Writ of Mandate (CCP §§ 1085 or 1094.5))**

179. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 113 of this Complaint.

180. Code of Civil Procedure §§ 1094.5 or 1085 authorizes Plaintiffs to seek a writ of mandate/mandamus, and which authorizes the Court to review and set aside public agency decisions involving a prejudicial abuse of discretion or error of law.

181. Plaintiffs request the Court issue a declaration, and/or writ of mandate or mandamus, setting aside and voiding the effect of the Moratoriums and the Phase Out Ordinance as set forth hereunder. Plaintiffs also seek an immediate stay to enjoin Defendants from enforcing the Phase Out Ordinance and the Moratoria's ban on virtually all evictions during that three-year period, as such enforcement would further harm Plaintiffs by violating their statutory and constitutional rights as alleged herein, and the issuance of such a stay would not be against the public interest.

182. In enacting the Moratoriums and Phase Out Ordinance, Defendants exceeded their

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

jurisdiction, prevented Plaintiffs from having a fair trial, failed to proceed as required by law, and prejudicially abused their discretion because:

a.     The Moratoriums and Phase Out Ordinance are preempted by the State's Covid-19 Renter Relief Act (the "Act"), both expressly and impliedly, because they conflict with the Act by depriving housing providers of the UD process altogether by prohibiting repossession of their properties in almost all circumstances under the timeframes set forth thereunder, thereby conflicting with that law.   Because the Moratoriums and Phase Out Ordinance conflict with the Act, they are preempted and void.

b.     The Moratoriums and Phase Out Ordinance unlawfully amend the CITY's Just Cause for Eviction Ordinance, which was enacted via voter initiative.  (Oak. Mun. Code § 8.22.310.)  While the COUNCIL is permitted to amend the Just Cause for Eviction Ordinance to a limited extent (see, Oak. Muni. Code § 8.22.360(F); City of Oakland Measure Y), the COUNTY is not, and the COUNCIL's moratorium and Phase Out Ordinance significantly surpasses the permissible scope of amendment permitted by the voters.  Thus, these regulations are invalid.

c.     The Phase Out Ordinance introduces substantive unlawful hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, allowing some renters to potentially stop paying rent altogether, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior, "unreasonable."

183.    Moreover, as alleged herein, Defendants' aforesaid acts constitute unconstitutional per se, regulatory, de facto, and physical takings of Plaintiffs' properties without just compensation under the U.S. Constitution and violate Plaintiffs' constitutional rights to equal protection and due process, and any purported legitimate and/or rational basis for the same is pretext.

184.    Because these are questions of law and implicate constitutional rights, the standard

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

of review falls under the independent judgment test/de novo review.

185. To the extent Plaintiffs were required to exhaust any administrative remedies, they have, as alleged herein.

186. As alleged herein, Plaintiffs have a beneficial interest in ensuring that the effect of the now-expired Moratoriums and current Phase Out Ordinance are struck down so that Plaintiffs statutory and constitutional rights are not infringed upon. Plaintiffs do not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary to compel Defendants to correct their actions, which are unlawful and in excess of their authority.

187. Plaintiffs are entitled to recover attorneys' fees under Cal. Civ. Code § 1021.5, and because the Moratoriums are arbitrary and capricious, lacking any reasonable basis, and/or discriminatory and illegal, Plaintiffs are additionally entitled to attorneys' fees under Govt. Code § 800(a).

WHEREFORE, Plaintiffs demand judgment against Defendants for the following:

**For Claims One, Two, Three and Four**:

1. A preliminary and permanent injunction preventing enforcement of the Phase Out Ordinance;

2. A declaratory judgment determining that Defendants' Moratoriums and Phase Out Ordinance constitute a taking under the United States and California Constitutions, and violate Plaintiffs' right to due process and equal protection;

3. For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained;

4. For general damages according to proof, in an amount that is yet to be ascertained;

5. For an award of attorneys' fees and costs as allowed by law; and

6. For any other relief that the Court deems just and proper.

**For Claim Five**:

1. For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Phase Out Ordinance for all of

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

the reasons alleged above;

2. For a judgment that the Moratoriums and Phase Out Ordinance constitute unlawful takings on their face and/or as applied, and have prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation;

3. For a judgment that Defendants have violated Plaintiffs' equal protection and due process rights;

4. For an immediate stay or preliminary injunction, and permanent injunction enjoining Defendants from enforcing the Phase Out Ordinance pending the determination of the merits;

5. For costs of suit herein, including attorneys' fees;

6. For any other relief that the Court deems just and proper.

Dated: March 3, 2025 ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*
By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all claims (other than the petition for writ of mandate) as stated herein.

Dated: March 3, 2025

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**VERIFICATION**

I, Emily L. Brough, am an attorney representing all Plaintiffs and Petitioners (collectively, "Plaintiffs") in this action. I have personal knowledge of the matters attested to in the fifth cause of action for writ of mandate (CCP § 1085), which are primarily questions of law, and it is for this reason that I, and not Plaintiffs, are verifying the fifth cause of action, only. I have read the cause of action for writ of mandate and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true. On this basis, I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge and that this verification was executed on March 3, 2025, in Soquel, California.

Emily L. Brough

# EXHIBIT A

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98122
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**DECLARATION OF RICHARD MARCHITELLI IN SUPPORT OF FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

Action Filed: March 1, 2022
Trial Date: None set

I, Richard Marchitelli, declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the following facts discussed below and would testify truthfully thereto if called to do so.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

2.  I am the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC.  Prior to my current position, I served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield.

3.  My practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices.  I have prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability.  I have served as a sole arbitrator and as a member of arbitration panels.

4.  I currently serve as Chair of the Body of Knowledge Committee of the Appraisal Institute.  I have formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICs, and Chair of Americas Valuation Standards Board of RICs.

5.  A true and correct copy of my curriculum vitae ("CV") is attached hereto as **Exhibit B**.

6.  I reviewed the temporary ordinances enacted by the City of Oakland[1] and Alameda County[2] in response to the COVID-19 pandemic. I also inspected the exterior of properties in Oakland located at 125 Moss Avenue, 1553 Alice Street, 1692-1694 12th Street, 2000 E. 30th Street, 3629 West Street, 3700 International Boulevard, and 8603 Hillside Street.

7.  The market value of a rental property is determined by dividing the property's net operating income (income after expenses but before debt service) by a capitalization rate.[3]  If a property's net operating income is $100,000 and 10% is the appropriate capitalization rate, its value is

---

[1]  Oakland City Ordinance No. 13606.

[2]  Alameda County Ordinance No. 2020-32.

[3]  The 7th edition of *The Dictionary of Real Estate Apprisal* published by the Appraisal Institute defines capitalization rate as "A ratio on one year's income provided by an asset to the value of the asset; used to convert income into value in the income capitalization approach."

calculated by dividing $100,000 by 10% or 100,000/.10 = 1,000,000. In this example, the indicated property value is $1,000,000. Proof of this calculation is demonstrated by multiplying the property's $100,000 income by a factor of 10 or 100,000 x 10 = $1,000,000.

8. The capitalization rate is a basic tool used by buyers and sellers, investment analysts, mortgage underwriters, brokers, appraisers, and other real estate market participants to convert income into value. The capitalization rate reflects the risk of investing in a property. Capitalization rates are higher when the investment risk is greater because investors demand a higher return as compensation for accepting more uncertainty. The opposite is also true. The less the risk, the lower the capitalization rate.

9. Using the above example, if the investment risk were greater, the 10% capitalization rate might be 13%. In such a situation, the $100,000 net income, which remains the same, would be divided by a 13% capitalization rate and the indicated property value would be $769,230 (100,000/.13 = 769,230). Conversely, if the investment risk were low and 7% is the appropriate capitalization rate, the property value would be $1,428,571 (100,000/.07 = 1,428,571).

10. In summary, the higher the capitalization rate, the lower the value; the lower the capitalization rate, the higher the value.

11. Situs RERC, a respected vendor of real estate data, publishes quarterly surveys of capitalization rates. Such surveys are aggregated by quarter, property type, capitalization rate, and region of the country. The following table reflects capitalization rate data of apartment buildings in the western United States. Because capitalization rates vary by the quality of the asset, RERC divides properties into the three categories: Tier 1, being new or newer quality construction in prime to good locations; Tier 2, being aging, former first-tier properties, in good to average locations; and Tier 3, being older properties with functional inadequacies and/or in marginal locations.

12. A true and correct copy of Situs RERC's Reported Capitalization Rates Second and Third Tier Properties from first quarter 2020 through second quarter 2023 (the "Table") is attached hereto as **Exhibit A**.

ZACKS & FREEDMAN, PC
180 Montgomery Street, Suite 1950
San Francisco, California 94104

13. Tier 1 properties are properties often purchased by pension funds, insurance companies, and sovereign wealth funds. I did not include Tier 1 capitalization rates in the Table because they are not relevant to this discussion.

14. The buildings I inspected were clearly Tier 3 properties. Nevertheless, the Table is useful to provide context and perspective by showing the gradation or differences in the capitalization rates between Tier 2 and 3 properties.

15. The Table's first column from the left is the quarter of each year from the beginning of 2020 through third quarter 2023. The second column from the left is the year. The Table reflects the low, average, and high capitalization rates reported by RERC each quarter for Tier 2 and Tier 3 properties. The column at the far right represents the quarterly difference in the capitalization rates between Tier 2 and Tier 3 properties. Beginning in first quarter 2021 the differences between Tier 2 and Tier 3 property capitalization rates appear to have widened.

16. The market value of properties in the City of Oakland and throughout Alameda County were adversely impacted by the city and county ordinances beginning on the dates they were adopted despite the expectation that, although unknown, the moratoriums were likely to be rescinded sometime in the future. This uncertainty substantially increased the risk profile of properties affected by the moratoriums, making such properties less desirable to prospective purchasers.

17. The risk profile of such properties was further increased by the various terms imposed by the moratoriums such as prohibiting eviction of certain residential tenants for non-payment of rent, landlords not being able to impose late charges, and landlords being forced to work out payment plans over time for back rent. There was also uncertainty as to whether 100% of the rents would be collected and whether some rents would be collected at all despite legal remedies available to landlords, which although available might not make economic sense to pursue.

18. Value is the anticipation of future benefits. Existing properties were faced with the economic reality that there was great uncertainty regarding the timing of when income would be received and the amount of income that would actually be collected. Timing and durability of income are major factors in the decision-making process of investors in determining the price to pay for property.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

19. In addition to the unpredictability of when the moratoriums would end and the realization that the effects of the moratoriums would not end immediately when they were rescinded, such as the difficulty of collecting rents, the regulations caused irreparable future harm to property values by reinforcing the perception of residential property investors that Oakland and Alameda County were not favorable places to do business and should be avoided.

20. There is no question that the risk profile of properties discussed above increased substantially and that the value of such properties was seriously impaired on the dates the moratoriums were adopted.

21. Below I have demonstrated potential effects of the moratoriums on the value of a property with a $100,000 net income by increasing the capitalization rate of a Tier 3 property to reflect the considerable uncertainty and risk associated with such properties.

22. I adjusted Tier 3 base capitalization rate of 6.5% upward in increments of 50 basis points. Applying an unadjusted base Tier 3 capitalization rate of 6.5% to a $100,000 income results in value of $1,538,000 (rounded).

23. Adding 200, 250, and 300 basis points to a Tier 3 capitalization rate of 6.5%, results in adjusted capitalization rates of 8.5%, 9.0%, and 9.5%, respectively. Applying those rates to an income of $100,000 results in the following:

100,000/.085 = 1,176, 470 or rounded value of $1,176,000

100,000/.09 = 1,111,111 or rounded value of $1,100,000

100,000/.09.5 = 1,052,631 or rounded value of $1,052,000

24. Based on my knowledge and experience, as a direct result of the restrictions imposed by the City of Oakland and Alameda County, the capitalization rates of these properties increased by at least 200 to 300 basis points, and likely more, possibly substantially more, depending upon the individual characteristics of each property.

25. The exact economic loss will be determined by an appraisal report to be prepared in the future in connection with this litigation.

I declare under the penalty of perjury that the foregoing is true and correct, and this declaration was executed March 3, 2025 in the City of Charlotte, North Carolina.

Richard Marchitelli, MAI, CRE

**[Notary Public Verification on Following Page]**

ZACKS & FREEDMAN, PC
180 Montgomery Street, Suite 1950
San Francisco, California 94104

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

Sworn to and subscribed before me this 3rd day of March, 2025, by Richard Marchitelli.

____________________________________

Tracey Marchitelli, Notary Public

My Commission Expires: 5/11/2027

[Notary Seal]

TRACEY MARCHITELLI
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires May 11, 2027

# EXHIBIT A

| Situs RERC - Reported Capitalization Rates Second and Third Tier Properties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Apartments | | | West Region 2nd Tier | | | West Region 3rd Tier | | Difference 2nd vs. 3rd |
| Quarter | Year | Low | High | Average | Low | High | Average | (Basis Points) |
| Q1 | 2020 | 4.00% | 7.00% | **5.60%** | 4.80% | 8.00% | **6.20%** | **60** |
| Q2 | 2020 | 4.00% | 7.50% | **5.80%** | 5.00% | 7.80% | **6.30%** | **50** |
| Q3 | 2020 | 4.50% | 7.80% | **5.80%** | 5.00% | 9.80% | **6.50%** | **70** |
| Q4 | 2020 | 5.00% | 7.00% | **5.80%** | 5.30% | 8.00% | **6.30%** | **50** |
| Q1 | 2021 | 5.00% | 7.50% | **6.10%** | 5.50% | 8.50% | **6.80%** | **70** |
| Q2 | 2021 | 4.50% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q3 | 2021 | 4.80% | 7.50% | **5.90%** | 5.30% | 8.50% | **6.50%** | **60** |
| Q4 | 2021 | 4.80% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q1 | 2022 | 4.50% | 7.50% | **5.70%** | 5.30% | 8.50% | **6.60%** | **90** |
| Q2 | 2022 | 5.00% | 7.00% | **6.10%** | 5.50% | 8.50% | **6.90%** | **80** |
| Q3 | 2022 | 4.80% | 10.00% | **6.20%** | 5.00% | 12.00% | **7.00%** | **80** |
| Q4 | 2022 | 5.00% | 7.50% | **6.30%** | 5.50% | 8.50% | **7.10%** | **80** |
| Q1 | 2023 | 4.00% | 7.80% | **6.10%** | 4.30% | 11.00% | **7.00%** | **90** |
| Q2 | 2023 | 5.00% | 8.00% | **6.50%** | 5.50% | 8.80% | **7.20%** | **70** |

# EXHIBIT B

CURRICULUM VITAE

## Richard Marchitelli, MAI, CRE

*Senior Managing Director, Newmark Valuation & Advisory, LLC*
*Leader Litigation Support Practice*

**Professional History**

**Newmark Valuation & Advisory, LLC**
Senior Managing Director
Leader Litigation Support Practice
Charlotte, North Carolina
201-421-5308
richard.marchitelli@nmrk.com
2024 - Present

**Cushman & Wakefield**
Executive Managing Director
Americas Leader Dispute Analysis & Litigation Support Practice
New York, New York/Charlotte, North Carolina
2003 - 2024

**PricewaterhouseCoopers**
Director, Real Estate Practice
Leader Real Estate Litigation Support Practice
New York, New York
2000 - 2003

**Marchitelli Barnes & Company**
Founding Partner
New York, New York
1973 – 2000

**Experience**

Mr. Marchitelli's practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices. Mr. Marchitelli has prepared expert reports in matters involving economic damages, breach of contract and breach of fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. Additionally, he has served as a sole arbitrator and as a member of arbitration panels.

Mr. Marchitelli has provided consulting and valuation services involving challenging and unusual properties such as the High Line, an elevated rail corridor in Manhattan that has been converted into an urban park; development restrictions on properties surrounding McCarran Airport in Las Vegas; the Trans Alaska Pipeline; a mixed-use development site in Lima, Peru; the Hancock Center Observation Deck in Chicago; an 1,800-mile rail corridor and over 900 separate underground pipeline easements extending through six western states from Texas to Oregon and Nevada; a submarine maintenance and manufacturing facility in Groton, Connecticut; regulatory takings cases; the Northrop Grumman former military aircraft manufacturing property in Bethpage, New York; BP headquarters building in Houston; an oil drill site on



the North Slope of Alaska; luxury condominium resort on St. John in the U.S. Virgin Islands; mixed-use development properties in Guadalajara and Puerto Vallarta, Mexico; the Ritz Carlton Condominiums, Washington, DC.; an office industrial complex in Dublin, Ireland; and environmental contamination matters throughout the U.S. involving groundwater, radioactive waste, and airborne particulates.

Mr. Marchitelli has testified in arbitration proceedings at the International Centre for Settlement of Investment Disputes in Washington, DC, and has qualified as an expert witness in United States District Court, United States Tax Court, United States District Court of Federal Claims, United States Bankruptcy Court, and in various state and local courts, including Alaska, California, Georgia, Florida, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin. He has also been a court-appointed third-party expert in matters involving the valuation of real property.

Mr. Marchitelli is a former Adjunct Assistant Professor of Real Estate at New York University in the Master of Real Estate program where he taught post graduate courses in real estate valuation principles and concepts and marketability and feasibility studies. For 20 years, he taught courses nationally on the Uniform Standards of Professional Appraisal Practice.

Mr. Marchitelli has authored articles published in The Appraisal Journal, Real Estate Issues, Real Estate Forum, Appraisal Digest, and The Canadian Appraiser. He was a reviewer of the 9th, 10th, 11th, 12th, 13th, 14th, and 15th editions of *The Appraisal of Real Estate* and, as a subject matter expert, supervised publication of the 9th and 13th editions of that text. He was a reviewer of the 1st through 6th editions of *The Dictionary of Real Estate Appraisal* and supervised production of the 1st and 5th editions. In addition, Mr. Marchitelli has served as a reviewer of various other texts and monographs published by the Appraisal Institute and as a reviewer of several courses developed by that organization. He is also co-author of a chapter on the valuation of pipeline corridors in *Corridor Valuation: An Overview and New Alternatives* published in 2019 by the Appraisal Institute, International Right of Way Association, and Appraisal Institute of Canada.

## Education

Belmont Abbey College, Belmont, North Carolina
Degree: Bachelor of Arts, Political Science
*Who's Who in American Universities and Colleges*

## Professional Affiliations

Appraisal Institute (MAI Designation)
The Counselors of Real Estate (CRE Designation)
American Bar Association (Associate Member)

Mr. Marchitelli currently serves as Chair of the Body of Knowledge Committee of the Appraisal Institute. He formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICS, and Chair of Americas Valuation Standards Board of RICS. In addition, Mr. Marchitelli is a past Editor-in-Chief of The Appraisal Journal and former Editor-in-Chief of Real Estate Issues. He served as Chair of the New York Metropolitan Chapter of The Counselors of Real Estate, President of the Metropolitan New York Chapter of the Appraisal Institute, President of the Long Island Chapter of the Appraisal Institute, and President of the New York Condemnation Conference. Mr. Marchitelli is also licensed as a general real estate appraiser in several states.



## Special Awards

Mr. Marchitelli was awarded the George L. Schmutz Memorial Award by the Appraisal Institute for his assistance in the publication of *The Dictionary of Real Estate Appraisal.* He received the Wagner Award from the Appraisal Institute, which is presented to individuals in recognition of their contribution to the advancement of valuation knowledge and education, and he was also a recipient of the Lum Award presented annually by the Appraisal Institute to individuals for furtherance of the ideals of the real estate valuation profession.

## Select Presentations

"Property Markets – Past Present and Future", Duane Morris Fall Conference, Boca Raton

"Appraisal Myths and Market Realities", International Association of Assessing Officers, Salt Lake City

"How To – And How Not to – Develop Cap Rates in Fee Simple Market Valuation", Institute for Property Taxation – American Bar Association, New Orleans

"Experts Beware: Calculating Damages Attributable to Environmental Impairment and Detrimental Conditions", Appraisal Institute, Las Vegas

"Environmental Impairment and Damages Models: Distinguishing Real Science from Junk Science," Connecticut Legal Conference, Connecticut Bar Association, Hartford

"Plaintiff Damages Theories in Property Valuation Diminution Cases," Defense Research Institute, New Orleans

"The Challenge of Temporary Damages", International Right of Way Association, Hickory, NC

"Problems in Valuation – Working Beyond the Obvious," American Law Institute, Scottsdale

"Property Rights Symposium," Appraisal Institute, Chicago

"Power Plant Decommissioning, Retirement & Remediation – Providing Assistance in the Decision-Making Process: Buy, Sell, or Hold," Marcus Evans, Nashville

"Outside the Box: The Wide World Beyond Appraisal Opinions," Appraisal Institute, Nashville

"Evidentiary and Other Problems in Developing Post-Event Damage Estimates," New York County Lawyers' Association, New York

"Corridor Valuation and Depreciation Theory: Controversies – Alternative Approaches – Differing Perspectives," the 44th Annual Wichita Program, Wichita State University

"Corridor Valuation: Alternative Approaches/Differing Perspectives," International Right of Way Association, Hartford



"Expert – Attorney Communication:  Defining the Scope of Work," National Association of Property Tax Attorneys, Las Vegas

"Project Influence", American Law Institute, Irvington, VA

"Fee Simple and Leased Fee Valuations:  Distinctions with Real and Subtle Meanings" ABT/IPT Advanced Property Tax Conference, New Orleans

"How to Simplify Valuation in the Courtroom", American Law Institute, San Francisco

"How Real Estate Valuers Have Abdicated Their Role in Commercial Litigation," Southern California Chapter of the Appraisal Institute, Los Angeles

"Ask the Valuation Experts," International Association of Assessing Officers, Sacramento

"Tracking Property Value Diminution through Market Cycles: Theory & Evidence", Moderator, Appraisal Institute, Austin

"The Value of Design:  Why Do Developers Hire Name Architects?" Los Angeles Chapter of the American Institute of Architects, Los Angeles

"The Role of an Arbitrator," Urban Land Institute, Denver

"Going Concern:  Differing Perspectives on Real Property and Valuation Issues" Moderator, RICS Summit, Toronto

"Complex Commercial Litigation – Taking Valuation Skills to the Next Level," Appraisal Institute, Indianapolis

"Use of First and Second-Generation Rents, Changes in Highest and Best Use, and Maintaining Distinctions Between Fee Simple and Leased Fee Valuations," New York County Lawyers' Association, New York

"Valuation of Real Property and Intangibles: Market Realities," Moderator, RICS Summit, Miami

"Analyzing Market Trends and Comparable Selection in a Declining Market" – Webinar – Appraisal Institute

"Appropriate (Inappropriate) Use of Fee Simple and Leased Fee Data and First and Second-Generation Rents," National Association of Property Tax Attorneys, New York

"Valuation of Real Estate in Distressed Markets," The Counselors of Real Estate, Philadelphia

"A New Paradigm for Valuation", Valuation Colloquium, Clemson University

"Assessment and Valuation Issues Surrounding Retail Properties," Institute for Professionals in Taxation, Austin



"Preparing for Deposition Testimony and Presentations at Trial," American Law Institute, Irvington, VA

"Trial Issues and Presentations" American Law Institute, Scottsdale

"The Recession and Its Causes: Where Do We Go from Here", International Association of Assessing Officers", Louisville

"Valuing and Pricing Distressed Properties," Buying Distressed Commercial Loans and Property, Summit East, New York

"Follow Up: Corridors and Rights of Way and Policy Issues", Appraisal Institute and Appraisal Institute of Canada, Ottawa

"Corridor and Rights of Way II: Valuation Policy", Moderator, Centre for Advanced Property Economics and International Right of Way Association, San Diego

"Right of Way: Valuation Policy Issues", Moderator, American Bar Association, Centre for Advanced Property Economics, Appraisal Institute, and International Right of Way Association, Washington, DC

"Elements of an Expert Report," CLE International, Richmond

"Contemporary Valuation Issues," Valuation & Legal Issues Shared Interest Group, Appraisal Institute, Washington, DC

"Issues Related to Real Estate in Dispute Resolution," Association for Conflict Resolution of Greater New York, New York

"Property Valuation: Problems & Issues in Litigation," New York City Law Department, New York

"An Introduction to Damages Models," Valuation & Legal Services Shared Interest Group of the Appraisal Institute, Chicago

"Do You Know a Ground Lease from a Leasehold?" Association for Conflict Resolution – Greater New York Chapter, New York

"Data Reliability," National Conference of State Tax Court Judges, Lincoln Land Institute, Chicago

# ATTACHMENT

# (Red-lined Complaint)

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
~~SAM SPIEGELMAN (N.Y. Bar No. 5573100)~~
~~255 South King Street, Suite 800~~1425 Broadway, #429
Seattle, WA 98104
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org
~~SSpiegelman@pacificlegal.org~~

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**~~FIRST~~ SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

(42 U.S.C § 1983; C.C.P § 1085)

**DEMAND FOR JURY TRIAL**

Action Filed: March 1, 2022
Trial Date: None set

1. Plaintiffs and Petitioners (collectively, "Plaintiffs"), hereby bring this first amended and supplemental complaint and petition for relief[1] against Defendants and Respondents ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND and OAKLAND CITY COUNCIL (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratoriums (collectively, "Moratoriums") and subsequent "phase out" regulations, and an order declaring said regulations invalid, illegal, and unenforceable.

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative fact, and thus form the same case or controversy under Article III of the United States Constitution.

## DIVISIONAL ASSIGNMENT

3. Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California and thus should be assigned to the Court's Oakland Division.

## VENUE

4. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that all defendants/respondents reside in this judicial district and the events giving rise to the claims occurred in this district.

## PARTIES

5. Defendant and Respondent ALAMEDA COUNTY (the "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6. Defendant and Respondent ALAMEDA COUNTY BOARD OF SUPERVISORS

[1] A blacklined comparison of the amended and supplemental complaint with the original complaint is attached hereto ~~as **Exhibit A**~~.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

(the "BOARD") is a policy making, legislative, and quasi-judicial administrative body of the COUNTY.

7.     Defendant and Respondent CITY OF OAKLAND (the "CITY") is a municipal corporation in the State of California.

8.     Defendant and Respondent OAKLAND CITY COUNCIL (the "COUNCIL") is a policy making, legislative, and quasi-judicial administrative body of the CITY.

9.     Plaintiff JOHN WILLIAMS is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

10.     Plaintiff ROBERT VOGEL is an individual over the age of 18 and is a housing provider and owner of real property in the COUNTY.

11.     Plaintiff SHEANNA ROGERS is an individual over the age of 18 and is a housing provider and the owner of real property in the COUNTY.

12.     Plaintiff MICHAEL LOEB is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

13.     Plaintiff JAQUELINE WATSON-BAKER is an individual over the age of 18 and the owner of real property in the CITY and COUNTY.

14.     Plaintiff HANNAH KIRK is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 4514 Fairbairn Ave, Oakland, CA.

15.     Plaintiff AMI SHAH is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

16.     Plaintiff AVINASH JHA is an individual over the age of 18 and the owner of real property in the COUNTY located at 133 Gable Dr. Fremont CA 94539.

17.     Plaintiff WILLIAM ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801 Summit Street, Oakland CA.

18.     Plaintiff MADELEEN ROSETTI is an individual over the age of 18 and an owner of real properties in the CITY and COUNTY located at 125 Moss Avenue, Oakland CA and 2801

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Summit Street, Oakland CA.

19. Plaintiff NORMAND GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

20. Plaintiff MICHELLE GROLEAU is an individual over the age of 18 and an owner of real property in the CITY and COUNTY located at 398 Euclid Ave, Oakland CA.

21. Plaintiff and Petitioner HOUSING PROVIDERS OF AMERICA (“HPOA”) is a § 501(c)(4) nonprofit corporation. HPOA is a network of housing activists fighting to protect the legal rights of housing providers, including those in the CITY and the COUNTY. HPOA’s members own rental housing in and throughout the CITY and the COUNTY, and have been directly and adversely affected by the CITY and COUNTY’s residential eviction Moratoriums and the CITY’s subsequent “phase out” regulations. All of HPOA’s members are housing providers in either the CITY and/or COUNTY; all of HPOA’s members have renters at their properties who are taking advantage of the CITY and COUNTY’s regulations, including but not limited to, refusing to pay rent for non-Covid-19 related reasons during the time period set forth thereunder, and refusing to relinquish possession, and creating nuisances and damage to HPOA’s members’ properties. HPOA’s members have been unable to collect rent for time periods of months and/or years with no financial relief provided by the CITY and COUNTY, and the CITY and COUNTY’s complete defense against virtually all residential evictions for a period of three-plus-years have tied HPOA’s ~~members~~members’ hands. HPOA’s members have suffered lost rents, devalued properties, and some face impending foreclosures and bankruptcies, as a result of the CITY and COUNTY’s regulations. The harm and injury brought to HPOA’s members by the regulations is current, ongoing, and concrete and particularized to all HPOA’s members. HPOA’s efforts to remedy these injustices are central to its purpose of fighting to protect the legal rights of housing providers, including those in the CITY and COUNTY. Neither the claims asserted, nor the relief requested requires the participation of individual members in this lawsuit. HPOA has a direct and substantial interest in ensuring that Defendants’ decisions are in conformity with the requirements of law, that those requirements are properly executed, and that Defendants’

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

duties are enforced.

22.     Plaintiff 2355 Broadway, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2355 Broadway, Oakland CA.

23.     Plaintiff 3900 Adeline, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the COUNTY located at 3900 Adeline, Emeryville CA.

24.     Plaintiff Hollis Street Partners, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3250 Hollis Street, Oakland CA.

25.     Plaintiff Vulcan Lofts, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4401 San Leandro Street, Oakland CA.

26.     Plaintiff 1614 Campbell Street DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1614 Campbell Street, Oakland CA.

27.     Plaintiff 3014 Chapman DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3030 Chapman Street, Oakland CA.

28.     Plaintiff B3 Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 5200 Adeline Street, Emeryville , CA.

29.     Plaintiff Bakery Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 4600 Adeline Street, Emeryville, CA.

30.     Plaintiff Exchange Studios DEL, LLC is a Delaware limited liability company,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

qualified to do business in California and the owner of real property in the CITY and COUNTY located at 527 23rd Avenue, Oakland, CA.

31.     Plaintiff Madison Park Properties II DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1155 - 5th Street, Oakland CA.

32.     Plaintiff P&D 23rd Avenue Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1080 23rd Avenue, Oakland CA.

33.     Plaintiff P&D 46th St. Associates DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 964 46th Street, Oakland CA.

34.     Plaintiff Sears Lofts DEL, LLC is a Delaware limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2633 Telegraph Ave, Oakland CA.

35.     Plaintiff 301 Lenox, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 301 Lenox Avenue, Oakland CA.

36.     Plaintiff 2228 Union Street Investors, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1438 Madison Street, Oakland CA, 7511-7527 Bancroft Avenue, Oakland CA, 8603 Hillside Street, Oakland CA, and 8701 Hillside Street, Oakland CA.

37.     Plaintiff J & R Land & Cattle LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1551 Madison Street, Oakland CA and 2000 E. 30th Street, Oakland CA.

38.     Plaintiff J & R Land & Cattle II LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1935-1948 E. 29th Street, Oakland CA, 1935-1945 E. 30th Street, Oakland CA, and 2032-2040

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E. 30th Street, Oakland CA.

39. Plaintiff Westpark Apartments, LLC is a California limited liability company, qualified to do business in California and the owner of real properties in the CITY and COUNTY, located at 433 Perkins Street, Oakland CA, 1553 Alice Street, Oakland CA, and 4220 Montgomery Street, Oakland CA.

40. Plaintiff Westpark II, GP is a California partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1530 Harrison Street, Oakland CA and 1555 Madison Street, Oakland CA.

41. Plaintiff 685 Scofield, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 385-389 Palm Avenue, Oakland CA.

42. Plaintiff 296 Mather Street, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 296 Mather Street #7, Oakland, CA.

43. Plaintiff BayOak Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real property in the CITY and COUNTY located at 2375 Fruitvale Ave #301, Oakland CA.

44. Plaintiff Burling Street Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1692 12th Street, Oakland CA, 1694 12th Street, Oakland CA, and 1704 Upper 14th Street, Oakland CA.

45. Plaintiff Rising Tide Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 722 Upper 30th Street, Oakland CA, 923-923A Apgar Street, Oakland CA, 827 30th Street Oakland, CA, 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 835 40th Street #4, Oakland CA, 860 34th Street, Oakland CA, 716-720 37th Street, Oakland, CA, 1021 Campbell Street, Oakland, CA, 1704 14th Street, Oakland, CA.

46. Plaintiff Oakland Point Properties, LLC is a California limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1630 Lower Center Street, Oakland CA, 3629 West Street, Oakland CA, 40th Street #4, Oakland CA, 860 34th Street, Oakland CA.

47. Plaintiff Truckee Zurich Place, LLC is a Delaware limited liability company, qualified to do business in California, and the owner of real properties in the CITY and COUNTY located at 1036 62nd Street #4, Oakland CA, 2215-2217 Eighth Street, Berkeley, CA~~2215 Eighth Street, Berkeley CA~~, 2839 Linden Street, Oakland CA, 1688-1692 12th Street, Oakland CA~~1692 12th Street, Oakland CA~~, 1694 12th Street, Oakland CA, 1704 Upper 14th Street, Oakland CA, 695-701 30th Street, Oakland CA.

48. Plaintiff 18th & Linden, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1054 18th Street, Oakland CA.

49. Plaintiff 220 Grand Investors, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 220 Grand Avenue, Oakland CA.

50. Plaintiff 818 East 20th Street Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 800-818 E 20th Street, Oakland CA.

51. Plaintiff 1130 30th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 3649 Martin Luther King Jr Way, Oakland CA.

52. Plaintiff 1701-1703 36th Avenue Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1701-1707 36th Avenue, Oakland CA.

53. Plaintiff 1732-1744 27th Avenue, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1732-1744 27th Avenue, Oakland CA.

54. Plaintiff 1844 7th Avenue 2013, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1844 7th Avenue, Oakland CA.

55. Plaintiff 2000 Linden Street, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2000 Linden Street, Oakland CA.

56. Plaintiff 2019 ABD Ozone Fund, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 831 6th Avenue, Oakland CA.

57. Plaintiff 2367 Washington, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 245 Lee Street, Oakland CA.

58. Plaintiff 2531 East 16th Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1638 47th Avenue, Oakland CA.

59. Plaintiff 2701 High Street, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2701 High Street, Oakland CA.

60. Plaintiff ABD Suites, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1008 E 23rd Street Oakland, CA and 1722 27th Avenue Oakland, CA.

61. Plaintiff 301 Hannah Park, LP is a California limited partnership, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 2850 Hannah Street, Oakland CA.

62. Plaintiff Oakbrook Partners, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

1125-1135 E 18th Street, Oakland CA and 1221 E 20th Street, Oakland CA.

63.     Plaintiff Riaz Capital Ozone Fund III, LP is a California limited partnership, qualified to do business in California and the owner of real properties in the CITY and COUNTY located at 1705 Mandela Parkway, Oakland CA, 2133-2143 Dwight Way, Berkeley CA, 2618 Martin Luther King Jr Way, Berkeley CA.

64.     Plaintiff Riaz Taplin, trustee of The A.R.T. Trust is an individual over the age of eighteen.  The A.R.T. Trust is the owner of real properties in the CITY and COUNTY located at 1454 36th Avenue, Oakland CA, 1616 35th Avenue, Oakland CA, 1828 28th Avenue, Oakland CA, 2166 E 27th Street, Oakland CA, 2554 E 16th Street, Oakland CA, 3700 International Boulevard, Oakland CA.

65.     Plaintiff 1715 FFT, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1715 High Street Oakland, CA.

66.     Plaintiff 1830 6th Ave Oakland, LLC is a California limited liability company, qualified to do business in California and the owner of real property in the CITY and COUNTY located at 1830 6th Avenue Oakland, CA.

67.     Plaintiffs are not aware of the identities of defendants/respondents DOES 1-10, who are responsible for the acts and omissions alleged herein and that caused damage to Plaintiff; therefore, Plaintiffs will amend this Complaint when the true identities of DOES 1-10 are ascertained.

68.     Plaintiffs are informed and believe that at all times mentioned in this Complaint, all defendants/respondents were the agents or employees of their co-defendants/respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## STATEMENT OF FACTS

### A.  Background: The California Governor's Order and the COVID-19 Renter Relief Act.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

69. In response to the Covid-19 pandemic, Governor Newsom declared a State of Emergency in California on March 4, 2020, pursuant to the California Emergency Services Act (ESA), Gov. Code sec. 8550, et seq. On March 16, 2020, Governor Newsom entered an executive order, which in part permitted local governments to temporarily limit housing providers' ability to evict for nonpayment of rent due to the Covid-19 crisis. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

(Executive Order (EO) N-28-20.) The March 16, 2020 provision, permitting local government to temporarily limit Covid-19-related nonpayment evictions, expired on September 30, 2020. (EO N-71-20.)

70. Prior to the expiration of that provision, the California Legislature enacted the "COVID-19 Renter Relief Act" and the "COVID–19 Small Housing provider and Homeowner Relief Act of 2020" via AB 3088, effective August 31, 2020. AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure section 1161 et seq., and was aimed at "**temporary emergency relief** for financially distressed renters, homeowners, and small housing providers . . . ." Among other things, AB 3088 provided statewide eviction protections during a particular time period for renters who could not pay their rent for Covid-19-related reasons. AB 3088 also directed state agencies to engage about potential strategies for relief for renters and housing providers who suffered Covid-19-related financial hardship.

71. Notably (and consistent with the Governor's prior order), AB 3088's temporary moratorium on residential evictions was *specifically* limited to those based upon inability to pay for Covid-19-related financial distress. Even during the temporary moratorium, housing providers were still permitted to file actions for, and courts were still permitted to find renters

guilty of, UD for fault, and no-fault "just cause" as defined under Civil Code sec. 1946.2.[2] (CCP § 1179.03.5(a)(3).)

72.    AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals ***negatively impacted*** by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID–19 pandemic to protect renters from eviction." (CCP § 1179.05(b), (e), (f), emph. add.)  While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give carte blanche authority to do so, nor did it immunize "emergency" municipal regulations from challenges based on state law preemption.

73.    The Covid-19-related nonpayment eviction protections of AB 3088 were extended thereafter through SB 91 AB 832, and AB 2179.  These enactments protected affected renters from eviction during this extended time period under the UD statutes so long as they complied with the Covid-19-related financial distress requirements.

74.    These enactments further clarified the State's rental assistance program.  Starting October 1, 2021, and until July 1, 2022, for any Covid-19-related hardship rental debt that came due between those dates, a renter was required to show that they completed an application for rental assistance through the State program.  If they did not, the housing provider could move forward with an UD action for nonpayment of rent.   A housing provider could also have moved forward with a UD action if the rental assistance application was denied.  (CCP § 1179.11(a), (c).)

---

[2] Civil Code sec. 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code sec. 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." (Civ. Code § 1946.2(g)(1).)

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**B. The CITY's Eviction Moratorium**

75. On March 9, 2020, the CITY declared a local state of emergency due to Covid-19. The CITY's local emergency was ratified on March 12, 2020, via Resolution No. 88075 C.M.S, and pursuant to the ESA, which permits municipalities to declare local emergencies under specified circumstances. (Gov. Code §§ 8558(c), 8630.) The ESA also requires a municipality to terminate the local emergency ". . . at the earliest possible date." (Gov. Code § 8630 (d).)

76. After ratifying the Local Emergency, on March 27, 2020, the CITY passed its eviction moratorium, Ordinance No. 13589. That moratorium not only prohibited evictions for nonpayment of rent due to Covid-19-related financial distress, but also *all other evictions*, with few exceptions:

> **Residential Eviction Moratorium.** Except when the renter poses an imminent threat to the health or safety of other occupants of the property, and such threat is stated in the notice as the grounds for the eviction, it shall be an absolute defense to any unlawful detainer action filed under Oakland Municipal Code 8.22.360A subsections (–) – (10) [excepting Ellis Act evictions] that the notice was served or expired, or that the complaint was filed or served, during the Local Emergency.

77. Initially, the CITY's moratorium on all evictions was set to expire on May 31, 2020, "unless extended." (Ordinance No. 13589.) Subsequently, the moratorium was extended until "the Local Emergency declared on March 9, 2020 has been terminated by the City Council, or August 31, 2020, whichever comes first." (Ordinance no. 13594.) However, on July 7, 2020, the extension on the eviction moratorium was again amended to *only* expire when the local Emergency had been terminated by the COUNCIL. (Ordinance No. 13606 (Ex. 1).) The local Emergency has no stated expiration date and the CITY's position is that it has not expired.

78. After this action was filed, the CITY enacted Ordinance No. 23-0216 ("Phase Out Ordinance") on May 2, 2023, which, while providing for a "phase out" of the CITY's moratorium, also kept the "local emergency" in place. The Phase Out Ordinance provides that the CITY's moratorium shall end on July 15, 2023. However, the Phase Out Ordinance

continued to prohibit evictions for virtually any reason, including non-payment, if the grounds for eviction arose between March 9, 2020 and July 14, 2023. Thus, per the Phase Out Ordinance, the effect of the CITY's moratorium is still in place for that three-year-plus period . The Phase Out Ordinance also amended the CITY's Rent Ordinance, further restricting housing providers' "just cause" reasons for eviction. For example, the amendments introduced substantive hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior "unreasonable" in light of that term.

**C. The COUNTY's Eviction Moratorium**

79. The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which, like the CITY's moratorium, purported to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO § 6.120 (Ex. 2).) The COUNTY's moratorium applied to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.) These exceptions were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).) Like the CITY's moratorium, the COUNTY'S moratorium provided that it was an "absolute defense" to an unlawful detainer action brought during its term. (ACCO § 6.120.030(D).)

80. As enacted, the moratorium expired sixty days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the ratification of the local emergency, the local emergency "shall remain in effect until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-91.) On February 28, 2023, the COUNTY rescinded its local emergency. Accordingly, the COUNTY's moratorium expired on April 29, 2023.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Notwithstanding, it is the COUNTY's position that evictions are prohibited for virtually any reason, including non-payment and even if there was no Covid-19 relate financial distress, if the grounds for eviction arose between March 9, 2020 and April 28, 2023. Thus, the effect of the COUNTY's moratorium is still in place for that three-year-plus period.

**D. The COUNTY and CITY's Rent Relief Assistance Programs**

81. State law requires local governments to develop mechanisms by which housing providers and renters may file applications for, and receive if eligible, Covid-related rent relief.

82. The CITY operated a rent relief assistance program called "Oakland's Emergency Rental Assistance."[3] At the time of filing this action, Oakland's Emergency Rental Assistance website stated: "UPDATE. PLEASE NOTE. As of January 7, the City of Oakland's Emergency Rental Assistance program is oversubscribed. Tenants and Landlords may still submit an application but will be placed on a waitlist." Currently, the website instead refers applicants to the COUNTY's rent relief assistance program, "Housing Secure." However, since this action was filed, the Housing Secure website stateds: "We have received more requests for funds than we have currently available." [4]

83. Importantly, tenants in the CITY and COUNTY need not to participate in *any* rent relief program to avoid eviction under the relevant three-year-plus time frames of the Moratoria and the Phase Out Ordinance; the Moratoria and the Phase Out Ordinance's ban on evictions for the three-year-plus period prohibit evictions even for those tenants who refuse to cooperate with a landlord's request that they seek relief under these programs. This directly contradicts the purpose, intent and procedures of state law.

**E. The Moratoriums' Detrimental Impact on Plaintiffs**

84. The Moratoria, and as codified through the Phase Out Ordinance, have had devastating impacts on housing providers throughout the CITY and COUNTY, and to all

[3] https://www.oaklandca.gov/departments/department-of-housing-and-community-development

[4] https://www.ac-housingsecure.org/?locale=en

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Plaintiffs in this action. The following cases are but a few more detailed examples.

85. Plaintiff JOHN WILLIAMS is a housing provider in the CITY and COUNTY and owns the property at 1109 32nd Street, Oakland, CA. ("1109 32nd Street"). 1109 32nd Street is a duplex, and the rent for the property only barely covered WILLIAMS' property expenses for 1109 32nd Street. The renter in the three-bedroom one-bath downstairs unit, Martina Martin, has occupied the unit for approximately twelve years, and until the Moratoria were enacted, always paid the rent for the unit, which was approximately $1,500.00 per month. After the CITY and COUNTY enacted the Moratoriums, however, the renter stopped paying rent and refused to pay through the entire duration of the CITY's Moratorium. The renter's failure to pay is not related to any Covid-19 related reason. In fact, the renter operated a moving and storage business, "Martina's Ride" out of her unit since 2017, and through much of 2021. The renter refuses to cooperate with WILLIAMS' efforts to obtain unpaid rents through the rent relief program, and therefore the CITY rejected WILLIAMS' application for noncompliance. The renter in the upper unit vacated in March of 2021. WILLIAMS was concerned that a new renter would move in and refuse to pay rent, so he kept that unit vacant after the renter left. In October of 2021, WILLIAMS was so riddled with stress caused by his non-paying renter and the very real possibility of losing 1109 32nd Street to foreclosure, he was hospitalized ~~and~~for panic attacks, chronic stress, and depression. To~~, to~~ date, WILLIAMS remains disabled as a result. His disability forced him to quit his job and move into the upper unit of 1109 32nd Street—directly above his non-paying renter—to save money. WILLIAMS was also forced to take out a business loan upon exhausting his 401(k) and savings. WILLIAMS was unable to commence a nonpayment eviction against his renter as a direct result of the Moratoriums and in contravention of state law. While WILLIAMS has recently received some mortgage assistance from the State of California, he has not received any back rent payments, nor does the amount of mortgage assistance that WILLIAMS has received cover what his nonpaying tenant refused to pay. In the short term, from 2020 through 2023, WILLIAMS is owed approximately $60,000.00 in delinquent rent. As a result of same, he has been unable to pay his monthly mortgage, taxes,

property maintenance, and utilities in a timely and routine manner. In the long term, the Moratoria and the CITY and COUNTY's enactment and enforcement of same have cast serious doubt on WILLIAMS future. WILLIAMS first purchased 1109 32nd Street to provide himself with housing security and reliable passive income upon hitting retirement. The occurrence of the events stemming from the CITY and COUNTY's Moratoria have clouded WILLIAMS' vision of his future, as it is no longer a safe assumption that he will be able to fully enjoy his rights as a residential property owner entering into a landlord-tenant relationship with others. It has been shown from the CITY and COUNTY's course of conduct that third parties may be allowed to move into WILLIAMS property and subsequently be granted relief from paying rent based on what the CITY and COUNTY find to be acceptable excuses. WILLIAMS is now forced to solve not only the situation with his current tenant but also what to do with this valuable piece of property that he once relied upon to secure his future.

86. Plaintiff ROBERT VOGEL ("VOGEL") is a housing provider in the COUNTY and owns a rental property located 20076 Emerald Ct., Castro Valley, CA ("20076 Emerald"). 20076 Emerald is a three-bedroom, one bath, 853 sq. ft single family home. VOGEL is semi-retired and is a disabled paraplegic. VOGEL relies on the rental income from 20076 Emerald for a substantial source of retirement income. VOGEL is required to pay approximately $1,328 per month for 20076 Emerald's mortgage, taxes and insurance, garbage service, and fees for property management. The former renter at 20076 Emerald lived there for approximately twelve years, from January 1, 2011 through March 1, 2023, and her current rent was $2,000 per month, however she stopped paying any rent in September 2021, and has not paid any rent since that date and only just recently vacated. The renter's failure to pay prevented VOGEL from being able to refinance 20076 Emerald to a lower rate. The renter also stopped maintaining 20076 Emerald's landscapinge and would park her car on the front yard. The renter's failure to pay was not related to any Covid-19 related reason. While the renter finally agreed to cooperate with ~~the~~ local and state rent relief programs, VOGEL only received a portion of the unpaid back rent. Most recently, VOGEL learned that his former nonpaying renter may have been selling

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

and/or manufacturing methamphetamine at 20076 Emerald. The renter covered all of the windows at the property, and neighbors reported strong chemical odors coming from the home. There was a "revolving door" of people making multiple, brief visits per day to the property, at all hours. When VOGEL was finally able to gain possession of 20076 Emerald, he discovered large quantities of drug paraphernalia, including what appeared to be used meth pipes and small zip-lock baggies. A large quantity of white powder was found in an ice chest, which VOGEL's agent turned over to the police. The renter had also stopped cleaning the house, leaving food and garbage everywhere, which caused a rat infestation that VOGEL was required to remediate. The renter also had multiple dogs in the house in violation of the lease, which repeatedly urinated and defecated indoors, and scratched through areas of drywall. When 20076 Emerald was finally recovered, there were puddles of dog urine on the floors, and an extreme stench which took months and multiple cleanings to remedy. VOGEL's bank account was depleted because of having to carry all the costs of 20076 Emerald, and having to make significant repairs to the property damage caused by his nonpaying renter, and he is deeply concerned he will lose the property as the result of his inability to meet the financial obligations of ownership. In total, VOGEL endured lost rent revenue amounting to $44,484.00 from 2020 to 2023 ($4,451 in 2020; $2,683 in 2021; $1,350 in 2022; and $36,000 in 2023). As a result of the eviction moratorium, VOGEL was forced to pay his mortgage, taxes, and maintenance on the property despite the aforementioned lost rent revenue. In order to do so, he had no choice but to deplete the majority of his retirement savings. VOGEL endured additional costs in the form of $4,000 in legal fees spent trying to evict his tenant; $5,000 that he ended up having to pay his tenant in a pre-trial "cash for keys" settlement; and $19,000 in repairing the damage that his tenant caused his property to endure (broken windows, removing two dumpsters, broken doors, thrashed flooring, and damaged walls). In addition to the financial losses that VOGEL knew he was enduring, he also because extremely stressed as a result of the damage done to his property by his tenant's aforementioned illegal conduct. VOGEL developed issues with sleeping and also experienced increased blood pressure. Furthermore, as a result of the prolonged nature of the eviction

moratorium, VOGEL felt completely and utterly helpless as a homeowner. He was not able to remove his tenant in order to sell his property at a higher price and in a timelier fashion. Had he been able to do so, he would have been that much more well situated for retirement, as someone already dealing with a significant physical disability. The extreme stress VOGEL suffered as a result of the CITY and COUNTY's senseless moratoria showed VOGEL that investing in affordable housing is no longer a smart or safe way for one to invest their money, as government oversight can causally strip one of their rights as a landlord and cause them to suffer hundreds of thousands of dollars in lost rent revenue and unforeseen costs as a result of misguided policymaking.

87. Plaintiff SHEANNA ROGERS is a housing provider in the COUNTY and owns the property at 23243 Maud Ave., Hayward CA ("23243 Maud Ave.") At one time, ROGERS ran a small, three-bedroom, independent living facility at 23243 Maud Ave., where she & her husband cared and provided for people who needed a "helping hand" to get on their feet. Many clients had lived at this address for over 5 years. ROGERS served a vulnerable population at the living facility; her clients often had mental disabilities and no families to turn to. ROGERS was able to provide her clients with a safe living space and meals they could count on at 23243 Maud Ave. In addition to the independent living facility space, 23243 Maud Ave. has a separate studio unit. ROGERS rented this unit in 2018 for $1000 per month. That renter was never part of the independent living facility program. ROGERS depends on this supplemental rental income to support her and her family. Prior to the COUNTY'S enactment of its Moratorium, the renter began harassing ROGERS'~~'s~~ clients in the independent living facility. The renter would scream profanities at ROGERS' clients and throw garbage from his unit into the street directly in front of the property. The renter's harassment of ROGERS' clients got so bad that ROGERS was forced to file a restraining order against the renter and commence eviction proceedings. In February 2020, ROGERS and the renter came to a settlement agreement, whereby the renter agreed to vacate the property in April of 2020. However, after the COUNTY enacted its Moratorium, in March 2020, the renter refused to leave. The renter did not pay rent

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

for over three years. The renter's failure to pay was not related to any Covid-19 related reason. Meanwhile, the renter's harassment of ROGERS' clients persisted, and ROGERS was forced to close her business as a result. ROGERS has also suffered devastating health consequences as a result of the stress caused by her nonpaying renter. ROGERS has applied for rental assistance from the COUNTY, however, because her renter will not cooperate, and his non-payment has nothing to do with Covid- 19 the COUNTY has refused to provide her with any relief. Due to ROGERS' loss of business as a direct result of her renter's harassment of her clients, causing all of them to be removed from her facility at 23243 Maud Ave., it is estimated that such abhorrent behavior by her renter caused ROGERS to lose out on $124,000 in business income from September 2021 through April 2024 ($4,000 on average per month, for 31 months.) This is in addition to the $48,000 in rent ROGERS has been deprived of pursuant to her renter's residence in 23243 Maud Ave.'s studio unit and not paying rent for same from April 2020 through April 2024 ($1,000.00 in delinquent rent for 48 months.) In addition to ROGERS suffering approximately $172,000 in losses over this period, her clients have suffered as well, as they have been forced to be placed elsewhere due to the CITY and COUNTY's allowing of ROGERS' renter to conduct himself in a bullying and threatening manner. There is no telling, at this time, whether or not ROGERS will be able to resume her once lucrative business at any point in the near future. The $172,000 she is rightfully owed may be just the start of years and years of losses that have yet to accrue – all stemming from the woefully misguided acts and omissions by the CITY and COUNTY as they relate to the Moratoria at issue here.

88. Plaintiff JAQUELINE WATSON-BAKER is a housing provider in the CITY and COUNTY and owns the property at 1225-1227 92nd Ave Oakland, CA. ("1225-1227 92nd Ave"). 1225-1227 92nd Ave was purchased by WATSON-BAKER's mother in or about the 1950's. WATSON-BAKER's mother, who moved from to California from the Southern United States, was one of the first African Americans to own property in her East-Oakland neighborhood. 1225-1227 92nd Ave is a duplex, with a two-bedroom, two-bath front unit, and a one-bedroom one-bath back unit. The renter in the back unit, Unit 1227, originally moved into the property in

2016. Thereafter, WATSON-BAKER attempted to get access to the unit because the renter had put tinfoil over the windowpanes and had installed an air conditioner, and she was concerned about the renter's activity at the property. When WATSON-BAKER arrived at the property, the renter stated that he did "not believe that a black woman" owned the property and demanded to see her identification. WATSON-BAKER showed the renter her identification, which the renter snatched out of her hand, but the renter still refused her access to the unit. Thereafter, the renter would insist on dropping off his rent check at WATSON-BAKER's home address, even though she asked him multiple times to mail it to a P.O. Box. WATSON-BAKER continued to see concerning signs at the property, but the renter continued to refuse her access. For example, she saw signs of rat infestation, but when she sent an exterminator, the renter would not give the exterminator access and turned his dogs loose on them. The exterminator eventually refused to go back to the property. Because the tenant refused to grant her access, and WATSON-BAKER became increasingly concerned about the unit's condition, WATSON-BAKER filed for relief in court in or about 2018. The renter of the front unit of 1225-1227 92nd Ave Oakland left in 2019 because of the renter of the back unit's erratic behavior, and that unit has remained ~~vacant since~~vacant due to the renter's behavior. WATSON-BAKER finally obtained a court date for March of 2020, which then was pushed back due to shelter in place orders. The renter stopped paying rent just prior to this time. The renter's failure to pay was not related to any Covid-19 related reason. WATSON-BAKER finally got access to the unit and saw that the unit was in gross disrepair. The renter put foil on all the unit's windows, there are dark yellow streaks running down the walls, and one of the unit's cabinets is hanging down from the ceiling. The unit was infested with insects and there ~~was~~were feces and urine all over the bathroom of the unit, and dog feces and garbage covered the unit's backyard. Notwithstanding the renter's damage to and perpetuation of a nuisance on her property, WATSON-BAKER was prevented from evicting the renter under the COUNTY's Moratorium. WATSON-BAKER considered selling the property, however, was advised that the renter's actions had devalued her property by almost a third of the market value. WATSON-BAKER applied for rental assistance from the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

COUNTY, however, her renter initially refused to cooperate with her. After he finally agreed to fill out an application, the COUNTY informed WATSON-BAKER that it could be up to a year until she received any rental relief funds.

89. Plaintiff Michael Loeb is a housing provider in the CITY and COUNTY and owns units 2501 and 2502 at 565 Bellevue Avenue, Oakland, California (565 Bellevue Units). Loeb, a 74 year-old74-year-old widower, lived with his wife in Piedmont, until she died in 2015, after nearly 46 years of marriage. After her death, and, in part, because of mobility issues resulting in back surgery, he sold his home. He purchased the 565 Bellevue Units in April, 2020, with the intent to combine and occupy them as his home, for his own use, for the remainder of his life. Renter Joshua Bloomfield (Bloomfield), a 1996 Graduate of the University of Pennsylvania, and 2000 UCLA School of Law graduate, is a successful class action lawyer with a prominent Oakland based class action law firm. Bloomfield currently pays LOEB $2,200 per month in rent for a studio apartment. LOEB has attempted to voluntarily negotiate an owner move in with Bloomfield, offering him $30,000 to move out. This is more than four times the amount of $7,116.22 required as a relocation payment under the Oakland Just Cause for Eviction Ordinance, which is codified at Oakland Municipal Code section 8.22.850. However, Bloomfield demanded that LOEB pay him more than $160,000 to vacate, telling LOEB that "it's nothing personal, just business." Multiple other comparable units became available in the same building and could have been occupied by Bloomfield. Bloomfield has not claimed any Covid--related hardship. LOEB was unable to commence an owner-move in eviction due to the Moratoriums. To date, LOEB has incurred more than $75,000 in legal fees as a direct and proximate result of the abhorrent behavior that the CITY and COUNTY have enabled Bloomfield to exhibit. In addition to the financial harm LOEB has suffered, far more concerning are the emotional and mental strains he's endured at the hands of his tenant and the CITY and COUNTY. He fears that he may never be allowed to re-occupy the property he purchased with the intention of living out his remaining years – of sound mind and body – therein. The long-lasting effects of the CITY and COUNTY's moratoriums have caused LOEB

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

*FIRST SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES [42 U.S.C. § 1983]; PETITION FOR WRIT, AND DEMAND FOR JURY TRIAL*
-22-

to endure irreparable mental harm, including but not limited to the harm inflicted upon him by his tenant's attempts to extort $160,000 from him.

90. Plaintiff HANNAH KIRK is a housing provider in the CITY and COUNTY and owns a single-family home at 4514 Fairbairn Ave, Oakland, CA. KIRK is a single mother and lived in 4514 Fairbairn Ave with her two children. KIRK's renter moved into her home in 2019, and the agreed upon rent was $800 per month. The renter shared KIRK's kitchen and bathroom at KIRK's home. KIRK's renter paid rent consistently until July 1, 2021, whereupon she stopped paying rent but did not move out of KIRK's home when asked. The renter also did not cooperate with the rental assistance programs, or return the Covid-19 declarations that KIRK provided to her, and instead accused KIRK of harassing her. Notwithstanding the renter's failure to pay rent even though no Covid-19 related reason existed, KIRK was prevented from evicting the renter under the CITY and COUNTY's Moratorium. After spending almost two years having to carry the expenses of the renter and having to face the nonpaying renter on a daily basis inside of her own home, KIRK moved out of her home due to the severe emotional distress the situation was causing her and her children. The CITY and COUNTY put KIRK in such an incredibly toxic situation that she was essentially forced to decide between paying her then-current mortgage or or paying rent at a new property – i.e., she was effectively coerced into selling her property, which she finally did in September 2023. In total, after generating an average annual net income of just under $5,000 from 2019 through 2021, KIRK's property generated $0.00 in net income from 2022 through 2023 despite being occupied by a tenant. This tenant was in default from July 2021 through August of 2023, and the total delinquent rent that accumulated in that span was approximately $20,364.80. Among the other costs that KIRK was forced to endure were legal fees to ensure that she would not get sued by her tenant for any number of frivolous causes. She also endured extreme pain and related health issues from the stress of being put in this situation.

~~90.~~91. ~~KIRK has not been able to pay her mortgage for approximately eight months and fears she will lose her home.~~

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Plaintiff AMI SHAH and AVINASH JHA were housing providers in the CITY and COUNTY and own a single-family home at 133 Gable Dr. Fremont CA. SHAH and JHA purchased 133 Gable Dr. in 2019, intending it to be their primary residence. However, for financial reasons, SHAH and JHA were required to rent 133 Gable Dr. until their lease obligations for their own rental were met. They did so, but after the COUNTY enacted its Moratorium, SHAH and JHA's renters paid partial rent from April 2020 through June 2020, stopped paying rent entirely after June June 2020, and refused to apply for rent relief through the state and local rent relief programs. Not only did SHAH and JHA's renters stop paying rent, but the renters physically converted 133 Gable Dr. into an "Airbnb motel," without the consent of either SHAH or JHA, renting out the individual rooms. SHAH and JHA reported the renters' unlawful activity to the Fremont police, and during the investigation it was discovered that the renters were conducting similar fraudulent rental activity with other homes as well. During the investigation, the renters abandoned the property, but the AirBnb guests did not, and refused to move out. The AirBnb guests even changed the locks Throughout, SHAH and JHA were prevented from evicting their nonpaying and breaching renters and the AirBnb guests due to the COUNTY's Moratorium. During this time, both the renters and the AirBbnb guests filed several frivolous legal actions against SHAH and JHA, most of which were later dismissed. When the AirBbnb guests finally abandoned the property (which they did involuntarily and only because the City of Fremont deemed the house unsafe and therefore condemned it), SHAH and JHA were left with rental losses, legal fees and a home that was destroyed, and with a huge toll on their finances and health. In total, after receiving partial rent from April 2020 through June 2020 and then not receiving any rent from June 2020 through the day their tenants were finally evicted, SHAH and JHA collected $19,500.00 in total rent revenue and were deprived of $42,153.00 in delinquent rent. Furthermore, after enduring six months of vacancy while refurbishing the damage done to their property by the AirBnb guests vacated, total vacancy losses amounted to $22,200 from June 2021 through December 2021. Despite the delinquent rent and vacancy losses, SHAH and JHA paid $124,800 in property expenses (mortgage, property tax, insurance, and maintenance),

$83,000 in repair costs, and $15,000 in legal fees.  SHAH and JHA are still experiencing the long-term effects of this ordeal, as well.  The AirBnb guests' unwelcome presence (and the resulting financial impact of delinquent rent and subsequent vacancy losses) made it impossible for SHAH and JHA to capitalize on historically low interest rates in 2020-2021, resulting in an estimated $450,000 in additional interest over the loan's remaining term at current rates.  Additionally, due to their ongoing legal fees, dealing with harassment from the AirBnb guests, and the related mental stresses involved with both, SHAH and JHA missed crucial opportunities to advance their careers.  (The technology sector saw an unprecedented salary boom during the pandemic, with recruiters offering $200,000 to $300,000 above SHAH and JHA's then-existing salaries.)  Their combined losses amount to an estimated $400,000 in just two years, and will likely have a lasting impact on their lifetime savings.  Lastly, the stressors of delinquent rent, vacancy losses, and unwelcome squatters at their home robbed SHAH and JHA of a once in a lifetime opportunity to purchase another home in 2020 – as they had planned to do – given the historically low interest rates and lower home prices in the Bay Area.  As a result, SHAH and JHA  missed out on an estimated $1.5M to $2.0M in potential gains from property appreciation in their neighborhood.  Not only did they forgo the opportunity to purchase an investment property, but the trauma of their experience forced them to sell their condominium unit, which will likely hinder their long-term financial goals – especially as they relate to planning for their children's future.  The compounded loss of all these financial setbacks continue to weigh heavily on SHAH and JHA from a financial, mental, and emotional standpoint.  SHAH and JHA remain fearful to this day over the prospect of ever purchasing another property, knowing full well that local government entities have the power to effectively allow the wrongful taking of that property by wanton third party conduct.

92.    In 2020, the 83-unit property commonly known as B3 Lofts and located at 5200 Adeline Street, Emeryville, CA ("B3"), owned and operated by Plaintiff B3 Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and

COUNTY. Specifically, the property endured a total of $20,791 in delinquent rent in 2020. In 2021, this number doubled to $40,500, and then shot up in 2022 and 2023, to delinquent rent amounts of $139,276 and $138,799, respectively (a four-year delinquent rent total of $339,366 from 2020 through 2023). Overall vacancy at B3 also took a hit, as it more than doubled from 4.2% in 2019 to 9.4% in 2023. B3's total value has dropped from $32.8M in 2020 to $26.96M in 2023 – a decline of $5.84M, or -17.8%. Finally, B3's internal rate of return (IRR) plummeted from a pre-COVID figure of 11.8% (from January 2018 through March of 2020) to -10.9% (from April 2020 through June 2023). As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

93. In 2020, the 102-unit property located at 3900 Adeline, Emeryville, CA ("ADE"), owned and operated by Plaintiff 3900 Adeline, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $40,691 in delinquent rent in 2020. In 2021, this number increased to $102,020, and then increased again in 2022 to $135,838. In 2023, the delinquent rent figure recovered some, dropping to $8,971. Over that four-year span, ADE experienced total delinquent rent of $287,520. Overall vacancy at ADE also increased from 5.0% in 2019 to 6.5% in 2023. ADE's total value has dropped from $46.08M in 2020 to $36.06M in 2023 – a decline of $10.02M or -22%. Since the onset of the pandemic, from April 2020 to June 2023, ADE has seen a negative cash-on-cash return of -21.2%.]]] As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

94. In 2020, the 76-unit property located at 4600 Adeline Street, Emeryville, CA ("BAK"), owned and operated by Plaintiff Bakery Lofts DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $36,821 in delinquent rent in 2020. In 2021, this number increased to $54,964. Over the four-year span from 2020 through 2023, BAK experienced total delinquent

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

rent of $95,752. Overall vacancy at BAK also increased from 2.8% in 2019 to 6.5% in 2023. BAK's total value has dropped from $22.45M in 2020 to $19.32M in 2023 – a decline of $3.13M or -13.9%. Since the onset of the pandemic, from April 2020 to June 2023, BAK has seen a negative cash-on-cash return of -5.0%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

95. In 2020, the 27-unit property located at 2355 Broadway, Oakland CA ("BRO"), owned and operated by Plaintiff 2355 Broadway, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $19,034 in delinquent rent in 2020. In 2021, this number was $6,163, followed by $11,174 in 2022 and $10,627 in 2023. Over the four-year span from 2020 through 2023, BRO experienced total delinquent rent of $46,998. Overall vacancy at BRO also increased from 4.1% in 2019 to 10.1% in 2023. BRO's total value has dropped from $12.68M in 2020 to $9.61M in 2023 – a decline of $3.07M or -24.2%. Since the onset of the pandemic, from April 2020 to June 2023, BRO has seen a negative cash-on-cash return of -14.5%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

96. In 2020, the 124-unit property located at 3250 Hollis Street, Oakland CA ("HOL"), owned and operated by Plaintiff Hollis Street Partners, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $86,857 in delinquent rent in 2020. In 2021, delinquent rent increased to $102,322, followed by another increase in 2022 to $307,802. In 2023, delinquent rent totaled $294,520. Over the four-year span from 2020 through 2023, HOL experienced total delinquent rent of $791,501. Overall vacancy at HOL also increased from 9.3% in 2020 to 10.3% in 2023. HOL's total value has dropped from $73.44M in 2020 to $44.13M in 2023 – a decline of $29.31M or -39.9%. Since the onset of the pandemic, from April 2020 to June 2023, HOL has seen a negative cash-on-cash return of -54.2%. As shown in the instant amended complaint and its

attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

97.    In 2020, the 27-unit property located at 1155 5th Street, Oakland, CA 94607 ("MPP2"), owned and operated by Plaintiff Madison Park Properties II DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, the property endured a total of $40,308 in delinquent rent in 2020.  In 2021, delinquent rent totaled $17,374, followed by a total of $86,397 in delinquent rent in 2022. In 2023, delinquent rent totaled $64,212. Over the four-year span from 2020 through 2023, MPP2 experienced total delinquent rent of $208,291.  Overall vacancy at MPP2 also increased from 2.4% in 2019 to 8.8% in 2023.  MPP2's total value has dropped from $12.1M in 2020 to $10.15M in 2023 – a decline of $1.95M or -24.2%.  Since the onset of the pandemic, from April 2020 to June 2023, MPP2 has seen a negative cash-on-cash return of -16.1%.]]]  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

98.    In 2020, the 36-unit property located at 964 46th Street, Oakland, CA ("PD46"), owned and operated by Plaintiff P&D 46th St. Associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  Specifically, over the four-year span from 2020 through 2023, PD46 experienced total delinquent rent of $139,757.  Overall vacancy at PD46 also increased from 3.5% in 2019 to 10.2% in 2022, before dropping back down to 3.5% once more in 2023.  PD46's total value has dropped from $14.8M in 2020 to $12.64M in 2023 – a decline of $2.16M or -14.6%.  Since the onset of the pandemic, from April 2020 to June 2023, PD46 has seen a negative cash-on-cash return of -6.8%.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

99.    In 2020, the 54-unit property located at 2633 Telegraph Ave, Oakland, CA

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

(“SLO”), owned and operated by Plaintiff Sears Lofts DEL, LLC (“SLO”), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $57,389 in delinquent rent in 2020. In 2021, delinquent rent totaled $2,967, followed by a total of $34,170 in delinquent rent in 2022. In 2023, delinquent rent totaled $50,117. Over the four-year span from 2020 through 2023, SLO experienced total delinquent rent of $144,643. Overall vacancy at SLO also increased from 4.3% in 2019 to 5.6% in 2023. SLO’s total value has dropped from $29.6M in 2020 to $28.16M in 2023 – a decline of $1,485,000 or -5.01%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY’s moratoriums and Plaintiff’s resulting inability to evict non-paying tenants.

100. In 2020, the 27-unit property located at 1080 23rd Avenue, Oakland, CA (“1080”), owned and operated by Plaintiff P&D 23rd Avenue associates DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $85,713 in delinquent rent in 2020. In 2021, delinquent rent dropped down to $3,135, before shooting back up to $42,485 and $39,670 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1080 experienced total delinquent rent of $171,003. Overall vacancy at 1080 also increased from 5.2% in 2019 to 6.9% in 2023. 1080’s total value has dropped from $9.20M in 2020 to $7.28M in 2023 – a decline of $1.92M or -21.1%. Since the onset of the pandemic, from April 2020 to June 2023, 1080 has seen a negative cash-on-cash return of -11.4%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY’s moratoriums and Plaintiff’s resulting inability to evict non-paying tenants.

101. In 2020, the 92-unit property located at 1614 Campbell Street, Oakland, CA (“1614”), owned and operated by Plaintiff 1614 Campbell Street DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $90,412 in delinquent rent in 2020. In 2021, delinquent rent dropped slightly to $89,164, before skyrocketing up to $318,490 and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$190,797 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, 1614 experienced total delinquent rent of $688,863. Overall vacancy at 1614 also increased from 3.0% in 2019 to 9.5% in 2023. 1614's total value has dropped from $39.1M in 2020 to $30.26M in 2023 – a decline of $8.84M or -22.61%. Since the onset of the pandemic, from April 2020 to June 2023, 1614 has seen a negative cash-on-cash return of -18.3%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

102.    In 2020, the 39-unit property located at 527 23rd Avenue, Oakland, CA ("ES"), owned and operated by Plaintiff Exchange Studios DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, over the four-year span from 2020 through 2023, ES experienced total delinquent rent of $39,382. Overall vacancy at ES also increased from 2.6% in 2019 to 8.5% in 2023. ES's total value has dropped from $14.1M in 2020 to $12.37M in 2023 – a decline of $1.73M or -12.27%. Since the onset of the pandemic, from April 2020 to June 2023, ES has seen a negative cash-on-cash return of -4.2%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

103.    In 2020, the 41-unit property located at 3030 Chapman Street, Oakland, CA ("GAL"), owned and operated by Plaintiff 3014 Chapman DEL, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured a total of $17,465 in delinquent rent in 2020. In 2021, delinquent rent shot upward to $47,679, before increasing twice more to $64,745 and $100,435 in 2022 and 2023, respectively. Over the four-year span from 2020 through 2023, GAL experienced total delinquent rent of $230,324. Overall vacancy at GAL also increased from 3.3% in 2019 to 7.8% in 2023. GAL's total value has dropped from $18.2M in 2020 to $14.37M in 2023 – a decline of $3.83M or -21%. Since the onset of the pandemic, from April 2020 to June 2023, GAL has seen a negative cash-on-cash return of -15.7%. As shown in the instant amended complaint and its attachments,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

104. In 2020, the 57-unit property located at 4401 San Leandro Street, Oakland, CA ("VUL"), owned and operated by Plaintiff Vulcan Lofts, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. Specifically, the property endured significant delinquent rent over the four-year span from 2020 to 2023: $194,110 in 2020; $118,740 in 2021; $168,730 in 2022; and $176,745 in 2023 – a total of $658,325 in delinquent rent in four years. VUL's total value has dropped from $15.04M in 2020 to $13.26M in 2023 – a decline of $1.78M or -11.8%. Since the onset of the pandemic, from April 2020 to June 2023, VUL has seen a negative cash-on-cash return of -2.6%. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

105. In 2020, the multi-unit residential building commonly known as and located at 1454 36th Avenue, Oakland, CA ("1454"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1454 totaled $123,622.72. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $205,414.10 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $140,000 an impressive 65.56% ROI. From January 2020 through December 2023, ROI dropped to 49.19%. Additionally, the overall estimated property value declined from $3,542,920 at the onset of the COVID-19 pandemic in March 2020 to $1,938,892.31 in June 2023 – i.e., a -43.3% decline in value in a period of just over three years.

106. In 2020, the multi-unit residential building commonly known as and located at 1616 35th Avenue, Oakland, CA ("1616"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the

moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1616 totaled $17,574.57. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $175,967.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $60,000 an impressive 126.57% ROI. From January 2020 through December 2023, ROI dropped to 80.41%. Additionally, the overall estimated property value declined from $3,397,940 at the onset of the COVID-19 pandemic in March 2020 to $1,597,498.31 in June 2023 – i.e, a -52.99% decline in value in a period of just over three years.

107. In 2020, the multi-unit residential building commonly known as and located at 1701-1707 36th Avenue, Oakland, CA ("1707"), owned and operated by Plaintiff 1701-1703 36th Avenue Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1707 totaled $76,953. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $217,899.67 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,040,820.00 at the onset of the COVID-19 pandemic in March 2020 to $2,554,661.69 in June 2023 – i.e, a -36.78% decline in value in a period of just over three years.

108. In 2020, the multi-unit residential building commonly known as and located at 2166 E. 27th Street, Oakland, CA ("2166"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2166 totaled $41,752.74. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $101,307.72 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on

Plaintiff's initial investment of $388,464 a 21.28% ROI. From January 2020 through December 2023, ROI dropped to 12.94%. Additionally, the overall estimated property value declined from $3,985,160 at the onset of the COVID-19 pandemic in March 2020 to $1786,986 in June 2023 – i.e, a -55.16% decline in value in a three-year period.

109.    In 2020, the multi-unit residential building commonly known as and located at 2554 E. 16th Street, Oakland, CA ("2554"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2554 totaled $151,114.64. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $357,896.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 53.31% ROI. From January 2020 through December 2023, ROI dropped to 48.05%. Additionally, the overall estimated property value declined from $6,911,740 at the onset of the COVID-19 pandemic in March 2020 to $4,975,793.23 in June 2023 – i.e, a -28.01 % decline in value in a three-year period.

110.    In 2020, the multi-unit residential building commonly known as and located at 2701 High Street, Oakland, CA ("2701"), owned and operated by Plaintiff 2701 High Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2701 totaled $374,805.56. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $656,053.62 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $200,000 an 83.14% ROI. From January 2020 through December 2023, ROI dropped to 74.24%. Additionally, the overall estimated property value declined from $9,164,080 at the onset of the COVID-19 pandemic in March 2020 to $4,242,292.31 in June 2023 – i.e, a -53.7% decline in

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

value in a three-year period.

111. In 2020, the multi-unit residential building commonly known as and located at 3700 International Boulevard, Oakland, CA ("3700"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 3700 totaled $278,320. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $456,728.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $8,911,700 at the onset of the COVID-19 pandemic in March 2020 to $5,443,692.31 in June 2023 – i.e, a -38.9% decline in value in a three-year period.

112. In 2020, the multi-unit residential building commonly known as and located at 1828 28th Avenue, Oakland, CA ("1828"), owned and operated by the A.R.T. Trust (of which Plaintiff Riaz Taplin is the trustee), began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1828 totaled $108,362.98. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $252,908 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $300,000 a 28.13% ROI. From January 2020 through December 2023, ROI dropped to 17.36%. Additionally, the overall estimated property value declined from $3,131560 at the onset of the COVID-19 pandemic in March 2020 to $1,915,512 in June 2023 – i.e, a -38.8% decline in value in a three-year period.

113. In 2020, the multi-unit residential building commonly known as and located at 1002-1008 E. 23rd Street, Oakland, CA ("1002"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1002 totaled $116,030.44. This figure,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $316,694.97 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,322,223 a 6.84% ROI. From January 2020 through December 2023, ROI dropped to 5.84%. Additionally, the overall estimated property value declined from $6,907,620 at the onset of the COVID-19 pandemic in March 2020 to $4,461,323.08 in June 2023 – i.e, a -35.4% decline in value in a three-year period.

114. In 2020, the multi-unit residential building commonly known as and located at 1844 7th Avenue, Oakland, CA ("1844"), owned and operated by Plaintiff 1844 7th Avenue 2013, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1844 totaled $80,123.77. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $275,123.89 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $7,534,560 at the onset of the COVID-19 pandemic in March 2020 to $4,452,938.46 in June 2023 – i.e, a -40.1% decline in value in a three-year period.

115. In 2020, the multi-unit residential building commonly known as and located at 800-818 E. 20th Street, Oakland CA ("800"), owned and operated by Plaintiff 818 East 20th Street Oakland, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 800 totaled $27,069.79. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $221,196.11 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $559,510 a 24% ROI. From January 2020 through December 2023, ROI dropped to 20.61%.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Additionally, the overall estimated property value declined from $5,987,940 at the onset of the COVID-19 pandemic in March 2020 to $4,504,492.31 in June 2023 – i.e, a -24.77% decline in value in a three-year period.

116. In 2020, the multi-unit residential building commonly known as and located at 1722 27th Avenue, Oakland, CA ("1722"), owned and operated by Plaintiff ABD Suites, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1722 totaled $79,390.33. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $308,641.86 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,920,220 at the onset of the COVID-19 pandemic in March 2020 to $4,201,092.31 in June 2023 – i.e, a -14.6% decline in value in a three-year period.

117. In 2020, the multi-unit residential building commonly known as and located at 2000 Linden St., Oakland, CA ("2000"), owned and operated by Plaintiff 2000 Linden Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2000 totaled $81,209,27. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $176,331.48 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $4,023,500 at the onset of the COVID-19 pandemic in March 2020 to $3,438,903.69 in June 2023 – i.e, a -14.53% decline in value in a three-year period.

118. In 2020, the multi-unit residential building commonly known as and located at 1732-1744 27th Avenue, Oakland CA ("1732"), owned and operated by Plaintiff 1732-1744 27th Avenue, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1732 totaled $9,900.50. This

figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $84,514.96 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, the overall estimated property value declined from $5,150,920 at the onset of the COVID-19 pandemic in March 2020 to $4,715,353.85 in June 2023 – i.e, a -8.5% decline in value in a three-year period.

119. In 2020, the multi-unit residential building commonly known as and located at 3649 Martin Luther King Jr. Way, Oakland CA ("3649"), owned and operated by Plaintiff 1130 30th Street, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 3649 totaled $19269.61. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $66,547.93 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $504,415 a -2.57% ROI. From January 2020 to December 2023, ROI dropped to -12.67%. Additionally, the overall estimated property value declined from $810,380 at the onset of the COVID-19 pandemic in March 2020 to -$159,723.08 in June 2023 – i.e, a -119.7% decline in value in a three-year period.

120. In 2020, the multi-unit residential building commonly known as and located at 245 Lee Street, Oakland CA ("245"), owned and operated by Plaintiff 2367 Washington, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 245 totaled $224,208.78. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $494,847.21 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

121. In 2020, the multi-unit residential building commonly known as and located at 1638 47th Avenue, Oakland, CA ("1638"), owned and operated by 2531 East 16th Street, LP,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 1638 totaled $376,603.50. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $471,481.22 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. From January 2017 through December 2019, the property had returned on Plaintiff's initial investment of $2,567,875.73 a 0.14% ROI. From January 2020 through December 2023, ROI dropped to -5.82%. Additionally, the overall estimated property value declined from $14,252,160 at the onset of the COVID-19 pandemic in March 2020 to $10,665,523.08 in June 2023 – i.e, a -25.17% decline in value in a three-year period.

122. In 2020, the multi-unit residential building commonly known as and located at 2850 Hannah Street, Oakland, CA ("2850"), owned and operated by 301 Hannah Park, LP, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, delinquent rents at 2850 totaled $360,386.95. This figure, along with increased operating expenses having to do with legal fees and tenant turnover, contributed to approximately $823,332.95 in Operating Losses stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. Additionally, from January 2020 through December 2023, 2850 posted an ROI of -2.33%.

123. In 2020, the two-unit duplex property commonly known as and located at 716-720 37th Street, Oakland, CA ("720"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, 720's fair market rent was $7,279.16, plus a utility fee of $179.56, for a market Total Operating Income of $7,458.72 per month or $89,504.64 per year. In 2020, 720 generated just $44,962.70 in rent revenue – roughly half its annual market rent. Accounting for an additional $992.80 in utility payments, 720's Total Operating Income of $45,955.50 represented $43,549.14 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 720's Total Operating Income was $7,463.24 less than its

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

annual fair market rent of $89,504.64, and after a slight recovery in 2022, 720's 2023 Total Operating Income underperformed to the tune of $11,924.54. From 2020 through 2023, therefore, 720 lost $53,694.30 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 720 experienced a dramatic -45.50% decrease in overall property value from pre-COVID 2019 to 2020 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value plummeted from $1.18M to $643,377 year over year. And though the property partially recovered from 2021 through 2023, its overall drop in property value from 2019 to 2023 was still a significant -8.0% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

124.    In 2020, the twelve-unit property commonly known as and located at 296 Mather Street, Oakland, CA ("296 Mather"), owned and operated by Plaintiff 296 Mather Street, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the twelve-unit building's combined fair market rent was $39,920, plus a utility fee of $1,250, for a market Total Operating Income of $41,170 per month or $494,040 per year. In 2020, 296 Mather generated just $421,489.89 in rent revenue – roughly 85% of its annual market rent. Accounting for an additional $12,811.67 in utility payments, 296 Mather's Total Operating Income of $434,918 represented $59,122 in lost income directly attributable to the CITY and COUNTY's moratoriums. In 2021, 296 Mather's Total Operating Income was $93,784 less than its annual market rent of $494,040, and its 2022 and 2023 Total Operating Incomes missed their mark by $110,488 and 93,608, respectively. From 2020 through 2023, therefore, 296 Mather lost $357,002 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 296 Mather experienced a -17.8% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $6.5M in 2019 to just under $5.37M in 2022. And though the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -14.2% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

125.    In 2020, the twelve-unit property commonly known as and located at 695-701 30th Street, Oakland CA ("695"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the four-unit building's combined fair market rent was $14,170, plus a utility fee of $319, for a market Total Operating Income of $14,489 per month or $173,864 per year.  In 2020, 695 generated just $76,843 in rent revenue – roughly 44% of its annual market rent.  Accounting for an additional $1,618 in utility payments, 695's Total Operating Income of $78,461 represented $95,402 in lost income directly attributable to the CITY and COUNTY's moratoriums.  In 2021, 695's Total Operating Income recovered slightly, but its 2022 and 2023 Total Operating Incomes missed their mark by $109,375 and $108,284, respectively.  From 2020 through 2023, therefore, 695 lost $299,353 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 695 experienced a -62.49% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just under $903,000 in 2022.  And though the property partially recovered in this respect in 2023, its overall drop in property value from 2019 to 2023 was still -61.86% – reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

126.    In 2020, the two-unit property commonly known as and located at 722 Upper 30th Street, Oakland CA ("722"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the two-unit building's combined fair market rent was $7,230, plus a utility fee of $208, for a market Total Operating Income of $7,438 per month or

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

$89,256 per year. In 2020, 722generated just $50,563 in rent revenue – roughly 57% of its annual market rent. Accounting for an additional $1,672 in utility payments, 722's Total Operating Income of $52,235 represented $37,021 in lost income directly attributable to the CITY and COUNTY's moratoriums. Subsequently, 722's Total Operating Income for 2021, 2022, and 2023 missed its marks by $80,454, $89,256, and $20,675, respectively. From 2020 through 2023, therefore, 722 lost $227,406 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 722 experienced a -20.04% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from over $2.4M in 2019 to just over $960,000 in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

127. In 2020, the two-unit property commonly known as and located at 827 30th Street, Oakland CA ("827"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit building's combined fair market rent was $5,522, plus a utility fee of $410, for a market Total Operating Income of $5,932 per month or $71,184 per year. In 2021, 827 generated just $37,964 in rent revenue – roughly 53% of its annual market rent. Accounting for an additional $2,475 in utility payments, 827's Total Operating Income of $40,439 represented $30,745 in lost income directly attributable to the CITY and COUNTY's moratoriums. 827's Total Operating Income in 2022 and 2023 missed its mark by $69,734 and $52,182, respectively. From 2020 through 2023, therefore, 827 lost $152,661 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 827 experienced a -67.18% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $810,520 in 2019 to $266,028 in 2023.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

128. In 2020, the four-unit property commonly known as and located at 1688-1692 12th Street, Oakland CA ("1688"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the four-unit building's combined fair market rent was $7,518.39, plus a utility fee of $90, for a market Total Operating Income of $7,608.39 per month or $91,300.68 per year. In 2020, 1688 generated just $73,353.95 in rent revenue – roughly 80% of its annual market rent. Accounting for an additional $840 in utility payments, 1688's Total Operating Income of $74,193.95 represented $17,107 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1688's Total Operating Income in 2021 and 2022 missed its mark by $49,081 and $19,428, respectively, before a slight recovery in 2023. From 2020 through 2023, therefore, 1688 lost $75,431 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1688 experienced a -9.99% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.18M in 2019 to $1.006M in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

129. In 2020, the single-family home commonly known as and located at 860 34th Street, Oakland, CA ("860"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the single-family home's combined fair market rent was $4,350, plus a utility fee of $40, for a market Total Operating Income of $4,390 per month or $52,680 per year. In 2020, 860 generated just $35,662 in rent revenue – roughly 68% of its annual market rent. Accounting for an additional $360 in utility payments, 860's Total Operating Income of $36,022 represented $16,658 in lost income directly attributable to the CITY and COUNTY's

moratoriums. 860's Total Operating Income in 2021 and 2022 missed its mark by $32,519 and $51,680, respectively, before a slight recovery in 2023. From 2020 through 2023, therefore, 860 lost $89,704 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 860 experienced a -97.88% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just under $662,000 in 2019 to $14,000 in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

130. In 2020, the two-unit property commonly known as and located at 1021 Campbell Street, Oakland, CA ("1021"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY. From 2020 through 2023, the two-unit property's combined fair market rent was $5,772.39, plus a utility fee of $440, for a market Total Operating Income of $6,212.39 per month or $74,548.68 per year. In 2020, 1021 generated just $45,120.84 in rent revenue – roughly 60% of its annual market rent. Accounting for an additional $4,080 in utility payments, 1021's Total Operating Income of $49,200.84 represented $25,348 in lost income directly attributable to the CITY and COUNTY's moratoriums. 1021's Total Operating Income missed its mark in 2021 and 2023 by $45,102 and $4,653, respectively, with a slight recovery occurring in 2022. From 2020 through 2023, therefore, 1021 lost $49,355 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 1021 experienced a -57.98% decrease in overall property value from pre-COVID 2019 to 2021 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from just over $981,000 in 2019 to just over $412,000 in 2021. And despite its recovery in 2022, the overall property value in 2023 was still down from its pre-COVID figure from 2019. This drop in value is reflective of reduced net operating income stemming from moratorium-

enabled delinquencies.

131.    In 2020, the two-unit property commonly known as and located at 1704 14th Street, Oakland, CA ("1704"), owned and operated by Plaintiff Rising Tide Properties, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the single-family home's combined fair market rent was $5,940, plus a utility fee of $310, for a market Total Operating Income of $6,250 per month or $75,000 per year.  In 2020, 1704 generated just $43,725 in rent revenue – roughly 58% of its annual market rent.  Accounting for an additional $2,325 in utility payments, 1704's Total Operating Income of $46,050 represented $28,950 in lost income directly attributable to the CITY and COUNTY's moratoriums.  1704's Total Operating Income missed its mark in 2021 and 2022 by $39,600 and $37,800, respectively, with a slight recovery occurring in 2023.  From 2020 through 2023, therefore, 1704 lost $101,956 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.  As a result of these lost rents, 1704 experienced a -50.40% decrease in overall property value from pre-COVID 2019 to 2022 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.05M in 2019 to $520,800 in 2022. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

132.    In 2020, the property located at 2215-2217 Eighth Street, Berkeley, CA ("2217"), owned and operated by Plaintiff Truckee Zurich Place, LLC, began underperforming financially as a direct result of the moratoriums enacted by CITY and COUNTY.  From 2020 through 2023, the property's combined fair market rent was $8,800, plus a utility fee of $75, for a market Total Operating Income of $8,875 per month or $106,500 per year.  In 2020, 2217 generated just $79,868.70 in rent revenue – roughly 75% of its annual market rent.  Accounting for an additional $750 in utility payments, 2217's Total Operating Income of $80,618.70 represented $25,881 in lost income directly attributable to the CITY and COUNTY's moratoriums.  2217's Total Operating Income missed its mark in 2021, 2022, and 2023 by $95,816, $42,527, and $19,500,

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

respectively. From 2020 through 2023, therefore, 2217 lost $183,724 in Total Operating Income as a direct result of underperforming rent revenue stemming from the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants. As a result of these lost rents, 2217 experienced a -18.93% decrease in overall property value from pre-COVID 2019 to 2023 – using on a Gross Rent Multiplier ("GRM") of 14, based on recent similar transactions in the market – as its value dropped from $1.5M in 2019 to $1.218M in 2023. This drop in value is reflective of reduced net operating income stemming from moratorium-enabled delinquencies.

133. The 28-unit property located at and commonly known as 385-389 Palm Avenue, Oakland, CA ("385 Palm"), owned and operated by Plaintiff 685 Scofield, LLC, generated $429,559.68 of total revenue in pre-COVID 2019, followed by $436,373.51 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -7.5% but total repairs and maintenance at the property totaled over $100,000 as pandemic-induced vacancy prompted management to make sweeping repairs to vacant units and under-utilized common areas. The drop in revenue and increase in operating expenses led to a 2021 NOI of -$37,688.31 after positive NOI in 2019 and 2020 of $108,887.11 and $166,54, respectively. Cash flow in 2021 was -$18,734.31. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

134. The 25-unit property located at and commonly known as 398 Euclid Avenue, Oakland, CA ("398 Euclid"), owned and operated by Plaintiff Normand Groleau, generated $435,963.81 of total revenue in pre-COVID 2019, followed by $444,272.39 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -12%, but costs related to property maintenance and unit turnover both spiked, leading to a YoY increase in property operating expenses from $265,575.46 in 2020 to $361,629.62 in 2021 – a 36.2% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $29,276.56 after NOI in 2019 and 2020 of $186,796.61 and $178,696.93, respectively. Cash flow in 2021 was just $15,772.58. As shown in the instant amended complaint and its

attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

135. The 30-unit property located at and commonly known as 433 Perkins Street, Oakland, CA ("433 Perkins"), owned and operated by Plaintiff Westpark Apartments, LLC, generated $501,207.97 of total revenue in pre-COVID 2019, followed by $519,550.59 in total revenue in the pandemic-affected year of 2020. In 2021, not only did total revenue drop by approximately -4%, but costs related to property maintenance and unit turnover both increased, leading to a YoY increase in property operating expenses from $282,337.92 to $295,531.75 – a 4.7% increase. The drop in revenue and increase in operating expenses led to a 2021 NOI of just $203,195.04 after the property generated $233,567.03 in 2020 (a -13% decrease). This also led to 433 Perkins' 2021 cash flow coming in at -$44,647.13. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

136. The 34-unit property located at and commonly known as 1438 Madison Street, Oakland, CA ("1438 Madison"), owned and operated by Plaintiff 2228 Union Street Investors, LP, generated $496,695.06 of total revenue in pre-COVID 2019, followed by a drop in 2020 down to $437,753.09. In 2021, not only did total revenue drop further – this time by approximately -4.2% - but increases in repair costs contributed to a YoY increase in 1438's operating expenses from $297,346.42 to $316,071.80 (a 6.3% increase). The drop in revenue and increase in operating expenses led to a 2021 NOI of just $103,188.51 following 2020 which, despite the pandemic, still saw the property generate $140,406.67 in NOI. In fact, not until 2023 did 1438 Mason post an NOI that met or exceeded its pre-pandemic level. This trend is once again directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's inability to evict non-paying tenants.

137. The 24-unit property located at and commonly known as 1530 Harrison Street, Oakland, CA ("1530 Harrison"), owned and operated by Plaintiff Westpark II, GP, was uniquely affected by the pandemic in terms of the capital expenditures and operating expenses that brought

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

down its bottom line in 2021. After a strong 2020 in which it generated $108,939.73 in NOI and $45,491.74 in total cash flow, costs in 2021 rose, particularly those relating to maintenance, unit turnover, and repairs. As a result, 1530 Harrison's total operating expenses increased from $186,985.05 in 2020 to $279,130.44 in 2021 (a 49.3% increase), yielding just $15,606.84 in NOI and turning cash flow red to the tune of -$36,926.16. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

138. The 69-unit property located at and commonly known as 1551 Madison Street, Oakland, CA ("1551 Madison"), owned and operated by Plaintiff J & R Land & Cattle LP, generated $1,388,274.26 in total revenue in pre-COVID 2019. This figure dropped to $1,283,390.88 in 2020 and then again to $1,259,057.03 in 2021 – an approximately 6% drop from its pre-COVID baseline. Simultaneously, total operating expenses at 1551 Madison increased by approximately 3.4% from 2020 to 2021, due primarily to a 24% YoY increase in maintenance costs and a 23% increase in monthly services. These increases contributed to property NOI dropping by 9.5% from 2020-2021 as well as the property's annual cash flow dropping from a positive $92,888.61 in 2020 to -$59,954.28 in 2021. Years later, in 2023, 1551 Madison was still feeling the effects of the pandemic as its dramatic spike in unit turnover expenses (up from $51,043.94 in 2022 to $134,897.95 in 2023) dragged down its NOI and yielded a total property cash flow of -$123,204.55. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

139. The 84-unit property located at and commonly known as 1553 Alice Street, Oakland, CA ("1553 Alice"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums. 1553 Alice has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by a 20% decline from $1.51M in 2019 to $1.21M in 2023. This slide coincided with an increase in total operating expenses during that same time period, from

$948,541.01 to $1,020,380.22 (a 7.5% increase). As a result of the narrowing margin between total revenue and total operating expenses over that five-year period, 1553 Alice posted a 2023 NOI of just $186,634.66, following a four-year stretch in which the property's annual NOI never dipped below $537,000. 1553 Alice's total cash flow in 2023 was negative, to the tune of -$212,201.34, following a three-year streak of positive annual cash flow of at least $47,000. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

140. The 27-unit property located at and commonly known as 1555 Madison Street, Oakland, CA ("1555 Madison"), owned and operated by Plaintiff Westpark II, GP, has been greatly affected by the early onset of the COVID-19 pandemic and its lasting effects – especially in terms of the eviction moratoriums imposed by the CITY and COUNTY over the last several years. From 2019 to 2021, 1555 Madison's total revenue plummeted from $520,423.40 to $480,064.83 to $417,773.79, marking a 19.7% drop in revenue from 2019 to 2021. Simultaneously, the property endured $344,606.23 in operating expenses in 2021, marking a sharp 31% increase YoY from 2020. As a result, 1555 Madison's NOI in 2021 of just $73,167.56 drastically underperformed its previous marks of $216,427.61 and $172,950.19 from 2020 and 2019, respectively. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

141. The 70-unit property located at and commonly known as 1935-1948 E. 29th Street, Oakland, CA ("1948 E. 29th"), owned and operated by Plaintiff J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 1948 E. 29th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 8.2% decrease from $959,875.45 in 2019 to $881,248.88 in 2023. Additionally, as a direct result of pandemic-induced vacancy, 1948 E. 29th has experienced a gradual rise in unit turnover expenses, which have risen

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

from $22,902.56 in 2019 to $35,411.43 in 2023. 1948 E. 29th was hit hardest by the lasting effects of the CITY and COUNTY's response to COVID-19 in 2022, when its $1.18M in total operating expenses dragged down its NOI and annual cash flows to -$237,064.07 and -$196,314.07, respectively. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

142. The 37-unit property located at and commonly known as 2000 E. 30th Street, Oakland, CA ("2000 E. 30th"), owned and operated by Plaintiff J & R Land & Cattle LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners. 2000 E. 30th has experienced a gradual slide in the last five years, particularly in terms of total revenue, marked by an 11.6% decrease from $512,611.05 in 2019 to $452,834.98 in 2023. In order to combat unit turnover, 2000 E. 30th expended nearly $360,000 in marketing costs from 2020 through 2022, while also experiencing rising maintenance costs from 2020 through 2022. After generating positive NOI from 2019 through 2021, the delayed onset effects of the pandemic-era eviction moratoriums finally took hold in 2022 and 2023, as 2000 E. 30th posted NOIs of -$126,787.69 and -$23,143.08, respectively, with a combined cash flow during that period of -$84,767.88. As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

143. The 37-unit property located at and commonly known as 2032-2040 E. 30th Street, Oakland, CA ("2032 E. 30th"), owned and operated by J & R Land & Cattle II LP, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs expended from 2019 through 2023. Total maintenance costs at the property have risen with increased vacancies, from a 2019 total of $43,628.24 up to an annual cost of $65,679.03 in 2023 (a 50% increase). Total unit turnover costs increased from $24,827.29 in 2019 and $18,813.94 in 2020 up to $39,032.28 in 2023. Zooming out, the effects of these increased costs have impacted 2032

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

E. 30th's bottom line, as the property has generated both negative NOI and negative cash flow in three of the last five years.  As shown in the instant amended complaint and its attachments, these downswings are directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

144.    The 30-unit property located at and commonly known as 4220 Montgomery Street, Oakland, CA ("4220 Montgomery"), owned and operated by Plaintiff Westpark Apartments, LLC, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of the costs expended from 2019 through 2023, which have cut into the property's bottom line.  In light of COVID-induced vacancies, 4220 Montgomery undertook more repairs in 2022 than it had in all of 2019 through 2021 combined.  These costs of repairs helped contribute to rising total operating expenses at 4220 Montgomery from 2019 through 2023, which grew from annual figures of $294,796.36 on the low end to $397,489.06 on the high end.  As a result of these downswings in net operating income, 4220 Montgomery has generated negative annual cash flow in three of the past five years, including a low mark of -$84,788.60 in 2023.  As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

145.    The 100-unit property located at and commonly known as 2801 Summit Street, Oakland, CA ("2801 Summit"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has been gradually affected by the COVID-19 pandemic and the CITY and COUNTY's related moratoriums impacting residential property owners – particularly in terms of costs related to unit turnover and repairs made therein, which have cut into the property's bottom line over the course of the last five years.  In light of COVID-induced vacancies, 2801 Summit's costs of repairs in 2023 nearly matched the total amount of repair costs it had expended from 2019 through 2022 combined.  This figure contributed to 2801's 2023 total operating expenses hitting a five-year high in 2023 ($1,147,194.93).  As a result, and despite generating $1,674,809.50, 2801 Summit's 2023 NOI was its second lowest in the period of 2019 through 2023, as its 2023 cash

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

flow also turned red to the tune of -$89,391.72. As shown in the instant amended complaint and its attachments, such deficient performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

146. The 23-unit property located at and commonly known as 125 Moss Avenue, Oakland, CA ("125 Moss"), owned and operated by Plaintiffs William Rosetti and Madeleen Rosetti, has also been impacted by the CITY and COUNTY's COVID-19 related moratoriums imposed against residential property owners. As a result of substantial costs related to unit turnover, unit and common area repairs and maintenance, and make-ready expenses, 125 Moss' NOI decreased from $308,102.97 in 2021 and $311,310.95 in 2021 and 2022 to just $276,519.82 in 2023. As a result, 125 Moss' annual cash flow in 2023 came in at -$26,582.64 for the second consecutive year. As shown in the instant amended complaint and its attachments, such inferior performance is directly attributable to the CITY and COUNTY's moratoriums and Plaintiff's resulting inability to evict non-paying tenants.

~~87.~~147. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 have ~~also~~ suffered devasting financial losses because of the Moratoria and Phase Out Ordinance. As alleged herein, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 own real property in either the COUNTY or the CITY or both. All Plaintiffs' properties listed in Paragraphs Nos. 17-20 and 22-66 are rental properties and/or contain rental units, and Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 are housing providers of these rental properties.

~~88.~~148. Plaintiffs named in Paragraphs Nos. 17-20 and 22-66 purchased all of these rental properties prior to the Moratoria being enacted with objective reasonable investment backed expectations based upon the regulatory environment in place at the time of purchase. When determining whether their purchase of these rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the same longstanding property law principles that other market participants would have relied on, namely, that a housing provider-renter relationship could only be maintained when there was payment of rent in exchange for possession and so long as the renter complied with the material terms of the

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

lease. When determining whether their purchase of the rental properties would be fruitful business investments, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's relied on the COUNTY and CITY just cause eviction ordinances then in place, including but not limited to, the ability to evict a renter who failed to pay rent or otherwise violated the material terms of the lease but was still in possession of their property. Prior to the Moratoria being enacted, Plaintiffs named in Paragraphs Nos. 17-20 and 22-66's rental properties were profitable businesses, all of which yielded an average of many thousands of dollars a year in profit.

~~89.~~149. All properties listed in Paragraphs Nos. 17-20 and 22-66 have been occupied by renters during the Moratoria. Since the Moratoria were enacted, and through the Moratoria's duration, all Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have had renters at these properties who have refused or failed to pay rent for their units or otherwise violated the material terms of their leases. Many of the renters that occupy the properties listed in in Paragraphs Nos. 17-20 and 22-66 did not cooperate with Plaintiffs' efforts to assist them in obtaining rental assistance through the CITY and COUNTY programs, resulting in Plaintiffs' inability to mitigate their lost rental profits. Other renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 did not qualify for rental assistance because their income level was too high and/or because they were not impacted by a Covid-19 related reason, resulting in Plaintiffs' inability to mitigate their lost rental profits. Plaintiffs' renters of the rental properties listed in Paragraphs Nos. 17-20 and 22-66 also committed acts that damaged these properties during the time the Moratoria were in effect, which further devalued their properties.

~~90.~~150. Despite the above acts, the blanket Moratoria and the Phase Out Ordinance prohibited Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 from evicting these renters during the time the Moratoria were in place. Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66 have seen significant losses in property values as a direct result of the Moratoria enabling renters to fail to pay rent for any reason at all, to damage these properties without consequence, and to violate the material terms of their leases with impunity. These rental properties have lost many millions of dollars in property value and income as a direct result of the Moratoria and Phase Out

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Ordinance.  Moreover, as a result of the CITY and COUNTY Moratoria and Phase Out Ordinance, Plaintiffs listed in Paragraphs Nos. 17-20 and 22-66's collective losses in rent and property damages, and other damages are in excess of tens of millions of dollars.

151.    The COUNTY and CITY are aware that the Moratoria and Phase Out Ordinance solely target housing providers in favor of renters, by allowing renters carte blanche to refuse to pay rent without basis, and permit renters to cause damage to housing providers' properties and otherwise violate their leases without consequence. Despite the significant harm the Moratoria and Phase Out Ordinance has caused housing providers, COUNTY and CITY have refused to amend these regulations.  Accordingly, the character of the Moratoria and Phase Out Ordinance placed a severe and disproportionate regulatory burden upon Plaintiffs and forced Plaintiffs to carry the cost of a public program.  These regulations were the functional equivalent of a classic taking in which government directly appropriates private property or ousts the owner from his or her domain.

152.    With respect to each and every Plaintiff above, each Plaintiff suffered additional and further economic losses as detailed by the Declaration of Richard Marchitelli, MAI, CRE, ("Marchitelli Decl.," a true and correct copy of which is attached hereto as **Exhibit A**).  The Marchitelli Decl. (and any exhibits attached thereto) is incorporated into this Second Amended Complaint in full.

153.    Richard Marchitelli is a licensed real estate appraiser and a Member of the Appraisal Institute (MAI), and is the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC. (Marchitelli Decl., ¶ 2.)  Prior to this position, he served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield. (*Id.*)  His practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices.  (Marchitelli Decl., ¶ 3.)  He has prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

certification, and lender liability. (*Id.*)

154. As Marchitelli has determined, each and every fee property has suffered a substantial impairment of value, economic loss and economic use as a direct result of the COUNTY'S eviction band and/or of the CITY'S eviction ban. (Marchitelli Decl., ¶ 16.) The severe and burdensome requirements of those ordinances, plus the uncertain and unpredictable end date, significantly increased the risk profile of these properties on a permanent basis and caused continuing negative harm to the economic value of each and every property. (*Id.*)

155. Marchitelli has estimated that, based on his knowledge and experience, as a direct result of the restrictions imposed by the CITY and/or COUNTY, the capitalization rates of each and every of these properties increased by at least 200 to 300 basis points, depending upon the individual characteristics of each property. (Marchitelli Decl., ¶ 24.) As detailed in the Marchitelli Decl., that increase in capitalization rate results in a corresponding decrease in economic value and economic use. (Marchitelli Decl., ¶¶ 7-10.)

156. The full scope of the economic impact for each and every property and Plaintiff herein shall be determined by the preparation of expert reports, determining the respective values before and after, in accordance with FRCP 26(a)). (Marchitelli Decl., ¶ 25.)

157.

With respect to each and every Plaintiff above, each Plaintiff had a reasonable investment backed expectation to operate its respective property, and benefit from its full economic use, consistent with the land use regulations that were in place at the time of the property's purchase and that were in place prior to the enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

—158. - Each Plaintiff did not, and could not, reasonably expect the subsequent enactment of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

159. Each Plaintiff did not, and could not, reasonably expect the substantial duration of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

160. Each Plaintiff did not, and could not, reasonably expect the severe impact and

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

disproportionate burden that the government forced them to bear as a result of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

161. As a result of all of the above, the reasonable investment backed expectations of each and every Plaintiff were destroyed as a result of the COUNTY's eviction moratorium and/or the CITY's eviction moratorium.

~~91.~~

**FIRST CLAIM[5]**

**(Violation of the 5th Amendment to the U.S. Constitution – Against All Defendants (42 U.S.C. § 1983))**

~~92.~~162. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 96 of this Complaint.

~~93.~~163. By enacting the Moratoriums and the Phase Out Ordinance, the COUNTY and the CITY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratoriums and the Phase Out Ordinance violate the Fifth Amendment of the United States Constitution on their face and as applied to Plaintiffs.

~~94.~~164. Defendants' Moratoriums and the Phase Out Ordinance purport to prohibit Plaintiffs from evicting any renter in the CITY and COUNTY for virtually any reason, with few exceptions under the three-year-plus timeframes thereunder. The Moratoriums and the Phase Out Ordinance perpetrate physical takings by illegally nullifying Plaintiffs and other housing providers' right to occupy their properties without just compensation; the Moratoriums and the Phase Out Ordinance *eliminate* renters' rent obligations and sanction renters' trespassing on Plaintiffs' properties. Preventing housing providers "from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to

---

[5] Per the Court's Order on Motions to Dismiss, filed September 3, 2024, the Court granted Defendants' motions with respect to dismissal of HPOA and "with prejudice as to all claims except the regulatory-takings claims, which are dismissed without prejudice." Plaintiffs reasserts claims and parties dismissed with prejudice herein to preserve Plaintiffs' right to appeal.

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

exclude." (*Alabama Association of Realtors v. Department of Health and Human Services* (2021) 141 S.Ct. 2485, 2489; also see, *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435; *Cedar Point Nursery v. Hassid* (2021) 141 S. Ct 2063; *Cwynar v. City and County of San Francisco* (2001) 90 Cal.App.4th 637, 655 [Physical taking occurs when a regulation "effectively extinguish[es] plaintiffs' right to occupy substantial portions of their property"].)

~~95.~~165. The COUNTY and the CITY's moratoriums and the Phase Out Ordinance also unreasonably and substantially interfered with Plaintiffs' investment-backed expectations, singled out Plaintiffs to bear the full cost of public benefits, and result in either a substantial or total deprivation of the economic value of Plaintiffs' properties. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104.) The Moratoriums devalued properties by prohibiting Plaintiffs from recovering possession of their properties—even for their personal use—and even despite renters perpetuating ongoing nuisances and/or committing material violation(s) of the lease. The Moratoriums and the Phase Out Ordinance further devalue properties by prohibiting eviction for *continued* nonpayment of rents for over a period of three years. Plaintiffs have suffered significant financial losses due to the Moratoriums, and continue to suffer these losses under the Phase Out Ordinance, notwithstanding the expiration of the Moratoria, because the current government "relief" programs in place, have resulted in little to no relief. Plaintiffs' "investment-backed expectations" have been violated as a matter of law. (*Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles* (C.D. Cal. 2020) 500 F. Supp. 3d 1088, 1096, *aff'd*, (9th Cir. 2021) 10 F.4th 905.) This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606.)

~~96.~~166. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance constitute takings without just compensation, and thus violates Plaintiffs' rights protected by the United States Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore

making a declaratory judgment necessary. (28 U.S.C. § 2201.)

~~97.~~167. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**SECOND CLAIM**
**(Inverse Condemnation – Violation of Article I, Section 19 of the California Constitution)**

~~98.~~168. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 102 of this Complaint.

~~99.~~169. The Moratoriums and the Phase Out Ordinance violate Article I, Section 19 of the California Constitution on their face and as applied to Plaintiffs, for all the reasons alleged herein.

~~100.~~170. The Moratoriums and the Phase Out Ordinance therefore constitute takings without just compensation, and thus violate Plaintiffs' rights protected by the California Constitution. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary.

~~101.~~171. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial.

**THIRD CLAIM**
**(Violation of Due Process (42 U.S.C. § 1983))**

~~102.~~172. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 106 of this Complaint.

~~103.~~173. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. (*Lockary v. Kayfetz* (9th Cir. 1990) 917 F.2d 1150, 1155; *Weinberg v. Whatcom County* (9th Cir. 2001) 241 F.3d 746, 752-755.) The Moratoriums and the Phase Out Ordinance violate Plaintiffs' substantive due

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

process rights on their face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' imposition of the blanket Moratoriums and the Phase Out Ordinance for that three-plus year time period are irrational and lacking in a legitimate government interest because there is no justification for such extreme measures. Indeed, California's COVID-19 Renter Relief Act never imposed such draconian restrictions. Further, the Bay Area saw significant improvement in circumstances relating to the pandemic since March of 2020, has a high rate of vaccinations, and federal and state officials recognized during the period of time the Moratoria were in place that Covid-19 was either in, or moving to, an endemic stage. The pandemic should not have been used as a "cursory" justification for what would otherwise be an illegal law. (See, *Texas v. United States* (S.D. Tex. Aug. 19, 2021) No. 6:21-CV-00016, 2021 WL 3683913, at *45; *Chrysafis v. Marks* (2021) 141 S.Ct. 2482; *Tandon v. Newsom* (2021)141 S.Ct. 1294.) Defendants therefore have no rational basis for the Moratoriums and the Phase Out Ordinance, and any offered is plainly pretext. The Moratoriums and the Phase Out Ordinance violate procedural due process because they, in effect, deprive Plaintiffs of *any* procedure to recover their properties under most cases under the time period set forth thereunder.

~~104.~~174. The aforesaid acts, and as further alleged herein, therefore constitute violations of Plaintiff's procedural and substantive due process rights. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.)

~~105.~~175. As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, emotional distress, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs are also entitled to recover attorneys' fees under 42 U.S.C. § 1983.

**FOURTH CLAIM**
**(Violation of Equal Protection (42 U.S.C. § 1983))**

~~106.~~176. Plaintiffs incorporate here by reference the allegations contained in

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

Paragraphs 1 through 110 of this Complaint.

~~107.~~177. The Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the laws, on their face and as applied. The purpose of the Moratoriums and the Phase Out Ordinance is to unlawfully single out, penalize, and target Plaintiffs, and all housing providers in the CITY and COUNTY, by preventing them from lawfully exercising their property rights to receive rents, occupy their properties, exclude others from their properties, and protect their properties from nuisance and damage. The "emergency" under which the Moratoriums were enacted no longer existed during their imposition; the Bay Area was open for business, has a high rate of vaccinations, and federal and state officials recognized that Covid-19 was either in, or moving to, and endemic stage. Thus, any stated rational government purpose to the contrary is pretext.

~~108.~~178. For the foregoing reasons, the Moratoriums and the Phase Out Ordinance violate Plaintiffs' right to equal protection of the law, and as a result, Plaintiffs have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. (28 U.S.C. § 2201.) Plaintiffs have also entitled to recover their attorneys' fees under 42 U.S.C. § 1983.

**FIFTH CLAIM**
**(Writ of Mandate (CCP §§ 1085 or 1094.5))**

~~109.~~179. Plaintiffs incorporate here by reference the allegations contained in Paragraphs 1 through 113 of this Complaint.

~~110.~~180. Code of Civil Procedure §§ 1094.5 or 1085 authorizes Plaintiffs to seek a writ of mandate/mandamus, and which authorizes the Court to review and set aside public agency decisions involving a prejudicial abuse of discretion or error of law.

~~111.~~181. Plaintiffs request the Court issue a declaration, and/or writ of mandate or mandamus, setting aside and voiding the effect of the Moratoriums and the Phase Out Ordinance

as set forth hereunder. Plaintiffs also seek an immediate stay to enjoin Defendants from enforcing the Phase Out Ordinance and the Moratoria's ban on virtually all evictions during that three-year period, as such enforcement would further harm Plaintiffs by violating their statutory and constitutional rights as alleged herein, and the issuance of such a stay would not be against the public interest.

~~112.~~182. In enacting the Moratoriums and Phase Out Ordinance, Defendants exceeded their jurisdiction, prevented Plaintiffs from having a fair trial, failed to proceed as required by law, and prejudicially abused their discretion because:

a. The Moratoriums and Phase Out Ordinance are preempted by the State's Covid-19 Renter Relief Act (the "Act"), both expressly and impliedly, because they conflict with the Act by depriving housing providers of the UD process altogether by prohibiting repossession of their properties in almost all circumstances under the timeframes set forth thereunder, thereby conflicting with that law. Because the Moratoriums and Phase Out Ordinance conflict with the Act, they are preempted and void.

b. The Moratoriums and Phase Out Ordinance unlawfully amend the CITY's Just Cause for Eviction Ordinance, which was enacted via voter initiative. (Oak. Mun. Code § 8.22.310.) While the COUNCIL is permitted to amend the Just Cause for Eviction Ordinance to a limited extent (see, Oak. Muni. Code § 8.22.360(F); City of Oakland Measure Y), the COUNTY is not, and the COUNCIL's moratorium and Phase Out Ordinance significantly surpasses the permissible scope of amendment permitted by the voters. Thus, these regulations are invalid.

~~c.~~ The Phase Out Ordinance introduces substantive unlawful hurdles to OMC § 8.22.360(A)(1) and (2), first by prohibiting housing providers from demanding less than one month of "fair market" rent, allowing some renters to potentially stop paying rent altogether, and second, by putting the onus on housing providers to prove that a material term of a lease is "reasonable" when a renter substantially violates that term, and the renter's behavior, "unreasonable."

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

c.

~~113.~~183. Moreover, as alleged herein, Defendants' aforesaid acts constitute unconstitutional per se, regulatory, de facto, and physical takings of Plaintiffs' properties without just compensation under the U.S. Constitution and violate Plaintiffs' constitutional rights to equal protection and due process, and any purported legitimate and/or rational basis for the same is pretext.

~~114.~~184. Because these are questions of law and implicate constitutional rights, the standard of review falls under the independent judgment test/de novo review.

~~115.~~185. To the extent Plaintiffs were required to exhaust any administrative remedies, they have, as alleged herein.

~~116.~~186. As alleged herein, Plaintiffs have a beneficial interest in ensuring that the effect of the now-expired Moratoriums and current Phase Out Ordinance are struck down so that Plaintiffs statutory and constitutional rights are not infringed upon. Plaintiffs do not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary to compel Defendants to correct their actions, which are unlawful and in excess of their authority.

~~117.~~187. Plaintiffs are entitled to recover attorneys' fees under Cal. Civ. Code § 1021.5, and because the Moratoriums are arbitrary and capricious, lacking any reasonable basis, and/or discriminatory and illegal, Plaintiffs are additionally entitled to attorneys' fees under Govt. Code § 800(a).

WHEREFORE, Plaintiffs demand judgment against Defendants for the following:

**For Claims One, Two, Three and Four:**

1. A preliminary and permanent injunction preventing enforcement of the Phase Out Ordinance;

2. A declaratory judgment determining that Defendants' Moratoriums and Phase Out Ordinance constitute a taking under the United States and California Constitutions, and violate Plaintiffs' right to due process and equal protection;

3. For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained;

4. For general damages according to proof, in an amount that is yet to be ascertained;

5. For an award of attorneys' fees and costs as allowed by law; and

6. For any other relief that the Court deems just and proper.

**<u>For Claim Five</u>**:

1. For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Phase Out Ordinance for all of the reasons alleged above;

2. For a judgment that the Moratoriums and Phase Out Ordinance constitute unlawful takings on their face and/or as applied, and have prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation;

3. For a judgment that Defendants have violated Plaintiffs' equal protection and due process rights;

4. For an immediate stay or preliminary injunction, and permanent injunction enjoining Defendants from enforcing the Phase Out Ordinance pending the determination of the merits;

5. For costs of suit herein, including attorneys' fees;

6. For any other relief that the Court deems just and proper.

Dated: ~~September~~ <u>March 3</u>~~20~~, 202<u>5</u>~~3~~

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*

By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury for all claims (other than the petition for writ of mandate) as stated herein.

Dated: ~~September~~ March 3~~20~~, 202~~5~~3

ZACKS & FREEDMAN, PC

*/s/ Andrew M. Zacks*
By: Andrew M. Zacks
Emily L. Brough
Attorneys for Plaintiffs and Petitioners

**VERIFICATION**

I, Emily L. Brough, am an attorney representing all Plaintiffs and Petitioners (collectively, "Plaintiffs") in this action. I have personal knowledge of the matters attested to in the fifth cause of action for writ of mandate (CCP § 1085), which are primarily questions of law, and it is for this reason that I, and not Plaintiffs, are verifying the fifth cause of action, only. I have read the cause of action for writ of mandate and I am informed and believe the matters therein to be true and on that ground allege that the matters stated therein are true. On this basis, I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge and that this verification was executed on ____________, 202~~3~~5, in Soquel, California.

______________________________
Emily L. Brough

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

# EXHIBIT A

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS & FREEDMAN, PC
1970 Broadway, Suite 1270
Oakland, CA 94612
Tel: (510) 469-0555
az@zfplaw.com
emily@zpflaw.com

PACIFIC LEGAL FOUNDATION
JONATHAN M. HOUGHTON (N.J. Bar No. 369652021)
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
BRIAN T. HODGES (Wash. Bar No. 31976)
1425 Broadway, #429
Seattle, WA 98122
Telephone: (916) 419-7111
JHoughton@pacificlegal.org
BHodges@pacificlegal.org

*Attorneys for all Plaintiffs and Petitioners, John Williams, et al.*

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

JOHN WILLIAMS, et. al,

Plaintiffs and Petitioners,

vs.

ALAMEDA COUNTY, ALAMEDA COUNTY BOARD OF SUPERVISORS, CITY OF OAKLAND, OAKLAND CITY COUNCIL and DOES 1-10,

Defendants and Respondents.

Case Number: 3:22-cv-01274-LB Case No.: 3:22-cv-02705-LB (related)

**DECLARATION OF RICHARD MARCHITELLI IN SUPPORT OF FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY**

Action Filed: March 1, 2022
Trial Date: None set

I, Richard Marchitelli, declare as follows:

1. I am an individual over the age of eighteen. I have personal knowledge of the following facts discussed below and would testify truthfully thereto if called to do so.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

2.  I am the Senior Managing Director – Leader, Litigation Support Practice, at Newmark Valuation & Advisory, LLC.  Prior to my current position, I served as the Executive Managing Director, Americas Leader Dispute Analysis & Litigation Support Practice, at Cushman & Wakefield.

3.  My practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices.  I have prepared expert reports in matters involving economic damages, breach of contract and fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability.  I have served as a sole arbitrator and as a member of arbitration panels.

4.  I currently serve as Chair of the Body of Knowledge Committee of the Appraisal Institute.  I have formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICs, and Chair of Americas Valuation Standards Board of RICs.

5.  A true and correct copy of my curriculum vitae ("CV") is attached hereto as **Exhibit B**.

6.  I reviewed the temporary ordinances enacted by the City of Oakland[1] and Alameda County[2] in response to the COVID-19 pandemic. I also inspected the exterior of properties in Oakland located at 125 Moss Avenue, 1553 Alice Street, 1692-1694 12th Street, 2000 E. 30th Street, 3629 West Street, 3700 International Boulevard, and 8603 Hillside Street.

7.  The market value of a rental property is determined by dividing the property's net operating income (income after expenses but before debt service) by a capitalization rate.[3]  If a property's net operating income is $100,000 and 10% is the appropriate capitalization rate, its value is

---

[1] Oakland City Ordinance No. 13606.

[2] Alameda County Ordinance No. 2020-32.

[3] The 7th edition of *The Dictionary of Real Estate Apprisal* published by the Appraisal Institute defines capitalization rate as "A ratio on one year's income provided by an asset to the value of the asset; used to convert income into value in the income capitalization approach."

calculated by dividing $100,000 by 10% or 100,000/.10 = 1,000,000. In this example, the indicated property value is $1,000,000. Proof of this calculation is demonstrated by multiplying the property's $100,000 income by a factor of 10 or 100,000 x 10 = $1,000,000.

8. The capitalization rate is a basic tool used by buyers and sellers, investment analysts, mortgage underwriters, brokers, appraisers, and other real estate market participants to convert income into value. The capitalization rate reflects the risk of investing in a property. Capitalization rates are higher when the investment risk is greater because investors demand a higher return as compensation for accepting more uncertainty. The opposite is also true. The less the risk, the lower the capitalization rate.

9. Using the above example, if the investment risk were greater, the 10% capitalization rate might be 13%. In such a situation, the $100,000 net income, which remains the same, would be divided by a 13% capitalization rate and the indicated property value would be $769,230 (100,000/.13 = 769,230). Conversely, if the investment risk were low and 7% is the appropriate capitalization rate, the property value would be $1,428,571 (100,000/.07 = 1,428,571).

10. In summary, the higher the capitalization rate, the lower the value; the lower the capitalization rate, the higher the value.

11. Situs RERC, a respected vendor of real estate data, publishes quarterly surveys of capitalization rates. Such surveys are aggregated by quarter, property type, capitalization rate, and region of the country. The following table reflects capitalization rate data of apartment buildings in the western United States. Because capitalization rates vary by the quality of the asset, RERC divides properties into the three categories: Tier 1, being new or newer quality construction in prime to good locations; Tier 2, being aging, former first-tier properties, in good to average locations; and Tier 3, being older properties with functional inadequacies and/or in marginal locations.

12. A true and correct copy of Situs RERC's Reported Capitalization Rates Second and Third Tier Properties from first quarter 2020 through second quarter 2023 (the "Table") is attached hereto as **Exhibit A**.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

13. Tier 1 properties are properties often purchased by pension funds, insurance companies, and sovereign wealth funds. I did not include Tier 1 capitalization rates in the Table because they are not relevant to this discussion.

14. The buildings I inspected were clearly Tier 3 properties. Nevertheless, the Table is useful to provide context and perspective by showing the gradation or differences in the capitalization rates between Tier 2 and 3 properties.

15. The Table's first column from the left is the quarter of each year from the beginning of 2020 through third quarter 2023. The second column from the left is the year. The Table reflects the low, average, and high capitalization rates reported by RERC each quarter for Tier 2 and Tier 3 properties. The column at the far right represents the quarterly difference in the capitalization rates between Tier 2 and Tier 3 properties. Beginning in first quarter 2021 the differences between Tier 2 and Tier 3 property capitalization rates appear to have widened.

16. The market value of properties in the City of Oakland and throughout Alameda County were adversely impacted by the city and county ordinances beginning on the dates they were adopted despite the expectation that, although unknown, the moratoriums were likely to be rescinded sometime in the future. This uncertainty substantially increased the risk profile of properties affected by the moratoriums, making such properties less desirable to prospective purchasers.

17. The risk profile of such properties was further increased by the various terms imposed by the moratoriums such as prohibiting eviction of certain residential tenants for non-payment of rent, landlords not being able to impose late charges, and landlords being forced to work out payment plans over time for back rent. There was also uncertainty as to whether 100% of the rents would be collected and whether some rents would be collected at all despite legal remedies available to landlords, which although available might not make economic sense to pursue.

18. Value is the anticipation of future benefits. Existing properties were faced with the economic reality that there was great uncertainty regarding the timing of when income would be received and the amount of income that would actually be collected. Timing and durability of income are major factors in the decision-making process of investors in determining the price to pay for property.

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

19. In addition to the unpredictability of when the moratoriums would end and the realization that the effects of the moratoriums would not end immediately when they were rescinded, such as the difficulty of collecting rents, the regulations caused irreparable future harm to property values by reinforcing the perception of residential property investors that Oakland and Alameda County were not favorable places to do business and should be avoided.

20. There is no question that the risk profile of properties discussed above increased substantially and that the value of such properties was seriously impaired on the dates the moratoriums were adopted.

21. Below I have demonstrated potential effects of the moratoriums on the value of a property with a $100,000 net income by increasing the capitalization rate of a Tier 3 property to reflect the considerable uncertainty and risk associated with such properties.

22. I adjusted Tier 3 base capitalization rate of 6.5% upward in increments of 50 basis points. Applying an unadjusted base Tier 3 capitalization rate of 6.5% to a $100,000 income results in value of $1,538,000 (rounded).

23. Adding 200, 250, and 300 basis points to a Tier 3 capitalization rate of 6.5%, results in adjusted capitalization rates of 8.5%, 9.0%, and 9.5%, respectively. Applying those rates to an income of $100,000 results in the following:

100,000/.085 = 1,176, 470 or rounded value of $1,176,000

100,000/.09 = 1,111,111 or rounded value of $1,100,000

100,000/.09.5 = 1,052,631 or rounded value of $1,052,000

24. Based on my knowledge and experience, as a direct result of the restrictions imposed by the City of Oakland and Alameda County, the capitalization rates of these properties increased by at least 200 to 300 basis points, and likely more, possibly substantially more, depending upon the individual characteristics of each property.

25. The exact economic loss will be determined by an appraisal report to be prepared in the future in connection with this litigation.

I declare under the penalty of perjury that the foregoing is true and correct, and this declaration was executed March __3__, 2025 in the City of Charlotte, North Carolina.

Richard Marchitelli, MAI, CRE

**[Notary Public Verification on Following Page]**

ZACKS & FREEDMAN, PC
180 MONTGOMERY STREET, SUITE 1950
SAN FRANCISCO, CALIFORNIA 94104

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

Sworn to and subscribed before me this 3rd day of March, 2025, by Richard Marchitelli.

______________________________

Tracey Marchitelli, Notary Public

My Commission Expires: 5/11/2027

[Notary Seal]

TRACEY MARCHITELLI
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires May 11, 2027

# EXHIBIT A

| Situs RERC - Reported Capitalization Rates Second and Third Tier Properties | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Apartments | | | West Region 2nd Tier | | | West Region 3rd Tier | | Difference 2nd vs. 3rd |
| Quarter | Year | Low | High | Average | Low | High | Average | (Basis Points) |
| Q1 | 2020 | 4.00% | 7.00% | **5.60%** | 4.80% | 8.00% | **6.20%** | **60** |
| Q2 | 2020 | 4.00% | 7.50% | **5.80%** | 5.00% | 7.80% | **6.30%** | **50** |
| Q3 | 2020 | 4.50% | 7.80% | **5.80%** | 5.00% | 9.80% | **6.50%** | **70** |
| Q4 | 2020 | 5.00% | 7.00% | **5.80%** | 5.30% | 8.00% | **6.30%** | **50** |
| Q1 | 2021 | 5.00% | 7.50% | **6.10%** | 5.50% | 8.50% | **6.80%** | **70** |
| Q2 | 2021 | 4.50% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q3 | 2021 | 4.80% | 7.50% | **5.90%** | 5.30% | 8.50% | **6.50%** | **60** |
| Q4 | 2021 | 4.80% | 7.50% | **5.80%** | 5.30% | 8.50% | **6.50%** | **70** |
| Q1 | 2022 | 4.50% | 7.50% | **5.70%** | 5.30% | 8.50% | **6.60%** | **90** |
| Q2 | 2022 | 5.00% | 7.00% | **6.10%** | 5.50% | 8.50% | **6.90%** | **80** |
| Q3 | 2022 | 4.80% | 10.00% | **6.20%** | 5.00% | 12.00% | **7.00%** | **80** |
| Q4 | 2022 | 5.00% | 7.50% | **6.30%** | 5.50% | 8.50% | **7.10%** | **80** |
| Q1 | 2023 | 4.00% | 7.80% | **6.10%** | 4.30% | 11.00% | **7.00%** | **90** |
| Q2 | 2023 | 5.00% | 8.00% | **6.50%** | 5.50% | 8.80% | **7.20%** | **70** |

# EXHIBIT B

**CURRICULUM VITAE**

## Richard Marchitelli, MAI, CRE

*Senior Managing Director, Newmark Valuation & Advisory, LLC*
*Leader Litigation Support Practice*

---

**Professional History**

**Newmark Valuation & Advisory, LLC**
Senior Managing Director
Leader Litigation Support Practice
Charlotte, North Carolina
201-421-5308
richard.marchitelli@nmrk.com
2024 - Present

**Cushman & Wakefield**
Executive Managing Director
Americas Leader Dispute Analysis & Litigation Support Practice
New York, New York/Charlotte, North Carolina
2003 - 2024

**PricewaterhouseCoopers**
Director, Real Estate Practice
Leader Real Estate Litigation Support Practice
New York, New York
2000 - 2003

**Marchitelli Barnes & Company**
Founding Partner
New York, New York
1973 – 2000

**Experience**

Mr. Marchitelli's practice focuses on applied research, property economics, unusual valuation problems, complex litigation, damages theory, and real estate industry standards and practices. Mr. Marchitelli has prepared expert reports in matters involving economic damages, breach of contract and breach of fiduciary duty, toxic torts and detrimental conditions, construction defects and construction delays, shareholder disputes, class certification, and lender liability. Additionally, he has served as a sole arbitrator and as a member of arbitration panels.

Mr. Marchitelli has provided consulting and valuation services involving challenging and unusual properties such as the High Line, an elevated rail corridor in Manhattan that has been converted into an urban park; development restrictions on properties surrounding McCarran Airport in Las Vegas; the Trans Alaska Pipeline; a mixed-use development site in Lima, Peru; the Hancock Center Observation Deck in Chicago; an 1,800-mile rail corridor and over 900 separate underground pipeline easements extending through six western states from Texas to Oregon and Nevada; a submarine maintenance and manufacturing facility in Groton, Connecticut; regulatory takings cases; the Northrop Grumman former military aircraft manufacturing property in Bethpage, New York; BP headquarters building in Houston; an oil drill site on



the North Slope of Alaska; luxury condominium resort on St. John in the U.S. Virgin Islands; mixed-use development properties in Guadalajara and Puerto Vallarta, Mexico; the Ritz Carlton Condominiums, Washington, DC.; an office industrial complex in Dublin, Ireland; and environmental contamination matters throughout the U.S. involving groundwater, radioactive waste, and airborne particulates.

Mr. Marchitelli has testified in arbitration proceedings at the International Centre for Settlement of Investment Disputes in Washington, DC, and has qualified as an expert witness in United States District Court, United States Tax Court, United States District Court of Federal Claims, United States Bankruptcy Court, and in various state and local courts, including Alaska, California, Georgia, Florida, New York, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Wisconsin. He has also been a court-appointed third-party expert in matters involving the valuation of real property.

Mr. Marchitelli is a former Adjunct Assistant Professor of Real Estate at New York University in the Master of Real Estate program where he taught post graduate courses in real estate valuation principles and concepts and marketability and feasibility studies. For 20 years, he taught courses nationally on the Uniform Standards of Professional Appraisal Practice.

Mr. Marchitelli has authored articles published in The Appraisal Journal, Real Estate Issues, Real Estate Forum, Appraisal Digest, and The Canadian Appraiser. He was a reviewer of the 9th, 10th, 11th, 12th, 13th, 14th, and 15th editions of *The Appraisal of Real Estate* and, as a subject matter expert, supervised publication of the 9th and 13th editions of that text. He was a reviewer of the 1st through 6th editions of *The Dictionary of Real Estate Appraisal* and supervised production of the 1st and 5th editions. In addition, Mr. Marchitelli has served as a reviewer of various other texts and monographs published by the Appraisal Institute and as a reviewer of several courses developed by that organization. He is also co-author of a chapter on the valuation of pipeline corridors in *Corridor Valuation: An Overview and New Alternatives* published in 2019 by the Appraisal Institute, International Right of Way Association, and Appraisal Institute of Canada.

**Education**

Belmont Abbey College, Belmont, North Carolina
Degree: Bachelor of Arts, Political Science
*Who's Who in American Universities and Colleges*

**Professional Affiliations**

Appraisal Institute (MAI Designation)
The Counselors of Real Estate (CRE Designation)
American Bar Association (Associate Member)

Mr. Marchitelli currently serves as Chair of the Body of Knowledge Committee of the Appraisal Institute. He formerly served as National Vice President of The Counselors of Real Estate, as a Director of the American Real Estate Society, as Vice Chair of the Board of Regents and Dean of the Publications Board of the Centre for Advanced Property Economics, member of the Global Valuation Standards Board of RICS, and Chair of Americas Valuation Standards Board of RICS. In addition, Mr. Marchitelli is a past Editor-in-Chief of The Appraisal Journal and former Editor-in-Chief of Real Estate Issues. He served as Chair of the New York Metropolitan Chapter of The Counselors of Real Estate, President of the Metropolitan New York Chapter of the Appraisal Institute, President of the Long Island Chapter of the Appraisal Institute, and President of the New York Condemnation Conference. Mr. Marchitelli is also licensed as a general real estate appraiser in several states.



### Special Awards

Mr. Marchitelli was awarded the George L. Schmutz Memorial Award by the Appraisal Institute for his assistance in the publication of *The Dictionary of Real Estate Appraisal.* He received the Wagner Award from the Appraisal Institute, which is presented to individuals in recognition of their contribution to the advancement of valuation knowledge and education, and he was also a recipient of the Lum Award presented annually by the Appraisal Institute to individuals for furtherance of the ideals of the real estate valuation profession.

### Select Presentations

"Property Markets – Past Present and Future", Duane Morris Fall Conference, Boca Raton

"Appraisal Myths and Market Realities", International Association of Assessing Officers, Salt Lake City

"How To – And How Not to – Develop Cap Rates in Fee Simple Market Valuation", Institute for Property Taxation – American Bar Association, New Orleans

"Experts Beware: Calculating Damages Attributable to Environmental Impairment and Detrimental Conditions", Appraisal Institute, Las Vegas

"Environmental Impairment and Damages Models: Distinguishing Real Science from Junk Science," Connecticut Legal Conference, Connecticut Bar Association, Hartford

"Plaintiff Damages Theories in Property Valuation Diminution Cases," Defense Research Institute, New Orleans

"The Challenge of Temporary Damages", International Right of Way Association, Hickory, NC

"Problems in Valuation – Working Beyond the Obvious," American Law Institute, Scottsdale

"Property Rights Symposium," Appraisal Institute, Chicago

"Power Plant Decommissioning, Retirement & Remediation – Providing Assistance in the Decision-Making Process: Buy, Sell, or Hold," Marcus Evans, Nashville

"Outside the Box: The Wide World Beyond Appraisal Opinions," Appraisal Institute, Nashville

"Evidentiary and Other Problems in Developing Post-Event Damage Estimates," New York County Lawyers' Association, New York

"Corridor Valuation and Depreciation Theory: Controversies – Alternative Approaches – Differing Perspectives," the 44th Annual Wichita Program, Wichita State University

"Corridor Valuation: Alternative Approaches/Differing Perspectives," International Right of Way Association, Hartford



"Expert – Attorney Communication:  Defining the Scope of Work," National Association of Property Tax Attorneys, Las Vegas

"Project Influence", American Law Institute, Irvington, VA

"Fee Simple and Leased Fee Valuations:  Distinctions with Real and Subtle Meanings" ABT/IPT Advanced Property Tax Conference, New Orleans

"How to Simplify Valuation in the Courtroom", American Law Institute, San Francisco

"How Real Estate Valuers Have Abdicated Their Role in Commercial Litigation," Southern California Chapter of the Appraisal Institute, Los Angeles

"Ask the Valuation Experts," International Association of Assessing Officers, Sacramento

"Tracking Property Value Diminution through Market Cycles: Theory & Evidence", Moderator, Appraisal Institute, Austin

"The Value of Design:  Why Do Developers Hire Name Architects?" Los Angeles Chapter of the American Institute of Architects, Los Angeles

"The Role of an Arbitrator," Urban Land Institute, Denver

"Going Concern:  Differing Perspectives on Real Property and Valuation Issues" Moderator, RICS Summit, Toronto

"Complex Commercial Litigation – Taking Valuation Skills to the Next Level," Appraisal Institute, Indianapolis

"Use of First and Second-Generation Rents, Changes in Highest and Best Use, and Maintaining Distinctions Between Fee Simple and Leased Fee Valuations," New York County Lawyers' Association, New York

"Valuation of Real Property and Intangibles: Market Realities," Moderator, RICS Summit, Miami

"Analyzing Market Trends and Comparable Selection in a Declining Market" – Webinar – Appraisal Institute

"Appropriate (Inappropriate) Use of Fee Simple and Leased Fee Data and First and Second-Generation Rents," National Association of Property Tax Attorneys, New York

"Valuation of Real Estate in Distressed Markets," The Counselors of Real Estate, Philadelphia

"A New Paradigm for Valuation", Valuation Colloquium, Clemson University

"Assessment and Valuation Issues Surrounding Retail Properties," Institute for Professionals in Taxation, Austin



"Preparing for Deposition Testimony and Presentations at Trial," American Law Institute, Irvington, VA

"Trial Issues and Presentations" American Law Institute, Scottsdale

"The Recession and Its Causes: Where Do We Go from Here", International Association of Assessing Officers", Louisville

"Valuing and Pricing Distressed Properties," Buying Distressed Commercial Loans and Property, Summit East, New York

"Follow Up: Corridors and Rights of Way and Policy Issues", Appraisal Institute and Appraisal Institute of Canada, Ottawa

"Corridor and Rights of Way II: Valuation Policy", Moderator, Centre for Advanced Property Economics and International Right of Way Association, San Diego

"Right of Way: Valuation Policy Issues", Moderator, American Bar Association, Centre for Advanced Property Economics, Appraisal Institute, and International Right of Way Association, Washington, DC

"Elements of an Expert Report," CLE International, Richmond

"Contemporary Valuation Issues," Valuation & Legal Issues Shared Interest Group, Appraisal Institute, Washington, DC

"Issues Related to Real Estate in Dispute Resolution," Association for Conflict Resolution of Greater New York, New York

"Property Valuation: Problems & Issues in Litigation," New York City Law Department, New York

"An Introduction to Damages Models," Valuation & Legal Services Shared Interest Group of the Appraisal Institute, Chicago

"Do You Know a Ground Lease from a Leasehold?" Association for Conflict Resolution – Greater New York Chapter, New York

"Data Reliability," National Conference of State Tax Court Judges, Lincoln Land Institute, Chicago

**PROOF OF SERVICE**

United States District Court—Northern District of California- Case No.: 3:22-cv-01274-LB
Case No.: 3:22-cv-02705-LB (related)

I, Valeria Bentorkia-Moran, declare that:

I am employed in the County of San Francisco, State of California. I am over the age of 18 and am not a party to this action. My business address is 180 Montgomery Street, Suite 1950, San Francisco, California 94104.

On March 3, 2025, I served:

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DAMAGES; PETITION FOR WRIT AND REQUEST FOR IMMEDIATE STAY (42 U.S.C § 1983; C.C.P § 1085) DEMAND FOR JURY TRIAL**

in said cause addressed as follows:

| | |
|---|---|
| PACIFIC LEGAL FOUNDATION<br>JONATHAN HOUGHTON (NJ Bar No. 369652021)<br>3100 Clarendon Blvd., Suite 610<br>Arlington, VA 22201<br>BRIAN HODGES (WA Bar No. 31976)<br>SAM SPIEGELMAN (NY Bar No. 5573100)<br>255 South King Street, Suite 800<br>Seattle, WA 98104<br>Email: JHoughton@pacificlegal.org<br>Email: BHodges@pacificlegal.org<br>Email: SSpiegelman@pacificlegal.org<br><br>*Attorney for John Williams, Robert Vogel, Sheanna Rogers, Michael Loeb, Jacqueline Watson-Baker, Housing Providers of America* | MARC SELTZER<br>KRYSTA K. PACHMAN<br>GLENN C. BRIDGMAN<br>NICHOLAS N. SPEAR<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067-6029<br>Email: mseltzer@susmangodfrey.com<br>Email: kpachman@susmangodfrey.com<br>Email: gbridgman@susmangodfrey.com<br>Email: nspear@susmangodfrey.com<br><br>*Attorneys for Intervenor-Defendant Alliance of Californians for Community Empowerment Action* |
| MATTHEW D. ZINN<br>EDWARD T. SCHEXNAYDER<br>MINDY K. JIAN<br>SHUTE, MIHALY & WEINBERGER LLP<br>396 Hayes Street<br>San Francisco, CA 94102<br>Email: Zinn@smwlaw.com<br>Email: Schexnayder@smwlaw.com<br>Email: mjian@smwlaw.com<br><br>*Attorney for Alameda County and Alameda County Board of Supervisors* | BARBARA J. PARKER<br>MARIA BEE<br>ALLISON EHLERT<br>One Frank H. Ogawa Plaza, 6th Floor<br>Oakland, CA 94612<br>E-Mail:aehlert@oaklandcityattorney.org<br>*Attorney for City of Oakland and Oakland City Council* |

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

| | |
|---|---|
| CHRISTOPHER E. SKINNELL<br>HILARY J. GIBSON<br>NIELSEN MERKSAMER<br>PARRINELLO GROSS & LEONI LLP<br>2350 Kerner Boulevard, Suite 250<br>San Rafael, CA 94941<br>Email: cskinnell@nmgovlaw.com<br>Email: hgibson@nmgovlaw.com<br>*Attorneys for Plaintiffs and Petitioners California Apartment Association Stephen Lin, Lakesh and Tripti Jain, Alison Mitchell, Michael Hagerty, H. Alex, Dannie Alvarez* | |

/XX/ **(BY ELECTRONIC SERVICE)** Based on a court order or an agreement of the parties to accept electronic service, I caused the said document to be served electronically through the CM/ECS System.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 3, 2025 at San Francisco, California.

VALERIA BENTORKIA-MORAN

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612

**PROOF OF SERVICE**

United States District Court—Northern District of California- Case No.: 3:22-cv-01274-LB
Case No.: 3:22-cv-02705-LB (related)

I, Valeria Bentorkia-Moran, declare that:

I am employed in the County of San Francisco, State of California. I am over the age of 18 and am not a party to this action. My business address is 180 Montgomery Street, Suite 1950, San Francisco, California 94104.

On July 14, 2025, I served:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

in said cause addressed as follows:

| | |
|---|---|
| PACIFIC LEGAL FOUNDATION<br>JONATHAN HOUGHTON (NJ Bar No. 369652021)<br>3100 Clarendon Blvd., Suite 610<br>Arlington, VA 22201<br>BRIAN HODGES (WA Bar No. 31976)<br>SAM SPIEGELMAN (NY Bar No. 5573100)<br>255 South King Street, Suite 800<br>Seattle, WA 98104<br>Email: JHoughton@pacificlegal.org<br>Email: BHodges@pacificlegal.org<br>Email: SSpiegelman@pacificlegal.org<br><br>*Attorney for John Williams, Robert Vogel, Sheanna Rogers, Michael Loeb, Jacqueline Watson-Baker, Housing Providers of America* | MARC SELTZER<br>KRYSTA K. PACHMAN<br>GLENN C. BRIDGMAN<br>NICHOLAS N. SPEAR<br>SUSMAN GODFREY L.L.P.<br>1900 Avenue of the Stars, Suite 1400<br>Los Angeles, CA 90067-6029<br>Email: mseltzer@susmangodfrey.com<br>Email: kpachman@susmangodfrey.com<br>Email: gbridgman@susmangodfrey.com<br>Email: nspear@susmangodfrey.com<br><br>*Attorneys for Intervenor-Defendant Alliance of Californians for Community Empowerment Action* |
| MATTHEW D. ZINN<br>EDWARD T. SCHEXNAYDER<br>MINDY K. JIAN<br>SHUTE, MIHALY & WEINBERGER LLP<br>396 Hayes Street<br>San Francisco, CA 94102<br>Email: Zinn@smwlaw.com<br>Email: Schexnayder@smwlaw.com<br>Email: mjian@smwlaw.com | BARBARA J. PARKER<br>MARIA BEE<br>ALLISON EHLERT<br>One Frank H. Ogawa Plaza, 6th Floor<br>Oakland, CA 94612<br>E-Mail:aehlert@oaklandcityattorney.org<br>*Attorney for City of Oakland and Oakland City Council* |

| | |
|---|---|
| *Attorney for Alameda County and Alameda County Board of Supervisors* | |
| CHRISTOPHER E. SKINNELL<br>HILARY J. GIBSON<br>NIELSEN MERKSAMER<br>PARRINELLO GROSS & LEONI LLP<br>2350 Kerner Boulevard, Suite 250<br>San Rafael, CA 94941<br>Email: cskinnell@nmgovlaw.com<br>Email: hgibson@nmgovlaw.com<br>*Attorneys for Plaintiffs and Petitioners California Apartment Association Stephen Lin, Lakesh and Tripti Jain, Alison Mitchell, Michael Hagerty, H. Alex, Dannie Alvarez* | |

/XX/ **(BY ELECTRONIC SERVICE)** Based on a court order or an agreement of the parties to accept electronic service, I caused the said document to be served electronically through the CM/ECS System.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on July 14, 2025 at San Francisco, California.

VALERIA BENTORKIA-MORAN

ZACKS & FREEDMAN, PC
1970 BROADWAY, SUITE 1270
OAKLAND, CA 94612